Execution Copy 4/1/2021
7/30/2021 Update

# FIFTH AMENDED AND RESTATED

# OPERATING AGREEMENT

## OF

## NUSCALE POWER, LLC,
**an Oregon limited liability company**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR
REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  BECAUSE
SUCH SECURITIES HAVE NOT BEEN REGISTERED OR QUALIFIED, THEY MAY NOT
BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED,
OR HYPOTHECATED UNLESS THE SECURITIES HAVE BEEN QUALIFIED AND
REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR
UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH
QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  TRANSFER OF THE
SECURITIES REPRESENTED BY THIS AGREEMENT MAY BE FURTHER SUBJECT TO
THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

EXHIBIT 1
Page 1 of 108

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS ...................................................................................... 3
    1.1    Definitions ....................................................................................... 3
    1.2    Construction .................................................................................. 15

ARTICLE II    THE COMPANY ................................................................................. 16
    2.1    Organization .................................................................................. 16
    2.2    Limited Liability Company Agreement ........................................ 16
    2.3    Company Name .............................................................................. 16
    2.4    Purpose .......................................................................................... 16
    2.5    Powers ........................................................................................... 16
    2.6    Term ............................................................................................... 16
    2.7    Principal Place of Business ........................................................... 16
    2.8    Filings; Agent for Service of Process ........................................... 16
    2.9    Other Business Opportunities ....................................................... 17
    2.10    No State-Law Partnership ........................................................... 18

ARTICLE III    MEMBERSHIP INTERESTS ............................................................ 19
    3.1    Units ............................................................................................... 19
    3.2    Capital Accounts ........................................................................... 29
    3.3    Negative Capital Accounts ........................................................... 30
    3.4    No Interest; No Withdrawal .......................................................... 30
    3.5    Loans From Members .................................................................... 30
    3.6    Distributions In-Kind .................................................................... 31
    3.7    Transfer of Capital Accounts ........................................................ 31
    3.8    Adjustments to Common Units ..................................................... 31
    3.9    Reserves ......................................................................................... 31

ARTICLE IV    DISTRIBUTIONS AND ALLOCATIONS ....................................... 32
    4.1    Distributions .................................................................................. 32
    4.2    Allocations ..................................................................................... 35
    4.3    Special Allocations ....................................................................... 35
    4.4    Offsetting Allocations ................................................................... 37
    4.5    Tax Allocations ............................................................................. 37

ARTICLE V    MANAGEMENT ................................................................................. 38
    5.1    Management .................................................................................... 38
    5.2    The Board of Managers ................................................................. 43
    5.3    Officers .......................................................................................... 47
    5.4    Limitation of Liability ................................................................... 48

ARTICLE VI    RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND
                MEMBERS ...................................................................................... 49
    6.1    Duties; Limitation of Liability ...................................................... 49

**EXHIBIT 1**
**Page 2 of 108**

# TABLE OF CONTENTS
(continued)

<div align="right"><b>Page</b></div>

| | | | |
|---|---|---|---|
| | 6.2 | Lack of Authority | 50 |
| | 6.3 | No Right of Partition | 50 |
| | 6.4 | Voting and Written Consents | 50 |
| | 6.5 | Confidentiality | 50 |
| | 6.6 | Restricted Business | 51 |
| ARTICLE VII | | INDEMNIFICATION | 52 |
| | 7.1 | Generally | 52 |
| | 7.2 | Standard of Conduct | 52 |
| | 7.3 | Certain Proceedings | 52 |
| | 7.4 | No Adverse Presumption | 52 |
| | 7.5 | Advances | 52 |
| | 7.6 | Contribution | 53 |
| | 7.7 | Nonexclusivity of Rights | 53 |
| | 7.8 | Insurance | 53 |
| | 7.9 | Limitation | 53 |
| | 7.10 | Savings Clause | 53 |
| | 7.11 | Survival | 53 |
| ARTICLE VIII | | BOOK AND RECORDS | 53 |
| | 8.1 | Books, Records and Company Affairs | 53 |
| | 8.2 | Determination by Board | 54 |
| | 8.3 | Fiscal Year | 54 |
| | 8.4 | Deposits | 54 |
| | 8.5 | Agreements, Consents, Checks, Etc | 54 |
| | 8.6 | Financial Records | 54 |
| ARTICLE IX | | TRANSFER OF UNITS | 55 |
| | 9.1 | Restrictions on Transfers | 55 |
| | 9.2 | Right of First Refusal | 56 |
| | 9.3 | Tag-Along Rights | 57 |
| | 9.4 | Conversion to Corporate Form | 59 |
| ARTICLE X | | ADMISSION OF MEMBERS | 62 |
| | 10.1 | Substituted Member | 62 |
| | 10.2 | Additional Members | 62 |
| ARTICLE XI | | WITHDRAWAL AND RESIGNATION OF MEMBERS | 63 |
| ARTICLE XII | | DISSOLUTION AND LIQUIDATION | 63 |
| | 12.1 | Dissolution | 63 |
| | 12.2 | Liquidation and Termination | 63 |
| | 12.3 | Security holders Agreement | 64 |

<b>EXHIBIT 1<br>Page 3 of 108</b>

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 12.4 | Articles of Dissolution | 65 |
| 12.5 | Reasonable Time for Winding Up | 65 |
| 12.6 | Return of Capital | 65 |
| | | |
| **ARTICLE XIII** | **TAX MATTERS** | 65 |
| 13.1 | Tax Matters | 65 |
| 13.2 | Code §83 Election | 67 |
| 13.3 | Budget Act Provisions | 67 |
| | | |
| **ARTICLE XIV** | **MISCELLANEOUS** | 68 |
| 14.1 | Representations and Warranties | 68 |
| 14.2 | Power of Attorney | 69 |
| 14.3 | Amendment | 69 |
| 14.4 | Notices | 70 |
| 14.5 | Further Assurances | 70 |
| 14.6 | Creditors | 70 |
| 14.7 | No Effect Upon Lender Relationship | 70 |
| 14.8 | Waivers; Exercise of Contractual Rights | 71 |
| 14.9 | Exculpation Among Members | 71 |
| 14.10 | Certain Acknowledgments | 71 |
| 14.11 | Governing Law | 71 |
| 14.12 | Dispute Resolution | 71 |
| 14.13 | Remedies Cumulative | 72 |
| 14.14 | Punitive Damages | 72 |
| 14.15 | Entire Agreement | 72 |
| 14.16 | Binding Effect | 72 |
| 14.17 | Severability | 72 |
| 14.18 | Counterpart Execution | 72 |
| 14.19 | Headings | 73 |
| 14.20 | Agreement among Parties | 73 |

<u>Schedules</u>

Schedule A – Schedule of Members
Schedule B – Member Contact Information
Schedule C – Officers
Schedule D – Distribution Example

**EXHIBIT 1**
**Page 4 of 108**

# FIFTH AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## NUSCALE POWER, LLC

This Fifth Amended and Restated Operating Agreement of NuScale Power, LLC, an Oregon limited liability company, is entered into as of April 1, 2021 (the "Effective Date"), by and among the Members set forth on Schedule A hereto, and each other Person as shall be a Member from time to time, pursuant to the provisions of this Agreement.

## R E C I T A L S

**WHEREAS**, the Company was incorporated as NuScale Power, Inc., an Oregon corporation ("NuScale Inc."), on June 22, 2007;

**WHEREAS,** on September 30, 2011, NuScale Inc. entered into a Recapitalization Agreement with certain of the Members (the "Recapitalization Agreement"), pursuant to which, on September 30, 2011, (i) NuScale Inc. engaged in a holding company reorganization through a statutory share exchange (the "Share Exchange") in which the shareholders of NuScale Inc. immediately prior to such Share Exchange became the shareholders of a newly formed Oregon corporation, NuScale Holdings Corp. ("Holdings"), and NuScale Inc. became a wholly owned subsidiary of Holdings and (ii) immediately following the Share Exchange, NuScale Inc. engaged in a statutory conversion in which NuScale Inc. became an Oregon limited liability company (the "Conversion");

**WHEREAS**, pursuant to the Recapitalization Agreement, as a result of the Conversion, the Company issued to Holdings 2,672,051.90 Common Units and became obligated to issue to Holdings up to an additional 76,382.00 Common Units on the terms and subject to the conditions set forth in the Recapitalization Agreement;

**WHEREAS**, pursuant to a Preferred Units Purchase Agreement, dated as of September 30, 2011 (as amended from time to time, the "Purchase Agreement"), by and among the Company and the "Investors" identified on the "Schedule of Investors" attached as Exhibit A thereto, the Company issued 17,480,000.00 Preferred Units to such Investors and became obligated to issue to certain of such Investors an additional 14,174,000.00 Preferred Units on the terms and subject to the conditions set forth in the Purchase Agreement;

**WHEREAS**, effective as of September 30, 2011, the Company and the Members entered into the Operating Agreement of NuScale Power, LLC to provide for the regulation and management of the affairs of the Company (the "Original LLC Agreement");

**WHEREAS**, the Original LLC Agreement was subsequently amended pursuant to the Written Consent and Waiver of Preemptive Rights of the Preferred Members of the Company dated October 26, 2011 and the resolutions adopted at the October 26, 2011 Meeting of the Board of Managers of the Company (the "October 2011 Amendment"), further amended pursuant to the Amendment to Operating Agreement dated November 12, 2012 (the "November 2012 Amendment"), further amended pursuant to the Second Amendment to Operating Agreement dated September 5, 2013 (the "September 2013 Amendment"), and further amended pursuant to

**EXHIBIT 1**
**Page 5 of 108**

the Third Amendment to Operating Agreement dated August 5, 2015 (the "August 2015 Amendment" and together with the October 2011 Amendment, the November 2012 Amendment and the September 2013 Amendment, the "Subsequent Amendments");

WHEREAS, the parties further amended and fully restated the Original LLC Agreement pursuant to the Amended and Restated Operating Agreement of NuScale Power, LLC, dated as of January 22, 2016 (the "Reclassification Date") to reflect the Subsequent Amendments and to provide for a new series of Preferred Units, to reclassify the existing Preferred Units, to allow for the voluntary conversion of Preferred Units into Common Units and to make such other changes to the Original LLC Agreement as are set forth therein (the "2016 LLC Agreement");

WHEREAS, pursuant to the 2016 LLC Agreement, each Preferred Unit outstanding immediately before the Reclassification Date became, effective on the Reclassification Date and without any action by the Preferred Member holding such Preferred Unit, one Series A Preferred Unit and, as a result of such reclassification, the only Preferred Units outstanding as of the Reclassification Date were Series A Preferred Units;

WHEREAS, the parties further amended and fully restated the 2016 LLC Agreement pursuant to the Second Amended and Restated Operating Agreement effective as of June 19, 2017 (the "2017 LLC Agreement") to create and authorize Series A-2 Preferred Units and to make such other changes to the 2016 LLC Agreement as are set forth therein;

WHEREAS, the parties further amended and fully restated the 2017 LLC Agreement pursuant to the Third Amended and Restated Operating Agreement effective as of July 11, 2018 (the "2018 LLC Agreement") to create and authorize Series A-3 Preferred Units, to increase the size of the Incentive Pool, to comply with the revised partnership audit procedures set forth in the Internal Revenue Code of 1986, as amended (the "Code"), and to make such other changes to the 2017 LLC Agreement as are set forth therein;

WHEREAS, the parties further amended and fully restated the 2018 LLC Agreement pursuant to the Fourth Amended and Restated Operating Agreement effective as of February 28, 2020 (the "Prior LLC Agreement") to create and authorize Series A-4 Preferred Units, to increase the size of the Incentive Pool, to comply with the revised partnership audit procedures set forth in the Internal Revenue Code of 1986, as amended (the "Code"), and to make such other changes to the Prior LLC Agreement as are set forth therein;

WHEREAS, (a) pursuant to Sections 3.1(d) and 5.1(d) of the Prior LLC Agreement, the Board and Members holding a majority of the outstanding Preferred Units desire to amend the Prior LLC Agreement to create a new series of Preferred Units, and (b) the Board and (i) Members holding a majority of the votes of the issued and outstanding Common Units and Preferred Units, consenting together as a single class (on an As-Converted Basis), and (ii) Members holding a majority of the outstanding Preferred Units (clauses (i) and (ii) collectively, the "Consenting Members"), desire to make such other changes to the Prior LLC Agreement as are set forth in this Agreement; and

2

EXHIBIT 1
Page 6 of 108

**WHEREAS**, the Board and the Consenting Members desire to fully restate the Prior LLC Agreement to reflect the amendments set forth herein in a new agreement that replaces and supersedes the Prior LLC Agreement.

**NOW**, **THEREFORE**, in consideration of the representations, warranties, agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree as follows:

<div align="center">

**ARTICLE I**

**DEFINITIONS**

</div>

1.1    **Definitions**.  For purposes of this Agreement, each of the following terms shall have the meaning given such term in this <u>Article I</u>.

"<u>Act</u>" means the Oregon Limited Liability Company Act, as amended from time to time.

"<u>Additional Member</u>" means a Person admitted to the Company as a Member pursuant to <u>Section 10.2</u>.

"<u>Additional Units</u>" has the meaning set forth in <u>Section 3.1(f)(iii)</u>.

"<u>Adjusted Capital Account Deficit</u>" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero.  For purposes of this definition, such Person's Capital Account balance shall be (i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and (ii) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to Member liabilities to the Company) or 1.704-2(g)(1) and 1.704-2(i), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Treasury Regulation Section 1.704-2(d)) and in minimum gain attributable to any partner for nonrecourse debt (as determined under Treasury Regulations Section 1.704-2(i)(3)).

"<u>Affiliate</u>" means, with respect to any particular Person, any other Person controlling, controlled by or under common control with such particular Person, where "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through the ownership of voting securities, contract or otherwise; <u>provided</u>, that no Company Party or Holdings shall be considered or treated as an Affiliate of any Member.

"<u>Agreement</u>" means this Fifth Amended and Restated Operating Agreement, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"<u>Applicable Tax Rate</u>" has the meaning set forth in <u>Section 4.1(b)(iii)</u>.

<div align="center">3</div>

**EXHIBIT 1**
**Page 7 of 108**

"Articles of Conversion" means the articles of conversion delivered by NuScale Inc. to the office of the Secretary of State of the State of Oregon in accordance with the OBCA and the Act for filing, which articles became effective on the Original Effective Date.

"Articles of Organization" means the articles of organization delivered by NuScale Inc. to the office of the Secretary of State of the State of Oregon in accordance with the Act for filing, which articles became effective on the Original Effective Date, as such articles may be amended from time to time in accordance with the Act.

"As-Converted Basis" means, as of any time of determination, with respect to (a) Preferred Units, assuming the hypothetical conversion of all Preferred Units into Common Units at the Common Equivalent Ratio in effect at the time of determination and (b) all other Equity Securities directly or indirectly convertible into or exchangeable or exercisable for Common Units, assuming such Equity Securities are converted, exercised or exchanged, as the case may be, for Common Units at the time of determination (without regard for whether such securities and instruments are vested or unvested, contingent or non-contingent or exercisable or not yet exercisable).

"At Large Managers" has the meaning set forth in Section 5.2(b)(iii).

"Authorization Date" has the meaning set forth in Section 9.2(a).

"Base Rate" means, on any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"Board" means the Board of Managers of the Company, designated pursuant to, and with the powers and duties set forth in, Article V.

"Book Value" means, with respect to any of the Company's property, the fair market value of such property as determined by the Board, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Sections 1.704-1(b)(2)(iv)(d)-(g) and (m).

"Budget Act" means the Bipartisan Budget Act of 2015, P.L. 114-74.

"Business Day" means any day other than Saturday, Sunday or any day on which Banks in the State of Oregon are closed.

"Business Opportunity" has the meaning set forth in Section 2.9(b)(i).

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member pursuant to Section 3.2.

"Capital Contributions" means, with respect to any Member, the amount of cash, cash equivalents, promissory obligations, forgiveness of debt or the Fair Market Value of other assets or property which such Member contributes to the Company with respect to any Unit pursuant to Section 3.1 or Section 3.7.

"CEO Manager" has the meaning set forth in Section 5.2(b)(iv).

4

EXHIBIT 1
Page 8 of 108

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor to such statute.

"Common Equivalent Price" means the Series A Common Equivalent Price, Series A-1 Common Equivalent Price, the Series A-2 Common Equivalent Price, the Series A-3 Common Equivalent Price, the Series A-4 Common Equivalent Price or the Series A-5 Common Equivalent Price, as applicable.

"Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Common Member" means a Member that holds one or more Common Units (irrespective of whether such Member also holds any Preferred Units or other Equity Interests).

"Common Participating Interest" means, with respect to each Member, the product of: (a) 100%, times (b) the sum of (i) the number of Common Units then owned by such Member and (ii) the number of Series A Preferred Units then owned by such Member multiplied by the Series A Common Equivalent Ratio and (iii) the number of Series A-1 Preferred Units then owned by such Member multiplied by the Series A-1 Common Equivalent Ratio and (iv) the number of Series A-2 Preferred Units then owned by such Member multiplied by the Series A-2 Common Equivalent Ratio and (v) the number of Series A-3 Preferred Units then owned by such Member multiplied by the Series A-3 Common Equivalent Ratio and (vi) the number of Series A-4 Preferred Units then owned by such Member multiplied by the Series A-4 Common Equivalent Ratio and (vii) the number of Series A-5 Preferred Units then owned by such Member multiplied by the Series A-5 Common Equivalent Ratio and (viii) to the extent applicable, the number of other Equity Securities hereafter authorized then owned by such Member (on an As-Converted Basis), divided by (c) the sum of (i) the aggregate number of Common Units then outstanding and (ii) the aggregate number of Series A Preferred Units then outstanding multiplied by the Series A Common Equivalent Ratio and (iii) the aggregate number of Series A-1 Preferred Units then outstanding multiplied by the Series A-1 Common Equivalent Ratio and (iv) the aggregate number of Series A-2 Preferred Units then outstanding multiplied by the Series A-2 Common Equivalent Ratio and (v) the aggregate number of Series A-3 Preferred Units then outstanding multiplied by the Series A-3 Common Equivalent Ratio and (vi) the aggregate number of Series A-4 Preferred Units then outstanding multiplied by the Series A-4 Common Equivalent Ratio and (vii) the aggregate number of Series A-5 Preferred Units then outstanding multiplied by the Series A-5 Common Equivalent Ratio and (viii) to the extent applicable, the number of other Equity Securities hereafter authorized then outstanding (on an As-Converted Basis).

"Common Pro Rata Interest" means, with respect to each Common Member, the product of: (a) 100%, times (b) the number of Common Units then owned by such Common Member, divided by (c) the aggregate number of Common Units then outstanding.

"Common Unit" means a Unit having the rights and privileges specified with respect to a Common Unit in this Agreement.

"Company" means NuScale Power, LLC, an Oregon limited liability company, and its successors.

5

EXHIBIT 1
Page 9 of 108

"Company Party" means the Company or any of its Subsidiaries.

"Competitor" means any Person who directly or indirectly through one or more intermediaries is primarily engaged in competitive, complementary or substantially similar lines of business in which the Company, Fluor or any of their respective Subsidiaries or Affiliates is then engaged as determined by the Board in its sole and absolute discretion.

"Confidential Information" has the meaning set forth in Section 6.5.

"Consenting Members" has the meaning set forth in the Recitals to this Agreement.

"Conversion" has the meaning set forth in the Recitals to this Agreement.

"Converted Units" has the meaning set forth in Section 4.1(e).

"Convertible Securities" means any evidences of indebtedness, units or other securities directly or indirectly convertible into or exchangeable or exercisable for Common Units, Preferred Units or other Equity Securities hereafter authorized, but excluding Options and Preferred Units.

"Corporate Conversion" has the meaning set forth in Section 9.4(a).

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following shall be a Distribution: (i) any redemption or repurchase by the Company of any Equity Securities of the Company in connection with the termination of employment of any Employee Member; (ii) any recapitalization or exchange of Equity Securities of the Company, and any subdivision (by Equity Security split or otherwise) or any combination (by reverse Equity Security split or otherwise) of any outstanding Equity Securities of the Company; or (iii) any redemption or repurchase of Equity Securities of the Company pursuant to any right of first refusal or other redemption or repurchase right or obligation of the Company.

"Effective Date" has the meaning set forth in the preamble hereto.

"Electing Member" has the meaning set forth in Section 9.3(a).

"Eligible Member" has the meaning set forth in Section 9.2(a).

"Employee Member" means a Member employed by a Company Party.

"Equity Agreements" has the meaning set forth in Section 3.1(d). For the avoidance of doubt, the term "Equity Agreement" shall include any equity incentive award agreement entered into between any Company Party and any Manager, Officer or Employee Member, pursuant to which such Manager, Officer or Employee Member purchased or otherwise acquired any Units or other Equity Securities.

"Equity Securities" means, with regard to any Person, as applicable, (a) any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital

of such Person, (b) any securities of such Person directly or indirectly exercisable for, convertible into or exchangeable for any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital of such Person or containing any profit participation features with respect to such Person, (c) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, partnership, membership, joint venture or other ownership or equity interests, other share capital of such Person or securities containing any profit participation features with respect to such Person or directly or indirectly to subscribe for or to purchase any securities directly or indirectly exercisable for, convertible into or exchangeable for any capital stock, partnership, membership, joint venture or other ownership interests, other share capital of such Person or securities containing any profit participation features with respect to such Person, and (d) any share or Unit appreciation rights, phantom share or Unit rights, contingent interest or other similar rights relating to such Person.  Unless the context otherwise requires, the term "Equity Securities" refers to Equity Securities of a Company Party or any successor of such Company Party.

"Equivalent Value" has the meaning set forth in Section 9.3(b).

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company.

"Exempted Securities" has the meaning set forth in Section 3.1(f)(iii).

"Exempt Transfer" has the meaning set forth in Section 9.1(a).

"Fair Market Value" means, as of the relevant date of determination, (a) with respect to a Unit, the value of the particular Unit at issue on a fully diluted basis as reasonably determined in good faith by the Board taking into consideration the Distributions to which such Unit would be entitled pursuant to Section 4.1(a) assuming the assets of the Company were sold in an arm's-length transaction between a willing buyer and a willing seller (without any discount for minority interest or lack of voting power applicable to such Units) and the net proceeds of such sale were distributed to the Members pursuant to Section 4.1(a) and (b) with respect to all other non-cash assets, the fair value for such assets in an arm's-length transaction between a willing buyer and a willing seller occurring on the date of valuation as reasonably determined in good faith by the Board, taking into account all relevant factors determinative of value (and giving effect to any transfer Taxes payable in connection with such sale).

"Fiscal Period" means any interim accounting period within a Taxable Year established by the Board and which is permitted or required by Code Section 706.

"Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board.

"Fiscal Year" has the meaning set forth in Section 8.3.

"Fluor" means Fluor Enterprises, Inc., a California corporation.

"Fluor Manager" has the meaning set forth in Section 5.2(b)(i).

EXHIBIT 1
Page 11 of 108

"Fully Exercising Member" has the meaning set forth in Section 3.1(e)(ii).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means any national, federal, state, provincial or local governmental authority, or any court, administrative or regulatory agency or commission or other governmental authority or agency, domestic or foreign.

"Highest Hurdle" means the highest Hurdle of any Preferred Unit.

"Holdings" has the meaning set forth in the Recitals to this Agreement.

"Hurdle" means, with respect to a Preferred Unit, the amount distributed pursuant to subsections (i) and (ii) of Section 4.1(a) on each Common Unit issuable upon the hypothetical conversion of that Preferred Unit into Common Unit(s) at the Common Equivalent Ratio in effect as of immediately prior to the Distribution.

"Incentive Pool" means a pool of Common Units in an aggregate amount of 94,800,000 (as adjusted for any subdivisions, combinations or like actions or events with respect to the Common Units after the Effective Date) set aside for issuance to employees, managers, directors or officers of, or consultants or advisors to, any Company Party as consideration for past or future services to any Company Party, whether as Common Units, as restricted Common Units or upon the exercise of options to purchase Common Units, in each case upon such terms, including vesting, transfer restrictions and repurchase options, as approved by the Board in its sole discretion.

"Indemnified Person" has the meaning set forth in Section 7.1.

"Independent Third Party" means any Person who, at any time in the 12 months prior to a contemplated transaction, was not a Member, shareholder of Holdings or an Affiliate of any of the foregoing.

"Initial Public Offering" means the initial Public Offering.

"Law" means any law, statute, code, regulation, ordinance, rule, Order, or governmental requirement enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Entity.

"Liquidation Assets" has the meaning set forth in Section 12.2(b).

"Liquidation FMV" has the meaning set forth in Section 12.2(b).

"Liquidation Statement" has the meaning set forth in Section 12.2(b).

"Liquidity Event" means a (i) Sale of the Company or a recapitalization or exchange transaction by the Company or any of its Subsidiaries where all or a substantial portion of the net proceeds of such transaction are distributed (or anticipated to be distributed) to the Members or (ii) a liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

8

EXHIBIT 1
Page 12 of 108

"Losses" means items of the Company's loss and deduction determined according to Section 3.2(b).

"Lowest Hurdle" means the lowest Hurdle of any Preferred Unit.

"Lowest Hurdle Preferred Unit" means a Preferred Unit that has the Lowest Hurdle.

"manager" means a member of a board of managers of a limited liability company or similar governing body, including a Manager.

"Manager" means a member of the Board, who, for purposes of the Act, will be deemed a "manager" (as defined in the Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"Member" means each of the Persons listed on Schedule A hereto, and any Person admitted to the Company as a Substituted Member or Additional Member; but, in each case, only for so long as such Person is the owner of one or more Units.

"Membership Interests" means a Member's entire interest in the Company, the right, if any, to vote on or participate in the Company's management, and the right to receive information concerning the business and affairs of the Company, in each case, set forth in the rights and privileges of Units expressly provided in this Agreement or required by the Act.

"Member Tax Distribution" has the meaning set forth in Section 4.1(b)(i).

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Net Taxable Income" has the meaning set forth in Section 4.1(b)(ii).

"New Issue Securities" has the meaning set forth in Section 3.1(e).

"Next Lowest Hurdle" means the lowest Hurdle of any Preferred Unit other than a Lowest Hurdle Preferred Unit.

"Next Lowest Hurdle Preferred Unit" means a Preferred Unit that has the Next Lowest Hurdle or any Subsequent Next Lowest Hurdle.

"NuScale Inc." has the meaning set forth in the Recitals to this Agreement.

"OBCA" means the Oregon Business Corporations Act, as amended from time to time.

"Offered Units" has the meaning set forth in Section 9.2(a).

"Offer Notice" has the meaning set forth in Section 9.2(a).

"Officer" has the meaning set forth in Section 5.3(a).

9

EXHIBIT 1
Page 13 of 108

"Options" means rights, options or warrants to subscribe for, purchase or otherwise acquire Common Units, Preferred Units, other Equity Securities hereafter authorized, or Convertible Securities.

"Order" means any award, decision, injunction, judgment, order, decree, writ, ruling, subpoena or verdict entered, issued, made or rendered by any Governmental Entity or by any arbitrator.

"Original Effective Date" means September 30, 2011.

"Other Indemnitors" has the meaning set forth in Section 7.12.

"OSU" has the meaning set forth in Section 3.1(f)(iii)(9).

"Per Share Offering Price" has the meaning set forth in the Section 9.4(b).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

"Preemptive Notice" has the meaning set forth in Section 3.1(e)(i).

"Preferred Managers" has the meaning set forth in Section 5.2(b)(ii).

"Preferred Member" means a Member that holds one or more Preferred Units (irrespective of whether such Member also holds any Common Units or other Equity Securities).

"Preferred Original Issue Price" means the Series A Preferred Original Issue Price, the Series A-1 Preferred Original Issue Price, the Series A-2 Preferred Original Issue Price, the Series A-3 Preferred Original Issue Price, the Series A-4 Preferred Original Issue Price or the Series A-5 Preferred Original Issue Price, as applicable.

"Preferred Pro Rata Interest" means, with respect to each Preferred Member, the product of: (a) 100%, times (b) the sum of the number of Units then owned by such Preferred Member (on an As-Converted Basis), divided by (c) the aggregate number of Units then outstanding held by all Preferred Members (on an As-Converted Basis).

"Preferred Return" means, with respect to any Preferred Unit, an amount accruing on such Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Preferred Unit, beginning on the date such Preferred Unit was issued. In calculating the amount of any Distribution to be made at any time, the portion of the Preferred Return for such portion of the period elapsing before such Distribution is made shall be taken into account.

"Preferred Units" means Series A Preferred Units, Series A-1 Preferred Units, Series A-2 Preferred Units, Series A-3 Preferred Units, Series A-4 Preferred Units, and Series A-5 Preferred Units, and, with respect to Preferred Units outstanding prior to the Reclassification Date, Units

EXHIBIT 1
Page 14 of 108

that had the rights and privileges specified with respect to Preferred Units in the Original LLC Agreement.

"Profits" means items of the Company's income and gain determined according to Section 3.2(b).

"Pro Rata Share" means with respect to each Unit, the proportional amount such Unit would receive of the Total Equity Value if an amount equal to the Total Equity Value were distributed to all Units in accordance with Section 4.1(a), and with respect to each Member, such Member's pro rata share of Total Equity Value represented by all Units owned by such Member, in each case as determined in good faith by the Board.

"Public Offering" means any underwritten sale of the Equity Securities of any Company Party (or any successor thereto, whether by merger, conversion, consolidation, recapitalization, exchange, reorganization or otherwise) pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act on Forms S-1 or S-3 (or any successor forms adopted by the Securities and Exchange Commission); provided that the following shall not be considered a Public Offering: (i) any issuance of Equity Securities in connection with and as consideration for a merger or acquisition; and (ii) any issuance of Equity Securities to employees, officers, managers, directors, consultants or other service providers of the Company Parties or others as part of an incentive or compensation plan, agreement or arrangement.

"Purchase Agreement" has the meaning set forth in the Recitals hereto.

"Qualified Public Offering" has the meaning set forth in Section 3.1(e)(iv).

"Recapitalization Agreement" has the meaning set forth in the Recitals to this Agreement.

"Reclassification Date" has the meaning set forth in the Recitals to this Agreement.

"Regulatory Allocations" has the meaning set forth in Section 4.3(e).

"Required Interest" has the meaning set forth in Section 6.4.

"Revised Partnership Audit Procedures" means the provisions of Subchapter C of Chapter 63 of Subtitle F of the Code, as amended by P.L. 114-74, the Bipartisan Budget Act of 2015 (together with any subsequent amendments thereto, Regulations promulgated thereunder, and published administrative interpretations thereof) or any similar procedures established by a State, local, or non-U.S. taxing authority.

"Sale of the Company" means any transaction or series of transactions pursuant to which any Independent Third Party in the aggregate acquires (i) Equity Securities of the Company possessing the voting power to elect a majority of the Board (whether by merger, consolidation, reorganization, combination or sale of Units or otherwise), or (ii) all or substantially all of the assets of the Company Parties determined on a consolidated basis.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

11

EXHIBIT 1
Page 15 of 108

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"Series A Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Series A Preferred Original Issue Price" shall be one dollar ($1.00) per Series A Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A Preferred Units after the Effective Date).

"Series A Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A Preferred Units in this Agreement.

"Series A-1 Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A-1 Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Series A-1 Preferred Original Issue Price" shall be one dollar and thirty-one cents ($1.31) per Series A-1 Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A-1 Preferred Units after the Effective Date).

"Series A-1 Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A-1 Preferred Units in this Agreement.

"Series A-2 Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A-2 Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Series A-2 Preferred Original Issue Price" shall be one dollar and forty-two cents ($1.42) per Series A-2 Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A-2 Preferred Units after the Effective Date). "Series A-2 Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A-2 Preferred Units in this Agreement.

"Series A-3 Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A-3 Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Series A-3 Preferred Original Issue Price" shall be one dollar and fifty-seven cents ($1.59) per Series A-3 Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A-3 Preferred Units after the Effective Date).

"Series A-3 Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A-3 Preferred Units in this Agreement.

"Series A-4 Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A-4 Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

12

**EXHIBIT 1**
**Page 16 of 108**

"Series A-4 Preferred Original Issue Price" shall be one dollar and ninety-two cents ($1.92) per Series A-4 Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A-4 Preferred Units after the Effective Date).

"Series A-4 Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A-4 Preferred Units in this Agreement.

"Series A-5 Common Equivalent Price" has the meaning set forth in Section 3.1(f)(ii).

"Series A-5 Common Equivalent Ratio" has the meaning set forth in Section 3.1(f)(ii).

"Series A-5 Preferred Original Issue Price" shall be two dollars and nineteen cents ($2.19) per Series A-5 Preferred Unit (as adjusted for any subdivisions, combinations or like actions or events with respect to the Series A-5 Preferred Units after the Effective Date).

"Series A-5 Preferred Unit" means a Unit having the rights and privileges specified with respect to Series A-5 Preferred Units in this Agreement.

"Service" means the Internal Revenue Service or any successor agency.

"Share Exchange" has the meaning set forth in the Recitals to this Agreement.

"Specified Person" has the meaning set forth in Section 2.9(b)(i).

"Subsequent Closing" means each Subsequent Closing as defined in the Purchase Agreement.

"Subsequent Next Lowest Hurdle" means, first, the Hurdle of any Preferred Unit that is next higher than the Next Lowest Hurdle, and subsequently, the Hurdle of any Preferred Unit that is next higher than the immediately preceding Hurdle derived under this definition.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership, partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the general partner, managing member, managing director (or a board comprised of any of the foregoing) or manager of such limited liability company, partnership, association or other business entity.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person

13

**EXHIBIT 1**
**Page 17 of 108**

has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Substituted Member" means a Person that is admitted as a Member to the Company pursuant to Section 10.1.

"Tag Along Sale" has the meaning set forth in Section 9.3(a).

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any liability as transferee, successor or indemnitor, and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"Taxable Year" means the Company's accounting period for federal income Tax purposes, which shall be the calendar year, unless a different taxable year is required by the Code.

"Tax Matters Member" has the meaning set forth in Section 13.1(b).

"Total Equity Value" means the aggregate proceeds which would be received by the Members if: (i) all of the assets of the Company were sold at their Fair Market Value; (ii) the Company satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses incurred in connection with such transaction and any reserves established by the Board for contingent liabilities); and (iii) such net sale proceeds were then distributed in accordance with Section 4.1(a), all as determined by the Board in its good faith judgment.

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of Law), but excluding redemptions or repurchases of Equity Securities of the Company by the Company made in accordance with Article IX or pursuant to any redemption or repurchase right of the Company pursuant to an Equity Agreement with respect to any Equity Securities of the Company. The terms "Transferee" and "Transferred" and other forms of the word "Transfer" shall have correlative meanings.

"Transfer Notice" has the meaning set forth in Section 9.3(a).

"Transferring Member" has the meaning set forth in Section 9.2(a).

"Treasury Regulations" means the final or temporary income Tax regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"Unit" means a unit of interest in the Company representing an interest in the Profits, Losses and Distributions of the Company and shall include the Preferred Units, Common Units and any other type, class or series of Equity Securities issued by the Company in accordance with

14

EXHIBIT 1
Page 18 of 108

Article III; provided that each holder of any type, class or series of Units who is a Member shall have the relative rights, powers, duties and obligations specified in this Agreement with respect to such type, class or series of Units. Except to the extent otherwise provided herein, each Unit in a type, class or series represents the same fractional interest in such Profits, Losses and Distributions of the Company as each other Unit in such type, class or series. Units may be issued in different types, classes and series and in whole and fractional numbers.

"Unpaid Preferred Return" of any Preferred Unit means, as of any date, an amount equal to (a) the aggregate Preferred Return accrued on such Preferred Unit for all periods (or portions thereof) prior to such date, minus (b) the aggregate amount of prior Distributions made by the Company with respect to such Preferred Unit pursuant to Section 4.1(a)(i).

"Unreturned Preferred Capital" means, with respect to any Preferred Unit, an amount equal to (a) the Preferred Original Issue Price, minus (b) the aggregate amount of prior Distributions made by the Company with respect to such Preferred Unit pursuant to Section 4.1(a)(ii).

"Unvested Units" means any Units that are subject to vesting in accordance with the applicable Equity Agreement pursuant to which such Units were issued and that have not vested in accordance with the terms of such Equity Agreement.

"Vested Units" means any Units that are not subject to vesting in accordance with the applicable Equity Agreement pursuant to which such Units were issued and any Units that have vested in accordance with the terms of the applicable Equity Agreement pursuant to which they were issued.

1.2     **Construction**. Unless otherwise expressly provided or unless the context requires otherwise: (a) all references in this Agreement to Articles, Sections and Schedules shall mean and refer to Articles, Sections and Schedules of this Agreement; (b) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations; (c) words using the singular or plural number also shall include the plural and singular number, respectively; (d) the words "herein," "hereby," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole (including the Schedules hereto) and not to any particular Article, Section or other subdivision of this Agreement; (e) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of any Governmental Entity, Persons succeeding to the relevant functions of such Person); (f) the term "including" and variations thereof shall mean "including, without limitation" and the phrase "ordinary course of business" means "ordinary course of business consistent with past practices"; (g) any definition incorporating, by reference to the Code or the Treasury Regulations, the term "Member" or "Company" shall mean "Member" or "Company", respectively, as defined herein; (h) except to the extent expressly set forth herein, each accounting term not otherwise defined in this Agreement has the meaning ascribed to it in accordance with GAAP; (i) all pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require; (j) all references to $ or dollar amounts will be to lawful currency of the United States; and (k) to the extent the term "day" or "days" is used, it shall mean calendar days.

15

EXHIBIT 1
Page 19 of 108

## ARTICLE II

## THE COMPANY

2.1     **Organization**.  The Company has been organized as an Oregon limited liability company by the filing of the Articles of Conversion and the Articles of Organization, pursuant to the OBCA and the Act on the Original Effective Date.

2.2     **Limited Liability Company Agreement**.  The Company and the Members hereby execute this Agreement for the purpose of regulating and managing the affairs of the Company. The Members hereby agree that during the term of the Company set forth in Section 2.6, the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the Act provides that such rights and obligations specified in the Act shall apply "except as provided in an operating agreement" or words of similar effect and such rights and obligations are set forth in this Agreement, the Act.

2.3     **Company Name**.  The name of the Company is NuScale Power, LLC, and all business of the Company shall be conducted in such name or such other name as the Board shall determine from time to time.  The Company shall hold all of its property in the name of the Company and not in the name of any Member.

2.4     **Purpose**.  The purpose of the Company is to carry on any and all lawful businesses and activities permitted from time to time under the Act.  On the terms and subject to the conditions of this Agreement, the Company is authorized to enter into, make and perform all contracts and other undertakings, and engage in all other activities and transactions as the Board may deem necessary, advisable or convenient for carrying out the purposes of the Company.

2.5     **Powers**.  The Company shall possess and may exercise all the powers and privileges granted by the Act, all other applicable Laws or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion and attainment of the business, purposes or activities of the Company approved by the Board.

2.6     **Term**.  The term of the Company shall be perpetual unless and until the Company is dissolved pursuant to this Agreement.

2.7     **Principal Place of Business**.  The principal place of business of the Company shall be in Portland, Oregon, or such other location as may be designated by the Board from time to time.

2.8     **Filings; Agent for Service of Process**.

(a)     The Articles of Conversion and Articles of Organization have been delivered to the office of, and filed by, the Secretary of State of the State of Oregon in accordance with the provisions of the OBCA and the Act.  The Officers shall take any and all other actions reasonably necessary to maintain the status of the Company under the Laws of the State of Oregon or any other state in which the Company shall do business.

16

**EXHIBIT 1**
**Page 20 of 108**

(b)     The registered agent for service of process on the Company in the State of Oregon, and the address of such agent, is Registered Agent Solutions, Inc., 8130 SW Beaverton-Hillsdale Hwy., Portland, OR 97225.  The Board, in its sole and absolute discretion, may change the registered agent and appoint successor registered agents.

(c)     Upon the dissolution of the Company, the Board (or the Person responsible for winding up and dissolution of the Company pursuant to Article XII), shall promptly execute and cause to be delivered to the office of the Secretary of State of the State of Oregon for filing articles of dissolution in accordance with the Act and take any and all actions as may be determined by the Board (or such Person) to reflect such dissolution under the Laws of any other states or jurisdictions in which the Company has registered to transact business or otherwise made filings.

2.9     **Other Business Opportunities**.

(a)     Unless the Company, following the approval of the Board, otherwise agrees in writing, each Officer and Employee Member shall bring all investment or business opportunities to the Company of which such Officer or Employee Member becomes aware and which are competitive, complementary or similar with the business of any Company Party.

(b)     Notwithstanding the provisions of Section 2.9(a), the Members expressly acknowledge and agree that, to the fullest extent permitted by applicable Law:

(i)     Each Preferred Member that is not an Employee Member, and each of their respective Affiliates and their respective managers, directors, officers, shareholders, partners, members, employees, representatives and agents (including any representative thereof serving on the Board or on the board of directors, board of managers or other governing body of any of the Company Parties or Holdings) (each, a "Specified Person") are, subject to Section 6.6, permitted (1) to have and develop, and may presently or in the future have and develop, investments, transactions, business ventures, contractual, strategic or other business relationships, prospective economic advantages or other opportunities in other businesses, including businesses that are and may be competitive, complementary or similar to any of the businesses of the Company Parties or Holdings, for their own account or for the account of any Person (not including any Officer) other than such Company Party or Holdings, including the Company, or any other Member (not including Employer Members) (each, a "Business Opportunity") or (2) to direct any such Business Opportunity to any other Person, excepting any Business Opportunity which is presented to a Specified Person, or of which a Specified Person becomes aware, in such person's capacity as a Manager, Officer, employee or other agent of the Company, or as a member of the board of directors, board of managers or other governing body, officer, employee or other agent of any Company Party or Holdings;

(ii)     subject to Section 6.6, none of the Specified Persons will be prohibited by virtue of their investments in the Company or their service on the

17

**EXHIBIT 1**
**Page 21 of 108**

Board or as a member of the board of directors or board of managers or other governing body of any of the Company Parties or Holdings from pursuing and engaging in any such Business Opportunities;

(iii)    none of the Specified Persons will be obligated to inform or present any of the Company Parties or Holdings, the Board or the board of directors or board of managers or other governing body of any of the Company Parties or any other Member with any such Business Opportunity;

(iv)    none of the Company Parties, or Holdings or the other Members will have or acquire or be entitled to any interest, expectancy or participation (such right to any interest, expectancy or participation, if any, being hereby renounced and waived) in any such Business Opportunity as a result of the involvement therein of any of the Specified Persons;

(v)    none of the Specified Persons will be obligated to account to any Company Party, or Holdings or any of the other Members for the profits from any such Business Opportunity; and

(vi)    the involvement of any of the Specified Persons in any such Business Opportunity will not constitute a conflict of interest or breach of fiduciary duty by such Persons with respect to the Company Parties, or Holdings or the other Members.

Notwithstanding the foregoing, this Section 2.9 shall not prohibit any Member, Officer or Manager from owning up to 2% of any class of securities of any Person if such securities are listed on a national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act. This Section 2.9 shall not in any way affect, limit or modify any liabilities, obligations, duties or responsibilities of any Person under any separate agreement with any of the Company Parties or Holdings.

2.10    **No State-Law Partnership**. The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.10, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income Tax purposes, and that each Member and the Company shall file all Tax returns and shall otherwise take all Tax and financial reporting positions in a manner consistent with such treatment.

18

EXHIBIT 1
Page 22 of 108

# ARTICLE III

# MEMBERSHIP INTERESTS

3.1    **Units**

    (a)    **General.** The Membership Interests of the Members shall be represented by Units, which may be divided into one or more types, classes or series, with each type, class or series having the rights and privileges, including voting rights, if any, set forth in this Agreement.  A Membership Interest shall for all purposes be personal property.  No Member has any interest in specific assets or property of the Company.  Ownership of a Unit (or fraction thereof) shall not entitle a Member to call for any accounting.

    (b)    **Authorized Units**. As of the Effective Date, (i) the Company is authorized to issue Common Units and Preferred Units, (ii) "Series A Preferred Units", "Series A-1 Preferred Units", "Series A-2 Preferred Units", "Series A-3 Preferred Units", "Series A-4 Preferred Units" and "Series A-5 Preferred Units" are designated series of the Preferred Units, each with the rights, preferences, powers, privileges and restrictions, qualifications and limitations set forth in this Agreement, and (iii) the Company has issued that number of Common Units and Preferred Units to each Member as appears next to its name on Schedule A attached hereto.  The Company may issue fractional Units, rounded to the nearest 1/100 of a Unit.  The ownership by a Member of any Unit shall entitle such Member to (x) allocations of Profits and Losses and other items and Distributions of cash and other property as set forth in Article IV; and (y) other rights as set forth in this Agreement.  The Secretary of the Company shall maintain a schedule of all Members from time to time with the Units held by them (as the same may be amended, modified or supplemented from time to time in accordance with the terms of this Agreement).

    (c)    **Capital Contributions**.  Each Member named on Schedule A attached hereto has made (or, with respect to Holdings, shall be deemed to have made) Capital Contributions as of the Effective Date (unless another date is specifically specified on Schedule A) to the Company in the amount set forth on Schedule A in exchange for the Units specified thereon.  Any reference in this Agreement to Schedule A shall be deemed a reference to Schedule A as amended and in effect from time to time.  No other Capital Contributions are required or permitted except in accordance with the terms of this Agreement.

    (d)    **Issuance of Additional Equity Securities**.  Subject to compliance with Section 3.1(e) and Section 5.1, the Board shall have the right to cause the Company to create and/or issue Equity Securities of the Company (including types, classes or series of Units having such rights and privileges which are different from, senior to or more favorable than those of existing types, classes and series of Units), in which event, (i) except as provided in Section 3.1(f), all outstanding Units shall be diluted on a pro rata basis with respect to any such issuance, (ii) the Board shall have the power to amend this Agreement to reflect such creation, and to make any such other amendments as the Board reasonably and in good faith deems necessary to reflect such creation (including amending this Agreement to create and authorize a new type, class or series of Units and to add the

19

**EXHIBIT 1**
**Page 23 of 108**

terms of such new type, class or series of Units, including distribution and voting rights which may be different from, senior to or more favorable than those of the other existing types, classes and series of Units), in each case without the approval or consent of any Member; provided, that if any Member's rights and privileges under this Agreement would be adversely affected in a manner which is disproportionate to other Members holding the same type, class or series of Units, then such Member's consent shall be required, and (iii) the CEO Manager shall have the power to amend or cause the amendment of Schedule A attached hereto to reflect any such creation, issuance and dilution.  In connection with any issuance of Equity Securities of the Company pursuant to this Section 3.1(d), each Person who acquires such Equity Securities and is not already a Member shall execute a counterpart to this Agreement, accepting and agreeing to be bound by all terms and conditions set forth herein, and shall enter into such other documents, instruments and agreements to effect such purchase as are required by the Board (each an "Equity Agreement").  Each Person who acquires Equity Securities of the Company may be required in exchange for such Equity Securities to make a Capital Contribution to the Company in an amount to be determined by the Board.

(e)    **Preemptive Rights**.  Except as otherwise provided in Section 3.1(e)(iii), each time any Company Party proposes to issue any Equity Securities (collectively, "New Issue Securities") to any Person (other than solely to another Company Party, and only so long as such Equity Securities are not subsequently Transferred to any Person other than a Company Party), the Company shall first offer, or shall cause the other Company Party to offer, the New Issue Securities to the Preferred Members in accordance with the following provisions:

(i)    The Company Party shall give a written notice to each Preferred Member (the "Preemptive Notice") stating: (1) its intention to issue the New Issue Securities; (2) the number and description of such New Issue Securities to be issued; (3) the purchase price (calculated as of the proposed issuance date) and the other terms upon which the Company Party is offering the New Issue Securities; and (4) the names of the Persons to whom the Company Party seeks to issue such New Issue Securities.

(ii)    Transmittal of the Preemptive Notice to the Preferred Members by the Company Party shall constitute an offer by the Company Party to sell each Preferred Member its Preferred Pro Rata Interest of the New Issue Securities, or any lesser number specified by the Preferred Member, for the price and on the other terms set forth in the Preemptive Notice.  Notwithstanding the foregoing, the Company Party shall not be under any obligation to consummate any proposed issuance of New Issue Securities regardless of whether it shall have delivered a Preemptive Notice, and the Company Party may elect, at any time in its sole and absolute discretion, not to consummate any such proposed issuance of New Issue Securities for any reason following transmittal and delivery of a Preemptive Notice. For a period of 10 days after the submission of the Preemptive Notice to the Preferred Members and subject to the prior sentence, each Preferred Member shall have the option, exercisable by written notice to the Company Party, to accept the Company Party's offer as to all or any part of such Preferred Member's Preferred

20

EXHIBIT 1
Page 24 of 108

Pro Rata Interest of the New Issue Securities, or any lesser number of the New Issue Securities. If two or more types of New Issue Securities are to be issued or New Issue Securities are to be issued together with other types of securities, including debt securities, in a single transaction or series of related transactions, the rights to purchase New Issue Securities granted to the Preferred Members under this <u>Section 3.1(e)</u> must be exercised to purchase all types of New Issue Securities and such other securities in the same proportion as such New Issue Securities and other securities are to be issued by the Company Party. The Company shall within 5 days after the end of the foregoing 10-day period, in writing, inform each Preferred Member that elects to purchase all the New Issue Securities available to it (a "<u>Fully Exercising Member</u>") of any other Preferred Member's failure to do likewise. During the five day period commencing after such information is given, each Fully Exercising Member may elect to purchase that portion of the New Issue Securities which Preferred Members were entitled to purchase, but which were not elected to be purchased by Preferred Members, that is equal to the proportion that the number of Units held by such Fully Exercising Member (on an As-Converted Basis) bears to the total number of Units of the Company held by all Fully Exercising Members (on an As-Converted Basis). If the Preferred Members (as a group) agree to purchase less than the total number of New Issue Securities proposed to be issued and sold, the Company Party shall have 90 days thereafter to sell any or all of the remaining New Issue Securities (<i>i.e.</i>, those not to be sold to any Preferred Member) to the Person or Persons set forth in the Preemptive Notice, on terms no less favorable to the Company Party, and no more favorable to such Person or Persons, than those set forth in the Preemptive Notice. In the event the Company Party has not sold such New Issue Securities within such 90-day period, the Company Party will not thereafter issue or sell any New Issue Securities without first offering such New Issue Securities to the Preferred Members in the manner provided above. The purchase of New Issue Securities by the Preferred Members agreeing to purchase any such New Issue Securities pursuant to this <u>Section 3.1(e)</u> shall be consummated simultaneously with the closing of the sale of the New Issue Securities set forth in the Preemptive Notice; <u>provided</u> that if all New Issue Securities referred to in the Preemptive Notice are elected to be purchased or acquired by the Preferred Members as provided in this <u>Section 3.1(e)</u>, the closing of any sale pursuant to this <u>Section 3.1(e)</u> shall occur within 50 days after the Preemptive Notice is given.

(iii)    The preemptive rights contained in this <u>Section 3.1(e)</u> shall not apply to:

(1)    the issuance of Exempted Securities;

(2)    the issuance of Equity Securities by a Company Party in connection with any bona fide Public Offering;

(3)    the issuance of Equity Securities by a Company Party in connection with a conversion pursuant to <u>Section 9.4</u>; and

21

**EXHIBIT 1**
**Page 25 of 108**

(4)    the issuance of Preferred Units in a Subsequent Closing pursuant to the Purchase Agreement.

(iv)    The preemptive rights contained in this Section 3.1(e) shall terminate upon the earlier of (1) immediately prior to the closing of the sale of Equity Securities to the public at a price of at least three times the Series A Preferred Original Issue Price then in effect, in a firm-commitment underwritten Public Offering, resulting in at least $50,000,000 of gross proceeds to the Company (a "Qualified Public Offering") and (2) a Sale of the Company in which all of the Units are acquired by an Independent Third Party.

(v)    Any of the rights set forth in this Section 3.1(e) may be waived on behalf of all Preferred Members by the affirmative written consent or vote of the holders of at least a majority of the Preferred Units then outstanding.

(f)    **Preferred Units**.

(i)    Voting.  On any matter presented to the Members for their action or consideration at any meeting of Members (or by written consent of Members in lieu of a meeting), each Preferred Member shall be entitled to cast the number of votes equal to (A) the number of Series A Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A Common Equivalent Ratio, with such product rounded to the nearest whole number, plus (B) the number of Series A-1 Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A-1 Common Equivalent Ratio, with such product rounded to the nearest whole number, plus (C) the number of Series A-2 Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A-2 Common Equivalent Ratio, with such product rounded to the nearest whole number, plus (D) the number of Series A-3 Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A-3 Common Equivalent Ratio, with such product rounded to the nearest whole number, plus (E) the number of Series A-4 Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A-4 Common Equivalent Ratio, plus (F) the number of Series A-5 Preferred Units held by such holder as of the record date for determining Members entitled to vote on such matter multiplied by the Series A-5 Common Equivalent Ratio, with such product rounded to the nearest whole number.  Except as provided by Law or by the other provisions of this Agreement, holders of Preferred Units shall vote together with the holders of Common Units as a single class.

(ii)    Common Equivalent Ratio.  The "Series A Common Equivalent Ratio" means the Series A Preferred Original Issue Price divided by the Series A Common Equivalent Price then in effect.  The "Series A-1 Common Equivalent Ratio" means the Series A-1 Preferred Original Issue Price divided by the Series A-1 Common Equivalent Price then in effect.  The "Series A-2 Common Equivalent

22

**EXHIBIT 1**
**Page 26 of 108**

Ratio" means the Series A-2 Preferred Original Issue Price divided by the Series A-2 Common Equivalent Price then in effect. The "Series A-3 Common Equivalent Ratio" means the Series A-3 Preferred Original Issue Price divided by the Series A-3 Common Equivalent Price then in effect. The "Series A-4 Common Equivalent Ratio" means the Series A-4 Preferred Original Issue Price divided by the Series A-4 Common Equivalent Price then in effect. The "Series A-5 Common Equivalent Ratio" means the Series A-5 Preferred Original Issue Price divided by the Series A-5 Common Equivalent Price then in effect. The "Common Equivalent Ratio" means the Series A Common Equivalent Ratio, the Series A-1 Common Equivalent Ratio, the Series A-2 Common Equivalent Ratio or the Series A-3 Common Equivalent Ratio, as applicable. The "Series A Common Equivalent Price" as of the Effective Date shall be $1.00. The "Series A-1 Common Equivalent Price" as of the Effective Date shall be $1.31. The "Series A-2 Common Equivalent Price" as of the Effective Date shall be $1.42. The "Series A-3 Common Equivalent Price" as of the Effective Date shall be $1.59. The "Series A-4 Common Equivalent Price" as of the Effective Date shall be $1.92. The "Series A-5 Common Equivalent Price" as of the Effective Date shall be $2.19. The Common Equivalent Price and the Common Equivalent Ratio shall be subject to adjustment as provided below.

(iii)    Special Definitions.  "Additional Units" means all Units issued (or, pursuant to Section 3.1(f)(v), deemed to be issued) by the Company after the Effective Date, other than the following Units and Units deemed issued pursuant to the following Options and Convertible Securities (collectively "Exempted Securities"):

(1)    Common Units, Preferred Units, other Equity Securities hereafter authorized, Options or Convertible Securities issued as a Distribution on Preferred Units;

(2)    Common Units issued by reason of a subdivision or combination of Common Units that is covered by Sections 3.1(f)(ix);

(3)    Common Units, Preferred Units or Convertible Securities actually issued upon the exercise of Options, or Common Units or Preferred Units actually issued upon the conversion or exchange of Preferred Units or Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(4)    Common Units issued from the Incentive Pool or Options exercisable for Common Units to be issued from the Incentive Pool;

(5)    Common Units, Preferred Units, other Equity Securities hereafter authorized, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to an equipment lease financing or bank credit arrangement, or real property lease, entered into for primarily non-equity financing purposes approved by the Board;

23

**EXHIBIT 1**
**Page 27 of 108**

(6)    Common Units, Preferred Units, other Equity Securities hereafter authorized, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board;

(7)    Common Units, Preferred Units, other Equity Securities hereafter authorized, Options or Convertible Securities issued in connection with the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided, that such issuances are approved by the Board;

(8)    Common Units, Preferred Units, other Equity Securities hereafter authorized, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, marketing or other similar agreements or strategic partnerships approved by the Board; and

(9)    Common Units issued to the State of Oregon acting by and through the State Board of Higher Education on behalf of Oregon State University ("OSU") pursuant to the Settlement Agreement between the Company and OSU dated September 30, 2011.

(iv)    No Adjustment of Common Equivalent Price.  No adjustment in the Common Equivalent Price shall be made as the result of the issuance or deemed issuance of Additional Units if the Company receives written notice from the holders of at least a majority of the then-outstanding Preferred Units agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Units.

(v)    Deemed Issue of Additional Units.

(1)    If the Company at any time or from time to time after the Effective Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities), then the maximum number of Units (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Units issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date; provided that in any

24

EXHIBIT 1
Page 28 of 108

such case in which Additional Units are deemed to be issued, no further adjustments in the Common Equivalent Price shall be made upon the subsequent issue of Common Units, Preferred Units, other Equity Securities hereafter authorized or Convertible Securities, as the case may be, upon the exercise of such Options or conversion or exchange of such Convertible Securities.

(2)    If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Common Equivalent Price pursuant to the terms of Section 3.1(f)(vi), are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (A) any increase or decrease in the number of Units issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (B) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Common Equivalent Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Common Equivalent Price as would have been obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.  Notwithstanding the foregoing, no readjustment pursuant to this Section 3.1(f)(v)(2) shall have the effect of increasing the Common Equivalent Price to an amount which exceeds the lower of (i) the Common Equivalent Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, and (ii) the Common Equivalent Price that would have resulted from any issuances of Additional Units (other than deemed issuances of Additional Units as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(3)    If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Common Equivalent Price pursuant to the terms of Section 3.1(f)(vi) (because the consideration per Unit (determined pursuant to Section 3.1(f)(vii)) of the Additional Units subject thereto was equal to or greater than the Common Equivalent Price then in effect), are revised after the Effective Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (A) any increase or decrease in the number of Units issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (B) any increase or decrease in the consideration

25

EXHIBIT 1
Page 29 of 108

payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Units subject thereto (determined in the manner provided in Section 3.1(f)(v)(1)) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(4)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Common Equivalent Price pursuant to the terms of Section 3.1(f)(vi), the Common Equivalent Price shall be readjusted to such Common Equivalent Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(5)     If the number of Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Common Equivalent Price provided for in this Section 3.1(f)(v) shall be effected at the time of such issuance or amendment based on such number of Units or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (2) and (3) of this Section 3.1(f)(v)). If the number of Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at the time such Option or Convertible Security is issued or amended, any adjustment to the Common Equivalent Price that would result under the terms of this Section 3.1(f)(v) at the time of such issuance or amendment shall instead be effected at the time such number of Units and/or amount of consideration is first calculable (assuming for purposes of calculating such adjustment to the Common Equivalent Price that such issuance or amendment took place at the time such calculation can first be made).

(vi)     Adjustment of Common Equivalent Price Upon Issuance of Additional Units.  In the event the Company shall at any time after the Effective Date issue Additional Units (including Additional Units deemed to be issued pursuant to Section 3.1(f)(v)), without consideration or for a consideration per Unit less than the Common Equivalent Price in effect immediately prior to such issuance, then the Common Equivalent Price shall be reduced, concurrently with such issuance, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula: $CP_2 = CP_1 * (A + B) \div (A + C)$.

26

**EXHIBIT 1**
**Page 30 of 108**

(1)    For purposes of the foregoing formula, the following definitions shall apply:

(A)    $CP_2$ shall mean the Common Equivalent Price in effect immediately after such issuance (or deemed issuance) of Additional Units;

(B)    $CP_1$ shall mean the Common Equivalent Price in effect immediately prior to such issuance (or deemed issuance) of Additional Units;

(C)    "A" shall mean the number of Units outstanding immediately prior to such issuance (or deemed issuance) of Additional Units (on an As-Converted Basis), treating for this purpose as outstanding all Units issuable upon exercise of Options outstanding immediately prior to such issue or upon conversion or exchange of Convertible Securities outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issuance (or deemed issuance);

(D)    "B" shall mean the number of Units that would have been issued if such Additional Units had been issued at a price per Unit equal to $CP_1$ (determined by dividing the aggregate consideration received by the Company in respect of such issuance (or deemed issuance) by $CP_1$); and

(E)    "C" shall mean the number of such Additional Units issued (or deemed issued) in such transaction.

(vii)    <u>Determination of Consideration</u>.  For purposes of this <u>Section 3.1(f)</u>, the consideration received by the Company for the issuance of any Additional Units shall be computed as follows:

(1)    <u>Cash and Property</u>:  Such consideration shall:

(A)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest and after deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance thereof; and

(B)    insofar as it consists of property other than cash, be computed at the Fair Market Value thereof at the time of such issuance.

(2)    <u>Options and Convertible Securities</u>.  The consideration per Unit received by the Company for Additional Units deemed to have been issued pursuant to <u>Section 3.1(f)(v)</u>, relating to Options and Convertible Securities, shall be determined by dividing

27

EXHIBIT 1
Page 31 of 108

(A)    the total amount, if any, received or receivable by the Company as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(B)    the maximum number of Units (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

(viii)    <u>Multiple Closing Dates</u>.  In the event the Company shall issue on more than one date Additional Units that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Common Equivalent Price pursuant to the terms of <u>Section 3.1(f)(vi)</u>, and such issuance dates occur within a period of no more than 60 days from the first such issuance to the final such issuance, then, upon the final such issuance, the Common Equivalent Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

(ix)    <u>Adjustment for Unit Subdivisions and Combinations</u>.  If the Company shall at any time or from time to time after the Effective Date effect a subdivision of the outstanding Common Units, the Common Equivalent Price in effect immediately before that subdivision, shall be proportionately decreased in proportion to the increase in the aggregate number of Common Units outstanding. If the Company shall at any time or from time to time after the Effective Date combine the outstanding Common Units, the Common Equivalent Price in effect immediately before the combination shall be proportionately increased in proportion to the decrease in the aggregate number of Common Units outstanding. Any adjustment under this section shall become effective at the close of business on the date the subdivision or combination becomes effective.

(x)    <u>Certificate as to Adjustments</u>.  Upon the occurrence of each adjustment or readjustment of the Common Equivalent Price pursuant to this <u>Section 3.1(f)</u>, the Company at its expense shall, as promptly as reasonably practicable thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Units a certificate setting

28

**EXHIBIT 1**
**Page 32 of 108**

forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Company shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Units, furnish or cause to be furnished to such holder a certificate setting forth the Common Equivalent Price then in effect.

(xi)    Conversion.  Subject to Section 4.1(e), each Preferred Unit shall be convertible, at the option of the Preferred Member holding such Preferred Unit, at any time and from time to time, and without the payment of additional consideration by the Preferred Member, into a number of Common Units equal to the Common Equivalent Ratio in effect at the time of conversion.  In the event of a Qualified Public Offering or a Liquidity Event, the right to convert each Preferred Unit pursuant to this Section 3.1(f)(xi) shall terminate at the close of business on the last full day preceding the date fixed for the issuance of common shares upon conversion of Units pursuant to Section 9.4(b) or the payment of any amounts distributable on a Liquidity Event to the Preferred Members.

(xii)    [Reserved.]

(xiii)    Waiver.  Any of the rights or privileges of the Preferred Units set forth in this Section 3.1(f) may be waived on behalf of all holders of Preferred Units by the affirmative written consent or vote of the holders of at least a majority of the Preferred Units then outstanding.

(g)    **Voting of Common Units**.  On any matter presented to the Members for their action or consideration at any meeting of Members (or by written consent of Members in lieu of a meeting), each Common Member shall be entitled to cast the number of votes equal to the number of whole Common Units held by such holder as of the record date for determining Members entitled to vote on such matter (with any fractional Units rounded down to the nearest whole number).  Except as provided by Law or by the other provisions of this Agreement, holders of Common Units shall vote together with the holders of Preferred Units as a single class.

(h)    **Non-Certificated Units.** The Units will not be certificated.

3.2    **Capital Accounts**.

(a)    **Maintenance of Capital Accounts**.  The Company shall maintain a separate Capital Account for each Member according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv).  For this purpose, the Company may, upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of the Company's property if the Board determines that such adjustment is appropriate.

(b)    **Computation of Income, Gain, Loss and Deduction Items**.  For purposes of computing the amount of any item of the Company's income, gain, loss or deduction to be allocated pursuant to Article IV and to be reflected in the Capital Accounts, the

**EXHIBIT 1**
**Page 33 of 108**

determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income Tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); <u>provided</u> that:

      (i)    The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(1)(B) or Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income Tax purposes.

      (ii)    If the Book Value of any of the Company's property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

      (iii)    Items of income, gain, loss or deduction attributable to the disposition of the Company's property having a Book Value that differs from its adjusted basis for Tax purposes shall be computed by reference to the Book Value of such property.

      (iv)    Items of depreciation, amortization and other cost recovery deductions with respect to the Company's property having a Book Value that differs from its adjusted basis for Tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

      (v)    To the extent an adjustment to the adjusted Tax basis of any of the Company's assets pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

      3.3    **<u>Negative Capital Accounts</u>**.  No Member shall be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

      3.4    **<u>No Interest; No Withdrawal</u>**.  No interest shall accrue on any Capital Contributions and no Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any distribution from the Company, except as expressly provided herein.

      3.5    **<u>Loans From Members</u>**.  Subject to the restrictions set forth in this Agreement, including <u>Section 5.1(d)</u>, the Company may borrow money from any Member, and such Member may advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company on terms agreed upon by the Board and the Member.  Any such loan or advance by any Member to the Company shall not be considered a

**EXHIBIT 1**
**Page 34 of 108**

Capital Contribution and shall not result in any increase in the amount of the Capital Account of such Member.  The amount of any such loan or advance shall be debt of the Company to such Member and shall be payable or collectible in accordance with the terms agreed upon by the Board and the Member.

      3.6    **Distributions In-Kind**.  Subject to compliance with applicable securities Laws, to the extent that the Company distributes property in-kind to the Members, the Company shall be treated as making a Distribution equal to the Fair Market Value of such property for purposes of Section 4.1 and such property shall be treated as if it were sold for an amount equal to its Fair Market Value and any resulting gain or loss shall be allocated to the Members' Capital Accounts in accordance with Sections 4.2 through 4.4.  Any Tax allocations required under Section 4.5 shall be made in accordance with the terms of such section.

      3.7    **Transfer of Capital Accounts**.  The initial Capital Account established for each Substituted Member shall be in the same amount as the Capital Account of the Member (or portion thereof) to which such Substituted Member succeeds, at the time such Substituted Member is admitted as a Member of the Company.  The Capital Account of any Member, whose interest in the Company shall be increased or decreased by means of (a) the Transfer to such Member of all or part of the Units of another Member, or the Transfer by such Member of all or part of the Units to another Member or (b) the redemption, repurchase or forfeiture (including becoming incapable of vesting) of Units, shall be appropriately adjusted to reflect such Transfer, redemption, repurchase or forfeiture.  Any reference in this Agreement to a Capital Contribution or Distribution to any Member that has succeeded any other Member shall include any Capital Contributions or Distributions previously made by or to such other Member on account of the Units of such other Member Transferred to such Member.

      3.8    **Adjustments to Common Units**.  If the Company at any time subdivides (by any split or otherwise) any Common Units into a greater number of Units, the Company shall also subdivide all other Common Units outstanding immediately prior to such subdivision based upon the same ratio, and if the Company at any time combines (by reverse split or otherwise) any Common Units into a smaller number of Units, the Company shall also combine all other Common Units outstanding immediately prior to such combination based upon the same ratio.

      3.9    **Reserves.**  Reserves in an amount determined by the Board, in its sole and absolute discretion, may be retained out of Capital Contributions, net proceeds from sales or refinancing or net proceeds from operations.  Any reserves remaining on dissolution of the Company shall be held until the final liquidation and then distributed to the Members in accordance with the provisions of Section 12.2.

EXHIBIT 1
Page 35 of 108

## ARTICLE IV

## DISTRIBUTIONS AND ALLOCATIONS

4.1  **Distributions**.

(a)  **General**.  Except as otherwise set forth in <u>Section 4.1(b)</u> or <u>Section 4.1(d)</u>, the Board may (but shall not be obligated to) direct the Company to make Distributions at any time or from time to time, but only in the following order of priority:

(i)  first, to the holders of Preferred Units (ratably among such holders based upon the aggregate Unpaid Preferred Return with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution) until the aggregate Unpaid Preferred Return with respect to each such holder's Preferred Units has been reduced to zero;

(ii)  second, to the holders of the Preferred Units (ratably among such holders based upon the aggregate Unreturned Preferred Capital with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution) until the aggregate Unreturned Preferred Capital with respect to each such holder's Preferred Units has been reduced to zero;

(iii)  third, to the holders of Common Units (ratably among such holders based on their respective Common Pro Rata Interests) until the amount distributed with respect to each Common Unit is equal to the Lowest Hurdle;

(iv)  fourth, to the holders of Common Units (including Common Units then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units into Common Units at the Common Equivalent Ratio then in effect) until the amount distributed with respect to each Common Unit is equal to the Next Lowest Hurdle;

(v)  fifth, and repeating this clause (v) until the amount distributed with respect to each Common Unit (including each Common Unit then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units and Next Lowest Hurdle Preferred Units into Common Units at the Common Equivalent Ratio then in effect) equals the Highest Preferred Hurdle, to the holders of Common Units (including Common Units then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units and Next Lowest Hurdle Preferred Units at the Common Equivalent Ratio then in effect) until the amount distributed with respect to each Common Unit is equal to the Subsequent Next Lowest Hurdle; and

(vi)  finally, to the holders of Units (ratably among such holders based on their respective Common Participating Interests).

An example of how the foregoing order of priority applies to a specific Distribution is set forth in <u>Schedule D</u>.

32

**EXHIBIT 1**
**Page 36 of 108**

(b)    <u>**Tax Distributions**</u>.

(i)    Notwithstanding <u>Section 4.1(a)</u>, no later than the tenth day of each March, June, September and December of each calendar year, the Board shall direct the Company to distribute (to the extent of available cash) to each Member such Member's Member Tax Distribution.  Each Member's "<u>Member Tax Distribution</u>" shall equal the excess of (A) the Net Taxable Income of the Company for such calendar year allocated to the Member multiplied by the Applicable Tax Rate, over (B) the amount of Member Tax Distributions previously made to such Member pursuant to this <u>Section 4.1(b)</u> during the calendar year with respect to which the distribution is being made.  For the avoidance of doubt, no Member Tax Distribution shall be made with respect to the liquidation of the Company or a Liquidity Event, or to pay any Tax attributable to any income recognized by a Person in connection with the receipt of Equity Securities as compensation for services rendered to any Company Party.  The Company may, but shall not have any obligation to, borrow funds to make such Member Tax Distribution to the Members.  Notwithstanding the foregoing, to the extent the Board directs the Company to distribute to the Members the Member Tax Distributions, each Member shall be entitled, as applicable, to a Member Tax Distribution for any partial calendar quarter that a Member owns any Units and is therefore obligated to pay any Taxes in accordance therewith.

(ii)    The "<u>Net Taxable Income</u>" of the Company allocable to a Member for a calendar year shall be (i) the taxable income of the Company allocated to such Member (excluding Code Section 704(c) items in respect of contributed property and Code Section 743 items) for such year reduced (but not below zero) by (ii) the excess of (A) the aggregate Losses of the Company allocated to such Member for all prior years (excluding Code Section 704(c) items in respect of contributed property and Code Section 743 items) over (B) the aggregate Profits of the Company allocated to such Member for all prior years (excluding Code Section 704(c) items in respect of contributed property and Code Section 743 items).  The Net Taxable Income for any Member for any year shall be reasonably determined by the Board using such estimates and simplifying assumptions as the Board may determine.

(iii)    Except as provided in the next sentence, the "<u>Applicable Tax Rate</u>" for each year shall be 40%.  If the Board determines in good faith that the combined net income Tax rate (taking into account the deductibility of state income Taxes for federal income Tax purposes) applicable to any Member for any year is higher than the Applicable Tax Rate or the highest combined income Tax rate applicable to all Members is lower than the Applicable Tax Rate, the Board may increase or decrease the Applicable Tax Rate for such year; <u>provided</u>, <u>however</u>, that the Applicable Tax Rate for each year shall be the same for each Member.  To the extent a Member is a pass through entity for Tax purposes, the Applicable Tax Rate of such Member for purposes of this Agreement shall mean the highest Applicable Tax Rate of any Person which is allocated income with respect to such Member.

33

**EXHIBIT 1**
**Page 37 of 108**

(iv)    Any Member Tax Distributions shall be treated as an advance against Distributions otherwise payable under <u>Section 4.1</u> and future Distributions under <u>Section 4.1</u> shall be adjusted accordingly.

(c)    **Withholding**.  If the Company is required by Law to pay any Tax that is specifically attributable to a Member, including federal or state withholding Taxes, state personal property Taxes and state unincorporated business Taxes, then such Member shall indemnify and reimburse the Company from, for and against the amount of such Tax (including any interest or penalties).  The Company may offset Distributions to any Member against such Member's obligation and such offset amounts shall be treated as distributed for all purposes of this Agreement.  A Members' obligation to indemnify and make contributions to the Company under this provision shall survive the Member Transferring its Units in the Company and the termination, dissolution, liquidation or winding up of the Company.  The Company may pursue remedies against any Member, including instituting a lawsuit to collect such indemnification and contribution with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by Law), compounded on the last day of each Fiscal Quarter so long as such amount remains unpaid.  Any contributions made pursuant to this <u>Section 4.1(c)</u> shall increase the Member's Capital Account, but shall not be treated as a Capital Contribution for purposes of this Agreement.  The obligations of OSU under this <u>Section 4.1(c)</u> are subject to Article XI, Section 7 of the Oregon Constitution and the Oregon Tort Claims Act.

(d)    **Distributions to Holders of Unvested Units**.  Notwithstanding the Distribution priorities set forth in <u>Section 4.1(a)</u>, no holder of Unvested Units shall be entitled to receive any Distribution (other than Distributions pursuant to <u>Section 4.1(b)</u>) made by the Company with respect to any such Units of the same type, class or series unless and until such Unvested Units become Vested Units.  Any amount that would otherwise be distributed to the holder of Unvested Units pursuant to <u>Section 4.1(a)</u> but for the application of the preceding sentence shall instead be retained by the Company in a segregated Company account to be distributed by the Company and paid to such holder if, as and when the Unvested Units become Vested Units.  If any Unvested Units have been redeemed or repurchased by the Company pursuant to an Equity Agreement or other agreement or have been forfeited (or otherwise become incapable of vesting), any amounts retained by the Company pursuant to this <u>Section 4.1(d)</u> on account of such Unvested Units (i) first shall be credited against and reduce the amount otherwise payable, if any, by the Company in connection with the exercise of the Company's redemption or repurchase right or obligation of the Company with respect to any Vested Units owned by the Member holding such redeemed, repurchased or forfeited Unvested Units and (ii) second shall be (or the balance of such retained amounts shall be, as the case may be) distributed among the holders of the outstanding Units pursuant to <u>Section 4.1(a)</u> and the Capital Accounts of the Members will be adjusted in accordance with <u>Section 3.7</u>.

(e)    **Treatment of Converted Units**.  For purposes of this <u>Section 4.1</u>, references to "Preferred Units" shall include any and all Common Units into which such Preferred Units are converted pursuant to <u>Section 3.1(f)(xi)</u> ("Converted Units").  In no case will Converted Units receive distributions that differ from the distributions that would

34

**EXHIBIT 1**
**Page 38 of 108**

have been received on the Preferred Units (on an As-Converted Basis) if such Preferred Units had not been converted into Converted Units pursuant to <u>Section 3.1(f)(xi)</u>.

4.2    <u>**Allocations**</u>.  Except as otherwise provided in <u>Sections 4.3</u> or <u>4.4</u>, Profits or Losses for any Taxable Year (and, in the year of liquidation of the Company, items thereof) shall be allocated among the Members in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such Taxable Year, between (a) the sum of (i) the Capital Account of each Member, (ii) such Member's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and (iii) such Member's share of partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) and (b) the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value (which Book Value, for the avoidance of doubt, shall not be adjusted to reflect the hypothetical liquidation), (ii) satisfy all of the liabilities of the Company pursuant to their terms, and (iii) distribute the proceeds of liquidation pursuant to the rules of <u>Section 4.1</u> (assuming all amounts distributable to holders of Unvested Units were distributed to such holders notwithstanding Section 4.1(d)).  For purposes of allocating Profits and Losses, and all other items of income, gain, deduction and loss, pursuant to this <u>Section 4.2</u> (and <u>Sections 4.3</u> and <u>4.4</u>, to the extent applicable), all outstanding Units, including Unvested Units, will be treated in the same manner.  For the avoidance of doubt, Losses allocated to a Member shall not exceed the amount that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of the Taxable Year. Notwithstanding the foregoing, to the extent that the Company has a net Loss for any Taxable Year and that net Loss was funded with the cash proceeds of the issuance of Preferred Units or other equity of the Company, Losses shall be allocated to the Members that contributed the cash used to fund such Loss (as determined by the Board in its reasonable discretion).

4.3    <u>**Special Allocations**</u>.

(a)    <u>**Member Nonrecourse Debt Minimum Chargeback**</u>.  Deductions attributable to partner nonrecourse debt (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i)(1).  If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)), items of Company income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Members in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(i)(4).  This <u>Section 4.3(a)</u> is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted in a manner consistent therewith.

(b)    <u>**Minimum Gain Chargeback**</u>.  Nonrecourse deductions (as determined according to Treasury Regulation Section 1.704-2(b)(1)) for any Taxable Year shall be allocated ratably among the Members based upon the manner in which Profits or Losses (determined without regard to such non-recourse deductions) are allocated among the Members for such Taxable Year.  Except as otherwise provided in <u>Section 4.3(a)</u>, if there is a net decrease in the Minimum Gain during any Taxable Year, each Member shall be

35

**EXHIBIT 1**
**Page 39 of 108**

allocated items of Company income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(f). This <u>Section 4.3(b)</u> is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c)    **Qualified Income Offset**. If any Member that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of <u>Sections 4.3(a)</u> and <u>4.3(b)</u> but before the application of any other provision of this <u>Article IV</u>, then items of Company income and gain for such Taxable Year shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as soon as possible (and, if two or more Members have such deficits, in proportion to their deficits). This <u>Section 4.3(c)</u> is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)    **Allocation of Certain Profits and Losses**. Profits and Losses described in <u>Section 3.2(b)(v)</u> shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

(e)    **Regulatory Allocations**. The allocations set forth in <u>Sections 4.3(a)-(d)</u> (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Profit and Loss of the Company or make the Company's distributions. Accordingly, notwithstanding the other provisions of this <u>Article IV</u>, but subject to the Regulatory Allocations, income, gain, deduction and loss shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero. In addition, if in any Fiscal Year or Fiscal Period there is a decrease in Minimum Gain, or in member nonrecourse debt Minimum Gain, and application of the Minimum Gain chargeback requirements set forth in <u>Section 4.3(a)</u> or <u>Section 4.3(b)</u> would cause a distortion in the economic arrangement among the Members, the Members may, if they do not expect that the Company will have sufficient other income to correct such distortion, request the Service to waive either or both of such Minimum Gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such Minimum Gain chargeback requirement.

36

**EXHIBIT 1**
**Page 40 of 108**

4.4    **Offsetting Allocations**.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and the Company pursuant to Sections 83, 482 or 7872 of the Code or any similar provision now or hereafter in effect, the Board shall use reasonable efforts to allocate any corresponding items of Profit or Loss to the Member who recognizes such item in order to appropriately reflect the Members' economic interest in the Company.

4.5    **Tax Allocations**.

(a)    **Allocations Generally**.  Except as provided in Section 4.5(b), the income, gains, losses, deductions and credits of the Company will be allocated for federal, state and local income Tax purposes among the Members in accordance with the allocation of the corresponding items of income, gains, losses, deductions and credits among the Members for computing their Capital Accounts.

(b)    **Code Section 704(c) Allocations**.  Items of the Company's taxable income, gain, loss and deduction with respect to any property contributed to the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to the Company for federal income Tax purposes and its Book Value.  In addition, if the Book Value of any asset of the Company is adjusted pursuant to the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), then subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income Tax purposes and its Book Value in the same manner as under Code Section 704(c).  The Board shall determine all allocations pursuant to this Section 4.5(b) using any method that is permitted under Treasury Regulation Section 1.704-3.

(c)    **Transfer of Capital Accounts**.  In the event that (i) a Member's Capital Account is debited (and the Capital Accounts of the other Members are credited by, in aggregate, a corresponding amount) pursuant to Section 3.7 in connection with the redemption, repurchase or forfeiture of Units or (ii) any other contribution, distribution or allocation made pursuant to this Agreement would (but for this Section 4.5(c)) cause the amounts allocated to a Member for federal and applicable state and local income Tax purposes to not ultimately be consistent with the cumulative distributions such Member receives (or is entitled to receive), the Company shall, to the extent possible and solely for federal and applicable state and local income Tax purposes, allocate its future income, gains, losses, deductions and credits among the Members in a manner which shall result in the cumulative federal and applicable state and local income Tax allocations to each Member being as nearly consistent with the cumulative distributions to each Member as possible.

(d)    **Allocation of Tax Credits, Tax Credit Recapture, Etc**.  Allocations of Tax credits, Tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

**EXHIBIT 1**
**Page 41 of 108**

(e)    **Effect of Allocations**.  Allocations pursuant to this <u>Section 4.5</u> are solely for purposes of federal, state and local income Taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Distributions (other than Distributions pursuant to <u>Section 4.1(b)</u>) or other items of income, gain, deduction and loss pursuant to any provision of this Agreement.

## ARTICLE V

## MANAGEMENT

5.1    **Management**.

(a)    **General Authority.** Pursuant to the Articles of Organization and this Agreement, the business and affairs of the Company shall be managed by multiple managers, who shall be the Managers.  Subject to <u>Section 5.1(d)</u>, the Board shall have all power and authority to manage, or to direct the management of, the business and affairs of and to make all decisions to be made by or on behalf of the Company.  The powers of the Board shall include all powers, statutory or otherwise, possessed by or permitted to managers of a limited liability company under the Laws of the State of Oregon and the Act.  The Board may delegate the day-to-day operation and control of the Company to the Officers.  Approval by, consent of or action taken by the Board shall constitute approval or action by the Company and, subject to <u>Section 5.1(d)</u>, shall be binding on the Company and each Member (in their capacity as a Member).  No Manager may delegate to any other Person that Manager's rights and obligations to participate in and vote at any meeting of the Board.

(b)    **Specific Authority**.  Subject to the limitations contained elsewhere herein (including <u>Section 5.1(d)</u>) and notwithstanding anything in the Act to the contrary, the Board shall have full power and authority to do all things deemed necessary or desirable by the Board to manage and conduct the business of the Company, including the following:

(i)    the making of any expenditures, the lending or borrowing of money, the assumption, guarantee of or other contracting of indebtedness and other liabilities, the issuance of evidences of indebtedness and the incurrence or guaranty of any obligations it deems necessary or desirable;

(ii)    the making of Tax, regulatory and other filings or rendering of periodic or other reports to Governmental Entities having jurisdiction over the Company or the business or assets of the Company;

(iii)    the license, sale, assignment, transfer, abandonment or other disposition of the assets, properties or goodwill of the Company;

(iv)    the use of the assets of the Company (including cash on hand) for any purpose and on any terms it sees fit, including the financing of the operations of the Company, the lending of funds to other Persons and the repayment of obligations of the Company;

38

**EXHIBIT 1**
**Page 42 of 108**

(v)     the negotiation, execution and performance of any contracts, conveyances or other instruments that the Board considers necessary or desirable for the Company's operations or the implementation of the Board's powers under this Agreement;

(vi)    the selection and dismissal of (1) employees, contractors and agents of the Company, and (2) outside attorneys, accountants and other advisors to the Board or the Company and the determination of their compensation and other terms of employment or hiring;

(vii)   the maintenance of insurance for the benefit of the Company;

(viii)  the formation of or acquisition of an interest in and the contribution of property to any limited or general partnership, limited liability companies, joint ventures or other relationships;

(ix)    the control of any matters affecting the rights and obligations of the Company, including the conduct of litigation, incurring of legal expense and settlement of claims and litigation and the indemnification of any Person against liabilities and contingencies to the extent permitted by Law;

(x)     the undertaking of any action in connection with the Company's direct or indirect investment in any other Person (including the contribution or loan of funds by the Company to such Persons);

(xi)    the issuance of Common Units from the Incentive Pool or the grant of Options exercisable for Common Units to be issued from the Incentive Pool; and

(xii)   the establishment and maintenance of working capital reserves in such amounts as the Board, in its sole and absolute discretion, deems appropriate and reasonable from time to time.

(c)     Subject to the provisions contained elsewhere herein (including Section 5.1(d)), the Members agree that the Board is authorized to execute, deliver and perform (including through delegation to the Officers) the above-mentioned agreements and transactions on behalf of the Company without any further act, approval or vote of the Members.  Notwithstanding anything in this Agreement to the contrary, no Manager, acting individually, has authority to act on behalf of, or otherwise bind, the Company without the Board first taking proper action on such matter.

(d)     **Preferred Units Protective Provisions**.  Notwithstanding anything to the contrary contained herein, at any time when any Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Preferred Units, voting together as a single class:

39

EXHIBIT 1
Page 43 of 108

(i) authorize or effect the acquisition of any material assets outside the ordinary course of business;

(ii) license, lease, sell, assign, transfer, abandon or otherwise dispose of any material assets or properties outside the ordinary course of business;

(iii) (A) make any loans or advances to or investments in another Person (other than (x) advances to employees for the payment of expenses incurred in the ordinary course of business and (y) advances to Indemnified Persons pursuant to Section 7.5), or (B) form a joint venture or similar relationship with another Person;

(iv) (A) incur, or authorize the incurrence of, any indebtedness or issue, or authorize the issuance of, any debt security, or (B) guarantee, directly or indirectly, any indebtedness or any debt security, if the aggregate outstanding indebtedness of the Company and its Subsidiaries for borrowed money following such action would exceed $10,000,000;

(v) grant or allow any lien on any of its properties or assets (except (A) liens for Taxes not yet due or payable, (B) liens that arise in the ordinary course of business and do not materially impair its ownership or use of such property or asset, and (C) liens that arise in connection with indebtedness incurred in accordance with Section 5.01(d)(iv));

(vi) effect any Distribution other than pursuant to Section 4.1(b);

(vii) declare, set aside, pay or make any other distribution in respect of any Units, or make any direct or indirect redemption, purchase or other acquisition of any Units (other than pursuant to redemptions or repurchases made in accordance with Article IX or pursuant to any redemption or repurchase right of the Company pursuant to an Equity Agreement);

(viii) create or issue or obligate itself to issue any Equity Securities other than issuances of Common Units from the Incentive Pool or grants of Options exercisable for Common Units to be issued from the Incentive Pool;

(ix) amend any of the rights and privileges of the Preferred Units;

(x) enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Preferred Units;

(xi) create any new plan or arrangement for the granting of Equity Securities or increase the number of Equity Securities authorized for issuance under any such existing plan or arrangement;

(xii) effect or consent to any Liquidity Event;

(xiii) enter into, amend in any material respects, or terminate or waive material rights under, any contract, agreement, arrangement, binding understanding

or commitment providing for, or that would result in, payments at any time by or to any Company Party in excess of $1,000,000 in the aggregate thereunder and that is not expressly permitted under, or contemplated by, this Agreement or an annual operating budget approved by the Board and delivered to the Preferred Members pursuant to Section 8.6;

(xiv)    amend any provision of this Agreement;

(xv)    change the size of the Board;

(xvi)    authorize or effect (A) any acquisition of the business of another Person (whether by purchase of stock or assets or otherwise) or (B) any merger or consolidation into or with another Person;

(xvii)    change any salaries or other compensation of, or pay any bonuses (including any incentive compensation, sale bonus, success, retention, change of control, severance or other payment) to, the Chief Executive Officer of the Company or any of the managers or directors of any Company Party;

(xviii)    enter into or otherwise amend, modify, or supplement the terms of any employment or similar agreement of the Chief Executive Officer of the Company, or hire or terminate the employment of the Chief Executive Officer of the Company;

(xix)    materially change the strategic direction or the lines of business of any Company Party;

(xx)    enter into any transaction with any manager, director, officer or beneficial owner of five percent or more of any type, class or series of equity securities of any Company Party or Holdings;

(xxi)    file any petition seeking relief, or consenting to the institution of any proceeding to adjudicate any Company Party as bankrupt or insolvent, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors;

(xxii)    enter into or amend any agreement for the provision of indemnification rights to any Manager;

(xxiii)    make any change in any Tax election, change in any annual accounting period, adoption or change in any method of accounting, filing of any amended Tax return, entrance into any closing agreement, settlement of any claim or assessment, surrender of any right to claim a refund, offset or other reduction in liability, consent to any extension or waiver of the limitations period applicable to any claim or assessment, or taking or omitting to take any other action that has had or will have the effect of increasing the present or future Tax liability or decreasing any present or future Tax benefit of any Company Party or any Member (except such actions that have not had and would not reasonably be expected to result in a negative impact on the Company of more than $100,000 in the aggregate);

41

**EXHIBIT 1**
**Page 45 of 108**

(xxiv)  engage or otherwise utilize the services of any auditor or accounting firm other than Deloitte Touche, Ernst & Young, KPMG or PricewaterhouseCoopers; or

(xxv)  enter into an agreement to take any of the actions set forth in this <u>Section 5.1(d)</u>.

(e)  **<u>Series A Preferred Units Protective Provisions.</u>**  Notwithstanding anything to the contrary contained herein, at any time when any Series A Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A Preferred Units:

(i)  amend any of the rights and privileges of the Series A Preferred Units; or

(ii)  enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A Preferred Units.

(f)  **<u>Series A-1 Preferred Units Protective Provisions.</u>**  Notwithstanding anything to the contrary contained herein, at any time when any Series A-1 Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A-1 Preferred Units:

(i)  amend any of the rights and privileges of the Series A-1 Preferred Units; or

(ii)  enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A-1 Preferred Units.

(g)  **<u>Series A-2 Preferred Units Protective Provisions.</u>**  Notwithstanding anything to the contrary contained herein, at any time when any Series A-2 Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A-2 Preferred Units:

(i)  amend any of the rights and privileges of the Series A-2 Preferred Units; or

(ii)  enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A-2 Preferred Units.

**EXHIBIT 1**
**Page 46 of 108**

(h) **Series A-3 Preferred Units Protective Provisions.** Notwithstanding anything to the contrary contained herein, at any time when any Series A-3 Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A-3 Preferred Units:

(i) amend any of the rights and privileges of the Series A-3 Preferred Units; or

(ii) enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A-3 Preferred Units.

(i) **Series A-4 Preferred Units Protective Provisions.** Notwithstanding anything to the contrary contained herein, at any time when any Series A-4 Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A-4 Preferred Units:

(i) amend any of the rights and privileges of the Series A-4 Preferred Units; or

(ii) enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A-4 Preferred Units.

(j) **Series A-5 Preferred Units Protective Provisions.** Notwithstanding anything to the contrary contained herein, at any time when any Series A-5 Preferred Units are outstanding, the Company shall not, and shall not permit any other Company Party to, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by this Agreement) the written consent or affirmative vote of the holders of at least a majority of the then-outstanding Series A-5 Preferred Units:

(i) amend any of the rights and privileges of the Series A-5 Preferred Units; or

(ii) enter into any agreement that would materially limit the Company's ability to perform its obligations in respect of Series A-5 Preferred Units.

5.2 **The Board of Managers**.

(a) **Number.** The number of Managers comprising the Board shall be up to seven.

(b) **Designation.** The Managers shall consist of the Persons described below:

**EXHIBIT 1**
**Page 47 of 108**

(i)     Fluor, so long as it is the owner of at least 20% of the outstanding Preferred Units, shall be entitled to designate one Manager to the Board (the "Fluor Manager").  The Fluor Manager as of the Effective Date shall be Al Collins.

(ii)    So long as Fluor is the owner of at least 20% of the outstanding Preferred Units, the holders of a majority of the Preferred Units shall be entitled to designate a total of three Managers to the Board and, if Fluor does not own at least 20% of the outstanding Preferred Units, the holders of a majority of the Preferred Units shall be entitled to designate a total of four Managers to the Board (the "Preferred Managers").  The Preferred Managers as of the Effective Date shall be Alan Boeckmann and Chris Panichi and one Preferred Manager position will be vacant as of the Effective Date.

(iii)   The holders of a majority of the Common Units and Preferred Units, voting together as a single class (on an As-Converted Basis), shall be entitled to designate two Managers to the Board (the "At Large Managers").  One At Large Manager as of the Effective Date shall be Kent Kresa and one At Large Manager position will be vacant as of the Effective Date.

(iv)    The Company's Chief Executive Officer shall be a Manager of the Board (the "CEO Manager").  The CEO Manager as of the Effective Date shall be John Hopkins.

(c)     **Chairman of the Board**.  The Board may appoint one of the Managers as a Chairman of the Board.

(d)     **Term**.  Each Manager shall serve until a successor is designated in accordance with the terms hereof or his or her earlier resignation, death or removal.  An individual shall become a Manager effective upon receipt by the Company of a written notice (or at such later time or upon the happening of some other event specified in such notice) of such individual's designation by the Members entitled to designate such Manager pursuant to Section 5.2(b) or, in the case of the CEO Manager, upon such time as specified in Section 5.2(f); provided that the individuals identified in Section 5.2(b) by name shall continue as Managers effective upon the Effective Date.  A Manager may resign at any time by delivering written notice to the Company.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

(e)     **Removal and Replacement of Fluor, Preferred and At Large Managers**.  The removal (with or without cause) from the Board and each committee thereof, if applicable, of any Fluor Manager, Preferred Manager or At Large Manager shall be only upon the written notice to the Board, as the case may be, by the Members entitled to designate such Manager pursuant to Section 5.2(b). In the event that any Fluor Manager, Preferred Manager or At Larger Member designated pursuant to this Section 5.2 for any reason ceases to serve as a Manager during his or her term of office, the resulting vacancy shall be filled by written notice to the Board, as the case may be, by the Members entitled to designate such Manager pursuant to Section 5.2(b).  If any Members fail to designate a

44

**EXHIBIT 1**
**Page 48 of 108**

Manager pursuant to the terms of <u>Section 5.2(b)</u>, such position on the Board shall remain vacant until such Members exercise their right to designate a Manager as provided hereunder.

(f)    **Removal and Replacement of CEO Manager**.  The CEO Manager shall not be removed from the Board unless and until the CEO Manager ceases to be the chief executive officer of the Company.  If the CEO Manager ceases to be the chief executive officer of the Company, such CEO Manager shall be removed automatically from the Board and each committee thereof upon such cessation (without any action on the part of the CEO Manager, the Board, such committees or any Member) and such Person's replacement as chief executive officer of the Company shall automatically become the new CEO Manager.

(g)    **Regular Meetings**.  Regular meetings of the Board shall be held at least once every Fiscal Quarter at such dates, times and places as the Board shall from time to time determine.  Notices of such regular meetings shall not be required.  Meetings of the Board shall be presided over by the Chairman of the Board or, if absent, a chair chosen at the meeting.  The Secretary of the Company shall act as secretary of the meeting, but in his or her absence the chair of the meeting may appoint any Person to act as secretary of the meeting.

(h)    **Special Meetings**.  Special meetings of the Board may be called at any time by any Manager or the Chief Executive Officer upon at least 24 hours' written notice given to each Manager.  Any such notice need not state the purpose of such meeting except as may otherwise be required by Law.  Notice of a special meeting may be waived (i) in writing by a Manager or (ii) by a Manager attending such meeting, in each case with respect to such Manager.  Each special meeting shall be held at such date, time and place as shall be fixed by the Manager or Chief Executive Officer calling the meeting.

(i)    **Telephonic Meetings Permitted**.  Managers may participate in a meeting of the Board, or any committee thereof, by means of conference telephone or similar communication equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute presence in person at such meeting.

(j)    **Minimum Board Size; Quorum; Vote Required for Action**.  At all meetings of the Board, a quorum for the transaction of business shall consist of a majority of the then-named Managers, at least two of which shall be Preferred Managers.  If a quorum shall not be present at any such meeting, then the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Provided that a quorum is constituted in accordance with the terms of this Agreement, the affirmative vote of the Managers comprising a majority of the Managers then serving on the Board shall be the act of the Board, unless this Agreement specifically calls for another required vote of the Managers in which case the affirmative vote of the required Managers shall be the act of the Board.  On all actions to be taken and matters to be decided by the Board, each Manager shall be entitled to one vote.

45

EXHIBIT 1
Page 49 of 108

(k)      **Action in Lieu of a Meeting**.  Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if the Managers unanimously consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of the Board.

(l)      **Committees**.  The Board may designate one or more committees, each such committee to consist of one or more Managers and each to have such lawfully delegable powers and duties as the Board may confer.  Each such committee shall serve at the pleasure of the Board or as may be specified in any resolution from time to time adopted by the Board.  The Board may designate one or more Managers as alternate members of any such committee, who may replace any absent or disqualified Manager at any meeting of such committee.  Except as otherwise provided by Law, any such committee, to the extent delegated by the Board, shall have and may exercise all the powers and authority of the Board to manage and conduct the business of the Company.  Any committee or committees so designated by the Board shall have the name or names as may be determined from time to time by resolution adopted by the Board.  Unless otherwise prescribed by the Board, a majority of the members of any committee of the Board shall constitute a quorum for the transaction of business, and the act of a majority of the members present at a meeting at which there is a quorum shall be the act of that committee.  Each committee shall prescribe its own rules for calling and holding meetings and its method of procedure, subject to any rules prescribed by the Board, and shall keep a written record of all actions taken by it.

(m)      **Compensation and Reimbursement**.  Managers who are not employees of any Company Party or Holdings may receive such reasonable compensation for serving in such capacity as is approved by the Board.  The Company shall pay, or shall cause one of its Subsidiaries to pay, the reasonable out-of-pocket costs and expenses incurred by each Manager in the course of his or her service hereunder, including in connection with attending regular and special meetings of the Board, any board of directors or board of managers of each of the other Company Parties or Holdings and/or any of their respective committees.

(n)      **Delegation of Authority**.  The Board may, from time to time, delegate to one or more Persons (including to any Member or Officer) such authority and duties as the Board may deem advisable.  Any delegation pursuant to this <u>Section 5.2</u> may be revoked at any time by the Board.

(o)      **D&O Insurance**.  The Company shall at all times maintain director's and officer's liability insurance policies for the benefit of the Managers, which policies shall contain customary provisions as those generally maintained by companies similarly situated to the Company and engaged in the same business as the Company Parties and as otherwise approved by the Board.

(p)      **Subsidiary Boards**.  The board of directors, board of managers or similar governing body of each Subsidiary of the Company shall have the same members thereof that constitute the Board except to the extent reasonably necessary to comply with applicable Law.

46

**EXHIBIT 1**
**Page 50 of 108**

(q)  **Expenses**. The Company shall pay for any and all expenses, costs and liabilities incurred in the conduct of the business of the Company and its Subsidiaries in accordance with the provisions hereof (collectively, "Company Expenses"), including all routine administrative and overhead expenses of the Company, including fees of auditors, attorneys and other professionals, expenses incurred by the Tax Matters Member and expenses associated with the maintenance of books and records of the Company and communications with Members and the preparation of Schedule K-1s for the Members and any direct or indirect partner or member of any Member (and any related fees and expenses of tax professionals incurred in connection therewith). If the Board shall determine that funds are necessary to pay any Company Expense, then the Company may borrow funds from any Person, including any Member, for the purpose of paying such Company Expense, subject to compliance with Section 3.5 and Section 5.1(d).

5.3  **Officers**.

(a)  **Appointment of Officers and Term of Office**. The day-to-day operation and control of the Company shall be overseen and implemented by such officers of the Company as determined by the Board (each, an "Officer" and collectively, the "Officers"), which Officers may include a Chief Executive Officer, President, Treasurer, Secretary, one or more Vice Presidents and such other Officers as the Board may from time to time determine. Each Officer, subject to the terms of any written agreement between the Company and such Officer, shall hold office until a successor shall have been duly appointed or until such Officer's death, resignation or removal in the manner provided hereinafter. An Officer may, but need not be, a resident of the State of Oregon, a Manager or a Member. Any one Person may hold more than one office. The authority and responsibility of the Officers shall include the carrying out of the Company's business and affairs on a day-to-day basis and such other duties as the Board may, from time to time, delegate to them. Unless the Board otherwise decides, if the title of an Officer is one commonly used for officers of a business corporation formed under the OBCA, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office. The Officers as of the Effective Date are set forth on Schedule C hereto.

(b)  **Resignation; Removal; Vacancies**. Any Officer (subject to any contract rights available to the Company, if applicable, including any employment agreement between the Company and an Officer) may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause, by the Board in its discretion at any time; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed. Designation of an Officer shall not of itself create contract or employment rights. Any vacancy occurring in any office of the Company may be filled by the Board and shall remain vacant until filled by the Board.

(c)  **Salaries**. The salaries or other compensation, if any, of the Officers shall, subject to (i) the terms of any written agreement between the Company and such applicable

<div align="center">47</div>

**EXHIBIT 1**
**Page 51 of 108**

Officer, and (ii) Section 5.1(d), be fixed from time to time by or at the direction of the Board.

5.4    **Limitation of Liability**.

(a)    **Exculpation**.  Except as otherwise provided herein or in any agreement entered into by such Person and the Company, to the fullest extent permitted by applicable Law, after taking into account the limitations set forth in Section 63.160 of the Act (the applicability of which shall be determined by a final, non-appealable Order), no present or former Manager or Officer nor any such Manager's or Officer's Affiliates, employers, employees, agents or representatives shall be liable to any Company Party or to any Member for any act or omission performed or omitted by such Person in his or her capacity as a Manager or Officer (or as a manager, director or officer of any Company Party or Holdings).

(b)    **Reliance**.  Each Manager is entitled to rely on information, opinions, reports or statements including financial statements and other financial data, prepared or presented by (i) one or more Officers or employees of the Company whom such Manager reasonably believes to be reliable and competent in the matters presented, (ii) legal counsel, public accountants or other persons as to matters such Manager reasonably believes are within such Person's professional or expert competence, or (iii) a committee of the Board of which such Manager is not a member if such Manager reasonably believes such committee merits confidence; and any act of or failure to act by such Manager in good faith reliance on such advice shall in no event subject such Manager to liability to any Company Party or any Member.  Each Officer is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by (i) one or more other Officers or employees of the Company whom such Officer reasonably believes to be reliable and competent in the matters presented or (ii) legal counsel, public accountants or other persons as to matters such Officer reasonably believes are within such Person's professional or expert competence; and any act of or failure to act by such Officer in good faith reliance on such advice shall in no event subject such Officer to liability to any Company Party or any Member.

(c)    **Good Faith and Other Standards**.  Whenever in this Agreement or any other agreement contemplated herein, the Board or an Officer is permitted or required to take any action or to make a decision or determination in its "good faith" or under another express standard, each Manager or such Officer shall act in good faith or under such express standard and, to the extent permitted by applicable Law, shall not be subject to any other or different standards, and, notwithstanding anything contained herein to the contrary, so long as such Manager or Officer acts in good faith and in accordance with such other express standard, if any, the resolution, action or terms so made, taken or provided by the Board or by such Officer shall not impose liability upon such Manager or Officer or any of such Manager's or Officer's Affiliates, employers, employees, agents or representatives. Whenever in this Agreement or any other agreement contemplated herein, the Board or an Officer is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, each Manager or such Officer shall act in good faith but shall be entitled to consider other such interests

48

EXHIBIT 1
Page 52 of 108

and factors as he or she desires, including his or her own, and shall, to the fullest extent permitted by applicable Law, not be required to give any consideration to any interests or factors affecting any Member.

(d)    **Limitation of Duties; Conflict of Interest**.

(i)    Except as otherwise specifically set forth in <u>Section 2.9(a)</u>, to the fullest extent permitted by applicable Law, no Manager or Officer shall be obligated to recommend or take any action in his or her capacity as a Manager or Officer that prefers the interests of the Company Parties or Holdings or their respective members or shareholders over the interests of such Person or its Affiliates, employers, employees, agents or representatives.

(ii)    To the fullest extent permitted by applicable Law, an act or transaction that otherwise would violate the duty of loyalty by a Manager or Officer may be authorized or ratified, after full disclosure of all material facts, by either (A) affirmative approval of a majority of the disinterested Managers or (B) affirmative approval by Members, whether interested or disinterested, holding a majority of the Preferred Units and Common Units, voting together as a single class (on an As-Converted Basis).

(e)    **Effect on Agreements**.    This <u>Section 5.4</u> shall not in any way affect, limit or modify any Person's liabilities, obligations, duties or responsibilities under any Equity Agreement or other separate agreement with any of the Company Parties.

(f)    **Holdings**.    For clarity, and notwithstanding anything herein to the contrary, nothing in this <u>Section 5.4</u> shall limit or eliminate the liability, or any fiduciary or other duty, of a director or officer of Holdings to the shareholders of Holdings under the OBCA or other applicable Law; the articles of incorporation, bylaws or other governing documents of Holdings; or any contract to which Holdings, its directors or its officers are a party or by which any of them are bound.

## ARTICLE VI

## RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND MEMBERS

6.1    **Duties; Limitation of Liability**.    No Member shall owe any duty to the Company or the other Members solely by reason of being a Member.  Except as otherwise provided by this Agreement or the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.  Except as otherwise provided in this Agreement, a Member's liability (in its capacity as such) for debts, liabilities and obligations of the Company shall be such Member's share of the Company's assets; <u>provided</u> that a Member shall be required to return to the Company any distribution made to it in clear and manifest accounting or similar error.

**EXHIBIT 1**
**Page 53 of 108**

6.2 **Lack of Authority**. No Member in its capacity as such has the authority or power to act for or on behalf of the Company in any manner or way, to bind the Company, or do any act that would be (or could be construed as) binding on the Company, in any manner or way, or to make any expenditures on behalf of the Company, unless such specific authority and power has been expressly granted to such Member, and not revoked, by the Board, and the Members hereby consent to the exercise by the Board of the powers conferred on it by Law and this Agreement.

6.3 **No Right of Partition**. No Member shall have the right to seek or obtain partition by court decree or operation of Law any property or assets of the Company, or the right to own or use particular or individual assets of the Company. Each of the Members irrevocably waives any right that it may have to maintain any action for partition with respect to any property or assets of the Company.

6.4 **Voting and Written Consents**. The Members shall have no right to vote or consent to any matter, except as specifically set forth in this Agreement, or as may otherwise be required under the Act. Any such vote or consent shall be at a meeting of the Members entitled to vote or in writing as provided herein. The affirmative vote of the Members holding a majority of the votes of the Units entitled to vote thereon (the "Required Interest") at a meeting of Members at which a quorum is present shall be the act of the Members. A meeting of the Members may be called by the Board or by Members holding the Required Interest on at least five days' prior written notice to all other Members entitled to vote, which notice shall state the purpose or purposes for which such meeting is called. A quorum shall be present at a meeting of Members if Members holding the Required Interest are represented at the meeting in person or by proxy. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum number of votes of the Preferred Units and Common Units, voting together as a single class, that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the action so taken without a meeting shall be given to those Members entitled to vote or consent who have not consented in writing. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof.

6.5 **Confidentiality**. Each Member recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company Parties (including their predecessors), including confidential information of the Company Parties (and their predecessors) regarding identifiable, specific and discrete business opportunities being pursued by the Company Parties (the "Confidential Information"). Except as otherwise consented to by the Board in writing, each Member (on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency Law, its managers, directors, officers, shareholders, partners, members, employees, representatives and agents) agrees that, during the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, it (a) will use the same degree of care as it uses to protect its own confidential information to keep confidential any Confidential Information furnished to such Member; (b) will not intentionally use any of the Confidential Information for any purpose other than monitoring its investment in the Company; and (c) will not disclose such Confidential Information to any third party for any reason or purpose whatsoever, except that each

50

**EXHIBIT 1**
**Page 54 of 108**

Member may disclose such information (i) to authorized managers, directors, officers, employees, representatives and agents of any Company Party and as otherwise may be proper in the course of performing such Member's obligations or enforcing its rights under this Agreement and the agreements expressly contemplated hereby; (ii) to such Member's (or any of its Affiliates') Affiliates, auditors, accountants, attorneys or other agents who are informed of the Member's obligations hereunder; (iii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, provided that such purchaser or merger partner agrees to be bound by the provisions of this Section 6.5 or other confidentiality agreement approved by the Board; or (iv) as is required to be disclosed by any Law or Order, by any Governmental Entity or stock exchange or by any listing or trading agreement concerning a Member or its Affiliates; provided that the Member required to make such disclosure pursuant to clause (iv) above shall provide to the Company prompt notice of such disclosure to enable the Company to seek an appropriate protective order or confidential treatment. It is acknowledged and agreed that a Member's review of Confidential Information will inevitably enhance its knowledge and understanding of the Company's industry in a way that cannot be separated from its other knowledge, and it shall not be a violation of Section 6.5(b) if such Member's overall knowledge and understanding are used for purposes other than monitoring its investment in the Company. For purposes of this Section 6.5, the term "Confidential Information" shall not include any information which (x) such Person learns from a source other than any Company Party, or any of their respective representatives, employees, agents or other service providers, and in each case who is not bound by a confidentiality obligation, (y) is disclosed in a prospectus, in other documents or in any other manner for dissemination to the public (in each case, not in violation of this Section 6.5), or (z) is independently developed by the disclosing Member without violating any requirement hereunder. Nothing in this Section 6.5 shall in any way limit or otherwise modify any confidentiality covenants entered into by any Member pursuant to any other agreement entered into with any Company Party.

6.6    **Restricted Business**.  Until the Investment Restriction Termination Date, without the consent of the Company, following unanimous approval of the Board, no Restricted Member shall make any cash investment in or loan any cash to, or acquire for cash or services from any Person any equity interest in or indebtedness (other than accounts payable arising in the ordinary course of business) of, a Restricted Business Entity; provided, however, that nothing in this Section 6.6 shall prevent a Restricted Member from (a) acquiring up to 2% of any class of securities of any Person if such securities are listed on a national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act or (b) investing in or loaning to, or acquiring from any Person any equity interest in or indebtedness of, the Company. For the avoidance of doubt, nothing in this Section 6.6 or any other provision of this Agreement shall prevent any Member from providing engineering, procurement or construction services or any other services to any Person, including any Restricted Business Entity. For purposes of this Section 6.6: (i) "Investment Restriction Termination Date" means the earlier to occur of (A) the date on which the Patent License Agreement, effective November 18, 2007, as amended September 30, 2011 (the "PLA"), between the Company and OSU, is terminated, (B) the date on which OSU notifies the Company in writing that the Company is not fulfilling its obligations to use commercially reasonable efforts to actively pursue on an ongoing basis the development and commercialization of, including pursuit of all necessary regulatory licensing for, the Licensed Products (as defined in the PLA), (C) the date on which the Company ceases to use commercially

51

**EXHIBIT 1**
**Page 55 of 108**

reasonable efforts to actively pursue on an ongoing basis the development and commercialization of, including pursuit of all necessary regulatory licensing for, the Licensed Products (as defined in the PLA), and (D) the date on which a dissolution event contemplated by the second sentence of <u>Section 12.1</u> occurs; (ii) "<u>Restricted Member</u>" means any Member that itself owns sufficient Units to entitle it to designate a majority of the Board pursuant to <u>Section 5.2</u>, and (iii) "<u>Restricted Business Entity</u>" means any business entity a material business of which is the development and commercialization of small scale modular nuclear reactors that would compete with the small scale modular nuclear reactors being developed by the Company, as determined by the Board in its sole and reasonable discretion.

## ARTICLE VII

## INDEMNIFICATION

7.1    **Generally**.  Subject to <u>Sections 7.2</u> and <u>7.3</u>, the Company shall indemnify and hold harmless each Person (each an "<u>Indemnified Person</u>") to the fullest extent permitted or required by the Laws of the State of Oregon in effect on the date hereof or as such Laws may from time to time hereafter be amended to increase the scope of such permitted or required indemnification, against all expenses, liabilities and losses (including attorney fees, judgments, fines, excise Taxes, amounts paid in settlement, interest and penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was serving as a Manager or Officer, or is or was serving at the request of the Company as a manager, director, officer, shareholder, partner, member, employee, representative or agent of a Subsidiary, Holdings or any other corporation, partnership, joint venture, limited liability company, trust or other enterprise.

7.2    **Standard of Conduct**.  No Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to actions or omissions by an Indemnified Person, in his or her capacity as a Manager or manager, director, officer, employee, representative or agent, to the extent the act or omission violates ORS 63.160(1)-(4), as determined by a final non-appealable Order.

7.3    **Certain Proceedings**.  Unless the Board otherwise determines, no Person shall be entitled to indemnification hereunder with respect to a proceeding initiated by such Person or with respect to a proceeding between such Person, on the one hand, and any Company Party, on the other, unless such proceeding is to enforce the indemnification provisions of this <u>Article VII</u>.

7.4    **No Adverse Presumption**.  The termination of any proceeding by Order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not meet the applicable standard of conduct required for indemnification hereunder.

7.5    **Advances**.  The Company shall, or shall cause any of its Subsidiaries to, pay expenses, including attorneys' fees and expenses, incurred by any such Indemnified Person in defending a proceeding (but not a proceeding initiated by such Indemnified Person, other than a proceeding to enforce such Indemnified Person's rights under this <u>Article VII</u>) in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an

52

**EXHIBIT 1**
**Page 56 of 108**

undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

7.6    **Contribution**.  If for any reason (other than pursuant to Section 7.2) the foregoing indemnification is unavailable to an Indemnified Person, or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Person as a result of such expenses, liabilities and losses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and such Person, on the other hand, or, if such allocation is not permitted by applicable Law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

7.7    **Nonexclusivity of Rights**.  The right to indemnification and the advancement of expenses conferred in this Article VII shall not be exclusive of any other right which any Person may have or hereafter acquire under any agreement or vote of the Board.

7.8    **Insurance**.  The Company may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in Article VII whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Article VII.

7.9    **Limitation**.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Article VII shall be provided out of and to the extent of the Company's assets only, and no Member (unless such Member otherwise agrees in writing or is found in a final non-appealable Order to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

7.10    **Savings Clause**.  If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person (i) to the fullest extent permitted by any applicable portion of this Article VII that shall not have been invalidated and (ii) to the fullest extent permitted by applicable Law.

7.11    **Survival**.  No amendment to this Article VII or any other provision of this Agreement shall eliminate or reduce the effect of this Article VII in respect of any acts or omissions occurring prior to such amendment.

## ARTICLE VIII

## BOOK AND RECORDS

8.1    **Books, Records and Company Affairs**.  The books and records of the Company shall be kept at the principal office of the Company or at such other place, within or without the State of Oregon, as the Board shall reasonably determine from time to time.  All books and records of the Company required to be maintained under Section 63.771 of the Act, as well as complete and accurate information regarding the Company's business and financial condition and other information regarding the affairs of the Company as is just and reasonable, shall be made available upon reasonable demand by any Preferred Member for any purpose reasonably related to such

53

**EXHIBIT 1**
**Page 57 of 108**

Member's interest as a Member, during ordinary business hours, for inspection and copying at the expense of such Member, and any such Member shall be entitled to discuss the Company's affairs, finances, and accounts with the Officers and Managers and the employees and accountants of the Company, at any time during business hours upon reasonable advance notice; provided, however, that such discussions shall be conducted at times and in a manner that does not unreasonably interfere with the operation of the Company's business.

8.2    **Determination by Board**.  All matters concerning (a) the determination of the relative amount of allocations and Distributions among the Members pursuant to Articles III and IV and (b) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board (or Persons to whom such authority is delegated), whose determination shall be final and conclusive as to all of the Members absent manifest clerical error.

8.3    **Fiscal Year**.  The fiscal year of the Company shall begin on the first day of January and end on the last day of December each year or such other annual accounting period as may be established by the Board ("Fiscal Year").

8.4    **Deposits**.  All funds of the Company shall be deposited in an account or accounts in such banks, trust companies or other depositories as the Chief Executive Officer or Chief Financial Officer may reasonably select or approve.

8.5    **Agreements, Consents, Checks, Etc**.  All agreements, consents, checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness, issued in the name of the Company shall be signed by a duly authorized Officer.

8.6    **Financial Records**.  All financial records shall be maintained and reported using GAAP.  The Company shall deliver to the Members holding Preferred Units:

(a)    as soon as practicable, but in any event within six months after the end of each Fiscal Year, (i) a balance sheet as of the end of such year, (ii) statements of income and of cash flows for such year, and (iii) a statement of Members' equity as of the end of such year, all such financial statements audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(b)    as soon as practicable, but in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, unaudited statements of income and of cash flows for such Fiscal Quarter, and an unaudited balance sheet and a statement of Members' equity as of the end of such Fiscal Quarter, all prepared in accordance with GAAP (except that the financial report may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(c)    as soon as practicable, but in any event 30 after the end of each Fiscal Year, a capital budget, operating budget and a business plan for the current Fiscal Year, prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months and, promptly after prepared, any other budgets or revised budgets prepared by the Company;

54

**EXHIBIT 1**
**Page 58 of 108**

(d)      with respect to the financial statements called for in <u>Section 8.6(a)</u> and <u>(b)</u>, an instrument executed by the Chief Financial Officer of the Company certifying that such financial statements were prepared in accordance with GAAP consistently applied with prior practice for earlier periods (except as otherwise set forth in <u>Section 8.6(b)</u>) and fairly present in all material respects the financial condition of the Company and its results of operation for the periods specified therein; and

(e)      such other information relating to the financial condition, business, prospects, or corporate affairs of the Company as any Member holding Preferred Units may from time to time reasonably request; <u>provided</u>, <u>however</u>, that the Company shall not be obligated under this <u>Section 8.6</u> to provide information the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

If, for any period, the Company has any Subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated Subsidiaries.

## ARTICLE IX

## TRANSFER OF UNITS

9.1      <u>**Restrictions on Transfers**</u>.

(a)      Holdings may not Transfer any interest in any Units (including to any other Member, or by gift, by operation of Law or otherwise), except that Holdings may Transfer its Units pursuant to <u>Section 9.2</u> ("<u>Right of First Refusal</u>"), <u>Section 9.3</u> ("<u>Tag-Along Rights</u>") or <u>Section 9.4(b)</u> and <u>(c)</u>.  A Transfer made pursuant to <u>Section 9.4(b)</u> and <u>(c)</u> is an "<u>Exempt Transfer</u>."

(b)      No Member shall Transfer any interest in Units to any Competitor without first obtaining the prior written consent of the Board, which consent may be granted or withheld in the Board's sole discretion.

(c)      No Transfer of Units may be made to any Transferee unless (i) in the event such Transferee is a Competitor, the prior written approval of the Board, which approval may be granted or withheld in the Board's sole discretion, with respect to such Transfer has been obtained, (ii) such Member proposing or making such Transfer shall have provided the Company with written notice of such proposed Transfer at least 15 days prior to consummating such Transfer stating the name and address of the Transferee, (iii) such Transferee shall have agreed in writing that such Transferee, as the assignee of a Member, accepts and agrees to be bound by all terms and conditions set forth herein and shall enter into such other documents, instruments and agreements to effect such Transfer as are required by the Board, (iv) if requested by the Company, such Member shall have provided the Company with an opinion of counsel or other evidence, satisfactory in form and substance to the Board, that such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability

55

**EXHIBIT 1**
**Page 59 of 108**

standards) applicable to the Company or the Units to be Transferred and (v) if requested by the Company, such Member shall have provided the Company with an opinion of counsel or other evidence, satisfactory in form and substance to the Board, that such Transfer would not cause the Company to fail to be in compliance with all U.S. Laws regarding foreign ownership and export control. Upon a Transfer of all of a Member's Units to a Transferee in compliance with the provisions of this Agreement and the admission of the Transferee thereof as a Substituted Member, the transferring Member shall cease to be a Member hereunder.

(d)    Notwithstanding anything to the contrary contained herein, no Member shall Transfer any portion of its Units at any time if such action would (i) cause the Company to be treated as an association taxable as a corporation for United States Federal income tax purposes, (ii) result in the termination of the Company for United States Federal income tax purposes, or (iii) cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704.

9.2    **Right of First Refusal**.

(a)    **Offer.**    At least 45 days prior to any proposed Transfer of Units by Holdings, other than pursuant to an Exempt Transfer, Holdings (the "Transferring Member") shall deliver a written notice (the "Offer Notice") to the Company and each Preferred Member (each an "Eligible Member"), specifying in reasonable detail the identity of the potential Transferee(s), the number and type, class or series of Units to be Transferred (the "Offered Units") and the price and other terms and conditions of the proposed Transfer; provided, that such proposed Transfer may be only for cash consideration. The Transferring Member shall not consummate such proposed Transfer until at least 45 days after the date of delivery of the Offer Notice, unless the parties to the Transfer have been finally determined pursuant to this Section 9.2 prior to the expiration of such 45-day period (the date of the first to occur of (i) the expiration of such 45-day period after delivery of the Offer Notice or (ii) such final determination is referred to herein as the "Authorization Date").

(b)    **Company Election.** The Company may elect to purchase all or any portion of the Offered Units at the price and on the other terms set forth in the Offer Notice, by delivering written notice of such election to the Transferring Member and each Eligible Member within 15 days of delivery of the Offer Notice.

(c)    **Member Election.**    If the Company does not elect to purchase all of the Offered Units, it shall so notify in writing the Eligible Members within 5 days after its election not to purchase pursuant to Section 9.2(b) or the expiration after the 15-day period in Section 9.2(b), whichever is sooner (the "Secondary Notice"), and thereafter each Eligible Member may elect to purchase up to such Eligible Member's Preferred Pro Rata Interest of the Offered Units at the price and on the other terms set forth in the Offer Notice, by delivering written notice of such election to the Transferring Member and the Company within ten days after delivery of the Secondary Notice. Any Offered Units not elected to be purchased by the end of such ten-day period shall during the immediately following ten-day period be reoffered by the Transferring Member to the Eligible Members who have

56

**EXHIBIT 1**
**Page 60 of 108**

elected to purchase in full their Preferred Pro Rata Interest of the Offered Units and, if such Eligible Members collectively indicate interest within such ten-day period in acquiring additional Offered Units in an amount in excess of the aggregate amount of Offered Units remaining, such remaining Offered Units will be allocated among such Eligible Members pro rata in accordance with their respective Preferred Pro Rata Interest.

(d)    **Closing**.  With respect to the Offered Units which the Company and/or the Eligible Members have elected to purchase from the Transferring Members, such purchase shall be consummated as soon as practicable after the delivery of the election notice(s) to the Transferring Member, but in any event within 30 days after the Authorization Date. With respect to the Offered Units which the Company and/or the Eligible Members do not elect to purchase from the Transferring Member, subject to Section 9.3, the Transferring Member shall have the right, within 90 days following the Authorization Date, to Transfer such Offered Units to the potential Transferee(s) specified in the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per Unit specified in the Offer Notice and on other terms no more favorable to the potential Transferee(s) than those specified in the Offer Notice.  Any Offered Units not so Transferred within such 90-day period shall be reoffered to the Company and the holders of Preferred Units prior to any subsequent Transfer in accordance with this Section 9.2.

(e)    **Application**.  The provisions of this Section 9.2 shall cease to apply upon the closing of a Qualified Public Offering or a Liquidity Event.

9.3    **Tag-Along Rights**.

(a)    **Participation Right and Election**.  If any Offered Units subject to Section 9.2 are not purchased in full by the Company and/or Eligible Members and thereafter are to be sold to a Transferee (any such transaction, a "Tag Along Sale"), the Transferring Member shall so notify in writing the Company and each Eligible Member (the "Transfer Notice") and set forth in the Transfer Notice the number and type, class or series of Offered Units remaining to be Transferred by the Transferring Member in the Tag Along Sale. Each Eligible Member shall have the right for a period of 15 days after the Transfer Notice is given to participate in the Tag Along Sale on the same terms and conditions specified in the Offer Notice (provided that if an Eligible Member sells Preferred Units, the price set forth in the Offer Notice shall be appropriately adjusted based on the Equivalent Value) by delivering a written notice to the Transferring Member within such 15-day period (each Eligible Member electing to participate in the contemplated Tag Along Sale is referred to herein as an "Electing Member").

(b)    **Shares Includable**.  Each Electing Member shall be entitled to sell in the contemplated Tag Along Sale up to a number of Preferred Units and/or Common Units equal to the product of (x) the Equivalent Value of the Offered Units to be sold in the contemplated Tag Along Sale (excluding shares purchased by the Company or the Eligible Members pursuant to Section 9.2) multiplied by (y) a fraction, the numerator of which is the Equivalent Value of the Preferred Units and Common Units held by such Electing Member, and the denominator of which is the Equivalent Value of all of the outstanding Preferred Units and Common Units held by all of the Eligible Members and the

57

**EXHIBIT 1**
**Page 61 of 108**

Transferring Member; provided that each Electing Member shall be required to sell in such contemplated Tag Along Sale the same type, class or series of Units held by such Electing Member (and, to the extent applicable, that were issued to such Electing Member on the same date as the Offered Units of the Transferring Member to be sold in such Tag Along Sale), and in the same proportion as the Transferring Member, before selling any other type, class or series of Units or selling Units in a different proportion; provided further that no Electing Member shall be entitled to Transfer Unvested Units pursuant to this Section 9.3.  For purposes of this Section 9.3, the term "Equivalent Value" means (i) with respect to any Units of the same type, class or series of Units, as applicable, the price specified to be paid to the Transferring Member for such type, class or series of Units, and (ii) with respect to any other Units, the Pro Rata Share of such Units determined based upon the Total Equity Value implied by the aggregate price to be paid to the Transferring Member in the contemplated Tag Along Sale as determined in good faith by the Board.  To the extent one or more of the Electing Members exercise such right of participation in accordance with the terms and conditions set forth herein, the number of Offered Units that the Transferring Member may sell in the Tag Along Sale shall be correspondingly reduced. Any Electing Member may elect to sell in any Tag Along Sale a lesser number of Units (subject to the same conditions with respect to the type and proportion of Units to be Transferred as set forth in this Section 9.3) than such Electing Member is otherwise entitled to sell pursuant to this Section 9.3, in which case the Transferring Member shall have the right to sell an additional number of Units in such Transfer equal to the number that such Electing Member has elected not to sell.

(c)    **Participation Conditions.**  With respect to any contemplated Tag Along Sale, the Transferring Member shall use commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Electing Members in such contemplated Tag Along Sale, and the Transferring Member shall not Transfer any of its Offered Units to any prospective Transferee pursuant to such Tag Along Sale if such prospective Transferee(s) declines to allow the participation of the Electing Members, unless in connection with such Tag Along Sale, the Transferring Member purchases (at the same price per Unit (subject to adjustment for Equivalent Value) and on the same other terms and conditions on which such applicable type, class and/or series of Units were sold to the Transferee(s) in the applicable Tag Along Sale) the number and type, class and/or series of Units from each Electing Member which such Electing Member would have been entitled to sell in the Tag Along Sale pursuant to Section 9.3(a).  Each Electing Member Transferring Units pursuant to this Section 9.3 shall (i) agree to become party to the agreement between the Transferring Member and the potential Transferee, which agreement shall be in form and substance as agreed to by the Transferring Member and pursuant to which each Electing Member will make several and not joint representations and warranties customary for a transaction of that nature, including (A) title to and ownership of the Units to be Transferred by such Electing Member pursuant to such agreement (including its ability to convey title free and clear of liens, encumbrances or adverse claims and reasonable covenants regarding confidentiality, publicity and similar matters), and (B) authority to enter into such agreement, (ii) pay its pro rata share (based on and not to exceed the aggregate proceeds to be paid with respect to such Electing Member's Units) of the expenses incurred by the Electing Members and the Transferring Member in connection with such Transfer, and (iii) be obligated to join in its pro rata share

of any indemnification or other obligations that the Transferring Member agrees to provide in connection with such Transfer (including any escrow, holdback or other similar arrangement); provided, however, that such obligation shall not exceed the aggregate proceeds received by such Electing Member pursuant to such agreement.

(d)    **Authorized Period to Sell**.    Prior to the Authorization Date, the Transferring Member will not complete any sale of Offered Units to the potential Transferee pursuant to a contemplated Tag Along Sale.  Thereafter, for a period of 90 days, the Transferring Member may sell to the potential Transferee for the consideration stated and on the terms set forth in the Transfer Notice the Units stated in the Transfer Notice as subject to purchase by the potential Transferee unless any Electing Members have elected to participate in the contemplated Tag Along Sale, in which case the Transferring Member may only sell to the potential Transferee in the contemplated Tag Along Sale such Transferring Member's pro rata share of the Units after taking into account the number of Units the Electing Members are entitled to sell in the contemplated Tag Along Sale as determined pursuant to this Section 9.3; provided, that the potential Transferee or the Transferring Member, as the case may be, shall, simultaneously with the purchase of the Transferring Member's Units, purchase all such Units that the Electing Members have elected to sell in the contemplated Tag Along Sale pursuant to and in accordance with the terms of this Section 9.3.

(e)    **Application**.    The provisions of this Section 9.3 shall cease to apply upon the closing of a Qualified Public Offering or a Liquidity Event.

9.4    **Conversion to Corporate Form**.

(a)    **Conversion to Corporation**.    If, in connection with a Qualified Public Offering, or otherwise with the prior written consent of the holders of at least a majority of the Preferred Units, the Board proposes in good faith to cause the Company to convert to a domestic or foreign corporation in accordance with the Act and the OBCA or any other applicable Law, whether by conversion, incorporation, merger, contribution or other permissible manner (a "Corporate Conversion") (which they may accomplish, in their discretion, through one or more transactions or structures, which transactions or structures shall not result in immediate Federal income tax liability to any Member), they will notify the Members in advance (including at least 20 days prior notice of the effectiveness of a registration statement under the Securities Act with respect thereto) and the Members will cooperate with any reasonable and good faith request of the Board in connection with such Corporate Conversion and enter into any transaction required to effect such Corporate Conversion.

(b)    **Conversion of Units in a Qualified Public Offering**.    Upon such Corporate Conversion in connection with a Qualified Public Offering, each Unit will be converted into a number of shares of common stock of the successor corporation determined by dividing (i) the amount that would be distributed pursuant to Section 4.1(a) in respect of such Unit upon a Liquidity Event, assuming an amount of cash available to distribute equal to the aggregate value of all of the outstanding Units immediately prior to such offering, based on the price per share at which shares of common stock of the

59

EXHIBIT 1
Page 63 of 108

successor corporation are to be sold to the public in such offering (the "Per Share Offering Price"), by (ii) the Per Share Offering Price. If the foregoing determination is reasonably required to be made prior to the determination of the actual Per Share Offering Price, the mid-point of the underwriters proposed range of offering prices shall be used as the Per Share Offering Price.

(c)    **Conversion of Units other than in a Qualified Public Offering**. If a Corporate Conversion occurs hereunder which is not in connection with a Qualified Public Offering, the then outstanding Units will be converted into corporate stock having substantially the same terms and conditions as such Units, including with respect to relative seniority, dividend rights, voting and consent rights, economic interests and other rights and obligations to the extent currently applicable to the Units, with such changes as the Board determines reasonably and in good faith (with the prior written approval of the holders of at least a majority of the Preferred Units) to be appropriate to reflect the corporate form.

(d)    **Cooperation**. In connection with any such Corporate Conversion, the Members shall cooperate in good faith to effectuate such Corporate Conversion and, if applicable, public offering, including taking such actions as are necessary or appropriate to cause:

(i)    such resulting corporation and the holders of capital stock thereof to enter into a stockholders' agreement providing for such terms and conditions as are necessary for the provisions of this Agreement to continue to apply to such resulting corporation, the stockholders of such resulting corporation and the capital stock of such resulting corporation, including an agreement to vote all shares of capital stock held by such stockholders to elect the board of directors of such resulting corporation in accordance with the substance of Section 5.2, subject to such changes as deemed appropriate by the Board (with the prior written approval of the holders of at least a majority of the Preferred Units) and an agreement affording the holders of common stock issuable upon conversion or exchange of the Preferred Units the approval rights contemplated by Section 5.1(d) with respect to the common stock held by them until such time as such public offering is actually consummated;

(ii)    the registration for sale to the public of the capital stock of such resulting corporation pursuant to any registration statement to be filed with the Securities and Exchange Commission under the rules and regulations promulgated under the Securities Act; and

(iii)    any such conversion to be structured, to the extent reasonably achievable, to maximize the ability of the Members and the shareholders of Holdings to aggregate (or "tack") the period during which they hold their Units or the securities in Holdings, respectively, together with the period during which they hold shares of capital stock of the resulting corporation for purposes of the United States securities laws, including Rule 144 under the Securities Act.

<center>60</center>

**EXHIBIT 1**
**Page 64 of 108**

(e)    **Structure**.  Notwithstanding the foregoing, the Company and the Members covenant and agree that the Company and the Members shall take commercially reasonable efforts to cause the Corporate Conversion to be structured (i) if requested by Holdings, in such a manner so as to enable the shareholders of Holdings to receive directly the number of shares of common stock of the resulting corporation that Holdings would otherwise be entitled to receive pursuant to this Section 9.4 in the absence of such request by Holdings and to afford the shareholders of Holdings with the same rights and privileges that were afforded to Holdings under this Agreement immediately prior to the Corporate Conversion, and (ii) in as tax-efficient a manner as is practicable for the Members as well as the shareholders of Holdings; provided, however, that nothing herein shall require the Company to accept any assets or assume any liabilities of Holdings in connection with any such Corporate Conversion.

(f)    **Registration Rights**.  Upon a Corporate Conversion, or at any time prior thereto upon the request of the holders of a majority of the Preferred Units, the Company or any successor thereto shall enter into a registration rights agreement with the Preferred Members with respect to the registration of the Company's securities in form and substance reasonably satisfactory to the Board and the holders of a majority of the Preferred Units. Such registration rights agreement shall provide (i) the holders of a majority of the Preferred Units with two demand registrations on a Form S-1 registration statement under the Securities Act (or any successor form), at the Company's expense, (ii) the holders of at least 20% of the Preferred Units with unlimited demand registrations on a Form S-3 registration statement under the Securities Act (or any successor form), at the Company's expense subject to a limit of two such registrations within any one year period, (iii) piggyback registration rights to the holders of Preferred Units with any registration of the securities of the corporate successor under the Securities Act (other than in connection with the foregoing demand registration or in connection with a merger, acquisition, corporate reorganization, exchange offer, dividend reinvestment plan, stock option plan or other employee benefit plan and other customary exclusions) in which the registration form to be used may be used for the registration of the securities held by such holders, (iv) such piggyback registration rights granted to the holders of Preferred Units to be allocated on a pro rata basis subject to customary cutback provisions in view of market conditions (with such cutbacks to be made on a pro rata basis), (v) Holdings shall have junior piggyback registration rights subject to customary cutback provisions in view of market conditions (with such cutbacks to be made on a pro rata basis), (vi) no other Person shall be granted any registration rights without the consent of the holders of a majority of the Preferred Units, and (vii) in the event a registration is not consummated at the request of the holders of Preferred Units, such holders shall pay all registration expenses associated therewith. No Person shall be granted any registration rights with respect to Equity Securities of the Company, other than as provided for herein, without the consent of the holders of a majority of the Preferred Units.

(g)    **Holdback Agreement**.  No Member shall effect any public sale or distribution of any Equity Securities of the Company or any successor thereto, (i) in the case of the Initial Public Offering, during the seven days prior to and the 180-day period beginning on the effective date of such Public Offering and (ii) in the case of any other underwritten Public Offering, during the seven days prior to and the 90-day period

EXHIBIT 1
Page 65 of 108

beginning on the effective date of such Public Offering, in each case, (x) exclusive of any units or other equity interest acquired in any underwritten Public Offering or after the Initial Public Offering, or (y) as otherwise permitted by the Board (provided, that if the Board permits any Member, then all Members shall be permitted).

(h)  **Dissolution of Holdings**.  Promptly after the effectiveness of the Corporate Conversion,  the board of directors and shareholders of Holdings may elect to  dissolve Holdings and distribute any securities issued to Holdings in the Corporate Conversion to Holdings' shareholders in accordance with Holdings' articles of incorporation and other governing documents.  Notwithstanding anything in this Agreement to the contrary, Holdings shall be permitted to make such distribution without restriction or any obligation to the Company and the other Members, including without first complying with Sections 9.1(a), 9.2 and 9.3.

## ARTICLE X

## ADMISSION OF MEMBERS

10.1  **Substituted Member**.  In connection with the Transfer of Units of a Member permitted under the terms of this Agreement, the Equity Agreements (if applicable) and any other agreements contemplated hereby and thereby, the Transferee of such Units shall become a Substituted Member on the later of (a) the effective date of such Transfer, and (b) the date on which the Board approves such Transferee as a Substituted Member, and such admission shall be shown on the books and records of the Company; provided, however, in connection with the Transfer of Units not restricted by Section 9.1(a) or 9.1(b), the Equity Agreements (if applicable) or any other agreement contemplated hereby and thereby, such Transferee shall become a Substituted Member on the effective date of such Transfer; provided, that no Transferee of Units shall become a Substituted Member until such Transferee furnishes to the Company (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, including  the  power  of  attorney  granted  in  Section 14.2,  and  (b) such  other  documents  or instruments as may be deemed necessary or appropriate by the Board to effect such Person's admission as a Member.

10.2  **Additional Members**.  A Person may be admitted to the Company as an Additional Member only as contemplated under Section 3.1 and only upon furnishing to the Company (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, including the power of attorney granted in Section 14.2, and (b) such other documents or instruments as may be deemed necessary or appropriate by the Board to effect such Person's admission as a Member.  Such admission shall become effective on the date on which the Board determines that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.

62

**EXHIBIT 1**
**Page 66 of 108**

# ARTICLE XI

## WITHDRAWAL AND RESIGNATION OF MEMBERS

No Member shall have the power or right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company pursuant to Article XII, without the prior written consent of the Board (which consent may be withheld by the Board in its sole discretion), except as otherwise expressly permitted by this Agreement. Upon a Transfer of all of a Member's Units in a Transfer permitted by this Agreement, and the Equity Agreements (if applicable), such Member shall cease to be a Member. Any completely withdrawing Member will not be considered a Member for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Member's Capital Account (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal. Except as set forth in Section 12.2, no Member shall be entitled to any distribution on account of an attempted or permitted withdrawal. No event described in Section 63.265 of the Act shall cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

# ARTICLE XII

## DISSOLUTION AND LIQUIDATION

12.1 **Dissolution**. The Company shall not be dissolved by the admission of Additional Members or Substituted Members. The Company shall dissolve and its affairs shall be wound up upon the first of the following to occur:

(a) the affirmative vote of the Board and the holders of a majority of the Preferred Units approving such dissolution and liquidation; and

(b) the entry of a judgment of dissolution of the Company under Section 63.671 of the Act.

The foregoing events are, to the fullest extent permitted by Law, the sole events that shall cause a dissolution of the Company. In furtherance, and not in limitation of the foregoing, an Event of Withdrawal shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

12.2 **Liquidation and Termination**. On the dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives, Members or other Persons as liquidator(s). The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne by the Company as an expense. The steps to be accomplished by the liquidators are as follows:

(a) The liquidators shall pay, satisfy or discharge from the Company's funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities and other reserves in such amount and for such term as the liquidators may reasonably determine).

EXHIBIT 1
Page 67 of 108

(b)     As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of the Company's remaining assets (the "Liquidation Assets"), (ii) determine the amounts to be distributed to each Member in accordance with Section 4.1, and (iii) deliver to each Member a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such distributions, which Liquidation Statement shall be final and binding on all Members.

(c)     As soon as the Liquidation FMV and the proper amounts of distributions have been determined in accordance with Section 12.2(b), the liquidators shall promptly distribute the Liquidation Assets to the Members in accordance with Section 4.1.

(d)     In making such Distributions, the liquidators shall allocate each type of Liquidation Assets (i.e., cash or cash equivalents, preferred or common equity securities, etc.) among the Members ratably based upon the aggregate amounts to be distributed with respect to the Units held by each such Member; provided that the liquidators shall allocate each type of Liquidation Assets so as to give effect to and take into account the relative priorities of the different Units; provided, further, that in the event that any securities are part of the Liquidation Assets, each Member that is not an "accredited investor" as such term is defined under the Securities Act may, in the discretion of the Board, receive, and hereby agrees to accept, in lieu of such securities, cash consideration with an equivalent value to such securities as determined in good faith by the Board.  Any non-cash Liquidation Assets will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Sections 4.2 and 4.3. After taking into account such allocations, it is anticipated that each Member's Capital Account will be equal to the amount to be distributed to such Member pursuant to Section 12.2(b).  If any Member's Capital Account is not equal to the amount to be distributed to such Member pursuant to Section 12.2(b), Profits and Losses for the Fiscal Year in which the Company is dissolved shall be allocated among the Members in such a manner as to cause, to the extent possible, each Member's Capital Account to be equal to the amount to be distributed to such Member pursuant to Section 12.2(b).

(e)     The distribution of cash and/or property to a Member in accordance with the provisions of this Section 12.2 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member in liquidation of its interest in the Company.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

12.3    **Securityholders Agreement**.   To the extent that Equity Securities of any Subsidiary of the Company are distributed to any Member in connection with the distribution of the Company's assets as provided herein, each of the Members shall enter into a securityholders agreement with respect to such Subsidiary's Equity Securities which agreement shall contain provisions regarding the Transfer of such Equity Securities (including those provisions relating to (a) restrictions on Transfer and (b) rights of Members to participate in certain Transfers by other Members) and other provisions (including with respect to the governance and control of such Subsidiary) in form and substance substantially similar to the provisions set forth herein (including in Section 3.1(e), Article V and Article IX).

EXHIBIT 1
Page 68 of 108

12.4    **Articles of Dissolution**.  On completion of the distribution of the Company's assets as provided herein, the Company is terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Act may require or permit) shall file articles of dissolution with the Secretary of State of the State of Oregon, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the Company.  The Company shall be deemed to continue in existence until it is terminated pursuant to this Section 12.4.

12.5    **Reasonable Time for Winding Up**.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 12.2 in order to minimize any losses otherwise attendant upon such winding up.

12.6    **Return of Capital**.  The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from the Company's assets).

## ARTICLE XIII

## TAX MATTERS

13.1    **Tax Matters**.

(a)    All elections and decisions required or permitted to be made by the Company under any applicable Tax Law shall (unless otherwise provided in this Agreement) be made by the Board; provided, however, that, if requested by a Transferee of Units from a Member, the Board shall file an election on behalf of the Company pursuant to Code Section 754 (and applicable state Law) to adjust the basis of the property in the case of a Transfer of any Units made in accordance with the provisions of this Agreement. The Board shall cause all income Tax returns to be prepared and filed on a timely basis. Each Member shall furnish to the Board all pertinent information in its possession relating to Company operations that is necessary to enable the Company's and Members' income Tax returns to be prepared and filed in a timely manner.

(b)    Tax Matters Member/Company Tax Representative. For taxable years ending prior to January 1, 2018, Fluor shall be the Company's "**Tax Matters Member**" pursuant to Section 6231(a) (7) of the Code. For taxable years beginning after December 31, 2017, Fluor shall be the "partnership representative" of the Company pursuant to Section 6223 of the Code and the Revised Partnership Audit Procedures (the "**Company Tax Representative**"). The Company Tax Representative, if an entity, shall designate an eligible individual to act on behalf of the Company Tax Representative for all purposes of the Revised Partnership Audit Procedures (the "**Designated Individual**") and may remove and replace the Designated Individual in its sole discretion. The Tax Matters Member or the Company Tax Representative, as applicable, shall have all the powers and responsibilities provided to a tax matters partner or partnership representative in Code Sections 6221 through 6241, or as provided in the Revised Partnership Audit Procedures, and analogous provisions of state and local law. The Tax Matters Member or the Company

65

**EXHIBIT 1**
**Page 69 of 108**

Tax Representative (as applicable), subject to the consent of the Board, shall be authorized to engage such professional advisors as it may deem appropriate in carrying out its duties as Tax Matters Member or Company Tax Representative, as applicable, including employing tax professionals and/or counsel to represent the Company in any audit or investigation of the Company by the Internal Revenue Service and any related administrative or judicial proceedings. The fees and expenses of such professionals and/or counsel shall be a Company expense. The Tax Matters Member or the Company Tax Representative, as applicable, shall comply in all respects with the requirements set forth in the Revised Partnership Audit Procedures and other provisions of the Code applicable to the Tax Matters Member or Company Tax Representative (as applicable) and shall keep the Board fully informed of any such audit or related administrative or judicial proceedings and provide the Board with copies of any correspondence sent to or received from any tax authorities. The Tax Matters Member or the Company Tax Representative, as applicable, shall not make any election (including, without limitation, any election under Section 6225 or Section 6226 of the Code), bind the Company or any Member (except the Tax Matters Member itself) to an extension of the statute of limitations, an audit, an administrative adjustment, a settlement agreement (it being understood that such an agreement shall not be entered into without the express consent of the affected Members), a petition for judicial review of a final administrative adjustment, or any change in the Company's returns as filed (that will affect the Members' tax liabilities) without, in each case, the approval of the Board. This Section 13.1(b) shall survive the dissolution of the Company, the termination of this Operating Agreement, the withdrawal of any Member from the Company, the transfer of any Member's membership interest in the Company, and the resignation, withdrawal, or revocation of Fluor (or the eligible Person appointed by Fluor as the Company Tax Representative) or the Designated Individual; provided, however, should Fluor resign, is removed, or ceases to be a member, the Board shall appoint a Tax Matters Member or Company Tax Representative, as applicable, to act until such time as this Agreement is amended.

(c)     Each Member acknowledges that this Agreement creates a partnership for federal and state income Tax purposes, and hereby agrees not to elect under Code Section 761 or applicable state Law to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute.

(d)     No Member, Officer, Manager, agent or employee of the Company is authorized to, or may, file Internal Revenue Service Form 8832 (or such alternative or successor form) to elect to be classified as a corporation for federal income Tax purposes, in accordance with Regulations Section 301.7701-3, except upon the express written direction of all the Managers or in accordance with <u>Section 9.4</u>.  In the absence of such written direction, the Members, Officers, Managers, agents and employees of the Company shall take such action as may be necessary (and permitted under the terms of this Agreement) to maintain the status of the Company as a partnership for federal income Tax purposes.

**EXHIBIT 1**
**Page 70 of 108**

13.2    **Code §83 Election**.

(a)    The Company and each Member agree that such Member may make a timely election under Section 83(b) of the Code with respect to any Units issued to such Member in exchange for services provided to the Company.

(b)    Notwithstanding anything herein to the contrary, unless the Board determines after consideration of any final guidance of the Service that such action is not in the best interests of the Company, the Members shall, in anticipation of or following the effective date of final Treasury Regulations, amend, in a manner reasonably determined by the Board taking into account the requirements of such final regulations, this Agreement to provide for (i) the election of a safe harbor under Treasury Regulation Section 1.83-3(l) (or similar provision) under which the fair market value of an interest in the Company that is transferred in connection with the performance of services is treated as being equal to the liquidation value of such interest, (ii) an agreement by the Company and all of its Members to comply with the requirements set forth in such regulations and Internal Revenue Service Notice 2005-43 (and any other guidance provided by the Service with respect to such election) with respect to all interests in the Company transferred in connection with the performance of services while the election remains in effect, and (iii) any other provisions reasonably required in connection with the foregoing; provided, however, that no amendment pursuant to this Section 13.2 shall be effective if such amendment adversely affects any of the Members holding Common Units without the affirmative vote of the Members holding a majority of the Common Units or if such amendment adversely affects any of the Preferred Units without the affirmative vote of Members holding a majority of the Preferred Units.  For purposes of the preceding sentence, the reduction in or minimization of a compensation deduction of the Company as a result of such amendment will not be treated as adversely affecting the Members holding Common Units or Preferred Units.

13.3    **Budget Act Provisions.**

(a)    None of the Members nor the Company shall make any election under section 1101(g)(4) of the Budget Act, or any subsequent law or guidance, to cause the provisions of section 1101 of the Budget Act to apply to the Company prior to any taxable year of the Company beginning after December 31, 2017.

(b)    The Members acknowledge that Subchapters C and D of Chapter 63 of the Code have been repealed, and that Chapter 63 of the Code has been amended, by Section 1101 of the Budget Act, to be effective with respect to taxable years beginning after December 31, 2017.  The Members agree to work together, reasonably and in good faith, to take such action (including, without limitation, amending this Agreement or entering into a separate agreement) as reasonably necessary to preserve and retain after the effective date of Section 1101 of the Budget Act (and Treasury Regulations, notices, revenue procedures, revenue rulings or other administrative guidance, interpreting or applying Section 1101 of the Budget Act), to the extent possible, the substantive arrangement and relative and analogous rights, duties, responsibilities and obligations of the Members reflected in this Agreement generally, and this Article XIII specifically, with respect to tax

67

EXHIBIT 1
Page 71 of 108

audits and other administrative procedures addressed by Section 1101 of the Budget Act (including, without limitation, by designating Flour as the "partnership representative" as that term is used in Section 6231(a) of the Code as amended by the Budget Act, and electing the application of Section 6226 of the Code as amended by the Budget Act, pursuant to which adjustments will be taken into account at the partner level).

# ARTICLE XIV

## MISCELLANEOUS

14.1 **Representations and Warranties**. Each Member (other than OSU, Holdings and each Employee Member with respect to Section 14.1(g) only) hereby represents and warrants to the Company and each other Member, and each Transferee of Units shall be deemed to represent and warrant to the Company and each other Member, upon the Transfer of Units to such Transferee, that:

(a)     such Person is acquiring the Units being acquired by it for investment for its own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that it has no present intention of selling, granting any participation in, or otherwise distributing the same;

(b)     such Person has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of this Agreement and any other agreement pursuant to which such Person acquired the Units, with the Company's management and has had an opportunity to review the Company's facilities;

(c)     such Person understands that the Units have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Person's representations as expressed herein;

(d)     such Person understands that the Units are "restricted securities" under applicable federal and state securities Laws and that, pursuant to such Laws, such Person must hold the Units indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available;

(e)     such Person acknowledges that the Company has no obligation to register or qualify the Units for resale except as set forth herein and that if an exemption from registration or qualification is available, it may be conditioned on various requirements including the time and manner of sale, the holding period for the Units, and on requirements relating to the Company which are outside of such Person's control, and which the Company is under no obligation and may not be able to satisfy;

(f)     such Person understands that no public market now exists for the Units, and that the Company has made no assurances that a public market will ever exist for the Units;

68

**EXHIBIT 1**
**Page 72 of 108**

(g)    such Person is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act;

(h)    if such Person is not a United States person (as defined by Section 7701(a)(30) of the Code), such Person has satisfied itself as to the full observance of the Laws of its jurisdiction in connection with this Agreement and any other agreement pursuant to which such Person acquired the Units, and such Person's performance of its obligations hereunder will not violate any applicable securities or other Laws of such Person's jurisdiction; and

(i)    neither such Person nor any of its managers, directors, officers, shareholders, partners, members, employees, representatives or agents has either directly or indirectly, including through a broker or finder, engaged in any general solicitation or published any advertisement in connection with the offer and sale of the Units.

14.2    **Power of Attorney**.  Each Member hereby constitutes and appoints the Board and the liquidators, and their respective designees, with full power of substitution, as its true and lawful agent and attorney in fact, with full power and authority in its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices: (a) all certificates and other instruments in accordance with the terms of this Agreement which the Board deems appropriate or necessary to form, qualify, or continue the qualification of the Company as a limited liability company in the State of Oregon and in all other jurisdictions in which the Company may conduct business or own property; (b) all instruments which the Board deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement effected in accordance with Section 14.3; (c) all conveyances and other instruments or documents which the Board and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Member pursuant to Article X or XI.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of its Units and shall extend to such Member's heirs, successors, assigns and personal representatives.

14.3    **Amendment**.  Subject to the right of the Company pursuant to Section 3.1(d) to amend this Agreement in connection with the creation and/or issuance of Equity Securities in accordance with the terms hereof, this Agreement may be amended or modified, or any provision waived, only with the written consent of (a) the Members holding a majority of the votes of the issued and outstanding Common Units and Preferred Units, consenting together as a single class (on an As-Converted Basis) and (b) the Members holding a majority of the Preferred Units consenting as a separate class; provided, however, that (v) any amendment to Section 5.1(e) shall also require the written consent of the Members holding a majority of the Series A Preferred Units, consenting as a separate class, (w) any amendment to Section 5.1(f) shall also require the written consent of the Members holding a majority of the Series A-1 Preferred Units, consenting as a separate class, (x) any amendment to Section 5.1(g) shall also require the written consent of the Members holding a majority of the Series A-2 Preferred Units, consenting as a separate class, (y) any amendment to Section 5.1(h) shall also require the written consent of the Members holding a majority of the Series A-3 Preferred Units, consenting as a separate class, (z) any amendment to

**EXHIBIT 1**
**Page 73 of 108**

Section 5.1(i) shall also require the written consent of the Members holding a majority of the Series A-4 Preferred Units, consenting as a separate class, and (aa) any amendment to Sections 3.1(g), 4.1(a)(iii), 4.1(a)(iv), 4.1(a)(v) or 12.2(c), or this clause (aa) to the proviso of Section 14.3 (other than any amendment to such Sections and clause (aa) pursuant to Section 3.1(d) in connection with the creation and/or issuance of Equity Securities), shall also require the written consent of the Members holding a majority of the Common Units, consenting as a separate class. Any amendment, modification or waiver approved by such Members in accordance with the foregoing sentence shall be binding upon and effective as to each other Member; provided, however, that if any amendment, modification, or waiver of this Agreement (whether directly or indirectly, by operation of Law or otherwise) would adversely affect the rights of a Member in respect of the rights of a type, class or series of Units, without similarly affecting the rights hereunder of all Members in respect of the rights of a type, class or series of Units, such amendment, modification or waiver shall not be binding upon or effective as to such affected Member without its prior written consent.

14.4    **Notices**.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally; on the next subsequent Business Day if delivered by facsimile for which a confirmation of delivery was received; three Business Days after sending if such notice is sent (i) with a reputable domestic overnight carrier (using any delivery option reasonably believed to deliver such notice within one Business Day), or (ii) via first class mail, return receipt requested, in each case, with postage thereon prepaid, and in each case, addressed to such Member at the address set forth on Schedule B attached hereto or, if not so set forth, in the Company's records (or such other address as may be designated by such Member from time to time by written notice to the Company and the other Members).

14.5    **Further Assurances**.  Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and to do all such other acts and things as may be necessary to more fully effectuate this Agreement.

14.6    **Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforced by any creditor of the Company or any Member.

14.7    **No Effect Upon Lender Relationship**.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of a Member in its capacity as a lender to any Company Party pursuant to any agreement under which any Company Party has borrowed money.  Without limiting the generality of the foregoing, any such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (a) its status or the status of any of its Affiliates as a direct or indirect Member or equityholder of any Company Party or Holdings, (b) the interests of any Company Party or Holdings, or (c) any duty it may have to any other Member or any direct or indirect equityholder of any Company Party or Holdings, except as may be required under the applicable loan documents or by commercial Law applicable to creditors generally.

**EXHIBIT 1**
**Page 74 of 108**

14.8    **Waivers; Exercise of Contractual Rights**.  The failure or delay of any party hereto to assert any of its rights, powers or privileges under this Agreement or otherwise shall not constitute a waiver of such rights, powers or privileges.  The waiver of any right, power or privilege with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances, and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  Each Member recognizes, acknowledges and agrees that the other Members have substantial financial interests in the Company to preserve and that (a) each Member, in its sole and absolute discretion, may exercise or refrain from exercising any rights, powers or privileges that such Member, in its capacity as a Member, may have pursuant to this Agreement or at law or in equity, (b) exercising or refraining from exercising such rights, powers or privileges shall not be deemed to constitute a lack of good faith or unfair dealing, and (c) such Member shall not incur or be subject to any liability or obligation to any other Member or any other Person, by reason of exercising or refraining from exercising any such rights, powers or privileges.

14.9    **Exculpation Among Members**.  Each Member acknowledges that it is not relying upon any other Person in making its investment or decision to invest in the Company (other than pursuant to any written agreement).  To the fullest extent permitted by the Act, each Member agrees that no Member nor such Member's Affiliates, controlling persons, managers, directors, officers, shareholders, partners, members, employees, representatives and agents shall be liable to any other Member for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with their purchase or acquisition of any Units.

14.10    **Certain Acknowledgments**.  Upon execution and delivery of a counterpart to this Agreement or a joinder to this Agreement, each Member (including each Substituted Member and each Additional Member) shall be deemed to acknowledge to each other Member as follows: (a) the determination of such Member to acquire Units in connection with this Agreement or any other agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member or by any agent or employee of any other Member and (b) no other Member has acted as an agent of such Member in connection with making its investment hereunder and that no other Member shall be acting as an agent of such Member in connection with monitoring its investment hereunder.

14.11    **Governing Law**.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Oregon, regardless of the laws that might otherwise govern under applicable conflict of laws principles.

14.12    **Dispute Resolution**.  Each party hereto:

(a)    irrevocably and unconditionally submits, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, to the exclusive jurisdiction of the state courts of the State of Oregon, and with respect to any suit, action or other proceeding that must be brought in federal forum, the United States District Court for the District of Oregon;

71

EXHIBIT 1
Page 75 of 108

(b)    shall not commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of the State of Oregon, and with respect to any suit, action or other proceeding that must be brought in federal forum, the United States District Court for the District of Oregon;

(c)    waives, and shall not assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that such party is not subject personally to the jurisdiction of the above-named courts, that such party's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court; and

(d)    consents to personal jurisdiction for any equitable action sought in any of the above-named courts.

14.13    **Remedies Cumulative**.  No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at Law or in equity or by statute or otherwise.  No single or partial exercise by any party of any right, power or remedy hereunder shall preclude any other or further exercise thereof.

14.14    **Punitive Damages**.  None of the Members or any other Person shall be entitled to special, punitive, exemplary, incidental, consequential or indirect damages in connection with this Agreement and the transactions contemplated hereby, and each of the Members hereby expressly waives any right to special, punitive, exemplary, incidental, consequential or indirect damages in connection with this Agreement and the transactions contemplated hereby.

14.15    **Entire Agreement**.  This Agreement (including the Exhibits and Schedules hereto) and each Equity Agreement constitute the entire agreement and understanding between the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersedes all prior agreements and understandings, oral and written, with respect to the subject matter hereof and thereto.

14.16    **Binding Effect**.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, permitted transferees and permitted assigns.

14.17    **Severability**.  If one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and such invalid, illegal or unenforceable provisions shall be refined, construed or enforced as if such invalid, illegal or unenforceable provision had never been set forth herein and there had been set forth in this Agreement instead such valid, legal and enforceable provisions as would most nearly accomplish the intent and purpose of such invalid, illegal or unenforceable provisions.

14.18    **Counterpart Execution**.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto

**EXHIBIT 1**
**Page 76 of 108**

and hereto were upon the same instrument.  A facsimile or electronic copy of any such signed counterpart shall be treated and shall have the same force and effect as an originally signed counterpart.

14.19  **Headings**.  The headings of the Articles and Sections of, or Schedules to, this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

14.20  **Agreement among Parties**.  This Agreement is the result of arm's-length negotiations among the parties hereto, and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a party hereto by reason of the fact that such party or its legal counsel was the draftsperson of that provision.

**[Signature Page Follows]**

73

**EXHIBIT 1**
**Page 77 of 108**

**IN WITNESS WHEREOF**, the parties have entered into this Fifth Amended and Restated Operating Agreement as of the date first set forth above.

NUSCALE POWER, LLC

By: _____
Name:  Christopher J. Colbert
Title:  Chief Financial Officer

**PREFERRED MEMBERS:**

**FLUOR ENTERPRISES, INC.**

By: _____
Name: Christopher J. Panichi
Title: Senior Vice President

REVIEWED
LEGAL

**ARES CORPORATION**

By: _____
Name: _____
Title: _____

**ENERCON SERVICES, INC.**

By: _____
Name: _____
Title: _____

**WEED INSTRUMENT COMPANY, INC., D/B/A ULTRA ELECTRONICS NUCLEAR SENSORS AND PROCESS INSTRUMENTATION**

By: _____
Name: _____
Title: _____

*[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]*

**EXHIBIT 1**
**Page 78 of 108**

**NEXT TECH 1 NEW TECHNOLOGY
INVESTMENT FUND**

By Its General Partner,

**IBK SECURITIES CO., LTD.**

By: _____
      Name: Young Kyu Kim
      Title: Chief Executive Officer

By Its General Partner,

**BH INVESTMENT AND LIBERTY
LTD.**

By: _____
      Name: Dae Seok Bae
      Title: Director

**NUSCALE KOREA HOLDINGS LLC**

By: _____
      Name:
      Title:

**SARGENT & LUNDY NUHOLDINGS,
 L.L.C.**

By: _____
      Name:
      Title:

**DOOSAN HEAVY INDUSTRIES &
CONSTRUCTION CO., LTD.**

By: _____
      Name:
      Title:

*[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]*

**EXHIBIT 1
Page 79 of 108**

**NEXT TECH 2 NEW TECHNOLOGY INVESTMENT FUND**

By Its General Partner,

**IBK SECURITIES CO., LTD.**

By: _____
    Name:
    Title:

By Its General Partner,

**BH INVESTMENT AND LIBERTY LTD.**

By: _____
    Name:
    Title:

**SARENS NUCLEAR & INDUSTRIAL SERVICES, LLC**

By: _____
    Name:
    Title:

**JAPAN NUSCALE INNOVATION, LLC**

By: _____
    Name:
    Title:

**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 80 of 108**

**GS ENERGY NA INVESTMENTS, INC.**


By: _____
    Name:
    Title:

**NEXT TECH 3 NEW TECHNOLOGY INVESTMENT FUND**

By Its Co-General Partner,

**BH INVESTMENT AND LIBERTY LTD.**


By: _____
    Name:
    Title:


By Its Co-General Partner,

**SB PARTNERS CO., LTD.**


By: _____
    Name:
    Title:

By Its Co-General Partner,

**SAC PARTNERS CO., LTD.**


By: _____
    Name:
    Title:

**SAMSUNG C&T CORPORATION**


By: _____
    Name:
    Title:

**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 81 of 108**

_____
Doug Graham


_____
For The Leaver 1990 Revocable Trust,
David E W Leaver and Linda Galbraith
Leaver, trustee, or their successor


_____
Dennis Murphy


_____
Edward Murphy


_____
Peter C. Murphy


_____
Frank Cloutier


_____
John Howes


**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 82 of 108**

**COMMON MEMBERS**

**NUSCALE HOLDINGS CORP.**

By: _____
    Name:
    Title:

_____
Bruce Landrey

_____
Adam Rasmussen

_____
Michael Willardson

_____
Sonia Kousha

_____
Carol Sessa

_____
Paul Lorenzini

_____
Donna Jean Reyes

_____
Julie Jensen

_____
Marc Hayden

_____
Edward Wallace

_____
Richard Sandvik

_____
Robin Rae Marshall

_____
Jeff Kosky

_____
Eric Coryell

_____
John Marking

_____
Donald Sulzer

_____
Chris Runckel

_____
Bruce Foster

_____
Lionel Wertz

_____
John Hardy

**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 83 of 108**

_____          _____
John Marshea                              Gulshat Galimov


_____          _____
Dong Wan Kim                              David Holick


_____          _____
Michael Willardson                        David Brown


_____          _____
Steven Shaw                               Shaun Gatherum


_____          _____
James Read                                Jackson Gibbs


_____          _____
Paul Bennett                              Jonathan Dee


_____          _____
Trevor Misfeldt                           Lenka Kollar


_____          _____
David Ethington                           Douglas Neve


_____          _____
William Estes                             Jesse Denham


_____          _____
Teresa Culver                             Isaac Hines


_____          _____
Laurence Losh                             Jennifer Hall


**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 84 of 108**

_____          _____
Andre L'Eplattenier                      Luann Jencyowski

_____          _____
Jennie Wike                              Dongyang Liu

_____          _____
Xiaorong Rao                             Kimberly O'Bryan-Heede

_____          _____
David Stricklan                          Jean Dolan

_____          _____
Brett Rampal                             Jeffrey Warnock

_____          _____
Grant Buster                             Roger Singleton

_____          _____
Elizabeth Bailey                         Matthew Beecher

_____          _____
Donald Higgins                           Kaylyn Chambers

_____          _____
Jayne Wagner                             Amber Carlson

_____          _____
Jordan Learmonth                         Charles Weaver

_____          _____
Alla Shevchenko                          Arden Bedell

_____          _____
Rebecca Brenton                          Lori Anderson

**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 85 of 108**

_____          _____
Cynthia Barr                                 Wayne Edmiston


_____          _____
Susan Voss                                   Jeff Limon


_____          _____
Alex Giurgiuman                              Aaron Frazier


_____          _____
Gary Jones                                   Douglas Van Bossuyt


_____          _____
Corey McDaniel                               Susan L. Edmiston


_____          _____
Kurt Vedros                                  Ahn Mai


_____          _____
Seung Choi                                   John Surina, Jr.


_____          _____
Saher Bishara                                Donna Reyes

                                             **OREGON STATE UNIVERSITY**


_____
Chris Bates                                  By: _____
                                                 Name:
                                                 Title:


**[Signature Page to NuScale Power, LLC Fifth Amended and Restated Operating Agreement]**

**EXHIBIT 1**
**Page 86 of 108**

## SCHEDULE A

| Member | Common Units | Preferred Units | Capital Contribution |
|---|---|---|---|
| Fluor Enterprises, Inc. | - | 495,824,430.17 | $ 566,559,862.00 |
| Japan NuScale Innovation, LLC | - | 29,965,753.42 | $ 60,000,000.00 |
| GS Energy NA Investments, Inc. | - | 18,264,840.18 | $ 40,000,000.00 |
| Next Tech 3 New Technology Investment Fund | - | 15,981,735.16 | $ 35,000,000.00 |
| Next Tech 1 New Technology Investment Fund | - | 15,723,270.00 | $ 24,999,999.30 |
| Doosan Heavy Industries & Construction Co., Ltd. | - | 13,931,248.38 | $ 29,000,000.00 |
| Samsung C&T Corporation | - | 9,132,420.09 | $ 20,000,000.00 |
| NuScale Korea Holdings LLC | - | 7,927,699.38 | $ 12,605,042.02 |
| Sargent & Lundy NuHoldings, LLC | - | 6,682,390.30 | $ 12,000,000.58 |
| ARES Corporation | - | 5,416,680.74 | $ 5,990,229.04 |
| Enercon | - | 4,693,058.40 | $ 4,999,999.50 |
| Sargent & Lundy, LLC | - | 3,652,968.04 | $ 8,000,000.00 |
| Sarens Nuclear & Industrial Services, LLC | - | 2,347,317.35 | $ 5,000,000.00 |
| Next Tech 2 New Technology Investment Fund | - | 1,380,477.16 | $ 2,194,958.68 |
| Ultra Electronics | - | 1,602,101.48 | $ 2,340,229.10 |
| Graham, Doug | - | 189,000.00 | $ 189,000.00 |
| Leaver, David | - | 176,250.00 | $ 176,250.00 |
| Murphy, Dennis | - | 100,000.00 | $ 100,000.00 |
| Murphy, Edward | - | 100,000.00 | $ 100,000.00 |
| Murphy, Peter C | - | 100,000.00 | $ 100,000.00 |
| Cloutier, Frank | - | 33,750.00 | $ 33,750.00 |

Schedule A

EXHIBIT 1
Page 87 of 108

| Member | Common Units | Preferred Units | Capital Contribution |
|---|---|---|---|
| Howes, John | - | 25,000.00 | $ 25,000.00 |
| Oregon State University | 6,000,000.00 | - | $ 1,061,630.47 |
| NuScale Holdings Corp. | 2,677,524.60 | - | $ 2,677,524.60 |
| Surina Jr, John | 1,488,000.00 | - | $ 177,360.00 |
| Lorenzini, Paul | 1,000,000.00 | - | $ 140,000.00 |
| Reyes, Donna Jean | 873,000.00 | - | $ 122,220.00 |
| Landrey, Bruce | 338,000.00 | - | $ 47,320.00 |
| Jensen, Julie | 185,600.00 | - | $ 21,406.00 |
| Hayden, Marc | 88,233.00 | - | $ 21,870.48 |
| Wallace, Edward | 88,000.00 | - | $ 10,430.00 |
| Sandvik, Richard | 75,000.00 | - | $ 8,768.64 |
| Marshall, Robin Rae | 66,383.00 | - | $ 13,226.98 |
| Kresa, Kent | 66,066.00 | - | $ 73,333.26 |
| Galimov, Gulshat | 60,000.00 | - | $ 66,600.00 |
| Kosky, Jeff | 49,062.00 | - | $ 19,765.40 |
| Coryell, Eric | 45,936.00 | - | $ 26,664.75 |
| Marking, John | 45,000.00 | - | $ 18,600.00 |
| Sulzer, Donald | 44,312.00 | - | $ 5,314.93 |
| Morrill, Randall | 43,750.00 | - | $ 18,200.00 |
| Runckel, Chris | 42,000.00 | - | $ 5,880.00 |
| Rasmussen, Adam | 40,099.00 | - | $ 4,814.00 |
| Foster, Bruce | 39,166.00 | - | $ 14,232.96 |

Schedule A

**EXHIBIT 1**
**Page 88 of 108**

| Member | Common Units | Preferred Units | Capital Contribution |
|---|---|---|---|
| Wertz, Lionel | 38,228.00 | - | $ 20,319.23 |
| The Eric and Kirsten Sandoval Living Trust | 35,200.00 | - | $ 4,202.00 |
| Hardy, John | 32,082.00 | - | $ 16,545.16 |
| Marshea, John | 31,525.00 | - | $ 3,767.75 |
| Kim, Dong Wan | 31,225.00 | - | $ 4,094.75 |
| Willardson, Michael | 29,166.00 | - | $ 4,083.24 |
| Kousha, Sonia | 25,700.00 | - | $ 3,217.00 |
| Shaw, Steven | 25,000.00 | - | $ 3,000.00 |
| Read, James | 25,000.00 | - | $ 3,000.00 |
| Bennett, Paul | 22,756.00 | - | $ 5,048.36 |
| Misfeldt, Trevor | 22,604.00 | - | $ 12,658.24 |
| Ethington, David | 22,500.00 | - | $ 15,975.00 |
| Estes, William | 22,395.00 | - | $ 10,077.75 |
| Sessa, Carol | 22,300.00 | - | $ 2,993.00 |
| Culver, Teresa | 21,000.00 | - | $ 2,940.00 |
| Losh, Laurence | 20,312.00 | - | $ 2,437.44 |
| Holick, David | 20,000.00 | - | $ 2,400.00 |
| Brown, David | 19,687.00 | - | $ 11,277.83 |
| Gatherum, Shaun | 19,583.00 | - | $ 2,349.96 |
| Gibbs, Jackson | 18,229.00 | - | $ 10,755.11 |
| Dee, Jonathan | 18,125.00 | - | $ 5,950.00 |
| Kollar, Lenka | 18,000.00 | - | $ 10,080.00 |

Schedule A

**EXHIBIT 1**
**Page 89 of 108**

| Member | Common Units | Preferred Units | Capital Contribution |
|---|---|---|---|
| Weaver, Charles | 17,333.00 | - | $ 2,426.62 |
| Neve, Douglas | 15,833.00 | - | $ 2,216.62 |
| Denham, Jesse | 15,312.00 | - | $ 4,355.97 |
| Hines, Isaac | 15,312.00 | - | $ 8,574.72 |
| Hall, Jennifer | 15,033.00 | - | $ 2,013.63 |
| L'Eplattenier, Andre | 15,000.00 | - | $ 8,550.00 |
| Wike, Jennie | 15,000.00 | - | $ 1,800.00 |
| Rao, Xiaorong | 13,020.00 | - | $ 7,681.80 |
| Bedell, Arden | 12,500.00 | - | $ 1,750.00 |
| Anderson, Lori | 11,800.00 | - | $ 1,538.00 |
| Barr, Cynthia | 11,687.00 | - | $ 1,636.18 |
| Stricklan, David | 11,666.00 | - | $ 8,282.86 |
| Rampal, Brett | 10,625.00 | - | $ 1,275.00 |
| Voss, Susan | 10,625.00 | - | $ 1,168.75 |
| Buster, Grant | 10,361.00 | - | $ 5,000.15 |
| Bailey, Elizabeth | 10,000.00 | - | $ 1,400.00 |
| Higgins, Donald | 10,000.00 | - | $ 1,100.00 |
| Giurgiuman, Alexandru | 9,687.00 | - | $ 1,356.18 |
| Jones, Gary | 9,479.00 | - | $ 1,327.06 |
| Wagner, Jayne | 9,113.00 | - | $ 4,702.33 |
| Keaney, Kenneth | 9,062.00 | - | $ 8,496.42 |
| McDaniel, Corey | 8,750.00 | - | $ 1,225.00 |

Schedule A

**EXHIBIT 1**
**Page 90 of 108**

| Member | Common Units | Preferred Units | Capital Contribution |
|---|---|---|---|
| Vedros, Kurt | 7,916.00 | - | $ 870.76 |
| Choi, Seung | 7,812.00 | - | $ 1,093.68 |
| Fillmore, Benjamin | 7,812.00 | - | $ 5,609.08 |
| Bishara, Saher A. | 6,875.00 | - | $ 962.50 |
| Jencyowski, Luann | 6,875.00 | - | $ 825.00 |
| Learmonth, Jordan | 5,625.00 | - | $ 3,318.75 |
| Bates, Chris | 5,312.00 | - | $ 743.68 |
| Shevchenko, Alla | 5,104.00 | - | $ 1,712.48 |
| Brenton, Rebecca | 5,000.00 | - | $ 2,800.00 |
| Edmiston, Wayne | 5,000.00 | - | $ 600.00 |
| Liu, Dongyang | 5,000.00 | - | $ 2,525.00 |
| Limon, Jeff | 4,875.00 | - | $ 682.50 |
| Frazier, Aaron | 4,687.00 | - | $ 656.18 |
| O'Bryan-Heede, Kimberly | 3,958.00 | - | $ 2,216.48 |
| Dolan, Jean | 3,905.00 | - | $ 2,014.98 |
| Warnock, Jeffrey | 3,750.00 | - | $ 525.00 |
| Leary, Eve | 2,604.00 | - | $ 2,619.64 |
| Singleton, Roger | 2,604.00 | - | $ 312.48 |
| Beecher, Matthew | 2,500.00 | - | $ 1,400.00 |
| Van Bossuyt, Douglas | 2,500.00 | - | $ 350.00 |
| Chambers, Kaylyn | 2,395.00 | - | $ 1,341.20 |
| Edmiston, Susan | 1,875.00 | - | $ 225.00 |

Schedule A

EXHIBIT 1
Page 91 of 108

| Member | Common Units | Preferred Units | Capital Contribution | |
|---|---|---|---|---|
| Carlson, Amber | 1,000.00 | - | $ | 560.00 |
| Mai, Anh | 100.00 | - | $ | 14.00 |
| Treasury Units | 33,676.00 | - | $ | - |

Schedule A

**EXHIBIT 1**
**Page 92 of 108**

# SCHEDULE B

## MEMBER CONTACT INFORMATION

**Oregon State University**
Office for Commercialization &
Corporate Development
308 Kerr Administration Building,
Oregon State University
Corvallis, OR 97331

**NuScale Holdings, Corp**
6650 SW Redwood Lane, #210
Portland, OR 97224

**Bruce Landrey**
1837 SW Edgewood Rd
Portland, OR 97201

**Donald Sulzer**
1601 S Lane St Apt 623
Seattle, WA 98144

**Adam Rasmussen**
4128 SW Hewett
Portland, OR 97221

**Michael Willardson**
5477 Leigh Avenue
San Jose, CA 95124

**Sonia Kousha**
259 SW Twin Oaks Circle
Corvallis, OR 97333

**Jesse Denham**
34246 Teddy Ave N
Albany, OR 97322-9538

**Carol Sessa**
1819 NW Whitmore Dr
Albany, OR 97231

**Teresa Culver**
3455 NE Granger Rd
Corvallis, OR 97330

**Charles Weaver**
10377 Caminito Rio Branco
San Diego, CA 92131

**Doug Neve**
36393 Blueberry Dr
Lebanon, OR 97355-9292

**Jennifer Hall**
3025 Wilt Ave SE
Albany, OR 97322

**Arden Bedell**
38203 Thimbleberry Dr
Gaston, OR 97119

**Xiaorong Rao**
702 SE Bayshore Circle
Corvallis, OR 97333

**Lori Anderson**
5318 Lakeview Blvd Apt 20
Lake Oswego, OR 97035

**Cynthia Barr**
17555 Upper Cherry Ln
Lake Oswego, OR 97034

**Susan Voss**
1690 NW Ribier PL
Corvallis, OR 97330

**Elizabeth Bailey**
2190 NW Cluster Oak Ave
Albany, OR 97321

**Jennie Wike**
2308 33rd Ave SE
Puyallup, WA 98374

**Alex Giurgiuman**
2236 Benton Ave
Richland, WA 99354

**Gary Jones**
2375 Lupine Lane
Wickenburg, AZ 85390

**Corey McDaniel**
840 S Rancho Dr., Ste 4 4-770
Las Vegas, NV 89106-3820

**Kurt Vedros**
4113 Mirinda Lane
Ammon, ID 83406

**Seung Choi**
13 Kristyn Dr.
Northboro, MA 01532

**Saher Bishara**
49 Mahogany Ln
Simi Valley, CA 93065

**Chris Bates**
3333 NW Countryman Circle
Albany, OR 97321

**Wayne Edmiston**
3699 Silver Oak Place
Danville, CA 94506

**Jeff Limon**
5935 SW Amberwood Ave
Corvallis, OR 97333

**Aaron Frazier**
9920 N Decatur St.
Portland, OR 97203

**Jean Dolan**
2760 NW 13th St
Corvallis, OR 97330

**Jeffrey Warnock**
PO Box 642
Philomath, OR 97370

**Roger Singleton**
5055 N Elliott Cir Unit 23
Corvallis, OR 97330-4989

**Douglas Van Bossuyt**
322 Larkin St FRNT
Monterey CA 93940

**Susan Edmiston**
3699 Silver Oak Place
Danville, CA 94506

**Anh Mai**
1105 Burns Ave
Santa Ana, CA 92707-3812

Schedule B

**EXHIBIT 1**
**Page 93 of 108**

**John Hardy**
4075 NW Elmwood Dr
Corvallis, OR 97330

**Donald Higgins**
35440 Oak View Dr
Brownsville, OR 97327-9510

**Luann Jencyowski**
3088 Glenmoor Rd
York, SC 29745

**Dong Wan Kim**
3490 NW Buttercup Dr
Corvallis, OR 973320

**Donyang Liu**
4386 NW Palmbrook Dr
Beaverton, OR 97006-7477

**John Marshea**
23 Ivernia Rd
Worcester, MA 01606

**Alla Shevchenko**
103 Jefferson Rd
Willmington, NC 28411

**Matthew Beecher**
1331 Acorn Park St
Eugene, OR 97402-3132

**David Brown**
1635 Drew Place SW
Albany, OR 97321

**Fluor Enterprises, Inc.**
Attention: Chief Legal Officer
6700 Las Colinas Blvd.
Irving, TX 75039

**ARES Corporation**
1440 Chapin Ave, Suite 390
Burlingame, CA 94010

**Enercon**
Enercon Services - Attention
Accounting
500 Townpark Lane,
Kennesaw, GA 30144

**Ultra Electronics**
707 Jeffrey Way
Round Rock, TX 78665-2408

**John Howes**
17017 Dace Drive
Rockville, MD 20855

**Doug Graham**
4294 S River Falls Ave
Boise, ID 83716

**The Leaver 1990 Revocable
Trust, David E W Leaver and
Linda Galbraith Leaver, trustee,
or their successor**
10545 West Loyola Drive
Los Altos, CA 94024

**Dennis Murphy**
Murphy Overseas, LLC
5319 SW Westgate Drive, Suite 236
Portland, OR 97221

**Edward Murphy**
0836 SW Curry St, #302
Portland, OR 97239

**Peter Murphy**
78154 San Timoteo
LaQuinta, CA 92253

**Frank Cloutier**
7595 NE Logsdon Rd
Corvallis, OR 97330

**Grant Buster**
465 Arapahoe Ave
Boulder, CO 80302

**Kaylyn Chambers**
3472 College Loop SE
Albany, OR 97332

**Eric Coryell**
11842 Pigeon Ct
Caldwell, ID 83605

**Jonathan Dee**
2660 SE Ryan St
Corvallis, OR 97333

**William Estes**
2500 Saddle Way
Richland, WA 99352

**Bruce Foster**
316 Glory Ridge Ave N
Las Vegas, NV 89031

**Shaun Gatherum**
13427 42nd Ave W,
Mukilteo, WA 98275

**Sarens Nuclear & Industrial
Services, LLC**
Sarens USA, Inc.
10855 John Ralston Rd.
Houston, TX 77044

**Isaac Hines**
2869 Daylily Ave
Corvallis, OR 97330

**David Holick**
1375 Elm St NW
Salem, OR 97304

**Julie Jensen**
163 Ogden Dr
Oregon City, OR 97045

**Jeffrey Kosky**
5137 Humbar Rd
Fulton, MO 65251

**Laurence Losh**
218 Deerwood Dr
Huddleston, VA 24104

Schedule B

**EXHIBIT 1**
**Page 94 of 108**

**Robin Rae Marshall**
6080 NW Tokay Pl
Corvallis, OR 97330

**Brett Rampal**
5420 Milford Rd
Charlotte, NC 28210

**Jayne Wagner**
2757 Cedarwood Ct SE
Albany, OR 97322

**Chris Runckel**
6611 SW Parkhill Dr
Portland, OR 97239

**Doosan Heavy Industries &
Construction Co., Ltd.**
155, Jeongjail-ro, Bundang-gu,
Seongnam-si, Gyeonggi-do, 13557,
Republic of Korea
Attention: Jaesub Sung

**Next Tech 2 New Technology
Investment Fund**
11, Gukjegeumyung-ro 6-gil,
Yeongdeungpo-gu, Seoul, 05263,
Republic of Korea
Attention: PE Team

**David Ethington**
6609 Becket Notch SW
Ocean Isle Beach, NC 28469

**Andre L'Eplattenier**
1332 Cleveland St SE Apt 6
Albany, OR  97322-7360

**Rebecca Brenton**
PO Box 2187
Corvallis, OR  97339

**James Read**
9615 Cockerham Ln.
Huntersville, NC 26078

**Japan NuScale Innovation, LLC**
3151 Briarpark Drive, Suite 400
Houston, ,TX 77042, U.S.A.
Attention:  Takeshi Hashizume

**Trevor Misfeldt**
622 NW 32nd St
Corvallis, OR 97330

**Richard Sandvik**
PO Box 1539
Sisters, OR 97759

**Edward Wallace**
8121 E 6th Ave
Denver, CO 80230

**Sargent & Lundy
NuHoldings, LLC**
55 E. Monroe Street
Chicago, IL 60603

**NuScale Korea Holdings LLC**
9F(IBK Securities M&A Division),
Samduk Bldg. 11, Gukjegeumyung-
ro 6-gil, Yeongdeungpo-gu,
Seoul, 07330, Republic of Korea
Attention: Jung Hun Kim

**Sargent & Lundy, LLC**
55 E. Monroe Street
Chicago, IL 60603

**Marc Hayden**
402 S 31st St.
Philomath, OR  97370

**David Sticklan**
5110 NW Wintercreek Dr.
Corvallis, OR 97330

**Jackson Gibbs**
28625 Oregon 99W
Corvallis, OR  97333

**Jordan Learmonth**
291 NE Stormy St
Albany, OR 97322

**John J. Surina, Jr.**
13366 Boones Ferry Rd
Lake Oswego , OR 97034

**Notice only:
IHI Corporation**
Toyosu IHI Building
1-1, Toyosu 3-Chome
Koto-ku, Japan
Attention: Masanori Ijichi, General
Manager, Nuclear Power Plant
Project Dept

**Kimberly O'Bryan-Heede**
1874 NW Jameson Pl
Corvallis, OR 97330

**Steve Shaw**
2324 NW Holly Pl
Albany, OR 97321

**Lionel Wertz**
1301 Lantern Ln
Middleboro, MA 02345

**Paul Lorenzini**
673 NW Ilwaco St
Camas, WA 98607

**Next Tech 1 New Technology
Investment Fund**
11, Gukjegeumyung-ro 6-gil,
Yeongdeungpo-gu, Seoul, 05263,
Republic of Korea
Attention: PE 1 Team

**Lenka Kollar**
PO Box 110056
Naples, FL  34108

**John Marking**
4161 Madrona Pl., SE
Albany, OR 97322

**Amber Carlson**
2427 W Mandalay Ln.
Phoenix, AZ 85023

**Gulshat Galimov**
6270 Colby
Oakland, CA 94618

**Paul Bennett**
142 W. Holland St.
San Marcos, TX  78666

**Donna Jean Reyes**
1566 NW Jonquil Place
Corvallis, Oregon 97330

**Notice only:
JGC Holdings Corporation**
2-3-1 Minato Mirai, Nishi-Ku,
Yokohama, Japan
Attention:  Juzo Iida

<div align="center">Schedule B</div>

**EXHIBIT 1
Page 95 of 108**

**Kent Kresa**
10431 Bellagio Rd.
Los Angeles, CA 90077

**Randall Morrill**
**441 S 925 E**
**Kaysville, UT 84037**

**Ben Fillmore**
2271 Waverly Dr SE #102
Albany, OR 97322

**GS Energy NA Investments, Inc.**
126 2nd Avenue
San Mateo
California 94401
U.S.A.
Attention: Kyung Joon Lee

**Next Tech 3 New Technology**
**Investment Fund**
9F, 21, Yeouidaebang-ro 67-gil,
Yeongdeungpo-gu, Seoul, Republic
of Korea
Attention:  Mr. Dae Seok Bae

**Samsung C&T Corporation**
Tower B, 26, Sangil-ro 6-gil,
Gangdong-gu, Seoul
Republic of Korea
Attention:  Il-Kwon Lee

Schedule B

**EXHIBIT 1**
**Page 96 of 108**

## <u>SCHEDULE C</u>

**OFFICERS AS OF THE EFFECTIVE DATE**

John Hopkins – CEO and President
Jose Reyes – Chief Technology Officer
Dale Atkinson -- Chief Operating Officer and Chief Nuclear Officer
Christopher Colbert – Chief Financial Officer
Thomas Bergman – VP, Regulatory Affairs
Robert K. Temple – General Counsel and Secretary

Schedule C

**EXHIBIT 1**
**Page 97 of 108**

## SCHEDULE D

## LIQUIDATION DISTRIBUTION EXAMPLE

Below is an example of a liquidity event, with Member distributions pursuant to Section 4.1 ("Distributions").  The example uses hypothetical assumptions to illustrate the applicability of Subsections 4.1(a)(i) through (vi).

Example Assumptions:

Series A Preferred Units:

▪ Series A Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2016 to December 1, 2016, resulting in aggregate Unreturned Preferred Capital of $120 million with respect to the Series A Preferred Units.

▪ Series A Preferred Original Issue Price shall be $1.00 per Series A Preferred Unit.

▪ The Series A Common Equivalent Ratio at all relevant times is equal to 1.0.

▪ With respect to any Series A Preferred Unit, an amount accruing on such Series A Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A Preferred Unit, beginning on the date such Series A Preferred Unit was issued.

▪ As of January 1, 2022, holders of Series A Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

All amounts in millions except Hurdle

| Date of Investment | Series A Preferred Units | Unpaid Series A Preferred Capital | Unpaid Series A Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2016 | 10.00 | $10.00 | $8.09 | $1.809 |
| 2/1/2016 | 10.00 | $10.00 | $7.94 | $1.794 |
| 3/1/2016 | 10.00 | $10.00 | $7.79 | $1.779 |
| 4/1/2016 | 10.00 | $10.00 | $7.65 | $1.765 |
| 5/1/2016 | 10.00 | $10.00 | $7.50 | $1.750 |
| 6/1/2016 | 10.00 | $10.00 | $7.36 | $1.736 |
| 7/1/2016 | 10.00 | $10.00 | $7.22 | $1.722 |
| 8/1/2016 | 10.00 | $10.00 | $7.07 | $1.707 |
| 9/1/2016 | 10.00 | $10.00 | $6.93 | $1.693 |
| 10/1/2016 | 10.00 | $10.00 | $6.80 | $1.680 |

Schedule D-1

EXHIBIT 1
Page 98 of 108

| | | | |
|---|---|---|---|
| 11/1/2016 | 10.00 | $10.00 | $6.66 | $1.666 |
| 12/1/2016 | 10.00 | $10.00 | $6.52 | $1.652 |
| **Total** | **120.00** | **$120.00** | **$87.52** | **N/A** |

<u>Series A-1 Preferred Units:</u>

▪ Series A-1 Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2017 to December 1, 2017, resulting in aggregate Unreturned Preferred Capital of $120 million with respect to the Series A-1 Preferred Units.

▪ Series A-1 Preferred Original Issue Price shall be $1.31 per Series A-1 Preferred Unit.

▪ The Series A-1 Common Equivalent Ratio at all relevant times is equal to 1.0.

▪ With respect to any Series A-1 Preferred Unit, an amount accruing on such Series A-1 Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A-1 Preferred Unit, beginning on the date such Series A-1 Preferred Unit was issued.

▪ As of January 1, 2022, holders of Series A-1 Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

All amounts in millions except Hurdle

| Date of Investment | Series A-1 Preferred Units | Unpaid Series A-1 Preferred Capital | Unpaid Series A-1 Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2017 | 7.63 | $10.00 | $6.39 | $2.147 |
| 2/1/2017 | 7.63 | $10.00 | $6.25 | $2.129 |
| 3/1/2017 | 7.63 | $10.00 | $6.12 | $2.112 |
| 4/1/2017 | 7.63 | $10.00 | $5.99 | $2.094 |
| 5/1/2017 | 7.63 | $10.00 | $5.86 | $2.077 |
| 6/1/2017 | 7.63 | $10.00 | $5.73 | $2.060 |
| 7/1/2017 | 7.63 | $10.00 | $5.60 | $2.043 |
| 8/1/2017 | 7.63 | $10.00 | $5.47 | $2.026 |
| 9/1/2017 | 7.63 | $10.00 | $5.34 | $2.010 |
| 10/1/2017 | 7.63 | $10.00 | $5.22 | $1.993 |
| 11/1/2017 | 7.63 | $10.00 | $5.09 | $1.977 |
| 12/1/2017 | 7.63 | $10.00 | $4.97 | $1.961 |
| | **91.60** | **$120.00** | **$68.01** | **N/A** |

Schedule D-2

**EXHIBIT 1**
**Page 99 of 108**

Series A-2 Preferred Units:

- Series A-2 Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2018 to December 1, 2018, resulting in aggregate Unreturned Preferred Capital of $120 million with respect to the Series A-2 Preferred Units.

- Series A-2 Preferred Original Issue Price shall be $1.42 per Series A-2 Preferred Unit.

- The Series A-2 Common Equivalent Ratio at all relevant times is equal to 1.0.

- With respect to any Series A-2 Preferred Unit, an amount accruing on such Series A-2 Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A-2 Preferred Unit, beginning on the date such Series A-2 Preferred Unit was issued.

- As of January 1, 2022, holders of Series A-2 Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

All amounts in millions except Hurdle

| Date of Investment | Series A-2 Preferred Units | Unpaid Series A-2 Preferred Capital | Unpaid Series A-2 Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2018 | 7.04 | $10.00 | $4.85 | $2.108 |
| 2/1/2018 | 7.04 | $10.00 | $4.72 | $2.091 |
| 3/1/2018 | 7.04 | $10.00 | $4.60 | $2.074 |
| 4/1/2018 | 7.04 | $10.00 | $4.48 | $2.057 |
| 5/1/2018 | 7.04 | $10.00 | $4.36 | $2.040 |
| 6/1/2018 | 7.04 | $10.00 | $4.25 | $2.023 |
| 7/1/2018 | 7.04 | $10.00 | $4.13 | $2.006 |
| 8/1/2018 | 7.04 | $10.00 | $4.01 | $1.990 |
| 9/1/2018 | 7.04 | $10.00 | $3.90 | $1.974 |
| 10/1/2018 | 7.04 | $10.00 | $3.79 | $1.957 |
| 11/1/2018 | 7.04 | $10.00 | $3.67 | $1.941 |
| 12/1/2018 | 7.04 | $10.00 | $3.56 | $1.926 |
| | **84.51** | **$120.00** | **$50.32** | **N/A** |

Series A-3 Preferred Units:

- Series A-3 Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2019 to December 1, 2019, resulting in

Schedule D-3

**EXHIBIT 1**
**Page 100 of 108**

aggregate Unreturned Preferred Capital of $120 million with respect to the Series A-3 Preferred Units.

- Series A-3 Preferred Original Issue Price shall be $1.59 per Series A-3 Preferred Unit.

- The Series A-3 Common Equivalent Ratio at all relevant times is equal to 1.0.

- With respect to any Series A-3 Preferred Unit, an amount accruing on such Series A-3 Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A-3 Preferred Unit, beginning on the date such Series A-3 Preferred Unit was issued.

- As of January 1, 2022, holders of Series A-3 Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

All amounts in millions except Hurdle

| Date of Investment | Series A-3 Preferred Units | Unpaid Series A-3 Preferred Capital | Unpaid Series A-3 Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2019 | 6.29 | $10.00 | $3.45 | $2.138 |
| 2/1/2019 | 6.29 | $10.00 | $3.34 | $2.121 |
| 3/1/2019 | 6.29 | $10.00 | $3.23 | $2.103 |
| 4/1/2019 | 6.29 | $10.00 | $3.12 | $2.086 |
| 5/1/2019 | 6.29 | $10.00 | $3.01 | $2.069 |
| 6/1/2019 | 6.29 | $10.00 | $2.91 | $2.052 |
| 7/1/2019 | 6.29 | $10.00 | $2.80 | $2.035 |
| 8/1/2019 | 6.29 | $10.00 | $2.70 | $2.019 |
| 9/1/2019 | 6.29 | $10.00 | $2.59 | $2.002 |
| 10/1/2019 | 6.29 | $10.00 | $2.49 | $1.986 |
| 11/1/2019 | 6.29 | $10.00 | $2.39 | $1.969 |
| 12/1/2019 | 6.29 | $10.00 | $2.28 | $1.953 |
| | **75.47** | **$120.00** | **$34.31** | **N/A** |

Series A-4 Preferred Units:

- Series A-4 Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2020 to December 1, 2020, resulting in aggregate Unreturned Preferred Capital of $120 million with respect to the Series A-4 Preferred Units.

- Series A-4 Preferred Original Issue Price shall be $1.92 per Series A-4 Preferred Unit.

- The Series A-4 Common Equivalent Ratio at all relevant times is equal to 1.0.

- With respect to any Series A-4 Preferred Unit, an amount accruing on such Series

Schedule D-4

**EXHIBIT 1**
**Page 101 of 108**

A-4 Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A-4 Preferred Unit, beginning on the date such Series A-4 Preferred Unit was issued.

- As of January 1, 2022, holders of Series A-4 Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

All amounts in millions except Hurdle

| Date of Investment | Series A-4 Preferred Units | Unpaid Series A-4 Preferred Capital | Unpaid Series A-4 Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2020 | 5.21 | $10.00 | $2.18 | $2.327 |
| 2/1/2020 | 5.21 | $10.00 | $2.08 | $2.308 |
| 3/1/2020 | 5.21 | $10.00 | $1.99 | $2.289 |
| 4/1/2020 | 5.21 | $10.00 | $1.89 | $2.270 |
| 5/1/2020 | 5.21 | $10.00 | $1.79 | $2.252 |
| 6/1/2020 | 5.21 | $10.00 | $1.69 | $2.233 |
| 7/1/2020 | 5.21 | $10.00 | $1.60 | $2.215 |
| 8/1/2020 | 5.21 | $10.00 | $1.50 | $2.197 |
| 9/1/2020 | 5.21 | $10.00 | $1.41 | $2.179 |
| 10/1/2020 | 5.21 | $10.00 | $1.31 | $2.161 |
| 11/1/2020 | 5.21 | $10.00 | $1.22 | $2.143 |
| 12/1/2020 | 5.21 | $10.00 | $1.13 | $2.126 |
|  | 62.50 | $120.00 | $19.79 | N/A |

Series A-5 Preferred Units:

- Series A-5 Preferred Units purchased for $120 million, occurring in equal monthly investments of $10 million, from January 1, 2021 to December 1, 2021, resulting in aggregate Unreturned Preferred Capital of $120 million with respect to the Series A-4 Preferred Units.

- Series A-5 Preferred Original Issue Price shall be $2.19 per Series A-5 Preferred Unit.

- The Series A-5 Common Equivalent Ratio at all relevant times is equal to 1.0.

- With respect to any Series A-5 Preferred Unit, an amount accruing on such Series A-5 Preferred Unit, compounded on each Fiscal Quarter, at the rate of ten percent (10.00%) per annum on the Unreturned Preferred Capital of such Series A-5 Preferred Unit, beginning on the date such Series A-5 Preferred Unit was issued.

- As of January 1, 2022, holders of Series A-5 Preferred Units have accrued the following in Unreturned Preferred Capital and Unpaid Preferred Return:

Schedule D-5

EXHIBIT 1
Page 102 of 108

All amounts in millions except Hurdle

| Date of Investment | Series A-5 Preferred Units | Unpaid Series A-5 Preferred Capital | Unpaid Series A-5 Preferred Return | Hurdle |
|---|---|---|---|---|
| 1/1/2020 | 4.57 | $10.00 | $1.04 | $2.417 |
| 2/1/2020 | 4.57 | $10.00 | $0.95 | $2.398 |
| 3/1/2020 | 4.57 | $10.00 | $0.86 | $2.378 |
| 4/1/2020 | 4.57 | $10.00 | $0.77 | $2.358 |
| 5/1/2020 | 4.57 | $10.00 | $0.68 | $2.339 |
| 6/1/2020 | 4.57 | $10.00 | $0.59 | $2.320 |
| 7/1/2020 | 4.57 | $10.00 | $0.51 | $2.301 |
| 8/1/2020 | 4.57 | $10.00 | $0.42 | $2.282 |
| 9/1/2020 | 4.57 | $10.00 | $0.33 | $2.263 |
| 10/1/2020 | 4.57 | $10.00 | $0.25 | $2.245 |
| 11/1/2020 | 4.57 | $10.00 | $0.17 | $2.226 |
| 12/1/2020 | 4.57 | $10.00 | $0.08 | $2.208 |
| | **54.79** | **$120.00** | **$6.65** | **N/A** |

Common Units:

- As of December 31, 2021, 25 million Common Units are outstanding.

Distribution:

- On January 1, 2022, a Distribution of $1,500.0M to Members is approved.

- Lowest Hurdle is $1.652.

- Next Lowest Hurdle is $1.666.

- Subsequent Next Lowest Hurdle is $1.680 and thereafter is the next lowest Hurdle in any of the five tables above.

- Lowest Hurdle Preferred Units are the 10 million Series A Preferred Units issued on 12/1/2016.

- Next Lowest Hurdle Preferred Units are the 10 million Series A Preferred Units issued on 11/1/2016 and thereafter are the tranche of Preferred Units having the Subsequent Next Lowest Hurdle.

- Highest Preferred Hurdle is $2.417.

- All decimals rounded to the nearest hundredth except Hurdle which is in thousandths.

- Distribution amounts are calculated on un-rounded Hurdle values

Schedule D-6

**EXHIBIT 1**
**Page 103 of 108**

<u>Example</u>:

4.1    **<u>Distributions</u>**.

(a)    **<u>General</u>**.  Except as otherwise set forth in <u>Section 4.1(b)</u> or <u>Section 4.1(d)</u>, the Board may (but shall not be obligated to) direct the Company to make Distributions at any time or from time to time, but only in the following order of priority:

(i)    first, to the holders of Preferred Units (ratably among such holders based upon the aggregate Unpaid Preferred Return with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution) until the aggregate Unpaid Preferred Return with respect to each such holder's Preferred Units has been reduced to zero;

1.    Each Series A Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all Series A Preferred Units issued on that date divided by 10 million.  The total distributed under this paragraph (i) on the Series A Preferred Units is $87.5 million.

2.    Each Series A-1 Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all Series A-1 Preferred Units issued on that date divided by 7.63 million.  The total distributed under this paragraph (i) on the Series A-1 Preferred Units is $68.0 million.

3.    Each Series A-2 Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all Series A-2 Preferred Units issued on that date divided by 7.04 million.  The total distributed under this paragraph (i) on the Series A-2 Preferred Units is $50.3 million.

4.    Each Series A-3 Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all Series A-3 Preferred Units issued on that date divided by 6.29 million.  The total distributed under this paragraph (i) on the Series A-3 Preferred Units is $34.3 million.

5.    Each Series A-4 Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all Series A-4 Preferred Units issued on that date divided by 5.24 million.  The total distributed under this paragraph (i) on the Series A-4 Preferred Units is $19.8 million.

6.    Each Series A-5 Preferred Unit issued on a particular date receives the amount equal to the aggregate Unpaid Preferred Return of all

**EXHIBIT 1**
**Page 104 of 108**

Series A-5 Preferred Units issued on that date divided by 4.57 million.  The total distributed under this paragraph (i) on the Series A-5 Preferred Units is $6.6 million.

7. The total distributed under this paragraph (i) is $266.6 million.

(ii) second, to the holders of the Preferred Units (ratably among such holders based upon the aggregate Unreturned Preferred Capital with respect to all outstanding Preferred Units held by each such holder immediately prior to such Distribution) until the aggregate Unreturned Preferred Capital with respect to each such holder's Preferred Units has been reduced to zero;

1. Each of the 120 million outstanding Series A Preferred Units receives $1.00 for a total of $120 million.

2. Each of the 91.6 million outstanding Series A-1 Preferred Units receives $1.31 for a total of $120 million.

3. Each of the 84.5 million outstanding Series A-2 Preferred Units receives $1.42 for a total of $120 million.

4. Each of the 75.5 million outstanding Series A-3 Preferred Units receives $1.59 for a total of $120 million.

5. Each of the 62.8 million outstanding Series A-4 Preferred Units receives $1.91 for a total of $120 million.

6. Each of the 54.8 million outstanding Series A-5 Preferred Units receives $2.19 for a total of $120 million.

7. The total distributed under this paragraph (ii) is $720 million.

(iii) third, to the holders of Common Units (ratably among such holders based on their respective Common Pro Rata Interests) until the amount distributed with respect to each Common Unit is equal to the Lowest Hurdle;

1. Each of the 25 million outstanding Common Units receives the Lowest Hurdle of $1.652.

2. The total distributed under this paragraph (iii) is $41.3 million.

(iv) fourth, on each Common Unit (including each Common Unit then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units into Common Units at the Common Equivalent Ratio then in effect) until the amount distributed with respect to each such Common Unit is equal to the Next Lowest Hurdle;

Schedule D-8

EXHIBIT 1
Page 105 of 108

1.      Each of the 25 million outstanding Common Units receives $0.014 per Unit to reach the Next Lowest Hurdle of $1.666, for a total of $341 thousand.

2.      Each of the 10 million outstanding Lowest Hurdle Preferred Units receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii) and this (iv) to the Next Lowest Hurdle of $1.666, for a total of $137 thousand.

3.      The total distributed under this paragraph (iv) is $478 thousand.

(v)     fifth, and repeating this clause (v) until the amount distributed with respect to each Common Unit (including each Common Unit then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units and Next Lowest Hurdle Preferred Units into Common Units at the Common Equivalent Ratio then in effect) equals the Highest Preferred Hurdle, on each Common Unit (including each Common Unit then issuable upon the hypothetical conversion of all Lowest Hurdle Preferred Units and Next Lowest Hurdle Preferred Units at the Common Equivalent Ratio then in effect) until the amount distributed with respect to each such Common Unit is equal to the Subsequent Next Lowest Hurdle; and

1.      Each of the 25 million outstanding Common Units receives $0.014 per Unit to reach the Subsequent Next Lowest Hurdle of $1.680, for a total of $344 thousand.

2.      Each of the 10 million outstanding Lowest Hurdle Preferred Units receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii), (iv) and this (v) to the Subsequent Next Lowest Hurdle of $1.680, for a total of $138 thousand.

3.      Each of the 10 million outstanding Next Lowest Hurdle Preferred Units with a Hurdle of $1.666 receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii), (iv) and this (v) to the Subsequent Next Lowest Hurdle of $1.680, for a total of $138 thousand.

4.      The total distributed under Items 1 through 3 of this paragraph (v) is $620 thousand.

5.      Each of the 25 million outstanding Common Units then receives $0.014 per Unit to reach the next Subsequent Next Lowest Hurdle of $1.693, for a total of $347 thousand.

6.      Each of the 10 million outstanding Lowest Hurdle Preferred Units receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii) and this (v) to the next

Schedule D-9

EXHIBIT 1
Page 106 of 108

Subsequent Next Lowest Hurdle of $1.693, for a total of $139 thousand.

7. Each of the 10 million outstanding Next Lowest Hurdle Preferred Units with a Hurdle of $1.666 receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii), (iv) and this (v) to the next Subsequent Next Lowest Hurdle of $1.693, for a total of $139 thousand.

8. Each of the 10 million outstanding Next Lowest Hurdle Preferred Units with a Hurdle of $1.680 receives $0.014 per Unit bringing the total amount received on each of those Units under paragraphs (i), (ii), (iv) and this (v) to the next Subsequent Next Lowest Hurdle of $1.693, for a total of $139 thousand.

9. The total distributed under Items 5 through 8 of this paragraph (v) is $763 thousand.

10. Continue to repeat the pattern illustrated by Items 1 through 3 and 5 through 8 until all Units have received the Highest Hurdle of $2.417.

11. The total distributed under this paragraph (v) is $215 million.

(vi)    finally, to the holders of Units (ratably among such holders based on their respective Common Participating Interests).

1. $1,243 million has been distributed under paragraphs (i) through (v), leaving $257 million available.

2. There are 459.1 million Units outstanding (120 million Series A Preferred Units, 91.6 million Series A-1 Preferred Units, 84.5 million Series A-2 Preferred Units, 75.5 million Series A-3 Preferred Units, 62.8 million Series A-4 Preferred Units, 54.8 million Series A-5 Preferred Units, and 25 million Common Units).

3. Each Unit receives $0.4998 under this paragraph (vi).

4. Each Unit receives $2.917 in the Distribution.

Summary of Example Results:

▪ The following table summarizes the priority of distributions for this example, pursuant to Section 4.1(a):

Schedule D-10

EXHIBIT 1
Page 107 of 108

All amounts in millions except Hurdle

| Section 4.1(a) | (i) | (ii) | (iii) | (iv) | (v) | (vi) |
|---|---|---|---|---|---|---|
| **Hurdle** | N/A | N/A | **1.652** | **1.666** | **1.68 - 2.417** | **3.163** |
| **Incremental Net Proceeds** | $266.6 | 720.0 | 41.3 | 0.5 | 0.6 - 214.6 | 1243.0 |
| **Cumulative Net Proceeds** | $266.6 | 986.6 | 1027.9 | 1028.4 | 1029 - 1243 | 1500.0 |
| **Incremental Series A Preferred** | $87.5 | 120.00 | - | 0.10 | 0.3 - 82.4 | 59.97 |
| **Cumulative Series A Preferred** | $87.5 | 207.5 | 207.5 | 207.7 | 207.9 - 290.1 | 350.1 |
| **Incremental Series A-1 Preferred** | $68.0 | 120.0 | - | - | 0.0 - 33.4 | 45.8 |
| **Cumulative Series A-1 Preferred** | $68.0 | 188.0 | 188.0 | 188.0 | 188 - 221.4 | 267.2 |
| **Incremental Series A-2 Preferred** | $50.3 | 120.0 | - | - | 0.0 - 34 | 42.2 |
| **Cumulative Series A-2 Preferred** | $50.3 | 170.3 | 170.3 | 170.3 | 170.3 - 204.3 | 246.5 |
| **Incremental Series A-3 Preferred** | $34.3 | 120.0 | - | - | 0.0 - 28.1 | 37.7 |
| **Cumulative Series A-3 Preferred** | $34.3 | 154.3 | 154.3 | 154.3 | 154.3 - 182.4 | 220.2 |
| **Incremental Series A-4 Preferred** | $19.8 | 120.0 | - | - | 0.0 - 12.1 | 31.4 |
| **Cumulative Series A-4 Preferred** | $19.8 | 139.8 | 139.8 | 139.8 | 139.8 - 151.9 | 183.3 |
| **Incremental Series A-5 Preferred** | $6.6 | 120.0 | - | - | 0.0 - 5.8 | 27.4 |
| **Cumulative Series A-5 Preferred** | $6.6 | 126.6 | 126.6 | 126.6 | 126.6 - 132.5 | 159.8 |
| **Incremental Common** | - | - | 41.3 | 0.3 | 0.3 - 18.8 | 12.5 |
| **Cumulative Common** | - | - | 41.3 | 37.7 | 42 - 56.6 | 72.9 |

Schedule D-11

**EXHIBIT 1**
**Page 108 of 108**