*Execution Version*

AGREEMENT AND PLAN OF MERGER

dated as of

December 13, 2021

by and among

SPRING VALLEY ACQUISITION CORP.,

SPRING VALLEY MERGER SUB, LLC,

and

NUSCALE POWER, LLC

**EXHIBIT 2**
**Page 1 of 404**

# TABLE OF CONTENTS

**Page**

ARTICLE I CERTAIN DEFINITIONS ................................................................ 2
    1.01   Definitions ................................................................................. 2
    1.02   Construction ............................................................................. 19
ARTICLE II THE CONTRIBUTION & MERGER; CLOSING ................................ 20
    2.01   The Contribution ....................................................................... 20
    2.02   The Merger ............................................................................... 20
    2.03   Effects of the Merger ................................................................ 21
    2.04   Closing ..................................................................................... 21
    2.05   Organizational Documents of the Company and Acquiror ............ 21
    2.06   Directors and Officers of the Companies .................................... 22
    2.07   Redomicile and Recapitalization ............................................... 23
    2.08   Sponsor Forfeiture .................................................................... 24
ARTICLE III EFFECTS OF THE MERGER ...................................................... 24
    3.01   Effect on Company Units ........................................................... 24
    3.02   Equitable Adjustments .............................................................. 25
    3.03   Treatment of Company Options and Company Unit Appreciation Rights. .......... 25
    3.04   Withholding .............................................................................. 26
    3.05   Cash in Lieu of Fractional Shares .............................................. 27
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................ 27
    4.01   Organization, Standing and Corporate Power ............................. 27
    4.02   Corporate Authority; Approval; Non-Contravention ..................... 28
    4.03   Governmental Approvals ........................................................... 28
    4.04   Capitalization ........................................................................... 28
    4.05   Financial Statements; Internal Controls ..................................... 30
    4.06   Compliance with Laws .............................................................. 31
    4.07   Absence of Certain Changes or Events ...................................... 32
    4.08   No Undisclosed Liabilities ......................................................... 32
    4.09   Information Supplied ................................................................. 32
    4.10   Litigation ................................................................................. 32
    4.11   Contracts ................................................................................. 33
    4.12   Employee Benefits ................................................................... 36
    4.13   Labor and Employment ............................................................. 37

**EXHIBIT 2**
**Page 2 of 404**

|       |                                                                                     |     |
|-------|-------------------------------------------------------------------------------------|-----|
| 4.14  | Taxes                                                                                | 39  |
| 4.15  | Intellectual Property                                                               | 40  |
| 4.16  | Data Protection                                                                     | 41  |
| 4.17  | Information Technology                                                              | 42  |
| 4.18  | Real Property                                                                       | 43  |
| 4.19  | Corrupt Practices; Sanctions                                                        | 44  |
| 4.20  | Insurance                                                                           | 45  |
| 4.21  | Competition and Trade Regulation                                                   | 45  |
| 4.22  | Environmental Matters                                                               | 46  |
| 4.23  | Customers and Suppliers                                                             | 46  |
| 4.24  | Brokers                                                                             | 47  |
| 4.25  | U.S. Nuclear Regulatory Matters.                                                    | 47  |
| 4.26  | Affiliate Agreements                                                               | 47  |
| 4.27  | No Other Representations or Warranties                                             | 47  |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF ACQUIROR AND MERGER SUB** ....... 48

|       |                                                                                     |     |
|-------|-------------------------------------------------------------------------------------|-----|
| 5.01  | Organization, Standing and Corporate Power                                          | 48  |
| 5.02  | Corporate Authority; Approval; Non-Contravention; Government Approvals              | 48  |
| 5.03  | Compliance with Laws                                                               | 49  |
| 5.04  | Employee Benefit Plans                                                             | 50  |
| 5.05  | Financial Ability; Trust Account                                                   | 50  |
| 5.06  | Taxes                                                                              | 51  |
| 5.07  | Brokers                                                                            | 52  |
| 5.08  | Acquiror SEC Reports; Financial Statements; Sarbanes-Oxley Act                     | 53  |
| 5.09  | Business Activities; Absence of Changes                                            | 54  |
| 5.10  | Information Supplied; Registration Statement                                       | 55  |
| 5.11  | Litigation                                                                         | 55  |
| 5.12  | No Outside Reliance                                                                | 56  |
| 5.13  | Capitalization                                                                     | 56  |
| 5.14  | NASDAQ Stock Market Quotation                                                      | 57  |
| 5.15  | Affiliate Agreements                                                               | 58  |
| 5.16  | Corrupt Practice.                                                                  | 58  |
| 5.17  | PIPE Investment Amount; Subscription Agreements                                    | 58  |
| 5.18  | No Other Representations or Warranties                                             | 59  |

**EXHIBIT 2**
**Page 3 of 404**

ARTICLE VI COVENANTS OF THE COMPANY ................................................................. 60

6.01   Conduct of Business ............................................................................. 60

6.02   Inspection ............................................................................................. 63

6.03   HSR Act and Regulatory Approvals...................................................... 64

6.04   No Claim Against the Trust Account..................................................... 65

6.05   Proxy Solicitation; Other Actions ........................................................ 66

6.06   Non-Solicitation.................................................................................... 66

6.07   Cooperation under the Credit Documents.............................................. 68

ARTICLE VII COVENANTS OF ACQUIROR ................................................................... 68

7.01   HSR Act and Regulatory Approvals...................................................... 68

7.02   Indemnification and Insurance.............................................................. 69

7.03   Conduct of Acquiror During the Interim Period.................................... 71

7.04   Trust Account ....................................................................................... 73

7.05   Inspection ............................................................................................. 73

7.06   Acquiror NASDAQ Listing ................................................................. 73

7.07   Acquiror Public Filings ....................................................................... 73

7.08   Financing.............................................................................................. 73

7.09   Additional Insurance Matters ............................................................... 75

7.10   Director and Officer Appointments ...................................................... 75

7.11   Exclusivity ........................................................................................... 75

7.12   Redomicile ........................................................................................... 75

7.13   Acquiror Transaction Expenses ............................................................ 76

ARTICLE VIII JOINT COVENANTS ............................................................................... 76

8.01   Support of Transaction......................................................................... 76

8.02   Preparation of Registration Statement; Special Meeting; Solicitation of
       Company Unitholder Approvals ............................................................ 76

8.03   Tax Matters .......................................................................................... 79

8.04   Confidentiality; Publicity..................................................................... 81

8.05   Post-Closing Cooperation; Further Assurances ..................................... 82

ARTICLE IX CONDITIONS TO OBLIGATIONS............................................................... 82

9.01   Conditions to Obligations of All Parties............................................... 82

9.02   Additional Conditions to Obligations of Acquiror ............................... 83

9.03   Additional Conditions to the Obligations of the Company .................... 84

ARTICLE X TERMINATION/EFFECTIVENESS ............................................................... 85

10.01  Termination.......................................................................................... 85

EXHIBIT 2
Page 4 of 404

10.02    Effect of Termination ................................................................................ 86

ARTICLE XI MISCELLANEOUS ............................................................................ 87

11.01    Waiver ......................................................................................................... 87

11.02    Notices ........................................................................................................ 87

11.03    Assignment ................................................................................................. 88

11.04    Rights of Third Parties ............................................................................... 88

11.05    Expenses ..................................................................................................... 88

11.06    Governing Law ........................................................................................... 89

11.07    Captions; Counterparts ............................................................................... 89

11.08    Schedules and Exhibits ............................................................................... 89

11.09    Entire Agreement ....................................................................................... 89

11.10    Amendments ............................................................................................... 89

11.11    Severability ................................................................................................. 90

11.12    Jurisdiction; WAIVER OF TRIAL BY JURY ......................................... 90

11.13    Enforcement ............................................................................................... 90

11.14    Non-Recourse ............................................................................................. 91

11.15    Non-survival of Representations, Warranties and Covenants .................... 91

11.16    Acknowledgements ..................................................................................... 91

**Exhibits**

Exhibit A – Form of Subscription Agreement
Exhibit B – Form of Support Agreements
Exhibit C – Form of Registration Rights Agreement
Exhibit D – Form of Lock-Up Agreement
Exhibit E – Form of Certificate of Incorporation of Acquiror
Exhibit F – Form of Bylaws of Acquiror
Exhibit G – Form of Tax Receivable Agreement
Exhibit H – Form of Amended and Restated Limited Liability Company Agreement

EXHIBIT 2
Page 5 of 404

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), dated as of December 13, 2021, is entered into by and among Spring Valley Acquisition Corp., a Cayman Islands exempted company ("Acquiror"), Spring Valley Merger Sub, LLC, an Oregon limited liability company ("Merger Sub") and NuScale Power, LLC, an Oregon limited liability company (the "Company"). Except as otherwise indicated, capitalized terms used but not defined herein shall have the meanings set forth in Article I of this Agreement.

## RECITALS

WHEREAS, (a) Acquiror is a blank check company incorporated as a Cayman Islands exempted company to acquire one or more operating businesses through a Business Combination and (b) Merger Sub is a wholly owned, direct subsidiary of Acquiror, and was formed for the sole purpose of merging with and into an operating business as part of a Business Combination;

WHEREAS, pursuant to the Acquiror Organizational Documents, Acquiror shall provide an opportunity to its shareholders to have their Acquiror Class A Shares redeemed prior to the Redomicile for the consideration, and on the terms and subject to the conditions and limitations, set forth in this Agreement, the Acquiror Organizational Documents, the Trust Agreement, and the Proxy Statement in conjunction with, *inter alia*, obtaining approval from the shareholders of Acquiror for the Proposals (the "Offer");

WHEREAS, contemporaneously with the execution and delivery of this Agreement, in connection with the Transactions, Acquiror and each of the investors listed on Schedule 5.17 (collectively, the "Subscribers") have entered into certain Subscription Agreements, dated as of the date hereof (as amended or modified from time to time, collectively, the "Subscription Agreements"), each in substantially the same form as set forth on Exhibit A, pursuant to which the Subscribers have agreed to subscribe for and purchase, a number of shares of Acquiror Common Stock, in each case, on the terms and subject to the conditions set forth in the applicable Subscription Agreements, in a private placement, such private placement to be consummated immediately after the consummation of the Redomicile and prior to the Merger (the "PIPE Investment");

WHEREAS, contemporaneously with the execution and delivery of this Agreement, in connection with the Transactions, the Sponsor has entered into that certain Sponsor Letter Agreement, dated as of the date hereof (the "Sponsor Letter Agreement"), with Acquiror and the Company;

WHEREAS, contemporaneously with the execution and delivery of this Agreement, in connection with the Transactions, the Sponsor and its board members have each entered into a certain Support Agreement, dated as of the date hereof (the "Support Agreements"), with the Company, in the form set forth on Exhibit B-1 or Exhibit B-2, pursuant to which, among other things, the Sponsor and its board members have each agreed to vote in favor of the Transactions;

WHEREAS, contemporaneously with the Closing, in connection with the Transactions, Acquiror, the Company, certain Acquiror Stockholders and certain Company Unitholders will

**EXHIBIT 2**
**Page 6 of 404**

enter into that certain Registration Rights Agreement (the "Registration Rights Agreement"), in the form set forth on Exhibit C to be effective upon the Closing;

WHEREAS, contemporaneously with the Closing, in connection with the Transactions, certain Company Unitholders will each enter into separate Lock-Up Agreements (each, a "Lock-Up Agreement"), substantially in the form set forth on Exhibit D;

WHEREAS, the Acquiror shall, subject to obtaining the Acquiror Stockholder Approvals, (i) on the day prior to the Closing Date, domesticate as a corporation in the State of Delaware (the "Redomicile"), and (ii) in connection with the Redomicile, Acquiror shall adopt (1) an initial certificate of incorporation in the form attached hereto as Exhibit E (the "Acquiror Charter") and (2) initial bylaws in the form attached hereto as Exhibit F (the "Acquiror Bylaws");

WHEREAS, contemporaneously with the Closing, Acquiror, the Surviving Company, and certain Company Unitholders will enter into the Tax Receivable Agreement ("Tax Receivable Agreement"), substantially in the form set forth in Exhibit G;

WHEREAS, at the Closing, immediately prior to the Effective Time, the Acquiror shall contribute, or cause to be contributed, to Merger Sub the Closing Acquiror Cash;

WHEREAS, subject to the terms and conditions hereof, at the Closing, Merger Sub will merge with and into the Company pursuant to the Merger, with the Company surviving as the Surviving Company;

WHEREAS, the respective board of directors, sole member and board of managers of each of Acquiror, Merger Sub and the Company have each approved and declared advisable this Agreement and the Transactions upon the terms and subject to the conditions of this Agreement and in accordance with the Laws of its jurisdiction;

WHEREAS, prior to the consummation of the Transactions, the Acquiror shall, subject to obtaining the Majority Acquiror Stockholder Approval, adopt the NuScale Power Corporation 2022 Long-Term Incentive Plan omnibus incentive plan (the "Acquiror Equity Incentive Plan") in the form materially consistent with the form provided to the Acquiror as of the date hereof; and

WHEREAS, Acquiror shall be renamed "NuScale Power Corporation" and shall trade publicly on NASDAQ under a new ticker symbol selected by the Company.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, Acquiror, Merger Sub and the Company agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

1.01    Definitions. As used herein, the following terms shall have the following meanings:

"A&R Company LLC Agreement" has the meaning set forth in Section 2.05(b).

EXHIBIT 2
Page 7 of 404

"Acquiror" has the meaning specified in the preamble hereto.

"Acquiror Affiliate Agreement" has the meaning specified in Section 5.15.

"Acquiror and Merger Sub Representations" means the representations and warranties of each of Acquiror and Merger Sub expressly and specifically set forth in Article V of this Agreement, as qualified by the Schedules. For the avoidance of doubt, the Acquiror and Merger Sub Representations are solely made by Acquiror and Merger Sub.

"Acquiror Board" means the board of directors of Acquiror.

"Acquiror Board Recommendation" has the meaning specified in Section 8.02(d).

"Acquiror Bylaws" has the meaning specified in the Recitals hereto.

"Acquiror Change in Recommendation" has the meaning specified in Section 8.02(d).

"Acquiror Charter" has the meaning specified in the Recitals hereto.

"Acquiror Class A Share" means, prior to the consummation of the Redomicile, a Class A ordinary share, par value $0.0001 per share, of the share capital of Acquiror.

"Acquiror Common Stock" means, after consummation of the Redomicile, a share of Class A common stock, par value $0.0001 per share, of Acquiror, as contemplated by the Acquiror Charter.

"Acquiror Cure Period" has the meaning specified in Section 10.01(c).

"Acquiror Director Designee" has the meaning specified in Section 2.06(c).

"Acquiror Equity Incentive Plan" has the meaning specified in the Recitals hereto.

"Acquiror Equity Plan Proposal" has the meaning specified in Section 8.02(c).

"Acquiror Material Adverse Effect" means any event, change, circumstance or development (each an "Effect") that, individually or in the aggregate with all other Effects, that has had or would reasonably be expected to have (x) a material adverse effect on the financial condition, assets, liabilities, business, or results of operations of Acquiror and Merger Sub, taken as a whole, or (y) a prevention, material delay or material impairment in the ability of Acquiror or Merger Sub to timely consummate the Transactions.

"Acquiror New Class B Stock" means, after consummation of the Redomicile, a non-economic voting share of Class B common stock, par value $0.0001 per share, of the Acquiror, with each share having non-economic rights equivalent to one share of Acquiror Common Stock, as contemplated by the Acquiror Charter.

"Acquiror Old Class B Share" means, prior to the consummation of the Redomicile, a Class B ordinary share, par value $0.0001 per share, of the share capital of Acquiror.

EXHIBIT 2
Page 8 of 404

"<u>Acquiror Organizational Documents</u>" means the Amended and Restated Memorandum and Articles of Association as dated 26 November 2020, as may be amended from time to time in accordance with the terms of this Agreement.

"<u>Acquiror SEC Reports</u>" has the meaning specified in <u>Section 5.08(a)</u>.

"<u>Acquiror Share Value</u>" means $10.00.

"<u>Acquiror Stockholder</u>" means a holder of any Acquiror Class A Shares or Acquiror Old Class B Shares.

"<u>Acquiror Stockholder Approvals</u>" means the Majority Acquiror Stockholder Approval and the Supermajority Acquiror Stockholder Approval.

"<u>Acquiror Tax Counsel</u>" has the meaning specified in <u>Section 8.03(c)</u>.

"<u>Acquiror Warrant</u>" means each whole warrant exercisable for one Acquiror Class A Share at a purchase price of $11.50 per Acquiror Class A Share in the form described in the Acquiror SEC Reports.

"<u>Acquisition Proposal</u>" means any proposal or offer from any Person or "group" (as defined in the Exchange Act) (other than Acquiror, Merger Sub or their respective Affiliates) relating to, in a single transaction or series of related transactions, (a) any direct or indirect acquisition or purchase of a business that constitutes 20% or more of the net revenues, net income or assets of the Company, (b) any direct or indirect acquisition of 20% or more of the consolidated assets of the Company (based on the fair market value thereof, as determined in good faith by the Company Board), (c) acquisition of beneficial ownership, or the right to acquire beneficial ownership, of 20% or more of the total voting power of the Equity Securities of the Company, any tender offer or exchange offer that if consummated would result in any Person beneficially owning 20% or more of the total voting power of the Equity Securities of the Company, or any merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company or (d) any issuance or sale or other disposition (including by way of merger, reorganization, division, consolidation, share exchange, business combination, recapitalization or other similar transaction) of 20% or more of the total voting power of the Equity Securities of the Company.

"<u>Action</u>" means any claim, action, suit, charge, complaint, grievance, assessment, audit, investigation, examination, arbitration, inquiry, dispute, litigation, or proceeding, in each case that is by or before any Governmental Authority.

"<u>Additional Proposal</u>" has the meaning specified in <u>Section 8.02(c)</u>.

"<u>Affiliate</u>" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, the ownership of voting securities, its capacity as a manager, sole or managing member or otherwise, through one or more intermediaries, where "<u>control</u>" means possession of the power to direct the management and policies of such specified Person.

4

**EXHIBIT 2**
**Page 9 of 404**

"Aggregate Exercise Price" means (i) the aggregate exercise price that would be paid to the Company in respect of all Company Options (whether or not vested) if all such Company Options were exercised in full immediately prior to the Effective Time (without giving effect to any "net" exercise or similar concept), plus (ii) the aggregate strike price of all Company Unit Appreciation Rights. For the avoidance of doubt, all references to the exercise price of Company Options shall be to the exercise price of the applicable Company Option immediately prior to the Effective Time, in accordance with the applicable option agreement.

"Agreement" has the meaning specified in the preamble hereto.

"Alternative PIPE Investment" has the meaning specified in Section 7.08(b).

"Alternative Subscription Agreement" has the meaning specified in Section 7.08(b).

"Amendment Proposal" has the meaning specified in Section 8.02(c).

"Ancillary Agreements" means the Subscription Agreements, the A&R Company LLC Agreement, the Support Agreements, the Registration Rights Agreement, the Sponsor Letter Agreement, the Lock-Up Agreements, the Trust Agreement, the Tax Receivable Agreement and any other agreement, instrument and certificate required by, or contemplated in connection with, this Agreement to be executed by any of the parties as contemplated by this Agreement, in each case, only as is applicable to the relevant party or parties to such Ancillary Agreement, as indicated by the context in which such term is used.

"Anti-Corruption Laws" means any applicable Laws relating to anti-bribery or anti-corruption (governmental or commercial), including Laws that prohibit the corrupt payment, offer, promise, or authorization of the payment or transfer of anything of value (including gifts or entertainment), directly or indirectly, to any representative of a foreign Governmental Authority or commercial entity to obtain a business advantage, including the U.S. Foreign Corrupt Practices Act and all national and international Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Antitrust Law" means (a) the HSR Act, the Federal Trade Commission Act, the Sherman Antitrust Act of 1890, the Clayton Antitrust Act, in each case, including the rules and regulations promulgated thereunder, (b) any applicable foreign antitrust Laws and (c) all other applicable Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Articles of Association" means the Articles of Association of Acquiror, dated August 20, 2020.

"Assumed Company Plan" has the meaning set forth in Section 3.03(e).

"Atomic Energy Act" means the Atomic Energy Act of 1954, as amended.

5

EXHIBIT 2
Page 10 of 404

"Balance Sheet Date" means September 30, 2021.

"Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, Contract, arrangement or other obligation, whether or not in writing and whether or not funded, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), "voluntary employees' beneficiary associations," under Section 501(c)(9) of the Code, employment, individual consulting, retirement, severance, termination pay, change in control, transaction or retention arrangements, deferred compensation, equity or equity-based compensation, incentive compensation, bonus, supplemental retirement, profit sharing, health, medical, welfare, vacation, paid time off, post-termination or retiree health or welfare, fringe or other benefits or remuneration plan.

"Business Combination" has the meaning ascribed to such term in the Articles of Association.

"Business Combination Proposal" has the meaning set forth in Section 7.11.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"CARES Act" means Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136) and any administrative or other guidance published with respect thereto by any Governmental Authority.

"Cash and Cash Equivalents" shall mean the cash and cash equivalents, including checks, money orders, marketable securities, short-term instruments, negotiable instruments, funds in time and demand deposits or similar accounts on hand, in lock boxes, in financial institutions or elsewhere, together with all accrued but unpaid interest thereon, and all bank, brokerage or other similar accounts.

"CBA" has the meaning set forth in Section 4.11(a)(xv).

"Certificate of Merger" has the meaning specified in Section 2.02.

"CLCI" means the Companies Act (As Revised) of the Cayman Islands.

"Closing" has the meaning specified in Section 2.04.

"Closing Acquiror Cash" means, without duplication, an amount equal to (a) the funds contained in the Trust Account as of immediately prior to the Effective Time; plus (b) all other Cash and Cash Equivalents of Acquiror as of immediately prior to the Effective Time; minus (c) the aggregate amount of cash proceeds that will be required to satisfy the redemption of any shares of Acquiror Class A Shares pursuant to the Offer (to the extent not already paid); plus (d) the PIPE Investment Amount that is actually paid to Acquiror at or prior to the Closing; minus (e) any Transaction Expenses in excess of $43,000,000 in the aggregate.

EXHIBIT 2
Page 11 of 404

"Closing Date" has the meaning specified in Section 2.04.

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning specified in the preamble hereto.

"Company Benefit Plan" means any Benefit Plan which is sponsored or maintained by, contributed to or required to be contributed to by, or with respect to or under which any current or potential liability or obligation is borne by any Company Group Member.

"Company Board" means the board of managers of the Company.

"Company Board Recommendation" has the meaning specified in Section 8.02(e).

"Company Common Units" means the "Common Units" of the Surviving Company (as defined in the A&R Company LLC Agreement).

"Company Cure Period" has the meaning specified in Section 10.01(b).

"Company Director Designees" has the meaning specified in Section 2.06(c).

"Company Fully-Diluted Units" means the total number of the Existing Company Common Units outstanding immediately prior to the Effective Time, expressed on a fully-diluted and as-converted to Existing Company Common Units basis, and including, without limitation or duplication, (a) the number of Existing Company Common Units issuable upon conversion of the Existing Company Preferred Units in accordance with Section 3.01(b), (b) the number of Existing Company Common Units issuable pursuant to the outstanding Company Options (whether or not vested), plus the number of Existing Company Common Units with respect to which outstanding Company Unit Appreciation Rights have been granted, and (c) the number of Existing Company Common Units issuable upon conversion in accordance with Section 3.01(a) of the Fluor Convertible Notes outstanding at the Closing, if any.

"Company Group" means the Company and any Subsidiaries of the Company.

"Company Group Member" means the Company or any Subsidiary of the Company.

"Company Group Organizational Documents" means Company Organizational Documents and the Company Subsidiary Organizational Documents.

"Company Intellectual Property" means all Owned Intellectual Property and all Intellectual Property used in the business of the Company Group, as currently conducted.

"Company Material Adverse Effect" means any Effect that, individually or in the aggregate with all other Effects, (a) is or would be reasonably expected to be materially adverse to the business, financial condition or results of operations of the Company Group, taken as a whole, or (b) the ability of the Company to consummate the Transactions;

7

**EXHIBIT 2**
**Page 12 of 404**

<u>provided</u>, <u>however</u>, that none of the following shall be deemed to constitute, alone or in combination, or be taken into account in the determination of whether, there has been or will be a Company Material Adverse Effect: (i) any change in or change in the interpretation of any applicable Laws (including COVID-19 Measures) or GAAP, (ii) any events or conditions generally affecting any geographic area in which the Company Group operates, (iii) any downturn in general economic conditions, including changes in the credit, debt, securities, financial or capital markets (including changes in interest or exchange rates, prices of any security or market index or commodity or any disruption of such markets), (iv) any geopolitical conditions, outbreak of hostilities, acts of war, sabotage, embargo, civil unrest, cyberterrorism, terrorism, military actions, earthquakes, volcanic activity, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions, epidemics, pandemics or other outbreaks of illness or public health events (including COVID-19) and other force majeure events (including any escalation or general worsening of any of the foregoing Effects), (v) any actions taken or not taken by any Company Group Member as required by this Agreement or any Ancillary Agreement, (vi) any Effect attributable to the announcement or execution, pendency or consummation of the Merger or the performance of this Agreement (including the impact thereof on relationships with customers, suppliers, licensors, distributors, partners, providers and employees) (<u>provided</u>, that this <u>clause (vi)</u> shall not apply to any representation or warranty in <u>Article IV</u> of this Agreement to the extent the purpose of such representation or warranty is to address the consequences resulting from this Agreement or the consummation of the transactions contemplated hereby), (vii) any such Effect relating to or resulting from general changes in the nuclear industry, (viii) any failure to meet any projections, forecasts or budgets; <u>provided</u>, that this <u>clause (viii)</u> shall not prevent a determination that any Effect underlying such failure has resulted in a Company Material Adverse Effect, or (ix) any actions taken, or failures to take action, or such other changes or events, in each case, which Acquiror has consented to in writing prior to the taking of, or failure to take, such action, except in the cases of <u>clauses (i)</u> through <u>(iv)</u> and <u>(vii)</u> to the extent the Company Group is as a whole materially disproportionately affected thereby as compared with other participants in the nuclear industry.

"<u>Company Option</u>" has the meaning specified in <u>Section 3.03(a)</u>.

"<u>Company Organizational Documents</u>" means the articles of organization and limited liability company agreement of the Company, in each case, as may be amended from time to time in accordance with the terms of this Agreement.

"<u>Company Permits</u>" has the meaning specified in <u>Section 4.06(d)</u>.

"<u>Company Plan</u>" means the Company's Third Amended And Restated 2011 Equity Incentive Plan, as amended, restated or otherwise modified from time to time.

"<u>Company Representations</u>" means the representations and warranties of the Company expressly and specifically set forth in <u>Article IV</u> of this Agreement, as qualified by the Schedules. For the avoidance of doubt, the Company Representations are solely made by the Company.

EXHIBIT 2
Page 13 of 404

"Company Software" means all Software owned by any Company Group Member.

"Company Subsidiary Organizational Documents" means, with respect to each Subsidiary of the Company, (a) in the case of a corporation, its certificate of incorporation (or analogous document) and bylaws; (b) in the case of a limited liability company, its certificate of formation (or analogous document) and limited liability company agreement or operating agreement; or (c) in the case of a Person other than a corporation or limited liability company, the documents by which such Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Company Tax Counsel" has the meaning specified in Section 8.03(c).

"Company Unit Appreciation Right" means each outstanding award of unit appreciation rights granted by the Company providing for the issuance of Existing Company Common Units upon the exercise thereof.

"Company Unitholder" means the holder of either Existing Company Common Units or Existing Company Preferred Units.

"Company Unitholder Approvals" has the meaning specified in Section 8.02(e).

"Company Unitholder Representative" means Fluor Enterprises, Inc.

"Confidentiality Agreement" means that certain letter agreement, dated as of October 9, 2021, by and among Acquiror, the Company and Fluor Enterprises, Inc.

"Contracts" means any legally binding contracts, agreements, subcontracts, licenses, leases, and purchase orders.

"Court of Chancery" has the meaning specified in Section 11.12

"COVID-19" means the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences), including any resulting evolutions thereof or related or associated epidemics, pandemics, disease outbreaks or public health emergencies.

"COVID-19 Measures" means any quarantine, isolation, "shelter in place," "stay at home," social distancing, shut down, closure, sequester or any other Law, decree, judgment, injunction or other order, directive, guidelines or recommendations by any Governmental Authority or industry group in connection with or in response to COVID-19, including, the CARES Act.

"Credit Documents" means, collectively, the documents set forth on Schedule 1.01(a).

"DGCL" means the General Corporation Law of the State of Delaware.

"DLLCA" means the Delaware Limited Liability Company Act.

EXHIBIT 2
Page 14 of 404

"Effect" has the meaning specified in the definition of "Acquiror Material Adverse Effect".

"Effective Time" has the meaning specified in Section 2.02.

"Enforceability Exceptions" has the meaning specified in Section 4.02(a).

"Environmental Laws" means all Laws relating to pollution or protection of the environment (including natural resources), health and safety (to the extent relating to management of or exposure to Hazardous Materials), or the use, generation, storage, emission, transportation, disposal or release of or exposure to Hazardous Materials.

"Equity Securities" means any share, share capital, capital stock, partnership, membership, joint venture or similar interest in any Person (including any stock appreciation right, phantom stock, restricted stock unit, performance stock unit, restricted stock, profit participation or similar rights) and any option, warrant, right or security (including debt securities) convertible, exchangeable or exercisable therefor.

"Equity Value" means $1,875,000,000.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Ex-Im Laws" means all applicable Laws relating to export, re-export, transfer and import controls, including the Export Administration Regulations and the customs and import Laws administered by U.S. Customs and Border Protection.

"Exchange Act" means the Securities Exchange Act of 1934.

"Exchange Ratio" means the following number (rounded to four decimal places): (a) the sum of (i) the Equity Value plus (ii) the Aggregate Exercise Price, divided by (b) the Company Fully-Diluted Units, divided by (c) the Acquiror Share Value.

"Exchanged Company Option" has the meaning set forth in Section 3.03(a).

"Existing Company Common Units" means the "Common Units" of the Company (as defined in the Existing Company LLCA).

"Existing Company LLCA" means the Fifth Amended and Restated Limited Liability Company Agreement of the Company, dated as of April 1, 2021, by and between the Company and the Company Unitholders.

"Existing Company Preferred Units" means the "Preferred Units" of the Company (as defined in the Existing Company LLCA).

"Existing Company Units" means the Existing Company Common Units and the Existing Company Preferred Units.

**EXHIBIT 2**
**Page 15 of 404**

"Financial Derivative/Hedging Arrangement" means any transaction (including an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any combination of these transactions.

"Financial Statements" has the meaning specified in Section 4.05(a).

"Fluor Convertible Notes" means that certain amended and restated senior secured convertible loan agreement issued by the Company on September 30, 2011 in the aggregate principal amount of $10,281,427.49.

"Fluor Line of Credit Note" means that certain Line of Credit Promissory Note issued by the Company on January 8, 2021 in the aggregate principal amount of $30,000,000.

"Fluor Payoff Letter" has the meaning specified in Section 6.07(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, arbitrator or arbitral body (public or private), court or tribunal.

"Government Official" means any official or employee of any directly or indirectly government-owned or controlled entity, and any officer or employee of a public international organization, as well as any person acting in an official capacity for or on behalf of any such entity or for or on behalf of any such public international organization.

"Governmental Order" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Hazardous Material" means any material, substance or waste that is listed, regulated, or defined as "hazardous," "toxic," or "radioactive," or as a "pollutant" or "contaminant" (or words of similar intent or meaning) under applicable Environmental Laws, including but not limited to petroleum, petroleum by-products, asbestos or asbestos-containing material, polychlorinated biphenyls, per- and pol-fluoroalkyl substances, flammable or explosive substances, toxic mold or pesticides.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

11

EXHIBIT 2
Page 16 of 404

"Indebtedness" means, with respect to any Person, without duplication, any obligations (whether or not contingent) consisting of (a) the outstanding principal amount of and accrued and unpaid interest on, and other payment obligations for, borrowed money, or payment obligations issued or incurred in substitution or exchange for payment obligations for borrowed money, (b) amounts owing as deferred purchase price for property or services, including "earnout" payments, (c) payment obligations evidenced by any promissory note, bond, debenture, mortgage or other debt instrument or debt security, (d) contingent reimbursement obligations with respect to letters of credit, bankers' acceptance or similar facilities (in each case to the extent drawn), (e) any obligations in the nature of accrued fees, interest, prepayment or other premiums, penalties, termination fees, expenses and other amounts incurred or that would be payable in connection with the prepayment, repayment, redemption, payoff, amendment, modification or supplement of any of the items in the foregoing clauses, (f) payment obligations of a third party secured by (or for which the holder of such payment obligations has an existing right, contingent or otherwise, to be secured by) any Lien, other than a Permitted Lien, on assets or properties of such Person, whether or not the obligations secured thereby have been assumed, (g) obligations under capitalized leases, (h) obligations net of benefits under all Financial Derivative/Hedging Arrangements, (i) any underfunded pension liability, unfunded deferred compensation plan obligations, and post-retirement health or welfare benefits, (j) any unpaid dividends or distributions declared or payable to any member of the Company, (k) any other indebtedness or obligation reflected or required to be reflected as indebtedness in a consolidated balance sheet, in accordance with GAAP, (l) guarantees, make-whole agreements, hold harmless agreements or other similar arrangements with respect to any amounts of a type described in the foregoing clauses, and (m) with respect to each of the foregoing, any unpaid interest, breakage costs, prepayment or redemption penalties or premiums, or other unpaid fees or obligations (including unreimbursed expenses or indemnification obligations for which a claim has been made); provided, however, that Indebtedness shall not include accounts payable to trade creditors in the ordinary course of business that are not past due and accrued expenses arising in the ordinary course of business consistent with past practice.

"Information or Document Request" means any request or demand for the production, delivery or disclosure of documents or other evidence, or any request or demand for the production of witnesses for interviews or depositions or other oral or written testimony, by any Regulatory Consent Authority relating to the transactions contemplated hereby or by any third party challenging the transactions contemplated hereby, including any so called "second request" for additional information or documentary material or any civil investigative demand made or issued by the Antitrust Division of the United States Department of Justice or the United States Federal Trade Commission or any subpoena, interrogatory or deposition.

"Insurance Policies" has the meaning specified in Section 4.20(a).

"Intellectual Property" means all intellectual property rights, as they exist anywhere in the world, whether registered or unregistered, including all: (a) patents and patent applications (including any divisions, continuations, continuations-in-part, reissues, reexaminations and interferences thereof); (b) trademarks, service marks, trade dress, trade

names, brand names, logos and corporate names; (c) copyrights, mask works and designs; (d) internet domain names; (e) trade secrets and other intellectual property rights in know-how, technology, inventions (whether patentable or not), processes, procedures, database rights, confidential business information and other proprietary information and rights; and (f) intellectual property rights in Software.

"Intended Tax Treatment" has the meaning specified in Section 8.03(b).

"Interim Financial Statements" has the meaning specified in Section 4.05(a).

"Interim Period" has the meaning specified in Section 6.01.

"Intervening Acquiror Event" means any Effect with respect to the Acquiror that (a) is material to the Acquiror, (b) was not known to or reasonably foreseeable by the Acquiror Board (or if so known or reasonably foreseeable, the material consequences of which were not known or reasonably foreseeable by the Acquiror Board) as of the date of this Agreement and (c) does not relate to (i) any Business Combination or (ii) clearance of the Transactions by any Governmental Authority, including with respect to the actions taken pursuant to or required to be taken pursuant to Section 7.01; provided, however, that any change in the price or trading volume of Acquiror Class A Shares (in and of itself, but without preventing a determination of an Intervening Acquiror Event as to the events underlying such change) shall not be taken into account for purposes of determining whether an Intervening Acquiror Event has occurred.

"IT Systems" means all computer hardware (including hardware, firmware, peripherals, communication equipment and links, storage media, networking equipment, power supplies and any other components used in conjunction with such), data processing systems, Software, and all other information technology equipment owned or controlled by any Company Group Member and used in the operation of the Company Group business.

"Knowledge" shall mean the actual knowledge of (a) in the case of the Company, John Hopkins, Chris Colbert and Bob Temple and (b) in the case of Acquiror, Christopher Sorrells, Jeffrey Schramm and Robert Kaplan.

"Law" means any statute, law (including common law), act, constitution, treaty, code, ordinance, rule, ruling, regulation or Governmental Order, in each case, of any Governmental Authority. All references to "Laws" shall be deemed to include any amendments thereto, and any successor Law, unless the context otherwise requires.

"Lease Documents" has the meaning specified in Section 4.18(c).

"Leased Company Properties" has the meaning specified in Section 4.18(b).

"Lien" means any mortgage, deed of trust, pledge, hypothecation, easement, right of way, purchase option, right of first refusal, covenant, restriction, security interest, license, title defect, encroachment or other survey defect, or other lien or encumbrance of any kind, except for (a) any restrictions arising under any applicable Securities Laws, and

(b) immaterial easements, rights of way, covenants, encumbrances or restrictions that do not materially detract the value of the underlying asset or the use of the asset.

"Lock-Up Agreement" has the meaning specified in the Recitals hereto.

"Majority Acquiror Stockholder Approval" means, with respect to any Proposal other than the Redomicile Proposal and the Amendment Proposal, the affirmative vote of holders of a majority of the issued shares of Acquiror Class A Shares who will attend and vote at the Special Meeting.

"Material Contracts" has the meaning specified in Section 4.11(a).

"Material Customers" has the meaning specified in Section 4.23(a).

"Material Vendors" has the meaning specified in Section 4.23(b).

"Merger" has the meaning specified in Section 2.02.

"Merger Consideration" has the meaning specified in Section 3.01(b).

"Merger Sub" has the meaning specified in the preamble hereto.

"NASDAQ" means The Nasdaq Stock Market LLC.

"NASDAQ Proposal" has the meaning specified in Section 8.02(c).

"NRC" means the United States Nuclear Regulatory Commission or any successor.

"OFAC" has the meaning specified in the definition of "Sanctions".

"Offer" has the meaning specified in the Recitals hereto.

"OLLCA" means the Oregon Limited Liability Company Act, as amended from time to time.

"Outstanding Acquiror Expenses" has the meaning specified in Section 11.05.

"Outstanding Company Expenses" has the meaning specified in Section 11.05.

"Owned Intellectual Property" means all Intellectual Property owned by any Company Group Member.

"Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, together with any guidance issued thereunder or successor provisions and any similar or corresponding provisions of state or local Tax Laws.

"Pass Through Number" has the meaning specified in Section 3.01(a).

**EXHIBIT 2**
**Page 19 of 404**

"Permitted Liens" means (a) statutory or common law Liens of mechanics, materialmen, warehousemen, landlords, carriers, repairmen, construction contractors and other similar Liens that arise in the ordinary course of business, and (i) relate to amounts not yet delinquent or (ii) that are being contested in good faith through appropriate Actions and for which appropriate reserves for the amount being contested have been established in accordance with GAAP on the Financial Statements, (b) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business, (c) Liens for Taxes not yet due and payable or which are being contested in good faith through appropriate Actions, and for which appropriate reserves have been established in accordance with GAAP on the Financial Statements, (d) non-monetary Liens, encumbrances and restrictions on real property (including easements, covenants, rights of way and similar restrictions) of record affecting title to real property that do not, individually or in the aggregate, materially interfere with the occupancy or present uses of such real property, (e) non-exclusive licenses of Intellectual Property, (f) requirements and restrictions of zoning, building and other applicable Laws and municipal by-laws, and development, site plan, subdivision or other agreements with municipalities, which do not materially interfere with the current use or occupancy of any real property leased by any Company Group Member, and (g) Liens described on Schedule 1.01(b).

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or other entity of any kind.

"Personal Information" means any personal information that specifically identifies any individual who has provided information to any Company Group Member, including names, addresses, telephone numbers, personal health information, drivers' license numbers and government-issued identification numbers, as applicable.

"PIPE Investment" has the meaning specified in the Recitals hereto.

"PIPE Investment Amount" has the meaning specified in Section 5.17.

"Pre-Closing Flow-Through Tax Return" means any Tax Return of any Company Group Member in respect of which items of income, gain, loss deduction or credit are passed through, directly or indirectly, to the Company Unitholders, or any of their direct or indirect owners under applicable Law and that relates to a taxable period (or portion thereof) ending on or before the Closing Date.

"Pre-Closing Flow-Through Tax Item" means any matter relating to the determination of income, gain, loss, deduction or credits with respect to any Pre-Closing Flow-Through Tax Return.

"Privacy Laws" means any and all Laws applicable to any Company Group Member relating to the collection, use, storage, safeguarding and security (both technical and physical) of Personal Information.

"Products" mean any products or services, developed, manufactured, performed, out-licensed, sold, distributed or otherwise made available by or on behalf of any Company Group Member, from which any Company Group Member has derived previously, is currently deriving or is scheduled to derive, revenue from the sale or provision thereof.

"Proposals" has the meaning specified in Section 8.02(c).

"Proxy Statement" means the proxy statement filed by Acquiror as part of the Registration Statement with respect to the Special Meeting for the purpose of soliciting proxies from Acquiror Stockholders to approve the Proposals (which shall also provide the Acquiror Stockholders with the opportunity to redeem their Acquiror Class A Shares in conjunction with a shareholder vote on the Business Combination).

"Recapitalization" has the meaning specified in Section 2.07.

"Redeeming Stockholder" means an Acquiror Stockholder who demands that Acquiror redeem its Acquiror Class A Shares for cash in connection with the transactions contemplated hereby and in accordance with the Acquiror Organizational Documents.

"Redomicile" has the meaning specified in the Recitals hereto.

"Redomicile Effective Time" has the meaning specified in Section 2.07(a).

"Redomicile Proposal" has the meaning specified in Section 8.02(c).

"Registered IP" has the meaning specified in Section 4.15(a).

"Registration Rights Agreement" has the meaning specified in the Recitals hereto.

"Registration Statement" has the meaning specified in Section 8.02(a).

"Regulatory Consent Authorities" means the Antitrust Division of the United States Department of Justice or the United States Federal Trade Commission, as applicable.

"Related Party" means, with respect to any party hereto, any Subsidiary or Affiliate thereof, or any business or Person that any of the foregoing controls, is controlled by or is under common control with.

"Relevant Tax Audit" has the meaning specified in Section 8.03(h).

"Representative" means, as to any Person, any of the officers, directors, managers, employees, counsel, accountants, financial advisors, lenders, debt financing sources and consultants of such Person.

"Sanctioned Country" has the meaning specified in the definition of "Sanctioned Person".

"Sanctioned Person" means at any time any Person that is the subject or target of Sanctions or restrictions under Trade Control Laws, including any Person that is: (a) listed

16

EXHIBIT 2
Page 21 of 404

on any Sanctions-related list of designated or blocked Persons, including OFAC's List of Specially Designated Nationals and Blocked Persons or any other OFAC, U.S. Department of Commerce Bureau of Industry and Security, or U.S. Department of State Sanctions- or export-related restricted party list; (b) a Governmental Authority of, resident in, or organized under the Laws of a country or territory that is the target of comprehensive Sanctions from time to time (including Cuba, Iran, North Korea, Sudan, Syria, Venezuela and the Crimea region) (each, a "Sanctioned Country"); or (c) in the aggregate, 50 percent or greater owned, directly or indirectly, or controlled by any of the foregoing; or (d) any national of a Sanctioned Country.

"Sanctions" means those trade, economic and financial sanctions-related Laws, regulations, embargoes, and restrictive measures administered, enacted or enforced from time to time by (a) the United States (including without limitation the Department of Treasury, OFAC or the U.S. Department of State), (b) the European Union and enforced by its member states, (c) the United Nations or (d) Her Majesty's Treasury.

"Schedules" means the disclosure schedules of the Company or Acquiror, as applicable.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Securities Laws" means the securities laws of any state, U.S. federal or foreign jurisdiction and the rules and regulations promulgated thereunder.

"Software" means any and all (a) computer programs, including any and all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (d) all documentation including user manuals and other training documentation relating to any of the foregoing.

"Special Meeting" means a meeting of Acquiror Stockholders to be held for the purpose of approving the Proposals.

"Sponsor" means SV Acquisition Sponsor Sub, LLC, a Delaware limited liability company.

"Sponsor Capital Contribution" has the meaning set forth in Section 2.08.

"Sponsor Letter Agreement" has the meaning specified in the Recitals hereto.

"Subscribers" has the meaning specified in the Recitals hereto.

"Subscription Agreements" has the meaning specified in the Recitals hereto.

EXHIBIT 2
Page 22 of 404

"Subsidiary" means, with respect to a Person, any corporation or other organization (including a limited liability company or a partnership), whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization or any organization of which such Person or any of its Subsidiaries is, directly or indirectly, a general partner or managing member.

"Supermajority Acquiror Stockholder Approval" means, with respect to the Redomicile Proposal and the Amendment Proposal only, the affirmative vote of holders of at least two-thirds of the issued and outstanding shares of the Acquiror who attend and vote at the Special Meeting held in accordance with the Acquiror Organizational Documents.

"Support Agreements" has the meaning specified in the Recitals hereto.

"Surviving Company" has the meaning specified in Section 2.02.

"Surviving Provisions" has the meaning specified in Section 10.02.

"Tax" means any federal, state, provincial, territorial, local, foreign and other net income, alternative or add-on minimum, franchise, gross income, adjusted gross income or gross receipts, employment, environmental, unemployment, compensation, utility, social security (or similar), withholding, payroll, ad valorem, transfer, windfall profits, license, branch, excise, severance, production, stamp, occupation, premium, personal property, real property, capital stock, profits, disability, registration, value added, capital gains, goods and services, estimated, sales, use, unclaimed property or escheat obligation, or other tax, governmental fee, duty, charge, impost, or assessment of any kind whatever, whether disputed or not, together with any interest, deficiency, penalty, addition to tax or additional amount imposed with respect thereto by a Governmental Authority.

"Tax Authority" means any Governmental Authority with jurisdiction or authority to impose, administer, levy, assess or collect Tax.

"Tax Proceeding" has the meaning specified in Section 8.03(g).

"Tax Receivable Agreement" has the meaning specified in the preamble hereto.

"Tax Return" means any return, report, statement, refund, claim, election, disclosure, declaration, information report or return, estimate or other document filed or required to be filed with a Tax Authority with respect to Taxes, including any schedule or attachment thereto and including any amendments thereof.

"Terminating Acquiror Breach" has the meaning specified in Section 10.01(c).

"Terminating Company Breach" has the meaning specified in Section 10.01(b).

"Termination Date" has the meaning specified in Section 10.01(b).

**EXHIBIT 2**
**Page 23 of 404**

"Trade Control Laws" has the meaning specified in Section 4.19(c).

"Transaction Expenses" means any fees, costs and expenses incurred or subject to reimbursement by Acquiror and its Subsidiaries, whether accrued for or not, in each case in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, including (a) any brokerage fees, commissions, finders' fees, or financial advisory fees, and, in each case, related costs and expenses, (b) any fees, costs and expenses of counsel, accountants or other advisors or service providers, and (c) any fees, costs and expenses or payments of any of the Acquiror and its Subsidiaries related to any transaction bonus, discretionary bonus, change-of-control payment, retention or other compensatory payments made to any employee of the Acquiror or its Subsidiaries solely as a result or related to (and measured assuming the satisfaction of any other related contingencies such as termination or the passage of time) of the execution of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby and thereby (including the employer portion of any payroll, social security, unemployment or similar Taxes imposed with respect thereto). For the avoidance of doubt, no bonus, change-of-control payment, retention or other compensatory payment paid to any manager, officer or employee of the Company or any Subsidiary thereof shall be a Transaction Expense.

"Transaction Proposal" has the meaning specified in Section 8.02(c).

"Transactions" means the transactions contemplated by this Agreement to occur at or immediately prior to the Closing, including the Merger.

"Transfer Taxes" has the meaning specified in Section 8.03(a).

"Treasury Regulations" means the U.S. Treasury Department regulations promulgated under the Code.

"Trust Account" has the meaning specified in Section 5.05(a).

"Trust Agreement" has the meaning specified in Section 5.05(a).

"Trustee" has the meaning specified in Section 5.05(a).

"WARN Act" has the meaning specified in Section 4.13(b).

"Willful Breach" means, with respect to any agreement, a party's knowing and intentional material breach of any of its representations or warranties as set forth in such agreement, or such party's material breach of any of its covenants or other agreements set forth in such agreement, which material breach constitutes, or is a consequence of, a purposeful act or failure to act by such party with the knowledge that the taking of such act or failure to take such act would cause a material breach of such agreement.

1.02    Construction.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender, (ii) words using the singular or plural number also include the

19

EXHIBIT 2
Page 24 of 404

plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, (iv) the terms "Article", "Section", "Schedule", "Exhibit" and "Annex" refer to the specified Article, Section, Schedule, Exhibit or Annex of or to this Agreement unless otherwise specified, (v) the word "including" shall mean "including without limitation", (vi) the word "or" shall be disjunctive but not exclusive and (vii) any reference to a Law shall mean such Law as amended.

(b)    Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments, waivers and other modifications thereto.

(c)    Unless the context of this Agreement otherwise requires, references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(d)    The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and no rule of strict construction shall be applied against any party.

(e)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

(f)    All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(g)    The phrases "delivered," "provided to," "furnished to," "made available" and phrases of similar import when used herein, unless the context otherwise requires, means that a copy of the information or material referred to has been provided no later than two Business Days prior to the date of this Agreement to the party to which such information or material is to be provided or furnished (i) in the virtual "data room" set up by the Company in connection with this Agreement or (ii) by delivery to such party or its legal counsel via electronic mail or hard copy form.

## ARTICLE II
## THE CONTRIBUTION & MERGER; CLOSING

2.01    <u>The Contribution</u>. At the Closing, immediately prior to the Effective Time, Acquiror shall contribute, or cause to be contributed, to Merger Sub the Closing Acquiror Cash.

2.02    <u>The Merger</u>. Upon the terms and subject to the conditions set forth in this Agreement, on the day after the Redomicile, at the Effective Time, Merger Sub shall be merged with and into the Company (the "<u>Merger</u>"), with the Company being the surviving limited liability company (which is sometimes hereinafter referred to for the periods at and after the Effective Time as the "<u>Surviving Company</u>") following the Merger and the separate existence of Merger Sub shall cease. The Merger shall be consummated in accordance with this Agreement and the OLLCA and

**EXHIBIT 2**
**Page 25 of 404**

evidenced by articles of merger (the "Certificate of Merger"), such Merger to be consummated upon filing of the Certificate of Merger or at such later time as may be agreed by Acquiror and the Company in writing and specified in the Certificate of Merger (the "Effective Time").

2.03    Effects of the Merger. The Merger shall have the effects set forth in this Agreement and the OLLCA. Without limiting the generality of the foregoing and subject thereto, by virtue of the Merger and without further act or deed, at the Effective Time, all of the property, rights, privileges, powers and franchises of the Company and Merger Sub shall vest in the Surviving Company and all of the debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Company.

2.04    Closing. Subject to the terms and conditions of this Agreement, the closing of the Merger (the "Closing") shall take place electronically through the exchange of documents via e-mail or facsimile on the date which is three Business Days after the date on which all conditions set forth in Article IX shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such other time and place as Acquiror and the Company may mutually agree in writing. Subject to the satisfaction or waiver of all of the conditions set forth in Article IX of this Agreement, and provided this Agreement has not theretofore been terminated pursuant to its terms, on the Closing Date, the Company shall cause the Certificate of Merger to be executed, acknowledged and filed with the Secretary of State of Oregon as provided in the OLLCA. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date." Acquiror shall be renamed "NuScale Power Corporation" and shall trade publicly on the NASDAQ under the new ticker symbol, which will be SMR or if SMR is not available, another ticker symbol selected by the Company.

2.05    Organizational Documents of the Company and Acquiror.

(a)    At the Effective Time, the articles of organization of the Company, as in effect immediately prior to the Effective Time,  shall continue to be the articles of organization of the Surviving Company, until thereafter supplemented or amended in accordance with its terms and the OLLCA.

(b)    At the Effective Time, the Existing Company LLCA shall be amended and restated in its entirety as set forth on Exhibit H (the "A&R Company LLC Agreement") to, among other things, recapitalize the authorized Equity Securities of the Surviving Company (including the reclassification of Existing Company Units into Company Common Units), with the applicable, rights, preferences and obligations set forth in the A&R Company LLC Agreement, permit the issuance and ownership of the Company Common Units as contemplated to be issued and owned upon consummation of the Transactions, admit Acquiror as a member and designate Acquiror as the sole manager of the Surviving Company, otherwise amend and restate the rights and preferences of the Existing Company Units (in connection with the reclassification to Company Common Units) and set forth the rights and preferences of the Company Common Units (including matters relating to the exchangeability of Company Common Units into Acquiror Common Stock), and establish the ownership of the Company Common Units by the Persons indicated in the A&R Company LLC Agreement in each case, as set forth in the A&R Company LLC Agreement. The A&R Company LLC Agreement as so amended, shall be the limited liability

company agreement of the Surviving Company, until thereafter supplemented or amended in accordance with its terms and the OLLCA.

(c)     After the Redomicile, at the Effective Time, the Acquiror Charter, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Acquiror, until thereafter supplemented or amended in accordance with its terms and the DGCL.

(d)     After the Redomicile, at the Effective Time, the Acquiror Bylaws, as in effect immediately prior to the Effective Time, shall be the bylaws of the Acquiror, until thereafter supplemented or amended in accordance with its terms and the DGCL.

2.06     Directors and Officers of the Companies.

(a)     The Company shall take all necessary action prior to the Effective Time such that (i) each manager of the Company in office immediately prior to the Effective Time shall cease to be a manager immediately following the Effective Time (including by causing each such manager to tender an irrevocable resignation as a manager, effective as of the Effective Time) and (ii) the Acquiror shall become the sole manager of the Company from and after the Effective Time.

(b)     Persons constituting the officers of the Company prior to the Effective Time shall continue to be the officers of the Surviving Company until the earlier of their death, resignation or removal or until their respective successors are duly appointed.

(c)     Acquiror shall take all necessary action prior to the Redomicile such that (i) each director of Acquiror in office immediately prior to the Effective Time shall cease to be a director immediately following the Effective Time (including by causing each such director to tender an irrevocable resignation as a director, effective as of the Effective Time), (ii) the seven individuals designated by the Company (the "Company Director Designees"), three of whom shall each qualify as "independent directors" under the applicable listing and corporate governance rules and regulations of NASDAQ, pursuant to this Section 2.06(c) shall be appointed to the Acquiror Board, effective as of the Effective Time, (iii) the one individual designated by Acquiror (the "Acquiror Director Designee") shall be appointed to the Acquiror Board, effective as of the Effective Time, and (iv) as of the Effective Time, the Company Director Designees and the Acquiror Director Designee shall be the only directors of Acquiror, and there shall be no vacancies or unfilled newly created directorships on the Acquiror Board. If necessary to effect the foregoing, the Acquiror Board shall adopt resolutions prior to the Effective Time that, as of the Effective Time, expand or decrease the size of the Acquiror Board and appoint such persons to the vacancies resulting from the incumbent directors' respective resignations or, if applicable, the newly created directorships upon any expansion of the size of the Acquiror Board. Each Person appointed as a director of Acquiror pursuant to this Section 2.06(c) shall remain in office as a director of Acquiror for a minimum of one full calendar year and then until his or her successor is elected and qualified or until his or her earlier death, resignation or removal; provided that if such Acquiror Director Designee resigns or is otherwise unable to serve until the end of such calendar year (including for reason of death), then the Acquiror Board shall appoint a successor designated by the Sponsor to serve as a director until the end of such full calendar term. If any of the directors designated by the parties shall be unable or unwilling to serve at the Closing, the Company or Acquiror, respectively,

shall promptly designate a replacement director and provide any relevant information about such appointee as the other party hereto may reasonably request.

(d)    Acquiror shall take all necessary actions prior to the Effective Time such that (i) each officer of Acquiror in office immediately prior to the Effective Time shall cease to be an officer at the Effective Time and (ii) the Persons constituting the officers of the Company prior to the Effective Time shall, as of the Effective Time, be appointed the officers of Acquiror in identical positions until the earlier of their death, resignation or removal or until their respective successors are duly appointed.

2.07    Redomicile and Recapitalization.

(a)    Redomicile.  Subject to receipt of the Supermajority Acquiror Stockholder Approval, on the day prior to the Closing Date, Acquiror shall cause the Redomicile to become effective, including by (a) filing with the Delaware Secretary of State a Certificate of Domestication with respect to the Redomicile, together with the Acquiror Charter, in each case, in accordance with the provisions thereof and applicable Law, (b) completing and making and procuring all those filings required to be made with the Cayman Islands Registrar of Companies in connection with the Redomicile, and (c) obtaining a certificate of de-registration from the Cayman Islands Registrar of Companies. The Redomicile shall become effective at the time when the Certificate of Domestication and the Acquiror Charter have been duly filed with the Secretary of State of the State of Delaware (the "Redomicile Effective Time").

(b)    Bylaws of Acquiror. Acquiror shall take all actions necessary so that, at the Redomicile Effective Time, the bylaws of Acquiror shall be substantially in the form of the Acquiror Bylaws.

(c)    Capital Stock of Acquiror. At the Redomicile Effective Time, by virtue of the Redomicile and without any action on the part of the Acquiror or any holder of Acquiror Class A Shares, Acquiror Class B Shares or Acquiror Warrants:

(i)    each then issued and outstanding Acquiror Class A Share will convert automatically, on a one-for-one basis, into one share of Acquiror Common Stock;

(ii)    each then issued and outstanding Acquiror Warrant will convert automatically, on a one-for-one basis, into a warrant to acquire Acquiror Common Stock, in the same form and on the same terms and conditions (including the same "Warrant Price" and number of shares of common stock subject to such warrant) as the converted Acquiror Warrant; and

(iii)    a series of Acquiror New Class B Stock shall be authorized, each share of which will have voting rights equal to a share of Acquiror Common Stock but which shall have no entitlement to earnings or distributions of Acquiror.

(d)    Recapitalization.  Immediately prior to the Closing, Acquiror shall cause all of the Acquiror Old Class B Shares that are issued and outstanding immediately prior to the Redomicile to be converted into Acquiror Common Stock (the "Recapitalization").

EXHIBIT 2
Page 28 of 404

2.08    _Sponsor Forfeiture._ Two Business Days prior to the Closing Date, Acquiror shall deliver written notice to the Company setting forth its good faith estimate of the Closing Acquiror Cash as of the Closing Date, together with reasonably detailed support for the calculation of such Closing Acquiror Cash. Irrespective of such estimate, if the actual amount of Closing Acquiror Cash is less than $432,000,000, then, immediately prior to the Recapitalization, the Sponsor shall automatically be deemed to have irrevocably transferred to Acquiror, surrendered, and forfeited for no consideration the number of Acquiror Old Class B Shares as provided in the Sponsor Letter Agreement, and such Acquiror Old Class B Shares shall, by virtue of the Transactions, be deemed to have been canceled and extinguished (the "Sponsor Capital Contribution").

## ARTICLE III
## EFFECTS OF THE MERGER

3.01    _Effect on Company Units._ At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Acquiror, Merger Sub or the holder of any Existing Company Units:

(a)    _Conversion of Merger Sub Membership Interest._ All membership interests of Merger Sub, issued and outstanding immediately prior to the Effective Time shall be converted into the Pass Through Number of validly issued, fully paid and nonassessable (except as limited by the OLLCA) Class A Units of the Surviving Company free and clear of all Liens (other than restrictions on transfer under applicable Securities Laws and the A&R Company LLC) and Acquiror shall be admitted as a member and designated as the sole manager of the Surviving Company. The "Pass Through Number" shall equal the number of shares of Acquiror Common Stock that are outstanding immediately after the Effective Time, after giving effect to all Transactions contemplated herein and in the Subscription Agreement, including the conversion of Acquiror Class A Shares into Acquiror Common Stock, the Recapitalization, the redemption of Acquiror Class A Shares in connection with the Offer, the Sponsor Capital Contribution, and the issuance of Acquiror Common Stock under the Subscription Agreements.

(b)    _Consideration for All Other Company Interests._ At the Effective Time, (i) the Existing Company LLCA will be amended and restated and, in connection therewith, (1) each Existing Company Preferred Unit issued and outstanding immediately prior to the Effective Time shall be re-classified into a number of Existing Company Common Units equal to the applicable conversion ratio for such Existing Company Preferred Unit as described in the A&R Company LLC Agreement, and immediately after such reclassification, (2) each Existing Company Common Unit issued and outstanding immediately prior to the Effective Time (including each Existing Company Common Unit issued pursuant to the immediately preceding clause (1)) shall be re-classified into a number of Company Common Units equal to the Exchange Ratio and (ii) each holder of Existing Company Units issued and outstanding immediately prior to the Effective Time (including each Existing Company Common Unit issued pursuant to the immediately preceding clause (1)), shall receive such number of shares of duly authorized, validly issued, fully paid and nonassessable Acquiror New Class B Stock (collectively, the Company Common Units and Acquiror New Class B Stock so issued, the "Merger Consideration") equal to the Exchange Ratio; provided that no fractional Company Common Units or Acquiror New Class B Stock shall be issued, in connection therewith (with any such fractional amount being rounded down and paid in cash in lieu thereof pursuant to Section 3.05).

**EXHIBIT 2**
**Page 29 of 404**

3.02    Equitable Adjustments. If, between the date of this Agreement and the Closing, the outstanding Existing Company Units or shares of Acquiror Common Stock or Acquiror Class A Shares shall have been changed into a different number of units or shares or a different class or series, by reason of any stock dividend, conversion, subdivision, reclassification, recapitalization, split, change, combination or exchange of shares or units, or any similar event shall have occurred (other than as contemplated by Section 3.01(b)), then any number, value (including dollar value) or amount contained herein which is based upon the number of Existing Company Common Units or shares of Acquiror Common Stock or Acquiror Class A Shares will be appropriately adjusted to provide to Merger Sub and the holders of Existing Company Common Units and the holders of Acquiror Common Stock and holders of Acquiror Class A Shares the same economic effect as contemplated by this Agreement; provided, however, that this Section 3.02 shall not be construed to permit Acquiror, the Company or Merger Sub to take any action with respect to their respective securities that is prohibited by the terms and conditions of this Agreement.

3.03    Treatment of Company Options and Company Unit Appreciation Rights.

(a)    *Treatment of Company Options.* At the Effective Time, each Company Option that is outstanding immediately prior to the Effective Time, whether vested or unvested, shall, automatically and without any required action on the part of the holder thereof cease to represent an option to purchase an Existing Company Common Unit (a "Company Option") under the Company Plan or otherwise and shall be assumed by Acquiror and converted into an option to purchase a number of shares of Acquiror Common Stock (such option, an "Exchanged Company Option") equal to the product (rounded down to the nearest whole number) of (i) the number of units of Existing Company Common Units subject to such Company Option immediately prior to the Effective Time and (ii) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to (A) the exercise price per unit of the Existing Company Common Unit of such Company Option immediately prior to the Effective Time divided by (B) the Exchange Ratio; provided, however, that the exercise price and the number of shares of Acquiror Common Stock purchasable pursuant to the Exchanged Company Options shall be determined in a manner consistent with the requirements of Section 409A of the Code; provided, further, that in the case of any Exchanged Company Option to which Section 422 of the Code applies, the exercise price and the number of shares of Acquiror Common Stock purchasable pursuant to such option shall be determined in accordance with the foregoing, subject to such adjustments as are necessary in order to satisfy the requirements of Section 424(a) of the Code. Except as specifically provided above, following the Effective Time, each Exchanged Company Option shall continue to be governed by the same terms and conditions (including vesting and exercisability terms) as were applicable to the corresponding former Company Option immediately prior to the Effective Time.

(b)    *Treatment of Company Unit Appreciation Rights.* At the Effective Time, each Company Unit Appreciation Right that is outstanding immediately prior to the Effective Time, shall, automatically and without any required action on the part of the holder thereof, shall be cancelled and in exchange therefor the holder of such Company Unit Appreciation Right shall receive a number of shares of Acquiror Common Stock equal to (i) the Exchange Ratio minus (ii) the quotient of (A) the strike price per unit of the Existing Company Common Unit of such Company Unit Appreciation Right immediately prior to the Effective Time, divided by (B) the Acquiror Share Value; provided that no fractional Acquiror Common Stock shall be issued in

**EXHIBIT 2**
**Page 30 of 404**

connection therewith (with any such fractional amount being rounded down and paid cash in lieu thereof pursuant to Section 3.05).

(c) *Company Actions*. At or prior to the Effective Time, the Company and the Company Board shall (i) adopt any resolutions and take any actions that are necessary to effectuate the treatment of the Company Options pursuant to Section 3.03(a) and Company Unit Appreciation Rights pursuant to Section 3.03(b) and (ii) take all actions necessary to ensure that, from and after the Effective Time, Acquiror will not be required to deliver any Company Common Units or other Equity Securities of the Company to any Person pursuant to or in settlement of Company Options or Company Unit Appreciation Rights.

(d) *Acquiror Actions*. Acquiror shall take all actions that are necessary for the assumption and conversion of the Company Options and the conversion of the Company Unit Appreciation Rights pursuant to this Section 3.03 including the reservation, issuance and listing of shares of Acquiror Common Stock as necessary to effect the transactions contemplated by this Section 3.03. If registration of the Exchanged Company Options or shares of Acquiror Common Stock is required under the Securities Act, Acquiror shall file with the SEC, as promptly as practicable after the date that is 60 days after the Form 8-K announcing the Closing is filed (or any such earlier date permitted by applicable Law), a Registration Statement on Form S-8 with respect to such Exchanged Company Options or shares of Acquiror Common Stock, and shall use its commercially reasonable efforts to maintain the effectiveness of such Registration Statement for so long as the applicable Exchanged Company Options remain outstanding and such registration of the shares of Acquiror Common Stock issuable thereunder continues to be required.

(e) *Assumption of Stock Plan.* At the Effective Time, Acquiror shall assume the Company Plan, except that the Company Plan (and any option agreement thereunder) shall be amended at the Effective Time to conform with the requirements of Section 3.03(a) and to include additional amendments required to comply with any Law applicable to Acquiror with respect to the Exchanged Company Options (the "Assumed Company Plan"). At or following the Effective Time, Acquiror shall not be entitled to grant any new stock-based awards under the Assumed Company Plan.

3.04    Withholding. Each of Acquiror, Merger Sub, the Company, the Surviving Company and their respective Affiliates and agents shall be entitled to deduct and withhold from any amounts otherwise deliverable or payable under this Agreement such amounts that any such Persons are required to deduct and withhold with respect to any of the deliveries and payments contemplated by this Agreement under the Code or any other applicable Law. To the extent that Acquiror, Merger Sub, the Company, the Surviving Company or their respective Affiliates withholds or deducts such amounts with respect to any Person and properly remits such withheld or deducted amounts to the applicable Governmental Authority, such withheld or deducted amounts shall be treated as having been paid to or on behalf of such Person in respect of which such withholding or deduction was made for all purposes. In the case of any such payment payable to employees of the Company or its Affiliates in connection with the Merger that is properly treated as compensation, the parties shall cooperate to pay such amounts through the Company's or an Affiliate's payroll to facilitate applicable withholding.

EXHIBIT 2
Page 31 of 404

3.05    Cash in Lieu of Fractional Shares. Notwithstanding anything to the contrary contained herein, no certificates or scrip representing fractional shares of Acquiror Common Stock shall be issued upon the exchange for Existing Company Common Units pursuant to Section 3.01 or the conversion of Company Unit Appreciation Rights pursuant to Section 3.03(b), and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a holder of Acquiror Common Stock. In lieu of the issuance of any such fractional share, Acquiror shall pay to each former Company Unitholder or holder of Company Unit Appreciation Rights who otherwise would be entitled to receive such fractional share an amount in cash, without interest, rounded down to the nearest cent, equal to the product of (a) the amount of the fractional share interest in a share of Acquiror Common Stock to which such holder otherwise would have been entitled (but for this Section 3.05) multiplied by (b) $10.00.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Schedules to this Agreement (each of which qualifies (a) the correspondingly numbered representation, warranty or covenant if specified therein and (b) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent on its face), the Company represents and warrants to Acquiror and Merger Sub as follows:

4.01    Organization, Standing and Corporate Power.

(a)    The Company is a limited liability company duly organized and validly existing under the Laws of the State of Oregon, and has all requisite legal entity power and authority to carry on its business as now being conducted. The Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, except as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Company to consummate the Transactions or have a Company Material Adverse Effect. The Company Organizational Documents that have been made available to the Acquiror are true, correct and complete and are in effect as of the date of the Agreement and the Company is not in default under or in violation of any provision thereunder.

(b)    Each Subsidiary of the Company is duly organized or formed, as applicable, validly existing and in good standing (or its equivalent) under the Laws of its jurisdiction of organization or formation, as applicable, and has all requisite legal entity power and authority to carry on its business as now being conducted. Each Subsidiary of the Company is duly qualified or licensed to do business and is in good standing (or its equivalent) in each jurisdiction in which the conduct of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, except as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Company Group to consummate the Transactions or have a Company Material Adverse Effect. The Company Subsidiary Organizational Documents that have been made available to the Acquiror are true, correct and complete and are in effect as of the date of the Agreement and no Company Group Member is in default under or in violation of any provision thereunder.

27

EXHIBIT 2
Page 32 of 404

4.02    <u>Corporate Authority; Approval; Non-Contravention</u>.

(a)    The Company has all requisite limited liability company or other legal entity power and authority, and has taken all limited liability company or other legal entity action necessary in order to execute, deliver and perform its obligations under this Agreement and the Ancillary Agreements to which it is a party and, subject to satisfaction of the conditions to Closing contemplated hereby, to consummate the Transactions. The execution, delivery and performance by the Company of this Agreement and the Ancillary Agreements to which it is a party, and the consummation by it of the Transactions, have been duly and validly authorized by all necessary limited liability company consent and authorizations on the part of the Company, and no other limited liability company actions on the part of the Company are necessary to authorize the execution and delivery by the Company of this Agreement, the Ancillary Agreements to which it is a party and the consummation by it of the Transactions, in each case, subject to receipt of the Company Unitholder Approvals. This Agreement has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery hereof by the other parties hereto, is a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other Laws affecting creditors' rights generally from time to time in effect and by general equitable principles (the "<u>Enforceability Exceptions</u>")).

(b)    The execution, delivery and, subject to receipt of the Company Unitholder Approvals, performance of this Agreement and the Ancillary Agreements to which the Company is a party, and the consummation of the Transactions, do not, and will not, constitute or result in (i) a breach or violation of, or a default under, the Company Group Organizational Documents or, (ii) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) of or default or change of control under, the creation or acceleration of any obligations under or the creation of a Lien on any of the assets of the Company Group pursuant to, any Material Contract or Lease Document to which any Company Group Member is a party or, assuming (solely with respect to performance of this Agreement and consummation of the Transactions) compliance with the matters referred to in <u>Section 4.02(a)</u>, under any Law to which the Company Group is subject (except Laws that are applicable due to the Company Group's business, or the Contracts or licenses of the Company Group), except as disclosed on <u>Schedule 4.02(b)</u>.

4.03    <u>Governmental Approvals</u>. No consent of, or registration, declaration, notice or filing with, any Governmental Authority is required by or with respect to any Company Group Member in connection with the execution and delivery by the Company of this Agreement or the consummation of the Transactions, except for (a) the pre-merger notification requirements under the HSR Act and (b) such other consents, registrations, declarations, notices and filings which, if not obtained or made, would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

4.04    <u>Capitalization</u>.

(a)    Set forth on <u>Schedule 4.04(a)</u> is a true, correct and complete list of each holder of issued and outstanding Equity Securities (including notes and other securities convertible into Equity Securities) of each Company Group Member (other than Company Options and

**EXHIBIT 2**
**Page 33 of 404**

Company Unit Appreciation Rights) and the Equity Securities held by each such holder as of the date hereof. All of such outstanding Equity Securities have been duly authorized and are validly issued, fully paid and nonassessable. 96,800,000 Existing Company Common Units were reserved for issuance under the Company Plan as of the date of this Agreement. Each of the outstanding Equity Securities of each of the Company Group Members (1) is duly authorized, validly issued, fully paid and nonassessable, (2) was issued in compliance in all material respects with applicable Laws, (3) was not issued in breach or violation of any preemptive rights or Contract, and (4) is owned free and clear of any Lien.

(b)    Schedule 4.04(b) sets forth a Schedule of all holders of Company Options on an individual-by-individual and grant-by-grant basis, and provides the number of Company Options originally granted, the number of Company Options currently issued and outstanding, the grant date and exercise price associated with each Company Option, the vesting schedule and termination or expiration date of each Company Option and whether such Company Options are currently vested or unvested. Schedule 4.04(b) also sets forth a Schedule of all holders of Company Unit Appreciation Rights on an individual-by-individual and grant-by-grant basis, and provides the number of Company Unit Appreciation Rights originally granted, the number of Company Unit Appreciation Rights currently issued and outstanding, the grant date and strike price associated with each Company Unit Appreciation Right, the vesting schedule and termination or expiration date of each Company Unit Appreciation Right, and whether such Company Unit Appreciation Rights are currently vested or unvested. Except as set forth in Schedule 4.04(b), there are no preemptive or other outstanding rights, options, warrants, phantom interests, conversion rights, equity appreciation rights, profit participation rights, redemption rights, repurchase rights, agreements, arrangements, calls or commitments of any kind that obligate any Company Group Member to issue or to sell any Equity Securities of such Company Group Member, or any securities or obligations convertible or exchangeable into or exercisable for, valued by reference to or giving any Person a right to subscribe for or acquire, any Equity Securities of any Company Group Member or to vote with the unitholders of any Company Group Member on any matter, and no securities or obligations evidencing such rights are authorized, issued or outstanding. Except as set forth in Schedule 4.04(b), no Company Group Member is party to any unitholders agreement, voting agreement or registration rights agreement relating to its Equity Securities.

(c)    The Subsidiaries of the Company as of the date hereof are set forth on Schedule 4.04(c), including, as of such date, a description of the capitalization of each such Subsidiary and the names of the record owners of all Equity Securities in each Subsidiary. As of the date hereof, except for the Company's or any of its Subsidiaries' ownership interest in such Subsidiaries, neither the Company nor its Subsidiaries own any other Equity Securities in any other Person or has any right, option, warrant, conversion right, stock appreciation right, redemption right, repurchase right, agreement, arrangement or commitment of any character under which a Person is or may become obligated to issue or sell, or give any right to subscribe for or acquire, or in any way dispose of, any Equity Securities, or any Equity Securities or obligations exercisable or exchangeable for or convertible into any Equity Securities, of such Person.

(d)    Each Company Option and Company Unit Appreciation Right as set forth on Schedule 4.04(b) (i) was granted in compliance with all applicable Laws and all of the terms and conditions of the Company Plan to which it was issued, (ii) has a grant date identical to the date on which the Company Board (or compensation committee thereof) took valid limited liability

29

EXHIBIT 2
Page 34 of 404

company action to grant such Company Option or Company Unit Appreciation Right, (iii) was granted with an exercise price or strike price no less than the fair market value of the underlying Existing Company Unit as of the grant date, (iv) was properly accounted for in all respects in accordance with GAAP.

(e)     The Company Common Units to be issued by the Company in connection with the Transactions, upon issuance in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and nonassessable (except as otherwise limited by the OLLCA), and will not be subject to any preemptive rights, free and clear of all Liens (other than restrictions on transfer under applicable Securities Laws and the A&R Company LLC Agreement).

4.05   Financial Statements; Internal Controls.

(a)     The audited statements of financial position, statements of comprehensive income, statements of changes in unitholders' equity and statements of cash flows of the Company Group for each of the years ended December 31, 2020 and December 31, 2019 (collectively, the "Annual Financial Statements"), were prepared and audited in accordance with the standards, principles and practices specified therein and, subject thereto, in accordance with GAAP and applicable Law as at the Balance Sheet Date, except as otherwise noted therein. The unaudited statements of financial position, statements of comprehensive income, statements of changes in unitholders' equity and statements of cash flows of the Company Group as of September 30, 2021 and for the nine-month period ended September 30, 2021 (the "Interim Financial Statements" and, together with the Annual Financial Statements, the "Financial Statements") were prepared in accordance with the standards, principles and practices specified therein and, subject thereto, in accordance with GAAP and applicable Law as of the Balance Sheet Date, except as otherwise noted therein and for the absence of notes thereto as would be required by GAAP. Prior to the date hereof, true, complete and correct copies of the Financial Statements and, where applicable, the accompanying independent auditors' reports have been made available to Acquiror.

(b)     The Financial Statements were derived from the books and records of the Company Group and prepared in accordance with GAAP, except as may be indicated in the notes thereto (and, in the case of the Interim Financial Statements, the absence of notes) and using in all material respects the same accounting principles, practices, procedures, policies and methods (with consistent classifications, judgments, inclusions, exclusions and valuation and estimation methodologies) used and applied in the preparation of the consolidated financial statements of the Company Group since December 31, 2018. The Financial Statements fairly present in all material respects the assets, liabilities, cash flow and financial condition and results of operations of the Company Group as of the times and for the periods referred to therein. Since the Balance Sheet Date, the Company Group has not made any material change in the accounting practices or policies applied in the preparation of the Annual Financial Statements, except as required by applicable Law or GAAP.

(c)     The Company Group maintains a system of accounting and internal controls designed to provide reasonable assurances regarding the reliability of the financial reporting and the preparation of the financial statements of the Company Group in accordance in all material respects with GAAP. Except as set forth on Schedule 4.05(c), since December 31, 2018, the Company Group (including the Company Group's personnel and, to the Knowledge of the

30

EXHIBIT 2
Page 35 of 404

Company, independent accountants who participated in the preparation or review of financial statements or the internal accounting controls employed by the Company Group) has not identified nor been made aware of (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by the Company Group, (ii) any fraud, whether or not material, that involves management of the Company Group or any personnel involved in financial reporting or (iii) any written claim or allegation regarding any of the foregoing. The financial statements, when delivered by the Company for inclusion in the Registration Statement for filing with the SEC following the date of this Agreement in accordance with <u>Section 8.02</u>, will comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC and the Securities Act in effect as of such date.

      4.06    <u>Compliance with Laws</u>.

      (a)    Each Company Group Member is conducting and, since December 31, 2017, has conducted its business in compliance in all material respects with all Laws applicable to it and the Company's business, properties or other assets.

      (b)    There is, and since December 31, 2017 there has been, no Action by, against or affecting any Company Group Member, or any Person for whose acts or defaults any Company Group Member may be vicariously liable, and no such Action is pending or, to the Knowledge of the Company, threatened, nor since December 31, 2017 has any Governmental Authority notified in writing any Company Group Member that it intends to conduct such an Action.

      (c)    Since December 31, 2017, no Company Group Member has received any written notice (official or otherwise) from any Governmental Authority (i) with respect to an alleged, actual or potential violation and/or failure to comply, in any material respect, with any such applicable Law or (ii) requiring any Company Group Member to take or omit any material action to ensure compliance with any such applicable Law.

      (d)    The Company Group possesses all permits, approvals, orders, authorizations, consents, licenses, certificates, franchises, accreditations, waivers, identification numbers, exemptions of, or filings or registrations (excluding Intellectual Property registrations and certifications) with, or issued by, any Governmental Authority necessary for the ownership and use of the assets of the Company Group and the operation of the Company Group's business as currently conducted (the "<u>Company Permits</u>"), except where the failure to possess the same has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. Except as has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, all such Company Permits are valid and in full force and effect, and there are no lawsuits or other proceedings pending before or, to the Knowledge of the Company, threatened by any Governmental Authority that seek the revocation, cancellation, suspension or adverse material modification thereof. Except as has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, no Company Group Member is in default, and, to the Knowledge of the Company, no condition exists that with notice or lapse of time or both would constitute a default, under the Company Permits.

31

**EXHIBIT 2**
**Page 36 of 404**

4.07    <u>Absence of Certain Changes or Events</u>. Since the Balance Sheet Date and except as expressly set forth on <u>Schedule 4.07</u> and as required by this Agreement, (a) the Company Group has conducted its business in all material respects in the ordinary course of business, (b) the Company Group has not entered into any material transactions outside the ordinary course of business, (c) no action has been taken (or has been taken on its behalf) by the Company Group that would require consent under <u>Section 6.01</u> if such action were taken during the Interim Period (other than for any such actions for which such consent has been received in accordance with <u>Section 6.01</u>) and (d) there has not been any change, effect, event, circumstance, occurrence or state of facts that would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

4.08    <u>No Undisclosed Liabilities</u>. Except (a) as disclosed, reflected or reserved against in the Financial Statements or the notes thereto, (b) for liabilities incurred in the ordinary course of business since the Balance Sheet Date, (c) as expressly permitted or contemplated by this Agreement or otherwise incurred in connection with the Transactions, (d) as disclosed on <u>Schedule 4.08</u>, (e) contingent liabilities under executory contracts and (f) for liabilities that have been discharged or paid in full in the ordinary course of business, as of the date hereof, the Company Group does not have any material liabilities of any nature, whether accrued, contingent or otherwise.

4.09    <u>Information Supplied</u>. The information supplied in writing by the Company for inclusion in the Registration Statement and the Proxy Statement will not (a) in the case of the Registration Statement, at the time the Registration Statement is declared effective under the Securities Act and (b) in the case of the Proxy Statement, as of the date the Proxy Statement is first mailed to the Acquiror Stockholders and at the time of any meeting of the Acquiror Stockholders to be held in connection with the Transactions, contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not false or misleading. Notwithstanding the foregoing sentence, the Company makes no representation or warranty or covenant with respect to: (a) statements made or incorporated by reference therein in any of the foregoing documents based on information supplied by Acquiror or its Affiliates for inclusion therein or (b) any projections or forecasts or forward looking statements included in the Registration Statement or Proxy Statement.

4.10    <u>Litigation</u>.

(a)    Except as set forth on <u>Schedule 4.10(a)</u>, no Company Group Member nor, to the Knowledge of the Company, any of such Company Group Member's officers, directors, managers, agents or employees, in their capacities as such, has been since December 31, 2017 or is the subject of or engaged in any material Action or other dispute resolution process before a third party unrelated to the dispute, whether as claimant, defendant or otherwise, and no such Action or dispute resolution process is pending or, to the Knowledge of the Company, threatened, in each case, that would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. No Company Group Member is, nor to the Knowledge of the Company, are any of such Company Group Member's officers, directors, managers, agents or employees, in their capacities as such, subject to any settlement agreements or arrangements,

32

EXHIBIT 2
Page 37 of 404

whether written or oral, or is in discussions for a settlement or arrangement, regarding any material Actions.

(b)    No Company Group Member is a party to or subject to the provisions of any outstanding Governmental Order (except if generally applicable without any Company Group Member being named therein) that would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

4.11    Contracts.

(a)    Schedule 4.11(a) sets forth a true and complete list as of the date hereof of the following types of Contracts to which any Company Group Member is a party or is bound (other than any Contracts under which no Company Group Member has any continuing or potential liability) (all such Contracts set forth on Schedule 4.11(a), or which are required to be so disclosed, the "Material Contracts"):

(i)    each Contract with consideration paid or payable to any Company Group Member of more than $500,000, in the aggregate, over any 12-month period;

(ii)    all Contracts with (or with obligations of any Company Group Member to) a Related Party;

(iii)    all broker, distributor, agency, sales promotion, market research, marketing consulting and advertising Contracts or arrangements that are material to the business of the Company Group;

(iv)    all Contracts (excluding Contracts for employment) with management and consultants;

(v)    all bonus and commission plans of the Company Group with a reasonably expected value in excess of $250,000 in any 12-month period;

(vi)    all Contracts involving the payment or payment of royalties or other amounts calculated based upon the revenues or income of any Company Group Member or income or revenues related to any Product of any Company Group Member to which any Company Group Member is a party;

(vii)    all Contracts evidencing Indebtedness for borrowed money in an amount greater than $500,000, and any pledge agreements, security agreements or other collateral agreements in which any Company Group Member granted to any person a Lien on any of the property or assets of any Company Group Member;

(viii)    all partnership, joint venture or similar agreement or arrangement, including as may be provided in any letter of intent, memorandum of understanding or agreement in principle;

33

EXHIBIT 2
Page 38 of 404

(ix)    all Contracts, including any grant agreements with any economic development corporation, with any Governmental Authority to which any Company Group Member is a party, other than any Company Permits;

(x)    all Contracts that limit, or purport to limit, the ability of any Company Group Member to compete in any line of business or material business activity or with any Person or in any jurisdiction or during any period of time, excluding customary confidentiality agreements and agreements that contain customary confidentiality clauses;

(xi)    all Contracts that result in any Person or entity holding a power of attorney from any Company Group Member;

(xii)    all leases or master leases of personal property reasonably likely to result in annual payments of $500,000 or more in a 12-month period;

(xiii)    any note, mortgage, indenture or other obligation or agreement or other instrument for or relating to indebtedness for borrowed money in excess of $500,000, or any guarantee of third party obligations in excess of $500,000, or any letters of credit, performance bonds or other credit support for any Company Group Member;

(xiv)    all Contracts for the employment or engagement of any employee, officer, director or other individual service provider that (A) provide for annualized base compensation in excess of $250,000  or (B) are not terminable by a Company Group Member on no more than 30 days' notice and without liability to or financial obligation by such Company Group Member;

(xv)    any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization (each, a "CBA");

(xvi)    all Contracts relating to the purchase of engineering or design services that involve more than $500,000, other than those Contracts that have been fully performed and under which no further services are due;

(xvii)    any engineering, procurement and construction contract, equipment supply agreement, services agreement, construction and operating management agreement or any other similar agreement with a value in excess of $500,000;

(xviii)    all Contracts involving use of any Company Intellectual Property required to be listed in Schedule 4.15(a), excluding (A) nondisclosure agreements entered into in the ordinary course of business by a Company Group Member; (B) Contracts between a Company Group Member and its customers entered into in the ordinary course of business in which the use of any such Company Intellectual Property is licensed on a non-exclusive basis; (C) Contracts between a Company Group Member and its vendors or suppliers entered into in the ordinary course of business in which the Company Group Member has granted a license to the supplier or vendor (i) to use the Company Group Member's trademarks, service marks, or other source identifiers for purposes of indicating that the Company Group Member is a customer of the vendor or supplier; or (ii) to use any Company Intellectual Property for purposes of providing goods or services to the Company Group Member;

34

EXHIBIT 2
Page 39 of 404

(xix)   Contracts which involve the license or grant of rights to any Company Group Member or to Company Intellectual Property by any Company Group Member, excluding (A) nondisclosure agreements entered into in the ordinary course of business by a Company Group Member; (B) licenses of commercially available and/or off-the-shelf Software (including Software provided as a service) or other standard or commercially available Intellectual Property licensed under shrinkwrap, clickwrap, online terms of use or service or other standard license terms with an aggregate annual license cost of $100,000 or less; (C) Contracts between a Company Group Member and its customers entered into in the ordinary course of business in which the use of any such Company Intellectual Property is licensed on a non-exclusive basis; (D) employee invention assignment and confidentiality agreements between a Company Group Member and its employees and/or independent contractors entered into by the Company Group Member in the ordinary course of business; and (E) Contracts between a Company Group Member and its vendors or suppliers entered into in the ordinary course of business in which the Company Group Member has granted a license to the supplier or vendor (i) to use the Company Group Member's trademarks, service marks, or other source identifiers for purposes of indicating that the Company Group Member is a customer of the vendor or supplier; (ii) to use feedback, suggestions or ideas provided by the Company Group Member to the vendor or supplier in connection with the vendor's or supplier's provision of goods or performance of services to or for the Company Group Member; or (iii) to use any Company Intellectual Property for purposes of providing goods or services to the Company Group Member;

(xx)    all Contracts under which any Company Group Member has agreed to purchase goods or services from a vendor, supplier or other Person on a preferred supplier or "most favored supplier" basis;

(xxi)   all Contracts under which any Company Group Member has agreed to treat any customer on a "most favored" basis;

(xxii)  any Contract that is a settlement, conciliation or similar agreement with any Governmental Authority or pursuant to which any Company Group Member will have any material outstanding obligation after the date of this Agreement; and

(xxiii) all Contracts for the development of Intellectual Property for the benefit of any Company Group Member (other than employee invention assignment and confidentiality agreements entered into on terms and conditions that are materially the same as the Company's standard form of such agreement).

(b)     Except as set forth on <u>Schedule 4.11(b)</u>, the Company Group (i) is not, nor has it received written or, to the Knowledge of the Company, oral notice that any other party to any Material Contract is, except as such may be limited the Enforceability Exceptions, in material violation or material breach of or material default (immediately or upon notice or lapse of time) under or (ii) has not waived or failed to enforce any material rights or material benefits under any Material Contract to which it is a party or any of its properties or other assets is subject. No Material Contract is the subject of a notice to terminate delivered or communicated in accordance with the terms of any Material Contract, except for any expiration of the term of a Material Contract following the date of this Agreement in accordance with its terms. Each Material Contract is in full force and effect and, subject to the Enforceability Exceptions, is legal, valid and binding on

**EXHIBIT 2**
**Page 40 of 404**

the applicable Company Group Member, and, to the Knowledge of the Company, each other party thereto, except as would not be material and adverse to such Company Group Member. Except as set forth on Schedule 4.11(b), there is no default under any such Material Contracts by the applicable Company Group Member, or, to the Knowledge of the Company, any other party thereto, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by such Company Group Member, or, to the Knowledge of the Company, any other party thereto, in each case, except as would not be material and adverse to such Company Group Member.

4.12    Employee Benefits.

(a)    Schedule 4.12(a) sets forth an accurate and complete list of each material Company Benefit Plan. With respect to each material Company Benefit Plan, the Company has made available, to the extent applicable, accurate and complete copies of (i) the current plan document, including all amendments thereto, (ii) a written description of such Company Benefit Plan if it is not set forth in a written document, (iii) the most recently prepared actuarial report, (iv) the most recent summary plan description together with all summaries of all material modifications thereto, (v) the most recent IRS determination or opinion letter, (vi) the related insurance policies, trust agreements or other funding arrangements, and (vii) the most recent IRS Form 5500 annual report (and all schedules thereto).

(b)    Each Company Benefit Plan has been established, maintained, funded and administered in all material respects in accordance with its terms and is in material compliance with all applicable Laws. There is no pending or, to the Knowledge of the Company, threatened, Action or claim relating to or against any Company Benefit Plans (other than routine claims for benefits). All contributions, premiums and other payments that any Company Group Member is required to make with respect to any Company Benefit Plan have been fully and timely paid when due, and any such amounts not yet due have been paid or properly accrued. Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code has timely received a current favorable determination, advisory or opinion letter from the IRS, and nothing has occurred that would reasonably be expected to result in the loss of the qualification or tax exemption of any such Company Benefit Plan. No Company Group Member has incurred (whether or not assessed) any material Tax, penalty or other liability under Section 4980B, 4980D, 4980H, 6721 or 6722 of the Code. There is no unpaid liability for any nonexempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code) or any breach of fiduciary duty (as determined under ERISA) with respect to any Company Benefit Plan.

(c)    No Company Benefit Plan is, and no Company Group Member sponsors, maintains, contributes to (or is required to contribute to), or has any current or contingent liability or obligation under or with respect to: (i) any "defined benefit plan" (as defined in Section 3(35) of ERISA, whether or not subject thereto) or a plan that is or was subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA; (ii) a "multiple employer plan" (within the meaning of Section 413(c) of the Code or Section 210 of ERISA); (iii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); or (iv) a "multiemployer plan" (as defined in Section 3(37) of ERISA). No Company Benefit Plan provides, and no Company Group Member has promised to provide, any post-termination, post-ownership or retiree health or welfare benefits to any Person, other than (A) as required under Section 4980B of the Code or similar

36

EXHIBIT 2
Page 41 of 404

applicable Law for which the covered Person pays the full premium cost of coverage or which is paid pursuant to a government subsidy, (B) coverage through the end of the month of termination of employment or service (to the extent permitted under the terms of the applicable Company Benefit Plan), (C) disability benefits attributable to disabling events occurring at or prior to termination of employment or service, or (D) death benefits attributable to deaths occurring at or prior to termination of employment or service. No Company Group Member has any current or contingent liability or obligation by reason of at any time being treated as a single employer with any other Person under Section 414 of the Code.

(d)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby, (alone or in conjunction with any other event) could result in (i) any entitlement by any current or former employee or individual service provider of any Company Group Member to any compensation or benefit, (ii) any increase in the amount, or acceleration of the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any current or former employee or individual service provider of any Company Group Member, or (iii) the payment of any "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

(e)     Each Company Benefit Plan that is a "nonqualified deferred compensation plan" subject to Section 409A of the Code that constitutes in any part a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) subject to Section 409A of the Code has been operated and administered in all material respects in operational compliance with, and is in all material respects in documentary compliance with, Section 409A of the Code, and no amount under any such plan, agreement or arrangement is or has been subject to the interest and additional Tax set forth under Section 409A(a)(1)(B) of the Code.

(f)     No Company Group Member has any obligation to indemnify or gross-up any Person for any Tax under Section 4999 of the Code and Section 409A of the Code (or any corresponding provisions of state, local or non-U.S. Tax Laws).

4.13    Labor and Employment.

(a)     Except as set forth on Schedule 4.13(a), (i) no Company Group Member is a party to or bound by any CBA (including agreements with works councils and trade unions and side letters), and no employees of any Company Group Member are represented by any labor union, works council, or other labor organization with respect to their employment; (ii) in the past three years, no labor union, works council, other labor organization, or group of employees of any Company Group Member has made a demand for recognition or certification, and there are no representation or certification proceedings presently pending or, to the Knowledge of the Company, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority; (iii) to the Knowledge of the Company, in the past three years, there have been no actual or threatened organizing activities with respect to any employees of any Company Group Member, and no such activities are currently pending or, to the Knowledge of the Company, threatened; (iv) in the past three years, there has been no actual or, to the Knowledge of the Company, threatened strike, lockout, work stoppage, slowdown, picketing, hand billing, unfair labor practice charge, material labor grievance, material labor arbitration or other material labor dispute against or affecting any Company Group Member, and no such dispute is currently

pending or to the Knowledge of the Company, threatened; and (v) with respect to the Transactions, each Company Group Member has satisfied all notice, bargaining, consent, consultation or other obligations to its employees and employees' representatives under applicable Law and any CBA or other Contract.

(b)    Each Company Group Member is, and since December 31, 2017 has been, in compliance in all material respects with all applicable Laws respecting labor, employment and employment practices, including all Laws respecting terms and conditions of employment, health and safety, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), employment harassment, discrimination or retaliation, whistleblowing, disability rights or benefits, equal opportunity, plant closures and layoffs (including the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws (collectively, the "WARN Act")), employee trainings and notices, workers' compensation, labor relations, collective bargaining, employee leave issues, COVID-19, affirmative action and unemployment insurance.

(c)    To the Knowledge of the Company, no current or former employee or independent contractor of any Company Group Member is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, nonsolicitation agreement, restrictive covenant or other obligation: (i) owed to any Company Group Member; or (ii) owed to any third party with respect to such Person's right to be employed or engaged by a Company Group Member. To the Knowledge of the Company, no current employee of any Company Group Member with annualized compensation at or above $150,000, has given notice to the Company that the employee intends to terminate his or her employment prior to the one year anniversary of the Closing.

(d)    Each Company Group Member has promptly, thoroughly and impartially investigated all sexual harassment, or other discrimination or retaliation allegations of which any of them is or has been made aware in the past three years. With respect to each such allegation with potential merit, each Company Group Member has taken prompt corrective action that is reasonably calculated to prevent further improper action. No Company Group Member reasonably expects any material liabilities with respect to any such allegations and is not aware of any allegations relating to officers, directors, employees, contractors, or agents of such Company Group Member, that, if known to the public, would bring such Company Group Member into material disrepute.

(e)    No employee layoff, facility closure or shutdown, reduction-in-force, furlough, temporary layoff, material work schedule change or reduction in hours, or reduction in salary or wages, or other workforce changes affecting employees of any Company Group Member (other than terminations of employees for performance reasons) has occurred since March 1, 2020 or is currently contemplated, planned or announced, including as a result of COVID-19 or any Law directive, guidelines or recommendations by any Governmental Authority in connection with or in response to COVID-19. No Company Group Member has experienced any material employment-related liability with respect to COVID-19.

EXHIBIT 2
Page 43 of 404

(f)     Except as would not result in material liability for the Company Group, the Company Group has fully and timely paid all (i) wages, salaries, wage premiums, commissions, overtime, bonuses, severance and termination payments, fees, and other compensation that has come due and payable to its current or former employees and independent contractors under applicable Laws, Contract or Company Group policy, and (ii) fines, Taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation.

4.14    <u>Taxes</u>.

(a)     Each Company Group Member has timely filed with the appropriate Tax Authority, or has caused to be timely filed on its behalf (taking into account any valid extension of time within which to file), all material Tax Returns required to be filed by it, and all such Tax Returns were and are true, correct and complete in all material respects and were prepared in compliance in all material respects with all applicable Laws. Each Company Group Member has timely paid all material amounts of Taxes due and payable (whether or not shown on any Tax Return), other than Taxes being contested in good faith and for which adequate reserves have been established in accordance with GAAP on the Financial Statements.

(b)     Each Company Group Member has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and Tax information reporting, collection and retention and has, within the time and in the manner prescribed by applicable Laws, (i) withheld all material amounts of Taxes required to have been withheld by it in connection with amounts paid to any employee, independent contractor, creditor, stockholder or any other third party, and (ii) timely remitted such amounts required to have been remitted to the appropriate Tax Authority.

(c)     No Company Group Member has (i) made an election to defer the payment of any "applicable employment taxes" (as defined in Section 2302(d)(1) of the CARES Act) pursuant to Section 2302 of the CARES Act or made any such deferral or election pursuant to the presidential memorandum regarding Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster signed on August 8, 2020 or (ii) applied for a loan under 15 U.S.C. 636(a)(36).

(d)     No claim, assessment, deficiency or proposed adjustment for any Tax has been asserted or assessed by any Tax Authority against any Company Group Member that remains unresolved or unpaid except for claims, assessments, deficiencies or proposed adjustments being contested in good faith and for which adequate reserves have been established in accordance with GAAP. There is no Tax audit, examination or other Action of a Company Group Member presently in progress, and there are no waivers, extensions or written requests for any waivers or extensions of any statute of limitations currently in effect with respect to any material Taxes or Tax Returns of any Company Group Member.

(e)     No Company Group Member is or has been (i) a party to any Tax sharing, indemnification, allocation or similar agreement or arrangement (excluding the Existing Company LLCA or any commercial contract entered into in the ordinary course of business and not primarily related to Taxes), (ii) a member of an affiliated, consolidated, combined, unitary or similar Tax group (other than any such Tax group the common parent of which was the Company), or (iii) a

EXHIBIT 2
Page 44 of 404

party to any "listed transaction" under Treasury Regulations Section 1.6011-4(b)(2) (or any similar or corresponding provision of U.S. state or local or non-U.S. Law).

(f)     The Company Group does not have any liability for Taxes of any other Person as a result of Treasury Regulations Section 1.1502-6 (or any similar provision of U.S. state or local or non-U.S. Law), as a transferee or successor, or by operation of Law.

(g)     The Company Group will not be required to include any material item of income in, or exclude any material deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting, or use of an improper method of accounting, for a taxable period  (or portion thereof) ending on or prior to the Closing Date; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of U.S. state or local or non-U.S. Law) executed on or prior to the Closing Date; (iii) installment sale or open transaction disposition made on or prior to the Closing Date; (iv) prepaid amount received or deferred revenue accrued on or prior to the Closing Date outside of the ordinary course of business; or (v) intercompany item under Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of U.S. state or local or non-U.S. Law) or excess loss account under Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of U.S. state or local or non-U.S. Law).

(h)     There are no Liens for Taxes on any assets of the Company Group other than Permitted Liens.

(i)     No written claims have ever been made by any Tax Authority in a jurisdiction where the Company Group does not file Tax Returns that the Company Group is or may be subject to taxation by that jurisdiction, which claims have not been resolved or withdrawn.

(j)     No Company Group Member has taken or agreed to take any action not contemplated by this Agreement or any Ancillary Agreement that would reasonably be expected to prevent the Transactions from qualifying for the Intended Tax Treatment.

(k)     No Company Group Member has made any election or otherwise taken any action to cause the Partnership Tax Audit Rules to apply to such Company Group Member at any earlier date than is required by applicable Law.

(l)     Each Company Group Member is, and has at all times since its formation been, properly classified as a partnership (and not as a publicly traded partnership within the meaning of Section 7704(b) of the Code) or disregarded entity for U.S. federal and applicable state and local income tax purposes.

    4.15    Intellectual Property.

(a)     Schedule 4.15(a) contains a complete and accurate list of all (i) issued patents and pending patent applications, (ii) trademark and service mark registrations and applications and (iii) copyright registrations, in each case that are owned by any Company Group Member (collectively, "Registered IP"), indicating for each item, as applicable, the registration or application number, the applicable filing jurisdiction and the date of filing or issuance. The Company Group exclusively owns all right, title, and interest in and to the Registered IP, free and

40

EXHIBIT 2
Page 45 of 404

clear of any Liens other than Permitted Liens. The Registered IP is subsisting and, excluding any Registered IP which is the subject of an application for registration or issuance, is valid and, to the Knowledge of the Company, enforceable, in each case, except as would not be material and adverse to the Company Group, taken as a whole.

(b)     The Company Group owns all right, title, and interest in and to or is licensed to use or otherwise has the right to use all Intellectual Property used in or necessary to the conduct of the business of the Company Group as currently conducted, free and clear of any Liens other than Permitted Liens, in each case, except as would not be material and adverse to the Company Group, taken as a whole. All Intellectual Property used in or necessary to the conduct of the business of the Company Group as currently conducted shall be owned or available for use by the Company Group immediately after the Closing on terms and conditions substantially the same as those under which any Company Group Member owned or used such Intellectual Property immediately prior to the Closing, in each case, except as would not be material and adverse to the Company Group, taken as a whole.

(c)     Except as set forth on Schedule 4.15(c), to the Knowledge of the Company (i) the operation of the business of the Company Group as currently conducted does not infringe, misappropriate, dilute or otherwise violate, and since December 31, 2017, has not infringed, misappropriated, diluted or otherwise violated, any third-party Intellectual Property and (ii) no third party infringes, misappropriates, dilutes or otherwise violates on the date of this Agreement, and no third party has infringed, misappropriated, diluted or otherwise violated since December 31, 2017, any Intellectual Property owned by the Company Group.

(d)     As of the date hereof, there is no Action pending or, to the Knowledge of the Company, threatened in writing (including "cease and desist" letters or invitations to take a license) against any Company Group Member (i) challenging the ownership, validity, registrability, patentability, or enforceability of the Intellectual Property owned by any Company Group Member (excluding office actions and similar ex-parte proceedings in connection with the prosecution of applications for the registration or issuance of any Intellectual Property) or (ii) asserting that any Company Group Member has infringed, misappropriated, diluted or otherwise violated any third-party Intellectual Property since December 31, 2017, in the case of each of clause (i) and (ii), except as would not be material and adverse to the Company Group, taken as a whole.

(e)     To the Knowledge of the Company, all former and current officers, directors, employees, personnel, consultants, advisors, agents, and independent contractors of any Company Group Members, who have contributed to or participated in the conception and development of material Intellectual Property for any Company Group Member have entered into valid and binding proprietary rights agreements vesting ownership of such Intellectual Property in one or more Company Group Members.

4.16    Data Protection.

(a)     Since December 31, 2017, each Company Group Member (i) has been in compliance in all material respects with all Privacy Laws and (ii) has not been subject to any regulatory audits or, to the Knowledge of the Company, investigations by any Governmental

Authority relating to Privacy Laws. Each Company Group Member has taken commercially reasonable steps to ensure that all Personal Information is protected in all material respects against loss and against unauthorized access, use, modification, disclosure or other use or misuse. To the Knowledge of the Company, since December 31, 2017, there has been no loss, theft or unauthorized access to or misuse of any Personal Information, in each case, that has resulted in, or is reasonably likely to result in, material liability to the Company Group, taken as a whole.

(b)     No Company Group Member has received any written requests, complaints or objections to its collection or use of Personal Information from any data protection authority or third party (including data subjects) that remains unresolved. To the Knowledge of the Company, no individual has been awarded compensation from any Company Group Member under any Privacy Laws, and no written claim for such compensation is outstanding.

(c)     No Company Group Member sells, rents or otherwise makes available to any Person any Personal Information, except in a manner that complies in all material respects with the applicable Privacy Laws. The execution, delivery and performance of this Agreement and the transactions contemplated herein comply, and will comply, in all material respects, with all Privacy Laws and other contractual commitments related to the privacy and security of Personal Information to which any Company Group Member is bound, except as would not be material and adverse to the Company Group, taken as a whole.

4.17    <u>Information Technology</u>.

(a)     The IT Systems: (i) operate and perform in material accordance with their documentation and functional specifications and otherwise as required by each Company Group Member for the operation of its business as currently conducted and (ii) to the Knowledge of the Company, are materially free from bugs and other defects, in each case, except as would not be material and adverse to the Company Group, taken as a whole.

(b)     The Company Group uses commercially reasonable efforts to protect the confidentiality, integrity and security of the IT Systems used in the operation of the business of the Company Group from any unauthorized use, access, interruption, or modification. Such IT Systems (i) are sufficient for the immediate and currently anticipated future needs of the Company Group, including as to capacity, scalability and ability to process current and anticipated peak volumes in a timely manner, and (ii) are, to the Knowledge of the Company, in sufficiently good working condition to effectively perform all information technology operations.   To the Knowledge of the Company, the IT Systems include a sufficient number of license seats for all Software as necessary for the operation of the business of the Company Group as currently conducted.

(c)     To the Knowledge of the Company, since December 31, 2017, there have been no unauthorized intrusions, failures, breakdowns, security breaches, continued substandard performance, or other adverse events affecting any such IT Systems that have caused any substantial disruption of or interruption in or to the use of such IT Systems or any unauthorized use, misappropriation, modification, encryption, corruption, disclosure, or transfer of any information or data contained therein, in each case, that has resulted in, or is reasonably likely to result in, material liability to the Company Group. The Company Group maintains commercially

EXHIBIT 2
Page 47 of 404

reasonable disaster recovery and business continuity plans, procedures and facilities in connection with the operation of the business of the Company Group, acts in compliance therewith, and has taken commercially reasonable steps to test such plans and procedures on a periodic basis, and such plans and procedures have been proven effective upon such testing in all material respects.

4.18    Real Property.

(a)    No Company Group Member owns any real property.

(b)    Schedule 4.18(b) contains a complete and accurate list by property, city, state and country, of all real property leasehold or subleasehold estates and other rights to possess or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Company Group as of the date of this Agreement (the "Leased Company Properties"). The Company Group is the sole legal and beneficial owner of a leasehold or subleasehold interest in, or other right to possess or occupy, the Leased Company Properties.

(c)    Schedule 4.18(c) contains a complete and accurate list of all leases, subleases, licenses, concessions, and other Contracts, agreements and leasehold arrangements and all related supplemental documents (collectively, the "Lease Documents") pursuant to which the Company Group leases, licenses, subleases or otherwise occupies any Leased Company Property on the date hereof. The Company has delivered to Acquiror a true and complete copy of each such Lease Document.  No Company Group Member nor, to the Knowledge of the Company, any other party to any Lease Document is in material breach or material default under such Lease Document, and no event has occurred or circumstances exist which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination or acceleration of rent under such Lease Document, by a Company Group Member or, to the Knowledge of the Company, any other party thereto.

(d)    Each Lease Document is a written agreement in full force and effect, and, subject to the Enforceability Exceptions, is legal, valid, binding and enforceable against the Company Group Member that is a party to such Lease Document and, to the Knowledge of the Company, any other party to such Lease Document. The Company Group has paid the rent and all other sums that are due and payable under such Lease Documents and there are no significant arrears thereunder due and payable by the Company Group.

(e)    To the Knowledge of the Company, there exist no restrictions, covenants or encumbrances which encumber any of the Leased Company Properties and which prevent any of the Leased Company Properties from being used now or in the future for their current use or would prevent, or require consent from a third party as a result of, the consummation of the transactions contemplated by this Agreement or which would be material and adverse to the Company Group, taken as a whole.

(f)    No Company Group Member has at any time given any covenant or entered into any agreement in respect of any leasehold real property other than the Leased Company Properties in respect of which any material contingent liability of the Company Group remains as of the date of this Agreement. No Company Group Member has subleased, licensed or otherwise granted any Person the right to use or occupy any Leased Company Property or any portion thereof,

EXHIBIT 2
Page 48 of 404

and no Company Group Member has collaterally assigned or granted any other security interest in any Lease Document or any interest therein.

(g)     As of the date hereof, there are no material outstanding Actions to which any Company Group Member is a party in respect of any of the Leased Company Properties, other than nondelinquent real property assessments affecting the Leased Company Properties.  As of the date of this Agreement, the Company Group's possession and quiet enjoyment of the Leased Company Property under each Lease Document is not materially disturbed.

4.19    <u>Corrupt Practices; Sanctions</u>.

(a)     Since December 31, 2016, no Company Group Member nor any of such Company Group Member's Representatives has directly or indirectly paid, received, offered or promised to pay or receive, or authorized or ratified the payment, directly or indirectly, of any monies or anything of value to or from any Person, including any national, provincial, municipal or other Government Official or any political party or candidate for political office for the purpose of influencing any act or decision of such official or of any Governmental Authority to obtain or retain business, or direct business to any Person or to secure any other improper benefit or advantage in each case in violation of any Anti-Corruption Laws. Each Company Group Member (i) has instituted policies and procedures designed to ensure compliance with the Anti-Corruption Laws and other anti-bribery, anti-corruption and anti-money laundering Laws in each jurisdiction in which such Company Group Member operates and (ii) has maintained such policies and procedures in force. To the Knowledge of the Company, no Government Official nor any of his or her immediate family members is an officer or director or owns any securities of any Company Group Member.

(b)     Since December 31, 2016, no Company Group Member nor any of its Representatives, to the Knowledge of any Company Group Member or any of their respective Representatives has, or is presently or has agreed to become, engaged in any conduct that violates any applicable Anti-Corruption Laws.

(c)     Since December 31, 2016, no Company Group Member nor any of its Representatives is currently or has been (i) a Sanctioned Person, (ii) conducting, directly or indirectly, any business (including, without limitation, sales, reselling, licensing or sub-licensing arrangements, funding, making payments, procuring, insurance or otherwise providing assistance or support in connection with operations, business or any other activity) or engaged in any dealings with or for the direct or indirect benefit of or on behalf of any Sanctioned Person or in any Sanctioned Country, (iii) engaging in any export, reexport, transfer or provision of any goods, Software, technology, data or service without, or exceeding the scope of, any required or applicable licenses or authorizations under all applicable Ex-Im Laws, or (iv) otherwise in violation of any applicable Sanctions, Ex-Im Laws or U.S. anti-boycott Laws (collectively, "<u>Trade Control Laws</u>").

(d)     Since December 31, 2016, no Company Group Member has, in connection with or relating to the business of the Company Group, received from any Governmental Authority or any Person any written or, to the Knowledge of the Company, oral notice, inquiry, or internal or external allegation; made any voluntary or involuntary disclosure to a Governmental Authority; or conducted any internal investigation or audit concerning any actual or potential violation or

44

EXHIBIT 2
Page 49 of 404

wrongdoing in each case, related to Trade Control Laws or Anti-Corruption Laws. The Company Group maintains in effect written policies, procedures and internal controls, including an internal controls system, that are reasonably designed to prevent, deter and detect violations of applicable Trade Control Laws and Anti-Corruption Laws.

4.20    <u>Insurance</u>.

(a)    <u>Schedule 4.20(a)</u> sets forth a true and complete list of the material current insurance policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability and other casualty and property insurance and other material policies or binders maintained by the Company Group (the "<u>Insurance Policies</u>"). To the Knowledge of the Company, there are no events, circumstances or other liabilities that would reasonably be expected to give rise to a material claim under the Insurance Policies.

(b)    Except as has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Insurance Policies are in full force and effect as of the date of this Agreement with respect to the Company Group, and the limits thereunder have not been impaired, exhausted or materially diminished.

(c)    As of the date hereof, no Company Group Member has received any written notice of cancellation of, a material premium increase (relative to others in the industry in which any Company Group Member operates) with respect to, or of a material alteration of coverage under, any Insurance Policy. Except as has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, all of the Insurance Policies (i) are valid and binding in accordance with their terms, subject to Enforceability Exceptions and (ii) have not been subject to any lapse in coverage. There are no material claims related to the Company Group or the assets, business, operations, employees, officers and directors of the Company Group pending under any such Insurance Policies as to which coverage has been denied or disputed or in respect of which there is an outstanding reservation of rights.

4.21    <u>Competition and Trade Regulation</u>.

(a)    In the past five years, the Company Group has been and is currently in compliance with relevant Sanctions and export control Laws and regulations in jurisdictions in which the Company Group does business or to which the Company Group is otherwise subject, including the United States International Traffic in Arms Regulations, the Export Administration Regulations and United States Sanctions Laws and regulations administered by the United States Department of the Treasury's Office of Foreign Assets Control. The Company Group also has policies and procedures in place designed to ensure compliance with the applicable trade sanctions Laws and are following such policies and procedures in all material respects.

(b)    Each Company Group Member is in compliance with all applicable Antitrust Laws in all material respects. No Company Group Member is nor since December 31, 2017 has such Company Group Member been a party to any agreement or arrangement with a Governmental Authority under any Antitrust Laws in any jurisdiction in which the Company Group has assets or carries on or intends to carry on business.

**EXHIBIT 2**
**Page 50 of 404**

4.22    <u>Environmental Matters</u>. Except as has not had or would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect:

(a)    the Company Group is, and since December 31, 2017, except as set forth on <u>Schedule 4.22(a)</u>, has been, in compliance in all respects with all Environmental Laws and all Company Permits required under Environmental Laws in connection with the operation of the Company Group's business or ownership or operation of the Leased Company Properties, which Company Permits have been obtained by the Company Group and are current and valid;

(b)    there are no Actions or Governmental Orders pending, or to the Knowledge of the Company, threatened, against the Company Group, nor, to the Knowledge of the Company, has the Company Group received any written notification of or otherwise been made aware of, any actual or alleged violation of, or liability under, Environmental Laws;

(c)    the Company Group (or any other Person to the extent giving rise to liability for the Company Group) has not manufactured, generated, treated, stored, disposed or arranged for disposal of, transported, released, exposed any Person to, or owned or operated any property or facility contaminated by, any Hazardous Material under circumstances or in quantities that violate Environmental Laws or which would reasonably be expected to give rise to liability for the Company Group pursuant to Environmental Laws; and

(d)    the Company has furnished to the Acquiror copies of all material environmental reports, assessments and audits in its possession or reasonable control relating to the Company Group's compliance with Environmental Laws or the environmental condition of the real property operated or leased by the Company Group in connection with its business.

4.23    <u>Customers and Suppliers</u>.

(a)    <u>Schedule 4.23(a)</u> sets forth a true, correct and complete list, as of the date of this Agreement, of the 10 largest customers of the Company Group (each, a "<u>Material Customer</u>"), during each 12 month period ended as of December 31, 2020, December 31, 2019 and December 31, 2018, in each case measured by the amount of revenue received by any Company Group Member during such period. Except as set forth on <u>Schedule 4.23(a)</u>, as of the date hereof, no Company Group Member has since December 31, 2017 received any written, or to the Knowledge of the Company, oral notice that any Material Customer has cancelled, materially decreased or otherwise materially modified, or intends to cancel, materially decrease or otherwise materially modify, its relationship with any Company Group Member or its purchase of Products.

(b)    <u>Schedule 4.23(b)</u> sets forth a complete and correct list, as of the date of this Agreement, of the 10 largest vendors, suppliers, service providers and other similar business relations of the Company Group (each, a "<u>Material Vendor</u>") during each 12 month period ended as of December 31, 2020, December 31, 2019 and December 31, 2018 in each case measured by the amount of expenditure by any Company Group Member during such period. Except as set forth in <u>Schedule 4.23(b)</u>, as of the date hereof, no Company Group Member has since December 31, 2017 received any written, or to the Knowledge of the Company, oral notice that any Material Vendor has cancelled, terminated or otherwise materially modified, or intends to cancel, terminate or otherwise materially modify its relationship with any Company Group Member.

**EXHIBIT 2**
**Page 51 of 404**

4.24    <u>Brokers</u>. No broker, investment banker, financial advisor or other Person, other than those set out in <u>Schedule 4.24</u>, the fees and expenses of which will be paid by the Company Group pursuant to an engagement letter entered into therewith, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of any Company Group Member.

4.25    <u>U.S. Nuclear Regulatory Matters.</u>

(a)    No Company Group Member has operated or is currently operating any "utilization facility," as defined in the Atomic Energy Act and the regulations of the NRC thereunder, whether or not owned, in whole or part, by any Company Group Member. Further, no Company Group Member possesses a license from the NRC for the construction or operation, or construction and operation, of any utilization facility.

(b)    No Company Group Member currently holds or requires any license for the possession or use of nuclear materials, whether such materials are classified as "source materials," "special nuclear materials," or "byproduct materials" pursuant to the Atomic Energy Act and the regulations of the NRC thereunder.

(c)    Each Company Group Member is in compliance with all applicable Laws relating to the design, licensing, construction and operation of "utilization facilities," as defined in the Atomic Energy Act and the regulations of the NRC thereunder. No Company Group Member is subject to any Law that could prevent or materially inhibit the Company Group's ability to design, license, or construct any such facilities, and the execution, delivery and performance by the Company Group of this Agreement and the Ancillary Agreements to which it is a party, and the consummation by it of the Transactions, shall not cause the Company Group or any Company Group Member to become subject to any such Law.

4.26    <u>Affiliate Agreements</u>. Except as set forth on <u>Schedule 4.26</u>, no Company Group Member is party to any transaction, agreement, arrangement or understanding with any (a) present or former executive officer or director of any Company Group Member, (b) beneficial owner (within the meaning of Section 13(d) of the Exchange Act) of five percent or more of the capital stock or equity interests of the Acquiror, Merger Sub or any Company Group Member or (c) Affiliate, "associate" or member of the "immediate family" (as such terms are respectively defined in Rules 12b-2 and 16a-1 of the Exchange Act) of any of the foregoing.

4.27    <u>No Other Representations or Warranties</u>. The representations and warranties made by the Company in this <u>Article IV</u> are the exclusive representations and warranties made by the Company Group, its Affiliates and their respective Representatives. Except for the representations and warranties contained in this <u>Article IV</u>, neither the Company nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Company, to the accuracy or completeness of any information regarding the Company available to the other parties or their respective Representatives and expressly disclaims any such other representations or warranties. For the avoidance of doubt, the Company Group, its Affiliates and each of their respective Representative has not made and does not make any express or implied representation or warranty, either written or oral, with respect to the Company Group. In particular, without limiting the foregoing, neither the Company nor any other Person makes or has made any

**EXHIBIT 2**
**Page 52 of 404**

representation or warranty to the other parties hereto, and shall have no liability in respect of, with respect to (a) any financial projection, forecast, estimate, budget or prospect information relating to the Company Group or (b) any oral or, except for the representations and warranties expressly made by the Company in this <u>Article IV</u>, written information made available to the other parties hereto in the course of their evaluation of the Company and the negotiation of this Agreement or in the course of the Transactions.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES
## OF ACQUIROR AND MERGER SUB

Except as set forth in the Schedules to this Agreement (each of which qualifies (a) the correspondingly numbered representation, warranty or covenant if specified therein and (b) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent on its face) or in the Acquiror SEC Reports filed or furnished by Acquiror on or before December 12, 2021 (excluding (i) any disclosures in such Acquiror SEC Reports under the headings "Risk Factors" or "Forward-Looking Statements" and other disclosures that are predictive, cautionary or forward looking in nature and (ii) any exhibits or other documents appended thereto), each of Acquiror and Merger Sub represents and warrants to the Company as follows:

5.01    <u>Organization, Standing and Corporate Power</u>.

(a)    Acquiror is an entity duly incorporated validly existing and in good standing under the Laws of its jurisdiction of formation, and has all requisite legal entity power and authority to carry on its business as now being conducted. Acquiror is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, except as would not have an Acquiror Material Adverse Effect.

(b)    Merger Sub is an entity duly organized, validly existing and in good standing under the Laws of Delaware, with full legal entity power and authority to enter into this Agreement and perform its obligations hereunder. Other than Merger Sub, Acquiror has no other Subsidiaries or any equity or other interests in any other Person.

(c)    Acquiror has provided to the Company a true, complete and correct copy of the Acquiror Organizational Documents and, other than as contained in the Acquiror SEC Reports, there are no other Contracts which would amend, supplement or relate to the subject matters described in the Acquiror Organizational Documents.

5.02    <u>Corporate Authority; Approval; Non-Contravention; Government Approvals</u>.

(a)    Each of Acquiror and Merger Sub has the requisite corporate or other legal entity power and authority, and has taken all corporate or other legal entity action necessary in order to execute, deliver and perform its obligations under this Agreement and the Ancillary Agreements to which it is a party and, subject to satisfaction of the conditions to Closing contemplated hereby, to consummate the Transactions. The execution, delivery and performance by Acquiror and Merger Sub of this Agreement and the Ancillary Agreements to which it is a

48

EXHIBIT 2
Page 53 of 404

party, and the consummation by it of the Transactions, have been duly and validly authorized by all necessary corporate consent and authorizations on the part of Acquiror and Merger Sub, and no other corporate or other actions on the part of Acquiror or Merger Sub are necessary to authorize the execution and delivery by Acquiror or Merger Sub of this Agreement, the Ancillary Agreements to which it is a party and the consummation by it of the Transactions, in each case, subject to receipt of the Acquiror Stockholder Approvals. This Agreement has been duly executed and delivered by Acquiror and Merger Sub and, assuming due authorization, execution and delivery hereof by the other parties, is a legal, valid and binding obligation of Acquiror and Merger Sub, enforceable against Acquiror and Merger Sub in accordance with its terms (subject to the Enforceability Exceptions).

(b)     The execution, delivery, and performance of this Agreement and the Ancillary Agreements to which Acquiror and/or Merger Sub is a party, and the consummation of the Transactions, and (in the case of Acquiror) subject to receipt of the Acquiror Stockholder Approvals, do not, and will not, constitute or result in (i) a breach or violation of, or a default under, the Acquiror Organizational Documents or any organizational documents of Merger Sub or (ii) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) of or default under, the creation or acceleration of any obligations under or the creation of a Lien on any of the assets of Acquiror, Merger Sub or any of their Affiliates pursuant to, any Contract to which Acquiror, Merger Sub or any of their Affiliates is a party or, assuming (solely with respect to performance of this Agreement and consummation of the Transactions) compliance with the matters referred to in Section 5.02(a), under any Law to which Acquiror, Merger Sub or any of their Affiliates is subject, except (in the case of clause (ii) above) for such violations, breaches or defaults which has not had or would not, individually or in the aggregate, reasonably be expected to materially impair, delay or prohibit the ability of Acquiror or Merger Sub to enter into, perform its obligations under this Agreement and consummate the Transactions.

(c)     No consent of, or registration, declaration, notice or filing with, any Governmental Authority is required by or with respect to Acquiror or Merger Sub in connection with the execution and delivery by Acquiror or Merger Sub of this Agreement or the consummation of the Transactions contemplated by this Agreement or the Ancillary Agreements, except for (i) compliance with and filings under the HSR Act, (ii) the filing with the SEC of (A) the Registration Statement / Proxy Statement and the declaration of the effectiveness thereof by the SEC and (B) such reports under Section 13(a) or 15(d) of the Exchange Act as may be required in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby, (iii) filing of the Certificate of Merger or (iv) such other consents, registrations, declarations, notices and filings which, if not obtained or made, would not have an Acquiror Material Adverse Effect.

5.03    Compliance with Laws. Acquiror and Merger Sub are, and since their respective dates of incorporation, have been, operating in all material respects in a manner that is customary for businesses similar to Acquiror and Merger Sub, and each of Acquiror and Merger Sub is conducting and, since their respective dates of incorporation, has conducted its business in material compliance with all Laws, and no written notices have been received by either Acquiror or Merger Sub from any Governmental Authority or any other Person alleging an uncured material violation of any Law.

5.04    Employee Benefit Plans. Except as may be contemplated by the Acquiror Equity Plan Proposal, neither Acquiror nor Merger Sub maintains or contributes to any Benefit Plan. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement (either alone or in combination with another event) will (i) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any shareholder, stockholder, director, officer or employee of Acquiror or Merger Sub, or (ii) result in the acceleration, vesting or creation of any rights of any shareholder, director, officer or employee of Acquiror or Merger Sub to payments or benefits or increases in any existing payments or benefits or any loan forgiveness.

5.05    Financial Ability; Trust Account.

(a)    As of the date hereof, there is at least $232,300,000 invested in a trust account at Morgan Stanley Smith Barney LLC (the "Trust Account"), with Continental Stock Transfer & Trust Company, acting as trustee (the "Trustee"), pursuant to the Investment Management Trust Agreement, dated November 23, 2020, by and between Acquiror and the Trustee (the "Trust Agreement"). The Trust Agreement is in full force and effect and is a legal, valid and binding obligation of Acquiror and, to the Knowledge of Acquiror, the Trustee, enforceable in accordance with its terms, subject to Enforceability Exceptions. The Trust Agreement has not been terminated, repudiated, rescinded, amended or supplemented or modified, in any respect, and, to the Knowledge of Acquiror, no such termination, repudiation, rescission, amendment, supplement or modification is contemplated. To the Knowledge of Acquiror, there are no side letters and there are no agreements, Contracts, arrangements or understandings, whether written or oral, with the Trustee or any other Person that would (i) cause the description of the Trust Agreement in the Acquiror SEC Reports to be inaccurate or (ii) entitle any Person (other than any Acquiror Stockholder who is a Redeeming Stockholder) to any portion of the proceeds in the Trust Account. Prior to the Closing, none of the funds held in the Trust Account may be released except in accordance with the Trust Agreement, the Acquiror Organizational Documents and Acquiror's final prospectus, dated November 23, 2020. Amounts in the Trust Account are invested in United States Government securities or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act of 1940. Acquiror has performed all material obligations required to be performed by it to date under, and is not in material default, breach or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default or breach thereunder. There are no Actions pending or, to the Knowledge of Acquiror, threatened with respect to the Trust Account. Since November 24, 2020, Acquiror has not released any money from the Trust Account (other than interest income earned on the principal held in the Trust Account as permitted by the Trust Agreement and for the period from August 16, 2021 to October 14, 2021 in connection with Acquiror's prior business combination transaction, upon the termination of which, such funds were promptly returned to the Trust Account). As of the Effective Time, the obligations of Acquiror to dissolve or liquidate pursuant to the Acquiror Organizational Documents shall terminate, and, as of the Effective Time, Acquiror shall have no obligation whatsoever pursuant to the Acquiror Organizational Documents to dissolve and liquidate the assets of Acquiror by reason of the consummation of the transactions contemplated hereby. Following the Effective Time, no Acquiror Stockholder shall be entitled to receive any amount from the Trust Account except to the extent such Acquiror Stockholder is a Redeeming Stockholder.

EXHIBIT 2
Page 55 of 404

(b)     As of the date hereof, assuming the accuracy of the representations and warranties of the Company herein and the compliance by the Company with its respective obligations hereunder, Acquiror has no reason to believe that any of the conditions to the use of funds in the Trust Account will not be satisfied or funds available in the Trust Account will not be available to Acquiror on the Closing Date.

(c)     As of the date hereof, Acquiror does not have, or have any present intention, agreement, arrangement or understanding to enter into or incur, any obligations with respect to or under any Indebtedness.

5.06    Taxes.

(a)     Acquiror is, and has at all times since its date of formation been, treated as a corporation for U.S. federal income tax purposes, and Merger Sub is, and has at all times since its date of formation been, treated as a disregarded entity for U.S. federal income Tax purposes.

(b)     Each of Acquiror and Merger Sub has timely filed with the appropriate Tax Authority, or has caused to be timely filed on its behalf (taking into account any valid extension of time within which to file), all material Tax Returns required to be filed by it, and all such Tax Returns were and are true, correct and complete in all material respects and were prepared in compliance in all material respects with all applicable Laws. Each of Acquiror and Merger Sub has timely paid all material amounts of Taxes due and payable (whether or not shown on any Tax Return), other than Taxes being contested in good faith and for which adequate reserves have been established in accordance with GAAP.

(c)     Each of Acquiror and Merger Sub, as applicable, has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and Tax information reporting, collection and retention and has, within the time and in the manner prescribed by applicable Laws, (i) withheld all material amounts of Taxes required to have been withheld by it in connection with amounts paid to any employee, independent contractor, creditor, stockholder or any other third party, and (ii) timely remitted such amounts required to have been remitted to the appropriate Tax Authority.

(d)     Neither Acquiror nor Merger Sub has (i) made an election to defer the payment of any "applicable employment taxes" (as defined in Section 2302(d)(1) of the CARES Act) pursuant to Section 2302 of the CARES Act or made any such deferral or election pursuant to the presidential memorandum regarding Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster signed on August 8, 2020 or (ii) applied for a loan under 15 U.S.C. 636(a)(36).

(e)     No claim, assessment, deficiency or proposed adjustment for any Tax has been asserted or assessed by any Tax Authority against Acquiror or Merger Sub that remains unresolved or unpaid except for claims, assessments, deficiencies or proposed adjustments being contested in good faith and for which adequate reserves have been established in accordance with GAAP.

(f)     There is no Tax audit, examination or other Action of Acquiror or Merger Sub presently in progress, and there are no waivers, extensions or requests for any waivers or

extensions of any statute of limitations currently in effect with respect to any material Taxes of Acquiror or Merger Sub.

(g)     Neither Acquiror nor Merger Sub is or has been (i) a party to any Tax sharing, indemnification, allocation or similar agreement or arrangement (excluding any commercial contract entered into in the ordinary course of business and not primarily related to Taxes), (ii) a member of an affiliated, consolidated, combined, unitary or similar Tax group (other than any such Tax group the common parent of which was the Company), or (iii) a party to any "listed transaction" under Treasury Regulations Section 1.6011-4(b)(2) (or any similar or corresponding provision of U.S. state or local or non-U.S. Law).

(h)     Acquiror and Merger Sub do not have any liability for Taxes of any other Person as a result of Treasury Regulations Section 1.1502-6 (or any similar provision of U.S. state or local or non-U.S. Law), as a transferee or successor, or by operation of Law.

(i)     Acquiror and Merger Sub will not be required to include any material item of income in, or exclude any material deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting, or use of an improper method of accounting, for a taxable period  (or portion thereof) ending on or prior to the Closing Date; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of U.S. state or local or non-U.S. Law) executed on or prior to the Closing Date; (iii) installment sale or open transaction disposition made on or prior to the Closing Date; (iv) prepaid amount received or deferred revenue accrued on or prior to the Closing Date outside of the ordinary course of business; or (v) intercompany item under Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of U.S. state or local or non-U.S. Law) or excess loss account under Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of U.S. state or local or non-U.S. Law).

(j)     There are no Liens for Taxes on any assets of either Acquiror or Merger Sub other than Permitted Liens.

(k)     No written claims have ever been made by any Tax Authority in a jurisdiction where Acquiror and Merger Sub do not file Tax Returns that the Company Group is or may be subject to taxation by that jurisdiction, which claims have not been resolved or withdrawn.

(l)     Neither Acquiror nor Merger Sub has taken or agreed to take any action not contemplated by this Agreement or any Ancillary Agreement that would reasonably be expected to prevent the Transactions from qualifying for the Intended Tax Treatment.

(m)     To the Knowledge of Acquiror, no facts or circumstances exist that would reasonably be expected to prevent the Transactions from qualifying for the Intended Tax Treatment.

5.07     Brokers. No broker, investment banker, financial advisor or other Person, other than those set out in Schedule 5.07, the fees and expenses of which will be paid by Acquiror or Merger Sub pursuant to an engagement letter entered into therewith, is entitled to any broker's, finder's,

financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Acquiror, Merger Sub or any of their Affiliates.

5.08    Acquiror SEC Reports; Financial Statements; Sarbanes-Oxley Act.

(a)    Acquiror has filed in a timely manner all required registration statements, reports, schedules, forms, statements and other documents required to be filed by it with the SEC since November 23, 2020 (collectively, as they have been amended since the time of their filing and including all exhibits thereto, the "Acquiror SEC Reports"). None of the Acquiror SEC Reports, as of their respective dates (or if amended or superseded by a filing prior to the date of this Agreement or the Closing Date, then on the date of such filing), contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. Except as disclosed in Schedule 5.08(a), the audited financial statements and unaudited interim financial statements (including, in each case, the notes and schedules thereto) included in the Acquiror SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, were prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto and except with respect to unaudited statements as permitted by Form 10-Q of the SEC), and fairly present (subject, in the case of the unaudited interim financial statements included therein, to normal year-end adjustments and the absence of complete footnotes) in all material respects the financial position of Acquiror as of the respective dates thereof and the results of their operations and cash flows for the respective periods then ended.

(b)    Acquiror has established and maintains disclosure controls and procedures (as defined in Rule 13a-15 under the Exchange Act). Such disclosure controls and procedures are designed to ensure that material information relating to Acquiror and other material information required to be disclosed by Acquiror in the reports and other documents that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material information is accumulated and communicated to Acquiror's management, including its principal executive officer and its principal financial officer as appropriate to allow timely decisions regarding required disclosure and to make the certifications required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act. Except as disclosed in Schedule 5.08(b), such disclosure controls and procedures are effective in timely alerting Acquiror's principal executive officer and principal financial officer to material information required to be included in Acquiror's periodic reports required under the Exchange Act.

(c)    Acquiror has established and maintained a system of internal control over financial reporting (as defined in Rule 13a-15 under the Exchange Act). Except as disclosed in Schedule 5.08(c), such internal control over financial reporting is sufficient to provide reasonable assurance regarding the reliability of Acquiror's financial reporting and the preparation of Acquiror's financial statements for external purposes in accordance with GAAP.

(d)    There are no outstanding loans or other extensions of credit made by Acquiror to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of Acquiror. Acquiror has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

EXHIBIT 2
Page 58 of 404

(e)     Except as disclosed in the Schedule 5.08(e), neither Acquiror (including any employee thereof) nor Acquiror's independent auditors has identified or been made aware of (i) any significant deficiency or material weakness in Acquiror's internal control over financial reporting, (ii) any fraud, whether or not material, that involves Acquiror's management or other employees who have a role in the preparation of financial statements or Acquiror's internal control over financial reporting or (iii) any claim or allegation regarding any of the foregoing.

(f)     Acquiror does not have any past due liability relating to the PCAOB issuer accounting support fee.

(g)     To the Knowledge of Acquiror, as of the date hereof, there are no outstanding comments from the SEC with respect to the Acquiror SEC Reports. To the Knowledge of Acquiror, none of the Acquiror SEC Reports filed on or prior to the date hereof is subject to ongoing SEC review or investigation as of the date hereof.

5.09    Business Activities; Absence of Changes.

(a)     Since its incorporation, Acquiror has not conducted any business activities other than activities directed toward the accomplishment of a Business Combination. Except as set forth in the Acquiror Organizational Documents, there is no agreement, commitment or Governmental Order binding upon Acquiror or to which Acquiror is a party which has had or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Acquiror or any acquisition of property by Acquiror or the conduct of business by Acquiror as currently conducted or as contemplated to be conducted as of the Closing other than such effects, individually or in the aggregate, which have not had an Acquiror Material Adverse Effect on the ability of Acquiror or Merger Sub to enter into, perform its obligations under this Agreement and consummate the Transactions.

(b)     Other than Merger Sub, Acquiror does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity. Except for this Agreement and the Transactions, Acquiror has no interests, rights, obligations or liabilities with respect to, and is not party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or could reasonably be interpreted as constituting, a Business Combination.

(c)     Except for (i) this Agreement and the agreements expressly contemplated hereby (including any agreements permitted by Section 7.03), (ii) as set forth on Schedule 5.09(c) and (iii) with respect to fees and expenses of Acquiror's legal, financial and other advisors, Acquiror is not party to any Contract with any other Person that would require payments by Acquiror in excess of $150,000 in the aggregate with respect to any individual Contract or when taken together with all other Contracts (other than this Agreement and the agreements expressly contemplated hereby (including any agreements permitted by Section 7.03) and Contracts set forth on Schedule 5.09(c)).

(d)     There is no liability, debt or obligation against Acquiror or Merger Sub, except for liabilities and obligations (i) reflected or reserved for on Acquiror's consolidated

54

EXHIBIT 2
Page 59 of 404

balance sheet as of December 31, 2020 or disclosed in the notes thereto (other than any such liabilities not reflected, reserved or disclosed as are not and would not be, in the aggregate, material to Acquiror and Merger Sub, taken as a whole), (ii) that have arisen since the date of Acquiror's consolidated balance sheet for the quarterly period December 31, 2020 in the ordinary course of the operation of business of the Acquiror and Merger Sub (other than any such liabilities as are or would be, in the aggregate, material to Acquiror and Merger Sub, taken as a whole) or (iii) disclosed in Schedule 5.09(d).

(e)     Since its organization, Merger Sub has not conducted any business activities other than activities directed toward the accomplishment of the Merger. Except as set forth in Merger Sub's organizational documents, there is no agreement, commitment, or Governmental Order binding upon Merger Sub or to which Merger Sub is a party which has had or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Merger Sub or any acquisition of property by Merger Sub or the conduct of business by Merger Sub as currently conducted or as contemplated to be conducted as of the Closing other than such effects which have not had and would not reasonably be expected to have an Acquiror Material Adverse Effect.

(f)     Merger Sub does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity.

(g)     Merger Sub was formed solely for the purpose of effecting the Merger and has not engaged in any business activities or conducted any operations other than in connection with the Merger and has no, and at all times prior to the Effective Time except as contemplated by this Agreement or the Ancillary Agreements, will have no, assets, liabilities or obligations of any kind or nature whatsoever other than those incident to its formation.

(h)     (i) Since the date of Acquiror's incorporation, there has not been any change, development, condition, occurrence, event or effect relating to the Acquiror or Merger Sub that, individually or in the aggregate, resulted in, or would reasonably be expected to result in, an Acquiror Material Adverse Effect and (ii) from November 23, 2020 through the date of this Agreement, Acquiror and Merger Sub have not taken any action that would require the consent of the Company pursuant to Section 7.03 if such action had been taken after the date hereof.

5.10     Information Supplied; Registration Statement. None of the information supplied or to be supplied by the Acquiror or Merger Sub for inclusion in the Registration Statement (together with any amendments or supplements thereto) will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading at the time such information is filed, submitted or made publicly available with the SEC; provided, however, that Acquiror makes no representations or warranties as to the information contained in or omitted from the Registration Statement in reliance upon and in conformity with information furnished in writing to the Acquiror by or on behalf of the Company specifically for inclusion in the Registration Statement.

5.11     Litigation. As of the date of this Agreement, there are no material Actions pending or, to the Knowledge of the Acquiror, threatened against the Acquiror or, to the Knowledge of the

Acquiror, any director, officer or employee of the Acquiror (in their capacity as such) and since the Acquiror's date of incorporation there have not been any such material Actions. There are no material Actions pending or threatened by Acquiror against any other Person.

5.12    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article V</u> or any other provision hereof, Acquiror and its Affiliates acknowledge and agree that Acquiror has made its own investigation of the Company and that neither the Company nor any of its Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or Representatives is making any representation or warranty whatsoever, express or implied, beyond those expressly given by the Company in <u>Article IV</u> or any certificate delivered in accordance with <u>Section 9.02(b)</u>, including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Company. Without limiting the generality of the foregoing, it is understood that any cost or other estimates, financial or other projections or other predictions that may be contained or referred to in the Schedules or elsewhere, as well as any information, documents or other materials (including any such materials contained in any "data room" (whether or not accessed by Acquiror or its Representatives) or reviewed by Acquiror pursuant to the Confidentiality Agreement) or management presentations that have been or shall hereafter be provided to Acquiror or any of its Affiliates, agents or Representatives are not and will not be deemed to be representations or warranties of the Company, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing except as may be expressly set forth in <u>Article IV</u> of this Agreement or any certificate delivered in accordance with <u>Section 9.02(b)</u>. Except as otherwise expressly set forth in this Agreement, Acquiror understands and agrees that any assets, properties and business of the Company are furnished "as is", "where is" and subject to and except as otherwise provided in the representations and warranties contained in <u>Article IV</u> or any certificate delivered in accordance with <u>Section 9.02(b)</u>, with all faults and without any other representation or warranty of any nature whatsoever.

5.13    <u>Capitalization</u>.

(a)    As of the date hereof, the authorized capital stock of Acquiror consists of (i) 300,000,000 Acquiror Class A Shares, of which (A) 23,000,000 Acquiror Class A Shares are issued and outstanding as of the date of this Agreement and (B) 20,400,000 Acquiror Warrants are issued and outstanding as of the date of this Agreement, (ii) 30,000,000 Acquiror Old Class B Shares, par value $0.0001, of which 5,750,000 shares are issued and outstanding as of the date of this Agreement and (iii) 1,000,000 preference shares of the Acquiror, par value $0.0001, none of which are issued and outstanding as of the date of this Agreement. All of the issued and outstanding Acquiror Class A Shares and Acquiror Warrants (1) have been duly authorized and validly issued and are fully paid and nonassessable, (2) were issued in compliance in all material respects with applicable Law, (3) were not issued in breach or violation of any preemptive rights or Contract and (4) are fully vested and not otherwise subject to a substantial risk of forfeiture within the meaning of Code Section 83, except as disclosed in the <u>Schedule 5.13(a)</u> with respect to certain Acquiror Class A Shares held by the Sponsor.

(b)    Except for this Agreement, the Acquiror Warrants, Acquiror Old Class B Shares and the Subscription Agreements, as of the date hereof, there are (i) no subscriptions, calls, options, warrants, rights or other securities convertible into or exchangeable or exercisable for

56

**EXHIBIT 2**
**Page 61 of 404**

Acquiror Class A Shares or the equity interests of Acquiror, or any other Contracts to which Acquiror is a party or by which Acquiror is bound obligating Acquiror to issue or sell any shares of capital stock of, other equity interests in or debt securities of, Acquiror, and (ii) no equity equivalents, stock appreciation rights, phantom stock ownership interests or similar rights in Acquiror. Except as disclosed in Schedule 5.13(b) or the Acquiror Organizational Documents, there are no outstanding contractual obligations of Acquiror to repurchase, redeem or otherwise acquire any securities or equity interests of Acquiror. There are no outstanding bonds, debentures, notes or other indebtedness of Acquiror having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matter for which Acquiror Stockholders may vote. Except as disclosed in Schedule 5.13(b), Acquiror is not a party to any stockholders agreement, voting agreement or registration rights agreement relating to Acquiror Class A Shares or any other equity interests of Acquiror. Other than Merger Sub, Acquiror does not own any capital stock or any other equity interests in any other Person or has any right, option, warrant, conversion right, stock appreciation right, redemption right, repurchase right, agreement, arrangement or commitment of any character under which a Person is or may become obligated to issue or sell, or give any right to subscribe for or acquire, or in any way dispose of, any shares of the capital stock or other equity interests, or any securities or obligations exercisable or exchangeable for or convertible into any shares of the capital stock or other equity interests, of such Person. There are no securities or instruments issued by or to which the Acquiror is a party containing anti-dilution or similar provisions that will be triggered by the consummation of the transactions contemplated by the Subscription Agreements that have not been or will not be waived on or prior to the Closing Date.

(c)    All of the issued and outstanding Equity Securities of Merger Sub are held by Acquiror as of the date of this Agreement. All outstanding Equity Securities of such Merger Sub are validly issued, fully paid and non-assessable, and are not subject to preemptive rights or any other Liens (other than Liens arising pursuant to applicable Securities Laws).

(d)    Subject to approval of the Proposals, the shares of Acquiror New Class B Stock to be issued by Acquiror in connection with the Transactions, upon issuance in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and nonassessable under Delaware Law, and will not be subject to any preemptive rights of any other shareholder of Acquiror and will be capable of effectively vesting in the Company Unitholders title to all such securities, free and clear of all Liens (other than Liens arising pursuant to applicable Securities Laws).

5.14    NASDAQ Stock Market Quotation. The issued and outstanding shares of Acquiror Class A Shares are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on NASDAQ under the symbol "SV". Acquiror is in compliance in all material respects with the rules of NASDAQ and there is no action or proceeding pending or, to the Knowledge of Acquiror, threatened against Acquiror by NASDAQ, the Financial Industry Regulatory Authority or the SEC with respect to any intention by such entity to deregister the Acquiror Class A Shares or terminate the listing of Acquiror Class A Shares on NASDAQ. None of Acquiror or its Affiliates has taken any action in an attempt to terminate the registration of the Acquiror Class A Shares or Acquiror Warrants under the Exchange Act except as contemplated by this Agreement.

EXHIBIT 2
Page 62 of 404

5.15    <u>Affiliate Agreements</u>. Except as set forth on <u>Schedule 5.15</u>, neither of the Acquiror nor Merger Sub is a party to any transaction, agreement, arrangement or understanding with any (a) present or former executive officer or director of either of the Acquiror or Merger Sub, (b) beneficial owner (within the meaning of Section 13(d) of the Exchange Act) of five percent or more of the capital stock or equity interests of Acquiror or (c) Affiliate, "associate" or member of the "immediate family" (as such terms are respectively defined in Rules 12b-2 and 16a-1 of the Exchange Act) of any of the foregoing (each of the foregoing, an "<u>Acquiror Affiliate Agreement</u>").

5.16    <u>Corrupt Practice.</u>

(a)    Since their respective dates of incorporation, to the Knowledge of Acquiror, neither Acquiror nor Merger Sub, nor any of their respective Representatives, have directly or indirectly paid, offered or promised to pay, or authorized or ratified the payment, directly or indirectly, of any monies or anything of value to any national, provincial, municipal or other Government Official or any political party or candidate for political office for the purpose of influencing any act or decision of such official or of any Governmental Authority to obtain or retain business, or direct business to any person or to secure any other improper benefit or advantage in each case in violation in any material respect any Anti-Corruption Laws.

(b)    Since their respective dates of incorporation, neither Acquiror nor Merger Sub nor, to the Knowledge of Acquiror, any of their respective Representatives, has, or is presently or has agreed to become, engaged in any conduct that violates in any material respect any applicable Anti-Corruption Laws.

(c)    Since their respective dates of incorporation, neither Acquiror nor Merger Sub is conducting or has conducted, directly or to the Knowledge of the Acquiror, indirectly, any business (including, without limitation, sales, reselling, licensing or sub-licensing arrangements, funding, making payments, procuring, insurance or otherwise providing assistance or support in connection with operations, business or any other activity) with or for the direct or to the Knowledge of the Acquiror, indirect benefit of or on behalf of a person or entity:

(i)    named as a "specially designated national and blocked person" on the most current Specially Designated Nationals and Blocked Persons List maintained by OFAC or with whom it would be prohibited for Acquiror or Merger Sub to engage in transactions or dealings under any of the sanctions programs of the United States administered by OFAC which would be applicable to the relevant transaction, in violation of applicable Sanctions; or

(ii)    which is the subject of or otherwise targeted by, or is located or organized in any country or territory that is subject to, any such sanctions which would be applicable to the relevant transaction, in violation of applicable Sanctions.

5.17    <u>PIPE Investment Amount; Subscription Agreements</u>. Acquiror has delivered to the Company true, correct and complete copies of each of the fully executed Subscription Agreements pursuant to which the Subscribers have committed, subject to the terms and conditions therein, to purchase at least 21,300,000 shares of Acquiror Common Stock in the aggregate for an aggregate amount equal to $211,000,000 (the "<u>PIPE Investment Amount</u>"). Each of the Subscription Agreements is in full force and effect and is legal, valid and binding upon the Acquiror, enforceable

58

EXHIBIT 2
Page 63 of 404

in accordance with its terms. Each such Subscription Agreement provides that the Company is a third-party beneficiary thereunder, entitled to enforce such agreements against the Subscriber. None of the Subscription Agreements has been withdrawn, terminated, amended or modified since the date of delivery hereunder and prior to the execution of this Agreement, and, to the Knowledge of Acquiror, as of the date of this Agreement no such withdrawal, termination, amendment or modification is contemplated, and as of the date of this Agreement the commitments contained in the Subscription Agreements have not been withdrawn, terminated or rescinded by any Subscriber party thereto in any respect. As of the date hereof, there are no Contracts to which Acquiror or Merger Sub is a party related to the provision or funding, as applicable, of the purchases contemplated by the Subscription Agreements or the transactions contemplated hereby other than as expressly set forth in this Agreement, the Subscription Agreements or any other agreement entered into (or to be entered into) in connection with the Transactions delivered to the Company. Acquiror has fully paid any and all commitment fees or other fees required in connection with the Subscription Agreements that are payable on or prior to the date hereof and will pay any and all such fees when and as the same become due and payable after the date hereof pursuant to the Subscription Agreements. Acquiror has, and to the Knowledge of Acquiror, each Subscriber has, complied with all of its obligations under the Subscription Agreements. There are no conditions precedent or other contingencies related to the consummation of the purchases set forth in the Subscription Agreements, other than as expressly set forth in the Subscription Agreements. To the Knowledge of Acquiror, as of the date hereof, no event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (a) constitute a default or breach on the part of Acquiror or the Subscribers, (b) assuming the conditions set forth in <u>Section 9.01</u> and <u>Section 9.02</u> will be satisfied, constitute a failure to satisfy a condition on the part of Acquiror or each Subscriber or (c) assuming the conditions set forth in <u>Section 9.01</u> and <u>Section 9.02</u> will be satisfied result in any portion of the amounts to be paid by the Subscribers in accordance with the Subscription Agreements being unavailable on the Closing Date. As of the date hereof, assuming the conditions set forth in <u>Section 9.01</u> and <u>Section 9.02</u> will be satisfied, Acquiror has no reason to believe that any of the conditions to the consummation of the purchases under the Subscription Agreements will not be satisfied, and, as of the date hereof, Acquiror is not aware of the existence of any fact or event that would or would reasonably be expected to cause such conditions not to be satisfied.

5.18    <u>No Other Representations or Warranties</u>. The representations and warranties made by Acquiror and Merger Sub in this <u>Article V</u> are the exclusive representations and warranties made by Acquiror, Merger Sub, their Affiliates, and their respective Representatives. Except for the representations and warranties contained in this <u>Article V</u>, neither Acquiror nor Merger Sub, nor any other Person, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Acquiror or Merger Sub, to the accuracy or completeness of any information regarding Acquiror or Merger Sub available to the other parties or their respective Representatives and expressly disclaims any such other representations or warranties. Without limiting the foregoing, neither Acquiror nor Merger Sub, nor any other Person, makes or has made any representation or warranty to the other parties hereto with respect to, and shall have no liability in respect of, (a) any financial projection, forecast, estimate, budget or prospect information relating to Acquiror or Merger Sub or (b) any oral or, except for the representations and warranties expressly made by Acquiror or Merger Sub in this <u>Article V</u>, written information made available to the other parties hereto in the course of their evaluation of Acquiror and Merger Sub and the negotiation of this Agreement or in the course of the Transactions.

59

**EXHIBIT 2**
**Page 64 of 404**

## ARTICLE VI
## COVENANTS OF THE COMPANY

6.01    Conduct of Business. From the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms (the "Interim Period"), the Company shall (and shall cause each other Company Group Member to), except as set forth on Schedule 6.01, as expressly contemplated by this Agreement or as consented to by Acquiror in writing (which consent shall not be unreasonably conditioned, withheld or delayed), or as may be required by Law (including COVID-19 Measures), (i) use its commercially reasonable efforts to conduct and operate its business in the ordinary course consistent with past practice in all material respects, (ii) use commercially reasonable efforts to preserve intact the current business organization and ongoing businesses of the Company Group, and maintain the existing relations and goodwill of the Company Group with the Company Group's customers, suppliers, distributors and creditors, as well as with the NRC and any analogous Governmental Authority outside of the United States and (iii) use commercially reasonable efforts to keep available the services of the present officers of the Company Group; provided, that, in the case of each of the preceding clauses (i)-(iii), the Company may, in connection with COVID-19, take such actions in good faith as are reasonably necessary (A) to protect the health and safety of the Company Group's employees and other individuals having business dealings with the Company Group or (B) to respond to third-party supply or service disruptions caused by COVID-19, including, but not limited to COVID-19 Measures, and any such actions taken (or not taken) as a result of, in response to, or otherwise related to COVID-19 shall be deemed to be taken in the "ordinary course of business" for all purposes of this Section 6.01 and not be considered a breach of this Section 6.01; provided, further, that to the extent that any Company Group Member took any actions pursuant to the immediately preceding proviso that caused deviations from its business being conducted in the ordinary course of business consistent with past practice, such Company Group Member resumes conducting its business in the ordinary course of business consistent with past practice in all material respects as soon as reasonably practicable. Without limiting the generality of the foregoing, except as set forth on Schedule 6.01, as expressly contemplated by this Agreement or as consented to by Acquiror in writing (which consent shall not be unreasonably conditioned, withheld or delayed), or as may be required by Law, the Company shall not (and shall cause each other Company Group Member not to) during the Interim Period:

(a)    change or amend the Company Group Organizational Documents;

(b)    declare, make or pay any dividend or other distribution (whether in cash, equity or property) to its members or repurchase or redeem any of its equity interests;

(c)    create, allot, issue, redeem or repurchase or agree to create, allot, issue, redeem or repurchase any Equity Securities or other securities of whatsoever nature convertible into Equity Securities (or any option to subscribe for the same) of any Company Group Member, except pursuant to the exercise of Company Options outstanding as of the date hereof;

(d)    reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of its Equity Securities, other than redemptions of Equity Securities from former employees in the ordinary course of business consistent with past practice upon the terms set forth in the underlying agreements governing such Equity Securities;

EXHIBIT 2
Page 65 of 404

(e)      enter into, or amend or modify any material term of, terminate, or waive or release any material rights, claim or benefits under any Material Contract or Lease Document (or any Contract, that if existing on the date hereof, would be a Material Contract or Lease Document), other than entry into, amendments of, modifications of, terminations of, or waivers or releases under, such Contracts in the ordinary course of business consistent with past practice;

(f)      enter into, or amend or modify any material term of, terminate, or waive or release any material rights, claim or benefits under any Contract or other arrangement to which any Company Group Member, on one hand, and a Company Unitholder or its Affiliate, on the other hand, are parties, except as set forth on Schedule 6.01(f);

(g)      sell, transfer, lease, pledge, license or otherwise encumber or subject to any Lien, abandon, cancel, let lapse or convey or dispose of any assets, properties or business of any Company Group Member (including Company Intellectual Property and Company Software) to any Person that is not a Company Group Member, except for sales of inventory in the ordinary course of business consistent with past practice, other than (i) as set forth on Schedule 6.01(f), (ii) Permitted Liens or (iii) pledges, non-exclusive licenses and encumbrances on property and assets in the ordinary course of business consistent with past practice (including in performance and warranty bonds for the benefit of customers) and that would not, individually or in the aggregate, reasonably be expected to be material to the Company Group, taken as a whole;

(h)      intentionally permit any material item of Owned Intellectual Property to lapse or to be abandoned, invalidated, dedicated to the public, or disclaimed, or otherwise become unenforceable or fail to perform or make any applicable filings, recordings or other similar actions or filings, or fail to pay all required fees and Taxes required or advisable to maintain and protect its interest in each and every material item of Owned Intellectual Property;

(i)      except as set forth on Schedule 6.01(i) or as otherwise required pursuant to the terms of a Company Benefit Plan in effect on the date of this Agreement and set forth on Schedule 4.12(a) or applicable Law, (i) grant or promise to grant any increase or decrease in compensation, benefits or severance to any current or former employee, officer, director or other individual service provider of the Company Group, except in the ordinary course of business and consistent with past practice, (ii) except for changes to health or welfare benefit plans (other than severance arrangements) in connection with annual renewals in the ordinary course of business, adopt, enter into, amend, modify, or terminate any Company Benefit Plan, any benefit or compensation plan, policy, program, agreement or arrangement that would be a Company Benefit Plan if in effect as of the date hereof, or any collective bargaining or similar agreement (including agreements with works councils and trade unions and side letters) to which any Company Group Member is a party or by which it is bound, (iii) grant, provide or promise to grant or provide any severance or termination payments, incentive compensation, deferred compensation, equity or equity-based compensation, or transaction, retention or change in control payments or benefits to any current or former director, employee, officer or other individual service provider of the Company Group, except in the ordinary course of business and consistent with past practice, (iv) accelerate the timing, vesting or payment of any compensation or benefit payable to any current or former employee or individual service provider of the Company Group, except in the ordinary course of business and consistent with past practice, (v) hire, engage, terminate (other than for cause), furlough, or temporarily layoff any employee or independent contractor of the

EXHIBIT 2
Page 66 of 404

Company Group with annualized compensation in excess of $250,000, (vi) terminate, negotiate, modify, extend, or enter into any CBA, or recognize or certify any labor union, works council, labor organization, or group of employees as the bargaining representative for any employees of the Company Group, (vii) implement or announce any employee layoffs, plant closings, reductions-in-force, furloughs, temporary layoffs, reduction in terms and conditions of employment, or other actions that could implicate the WARN Act or any similar Laws, or (viii) waive or release any noncompetition, nonsolicitation, nondisclosure, noninterference, nondisparagement, or other restrictive covenant obligation of any current or former employee or independent contractor with annualized compensation in excess of $250,000;

(j)    acquire (including by merger or consolidation with), or merge or consolidate with, or purchase a material portion of the assets or equity of, any Person or division thereof;

(k)    enter into any joint venture;

(l)    adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any Company Group Member (other than the transactions contemplated by this Agreement);

(m)    make any capital expenditures (or commitment to make any capital expenditures) that in the aggregate exceed $2,500,000, other than any capital expenditure (or series of related capital expenditures) consistent with the Company's annual capital expenditure budget for periods following the date hereof, as set forth on Schedule 6.01(m), and made available to Acquiror prior to the date hereof;

(n)    make, revoke or change any material Tax election, adopt or change any material Tax accounting method or period, file any material Tax Return in a manner inconsistent with past practices in any material respect, file any amendment to a material Tax Return, enter into any agreement with a Governmental Authority with respect to a material amount of Taxes, settle or compromise any examination, audit or other Action with a Governmental Authority of or relating to any material Taxes or settle or compromise any claim or assessment by a Governmental Authority in respect of material Taxes, consent to any extension or waiver of the statutory period of limitations applicable to any claim or assessment in respect of material Taxes, incur any material liability for Taxes outside the ordinary course of business, or enter into any Tax sharing, indemnification, allocation or similar agreement or arrangement (excluding any commercial contract entered into in the ordinary course of business and not primarily related to Taxes);

(o)    initiate, waive, release, compromise, settle or satisfy any pending or threatened material claim (which shall include, but not be limited to, any pending or threatened Action) or compromise or settle any liability, other than in the ordinary course of business consistent with past practice and where such waiver, release, compromise, settlement or satisfaction involves monetary damages not to exceed $1,000,000 in the aggregate;

(p)    incur, issue, assume, guarantee, endorse or otherwise become responsible for any Indebtedness, or make any loans or advances, or intentionally grant any security interest

62

**EXHIBIT 2**
**Page 67 of 404**

in any assets, or in any material respect, modify any Indebtedness, other than intercompany Indebtedness or except in the ordinary course of business consistent with past practice;

(q)     make any loans, advances or capital contributions to, or investments in, any other Person (including to any of its officers, directors, agents or consultants), make any material change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person;

(r)     enter into any material new line of business outside of the business currently conducted by, or contemplated to be conducted by and set forth on Schedule 6.01(r), the Company Group as of the date of this Agreement;

(s)     fail to maintain the Company Permits;

(t)     make any material change in financial accounting methods, principles or practices, except insofar as may be required by a change in, or a new application of, GAAP (including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization) or applicable Law;

(u)     voluntarily fail to maintain, cancel or materially change coverage under, in a manner detrimental to the Company Group, taken as a whole, any Insurance Policy maintained with respect to the Company Group Members and their assets and properties;

(v)     voluntarily terminate or fail to diligently pursue any design certification, pre-application, application or standard design approval activities at the NRC or analogous proceedings with any Governmental Authority outside of the United States;

(w)     fail to maintain the Leased Company Properties in substantially the same condition as of the date of this Agreement, ordinary wear and tear, casualty and condemnation excepted;

(x)     issue any additional Equity Securities pursuant to (i) the Agreement to Convert Debt into Equity, dated March 3, 2014, by and between the Company and Enercon Services, Inc., as amended by Amendment No. 1 to Agreement to Convert Debt to Equity dated November 16, 2015, (ii) the Agreement to Convert Debt into Equity, dated April 26, 2012, by between the Company and ARES Corporation, and (iii) the Strategic Supplier Agreement dated May 5, 2016 between the Company and Weed Instrument Co., dba Ultra Electronics Nuclear Sensors and Process Instrumentation; and

(y)     enter into any agreement or undertaking to do any action prohibited under this Section 6.01.

6.02    Inspection. Subject to confidentiality obligations and similar restrictions that may be applicable to information furnished to a Company Group Member by third parties that may be in a Company Group Member's possession from time to time, and except for any information which (a) relates to interactions with prospective buyers of the Company or the negotiation of this Agreement and the transactions contemplated hereby or (b) in the judgment of legal counsel (including in-house counsel) of the Company would result in the loss of attorney-client privilege

EXHIBIT 2
Page 68 of 404

or other privilege from disclosure or would conflict with any applicable Law or the Company's documented security clearance policy currently in place or confidentiality obligations to which a Company Group Member is bound, the Company shall afford to Acquiror and its Representatives reasonable access during the Interim Period, during normal business hours and with reasonable advance notice, in such manner as to not interfere with the normal operation of the Company Group, to all of the properties, books, projections, plans, systems, Contracts, commitments, Tax Returns, records, commitments, analyses and appropriate officers and employees of the Company Group, and shall furnish such Representatives with all financial and operating data and other information concerning the affairs of the Company Group and that are in the possession of the Company Group as such Representatives may reasonably request; provided, that such access shall not include any invasive or intrusive investigations or other testing, sampling or invasive analysis of any properties, facilities or equipment of the Company Group without the prior written consent of the Company. Acquiror shall coordinate its access rights pursuant to Section 6.02 with the Company to reasonably minimize any inconvenience to or interruption of the conduct of the business of the Company Group. The parties shall use commercially reasonable efforts to make alternative arrangements for such disclosure where the restrictions in the preceding sentence apply. All information obtained by Acquiror and its Representatives under this Agreement shall be subject to the Confidentiality Agreement prior to the Closing.

6.03    HSR Act and Regulatory Approvals. In connection with the transactions contemplated by this Agreement, the Company shall file promptly but in no event later than 10 Business Days after the date hereof, the notification required from the Company under the HSR Act. The Company shall use its reasonable best efforts to submit, as soon as practicable, any other required applications or filings pursuant to any Antitrust Laws and furnish to the Acquiror as promptly as reasonably practicable all information required for any application or other filing required to be made by Acquiror pursuant to any Antitrust Law. The Company shall (a) substantially comply with any Information or Document Requests and (b) if available, request early termination of any waiting period under the HSR Act. The Company shall exercise its reasonable best efforts to (i) obtain termination or expiration of the waiting period under the HSR Act and consents or approvals pursuant to any other applicable Antitrust Laws, (ii) prevent the entry in any Action brought by a Regulatory Consent Authority or any other Person of any Governmental Order which would prohibit, make unlawful or delay the consummation of the transactions contemplated by this Agreement and (iii) if any such Governmental Order is issued in any such Action, cause such Governmental Order to be lifted. The Company shall promptly notify the Acquiror of any substantive communication with any Governmental Authority or third party with respect to the transactions contemplated by this Agreement, and to the extent permitted, furnish to Acquiror, upon written request, copies of any notices or written communications received by the Company or any of its Affiliates with respect to the transactions contemplated by this Agreement, and to the extent permitted, the Company shall permit counsel to Acquiror an opportunity to review in advance, and the Company shall consider in good faith the views of such counsel in connection with, any proposed written communications by any Company Group Member to any Governmental Authority concerning the transactions contemplated by this Agreement; provided, that the Company shall not extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Authority to delay the consummation of the transactions contemplated by this Agreement without the written consent of Acquiror (which consent shall not be unreasonably withheld, conditioned or delayed). The Company agrees to provide, to the extent permitted by the applicable Governmental Authority,

EXHIBIT 2
Page 69 of 404

Acquiror and its counsel the opportunity, on reasonable advance notice, to participate in any substantive meetings or discussions, either in person or by telephone, between any Company Group Member or any of their Affiliates, agents or advisors, on the one hand, and any Governmental Authority, on the other hand, concerning or in connection with the transactions contemplated hereby. Any materials exchanged in connection with this <u>Section 6.03</u> may be redacted or withheld as necessary to address reasonable privilege or confidentiality concerns of legal counsel (including in-house counsel) of the Company, and to remove competitively sensitive material; <u>provided</u>, that the Company may, as it deems advisable and necessary, designate any materials provided to the Acquiror under this <u>Section 6.03</u> as "outside counsel only." Notwithstanding anything in this Agreement to the contrary, nothing in this <u>Section 6.03</u> or any other provision of this Agreement shall require or obligate the Company Group to, and the Company Group shall not, without the prior written consent of the Acquiror or Merger Sub, agree or otherwise be required to, take any action with respect to the Company Group, including selling, divesting, or otherwise disposing of, licensing, holding separate, or taking or committing to take any action that limits in any respect its freedom of action with respect to, or its ability to retain, any business, products, rights, services, licenses, assets or properties of the Company Group, or any interest therein.

6.04    <u>No Claim Against the Trust Account</u>. The Company acknowledges that the Acquiror is a blank check company with the power and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving the Company and one or more businesses or assets, , that Acquiror has established the Trust Account for the benefit of Acquiror's public shareholders and that disbursements from the Trust Account are available only in the limited circumstances set forth therein. The Company further agrees that the Acquiror's sole assets consist of the cash proceeds of the Acquiror's initial public offering and private placements of its securities, and substantially all of these proceeds have been deposited in the Trust Account for the benefit of its public shareholders. The Company further acknowledges that, if the transactions contemplated by this Agreement or, in the event of termination of this Agreement, another Business Combination, are or is not consummated by May 27, 2022 or such later date as approved by the Acquiror Board to complete a Business Combination, Acquiror will be obligated to return to its shareholders the amounts being held in the Trust Account. Accordingly, the Company (on behalf of itself, each other Company Group Member and its and their respective Affiliates) hereby waives any past, present or future claim of any kind against, and any right to access, the Trust Account, any trustee of the Trust Account and Acquiror to collect from the Trust Account any monies that may be owed to them by Acquiror or any of its Affiliates for any reason whatsoever, and will not seek recourse against the Trust Account at any time for any reason whatsoever, provided that (x) nothing herein shall serve to limit or prohibit the Company's right to pursue a claim against Acquiror for legal relief against monies or other assets held outside the Trust Account, for specific performance or other equitable relief in connection with the consummation of the transactions (including a claim for Acquiror to specifically perform its obligations under this Agreement and cause the disbursement of the balance of the cash remaining in the Trust Account to the Company in accordance with the terms of this Agreement and the Trust Agreement) so long as such claim would not affect Acquiror's ability to fulfill its obligation to effectuate redemptions of any shares of Acquiror and (y) nothing herein shall serve to limit or prohibit any claims that the Company may have in the future against Acquiror's assets or funds that are not held in the Trust Account (including any funds that have been released from the Trust

65

EXHIBIT 2
Page 70 of 404

Account and any assets that have been purchased or acquired with any such funds). This <u>Section 6.04</u> shall survive the termination of this Agreement for any reason.

6.05    <u>Proxy Solicitation; Other Actions</u>.

(a)    The Company agrees to use reasonable best efforts to provide Acquiror, as soon as reasonably practicable after the date hereof and, in any event, no later than December 19, 2021, audited financial statements, including consolidated balance sheets, statements of operations, statements of cash flows, and statements of unitholders' equity of the Company as of and for the years ended December 31, 2019 and December 31, 2020, audited in accordance with the standards of the Public Company Accounting Oversight Board, and unaudited interim financial statements, including consolidated balance sheets, statements of operations, statements of cash flows, and statements of unitholders' equity of the Company as of and for the quarters ended September 30, 2020 and September 30, 2021, in each case, prepared in accordance with GAAP and Regulation S-X. The Company shall be available to, and the Company shall use reasonable best efforts to make their officers and employees available to, in each case, during normal business hours and upon reasonable advanced notice, Acquiror and its counsel in connection with (i) the drafting of the Registration Statement and (ii) responding in a timely manner to comments on the Registration Statement from the SEC. Without limiting the generality of the foregoing, the Company shall reasonably cooperate with Acquiror in connection with Acquiror's preparation for inclusion in the Registration Statement of pro forma financial statements that comply with the requirements of Regulation S-X under the rules and regulations of the SEC (as interpreted by the staff of the SEC) to the extent such pro forma financial statements are required by Form S-4.

(b)    From and after the date on which the Registration Statement becomes effective under the Securities Act until the Closing Date, the Company will give Acquiror prompt written notice of any action taken or not taken by the Company Group or of any development regarding the Company Group, in any such case which is known by the Company, that would cause the Registration Statement to contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; <u>provided</u>, that, if any such action shall be taken or fail to be taken or such development shall otherwise occur, Acquiror and the Company shall cooperate fully to cause an amendment or supplement to be made promptly to the Registration Statement, such that the Registration Statement no longer contains an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; <u>provided</u>, <u>further</u>, <u>however</u>, that no information received by Acquiror pursuant to this <u>Section 6.05</u> shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the party who disclosed such information, and no such information shall be deemed to change, supplement or amend the Schedules.

6.06    <u>Non-Solicitation</u>.

(a)    From the date of this Agreement until the Effective Time or, if earlier, the valid termination of this Agreement in accordance with <u>Section 10.01</u>, except as disclosed in <u>Schedule 6.06</u>, the Company shall not, and shall cause the other Company Group Members and use its reasonable best efforts to cause its and their respective Representatives not to, directly or indirectly:

66

**EXHIBIT 2**
**Page 71 of 404**

(i)      initiate, solicit or knowingly encourage or knowingly facilitate any inquiries or requests for information with respect to, or the making of, any inquiry regarding, or any proposal or offer that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal;

(ii)      engage in, continue or otherwise participate in any negotiations or discussions concerning, or provide access to its properties, books and records or any confidential information or data to, any Person relating to any proposal, offer, inquiry or request for information that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal;

(iii)      approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Acquisition Proposal;

(iv)      execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, confidentiality agreement, merger agreement, acquisition agreement, exchange agreement, joint venture agreement, partnership agreement, option agreement or other similar agreement for or relating to any Acquisition Proposal; or

(v)      resolve or agree to do any of the foregoing.

(b)      Except as disclosed in Schedule 6.06, the Company also agrees that immediately following the execution of this Agreement it shall, and shall cause the other Company Group Members and use its reasonable best efforts to cause its and their respective Representatives to, cease any solicitations, discussions or negotiations with any Person (other than the parties hereto and their respective Representatives) conducted heretofore in connection with an Acquisition Proposal or any inquiry or request for information that could reasonably be expected to lead to, or result in, an Acquisition Proposal. The Company also agrees that within three Business Days of the execution of this Agreement, the Company shall request each Person (other than the parties hereto and their respective Representatives) that has prior to the date hereof executed a confidentiality agreement in connection with its consideration of acquiring any Company Group Member (and with whom any Company Group Member has had contact in 12 months prior to the date of this Agreement regarding the acquisition of any Company Group Member) to return or destroy all confidential information furnished to such Person by or on behalf of it prior to the date hereof and terminate access to any physical or electronic data room maintained by or on behalf of any Company Group Member. The Company shall promptly (and in any event within two Business Days) notify, in writing, Acquiror of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Acquisition Proposal, which notice shall include a summary of the material terms of, and the identity of the Person or group of Persons making, such inquiry, proposal, offer or request for information and an unredacted copy of any Acquisition Proposal or inquiry, proposal or offer made in writing or, if not in writing, a written description of the material terms and conditions of such inquiry, proposal or offer. The Company shall promptly (and in any event within two Business Days) keep Acquiror informed of any material developments with respect to any such inquiry, proposal, offer, request for information or Acquisition Proposal (including any material changes thereto and copies of any additional written materials received by any Company Group Member or its Representatives). Without limiting the foregoing, it is understood that any violation of the restrictions contained in this Section 6.06 by

67

**EXHIBIT 2**
**Page 72 of 404**

any Company Group Member or of any other Company Group Member's Representatives acting on the Company's behalf, shall be deemed to be a breach of this <u>Section 6.06</u> by the Company.

6.07    <u>Cooperation under the Credit Documents</u>.

(a)    During the Interim Period, (i) the Company shall not terminate any commitments under the Credit Documents without the prior written consent of Acquiror (such consent not to be unreasonably withheld, conditioned or delayed), and (ii) the Company shall maintain in effect and comply with, in all respects, the terms of the Credit Documents, in each case, as in effect on the date hereof, in accordance with the terms and subject to the conditions thereof.

(b)    At least three (3) Business Days prior to the Closing Date, the Company shall obtain and deliver to Acquiror a fully executed and effective copy of a payoff letter with respect to the Fluor Line of Credit Note (the "<u>Fluor Payoff Letter</u>") in form and substance reasonably acceptable to Acquiror.

(c)    The Company shall obtain and deliver to Acquiror all documentation necessary to convert the balance of the Fluor Convertible Note into Equity Securities of the Company on or prior to the Closing in accordance with the terms thereof and to extend the maturity of the Fluor Convertible Note to the Termination Date.

**ARTICLE VII**
**COVENANTS OF ACQUIROR**

7.01    <u>HSR Act and Regulatory Approvals</u>.

(a)    In connection with the transactions contemplated by this Agreement, Acquiror shall file promptly but in no event later than 10 Business Days after the date hereof, the notification required from Acquiror or any of its Affiliates under the HSR Act. Acquiror shall use its reasonable best efforts to submit, as soon as practicable, any other required applications or filings pursuant to any Antitrust Laws and furnish to the Company as promptly as reasonably practicable all information required for any application or other filing required to be made by the Company pursuant to any Antitrust Law. Acquiror shall substantially comply with any Information or Document Requests.

(b)    If available, Acquiror shall request early termination of any waiting period under the HSR Act and exercise its reasonable best efforts to (i) obtain termination or expiration of the waiting period under the HSR Act and consents or approvals pursuant to any other applicable Antitrust Laws, (ii) prevent the entry in any Action brought by a Regulatory Consent Authority or any other Person of any Governmental Order which would prohibit, make unlawful or delay the consummation of the transactions contemplated by this Agreement and (iii) if any such Governmental Order is issued in any such Action, cause such Governmental Order to be lifted.

(c)    Acquiror shall cooperate in good faith with the Regulatory Consent Authorities and exercise its reasonable best efforts to undertake promptly any and all action required to complete lawfully the transactions contemplated by this Agreement as soon as practicable (but in any event prior to the Termination Date) and any and all action necessary or

68

**EXHIBIT 2**
**Page 73 of 404**

advisable to avoid, prevent, eliminate or remove any impediment under Antitrust Law or the actual or threatened commencement of any proceeding in any forum by or on behalf of any Regulatory Consent Authority or the issuance of any Governmental Order that would delay, enjoin, prevent, restrain or otherwise prohibit the consummation of the Merger; provided that notwithstanding anything in this Agreement to the contrary, nothing in this Section 7.01 or any other provision of this Agreement shall require or obligate (i) Acquiror to take any actions, including selling, divesting, or otherwise disposing of, licensing, holding separate, or taking or committing to take any action that limits in any respect the Acquiror's or the Company's freedom of action with respect to, or its ability to retain, any business, products, rights, services, licenses, assets or properties of the Acquiror or the Company or (ii) Acquiror or any other Person to take any actions with respect to Acquiror's Affiliates, the Sponsor, the Subscriber, their respective Affiliates and any investment funds or investment vehicles affiliated with, or managed or advised by, Acquiror's Affiliates, the Sponsor, the Subscriber or any portfolio company (as such this term is commonly understood in the private equity industry) or investment of Acquiror's Affiliates, Sponsor or of any such investment fund or investment vehicle.

(d)     Acquiror shall promptly notify the Company of any substantive communication with, and to the extent permitted, furnish to the Company upon request copies of any notices or written communications received by, Acquiror or any of its Affiliates and any third party or Governmental Authority with respect to the transactions contemplated by this Agreement, and to the extent permitted, Acquiror shall permit counsel to the Company an opportunity to review in advance, and Acquiror shall consider in good faith the views of such counsel in connection with, any proposed communications by Acquiror or its Affiliates to any Governmental Authority concerning the transactions contemplated by this Agreement; provided, that Acquiror shall not extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Authority to delay the consummation of the transactions contemplated by this Agreement without the written consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed). Acquiror agrees to provide, to the extent permitted by the applicable Governmental Authority, the Company and its counsel the opportunity, on reasonable advance notice, to participate in any substantive meetings or discussions, either in person or by telephone, between Acquiror or any of its Affiliates, agents or advisors, on the one hand, and any Governmental Authority, on the other hand, concerning or in connection with the transactions contemplated hereby. Any materials exchanged in connection with this Section 7.01 may be redacted or withheld as necessary to address reasonable privilege or confidentiality concerns of legal counsel of Acquiror, and to remove competitively sensitive material; provided, that the Acquiror may, as it deems advisable and necessary, designate any materials provided to the Company under this Section 7.01 as "outside counsel only."

(e)     Acquiror and the Company shall each bear 50% of all filing fees or similar fees payable to any Governmental Authority (including the Regulatory Consent Authorities) in connection with the transactions contemplated by this Agreement.

7.02    Indemnification and Insurance.

(a)     From and after the Effective Time, Acquiror and the Surviving Company shall indemnify and hold harmless each present and former director and officer of the Company against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses,

**EXHIBIT 2**
**Page 74 of 404**

claims, damages or liabilities incurred in connection with any Action arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that the Company would have been permitted under applicable Law, the Existing Company LLCA and indemnification agreements in effect on the date of this Agreement to indemnify such Person (and advance expenses as incurred in defense of any Action to the fullest extent permitted under applicable Law). Without limiting the foregoing, Acquiror shall, and shall cause the Surviving Company to, for a period of not less than six years from the Effective Time, (i) maintain provisions in its certificate of incorporation, bylaws, and indemnification agreements, to the extent applicable, concerning the indemnification and exculpation (and provisions relating to expense advancement) of officers and directors that are no less favorable to those Persons than the provisions of the Existing Company LLC Agreement, and such indemnification agreements, to the extent applicable, as of the date of this Agreement and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law. Acquiror shall assume, and be liable for, and shall cause the Surviving Company and its Subsidiaries to honor, each of the covenants in this Section 7.02.

(b)     For a period of six years from the Effective Time, Acquiror shall, or shall cause one or more of its Subsidiaries to, maintain in effect directors' and officers' liability insurance covering those Persons who are currently covered by the Company's directors' and officers' liability insurance policies (true, correct and complete copies of which have been heretofore made available to Acquiror or its agents or Representatives) on terms not less favorable than the terms provided to then-current directors and officers of the Acquiror; provided, however, that (i) Acquiror may cause coverage to be extended under the current directors' and officers' liability insurance by obtaining a six-year "tail" policy containing terms not materially less favorable than the terms of such current insurance coverage with respect to claims existing or occurring at or prior to the Effective Time, provided that the aggregate cost of such tail policy (together with any insurance purchased pursuant to Section 7.09) shall not exceed $450,000 without the prior written consent of the Company and any such cost shall be deemed to be a Transaction Expense; and (ii) if any claim is asserted or made within such six-year period, any insurance required to be maintained under this Section 7.02 shall be continued in respect of such claim until the final disposition thereof.

(c)     This Section 7.02 shall survive the consummation of the Merger indefinitely and shall be binding, jointly and severally, on Acquiror and the Surviving Company and all successors and assigns of Acquiror and the Surviving Company. In the event that Acquiror, the Surviving Company or any of their respective successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, Acquiror and the Surviving Company shall ensure that proper provision shall be made so that the successors and assigns of Acquiror or the Surviving Company, as the case may be, shall succeed to the obligations set forth in this Section 7.02. The obligations of Acquiror and the Surviving Company under this Section 7.02 shall not be terminated or modified in such a manner as to materially and adversely affect any present and former director and officer of the Company without the consent of the affected Person.

EXHIBIT 2
Page 75 of 404

7.03    Conduct of Acquiror During the Interim Period.

(a)    During the Interim Period, Acquiror and Merger Sub shall, subject to Section 7.11, carry on their business in the ordinary course of business and in accordance with applicable Law. During the Interim Period, except as set forth on Schedule 7.03 or as expressly contemplated by this Agreement or the Sponsor Letter Agreement (including Section 8.06) or as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld or delayed), or as may be required by Law, Acquiror shall not and shall not permit Merger Sub to:

(i)    change, modify or amend the Trust Agreement, the Acquiror Organizational Documents or the organizational documents of Merger Sub;

(ii)    (A) make, declare, set aside or pay any dividends on, or make any other distribution (whether in cash, stock or property) in respect of any of its outstanding Equity Securities; (B) split, combine, reclassify or otherwise change any of its Equity Securities; or (C) other than the redemption of any shares of Acquiror Class A Shares or Acquiror Common Stock, as applicable, required by the Offer or as otherwise required by Acquiror's Organizational Documents in order to consummate the transactions contemplated hereby, repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any Equity Securities in, Acquiror;

(iii)    make, revoke or change any material Tax election, adopt or change any material Tax accounting method or period, file any material Tax Return in a manner inconsistent with past practices in any material respect, file any amendment to a material Tax Return, enter into any agreement with a Governmental Authority with respect to a material amount of Taxes, settle or compromise any examination, audit or other Action with a Governmental Authority of or relating to any material Taxes or settle or compromise any claim or assessment by a Governmental Authority in respect of material Taxes, consent to any extension or waiver of the statutory period of limitations applicable to any claim or assessment in respect of material Taxes, incur any material liability for Taxes outside the ordinary course of business, or enter into any Tax sharing, indemnification, allocation or similar agreement or arrangement (excluding any commercial contract entered into in the ordinary course of business and not primarily related to Taxes);

(iv)    other than as set forth on Schedule 7.03(a)(iv), enter into, renew or amend in any material respect, any Acquiror Affiliate Agreement (or any Contract, that if existing on the date hereof, would have constitute an Acquiror Affiliate Agreement);

(v)    waive, release, compromise, settle or satisfy any pending or threatened Action or compromise or settle any material liability, other than in the ordinary course of business consistent with past practice;

(vi)    incur, create, assume, refinance, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness;

(vii)    (A) offer, issue, deliver, grant or sell, or authorize or propose to offer, issue, deliver, grant or sell, any Equity Securities in, Acquiror or Merger Sub or any

71

EXHIBIT 2
Page 76 of 404

securities convertible into, or any rights, warrants or options to acquire, any Equity Securities, other than (i) in connection with the exercise of any Acquiror Warrants outstanding on the date hereof or (ii) the transactions contemplated by this Agreement (including the transactions contemplated by the Subscription Agreements) or (B) amend, modify or waive any of the terms or rights set forth in, any Acquiror Warrant, including any amendment, modification or reduction of the warrant price set forth therein;

(viii)    adopt or amend any Benefit Plan, or enter into any employment contract or collective bargaining agreement other than the Acquiror Equity Incentive Plan or as otherwise contemplated by this Agreement;

(ix)    acquire (including by merger or consolidation with, or merge or consolidate with, or purchase a material portion of the assets or equity of) any Person or division thereof;

(x)    adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Acquiror or Merger Sub (other than the transactions contemplated by this Agreement);

(xi)    make any capital expenditures;

(xii)    make any loans, advances or capital contributions to, or investments in, any other Person (including to any of its officers, directors, agents or consultants), make any change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person;

(xiii)    enter into any new line of business outside of the business currently conducted by Acquiror and Merger Sub as of the date of this Agreement;

(xiv)    make any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in, or a new application of, GAAP (including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization) or applicable Law;

(xv)    voluntarily fail to maintain, cancel or materially change coverage under any insurance policy in form and amount equivalent in all material respects to the insurance coverage currently maintained with respect to the Acquiror and Merger Sub and their assets and properties; or

(xvi)    enter into any agreement or undertaking to do any action prohibited under this Section 7.03.

(b)    During the Interim Period, Acquiror shall, and shall cause Merger Sub to comply with, and continue performing under, as applicable, the Acquiror Organizational Documents, the Trust Agreement and all other agreements or Contracts to which Acquiror or Merger Sub may be a party.

EXHIBIT 2
Page 77 of 404

7.04    <u>Trust Account</u>. Prior to or at the Closing (subject to the satisfaction or waiver of the conditions set forth in <u>Article IX</u>), Acquiror shall make appropriate arrangements to cause the funds in the Trust Account to be disbursed in accordance with the Trust Agreement for the following: (a) all amounts payable to Redeeming Stockholders who shall have validly elected to redeem shares of Acquiror Class A Shares in connection with the Offer; (b) the payment of the Outstanding Company Expenses and Outstanding Acquiror Expenses pursuant to <u>Section 11.05</u>, and (c) the balance of the assets in the Trust Account, if any, after payment of the amounts required under the foregoing <u>clauses (a)</u> and <u>(b)</u>, to be contributed to Merger Sub.

7.05    <u>Inspection</u>. Subject to confidentiality obligations and similar restrictions that may be applicable to information furnished to Acquiror or Merger Sub by third parties that may be in Acquiror's or Merger Sub's possession from time to time, and except for any information which in the opinion of legal counsel (including in-house counsel) of Acquiror would result in the loss of attorney-client privilege or other privilege from disclosure or would conflict with any applicable Law or confidentiality obligations to which Acquiror or Merger Sub is bound, Acquiror shall afford to the Company, its Affiliates and their respective Representatives reasonable access during the Interim Period, during normal business hours and with reasonable advance notice, to all of their respective properties, books, projections, plans, systems, Contracts, commitments, Tax Returns, records, commitments, analyses and appropriate officers and employees of Acquiror, and shall furnish such Representatives with all financial and operating data and other information concerning the affairs of Acquiror that are in the possession of Acquiror as such Representatives may reasonably request. The parties shall use commercially reasonable efforts to make alternative arrangements for such disclosure where the restrictions in the preceding sentence apply. All information obtained by the Company Group, its Affiliates and their respective Representatives under this Agreement shall be subject to the Confidentiality Agreement prior to the Effective Time.

7.06    <u>Acquiror NASDAQ Listing</u>.

(a)    From the date hereof through the Closing, Acquiror shall use best efforts to ensure Acquiror remains listed as a public company on, and shall use best efforts to cause the Acquiror Class A Shares, the Acquiror Common Stock and the Acquiror Warrants to be listed on, NASDAQ.

(b)    Acquiror shall use best efforts to cause the Acquiror Common Stock to be issued in connection with the Transactions or otherwise reserved for issuance and the Acquiror Warrants to be approved for listing on NASDAQ as promptly as practicable following the issuance thereof, subject to official notice of issuance, on or prior to the Closing Date.

7.07    <u>Acquiror Public Filings</u>. From the date hereof through the Closing, Acquiror will keep current and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable Securities Laws.

7.08    <u>Financing</u>.

(a)    Acquiror and Merger Sub shall take, or cause to be taken, as promptly as practicable after the date hereof, all actions, and to do, or cause to be done, all things necessary, proper or advisable (including enforcing its rights under the Subscription Agreements), on or prior

to the Closing Date, to consummate the purchases contemplated by the Subscription Agreements on the terms and conditions described or contemplated therein, including using its reasonable efforts to (i) comply with its respective obligations under the Subscription Agreements, (w) maintain in effect the Subscription Agreements in accordance with the terms and conditions thereof, (x) satisfy on a timely basis all conditions and covenants applicable to Acquiror set forth in the applicable Subscription Agreements within its control, (y) consummate the PIPE Investment when required pursuant to this Agreement, and (z) enforce its rights under the Subscription Agreements to cause the Subscribers to pay to (or as directed by) Acquiror the applicable purchase price under each Subscriber's applicable Subscription Agreement in accordance with its terms. Acquiror shall give the Company prompt written notice upon (A) becoming aware of any breach or default by any party to any of the Subscription Agreements or any termination (or purported termination) of any of the Subscription Agreements, (B) the receipt of any written notice or other written communication from any party to any Subscription Agreement with respect to any actual, potential or claimed expiration, lapse, withdrawal, breach, default, termination or repudiation by any party to any Subscription Agreement or any provisions of any Subscription Agreement and (C) if Acquiror does not expect to receive all or any portion of the PIPE Investment Amount on the terms, in the manner or from the sources contemplated by the Subscription Agreements. Acquiror shall not, without the prior written consent of the Company, amend, modify, supplement or waive (or permit any waiver of) any provision of, or terminate or abandon its plans with respect to, or provide consent to amend, modify, supplement, waive, assign or terminate any provision or remedy under, or any replacements of, any Subscription Agreement.

(b)     If all or any portion of the PIPE Investment becomes unavailable, (i) Acquiror shall promptly notify the Company, (ii) Acquiror and the Company shall mutually cooperate in good faith and Acquiror and the Company shall promptly use its reasonable best efforts to promptly obtain the PIPE Investment or such portion of the PIPE Investment from alternative sources in an amount, when added to any portion of the PIPE Investment that is available, equal to the PIPE Investment Amount (any alternative source(s) of financing, "Alternative PIPE Investment") and (iii) in the event that Acquiror is able to obtain any Alternative PIPE Investment, subject to the prior written consent of the Company (in its sole discretion), Acquiror shall use its reasonable best efforts to enter into a new subscription agreement (each, an "Alternative Subscription Agreement") that provides for the subscription and purchase of Acquiror Common Stock at $10.00 per share and containing terms and conditions not less favorable in the aggregate from the standpoint of Acquiror and the Company than those in the Subscription Agreements entered into as of the date hereof (as determined by the Company (in its sole discretion)). In such event, the term "PIPE Investment" as used in this Agreement shall be deemed to include any Alternative PIPE Investment, the term "Subscription Agreements" as used in this Agreement shall be deemed to include any Alternative Subscription Agreement and the term "PIPE Acquiror" as used in this Agreement shall be deemed to include any Person that is subscribing for Acquiror Common Stock under any Alternative Subscription Agreement. For the avoidance of doubt, if all or any portion of the PIPE Investment or Alternative PIPE Investment becomes unavailable, in each case subject to the prior written consent of the Company (in its sole discretion) Acquiror may utilize deposits, proceeds or any other amounts from the Trust Account and, to the extent acceptable to the Company, any additional third party financing to satisfy its financing obligations hereunder.

**EXHIBIT 2**
**Page 79 of 404**

7.09    <u>Additional Insurance Matters</u>. Prior to the Closing, Acquiror may obtain directors' and officers' liability insurance that shall be effective as of Closing and will cover those Persons who will be the directors and officers of Acquiror and its Subsidiaries (including the officers of the Company) at and after the Closing on terms customary for a typical directors' and officers' liability insurance policy for a company whose equity is listed on NASDAQ which policy has a scope and amount of coverage that is reasonably appropriate for a company of similar characteristics (including the line of business and revenues) as Acquiror and its Subsidiaries (including the Company); provided that the aggregate cost of such liability insurance policy (together with any tail policy purchased pursuant to <u>Section 7.02(b)</u>) shall not exceed $450,000 without the prior written consent of the Company and any such cost shall be deemed to be a Transaction Expense.

7.10    <u>Director and Officer Appointments</u>. Except as otherwise agreed in writing by the Company and Acquiror prior to the Closing, and conditioned upon the occurrence of the Closing, subject to any limitation imposed under applicable Laws and NASDAQ listing requirements, Acquiror shall take all actions necessary or appropriate to cause (a) the number of directors constituting the Acquiror Board to be such number as is specified on <u>Schedule 7.10(a)</u>, (b) the individuals set forth on <u>Schedule 7.10(b)</u> to be elected as members of the Acquiror Board, effective as of the Closing and (c) the individuals set forth on <u>Schedule 7.10(c)</u> to be the executive officers of Acquiror effective as of the Closing. On the Closing Date, Acquiror shall enter into customary indemnification agreements reasonably satisfactory to the Company with the individuals set forth on <u>Schedule 7.10</u>, which indemnification agreements shall continue to be effective following the Closing.

7.11    <u>Exclusivity</u>. Acquiror agrees that immediately following the execution of this Agreement it shall, and shall use its reasonable best efforts to cause its Representatives to, cease any solicitations, discussions or negotiations with any Person (other than the parties hereto and their respective Representatives) conducted heretofore in connection with the Business Combination or any inquiry or request for information that could reasonably be expected to lead to, or result in, a Business Combination. Acquiror shall promptly (and in any event within one Business Day) notify, in writing, the Company of the receipt of any inquiry, proposal, offer or request for information received after the date hereof that constitutes, or could reasonably be expected to result in or lead to, any Business Combination other than with the Company, which notice shall include a summary of the material terms of, and the identity of the Person or group of Persons making, such inquiry, proposal, offer or request for information and an unredacted copy of proposal or indication of interest, written or oral relating to any Business Combination (a "<u>Business Combination Proposal</u>"). Acquiror shall promptly (and in any event within one Business Day) keep the Company reasonably informed of any material developments with respect to any such Business Combination Proposal, but for purposes of clarity, Acquiror is not permitted to initiate discussions or engage in any negotiations with any Person other than the Company relating to a Business Combination Proposal.

7.12    <u>Redomicile</u>. Prior to the consummation of the Transactions, and subject to the Supermajority Acquiror Stockholder Approval, Acquiror shall take all steps necessary to effect the Redomicile on the day prior to the Closing Date. In connection with the Redomicile, Acquiror shall adopt as Acquiror's initial certificate of incorporation the form attached hereto as <u>Exhibit E</u> and Acquiror's initial bylaws in the form attached hereto as <u>Exhibit F</u>. Acquiror shall effect the

75

EXHIBIT 2
Page 80 of 404

Redomicile in such a way that Acquiror's representations and warranties set forth in <u>Article V</u> remain true and correct.

7.13    <u>Acquiror Transaction Expenses</u>.  Acquiror shall not incur Transaction Expenses (excluding any deferred underwriting fees and PIPE placement agent fees) in excess of $7,300,000 without the prior written consent of the Company, not to be unreasonably withheld, conditioned or delayed.

**ARTICLE VIII**
**JOINT COVENANTS**

8.01    <u>Support of Transaction</u>. Without limiting any covenant contained in <u>Article VI</u> or <u>Article VII</u>, including the obligations of the Company and Acquiror with respect to the notifications, filings, reaffirmations and applications described in <u>Section 6.03</u> and <u>Section 7.01</u>, respectively, which obligations shall control to the extent of any conflict with the succeeding provisions of this <u>Section 8.01</u>, Acquiror and the Company shall each, and Acquiror shall cause Merger Sub to: (a) use commercially reasonable efforts to assemble, prepare and file any information (and, as needed, to supplement such information) as may be reasonably necessary to obtain as promptly as practicable all governmental and regulatory consents required to be obtained in connection with the Transactions, (b) use commercially reasonable efforts to obtain all material consents and approvals of third parties that any of Acquiror, the Company, or their respective Affiliates are required to obtain in order to consummate the Transactions, including any required approvals of parties to Material Contracts with the Company, and (c) take such other action as may reasonably be necessary or as another party may reasonably request to satisfy the conditions of <u>Article IX</u> or otherwise to comply with this Agreement and to consummate the Transactions as soon as practicable. Notwithstanding the foregoing, in no event shall Acquiror, Merger Sub or the Company be obligated to bear any expense or pay any fee or grant any concession in connection with obtaining any consents, authorizations or approvals pursuant to the terms of any Contract to which the Company is a party or otherwise in connection with the consummation of the Transactions.

8.02    <u>Preparation of Registration Statement; Special Meeting; Solicitation of Company Unitholder Approvals</u>.

(a)    As promptly as practicable following the execution and delivery of this Agreement and in any event no later than 20 Business Days following the date of the delivery of the financial statements described in <u>Section 6.05(a)</u>, Acquiror shall prepare, with the assistance of the Company, and cause to be filed with the SEC a registration statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy Statement contained therein, the "<u>Registration Statement</u>") in connection with the registration under the Securities Act of the Acquiror Common Stock to be issued under this Agreement, which Registration Statement will also contain the Proxy Statement. Each of Acquiror and the Company shall use its reasonable best efforts to cause the Registration Statement and the Proxy Statement to comply with the rules and regulations promulgated by the SEC, to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and to keep the Registration Statement effective as long as is necessary to consummate the Merger. Each of Acquiror and the Company shall furnish all information concerning it as may reasonably be requested by the other

76

**EXHIBIT 2**
**Page 81 of 404**

party in connection with such actions and the preparation of the Registration Statement and the Proxy Statement. Promptly after the Registration Statement is declared effective under the Securities Act, Acquiror will cause the Proxy Statement to be mailed to shareholders of Acquiror. Acquiror and the Company shall each bear 50% of all fees and expenses incurred in connection with the preparation and filing of the Registration Statement and the receipt of stock exchange approval in connection therewith, other than fees and expenses of advisors (which shall be borne by the party incurring such fees). Acquiror also agrees to use its reasonable best efforts to obtain all necessary state Securities Laws or "Blue Sky" permits and approvals required to carry out the transactions contemplated hereby.

(b)     To the extent permitted by applicable Law, each of Acquiror and the Company shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld or delayed), any response to comments of the SEC or its staff with respect to the Registration Statement and any amendment to the Registration Statement filed in response thereto. If Acquiror or the Company becomes aware that any information contained in the Registration Statement shall have become false or misleading in any material respect or that the Registration Statement is required to be amended in order to comply with applicable Law, then (i) such party shall promptly inform the other party and (ii) Acquiror, on the one hand, and the Company, on the other hand, shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld or delayed) an amendment or supplement to the Registration Statement. Acquiror and the Company shall use reasonable best efforts to cause the Registration Statement as so amended or supplemented, to be filed with the SEC and to be disseminated to the holders of shares of Acquiror Common Stock, as applicable, in each case pursuant to applicable Law and subject to the terms and conditions of this Agreement and the Acquiror Organizational Documents. Each of the Company and Acquiror shall provide the other parties with copies of any written comments, and shall inform such other parties of any oral comments, that Acquiror receives from the SEC or its staff with respect to the Registration Statement promptly after the receipt of such comments and shall give the other parties a reasonable opportunity to review and comment on any proposed written or oral responses to such comments prior to responding to the SEC or its staff, including by participating with the Company or its counsel in any discussions or meetings with the SEC.

(c)     Acquiror agrees to include provisions in the Proxy Statement and to take reasonable action related thereto, with respect to (i) approval of the Transactions, including the Business Combination (as defined in the Articles of Association), and the adoption and approval of this Agreement (the "Transaction Proposal") by way of Majority Acquiror Stockholder Approval, (ii) approval of the Acquiror Charter (the "Amendment Proposal") by way of Supermajority Acquiror Stockholder Approval and each change to the Acquiror Charter that is required to be separately approved, (iii) approval of the issuance of the Merger Consideration pursuant to this Agreement and Acquiror Common Stock pursuant to Section 3.03 of this Agreement and pursuant to the Subscription Agreements in accordance with the rules of NASDAQ (the "NASDAQ Proposal") by way of Majority Acquiror Stockholder Approval, (iv) the approval and adoption of the Acquiror Equity Incentive Plan (the "Acquiror Equity Plan Proposal") by way of Majority Acquiror Stockholder Approval, (v) adjournment of the Special Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing proposals by way of Majority Acquiror Stockholder Approval, (vi) the Redomicile (the "Redomicile Proposal") by way of Supermajority Acquiror Stockholder Approval and (vii) approval of any other proposals reasonably agreed by Acquiror and the Company to be

EXHIBIT 2
Page 82 of 404

necessary or appropriate in connection with the Transactions contemplated hereby (the "Additional Proposal" and together with the Transaction Proposal, the Amendment Proposal, the NASDAQ Proposal, the Acquiror Equity Plan Proposal and the Redomicile Proposal, the "Proposals") by way of Majority Acquiror Stockholder Approval. Without the prior written consent of the Company, the Proposals shall be the only matters (other than procedural matters) which Acquiror shall propose to be acted on by Acquiror Stockholders at the Special Meeting.

(d)    Acquiror shall use reasonable best efforts to, as promptly as practicable after the Registration Statement is declared effective under the Securities Act, (i) establish the record date (which record date shall be mutually agreed with the Company) for, duly call, give notice of, convene and hold the Special Meeting in accordance with the CLCI, (ii) cause the Proxy Statement to be disseminated to Acquiror Stockholders in compliance with applicable Law and (iii) solicit proxies from the holders of Acquiror Class A Shares to vote in favor of each of the Proposals. Acquiror shall, through the Acquiror Board, recommend to its shareholders that they approve the Proposals (the "Acquiror Board Recommendation") and shall include the Acquiror Board Recommendation in the Proxy Statement. The Acquiror Board shall not (and no committee or subgroup thereof shall) change, withdraw, withhold, qualify or modify, or publicly propose to change, withdraw, withhold, qualify or modify, the Acquiror Board Recommendation (an "Acquiror Change in Recommendation"); provided, that if at any time prior to obtaining the Acquiror Stockholder Approvals, the Acquiror Board determines in good faith, after consultation with and receipt of a written opinion of outside legal counsel, that the failure to make an Acquiror Change in Recommendation in response to an Intervening Acquiror Event would, or upon advice of outside counsel, would reasonably be expected to, constitute a breach of its fiduciary duties under applicable Law, the Acquiror or the Acquiror Board may make an Acquiror Change in Recommendation solely to the extent necessary to avoid a breach of its fiduciary duties under applicable Law. Notwithstanding the foregoing provisions of this Section 8.02(d), if on a date for which the Special Meeting is scheduled, Acquiror has not received proxies representing a sufficient number of Acquiror Class A Shares to obtain the Acquiror Stockholder Approvals, as applicable, whether or not a quorum is present, subject to the Articles of Association, Acquiror shall have the right to make one or more successive postponements or adjournments of the Special Meeting; provided, that the Special Meeting, without the prior written consent of the Company, (1) may not be adjourned to a date that is more than 10 Business Days after the date for which the Special Meeting was originally scheduled or the most recently adjourned Special Meeting (excluding any adjournments required by applicable Law) and (2) is held no later than four Business Days prior to the Termination Date.

(e)    As promptly as practicable following the execution of this Agreement, the Company shall solicit a written consent from the Company Unitholders approving and adopting this Agreement, the Merger and, to the extent required by Law, the Transactions (including (i) approval of the Transactions by the holders of at least a majority of all outstanding units of Existing Company Preferred Units and (ii) approval of the Transactions by the holders of a majority of the outstanding Existing Company Units, voting together as a single class on an as-converted basis (collectively, the "Company Unitholder Approvals")). In connection therewith, the Company shall use reasonable best efforts to, as promptly as practicable, (1) establish the record date (which record date shall be mutually agreed with Acquiror) for determining the Company Unitholders entitled to provide such written consent, (2) cause the consent solicitation statement to be disseminated to the Company Unitholders in compliance with applicable Law and

EXHIBIT 2
Page 83 of 404

(3) solicit written consents from the Company Unitholders to give the Company Unitholder Approvals. The Company shall, through the Company Board, recommend to the Company Unitholders that they adopt this Agreement (the "Company Board Recommendation"). The Company Board shall not (and no committee or subgroup thereof shall) change, withdraw, withhold, qualify or modify, or publicly propose to change, withdraw, withhold, qualify or modify, the Company Board Recommendation. The Company will provide Acquiror with copies of all member consents it receives within one Business Day of receipt.

8.03    Tax Matters.

(a)    *Transfer Taxes*. Except as otherwise set forth in this Agreement, all transfer, documentary, sales, use, stamp, registration, value added or other similar Taxes incurred in connection with the Transactions ("Transfer Taxes") shall be paid 50% by the Company and 50% by Acquiror. The Company and Acquiror further agree to reasonably cooperate to reduce or eliminate the amount of any such Transfer Taxes.

(b)    *Tax Treatment*. The parties intend that, for United States federal income tax purposes, (i) the Redomicile will qualify as a "reorganization" pursuant to Section 368(a)(1)(F) of the Code and the Treasury Regulations thereunder, (ii) the Recapitalization will qualify as a "reorganization" within the meaning of Section 368(a)(1)(E) of the Code and the Treasury Regulations thereunder, (iii) the Merger will qualify as a transfer under Section 721(a) of the Code, (iv) the Sponsor Capital Contribution will qualify as a tax-free capital contribution under Section 118 of the Code, and (v) this Agreement is adopted as a plan of reorganization for purposes of Sections 354, 361 and the 368 of the Code and within the meaning of Treasury Regulations Section 1.368-2(g) and 1.368-3(a) (collectively, the "Intended Tax Treatment"). The Transactions shall be reported by the parties for all Tax purposes in accordance with the Intended Tax Treatment, unless otherwise required by a Tax Authority as a result of a "determination" within the meaning of Section 1313(a) of the Code (or any similar or corresponding provision of applicable Law). The parties hereto shall, and shall cause their Affiliates to, cooperate with each other and their respective counsel to document and support the Intended Tax Treatment and, following the Closing, the parties hereto shall not, or and shall not permit or cause their respective controlled Affiliates to, take any action, or knowingly fail to take any action, which action or failure to act prevents or impedes, or would reasonably be expected to prevent or impede, the Transactions from qualifying for the Intended Tax Treatment.

(c)    The parties hereto shall, and shall cause their controlled Affiliates, to (i) cooperate in order to facilitate the issuance of any opinions relating to Tax matters that the SEC requires to be filed in connection with the Registration Statement, and (ii) deliver to Kirkland & Ellis LLP (or other applicable legal counsel to Acquiror) and Gibson, Dunn & Crutcher LLP, in each case, to the extent requested by such counsel, a duly executed certificate dated as of the date requested by such counsel, containing such representations, warranties and covenants as shall be reasonably necessary or appropriate to enable such counsel to render any such opinion. If, in connection with the preparation and filing of the Registration Statement, the SEC requests or requires that tax opinions be prepared and submitted with respect to the Tax treatment of the Transactions, (I) for Acquiror or the pre-Closing holders of Acquiror Class A Shares, Acquiror Warrants or Acquiror Old Class B Shares, then Acquiror will procure Kirkland & Ellis LLP or other counsel to Acquiror ("Acquiror Tax Counsel") to deliver such tax opinions or (II) for the

Company or the Company Unitholders, then Acquiror will procure Gibson, Dunn & Crutcher LLP or other counsel to the Company ("Company Tax Counsel") to deliver such tax opinions, and, in either case, Acquiror and the Company shall deliver to Acquiror Tax Counsel or Company Tax Counsel, as applicable, customary Tax representation letters reasonably satisfactory to Acquiror Tax Counsel or Company Tax Counsel, as applicable, at such time or times as may be reasonably requested by Acquiror Tax Counsel or Company Tax Counsel, as applicable, in connection with the delivery of any such tax opinions with respect to the Tax treatment of the Transactions.

(d)     Acquiror or the Surviving Company shall prepare and timely file, or shall cause to be prepared and timely filed, all Pre-Closing Flow-Through Tax Returns for the Surviving Company, the Company and its Subsidiaries required to be filed after the Closing.  With respect to each such Pre-Closing Flow-Through Tax Return, (i) such Tax Returns shall be prepared consistent with past practice, except as otherwise required by applicable Law, (ii) Acquiror or the Surviving Company shall submit such Tax Return to the Company Unitholder Representative no later than thirty (30) days prior to filing any such Tax Return for its review, (iii) Acquiror or the Surviving Company shall make any changes to such Tax Returns reasonably requested by the Company Unitholder Representative to the extent such comments relate solely to Pre-Closing Flow-Through Tax Items and (iv) no such Pre-Closing Flow-Through Tax Return shall be filed without the prior written consent of the Company Unitholder Representative (which consent shall not be unreasonably withheld, conditioned or delayed and which consent shall be deemed to be granted fifteen (15) days after a Pre-Closing Flow-Through Tax Return is provided to the Company Unitholder Representative if the Company Unitholder Representative does not provide comments by such time).  All other Tax Returns shall be prepared consistently with the provisions of the A&R Company LLC Agreement.

(e)     After the Closing, without the prior written consent of the Company Unitholder Representative (which consent shall not be unreasonably withheld, conditioned or delayed), the Acquiror shall not (and shall neither cause nor permit the Surviving Company and its Subsidiaries to) take any of the following actions: (w) amend, re-file or otherwise modify any Pre-Closing Flow-Through Tax Return, (x) enter into an agreement to extend the statute of limitations with respect to any Pre-Closing Flow-Through Tax Return (other than in the ordinary course consistent with past practice), (y) make, change, or revoke any Tax election affecting a Pre-Closing Flow-Through Tax Return or Pre-Closing Flow-Through Tax Item, or (z) initiate any discussion, voluntary disclosure or examination with any Governmental Authority regarding Pre-Closing Flow-Through Tax Returns or Pre-Closing Flow-Through Tax Items.

(f)     Each of the parties hereto shall (and shall cause their respective Affiliates to) cooperate fully, as and to the extent reasonably requested by another party, including in connection with the filing of relevant Tax Returns and any Tax audit, examination or other Action. Such cooperation shall include the retention and (upon the other party's request) the provision (with the right to make copies) of records and information reasonably relevant to any tax audit, examination or other Action, making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and making available to the pre-Closing holders of Acquiror Class A Shares, Acquiror Warrants or Acquiror Old Class B Shares information reasonably necessary to compute any income of any such holder (or its direct or indirect owners) arising (i) if applicable, as a result of Acquiror's status as a "passive foreign investment company" within the meaning of Section 1297(a) of the Code or a

80

EXHIBIT 2
Page 85 of 404

"controlled foreign corporation" within the meaning of Section 957(a) of the Code for any taxable period beginning on or prior to the Closing, including timely providing (A) a PFIC Annual Information Statement to enable such holders to make a "Qualifying Electing Fund" election under Section 1295 of the Code for such taxable period, and (B) information to enable applicable holders to report their allocable share of "subpart F" income under Section 951 of the Code and "global intangible low-taxed income" under Section 951A of the Code for such taxable period and (ii) under Section 367(b) of the Code and the Treasury Regulations thereunder as a result of the Redomicile or Recapitalization. For the avoidance of doubt, the parties agree that the cooperation contemplated by this Section 8.03(f) shall be carried out in a manner so as not to unreasonably interfere with the conduct of business of the parties.

(g)    After the Closing, each party shall promptly notify the other parties in writing upon receipt by the applicable party or its Affiliates of notice of any audit, examination, claim or other similar proceeding (a "Tax Proceeding") with respect to Pre-Closing Flow-Through Tax Returns or Pre-Closing Flow-Through Tax Items. Such notification shall include a copy of the relevant portion of any correspondence received from the Tax Authority. Subject to Section 8.03(h), the Company Unitholder Representative shall have exclusive authority to control any Tax Proceeding pertaining solely to any Pre-Closing Flow-Through Tax Return for any taxable period ending on or before the Closing Date, provided that (i) Acquiror shall have the right to participate in any such Tax Proceeding, and (ii) the Company Unitholder Representative shall not settle or compromise any such Tax Proceeding without the prior written consent of Acquiror which consent shall not be unreasonably withheld, conditioned or delayed. Acquiror shall have the exclusive authority to control any other Tax Proceeding relating to the Surviving Company, the Company and its Subsidiaries; provided that the Company Unitholder Representative shall have the participation, consent, and other rights granted thereto in the A&R Company LLC Agreement.

(h)    *Section 6226 Election.*    Notwithstanding anything to the contrary in this Agreement or the A&R LLC Agreement, with respect to any Tax Proceeding of any Company Group Member for any taxable period (or portion thereof) ending on or prior to the Closing Date in which the Partnership Tax Audit Rules apply (each, a "Relevant Tax Audit"), unless otherwise agreed in writing by the Acquiror, the "partnership representative" (within the meaning of the Partnership Tax Audit Rules) of such Company Group Member, the Company Group Members, and all of their respective Affiliates shall take such actions as are necessary to make (or cause to be made) an election under Section 6226 of the Code with respect to any "imputed underpayment" (within the meaning of the Partnership Tax Audit Rules) arising in connection with any such Relevant Tax Audit (and to make any similar elections under any applicable state or local Law). Neither the "partnership representative" (within the meaning of the Partnership Tax Audit Rules) of such Company Group Member nor any Company Group Member nor any of their respective Affiliates shall make any election or otherwise take any action to cause the Partnership Tax Audit Rules to apply to the Company Group Members at any earlier date than is required by applicable Law.

8.04    Confidentiality; Publicity.

(a)    Acquiror acknowledges that the information being provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby is

subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference.

(b)    The parties agree that the initial press release to be issued with respect to the Transactions shall be in the form previously agreed by the parties. None of Acquiror, Merger Sub, the Company or any of their respective Affiliates shall make any public announcement or issue any public communication regarding this Agreement or the transactions contemplated hereby, or any matter related to the foregoing, without first obtaining the prior consent of the Company or Acquiror, as applicable (which consent shall not be unreasonably withheld, conditioned or delayed), except if such announcement or other communication is required by applicable Law or legal process (including pursuant to the Securities Law or the rules of any national securities exchange), in which case Acquiror or the Company, as applicable, shall use its commercially reasonable efforts to coordinate such announcement or communication with the other party, prior to announcement or issuance and allow the other party a reasonable opportunity to comment thereon (which shall be considered by Acquiror or the Company, as applicable, in good faith); provided, however, that, notwithstanding anything contained in this Agreement to the contrary, (i) each party and its Affiliates may make announcements and may provide information regarding this Agreement and the transactions contemplated hereby to their respective owners, their Affiliates, and its and their respective directors, officers, employees, managers, advisors, direct and indirect investors and prospective investors without the consent of any other party hereto and (ii) subject to Section 6.02 and this Section 8.04, each party hereto may communicate with third parties to the extent necessary for the purpose of seeking any third party consent.

8.05    Post-Closing Cooperation; Further Assurances. Following the Closing, each party shall, on the request of any other party, execute such further documents, and perform such further acts, as may be reasonably necessary or appropriate to give full effect to the allocation of rights, benefits, obligations and liabilities contemplated by this Agreement and the transactions contemplated hereby.

**ARTICLE IX**
**CONDITIONS TO OBLIGATIONS**

9.01    Conditions to Obligations of All Parties. The obligations of the parties hereto to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following conditions, any one or more of which may be waived (if legally permitted) in writing by all of such parties:

(a)    *Antitrust Law Approval.* (i) All applicable waiting periods (and any extensions thereof) under the HSR Act in respect of the Transactions shall have expired or been terminated, (ii) all waiting periods (and any extensions thereof) under any Antitrust Laws in the jurisdictions listed in Schedule 9.01(a) that are required to be terminated or expired prior to the Closing shall have terminated or expired, and all approvals, clearances or authorizations under any Antitrust Laws in the jurisdictions listed in Schedule 9.01(a) required to be obtained prior to the Closing shall have been obtained, and (iii) any agreement with any Governmental Authority not to consummate the transactions contemplated hereby shall have expired or been terminated.

82

**EXHIBIT 2**
**Page 87 of 404**

(b)    *No Prohibition*. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law, judgment, decree, executive order or award which is then in effect and has the effect of making the Transactions, including the Merger, illegal or otherwise prohibiting or enjoining consummation of the Transactions, including the Merger.

(c)    *Offer Completion*. The Offer shall have been completed in accordance with the terms hereof and the Proxy Statement.

(d)    *Registration Statement*. The Registration Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC and not withdrawn.

(e)    *Acquiror Stockholder Approvals*. The Acquiror Stockholder Approvals shall have been obtained.

(f)    *Company Unitholder Approvals*. The Company Unitholder Approvals shall have been obtained.

(g)    *Acquiror Net Tangible Assets.*  Acquiror shall not have redeemed the Acquiror Class A Shares in an amount that would cause the Acquiror to have net tangible assets of less than $5,000,001.

9.02    <u>Additional Conditions to Obligations of Acquiror</u>. The obligations of Acquiror to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by Acquiror:

(a)    *Representations and Warranties*. The representations and warranties of the Company contained in <u>Section 4.01</u> (Organization, Standing and Corporate Power), <u>Section 4.02(a)</u> (Corporate Authority; Approval; Non-Contravention), <u>Section 4.07(d)</u> (Absence of Certain Changes or Events) and <u>Section 4.24</u> (Brokers) shall each be true and correct in all material respects as of the Closing Date as though made on the Closing Date, except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date. The representations and warranties of the Company contained in <u>Section 4.04</u> (Capitalization) shall be true and correct in all respects other than *de minimis* inaccuracies as of the Closing Date as though made on the Closing Date, except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all respects other than *de minimis* inaccuracies as of such earlier date. All other representations and warranties of the Company contained in this Agreement shall be true and correct (without giving any effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation set forth therein) as of the Closing Date, as though made on and as of the Closing Date, except (i) to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date and (ii) where the failure of such representations and warranties to be true and correct

EXHIBIT 2
Page 88 of 404

(whether as of the Closing Date or such earlier date), taken as a whole, does not result in a Company Material Adverse Effect.

(b)    *Agreements and Covenants*. Each of the covenants of the Company to be performed or complied with as of or prior to the Closing shall have been performed or complied with in all material respects.

(c)    *Officer's Certificate*. The Company shall have delivered to Acquiror a certificate signed by an officer of the Company, dated the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in <u>Section 9.02(a)</u> and <u>Section 9.02(b)</u> have been fulfilled.

(d)    *Ancillary Agreements*. The Company shall have delivered to Acquiror executed counterparts to all of the Ancillary Agreements to which the Company, or any Company Unitholder, is party.

(e)    *No Material Adverse Effect*. Since the date of this Agreement, there shall not have occurred any Company Material Adverse Effect.

(f)    *Debt Instruments*. The Company shall have delivered to Acquiror fully executed copies of the Fluor Payoff Letter in form and substance reasonably satisfactory to Acquiror and at least three (3) Business Days prior to the Closing Date.

9.03    <u>Additional Conditions to the Obligations of the Company</u>. The obligations of the Company to consummate the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Company:

(a)    *Representations and Warranties*. The representations and warranties of Acquiror and Merger Sub contained in <u>Section 5.01</u> (Organization, Standing and Corporate Power), <u>Section 5.02(a)</u> (Corporate Authority; Approval; Non-Contravention), <u>Section 5.09(h)(i)</u> (Absence of Certain Changes or Events) and <u>Section 5.07</u> (Brokers) shall each be true and correct in all material respects as of the Closing Date as though made on the Closing Date, except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date. The representations and warranties of Acquiror and Merger Sub contained in <u>Section 5.13</u> (Capitalization), shall be true and correct in all respects other than *de minimis* inaccuracies as of the Closing Date as though made on the Closing Date, except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all respects other than *de minimis* inaccuracies as of such earlier date. All other representations and warranties of Acquiror and Merger Sub contained in this Agreement shall be true and correct (without giving any effect to any limitation as to "materiality" or "Acquiror Material Adverse Effect" or any similar limitation set forth therein) as of the Closing Date, as though made on and as of the Closing Date, except (i) to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date and (ii) where the failure of such representations and warranties to be true and correct (whether as of the Closing Date or such earlier date), taken as a whole, does not result in an Acquiror Material Adverse Effect.

**EXHIBIT 2**
**Page 89 of 404**

(b)    *Agreements and Covenants*. Each of the covenants of Acquiror to be performed or complied with as of or prior to the Closing shall have been performed or complied with in all material respects.

(c)    *Officer's Certificate*. Acquiror shall have delivered to the Company a certificate signed by an officer of Acquiror, dated the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in <u>Section 9.03(a)</u> and <u>Section 9.03(b)</u> have been fulfilled.

(d)    *Acquiror Initial Charter*. The Acquiror shall have filed and adopted the Acquiror Charter.

(e)    *NASDAQ*. The Acquiror Common Stock to be issued in connection with the Transactions shall have been approved for listing on NASDAQ, subject only to official notice of issuance thereof and the requirement to have a sufficient number of round lot holders.

(f)    *Ancillary Agreements*. Acquiror shall have delivered to the Company executed counterparts to all of the Ancillary Agreements to which Acquiror or Sponsor is party.

(g)    *Resignations*. The directors and executive officers of Acquiror listed on <u>Schedule 9.03(g)</u> shall have been removed from their respective positions or tendered their irrevocable resignations, in each case effective as of the Effective Time.

(h)    *Company's Required Funds*. The Closing Acquiror Cash shall equal or exceed $200 million, and Acquiror shall have made arrangements for any Closing Acquiror Cash held in the Trust Account to be released from the Trust Account at the Effective Time.

## ARTICLE X
## TERMINATION/EFFECTIVENESS

10.01  <u>Termination</u>. This Agreement may be terminated, and the transactions contemplated hereby abandoned:

(a)    by mutual written consent of the Company and Acquiror;

(b)    prior to the Closing, by written notice to the Company from Acquiror if (i) there is any breach of any representation, warranty, covenant or agreement on the part of the Company set forth in this Agreement, such that any condition specified in <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> would not be satisfied at the Closing (a "<u>Terminating Company Breach</u>"), except that, if any such Terminating Company Breach is curable by the Company through the exercise of its commercially reasonable efforts, then, for a period of up to thirty (30) days (or any shorter period of the time that remains between the date Acquiror provides written notice of such violation or breach and the Termination Date) after receipt by the Company of notice from Acquiror of such breach, but only as long as the Company continues to use its commercially reasonable efforts to cure such Terminating Company Breach (the "<u>Company Cure Period</u>"), such termination shall not be effective, and such termination shall become effective only if the Terminating Company Breach is not cured within the Company Cure Period, (ii) the Closing has not occurred on or before May 20, 2022, as such date may be extended upon the mutual written consent of Company and Acquiror

(the "Termination Date"), or (iii) the consummation of the Merger is permanently enjoined or prohibited by the terms of a final, non-appealable Governmental Order or other Law; provided, that the right to terminate this Agreement under Section 10.01(b)(ii) shall not be available if either (A) Acquiror's failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before such date or (B) Acquiror is in breach of this Agreement on such date, which breach could give rise to a right of the Company to terminate this Agreement;

(c)    prior to the Closing, by written notice to Acquiror from the Company if (i) there is any breach of any representation, warranty, covenant or agreement on the part of Acquiror set forth in this Agreement, such that any condition specified in Section 9.03(a) or Section 9.03(b) would not be satisfied at the Closing (a "Terminating Acquiror Breach"), except that, if any such Terminating Acquiror Breach is curable by Acquiror through the exercise of its commercially reasonable efforts, then, for a period of up to 30 days (or any shorter period of the time that remains between the date the Company provides written notice of such violation or breach and the Termination Date) after receipt by Acquiror of notice from the Company of such breach, but only as long as Acquiror continues to use its commercially reasonable efforts to cure such Terminating Acquiror Breach (the "Acquiror Cure Period"), such termination shall not be effective, and such termination shall become effective only if the Terminating Acquiror Breach is not cured within the Acquiror Cure Period, (ii) the Closing has not occurred on or before the Termination Date, or (iii) the consummation of the Merger is permanently enjoined or prohibited by the terms of a final, non-appealable Governmental Order or other Law; provided, that the right to terminate this Agreement under Section 10.01(c)(ii) shall not be available if either (A) the Company's failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before such date or (B) the Company is in breach of this Agreement on such date, which breach could give rise to a right of Acquiror to terminate this Agreement;

(d)    by written notice from the Company to the Acquiror if Acquiror Stockholder Approval is not obtained at the Special Meeting (subject to any adjournment or recess of the meeting); or

(e)    by written notice from Acquiror to the Company if the Company Unitholder Approvals have not been obtained within 10 Business Days following the date hereof.

10.02    Effect of Termination. Except as otherwise set forth in this Section 10.02, in the event of the termination of this Agreement pursuant to Section 10.01, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party hereto or any of their respective Affiliates, officers, directors, employees or stockholders, other than liability of any party hereto for any Willful Breach of this Agreement by such party occurring prior to such termination. The provisions of Sections 6.04, 8.04, 10.02 and Article XI (collectively, the "Surviving Provisions") and the Confidentiality Agreement, and any other Section or Article of this Agreement referenced in the Surviving Provisions, to the extent required to survive in order to give appropriate effect to the Surviving Provisions, shall in each case survive any termination of this Agreement.

**EXHIBIT 2**
**Page 91 of 404**

## ARTICLE XI
## MISCELLANEOUS

11.01    Waiver. Any party to this Agreement may, at any time prior to the Closing, by action taken by its board of directors or board of managers, as applicable, or officers thereunto duly authorized, waive any of the terms or conditions of this Agreement, or agree to an amendment or modification to this Agreement in the manner contemplated by Section 11.10 and by an agreement in writing executed in the same manner (but not necessarily by the same Persons) as this Agreement.

11.02    Notices. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service or (iv) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

(a)    If to Acquiror or Merger Sub to:

Spring Valley Acquisition Corp.
2100 McKinney Ave., Suite 1675
Dallas, TX 75201
Attn:     Christopher Sorrells
E-mail:    Chris.Sorrells@sv-ac.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attn:     Adam D. Larson, P.C.
          Allan Kirk
E-mail:    Adam.Larson@kirkland.com
           Allan.Kirk@kirkland.com

(b)    If to the Company to:

NuScale Power, LLC
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attn: General Counsel
E-mail: generalcounsel@nuscalepower.com

with copies (which shall not constitute notice) to:

Fluor Enterprises, Inc.
6700 Las Colinas Blvd.

EXHIBIT 2
Page 92 of 404

Irving, TX 75039
Attention: Chief Legal Officer
E-mail:  John.Reynolds@Fluor.com

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attn:        David C. Lee
              John M. Williams III
              Evan M. D'Amico
E-mail:    DLee@GibsonDunn.com
              JWilliams@GibsonDunn.com
              EDAmico@GibsonDunn.com

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Attn:        Jason M. Brauser
              James M. Kearney
E-mail:    jason.brauser@stoel.com
              jim.kearney@stoel.com

or to such other address or addresses as the parties may from time to time designate in writing.

11.03    Assignment. No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. Any attempted assignment in violation of the terms of this Section 11.03 shall be null and void, *ab initio*.

11.04    Rights of Third Parties. Except as otherwise provided in Section 11.16, this Agreement is exclusively for the benefit of the Company, and its respective successors and permitted assigns, with respect to the obligations of Acquiror and Merger Sub under this Agreement, and for the benefit of Acquiror and Merger Sub, and their respective successors and permitted assigns, with respect to the obligations of the Company under this Agreement, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right.

11.05    Expenses. Except as otherwise provided herein (including Section 7.01(e), Section 8.03(a) and this Section 11.05), each party hereto shall bear its own expenses incurred in connection with this Agreement and the transactions herein contemplated whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that, each of the Acquiror and the Company shall bear 50% of all transfer agent fees and exchange agent fees incurred in connection with this Agreement and the Transactions herein contemplated whether or not such Transactions shall be consummated, and on the Closing Date following the Closing, (a) Acquiror shall pay or cause to be paid by wire transfer

88

EXHIBIT 2
Page 93 of 404

of immediately available funds all documented out-of-pocket fees and disbursements of the Company for outside counsel incurred in connection with the Transactions and fees and expenses of the Company for any other agents, advisors, consultants, experts and financial advisors employed by the Company incurred in connection with the Transactions (the "Outstanding Company Expenses"), and (b) Acquiror shall pay or cause to be paid by wire transfer of immediately available funds all reasonable, documented out-of-pocket fees and disbursements of Acquiror, Merger Sub, or the Sponsor for outside counsel and fees and expenses of Acquiror, Merger Sub or the Sponsor or for any other agents, advisors, consultants, experts and financial advisors employed by or on behalf of Acquiror, Merger Sub or the Sponsor incurred in connection with the Transactions (collectively, the "Outstanding Acquiror Expenses").

11.06   Governing Law. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction; provided that, the Redomicile shall be effected in accordance with both the DGCL and the CLCI, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

11.07   Captions; Counterparts. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.08   Schedules and Exhibits. The Schedules and Exhibits referenced herein are a part of this Agreement as if fully set forth herein. All references herein to Schedules and Exhibits shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Any disclosure made by a party in the Schedules with reference to any section or schedule of this Agreement shall be deemed to be a disclosure with respect to all other sections or schedules to which such disclosure may apply solely to the extent the relevance of such disclosure is reasonably apparent on the face of the disclosure in such Schedule. Certain information set forth in the Schedules is included solely for informational purposes.

11.09   Entire Agreement. This Agreement (together with the Schedules and Exhibits to this Agreement), the Ancillary Agreements executed on the date hereof and the Confidentiality Agreement constitute the entire agreement among the parties relating to the transactions contemplated hereby and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto or any of their respective Subsidiaries relating to the transactions contemplated hereby. No representations, warranties, covenants, understandings, agreements, oral or otherwise, relating to the transactions contemplated by this Agreement exist between the parties except as expressly set forth or referenced in this Agreement and the Confidentiality Agreement.

11.10   Amendments. This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement (but not necessarily by the same natural persons who executed this Agreement) and which makes

reference to this Agreement. The approval of this Agreement by the equityholders of any of the parties shall not restrict the ability of the board of directors or managers of any of the parties to terminate this Agreement in accordance with <u>Section 10.01</u> or to cause such party to enter into an amendment to this Agreement pursuant to this <u>Section 11.10</u>.

11.11    <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

11.12    <u>Jurisdiction; WAIVER OF TRIAL BY JURY</u>. Any Action based upon, arising out of or related to this Agreement, or the transactions contemplated hereby, shall be brought in the Court of Chancery of the State of Delaware (the "<u>Court of Chancery</u>") and any state appellate court therefrom or, if the Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court located in the State of Delaware, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of the Action shall be heard and determined only in any such court, and agrees not to bring any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court; <u>provided</u> that the courts of the Cayman Islands shall have jurisdiction over the Redomicile to the extent required by the CLCI. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law, or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action brought pursuant to this <u>Section 11.12</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS IN THIS <u>SECTION 11.12</u>.

11.13    <u>Enforcement</u>. The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties do not perform their obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions. The parties acknowledge

90

**EXHIBIT 2**
**Page 95 of 404**

and agree that (a) the parties shall be entitled to an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, without proof of damages, prior to the valid termination of this Agreement in accordance with <u>Section 10.01</u>, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties would have entered into this Agreement. Each party agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The parties acknowledge and agree that any party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 11.13</u> shall not be required to provide any bond or other security in connection with any such injunction.

11.14   <u>Non-Recourse</u>. This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as parties hereto, and then only with respect to the specific obligations set forth herein with respect to such party. Except to the extent a named party to this Agreement (and then only to the extent of the specific obligations undertaken by such named party in this Agreement), (a) no past, present or future director, manager, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or Representative or Affiliate of any named party to this Agreement and (b) no past, present or future director, manager, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or Representative or Affiliate of any of the foregoing shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of the Company, Acquiror or Merger Sub under this Agreement of or for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby.

11.15   <u>Non-survival of Representations, Warranties and Covenants</u>. None of the representations, warranties, covenants, obligations or other agreements in this Agreement or in any certificate, statement or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants, obligations, agreements and other provisions, shall survive the Closing and shall terminate and expire upon the occurrence of the Closing (and there shall be no liability after the Effective Time in respect thereof), except for (a) those covenants and agreements contained herein that by their terms expressly apply in whole or in part after the Closing and then only with respect to any breaches occurring after the Closing and (b) this <u>Article XI</u>.

11.16   <u>Acknowledgements</u>. Each of the parties acknowledges and agrees (on its own behalf and on behalf of its respective Affiliates and its and their respective Representatives) that: (a) it has conducted its own independent investigation of the financial condition, results of operations, assets, liabilities, properties and projected operations of the other parties (and their respective Subsidiaries) and has been afforded satisfactory access to the books and records, facilities and personnel of the other parties (and their respective Subsidiaries) for purposes of conducting such investigation; (b) the Company Representations constitute the sole and exclusive

91

**EXHIBIT 2**
**Page 96 of 404**

representations and warranties of the Company in connection with the transactions contemplated hereby; (c) the Acquiror and Merger Sub Representations constitute the sole and exclusive representations and warranties of Acquiror and Merger Sub; (d) except for the Company Representations by the Company and the Acquiror and Merger Sub Representations by each of Acquiror and Merger Sub, respectively, none of the parties hereto or any other Person makes, or has made, any other express or implied representation or warranty with respect to any party hereto (or any party's Affiliates) or the transactions contemplated by this Agreement and all other representations and warranties of any kind or nature expressed or implied (including (i) regarding the completeness or accuracy of, or any omission to state or to disclose, any information, including in the estimates, projections or forecasts or any other information, document or material provided to or made available to any party hereto or their respective Affiliates or Representatives in certain "data rooms," management presentations or in any other form in expectation of the Transactions, including meetings, calls or correspondence with management of any party hereto (or any party's Subsidiaries), and (ii) any relating to the future or historical business, condition (financial or otherwise), results of operations, prospects, assets or liabilities of any party hereto (or its Subsidiaries), or the quality, quantity or condition of any party's or its Subsidiaries' assets) are specifically disclaimed by all parties hereto and their respective Subsidiaries and all other Persons (including the Representatives and Affiliates of any party hereto or its Subsidiaries); and (e) each party hereto and its respective Affiliates are not relying on any representations and warranties in connection with the Transactions except the Company Representations by the Company, the Acquiror and Merger Sub Representations by each of Acquiror and Merger Sub and the other representations expressly made by a Person in the Ancillary Agreements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT 2**
**Page 97 of 404**

IN WITNESS WHEREOF, Acquiror, Merger Sub and the Company have caused this Agreement to be executed and delivered as of the date first written above by their respective officers thereunto duly authorized.

SPRING VALLEY ACQUISITION CORP.

By: _____

Name:  Christopher Sorrells
Title:   Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

EXHIBIT 2
Page 98 of 404

**SPRING VALLEY MERGER SUB, LLC**
By: Spring Valley Acquisition Corp., its sole
    member

By: _____

Name:  Christopher Sorrells
Title:   Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

**EXHIBIT 2**
**Page 99 of 404**

**NuScale Power, LLC**

By: _____

    Name:  John Hopkins
    Title:   Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

**EXHIBIT 2**
**Page 100 of 404**

**Exhibit A**                                                                    *FINAL FORM*

SUBSCRIPTION AGREEMENT

Spring Valley Acquisition Corp.
2100 McKinney Ave., Suite 1675
Dallas, TX 75201

Ladies and Gentlemen:

This Subscription Agreement (this "Subscription Agreement") is being entered into as of the date set forth on the signature page hereto, by and between Spring Valley Acquisition Corp., a Cayman Islands exempted company ("SVAC"), and the undersigned subscriber (the "Investor"), in connection with that certain Agreement and Plan of Merger, dated as of the date hereof (as may be amended, supplemented or otherwise modified from time to time, the "Transaction Agreement"), by and among SVAC, Spring Valley Merger Sub, Inc., a Delaware corporation ("Merger Sub"), and NuScale Power, LLC, an Oregon limited liability company (the "Company"), pursuant to which, among other things, SVAC shall, subject to obtaining stockholder approval (i) domesticate as a corporation in the State of Delaware (the "Redomicile"), (ii) adopt an amended and restated certificate of incorporation (the "A&R Charter"), and (iii) Merger Sub will merge with and into the Company (the "Merger"), with the Company surviving as the surviving company in the Merger and, after giving effect to such Merger, will become a wholly-controlled subsidiary of SVAC, on the terms and subject to the conditions set forth in the Transaction Agreement (the transactions contemplated by the Transaction Agreement, including the Merger, the "Transaction"). In connection with the Transaction, SVAC is seeking commitments from interested investors to purchase, contingent upon, and substantially concurrently with the closing of the Transaction (the "Transaction Closing"), shares of SVAC's Class A common stock, par value $0.0001 per share (in the form converted as part of the Redomicile, the "Shares"), in a private placement for a purchase price of $10.00 per Share (the "Per Share Purchase Price"). On or about or after the date of this Subscription Agreement, SVAC is entering into subscription agreements (the "Other Subscription Agreements," and together with this Subscription Agreement, collectively, the "Subscription Agreements") with certain other investors (the "Other Investors," and together with the Investor, collectively, the "Investors"), pursuant to which the Investors, severally and not jointly, have agreed to purchase, contingent upon, and substantially concurrently with the Transaction Closing, inclusive of the Shares subscribed for by the Investor under this Subscription Agreement, an aggregate amount of up to 20,000,000 Shares. The aggregate purchase price to be paid by the Investor for the subscribed Shares (as set forth on the signature page hereto) is referred to herein as the "Subscription Amount."

In connection therewith, and in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, set forth herein, and intending to be legally bound hereby, each of the Investor and SVAC acknowledges and agrees as follows:

1.    Subscription.    The Investor hereby irrevocably subscribes for and agrees to purchase from SVAC, and SVAC agrees to issue and sell to the Investor, the number of Shares set forth on the signature page of this Subscription Agreement on the terms and subject to the conditions provided for in this Subscription Agreement. Notwithstanding the foregoing or

KE 81329791

**EXHIBIT 2**
**Page 101 of 404**

anything to the contrary in Section 9 below, in the event that the Closing Date (as defined below) shall not have occurred by the Outside Date (as defined below) this Subscription Agreement shall be void and of no further effect and any monies paid by the Investor to SVAC in connection herewith shall immediately be returned to the Investor in the same manner and terms and conditions set forth under Section 2 below for the return of the Subscription Amount.

2.      Closing.  The closing of the sale of the Shares contemplated hereby (the "Closing") shall occur on the date of, and substantially concurrently with and conditioned upon, the Transaction Closing.  Upon (a) satisfaction or waiver of the conditions set forth in Section 3 below and (b) delivery of written notice from (or on behalf of) SVAC to the Investor (the "Closing Notice") that SVAC reasonably expects all conditions to the Transaction Closing to be satisfied or waived on a date that is not less than five (5) business days from the date on which the Closing Notice is delivered to the Investor, the Investor shall deliver to SVAC, two (2) business days prior to the closing date specified in the Closing Notice (the "Closing Date"), the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account(s) specified by SVAC in the Closing Notice (which such funds shall be held in escrow by SVAC until Closing).  On the Closing Date, SVAC shall issue the number of Shares to the Investor set forth on the signature page to this Subscription Agreement and subsequently cause such Shares to be registered in book entry form in the name of the Investor (or its nominee) or as otherwise directed by the Investor, free and clear of any liens or other restrictions (other than those arising under state or federal securities laws) on SVAC's share register and (ii) provide to Investor evidence of the issuance of such Shares to the Investor from SVAC's transfer agent (the "Transfer Agent"); *provided*, *however*, that SVAC's obligation to issue the Shares to the Investor is contingent upon SVAC having received the Subscription Amount in full accordance with this Section 2.  If the Closing does not occur within three (3) business days following the Closing Date specified in the Closing Notice, SVAC shall promptly (but not later than one (1) business day thereafter or such later date as shall be agreed in writing by the Investor) return by wire transfer of United States dollars in immediately available funds to the account specified by the Investor the Subscription Amount in full to the Investor, without any deduction or penalty of any kind, for or on account of any tax, withholding, charges, set-off or otherwise, to the Investor by wire transfer of U.S. dollars in immediately available funds to the account designated by the Investor; *provided*, that unless this Subscription Agreement has been terminated pursuant to Section 9 hereof, such return of funds shall not terminate this Subscription Agreement or relieve the Investor of its obligations to purchase the Shares at the Closing in the event SVAC delivers a subsequent Closing Notice in accordance with this Section 2.  For purposes of this Subscription Agreement, "business day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to be closed for business.  Each book entry for the Shares shall contain a legend in substantially the following form:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE HOLDER WILL NOTIFY ANY SUBSEQUENT PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

**EXHIBIT 2**
**Page 102 of 404**

3.    <u>Closing Conditions</u>.

a.    The obligations of the parties hereto to consummate the purchase and sale of the Shares pursuant to this Subscription Agreement are subject to the satisfaction or waiver in writing of each of the following conditions:

(i)    no suspension or removal from listing of the Shares on NASDAQ (as defined below), and no initiation or threatening of any proceedings for any of such purposes or delisting, shall have occurred, and the Shares shall be approved for listing on NASDAQ, subject to official notice of issuance;

(ii)    no applicable governmental authority shall have enacted, issued, promulgated, enforced or entered any law, judgment, decree, order, award, rule or regulation (whether temporary, preliminary, or permanent) which is then in effect and has the effect of making consummation of the transactions contemplated hereby illegal or otherwise prohibiting or enjoining consummation of the transactions contemplated hereby, and no governmental authority shall have instituted or threatened in writing a proceeding seeking to impose any such illegality, prohibition or enjoinment; and

(iii)    all conditions precedent to the closing of the Transaction set forth in the Transaction Agreement, and including the approval of SVAC stockholders shall have been satisfied (as determined by the parties to the Transaction Agreement and other than those conditions under the Transaction Agreement which, by their nature, are to be fulfilled at the Transaction Closing, including to the extent that any such condition is dependent upon the consummation of the purchase and sale of the Shares pursuant to this Subscription Agreement) or waived and the Transaction Closing shall be scheduled to occur substantially concurrently with or immediately following the Closing.

b.    The obligation of SVAC to consummate the issuance and sale of the Shares pursuant to this Subscription Agreement shall be subject to satisfaction or waiver in writing of each of the following conditions:

(i)    that all representations and warranties of the Investor contained in this Subscription Agreement are true and correct in all material respects at and as of the Closing Date (unless made as of a specified date in which case they shall be true and correct in all material respects as of such date), and consummation of the Closing shall constitute a reaffirmation by the Investor of each of the representations and warranties of the Investor contained in this Subscription Agreement at and as of the Closing Date; and

(ii)    Investor shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to the Closing, except where the failure of such performance, satisfaction or compliance would not or would not be reasonably likely to prevent, materially delay, or materially impair the ability of Investor to consummate the Closing.

3

**EXHIBIT 2**
**Page 103 of 404**

c.    The obligation of the Investor to consummate the purchase of the Shares pursuant to this Subscription Agreement shall be subject to the satisfaction or waiver in writing of each of the following conditions:

(i)    that all representations and warranties of SVAC contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect (as defined below) or any similar limitation contained therein, which representations and warranties shall be true in all respects) at and as of the Closing Date, and consummation of the Closing shall constitute a reaffirmation by SVAC of each of the representations and warranties of SVAC contained in this Subscription Agreement at and as of the Closing Date;

(ii)    SVAC shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to the Closing;

(iii)    the subscriptions contemplated by the Other Subscription Agreements executed by the Other Investors shall have been or will be consummated substantially concurrently with the Closing and there shall have been no amendment, waiver or modification to the Other Subscription Agreements that materially economically benefits the Other Investors unless the Investor has been offered substantially the same benefits;

(iv)    no suspension or the offering or sale of the Shares shall have been initiated or, to SVAC's knowledge, threatened by the Securities and Exchange Commission (the "SEC"); and

(v)    no amendment or modification of, or waiver under, the Transaction Agreement (as in effect on the date hereof, a copy of which SVAC has furnished to the Investor) shall have occurred that would reasonably be expected to materially and adversely affect the economic benefits to Investor under this Subscription Agreement without having received Investor's prior written consent (which consent is not to be unreasonably withheld, conditioned or delayed), provided that, for the avoidance of doubt, the waiver of any condition to closing under the Transaction Agreement shall not require the prior written consent of any Investor.

4.    <u>Further Assurances</u>.  At or prior to the Closing, each of SVAC and the Investor shall execute and deliver such additional documents and take such additional actions as the parties reasonably may deem to be practical and necessary in order to consummate the subscription as contemplated by this Subscription Agreement.  Prior to or at the Closing, the Investor shall deliver to SVAC a duly complete and executed Internal Revenue Service Form W-9 or appropriate Form W-8, as applicable.

5.    <u>SVAC Representations and Warranties</u>.  SVAC represents and warrants to the Investor and the Placement Agents (as defined below) that:

**EXHIBIT 2**
**Page 104 of 404**

a.      SVAC is an exempted company duly incorporated, validly existing and in good standing under the laws of the Cayman Islands.  SVAC has all corporate power and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.  As of the Closing Date immediately following the Redomicile, SVAC will (i) be duly incorporated, validly existing and in good standing under the laws of the State of Delaware and (ii) have all corporate power and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

b.      As of the Closing Date, the Shares will be duly authorized by SVAC and, when issued and delivered to the Investor against full payment therefor in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable, free and clear of any liens or other restrictions (other than those arising under state or federal securities laws), and will not have been issued in violation of or subject to any preemptive or similar rights created under the A&R Charter or bylaws of SVAC (each as amended to the Closing Date) or under the General Corporation Law of the State of Delaware.  Immediately after giving effect to the Closing, the Investor shall have received all right and title to, and interests in, the Shares to be purchased pursuant to this Subscription Agreement, free and clear of all liens (other than those arising under this Subscription Agreement or state or federal securities laws).

c.      This Subscription Agreement and the Transaction Agreement (collectively, the "Transaction Documents") have been duly authorized, executed and delivered by SVAC and, assuming that the Transaction Documents constitute the valid and binding agreements of the other parties thereto, the Transaction Documents are valid and binding obligations of SVAC, enforceable against SVAC in accordance with their respective terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

d.      The execution, delivery and the performance by SVAC of this Subscription Agreement and the other Transaction Documents, including the issuance and sale of the Shares and the compliance by SVAC with all of the provisions of this Subscription Agreement and the consummation of the transactions contemplated herein and therein, will (i) be substantially done in accordance with the rules of The Nasdaq Capital Market ( "NASDAQ") and (ii) not (A) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of SVAC or any of its subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which SVAC or any of its subsidiaries is a party or by which SVAC or any of its subsidiaries is bound or to which any of the property or assets of SVAC is subject that would (i) reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, financial condition, stockholders' equity or results of operations of SVAC and its subsidiaries, taken as a whole, (ii) affect the validity of the Shares or (iii) prevent or materially impair the ability of SVAC to (x) comply in all material respects with the terms of this Subscription Agreement or (y) consummate the transactions contemplated by the Transaction Documents (each of (i), (ii) and (iii) constituting a "Material Adverse Effect"); (B) result in any violation of the provisions of the organizational documents of SVAC or any of its subsidiaries; or (C) result in any violation of any statute or any

5

EXHIBIT 2
Page 105 of 404

judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over SVAC or any of its subsidiaries or any of their respective properties that would reasonably be expected to have a Material Adverse Effect.

      e.    As of their respective filing dates, each report (collectively, the "SEC Reports") required to be filed by SVAC with the SEC complied in all material respects with the applicable requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the SEC promulgated thereunder, and were timely filed. None of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Except as disclosed in the SEC Reports filed prior to the date hereof, the financial statements of SVAC included in the SEC Reports complied, as of the respective filing dates of such SEC Reports, in all material respects with applicable accounting requirements and rules and regulations of the SEC with respect thereto as in effect as of the applicable filing date and fairly present in all material respects the financial position of SVAC as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. There are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the SEC with respect to any of the SEC Reports.

      f.    Other than the Other Subscription Agreements, the Transaction Agreement and any other agreement contemplated by the Transaction Agreement, SVAC has not entered into any side letter or similar agreement with any Other Investor in connection with such Other Investor's direct or indirect investment in SVAC. Except for the Other Subscription Agreement with Samsung C&T Corporation, no Other Subscription Agreement includes terms or conditions that are materially more advantageous to such Other Investor than the Investor hereunder (other than terms particular to the legal or regulatory requirements of such Other Investor or its affiliates, related persons or related funds that are mutual funds or are otherwise subject to regulations related to the timing of funding and the issuance of the related Shares).

      g.    As of the date of this Subscription Agreement, the authorized capital stock of SVAC consists of 1,000,000 preference shares, par value $0.0001 per share ("Preferred Shares") and 330,000,000 shares of common stock, par value $0.0001 per share, including (i) 300,000,000 shares of Class A ordinary shares ("Class A Shares") and (ii) 30,000,000 Class B ordinary shares (the "Class B Shares"). As of the date of this Subscription Agreement, (i) no Preferred Shares are issued and outstanding, (ii) 23,000,000 Class A Shares are issued and outstanding, (iii) 5,750,000 Class B Shares are issued and outstanding, and (iv) 11,500,000 redeemable warrants and 8,900,000 private placement warrants to acquire Class A Shares are outstanding. All (A) issued and outstanding Class A Shares and Class B Shares have been duly authorized and validly issued, are fully paid and are non-assessable and are not subject to preemptive rights, and (B) outstanding warrants have been duly authorized and validly issued, are fully paid and are not subject to preemptive rights. Except as set forth above in this Subscription Agreement and pursuant to the Other Subscription Agreements, the Transaction Agreement and the other agreements and arrangements referred to therein or in the SEC Reports, as of the date hereof, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from SVAC any Class A Shares, Class B Shares or other equity interests in SVAC, or securities convertible into or

6

**EXHIBIT 2**
**Page 106 of 404**

exchangeable or exercisable for such equity interests.  As of the date hereof, SVAC has no subsidiaries, other than Merger Sub, and does not own, directly or indirectly, interests or investments (whether equity or debt) in any person, whether incorporated or unincorporated. There are, as of the date hereof, no stockholder agreements, voting trusts or other agreements or understandings to which SVAC is a party or by which it is bound relating to the voting of any securities of SVAC, other than (1) as set forth in the SEC Reports and (2) as contemplated by the Transaction Agreement.  There are no securities or instruments issued by or to which SVAC is a party containing anti-dilution or similar provisions that will be triggered by the issuance of the Shares, except that have not been or will not be validly waived on or prior to the Closing Date.

   h. The issued and outstanding Class A Shares are registered pursuant to Section 12(b) of the Exchange Act, and the Class A Shares are, and the Shares will be, listed for trading on NASDAQ.  There is no suit, action, proceeding or investigation pending or, to the knowledge of SVAC, threatened against SVAC by NASDAQ or the SEC, respectively, to deregister the Class A Shares or to prohibit or terminate the listing of the Class A Shares.  SVAC has taken no action that is designed to terminate the listing of the Class A Shares on NASDAQ or the registration of the Class A Shares under the Exchange Act, other than as contemplated by the Redomicile.

   i. Assuming the accuracy of the Investor's representations and warranties set forth in Section 6, no registration under the Securities Act is required for the offer and sale of the Shares by SVAC to the Investor in the manner contemplated by this Subscription Agreement.  The Shares (i) were not offered by a form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act or any state securities laws.

   j. Except for such matters as have not had or would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect, there is no (i) investigation, action, suit, claim or other proceeding, in each case by or before any governmental authority pending, or, to the knowledge of SVAC, threatened against SVAC or (ii) judgment, decree, injunction, ruling or order of any governmental entity or arbitrator outstanding against SVAC. The aggregate of all pending legal or governmental proceedings to which SVAC is a party to or of which any of its property or assets is the subject of that are not described in the SEC Reports, including ordinary routine litigation incidental to the business, would not reasonably be expected to result in a Material Adverse Effect.

   k. Other than Guggenheim Securities, LLC or any of its affiliates ("Guggenheim") or Cowen and Company, LLC or any of its affiliates ("Cowen", and together with Guggenheim, collectively, the "Placement Agents" and each a "Placement Agent"), SVAC has not entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other person to any broker's or finder's fee or any other commission or similar fee in connection with the transactions contemplated by this Subscription Agreement for which the Investor could become liable.

   l. SVAC is not, and immediately after receipt of payment for the Shares, will not be (i), an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "1940 Act"), or a company "controlled" by an "investment company" within the

7

**EXHIBIT 2**
**Page 107 of 404**

meaning of the 1940 Act, as amended, and as such subject to registration as an "investment company" under the 1940 Act or (ii) a "business development company" (as defined in Section 2(a)(48) of the 1940 Act.

m.    As of the date hereof, SVAC is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of (i) the organizational documents of SVAC, (ii) any loan or credit agreement, guarantee, note, bond, mortgage, indenture, lease or other agreement, permit, franchise or license to which, as of the date of this Subscription Agreement, SVAC is a party or by which SVAC's properties or assets are bound or (iii) any statute or any judgment, order, rule or regulation of any court or governmental agency, taxing authority or regulatory body, domestic or foreign, having jurisdiction over SVAC or any of its properties, except, in the case of clauses (ii) and (iii), for defaults or violations that would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

n.    SVAC is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority, self-regulatory organization or other person in connection with the execution, delivery and performance by SVAC of this Subscription Agreement (including, without limitation, the issuance of the Shares), other than (i) filings with the SEC, (ii) filings required by applicable state securities laws, (iii) filings required in accordance with Section 8 of this Subscription Agreement; (iv) those required by NASDAQ, including with respect to obtaining approval of SVAC's stockholders; and (vi) any filing, the failure of which to obtain would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

o.    SVAC is in compliance with all applicable laws and has not received any written communication from a governmental entity that alleges that SVAC is not in compliance with or is in default or violation of any applicable law, except where such non-compliance, default or violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

p.    Neither SVAC nor any of its subsidiaries has taken any steps to seek protection pursuant to any law or statute relating to bankruptcy, insolvency, reorganization, receivership, liquidation, administration or winding up or failed to pay its debts when due, nor does SVAC or any subsidiary have any knowledge or reason to believe that any of their respective creditors intend to initiate involuntary bankruptcy proceedings or seek to commence an administration.

q.    As of the date hereof, there are no pending or, to the knowledge of SVAC, threatened, suits, claim, actions, investigation, arbitration, review or inquiry or proceedings (collectively, "Actions"), which, if determined adversely, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

r.    Each of SVAC, Merger Sub, any of their respective directors and officers and, any of SVAC's and Merger Sub's and its affiliate's employees, representatives, agents and any person acting on its or their behalf is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office

8

**EXHIBIT 2**
**Page 108 of 404**

of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) owned, directly or indirectly, or controlled by, or acting on behalf of, a person, that is named on an OFAC List; (iii) organized, incorporated, established, located, resident or born in, or a citizen, national, or the government, including any political subdivision, agency, or instrumentality thereof, of, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, or any other country or territory embargoed or subject to substantial trade restrictions by the United States or (iv) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515.

s.      Each of SVAC, Merger Sub, any of their respective directors and officers and any of their respective directors and officers and any of SVAC's and Merger Sub's and its affiliate's employees, representatives, agents and any person acting on its or their behalf has not engaged in any activity or conduct which would violate any applicable anti-bribery, anti-corruption or anti-money laundering laws, regulations or rules in any applicable jurisdiction (including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended), (ii) SVAC and Merger Sub have instituted and maintain systems, policies and procedures designed to prevent violation of such laws, regulations and rules, and (iii) no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator having jurisdiction over SVAC or Merger Sub with respect to such laws, regulations and rules is pending and, to SVAC's knowledge, no such actions, suits or proceedings are threatened or contemplated.

t.      As of the date hereof, to the knowledge of SVAC, none of the documents or written information provided to the Investor or any of its advisors or representatives or by or on behalf of SVAC and its affiliates in connection with the transactions contemplated by this Subscription Agreement, (i) contains any untrue statement of a material fact or omits to state a material fact necessary, in each case relating to SVAC and its affiliates, in order to make the statements contained therein not misleading in light of the circumstances under which they were made and (ii) the financial projections relating to SVAC or any affiliate, if any, delivered to the Investor or its advisors or representatives are made in good faith and are based upon reasonable assumptions, and SVAC is not aware of any fact or set of circumstances that would lead it to believe that such projections are incorrect or misleading in any material respect. For the avoidance of doubt, Company and its affiliates are not affiliates of SVAC as of the date hereof.

u.      The Investor's purchase of the Shares shall not result in the Investor holding securities of SVAC at the time of Closing representing more than 10% of (i) the votes attaching to the outstanding voting securities of SVAC or (ii) the outstanding equity securities of SVAC.

6.      <u>Investor Representations and Warranties</u>.  The Investor represents and warrants to SVAC and the Placement Agents that:

a.      The Investor, or each of the funds managed by or affiliated with the Investor for which the Investor is acting as nominee, as applicable, (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act ("Rule 144A")), or an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act), in each case, satisfying the applicable requirements set forth on <u>Schedule A</u>, (ii) is acquiring the Shares only for his, her or its own account and not for the account of others, or if the Investor is subscribing for the Shares as a

9

**EXHIBIT 2**
**Page 109 of 404**

fiduciary or agent for one or more investor accounts, the Investor has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each owner of each such account, and (iii) is not acquiring the Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act (and shall provide the requested information set forth on Schedule A).  The Investor acknowledges that this offering of the Shares meets the exemptions from filing under FINRA Rule 5123.  The Investor is not an entity formed for the specific purpose of acquiring the Shares, unless such newly formed entity is an entity in which all of the equity owners are "accredited investors" (within the meaning of Rule 501(a) under the Securities Act).

       b.      The Investor acknowledges that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares have not been registered under the Securities Act.  The Investor acknowledges and agrees that the Shares may not be offered, resold, transferred or otherwise disposed of by the Investor absent an effective registration statement under the Securities Act except (i) to SVAC or a subsidiary thereof, (ii) to non-U.S. persons pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act or (iii) pursuant to another applicable exemption from the registration requirements of the Securities Act, and in each of clauses (i) and (iii) in accordance with any applicable securities laws of the states and other jurisdictions of the United States, and that any book entry positions representing the Shares shall contain a restrictive legend to such effect (*provided*, that such legend shall be subject to removal in accordance with Section 8(c)) and, as a result, the Investor may not be able to readily resell the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time.  The Investor acknowledges and agrees that the Shares may not immediately be eligible for resale pursuant to Rule 144.  The Investor acknowledges that it has been advised to consult legal counsel prior to making any offer, resale, transfer, pledge or other disposition of any of the Shares. Nothing contained herein shall be deemed a representation or warranty by such Investor to hold the Shares for any period of time.

       c.      The Investor acknowledges and agrees that the Investor is purchasing the Shares from SVAC.  The Investor further acknowledges that there have been no representations, warranties, covenants and agreements made to the Investor by or on behalf of SVAC, the Company, any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing or any other person or entity, expressly or by implication, other than those representations, warranties, covenants and agreements of SVAC expressly set forth in Section 5.

       d.      The Investor is not, and is not acting on behalf of, (i) an "employee benefit plan" subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) an individual retirement account or annuity or other "plan" that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) any entity or account that is deemed under the Department of Labor regulation codified at 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, to include the "plan assets" of any "employee benefit plan" subject to ERISA or "plan" subject to Code §4975, or (iv) any other plan subject to non-U.S., state, local or other federal laws or regulations that are substantially similar to the foregoing provisions of ERISA or the Code.

**EXHIBIT 2**
**Page 110 of 404**

e.     The Investor acknowledges and agrees that the Investor has received such information as the Investor deems necessary in order to make an investment decision with respect to the Shares, including, with respect to SVAC, the Transaction and the business of the Company and its subsidiaries.  Without limiting the generality of the foregoing, the Investor acknowledges that the Investor has had an opportunity to review the SEC Reports.  The Investor acknowledges and agrees that the Investor and the Investor's professional advisor(s), if any, have had the opportunity to ask such questions, receive such answers and obtain such information as the Investor and such Investor's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares.

f.     The Investor became aware of this offering of the Shares solely by means of direct contact between the Investor and SVAC, the Company or a representative of SVAC or the Company, and the Shares were offered to the Investor solely by direct contact between the Investor and SVAC, the Company or a representative of SVAC or the Company.  The Investor did not become aware of this offering of the Shares, nor were the Shares offered to the Investor, by any other means.  The Investor acknowledges that the Shares (i) were not offered to the Investor by a form of general solicitation or general advertising and (ii) to the Investor's knowledge, are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act or any state securities laws.  The Investor acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, SVAC, the Company, the Placement Agents, any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the representations and warranties of SVAC contained in Section 5 of this Subscription Agreement, in making its investment or decision to invest in SVAC.

g.     The Investor acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in the SEC Reports. The Investor is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and the Investor has sought such accounting, legal and tax advice as the Investor has considered necessary to make an informed investment decision.  The Investor (i) will not look to the Placement Agents for all or part of any such loss or losses the Investor may suffer, is able to sustain a complete loss on its investment in the Shares and (ii) acknowledges that the Investor shall be responsible for any of the Investor's tax liabilities that may arise as a result of the transactions contemplated by this Subscription Agreement, and that neither SVAC nor the Company has provided any tax advice or any other representation or guarantee regarding the tax consequences of the transactions contemplated by this Subscription Agreement.

h.     Alone, or together with any professional advisor(s), the Investor has analyzed and considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for the Investor and that the Investor is able at this time and in the foreseeable future to bear the economic risk of a total loss of the Investor's investment in SVAC. The Investor acknowledges specifically that a possibility of total loss exists.

i.     In making its decision to purchase the Shares, the Investor has relied solely upon independent investigation made by the Investor, the SEC Reports and SVAC's

EXHIBIT 2
Page 111 of 404

representations and warranties in <u>Section 5</u>.  Without limiting the generality of the foregoing, the Investor has not relied on any statements or other information provided by or on behalf of the Placement Agents or any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing concerning SVAC, the Company, the Transaction, the Transaction Agreement, this Subscription Agreement or the transactions contemplated hereby or thereby, the Shares or the offer and sale of the Shares.

j.      The Investor acknowledges that the Placement Agents:  (i) have not provided the Investor with any information or advice with respect to the Shares, (ii) have not made or make any representation, express or implied as to SVAC, the Company, the Company's credit quality, the Shares or the Investor's purchase of the Shares, (iii) have not acted as the Investor's financial advisor or fiduciary in connection with the issue and purchase of Shares, (iv) may have acquired, or during the term of the Shares may acquire, non-public information with respect to the Company, which, subject to the requirements of applicable law, the Investor agrees need not be provided to it, and (v) may have existing or future business relationships with SVAC and the Company (including, but not limited to, lending, depository, risk management, advisory and banking relationships) and will pursue actions and take steps that it deems or they deem necessary or appropriate to protect its or their interests arising therefrom without regard to the consequences for a holder of Shares, and that certain of these actions may have material and adverse consequences for a holder of Shares.

k.      The Investor acknowledges and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Shares or made any findings or determination as to the fairness of this investment.

l.      The Investor, if not an individual, has been duly formed or incorporated and is validly existing and is in good standing under the laws of its jurisdiction of formation or incorporation, with power and authority to enter into, deliver and perform its obligations under this Subscription Agreement.

m.      The execution, delivery and performance by the Investor of this Subscription Agreement are within the powers of the Investor, have been duly authorized and will not (i) constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Investor is a party or by which the Investor is bound, except for such breaches, defaults or conflicts that would not reasonably be expected to have a material adverse effect on the ability of the Investor to enter into and timely perform its obligations under this Subscription Agreement and, (ii) if the Investor is not an individual, will not violate any provisions of the Investor's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable.  The signature on this Subscription Agreement is genuine, and the signatory, if the Investor is an individual, has legal competence and capacity to execute the same or, if the Investor is not an individual, the signatory has been duly authorized to execute the same, and, assuming that this Subscription Agreement constitutes the valid and binding obligation of SVAC, this Subscription Agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or

12

**EXHIBIT 2**
**Page 112 of 404**

other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

n.     The Investor is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the OFAC or in any OFAC List, or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank (each, a "Prohibited Investor").  The Investor agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, *provided* that the Investor is permitted to do so under applicable law.  If the Investor is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.) (the "BSA"), as amended by the USA PATRIOT Act of 2001 (the "PATRIOT Act"), and its implementing regulations (collectively, the "BSA/PATRIOT Act"), the Investor maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act.  To the extent required by applicable law, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List.  To the extent required by applicable law, the Investor maintains policies and procedures reasonably designed to ensure that the funds held by the Investor and used to purchase the Shares were legally derived and were not obtained, directly or indirectly, from a Prohibited Investor.

o.     The Investor acknowledges and agrees that it has been informed that no disclosure or offering document has been prepared by any Placement Agent in connection with the offer and sale of the Shares.

p.     The Investor acknowledges that neither the Placement Agents, any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing have made any independent investigation with respect to SVAC, the Company or its subsidiaries or any of their respective businesses, or the Shares or the accuracy, completeness or adequacy of any information supplied to the Investor by SVAC.

q.     At the Closing, the Investor will have sufficient funds to pay the Subscription Amount and consummate the purchase and sale of the Shares pursuant to this Subscription Agreement.

r.     Neither the due diligence investigation conducted by the Investor in connection with making its decision to acquire the Shares nor any representations or warranties made by the Investor in this Subscription Agreement shall modify, amend or affect the Investor's right to rely on the truth, accuracy and completeness of SVAC's representations and warranties contained in this Subscription Agreement, subject to the terms hereof.

s.     The Investor acknowledges and agrees that the Placement Agents are not making a recommendation to Investor to participate in the offer and sale of the Shares, and nothing set forth in any disclosure or documents that may be provided to Investor from time to time is intended to suggest that the Placement Agents are making such a recommendation.

EXHIBIT 2
Page 113 of 404

t.    The Investor hereby acknowledges and agrees that, from the date of this Subscription Agreement, that it will not, nor will any person acting at the Investor's direction or pursuant to any understanding with the Investor, engage in any Short Sales with respect to securities of SVAC prior to the Closing (or the termination of this Subscription Agreement, if earlier).  "Short Sales" shall include, without limitation, all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act.  Notwithstanding the foregoing, (i) nothing herein shall prohibit other entities under common management with the Investor that have no knowledge of this Subscription Agreement or of the Investor's participation in the subscription (including the Investor's controlled affiliates and/or affiliates) from entering into any short sales; (ii) in the case of an Investor that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Investor's assets and the portfolio managers have no knowledge of the investment decisions made by the portfolio managers managing other portions of such Investor's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Shares covered by this Subscription Agreement; and (iii) nothing herein shall prohibit the Investor from engaging in derivative transactions of any kind, including, but not limited to, forward sale contracts, options, puts, calls, swaps and similar arrangements (including on a total return basis), and sales and other transactions through U.S. broker dealers or non-U.S. broker dealers or foreign regulated brokers.

7.    <u>Committee on Foreign Investment in the United States</u>.  The parties agree that the Transaction shall not afford the Investors, directly or indirectly, (i) any access, rights, or involvement, as described in 31 C.F.R. § 800.211(b), with respect to SVAC, Merger Sub, or the Company, or (ii) "control," as defined at 31 C.F.R. § 800.208, of SVAC, Merger Sub, or the Company.

8.    <u>Registration Rights</u>.

a.    SVAC agrees that, as soon as practicable (but in any case no later than thirty (30) calendar days after the consummation of the Transaction (the "<u>Filing Date</u>")), it shall file with the SEC (at its sole cost and expense) a registration statement registering the resale of the Registrable Securities (as defined below) (the "<u>Registration Statement</u>"), and it shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) sixty (60) calendar days after the filing thereof (or ninety (90) calendar days after the filing thereof if the SEC notifies SVAC that it will "review" the Registration Statement) and (ii) seven (7) business days after SVAC is notified (orally or in writing, whichever is earlier) by the SEC that the Registration Statement will not be "reviewed" or will not be subject to further review (such earlier date, the "<u>Effectiveness Date</u>"); *provided*, that if the Effectiveness Date falls on a Saturday, Sunday or other day that the SEC is closed for business, the Effectiveness Date shall be extended to the next business day on which the SEC is open for business.  Notwithstanding the foregoing, if the SEC prevents SVAC from including any or all of the Registrable Securities proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 under the Securities Act for the resale of Registrable Securities by the applicable stockholders or otherwise, such Registration Statement shall register for resale such number of Registrable Securities which is equal to the maximum number of Registrable Securities as is permitted to be registered by the SEC.  In such event, the number of Registrable Securities to be registered for each Investor named in the

14

**EXHIBIT 2**
**Page 114 of 404**

Registration Statement shall be reduced pro rata among all such Investors and as promptly as practicable after being permitted to register additional Registrable Securities under Rule 415 under the Securities Act, SVAC shall amend the Registration Statement or file a new Registration Statement to register such additional Registrable Securities and cause such amendment or Registration Statement to become effective as promptly as practicable. "Registrable Securities" shall mean, as of any date of determination, the Shares and any other equity security of SVAC issued or issuable with respect to the Shares by way of share split, dividend, distribution, recapitalization, merger, exchange, replacement or similar event or otherwise. The Investor agrees to disclose its ownership to SVAC upon request to assist it in making the determination described above. SVAC may amend the Registration Statement so as to convert the Registration Statement to a Registration Statement on Form S-3 at such time after SVAC becomes eligible to use such Form S-3. SVAC will provide a draft of the Registration Statement to the Investor for review at least three (3) business days in advance of filing the Registration Statement. If the SEC requests that the Investor be identified as a statutory underwriter in the Registration Statement, the Investor will have an opportunity to withdraw from the Registration Statement. The Investor acknowledges and agrees that SVAC may postpone or suspend, as applicable, the use of any such Registration Statement (i) if it determines that in order for such Registration Statement not to contain a material misstatement or omission, an amendment thereto would be needed to include information that would at that time not otherwise be required in a current, quarterly, or annual report under the Exchange Act, (ii) during any customary blackout or similar period or as permitted hereunder and (iii) as may be necessary in connection with the preparation and filing of a post-effective amendment to the Registration Statement following the filing of SVAC's Annual Report on Form 10-K for its first completed fiscal year (each such circumstance, a "Suspension Event"); *provided*, that (I) SVAC shall not so delay filing or so suspend the use of the Registration Statement on more than two (2) occasions, or for more than sixty (60) consecutive calendar days, or more than ninety (90) total calendar days, in each case in any three hundred sixty (360) day period and (II) SVAC shall use commercially reasonable efforts to make such registration statement available for the sale by the Investor of such securities as soon as practicable thereafter. Any failure by SVAC to file the Registration Statement by the Filing Date or to effect such Registration Statement by the Effectiveness Date shall not otherwise relieve SVAC of its obligations to file or effect the Registration Statement as set forth above in this Section 8. SVAC's obligations to include the Registrable Securities for resale in the Registration Statement are contingent upon the Investor furnishing in writing to SVAC such information regarding the Investor, the securities of SVAC held by the Investor and the intended method of disposition of such Shares, which shall be limited to non-underwritten public offerings, as shall be reasonably requested by SVAC to effect the registration of such Shares, and shall execute such documents in connection with such registration as SVAC may reasonably request that are customary of a selling stockholder in similar situations, including providing that SVAC shall be entitled to postpone and suspend the effectiveness or use of the Registration Statement during any customary blackout or similar period or as permitted hereunder, *provided* that, the Investor shall not, in connection with the foregoing, be required to execute any lock-up or similar agreement or otherwise be subject to any contractual restriction on the ability to transfer the Shares. SVAC will request such information from the Investor at least five (5) business days in advance of the expected filing date of the initial Registration Statement.

b.     In the case of the registration, qualification, exemption or compliance effected by SVAC pursuant to this Subscription Agreement, SVAC shall, upon reasonable request,

**EXHIBIT 2**
**Page 115 of 404**

inform Investor as to the status of such registration, qualification, exemption and compliance.  At its expense, SVAC shall:

(i)       except for such times as SVAC is permitted hereunder to suspend the use of the prospectus forming part of a Registration Statement, use its commercially reasonable efforts to keep such registration, and any qualification, exemption or compliance under state securities laws which SVAC determines to obtain, continuously effective with respect to Investor, and to keep the applicable Registration Statement or any subsequent shelf registration statement free of any material misstatements or omissions, until the earlier of the following:  (i) Investor ceases to hold any Registrable Securities, (ii) the date all Registrable Securities held by Investor may be sold without restriction under Rule 144, including without limitation, any volume and manner of sale restrictions which may be applicable to affiliates under Rule 144 and without the requirement for SVAC to be in compliance with the current public information required under Rule 144(c)(1) or Rule 144(i)(2), as applicable and (iii) two (2) years from the effective date of the Registration Statement.

(ii)      advise Investor (or, if directed by the Investor in writing, its counsel) within five (5) business days:

(1)       when a Registration Statement or any amendment thereto has been filed with the SEC and when such Registration Statement or any post-effective amendment thereto has become effective;

(2)       any request by the SEC for amendments or supplements to any Registration Statement or other prospectus included therein or for additional information;

(3)       of the issuance by the SEC of any stop order or other matter causing the suspension of the effectiveness of any Registration Statement or the initiation of any proceedings for such purpose;

(4)       of the receipt by SVAC of any notification with respect to the suspension of the qualification of the Registrable Securities included therein for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and

(5)       subject to the provisions in this Subscription Agreement, of the occurrence of any event that requires the making of any changes in any Registration Statement or prospectus included therein so that, as of such date, the statements therein are not misleading and do not omit to state a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, in the light of the circumstances under which they were made) not misleading.

Notwithstanding anything to the contrary set forth herein, SVAC shall not, when so advising Investor of such events, provide Investor with any material, nonpublic information regarding SVAC other than to the extent that providing notice to Investor of the occurrence of the

**EXHIBIT 2**
**Page 116 of 404**

events listed in (1) through (5) above constitutes material, nonpublic information regarding SVAC;

(iii)    use its commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of any Registration Statement as soon as reasonably practicable;

(iv)    upon the occurrence of any event contemplated in Section 8(b)(ii)(5), except for such times as SVAC is permitted hereunder to suspend, and has suspended, the use of a prospectus forming part of a Registration Statement, SVAC shall use its commercially reasonable efforts to as soon as reasonably practicable prepare a post-effective amendment to such Registration Statement or a supplement to the related prospectus, or file any other required document so that, as thereafter delivered to purchasers of the Registrable Securities included therein, such prospectus will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(v)    use its commercially reasonable efforts to cause all Shares to be listed on the primary securities exchange or market, if any, on which the Shares issued by SVAC have been listed; and

(vi)    use its commercially reasonable efforts to take all other steps necessary to effect the registration of the Shares contemplated hereby and to enable Investor to sell the Shares under Rule 144.

c.    In connection with the effectiveness of any Registration Statement hereunder, any sale, assignment, transfer or other disposition of the Shares by the Investor pursuant to an effective Registration Statement, Rule 144 or any other exemption under the Securities Act such that the Shares held by the Investor become freely tradable and upon compliance by the Investor with the requirements of this Section 8(c), if requested by the Investor, SVAC shall use its commercially reasonable efforts to cause the Transfer Agent to remove any restrictive legends related to the book entry account holding such Shares and make a new, unlegended entry for such book entry Shares without restrictive legends within two (2) trading days of any such request therefor from the Investor, *provided* that SVAC and the Transfer Agent have timely received from the Investor customary representations and other documentation reasonably acceptable to SVAC and the Transfer Agent in connection therewith.  Subject to receipt from the Investor by SVAC and the Transfer Agent of customary representations and other documentation reasonably acceptable to SVAC and the Transfer Agent in connection therewith, including, if required by the Transfer Agent, an opinion of SVAC's counsel, in a form reasonably acceptable to the Transfer Agent, to the effect that the removal of such restrictive legends in such circumstances may be effected under the Securities Act, the Investor may request that SVAC remove any legend from the book entry position evidencing its Shares following the earliest of such time as such Shares (i) are covered by and may be sold or transferred pursuant to an effective registration statement, (ii) have been or are about to be sold pursuant to Rule 144, or (iii) are eligible for resale under Rule 144(b)(1) or any successor provision without the requirement for SVAC to be in compliance with the current public information requirement under Rule 144 and without volume or manner-of-sale restrictions applicable to the sale or transfer of such Shares.  If restrictive legends are no longer

required for such Shares pursuant to the foregoing, SVAC shall, in accordance with the provisions of this <u>Section 8(c)</u> and within two (2) trading days of any request therefor from the Investor accompanied by such customary and reasonably acceptable representations and other documentation referred to above establishing that restrictive legends are no longer required, deliver to the Transfer Agent irrevocable instructions and, upon the Transfer Agent's request, a legal opinion of SVAC's counsel, that the Transfer Agent shall make a new, unlegended entry for such book entry Shares. SVAC shall be responsible for the fees of its Transfer Agent, its legal counsel and all DTC fees associated with such issuance.

        d.    <u>Indemnification</u>.

        (i)    SVAC agrees to indemnify and hold harmless, to the extent permitted by law, the Investor, its directors, and officers, employees, and agents, and each person who controls the Investor (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and each affiliate of the Investor (within the meaning of Rule 405 under the Securities Act) from and against any and all losses, claims, damages, liabilities, costs and expenses (including, without limitation, any reasonable attorneys' fees and expenses incurred in connection with defending or investigating any such action or claim), as incurred, that arise out of, are based upon, or are caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, prospectus included in any Registration Statement or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as and to the extent, but only to the extent, the same are caused by or contained in any information or affidavit regarding the Investor furnished in writing to SVAC by or on behalf of the Investor expressly for use therein.

        (ii)    The Investor agrees, severally and not jointly with any person that is a party to the Other Subscription Agreements, to indemnify and hold harmless SVAC, its directors and officers and agents and employees and each person who controls SVAC (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) against any losses, claims, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees), as incurred, that arise out of, are based upon, or are caused by any untrue statement of a material fact contained in the Registration Statement, or any form of prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein (in the case of any prospectus, or any form of prospectus or preliminary prospectus or supplement thereto, in light of the circumstances under which they were made) or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by the Investor expressly for use therein. In no event shall the liability of the Investor be greater in amount than the dollar amount of the net proceeds received by the Investor upon the sale of the Shares purchased pursuant to this Subscription Agreement giving rise to such indemnification obligation.

        (iii)    Any person entitled to indemnification herein shall (1) give prompt written notice to the indemnifying party of any claim with respect to which it seeks

18

**EXHIBIT 2**
**Page 118 of 404**

indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and, (2) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties exists with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of legal counsel to any indemnified party a conflict of interest exists between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement includes a statement or admission of fault and culpability on the part of such indemnified party or which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

(iv)    The indemnification provided for under this Subscription Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director, employee, agent, affiliate or controlling person of such indemnified party and shall survive the transfer of the Shares purchased pursuant to this Subscription Agreement.

(v)    If the indemnification provided under this Section 8(d) from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in this Section 8, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 8(d) from any person who was not

19

EXHIBIT 2
Page 119 of 404

guilty of such fraudulent misrepresentation. In no event shall the liability of the Investor be greater in amount than the dollar amount of the net proceeds received by the Investor upon the sale of the Shares purchased pursuant to this Subscription Agreement giving rise to such contribution obligation. Notwithstanding anything to the contrary herein, in no event will any party be liable for consequential, special, exemplary or punitive damages in connection with this Subscription Agreement.

e. Following such time as Rule 144 is available, with a view to making available to the Investor the benefits of Rule 144, SVAC agrees, for so long as the Investor holds the Shares purchased pursuant to this Subscription Agreement, to:

(i) make and keep public information available, as those terms are understood and defined in Rule 144; and

(ii) file with the SEC in a timely manner all reports and other documents required of SVAC under the Securities Act and the Exchange Act so long as SVAC remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144.

9. <u>Termination</u>. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earliest to occur of (a) such date and time as the Transaction Agreement is terminated in accordance with its terms, (b) upon the mutual written agreement of SVAC and the Investor, and to the extent required by the Transaction Agreement, the Company, to terminate the Subscription Agreement, (c) thirty (30) days after the Termination Date (as defined in the Transaction Agreement, as in effect from time to time), if the Closing has not occurred by such date (the "<u>Outside Date</u>"), or (d) if any of the conditions to Closing set forth in <u>Section 3</u> are not capable of being satisfied or waived on or prior to the Closing, and, as a result thereof, the transactions contemplated by this Subscription Agreement will not be and are not consummated at the Closing (the termination events described in clauses (a)–(d) above, collectively, the "<u>Termination Events</u>"); *provided* that nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from any such willful breach. SVAC shall notify the Investor in writing of the termination of the Transaction Agreement promptly after the termination of such agreement. Upon the occurrence of any Termination Event, this Subscription Agreement shall be void and of no further force and effect (subject to the proviso of the immediately preceding sentence); *provided* that any monies paid by the Investor to SVAC in connection herewith shall promptly (and in any event within one (1) business day) following the Termination Event be returned to the Investor, in full, without any deduction or penalty of any kind, for or on account of any tax, withholding, charges, set-off or otherwise, by wire transfer of immediately available funds to the account specified by Investor.

10. <u>Trust Account Waiver</u>. The Investor acknowledges that SVAC is a blank check company with the powers and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving SVAC and one or more businesses or assets. The Investor further acknowledges that, as described in the final prospectus of SVAC, filed with the SEC (File

20

**EXHIBIT 2**
**Page 120 of 404**

No. 333-249067), and dated as of November 23, 2020 (the "Prospectus"), available at www.sec.gov, SVAC has established a trust account containing the proceeds of its initial public offering (the "IPO") (with interest accrued from time to time thereon, the "Trust Fund") initially in an amount of $232,300,000 for the benefit of SVAC's public stockholders (the "Public Stockholders") and certain parties (including the underwriters of the IPO) and that SVAC may disburse monies from the Trust Fund only:  (i) to the Public Stockholders in the event they elect to redeem the Class A Shares in connection with the consummation of SVAC's initial business combination (as such term is used in the Prospectus) (the "Business Combination"), (ii) to the Public Stockholders if SVAC fails to consummate a Business Combination within twenty-four (24) months from the closing of the IPO, (iii) any interest earned on the amounts held in the Trust Fund necessary to pay for franchise and income taxes, or (iv) to SVAC after or concurrently with the consummation of a Business Combination.  For and in consideration of SVAC entering into this Subscription Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Investor hereby agrees that it does not now and shall not at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Fund or distributions therefrom, or make any claim against, the Trust Fund, with respect to claims arising out of this Subscription Agreement, regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the "Claims").  The Investor hereby irrevocably waives any Claims it may have against the Trust Fund (including any distributions therefrom) now or in the future as a result of, or arising out of, this Subscription Agreement and will not seek recourse against the Trust Fund (including any distributions therefrom) for Claims arising out of this Subscription Agreement; *provided* that nothing in this Section 10 (x) shall serve to limit or prohibit the Investor's right to pursue a claim against SVAC for legal relief against assets held outside the Trust Fund, for specific performance or other equitable relief, (y) shall serve to limit or prohibit any claims that the Investor may have in the future against SVAC's assets or funds that are not held in the Trust Fund (including any funds that have been released from the Trust Fund and any assets that have been purchased or acquired with any such funds) or (z) shall be deemed to limit the Investor's right, title, interest or claim to any monies held in the Trust Fund by virtue of its record or beneficial ownership of Class A Shares acquired other than pursuant to this Subscription Agreement, pursuant to a validly exercised redemption right with respect to any such Class A Shares, except to the extent that the Investor has otherwise agreed with SVAC to not exercise such redemption right.  The Investor agrees and acknowledges that such irrevocable waiver is material to this Subscription Agreement and specifically relied upon by SVAC to induce it to enter in this Subscription Agreement, and the Investor further intends and understands such waiver to be valid, binding and enforceable under applicable law.

11.    Standstill. From the date hereof until the Closing Date, unless specifically waived by SVAC in writing, Investor shall not in any manner, directly or indirectly, without the consent of SVAC and the Company (i) effect or seek, offer or propose (whether publicly or otherwise) to effect, or announce any intention to effect or cause or participate in or in any way assist or encourage any other person to effect or seek, offer or propose (whether publicly or otherwise) to effect or participate in, (A) any acquisition of any securities (or beneficial ownership thereof) or assets of SVAC or the Company or any of their respective affiliates, including rights or options to acquire such ownership or any other securities, rights or interests, including without limitation, options, swaps, derivatives or convertibles or other similar instruments, whether real or synthetic,

EXHIBIT 2
Page 121 of 404

that give Investor the right to vote or to direct the voting of any securities of SVAC or the Company or otherwise convey the economic interest of beneficial ownership of any securities of SVAC or the Company; (B) any tender or exchange offer, merger or other business combination involving SVAC, the Company or any of their respective affiliates; (C) any recapitalization, restructuring, liquidation, dissolution or other extraordinary transaction with respect to SVAC, the Company or any of their respective affiliates; or (D) any "solicitation" of "proxies" (as such terms are defined in Rule 14a 1 of Regulation 14A under the Exchange Act, disregarding clause (iv) of Rule 14a 1(l)(2) and including any otherwise exempt solicitation pursuant to Rule 14a 2(b)) or consents to vote any voting securities of SVAC, the Company or any of their respective affiliates; (ii) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the Exchange Act and the rules and regulations thereunder) with respect to any voting securities of SVAC, the Company or any of their respective affiliates or otherwise act in concert with any person in respect of any such securities; (iii) otherwise act, alone or in concert with others, to seek to control, advise, change or influence the management, board of directors, governing instruments, shareholders, policies or affairs of SVAC, the Company or any of their respective affiliates; (iv) enter into any discussions or arrangements with any third party with respect to any of the foregoing; or (v) make any public disclosure, or take any action that might force SVAC, the Company, any of their respective affiliates or any other person to make any public disclosure, with respect to the matters set forth in this Subscription Agreement.

12.    <u>Miscellaneous</u>.

a.    Neither this Subscription Agreement nor any rights that may accrue to the Investor hereunder (other than the Shares acquired hereunder, if any) may be transferred or assigned without SVAC's prior written consent.  Notwithstanding the foregoing, Investor may assign its rights and obligations under this Subscription Agreement to one or more of its affiliates (including other investment funds or accounts managed or advised by the investment manager who acts on behalf of the Investor); provided, that each transferee shall make the representations and warranties set forth in <u>Section 6</u> hereof and that no such assignment shall relieve the Investor of its obligations hereunder.

b.    SVAC may request from the Investor such additional information as SVAC may deem reasonably necessary to evaluate the eligibility of the Investor to acquire the Shares, and the Investor shall promptly provide such information as may reasonably be requested; provided that SVAC agrees to keep any such information confidential, except as may be required by applicable law, rule, regulation or in connection with any legal proceeding or regulatory request. Subject to Section 15, the Investor acknowledges that SVAC may file a form of this Subscription Agreement with the SEC as an exhibit to a periodic report or a registration statement of SVAC.

c.    The Investor acknowledges that SVAC, the Placement Agents, the Company and others will rely on the acknowledgments, understandings, agreements, representations and warranties contained in this Subscription Agreement.  SVAC acknowledges that the Investor will rely on the acknowledgments, understandings, agreements, representations and warranties of SVAC contained in this Subscription Agreement. Prior to the Closing, the Investor agrees to promptly notify SVAC and the Placement Agents if any of the acknowledgments, understandings, agreements, representations and warranties made by Investor set forth in <u>Section 6</u> above are no longer accurate in any material respect. Prior to the Closing, SVAC agrees to

22

**EXHIBIT 2**
**Page 122 of 404**

promptly notify the Investor if any of the acknowledgments, understandings, agreements, representations and warranties made by SVAC set forth in <u>Section 5</u> above are no longer accurate in any material respect.

       d.     This Subscription Agreement (including the schedule hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns. Except as expressly provided for herein, this Subscription Agreement shall not confer rights or remedies upon any person other than the parties hereto and their respective successors and permitted assigns, and the parties hereto acknowledge that such persons so referenced are third party beneficiaries of this Subscription Agreement for the purposes of, and to the extent of, the rights granted to them, if any, pursuant to the applicable provisions.

       e.     Each of SVAC and Investor is entitled to rely upon this Subscription Agreement and each is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby; provided, however, that the foregoing clause of this <u>Section 12(e)</u> shall not give the Company or the Placement Agents any rights other than those expressly set forth herein and, without limiting the generality of the foregoing and for the avoidance of doubt, in no event shall the Company be entitled to rely on any of the representations and warranties of SVAC set forth in this Subscription Agreement.

       f.     Each of the parties agrees that the Company is an express third-party beneficiary of this Agreement, and the Company may directly enforce (including by an action for specific performance, injunctive relief or other equitable relief) each of the provisions of this Agreement, as amended, modified, supplemented or waived in accordance with <u>Section 12(h)</u>, against the Investor as if it were a direct party hereto having the same rights as, and instead of, SVAC hereunder. Each of the parties further agrees that each of the Company and each of the Placement Agents is a third-party beneficiary of the representations and warranties of Investor under this Subscription Agreement and the Placement Agents are also third party beneficiaries of Sections 12(c), (e), (f), (g) and Section 13 hereof.

       g.     SVAC, the Company, the Investor and the Placement Agents are each entitled to rely upon this Subscription Agreement and each is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby; provided, however, that the foregoing clause of this <u>Section 12(g)</u> shall not give the Company or the Placement Agents any rights other than those expressly set forth herein and, without limiting the generality of the foregoing and for the avoidance of doubt, in no event shall the Company be entitled to rely on any of the representations and warranties of SVAC set forth in this Subscription Agreement.

**EXHIBIT 2**
**Page 123 of 404**

h.      All of the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

i.      This Subscription Agreement may not be amended, modified, waived or terminated (other than pursuant to the terms of Section 9 above) except by an instrument in writing, signed by the Investor and SVAC.  No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties and third party beneficiaries hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

j.      If any provision of this Subscription Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

k.      This Subscription Agreement may be executed in one or more counterparts (including by facsimile or electronic mail or in .pdf) and by different parties in separate counterparts, with the same effect as if all parties hereto had signed the same document.  All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

l.      The parties hereto acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Subscription Agreement, without posting a bond or undertaking and without proof of damages, to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

m.      This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters (including any action, suit, litigation, arbitration, mediation, claim, charge, complaint, inquiry, proceeding, hearing, audit, investigation or reviews by or before any governmental entity related hereto), including matters of validity, construction, effect, performance and remedies.

n.      Any notice or communication required or permitted hereunder to be given to a party shall be in writing and either delivered personally, emailed or sent by overnight mail via a reputable overnight carrier, or sent by certified or registered mail, postage prepaid, to such address(es) or email address(es) set forth on the signature page hereto, and shall be deemed to be given and received (i) when so delivered personally, (ii) when sent, with no mail undeliverable or other rejection notice, if sent by email, or (iii) three (3) business days after the date of mailing to the address below or to such other address or addresses as such party may hereafter designate by

24

EXHIBIT 2
Page 124 of 404

notice to the other party. A courtesy copy of any communication or notice shall be emailed to Investor.

o.      The Investor and SVAC hereby agree, and any person asserting rights as a third party beneficiary may do so only if he, she or it, irrevocably agrees, that any action, suit or proceeding between or among the parties hereto, whether arising in contract, tort or otherwise, arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Subscription Agreement or any related document or any of the transactions contemplated hereby or thereby ("Legal Dispute") shall be brought only to the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each party hereto hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum. During the period a Legal Dispute that is filed in accordance with this Section 12(o) is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party hereto and any person asserting rights as a third party beneficiary may do so only if he, she or it hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such party is not personally subject to the jurisdiction of the above named courts for any reason, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum, or (e) the venue of such action, suit or proceeding is improper. A final judgment in any action, suit or proceeding described in this Section 12(o) following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable laws. EACH OF THE PARTIES HERETO, AND ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY MAY DO SO ONLY IF HE, SHE OR IT, IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM RELATING THERETO. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHERMORE, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

p.      If any change in the number, type or classes of authorized shares of SVAC (including the Shares), other than as contemplated by the Transaction Agreement or any agreement contemplated by the Transaction Agreement, shall occur between the date hereof and immediately prior to the Closing by reason of reclassification, recapitalization, stock split (including reverse

**EXHIBIT 2**
**Page 125 of 404**

stock split) or combination, exchange or readjustment of shares, or any stock dividend, the number of Shares issued to the Investor and Per Share Purchase Price applicable to the Investor shall be appropriately adjusted to reflect such change. In no event will this <u>Section 12(p)</u> be construed to require the Investor to complete the purchase of the Shares contemplated hereby without satisfaction of all of the conditions to Closing contained in this Subscription Agreement.

13.     <u>Non-Reliance</u>.  The Investor acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, the Placement Agents, any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the statements, representations and warranties of SVAC expressly contained in <u>Section 5</u>, in making its investment or decision to invest in SVAC.  The Investor acknowledges and agrees that none of (a) any Other Investor pursuant to any Other Subscription Agreement (including such Other Investor's respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), (b) the Placement Agents, their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing, or (c) any party to the Transaction Agreement other than SVAC, or any Non-Party Affiliate, shall have any liability to the Investor pursuant to, arising out of or relating to this Subscription Agreement, the negotiation hereof or its subject matter, or the transactions contemplated hereby, including, without limitation, with respect to any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Shares or with respect to any claim (whether in tort, contract or otherwise) for breach of this Subscription Agreement or in respect of any written or oral representations made or alleged to be made in connection herewith, as expressly provided herein, or for any actual or alleged inaccuracies, misstatements or omissions with respect to any information or materials of any kind furnished by SVAC, the Company, the Placement Agents or any Non-Party Affiliate concerning SVAC, the Company, the Placement Agents, any Non-Party Affiliate, any of their controlled affiliates, this Subscription Agreement or the transactions contemplated hereby. For purposes of this Subscription Agreement, "<u>Non-Party Affiliates</u>" means each former, current or future officer, director, employee, partner, member, manager, direct or indirect equityholder or affiliate of SVAC, the Company, any Placement Agent or any of SVAC's, the Company's or any Placement Agent's controlled affiliates or any family member of the foregoing.

14.     <u>Expenses</u>.  Investor shall pay all of its own expenses in connection with the negotiation, execution and delivery of this Subscription Agreement and the transactions contemplated herein.

15.     <u>Disclosure</u>.  SVAC shall, by 9:00 a.m., New York City time, on the first (1st) business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "<u>Disclosure Document</u>") disclosing all material terms of the transactions contemplated hereby and by the Other Subscription Agreements, the Transaction and any other material, nonpublic information that SVAC, or any of its officers, employees or agents on behalf of SVAC, has provided to the Investor at any time prior to the filing of the Disclosure Document.  Upon the issuance of the Disclosure Document, to the knowledge of SVAC, the Investor shall not be in possession of any material, non-public information received from SVAC, the Company or any of its respective officers, directors, or employees or agents, and the Investor shall no longer be subject to any confidentiality

**EXHIBIT 2**
**Page 126 of 404**

or similar obligations under any current agreement, whether written or oral with SVAC, the Placement Agents or any of their respective affiliates, relating to any such material nonpublic information that is so disclosed in the Disclosure Document.  Notwithstanding anything in this Subscription Agreement to the contrary, SVAC shall not publicly disclose the name of the Investor or any of its affiliates or advisers, or include the name of the Investor or any of its affiliates or advisers, or include the name of the Investor or any of its affiliates or advisers, in any press release, promotional materials, media or similar circumstances, or in any filing with the SEC or any regulatory agency or trading market, without the prior written consent of the Investor, except (a) as required by the federal securities law or pursuant to other routine proceedings of regulatory authorities or (b) to the extent such disclosure is required by law, at the request of the staff of the SEC or regulatory agency or under the regulations of any national securities exchange on which the Shares are listed; *provided, however*, that SVAC shall provide the Investor with prior written notice of such permitted disclosure.  Investor will promptly provide any information reasonably requested by SVAC or any of its affiliates that is required for any regulatory application or filing made or approval sought in connection with the Transaction (including filings with the SEC).

      16.   <u>Several Obligations</u>. The obligations of the Investor under this Subscription Agreement are several and not joint with the obligations of any Other Investor under the Other Subscription Agreements, and the Investor shall not be responsible in any way for the performance of the obligations of any Other Investor under any Other Subscription Agreements.  The decision of the Investor to purchase the Shares pursuant to this Subscription Agreement has been made by the Investor independently of any Other Investor and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of SVAC, the Company or any of their respective subsidiaries which may have been made or given by or to any Other Investor or investor or by any agent or employee of any Other Investor or investor, and neither the Investor nor any of its agents or employees shall have any liability to any Other Investor or investor (or any other person) relating to or arising from any such information, materials, statements or opinions.  The decision of each Other Investor to purchase Shares pursuant to an Other Subscription Agreement has been made by such Other Investor independently of the Investor and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the SVAC, the Company or any of their respective subsidiaries which may have been made or given by the Investor.  Nothing contained herein or in any Other Subscription Agreement, and no action taken by the Investor or Other Investor pursuant hereto or thereto, shall be deemed to constitute Investor and any Other Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investor and any Other Investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Subscription Agreement and the Other Subscription Agreements.  The Investor acknowledges that no Other Investor has acted as agent for the Investor in connection with making its investment hereunder and no Other Investor will be acting as agent of the Investor in connection with monitoring its investment in the Shares or enforcing its rights under this Subscription Agreement. The Investor shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Subscription Agreement, and it shall not be necessary for any Other Investor to be joined as an additional party in any proceeding for such purpose.

*[Signature pages follow]*

**EXHIBIT 2**
**Page 127 of 404**

IN WITNESS WHEREOF, the Investor has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date set forth below.

Name of Investor:                          Date: _____, 2021

_____          State/Country of Formation or Domicile:

By: _____          _____

Name:_____

Title:_____          Name in which Shares are to be
                                           Registered (if different):

Investor's EIN: _____          _____

Business Address:                          Mailing Address (if different):

Street: _____          Street: _____

City, State, Zip: _____          City, State, Zip: _____

Attn: _____          Attn: _____

Telephone No.: _____          Telephone No.: _____

Facsimile No.: _____          Facsimile No.: _____

Email: _____          Email: _____

Number of Shares subscribed for: _____

Aggregate Subscription Amount: _____    Price Per Share:  $10.00

You must pay the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account specified by SVAC in the Closing Notice.

*[Signature Page to Subscription Agreement]*

**EXHIBIT 2**
**Page 128 of 404**

IN WITNESS WHEREOF, SVAC has accepted this Subscription Agreement as of the date set forth below.

SPRING VALLEY ACQUISITION CORP.

By: _____
Name:  Christopher Sorrells
Title:  Chief Executive Officer

Date: _____, 2021

Address for purposes of notice:

_____

_____

Email: _____

*[Signature Page to Subscription Agreement]*

**EXHIBIT 2**
**Page 129 of 404**

**SCHEDULE A**

**ELIGIBILITY REPRESENTATIONS OF THE INVESTOR**

A.  QUALIFIED INSTITUTIONAL BUYER STATUS
   (Please check the applicable subparagraphs):

   ☐ We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act (a "QIB")).

**\*OR\***

B.  ACCREDITED INVESTOR STATUS
   (Please check the applicable subparagraphs):

   1.  ☐ We are an "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3), (7), or (9) under the Securities Act, or an entity in which all of the equity holders are accredited investors within the meaning of Rule 501(a) under the Securities Act), and have marked and initialed the appropriate box on the following page indicating the provision under which we qualify as an "accredited investor."

   2.  ☐ We are not a natural person.

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person.  The Investor has indicated, by marking and initialing the appropriate box below, the provision(s) below which apply to the Investor and under which the Investor accordingly qualifies as an "accredited investor."

   ☐  Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company;

   ☐  Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

   ☐  Any employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5,000,000;

   ☐  Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

   ☐  Any trust with assets in excess of $5,000,000, not formed to acquire the securities offered, whose purchase is directed by a sophisticated person; or

   ☐  Any entity in which all of the equity owners are accredited investors.

*This page should be completed by the Investor and constitutes a part of the Subscription Agreement*

**EXHIBIT 2**
**Page 130 of 404**

**EXHIBIT B-1**                                                          *FINAL FORM*

## SPONSOR SUPPORT AGREEMENT

This Sponsor Support Agreement (this "Agreement") is dated as of December 13, 2021, by and among SV Acquisition Sponsor Sub, LLC, a Delaware limited liability company (the "Sponsor"), Spring Valley Acquisition Corp., a Cayman Islands exempted company ("Acquiror"), and NuScale Power, LLC, an Oregon limited liability company (the "Company"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement (as defined below).

## RECITALS

WHEREAS, as of the date hereof, Sponsor holds 5,630,000 Class B ordinary shares of Acquiror, par value $0.0001 per share (the "Class B Shares"), of which 698,008 are held indirectly by those Persons listed on Schedule I attached hereto (such Persons, the "Strategic Investors");

WHEREAS, contemporaneously with the execution and delivery of this Agreement, Acquiror, Spring Valley Merger Sub, LLC, an Oregon limited liability company, and the Company entered into that certain Agreement and Plan of Merger, dated as of the date hereof (as it may be amended, restated or otherwise modified from time to time in accordance with its terms, the "Merger Agreement"); and

WHEREAS, as an inducement to the Company to enter into the Merger Agreement and to consummate the transactions contemplated therein, the parties hereto desire to agree to certain matters as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I
## SPONSOR SUPPORT AGREEMENT

Section 1.1    Sponsor Voting Agreements.

(a)    At any meeting of the stockholders of Acquiror, however called, or at any adjournment thereof, or in any other circumstance in which the vote, consent or other approval of the stockholders of Acquiror is sought, Sponsor shall (i) appear at each such meeting or otherwise cause all of its Class B Shares (other than any Class B Shares held by Sponsor on behalf of the Strategic Investors) and any shares of Acquiror Common Stock that Sponsor holds of record or beneficially, as of the date hereof, or acquires record or beneficial ownership of after the date hereof (collectively, the "Subject Acquiror Shares") to be counted as present thereat for purposes of calculating a quorum, (ii) not redeem any Subject Acquiror Shares at such meeting and (iii) vote (or cause to be voted), or execute and deliver a written consent (or cause a written consent to be executed and delivered) covering, all of its Subject Acquiror Shares:

(i)    in favor of each Proposal;

(ii)    in favor of any proposal to adjourn a meeting at which there is a proposal for shareholders of the Company to approve and adopt the Proposals to a later date if there are not sufficient votes to approve and adopt the Proposals, or if there are not sufficient shares present in person or represented by proxy at such meeting to constitute a quorum; and

(iii)    against any proposal in opposition to approval of the Merger Agreement or inconsistent with the Merger Agreement or the Transactions.

Section 1.2    No Inconsistent Agreement.  Sponsor hereby represents and covenants that Sponsor has not entered into, and shall not enter into, any agreement that would restrict, limit or interfere with the performance of such Sponsor's obligations hereunder.

## ARTICLE II
## SPONSOR REPRESENTATIONS AND WARRANTIES

Section 2.1    Sponsor Representations and Warranties. The Sponsor hereby represents and warrants as of the date hereof as follows:

(a)    The Sponsor holds 5,630,000 issued and outstanding Class B Shares.

(b)    The Sponsor has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to perform all of its obligations hereunder.

(c)    The execution and delivery of this Agreement has been, and the consummation of the transactions contemplated hereby have been, duly authorized by all requisite action by the Sponsor.

(d)    This Agreement has been duly and validly executed and delivered by the Sponsor and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, this Agreement constitutes, and upon its execution will constitute, a legal, valid and binding obligation of the Sponsor enforceable against it in accordance with its terms.

(e)    The Sponsor understands and acknowledges that each of Acquiror and the Company is entering into the Merger Agreement in reliance upon Sponsor's execution and delivery of this Agreement.

## ARTICLE III
## MISCELLANEOUS

Section 3.1    No Redemption.  Sponsor agrees and acknowledges that in connection with the transactions contemplated by the Merger Agreement Sponsor shall not seek redemption of its Class B Shares.

Section 3.2    Authorization; No Breach.  Each of Sponsor, Acquiror and the Company has all requisite corporate or limited liability company power, as applicable, without violating any agreement to which it is bound, to enter into this Agreement and to perform its obligations

2

**EXHIBIT 2**
**Page 132 of 404**

hereunder.  The execution, delivery and performance of this Agreement has been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, and no other actions or proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement.

Section 3.3    <u>Termination</u>.  This Agreement and all of its provisions shall terminate and be of no further force or effect upon the earlier of (a) the consummation of the Closing, (b) the termination of the Merger Agreement in accordance with Article X thereof and (c) the liquidation of Acquiror.  Upon such termination of this Agreement, all obligations of the parties under this Agreement will terminate, without any liability or other obligation on the part of any party hereto to any Person in respect hereof or the transactions contemplated hereby, and no party hereto shall have any claim against another (and no person shall have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter hereof; <u>provided</u>, <u>however</u>, that the termination of this Agreement shall not relieve any party hereto from liability arising in respect of any breach of this Agreement prior to such termination.  This <u>ARTICLE III</u> shall survive the termination of this Agreement.

Section 3.4    <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware (without reference to its choice of law rules).  Each party hereto hereby irrevocably and unconditionally (a) agrees that all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall only be brought in the Court of Chancery of the State of Delaware or the federal courts of the United States of America, the United States District Court for the District of Delaware, sitting in New Castle County, (b) expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof, and (c) waives and agrees not to raise (by way of motion, as a defense or otherwise) any and all jurisdictional, venue and convenience objections or defenses that such party may have in such action or proceeding.

Section 3.5    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 3.5</u>.

Section 3.6    <u>Assignment</u>.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned (including by operation of law) without the prior written consent of the parties hereto.

**EXHIBIT 2**
**Page 133 of 404**

Section 3.7    <u>Specific Performance</u>.   The parties hereto agree that irreparable damage may occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such party may be entitled under this Agreement, at law or in equity.

Section 3.8    <u>Amendment</u>.    This Agreement may not be amended, changed, supplemented, waived or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by Acquiror, Sponsor and the Company.

Section 3.9    <u>Severability</u>.  If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 3.10    <u>Notices</u>.  All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (c) when delivered by FedEx or other nationally recognized overnight delivery service or (d) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

<u>If to Acquiror or Sponsor</u>:

Spring Valley Acquisition Corp.
2100 McKinney Ave., Suite 1675
Dallas, TX 75201
Attention:   Christopher Sorrells
Email:       Chris.Sorrells@sv-ac.com

with a copy to (which will not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention:   Adam D. Larson, P.C.
             Allan Kirk
Email:       Adam.Larson@kirkland.com
             Allan.Kirk@kirkland.com

<u>If to the Company</u>:

NuScale Power, LLC
6650 SW Redwood Lane
Suite 210

4

**EXHIBIT 2**
**Page 134 of 404**

Portland, OR 97224
Attn:
E-mail:

With copies (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attention:   David C. Lee
             John M. Williams III
             Evan M. D'Amico
E-mail:      DLee@GibsonDunn.com
             JWilliams@GibsonDunn.com
             EDAmico@GibsonDunn.com

Stoel Rives LLP
760 SW Ninth Avenue
Suite 3000
Portland, OR 97205
Attention:   Jason M. Brauser
             James M. Kearney
E-mail:      Jason.brauser@stoel.com
             Jim.kearney@stoel.com

Section 3.11   <u>Counterparts</u>.  This Agreement may also be executed and delivered by facsimile signature or by other electronic means in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 3.12   <u>Entire Agreement</u>.  This Agreement and the agreements referenced herein constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties hereto to the extent they relate in any way to the subject matter hereof.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

5

**EXHIBIT 2**
**Page 135 of 404**

IN WITNESS WHEREOF, the Sponsor, Acquiror and the Company have each caused this Sponsor Support Agreement to be duly executed as of the date first written above.

**<u>SPONSOR:</u>**

**SV ACQUISITION SPONSOR SUB, LLC**

By: _____
      Name:  David Levinson
      Title:    Secretary

*[Signature Page to Sponsor Support Agreement]*

**EXHIBIT 2**
**Page 136 of 404**

**ACQUIROR:**

**SPRING VALLEY ACQUISITION CORP.**

By: _____
      Name:  Christopher Sorrells
      Title:   Chief Executive Officer

*[Signature Page to Sponsor Support Agreement]*

**EXHIBIT 2
Page 137 of 404**

**COMPANY:**

**NUSCALE POWER, LLC**

By: _____
     Name:
     Title:

[*Signature Page to Sponsor Support Agreement*]

**EXHIBIT 2**
**Page 138 of 404**

## **Schedule I**

### **Strategic Investors**

1. Adage Capital Management LP

2. Polar Multi-Strategy Master Fund

3. Kepos Alpha Master Fund L.P.

4. CVI Investments, Inc.

5. Glazer Special Opportunity Fund I, LP

6. Kepos Special Opportunities Master Fund L.P.

*Schedule I to Sponsor Support Agreement*

**EXHIBIT 2**
**Page 139 of 404**

**Exhibit B-2**                                                    *FINAL FORM*

## SUPPORT AGREEMENT

This Support Agreement (this "<u>Agreement</u>") is dated as of December 13, 2021, by and among Debora Frodl, Richard Thompson and Patrick Wood, III (each a "<u>Director</u>" and collectively, the "<u>Directors</u>"), Spring Valley Acquisition Corp., a Cayman Islands exempted company ("<u>Acquiror</u>"), and NuScale Power, LLC, an Oregon limited liability company (the "<u>Company</u>").  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement (as defined below).

## RECITALS

WHEREAS, contemporaneously with the execution and delivery of this Agreement, Acquiror, Spring Valley Merger Sub, LLC, an Oregon limited liability company, and the Company entered into that certain Agreement and Plan of Merger, dated as of the date hereof (as it may be amended, restated or otherwise modified from time to time in accordance with its terms, the "<u>Merger Agreement</u>"); and

WHEREAS, as an inducement to the Company to enter into the Merger Agreement and to consummate the transactions contemplated therein, the parties hereto desire to agree to certain matters as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I
## SUPPORT AGREEMENT

Section 1.1     <u>Director Voting Agreements</u>.

(a)     At any meeting of the stockholders of Acquiror, however called, or at any adjournment thereof, or in any other circumstance in which the vote, consent or other approval of the stockholders of Acquiror is sought, each Director agrees, on behalf of and solely with respect to himself or herself, and solely in his or her capacity as a stockholder and not in his or her capacity as a director of Acquiror, to (i) appear at each such meeting or otherwise cause all of his or her Class B ordinary shares of Acquiror, par value $0.0001 per share ("<u>Class B Shares</u>") (other than any Class B Shares held by Director on behalf of the Strategic Investors) and any shares of Acquiror Common Stock that such Director holds of record or beneficially, as of the date hereof, or acquires record or beneficial ownership of after the date hereof (collectively, the "<u>Subject Acquiror Shares</u>") to be counted as present thereat for purposes of calculating a quorum, (ii) not redeem any Subject Acquiror Shares at such meeting and (iii) vote (or cause to be voted), or execute and deliver a written consent (or cause a written consent to be executed and delivered) covering, all of its Subject Acquiror Shares with respect to any vote of the stockholders of Acquiror:

(i)     in favor of each Proposal;

**EXHIBIT 2**
**Page 140 of 404**

(ii)     in favor of any proposal to adjourn a meeting at which there is a proposal for shareholders of the Company to approve and adopt the Proposals to a later date if there are not sufficient votes to approve and adopt the Proposals, or if there are not sufficient shares present in person or represented by proxy at such meeting to constitute a quorum; and

(iii)     against any proposal in opposition to approval of the Merger Agreement or inconsistent with the Merger Agreement or the Transactions.

Section 1.2     <u>No Inconsistent Agreement</u>.  Each Director, solely with respect to himself or herself, hereby represents and covenants that such Director has not entered into, and shall not enter into, any agreement that would restrict, limit or interfere with the performance of such Director's obligations hereunder.

## ARTICLE II
## DIRECTOR REPRESENTATIONS AND WARRANTIES

Section 2.1     <u>Director Representations and Warranties</u>. Director, solely with respect to himself or herself, hereby represents and warrants as of the date hereof as follows:

(a)     Director holds 40,000 issued and outstanding Class B Shares.

(b)     Director is a natural person and has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to perform all of its obligations hereunder.

(c)     This Agreement has been duly and validly executed and delivered by Director and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, this Agreement constitutes, and upon its execution will constitute, a legal, valid and binding obligation of Director enforceable against it in accordance with its terms.

(d)     Director understands and acknowledges that each of Acquiror and the Company is entering into the Merger Agreement in reliance upon Director's execution and delivery of this Agreement.

## ARTICLE III
## MISCELLANEOUS

Section 3.1     <u>No Redemption</u>.  Director agrees and acknowledges solely on behalf of himself or herself that in connection with the transactions contemplated by the Merger Agreement, Director shall not seek redemption of its Class B Shares.

Section 3.2     <u>Authorization; No Breach</u>.  Each of Director, Acquiror and the Company has all requisite corporate or limited liability company power, as applicable, without violating any agreement to which it is bound, to enter into this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement has been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, and no other

2

**EXHIBIT 2**
**Page 141 of 404**

actions or proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement.

Section 3.3    Termination.  This Agreement and all of its provisions shall terminate and be of no further force or effect upon the earlier of (a) the consummation of the Closing, (b) the termination of the Merger Agreement in accordance with Article X thereof and (c) the liquidation of Acquiror.  Upon such termination of this Agreement, all obligations of the parties under this Agreement will terminate, without any liability or other obligation on the part of any party hereto to any Person in respect hereof or the transactions contemplated hereby, and no party hereto shall have any claim against another (and no person shall have any rights against such party), whether under contract, tort or otherwise, with respect to the subject matter hereof; provided, however, that the termination of this Agreement shall not relieve any party hereto from liability arising in respect of any breach of this Agreement prior to such termination.  This ARTICLE III shall survive the termination of this Agreement.

Section 3.4    Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware (without reference to its choice of law rules).  Each party hereto hereby irrevocably and unconditionally (a) agrees that all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall only be brought in the Court of Chancery of the State of Delaware or the federal courts of the United States of America, the United States District Court for the District of Delaware, sitting in New Castle County, (b) expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof, and (c) waives and agrees not to raise (by way of motion, as a defense or otherwise) any and all jurisdictional, venue and convenience objections or defenses that such party may have in such action or proceeding.

Section 3.5    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.5.

Section 3.6    Assignment.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned (including by operation of law) without the prior written consent of the parties hereto.

Section 3.7    Specific Performance.  The parties hereto agree that irreparable damage may occur in the event that any of the provisions of this Agreement were not performed in

**EXHIBIT 2**
**Page 142 of 404**

accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such party may be entitled under this Agreement, at law or in equity.

Section 3.8    Amendment.    This Agreement may not be amended, changed, supplemented, waived or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by Acquiror, Director and the Company.

Section 3.9    Severability.    If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 3.10    Notices.    All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (c) when delivered by FedEx or other nationally recognized overnight delivery service or (d) when e-mailed during normal business hours (and otherwise as of the immediately following Business Day), addressed as follows:

If to Acquiror or a Director:

Spring Valley Acquisition Corp.
2100 McKinney Ave., Suite 1675
Dallas, TX 75201
Attention:    Christopher Sorrells
Email:        Chris.Sorrells@sv-ac.com

with a copy to (which will not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention:    Adam D. Larson, P.C.
              Allan Kirk
Email:        Adam.Larson@kirkland.com
              Allan.Kirk@kirkland.com

If to the Company:

NuScale Power, LLC
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attention:    General Counsel

4

EXHIBIT 2
Page 143 of 404

E-mail:      generalcounsel@nuscalepower.com

With copies (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attention:  David C. Lee
            John M. Williams III
            Evan M. D'Amico
E-mail:     DLee@GibsonDunn.com
            JWilliams@GibsonDunn.com
            EDAmico@GibsonDunn.com

Stoel Rives LLP
760 SW Ninth Avenue
Suite 3000
Portland, OR 97205
Attention:  Jason M. Brauser
            James M. Kearney
E-mail:     Jason.brauser@stoel.com
            Jim.kearney@stoel.com

Section 3.11   Counterparts.  This Agreement may also be executed and delivered by facsimile signature or by other electronic means in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 3.12   Entire Agreement.  This Agreement and the agreements referenced herein constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties hereto to the extent they relate in any way to the subject matter hereof.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

      IN WITNESS WHEREOF, the Directors, Acquiror and the Company have each caused this Support Agreement to be duly executed as of the date first written above.

**<u>ACQUIROR:</u>**

**SPRING VALLEY ACQUISITION CORP.**

By: _____
     Name:  Christopher Sorrells
     Title:   Chief Executive Officer

[Signature Page to Support Agreement]

**EXHIBIT 2**
**Page 145 of 404**

_____
Debora Frodl


_____
Richard Thompson


_____
Patrick Wood, III


[Signature Page to Support Agreement]

**EXHIBIT 2**
**Page 146 of 404**

**<u>COMPANY</u>:**

**NUSCALE POWER, LLC**

By: _____

      Name:

      Title:

**EXHIBIT C**                                                                                   *FINAL FORM*

### AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT

THIS AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this "***Agreement***"), dated as of [●], 2022, is made and entered into by and among NuScale Power Corp., a Delaware corporation (formerly known as Spring Valley Acquisition Corp., a Cayman Islands exempted corporation) (the "***Company***"), Spring Valley Acquisition Sponsor, LLC, a Delaware limited liability company (the "***Sponsor Parent***"), SV Acquisition Sponsor Sub, LLC, a Delaware limited liability company (the "***Sponsor***"), and the undersigned parties listed under Holder or New Holder on the signature pages hereto (each such party, together with the Sponsor and any person or entity who hereafter becomes a party to this Agreement pursuant to <u>Section 6.2</u> of this Agreement, a "***Holder***," and collectively, the "***Holders***")*.*

### RECITALS

**WHEREAS**, the Company, Spring Valley Merger Sub, LLC, a Delaware limited liability company, and NuScale Power, LLC, an Oregon limited liability company ("***NuScale***"), have entered into that certain Agreement and Plan of Merger, dated as of December 13, 2021 (as amended or supplemented from time to time, the "***Merger Agreement***," and the transactions contemplated thereby, the "***Business Combination***");

**WHEREAS**, pursuant to the transactions contemplated by the Merger Agreement, the Company domesticated as a Delaware corporation and, as a result, the Sponsor holds (i) Class A common stock, par value $0.0001 per share, of the Company (the "***Common Stock***") and (ii) warrants to purchase Common Stock at an exercise price of $11.50 per share, subject to adjustment (the "***Warrants***");

**WHEREAS**, the Company and the Sponsor Parent entered into that certain Registration and Shareholder Rights Agreement, dated as of November 23, 2020 (the "***Original RRA***");

**WHEREAS**, certain of the holders designated as New Holders on the signature pages hereto (the "***New Holders***") will have the right, in certain circumstances, to receive Class A common stock, par value $0.0001 per share, of the Company upon exchange of the New Holders' Company Common Units (as defined in the Merger Agreement) and Acquiror New Class B Stock (as defined in the Merger Agreement) (such Class A common stock received by the New Holders upon exchange is referred to as, the "***Business Combination Shares***"); and

**WHEREAS**, pursuant to Section 6.8 of the Original RRA, the provisions, covenants and conditions set forth therein may be amended or modified upon the written consent of the Company and the holders of at least a majority in interest of the "Registrable Securities" (as such term is defined in the Original RRA) at the time in question; and

**WHEREAS**, in connection with the execution of this Agreement, the Company and the Sponsor Parent desire to amend and restate the Original RRA in its entirety as set forth in this Agreement, and to include the recipients of the Business Combination Shares identified herein.

**NOW, THEREFORE**, in consideration of the mutual representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and

**EXHIBIT 2**
**Page 148 of 404**

sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     **Definitions**. The terms defined in this <u>Article 1</u> shall, for all purposes of this Agreement, have the respective meanings set forth below:

"***Agreement***" shall have the meaning given in the Preamble.

"***Block Trade***" means any non-marketed underwritten offering taking the form of a block trade to a financial institution, QIB or Institutional Accredited Investor, bought deal, over-night deal or similar transaction that does not include "road show" presentations to potential investors requiring substantial marketing effort from management over multiple days, the issuance of a "comfort letter" by the Company's auditors, and the issuance of legal opinions by the Company's legal counsel.

"***Board***" shall mean the Board of Directors of the Company.

"***Business Combination***" shall have the meaning given in the Recitals hereto.

"***Business Combination Shares***" shall have the meaning given in the Recitals hereto.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"***Closing Date***" shall have the meaning given in the Merger Agreement.

"***Commission***" shall mean the U.S. Securities and Exchange Commission.

"***Common Stock***" shall have the meaning given in the Recitals hereto.

"***Company***" shall have the meaning given in the Preamble.

"***Demand Registration***" shall have the meaning given in <u>subsection 2.2.1</u>.

"***Demanding Holder***" shall have the meaning given in <u>subsection 2.2.1</u>.

"***Effectiveness Period***" is defined in <u>Section 3.1.2</u>.

"***Exchange Act***" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time.

"***Form S-1***" means a Registration Statement on Form S-1.

"***Form S-3***" means a Registration Statement on Form S-3 or any similar short-form registration that may be available at such time.

2

**EXHIBIT 2**
**Page 149 of 404**

"*Holder*" and "*Holders*" shall have the meaning given in the Preamble.

"*Institutional Accredited Investor*" means an institutional "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

"*Joinder*" shall have the meaning given in Section 6.2.

"*Maximum Number of Securities*" shall have the meaning given in Section 2.3.

"*Merger Agreement*" shall have the meaning given in the Recitals hereto.

"*New Holders*" shall have the meaning given in the Recitals hereto.

"*NuScale*" shall have the meaning given in the Recitals hereto.

"*Original RRA*" shall have the meaning given in the Recitals hereto.

"*Permitted Transferees*" shall mean (a) the members of a Holder's immediate family (for purposes of this Agreement, "immediate family" shall mean with respect to any natural person, any of the following: such person's spouse, the siblings of such person and his or her spouse, and the direct descendants and ascendants (including adopted and step children and parents) of such person and his or her spouses and siblings), (b) any trust for the direct or indirect benefit of a Holder or the immediate family of a Holder, (c) if a Holder is a trust, to the trustor or beneficiary of such trust or to the estate of a beneficiary of such trust, (d) any officer, director, general partner, limited partner, shareholder, member, or owner of similar equity interests in a Holder or (e) any affiliate of a Holder or the immediate family of such affiliate.

"*Piggyback Registration*" shall have the meaning given in subsection 2.4.1.

"*Pro Rata*" shall have the meaning given in Section 2.3.

"*QIB*" shall mean a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"*Registrable Securities*" shall mean (a) all shares of Common Stock held by the Sponsor as of immediately following the closing of the Business Combination, (b) all Warrants held by the Sponsor Parent as of immediately following the closing of the Business Combination, (c) all shares of Common Stock issuable upon the exercise of any Warrants referred to in clause (b), (d) the Business Combination Shares held by the New Holders as of the date of this Agreement and (e) any equity securities of the Company or subsidiary of the Company that may be issued or distributed or be issuable with respect to the securities referred to in clauses (a), (b), (c) or (d) by way of conversion, dividend, stock split or other distribution, merger, consolidation, exchange, recapitalization or reclassification or similar transaction, in each case held by any Holder; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities when: (i) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (ii) such securities shall have been otherwise transferred, new certificates for such securities not bearing a

3

EXHIBIT 2
Page 150 of 404

legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (iii) such securities shall have ceased to be outstanding; (iv) following the third anniversary of this Agreement, such securities may be sold without registration pursuant to Rule 144 under the Securities Act (but without the requirement to comply with any limitations); or (v) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

"**Registration**" shall mean a registration effected by preparing and filing a registration statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"**Registration Expenses**" shall mean the out-of-pocket expenses of a Registration, including, without limitation, the following:

(a)     all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any securities exchange on which the shares of Common Stock or other Registrable Securities are then listed;

(b)     fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(c)     printing, messenger, telephone and delivery expenses;

(d)     reasonable fees and disbursements of counsel for the Company;

(e)     reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(f)     reasonable fees and expenses of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders initiating a Demand Registration in the applicable Registration or the Takedown Requesting Holder initiating an Underwritten Shelf Takedown.

"**Registration Statement**" shall mean any registration statement filed by the Company that covers the Registrable Securities pursuant to the provisions of this Agreement, including the prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

"**Requesting Holder**" shall have the meaning given in subsection 2.2.1.

"**Resale Shelf Registration Statement**" shall have the meaning given in subsection 2.1.1.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time.

"**Sponsor**" shall have the meaning given in the Preamble.

4

**EXHIBIT 2**
**Page 151 of 404**

"**Sponsor Parent**" shall have the meaning given in the Preamble.

"**Subscription Agreements**" shall mean the several subscription agreements entered into by the Company, each dated as of the date of the Merger Agreement, providing for the issuance to certain investors of Common Stock in connection with the consummation of the transactions contemplated by the Merger Agreement.

"**Transfer**" shall mean, with respect to any security, any interest therein, or any other securities or equity interests relating thereto, a direct or indirect transfer, sale, exchange, assignment, pledge, hypothecation or other encumbrance or other disposition thereof, including the grant of an option or other right, whether directly or indirectly, whether voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise. "**Transferred**" shall have a correlative meaning.

"**Underwriter**" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"**Underwritten Demand Registration**" shall mean an underwritten public offering of Registrable Securities pursuant to a Demand Registration, as amended or supplemented, that is a fully marketed underwritten offering that requires Company management to participate in "road show" presentations to potential investors requiring substantial marketing effort from management over multiple days, the issuance of a "comfort letter" by the Company's auditors, and the issuance of legal opinions by the Company's legal counsel.

"**Underwritten Registration**" or "**Underwritten Offering**" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

"**Underwritten Takedown**" shall mean an underwritten public offering of Registrable Securities pursuant to the Resale Shelf Registration Statement, as amended or supplemented that requires the issuance of a "comfort letter" by the Company's auditors and the issuance of legal opinions by the Company's legal counsel.

"**Warrants**" shall have the meaning given in the Preamble.

## ARTICLE 2
## REGISTRATIONS

2.1     <u>Resale Shelf Registration Rights</u>.

2.1.1     <u>Registration Statement Covering Resale of Registrable Securities</u>. Subject to compliance by the Holders with <u>subsection 3.3</u>, the Company shall use its commercially reasonable efforts to prepare and file or cause to be prepared and filed with the Commission, within thirty (30) calendar days following the Closing Date (the "**Filing Deadline**"), a Registration Statement on Form S-3 or similar short form registration statement that may be available at such time or its successor form, or, if the Company is ineligible to use Form S-3, a Registration Statement on Form S-1, for an offering to be made on a continuous basis pursuant to Rule 415 of the Securities Act registering the resale from time to time pursuant to any method or combination

5

**EXHIBIT 2**
**Page 152 of 404**

of methods legally available to, and requested by, the Holders of all of the Registrable Securities then held by such Holders that are not then covered by an effective resale registration statement (the "***Resale Shelf Registration Statement***"). The Company shall use commercially reasonable efforts to cause the Resale Shelf Registration Statement to be declared effective as soon as practicable after filing, but in any event no later than the earlier of (i) ninety (90) days (or one hundred twenty (120) days if the Commission notifies the Company that it will "review" the Registration Statement) after the date of this Agreement and (ii) the tenth (10th) Business Day after the date the Company is notified (orally or in writing, whichever is earlier) by the Commission that such Registration Statement will not be "reviewed" or will not be subject to further review (such deadline the "***Effectiveness Deadline***"), underlined(provided), that if the Filing Deadline or Effectiveness Deadline falls on a Saturday, Sunday or other day that the Commission is closed for business, the Filing Deadline or Effectiveness Deadline, as the case may be, shall be extended to the next Business Day on which the Commission is open for business, and, once effective, to keep the Resale Shelf Registration Statement continuously effective under the Securities Act at all times until the expiration of the Effectiveness Period. In the event that the Company files a Form S-1 pursuant to this Section 2.1, the Company shall use commercially reasonable efforts to convert the Form S-1 to a Form S-3 as soon as practicable after the Company is eligible to use Form S-3.

2.1.2    Notification and Distribution of Materials. The Company shall notify the Holders in writing of the effectiveness of the Resale Shelf Registration Statement and shall furnish to them, without charge, such number of copies of the Resale Shelf Registration Statement (including any amendments, supplements and exhibits), the prospectus contained therein (including each preliminary prospectus and all related amendments and supplements) and any documents incorporated by reference in the Resale Shelf Registration Statement or such other documents as the Holders may reasonably request in order to facilitate the sale of the Registrable Securities in the manner described in the Resale Shelf Registration Statement.

2.1.3    Amendments and Supplements. Subject to the provisions of subsection 2.1.1, the Company shall promptly prepare and file with the Commission from time to time such amendments and supplements to the Resale Shelf Registration Statement and prospectus used in connection therewith as may be necessary to keep the Resale Shelf Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all the Registrable Securities during the Effectiveness Period.

2.1.4    Notice of Certain Events. The Company shall promptly notify the Holders in writing of any request by the Commission for any amendment or supplement to, or additional information in connection with, the Resale Shelf Registration Statement required to be prepared and filed hereunder (or prospectus relating thereto). The Company shall promptly notify each Holder in writing of the filing of the Resale Shelf Registration Statement or any prospectus, amendment or supplement related thereto or any post-effective amendment to the Resale Shelf Registration Statement and the effectiveness of any post-effective amendment.

2.1.5    Underwritten Takedown. If the Company shall receive a request from the Holders of Registrable Securities with an estimated market value of at least $35,000,000 that the Company effect a Underwritten Takedown of all or any portion of the requesting holder's Registrable Securities, then the Company shall promptly give notice of such requested Underwritten Takedown at least three (3) Business Days prior to the anticipated filing date of the

**EXHIBIT 2**
**Page 153 of 404**

prospectus or supplement relating to such Underwritten Takedown to the other Holders and thereupon shall use commercially reasonable efforts to effect, as expeditiously as practicable, the offering in such Underwritten Takedown of:

(a)  subject to the restrictions set forth in Section 2.3, all Registrable Securities for which the requesting holder has requested such offering under this subsection 2.1.5, and

(b)  subject to the restrictions set forth in Section 2.3, all other Registrable Securities that any Holders have requested the Company to offer by request received by the Company within one (1) Business Day after such holders receive the Company's notice of the Underwritten Takedown Notice, all to the extent necessary to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Securities so to be offered.

(c)  Promptly after the expiration of the one-Business Day-period referred to in subsection 2.1.5(b), the Company will notify all selling holders of the identities of the other selling holders in the Underwritten Takedown and the number of shares of Registrable Securities requested to be included therein.

(d)  The Company shall only be required to effectuate one Underwritten Takedown pursuant to this Agreement within any six-month period and not more than five times in the aggregate.

2.1.6  Block Trade. If the Company shall receive a request from the Holders of Registrable Securities with an estimated market value of at least $15,000,000 that such holders wish to effect the sale of all or any portion of the Registrable Securities in a Block Trade, then the Company shall, as expeditiously as practicable, use commercially reasonable efforts to facilitate the offering of such Registrable Securities for which such requesting holder has requested in such Block Trade, and in any event, within 72 hours of receipt of such request. A Holder of Registrable Securities in the aggregate may demand no more than two Block Trades pursuant to this Section 2.1.6 in any 12-month period. For the avoidance of doubt, any Block Trade effected pursuant to this Section 2.1.6 shall not be counted as a demand for an Underwritten Takedown pursuant to Section 2.1.5.

2.1.7  Withdrawal. Holders of majority-in-interest of the Registrable Securities included in an Underwritten Takedown may elect to withdraw from such Underwritten Takedown by giving written notice to the Company and the Underwriter or Underwriters of their request to withdraw prior to the public announcement of such Underwritten Takedown, in which case, such withdrawn Underwritten Takedown will count as an Underwritten Takedown for the purposes of subsection 2.1.5(d) unless the withdrawing holders reimburse the Company for all Registration Expenses with respect to such Underwritten Takedown; provided, however, that if at the time of such withdrawal, the withdrawing holders have learned of a material adverse change in the condition, business or prospects of the Company from that known to the holders at the time of their request and have withdrawn the request with reasonable promptness following disclosure by the Company of such material adverse change, then the withdrawing holders shall not be required to pay any of such expenses and shall retain their rights pursuant to subsection 2.1.5(d). Following

7

EXHIBIT 2
Page 154 of 404

the receipt of a notice of withdrawal, the Company shall promptly forward such notice to any other holders that had elected to participate in such Underwritten Takedown. The Company shall be responsible for the Registration Expenses incurred in connection with an Underwritten Takedown prior to its withdrawal under this subsection 2.1.7, other than if a holder elects to pay such Registration Expenses pursuant to this subsection 2.1.7.

2.1.8   Selection of Underwriters. In connection with an Underwritten Takedown, the Company shall have the right to select the Underwriters for such offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the prior reasonable approval by the selling holder(s) (which approval shall not be unreasonably withheld, conditioned or delayed). The Company shall enter into customary agreements (including an underwriting agreement in customary form) and take such other actions as are reasonably required in order to expedite or facilitate the disposition of the Registrable Securities in such Underwritten Takedown, including, if necessary, the engagement of a "qualified independent underwriter" in connection with the qualification of the underwriting arrangements with the Financial Industry Regulatory Authority, Inc. No holder participating in an Underwritten Takedown shall be required to make any representations or warranties to or agreements with the Company or the Underwriters other than representations, warranties or agreements regarding such holder's authority to enter into such underwriting agreement and to sell, and its ownership of, the securities being registered on its behalf, its intended method of distribution and any other representation required by law.

2.1.9   Underwritten Takedowns effected pursuant to this Section 2.1 shall be counted as Demand Registrations effected pursuant to Section 2.2.

2.2   Demand Registration.

2.2.1   Request for Registration. Subject to compliance with Section 3.4 hereof, if there is not an effective Resale Shelf Registration Statement available for the resale for the Registrable Securities pursuant to Section 2.1, at any time and from time to time on or after the date that is 180 days from the consummation of the Business Combination, the Holders who hold at least a majority in interest of the then-outstanding number of Registrable Securities (the "**Demanding Holders**") may make a written demand for Registration of all or part of their Registrable Securities, which written demand shall describe the amount and type of securities to be included in such Registration and the intended method(s) of distribution thereof (such written demand a "**Demand Registration**"). The Company shall, within five (5) days of the Company's receipt of the Demand Registration, notify, in writing, all other Holders of such demand, and each Holder who thereafter wishes to include all or a portion of such Holder's Registrable Securities in a Registration pursuant to a Demand Registration (each such Holder that includes all or a portion of such Holder's Registrable Securities in such Registration, a "**Requesting Holder**") shall so notify the Company, in writing, within five (5) business days after the receipt by the Holder of the notice from the Company. Upon receipt by the Company of any such written notification from a Requesting Holder(s) to the Company, such Requesting Holder(s) shall be entitled to have their Registrable Securities included in a Registration pursuant to a Demand Registration and the Company shall use its commercially reasonable efforts to effect, as soon thereafter as practicable, the Registration of all Registrable Securities requested by the Demanding Holders and Requesting Holders pursuant to such Demand Registration. Under no circumstances shall the Company be obligated pursuant to this Agreement to take any action to effect: (1) any such Demand

8

EXHIBIT 2
Page 155 of 404

Registration for less than [●][1]% of the Company's then outstanding Common Stock, (2) more than one (1) Demand Registration during any six-month period, (3) more than three (3) Demand Registrations in total pursuant to this Section 2.2.1, or (4) any Demand Registration at any time there is an effective Resale Shelf Registration Statement on file with the Commission pursuant to Section 2.1.

      2.2.2   Effective Registration. Notwithstanding the provisions of subsection 2.2.1 above or any other part of this Agreement, a Registration pursuant to a Demand Registration shall not count as a Registration unless and until (a) the Registration Statement filed with the Commission with respect to a Registration pursuant to a Demand Registration has been declared effective by the Commission and (b) the Company has complied with all of its obligations under this Agreement with respect thereto; provided, however, that if, after such Registration Statement has been declared effective, an offering of Registrable Securities in a Registration pursuant to a Demand Registration is subsequently interfered with by any stop order or injunction of the Commission, federal or state court or any other governmental agency the Registration Statement with respect to such Registration shall be deemed not to have been declared effective, unless and until, (i) such stop order or injunction is removed, rescinded or otherwise terminated and (ii) a majority-in-interest of the Demanding Holders initiating such Demand Registration thereafter affirmatively elect to continue with such Registration and accordingly notify the Company in writing, but in no event later than five (5) business days, of such election; provided, further, that the Company shall not be obligated or required to file another Registration Statement until a Registration Statement that has been filed is counted as a Demand Registration or is terminated.

      2.2.3   Underwritten Demand Registration. If a majority-in-interest of the Demanding Holders so advise the Company as part of their Demand Registration that the offering of the Registrable Securities pursuant to such Demand Registration shall be in the form of an Underwritten Demand Registration, then the right of such Demanding Holder or Requesting Holder (if any) to include its Registrable Securities in such Registration shall be conditioned upon such Holder's participation in such Underwritten Offering and the inclusion of such Holder's Registrable Securities in such Underwritten Offering to the extent provided herein. All such Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such underwriting by the Company (which shall consist of one or more reputable nationally recognized investment banks), subject to the prior reasonable approval by the Demanding Holder(s) (which approval shall not be unreasonably withheld, conditioned or delayed). The parties agree that, in order to be effected, any Underwritten Demand Registration must result in aggregate proceeds to the selling shareholders of at least $35,000,000.

      2.2.4   Withdrawal. A majority-in-interest of the Demanding Holders may elect to withdraw from such Demand Registration by giving written notice to the Company and the Underwriter or Underwriters of their request to withdraw prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Demand Registration, in which case, such withdrawn Demand Registration will count as a Demand Registration for the purposes of subsection 2.2.1 unless the withdrawing Holders reimburse the Company for all Registration Expenses with respect to such Demand Registration; provided, however, that if at the

---

[1]   Note to draft: To include Sponsor, so long as it holds more than 1,000,000 SPAC shares.

**EXHIBIT 2**
**Page 156 of 404**

time of such withdrawal, the withdrawing Holders have learned of a material adverse change in the condition, business or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness following disclosure by the Company of such material adverse change, then the withdrawing Holders shall not be required to pay any of such expenses and shall retain their rights pursuant to <u>subsection 2.1.5(b)</u>. Following the receipt of a notice of withdrawal, the Company shall promptly forward such notice to any other Holders that had elected to participate in such Demand Registration. The Company shall be responsible for the Registration Expenses incurred in connection with a Demand Registration prior to its withdrawal under this <u>subsection 2.2.4</u>, other than if a Holder elects to pay such Registration Expenses pursuant to this <u>subsection 2.2.4</u>.

2.3    <u>Reduction of Underwritten Offering</u>. If the managing Underwriter or Underwriters in an Underwritten Registration conducted pursuant to this Agreement advises the Company, the Demanding Holders and the Requesting Holders (if any) in writing that, in such Underwriters' opinion, the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other securities of the Company that the Company desires to sell and the shares of Common Stock, if any, as to which a Registration has been requested pursuant to separate written contractual piggyback registration rights held by any other shareholders who desire to sell, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "***Maximum Number of Securities***"*)*, then the Company shall include in such Underwritten Offering, as follows: (a) first, the Registrable Securities of the Demanding Holders and the Requesting Holders (if any) (pro rata based on the respective number of Registrable Securities that each Demanding Holder and Requesting Holder (if any) has requested be included in such Underwritten Registration and the aggregate number of Registrable Securities that the Demanding Holders and Requesting Holders have requested be included in such Underwritten Registration, regardless of the number of shares held by each such person (such proportion is referred to herein as "***Pro Rata***")) that can be sold without exceeding the Maximum Number of Securities; (b) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (a), the securities of the Company that the Company desires to sell for its own account; and (c) any securities of the Company for the account of other persons that the Company is obligated to register pursuant to written contractual arrangements with such persons as to which "piggyback" registration has been requested by the holders thereof that can be sold without exceeding the Maximum Number of Securities.

2.4    <u>Piggyback Registration</u>.

2.4.1    <u>Piggyback Rights</u>. If, at any time, subject to compliance by the Holders with <u>Section 3.3</u>, the Company proposes to file a Registration Statement under the Securities Act with respect to an offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into equity securities, for its own account or for equityholders of the Company for their account (or by the Company and by the stockholders of the Company including, without limitation, pursuant to <u>Section 2.2</u> hereof (subject to <u>Section 2.3</u>)), other than a Registration Statement (a) filed in connection with any employee stock option or other benefit plan, (b) for an exchange offer or offering of securities solely to the Company's existing

10

**EXHIBIT 2**
**Page 157 of 404**

stockholders, (c) for an offering of debt that is convertible into equity securities of the Company, (d) for a dividend reinvestment plan, or (e) for a corporate reorganization or transaction under Rule 145 of the Securities Act, then the Company shall give written notice of such proposed filing to all of the Holders of Registrable Securities as soon as practicable but not less than seven (7) days before the anticipated filing date of such Registration Statement, which notice shall (i) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (ii) offer to all of the Holders of Registrable Securities the opportunity to register the sale of such number of Registrable Securities as such holders may request in writing within three (3) business days after receipt of such written notice (a "***Piggyback Registration***"). The Company shall cause such Registrable Securities to be included in such registration and shall use its commercially reasonable efforts to cause the managing Underwriter or Underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested to be included in a Piggyback Registration on the same terms and conditions as any similar securities of the Company and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. All holders proposing to distribute their securities through a Piggyback Registration shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Piggyback Registration.

2.4.2   <u>Reduction of Piggyback Registration</u>. If the managing Underwriter or Underwriters in an Underwritten Registration that is to be a Piggyback Registration advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that, in such Underwriters' opinion, the dollar amount or number of securities of the Company that the Company desires to sell for its own account, taken together with securities of the Company, if any, as to which Registration has been demanded pursuant to written contractual arrangements with persons other than the Holders of Registrable Securities hereunder, and the Registrable Securities as to which Registration has been requested pursuant this <u>Section 2.4</u>, exceeds the Maximum Number of Securities, then the Company shall include in any such Registration:

(a)    If the Registration is undertaken for the Company's account: (i) first, the securities of the Company that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Registrable Securities as to which Registration has been requested pursuant to the terms of this Agreement which can be sold without exceeding the Maximum Number of Securities; and (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the securities of the Company for the account of other persons that the Company is obligated to register pursuant to written contractual piggyback registration rights with such persons, other than pursuant to this Agreement, which can be sold without exceeding the Maximum Number of Securities; and

(b)    If the Registration is undertaken as a demand pursuant to contractual rights with the Company other than this Agreement: (i) first, the securities of the Company for the account of the persons entitled to such contractual rights making such demand that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the

Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to the terms of this Agreement that can be sold without exceeding the Maximum Number of Securities, Pro Rata; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the securities of the Company that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i), (ii) and (iii), the securities of the Company for the account of any other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities, which can be sold without exceeding the Maximum Number of Securities.

2.4.3    Piggyback Registration Withdrawal. Any Holder shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration, if such offering is pursuant to a Demand Registration, or prior to the public announcement of the offering, if such offering is pursuant to an Underwritten Takedown or similar transaction. The Company (whether on its own determination or as the result of a withdrawal by persons pursuant to written contractual obligations) may withdraw a Registration Statement at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this subsection 2.4.3.

2.5    Lock-up. The Company agrees and shall cause each director and officer (that makes filings pursuant to Section 16 of the Exchange Act) of the Company, along with any affiliated trust holding securities controlled by or for the benefit of such directors and officers or any other entity holding equity interests of the Company over which any such director or officer exercises dispositive control with respect to such equity securities of the Company, to agree, that, in connection with each sale of Registrable Securities pursuant to Section 2.1 or Section 2.2 conducted as an Underwritten Offering, if requested, to become bound by and to execute and deliver a customary lock-up agreement with the Underwriter(s) of such offering restricting such applicable person's or trust's right to (a) Transfer, directly or indirectly, any equity securities of the Company held by such person or entity or (b) enter into any swap or other arrangement that transfers to another any of the economic consequences of ownership of such securities during the period commencing on the date of the final prospectus relating to such offering and ending on the date specified by the Underwriters (such period not to exceed ninety (90) days). The terms of such lock-up agreements shall be negotiated among the applicable Holders, the Company and the Underwriters and shall include customary exclusions from the restrictions on Transfer set forth therein.

# ARTICLE 3
# COMPANY PROCEDURES

3.1    General Procedures. If at any time on or after the date the Company consummates a Business Combination the Company is required to effect the Registration of Registrable Securities, the Company shall use commercially reasonable efforts to effect such Registration to

**EXHIBIT 2**
**Page 159 of 404**

permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall, as expeditiously as practicable:

3.1.1    use commercially reasonable efforts to prepare and file with the Commission as soon as practicable a Registration Statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such Registration Statement to become effective and use commercially reasonable efforts to keep it effective until all Registrable Securities covered by such Registration Statement have been sold; provided, however, that the Company shall have the right to defer any Demand Registration for up to ninety (90) days, and any Piggy-Back Registration for such period as may be applicable to deferment of any Demand Registration under this Agreement to which such Piggy-Back Registration relates, in each case if the Company shall furnish to the holders a certificate signed by the Chief Executive Officer or Chairman of the Company stating that, in the good faith judgment of the Board, it would be materially detrimental to the Company and its stockholders for such Registration Statement to be effected at such time;

3.1.2    prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the prospectus, as may be requested by any holder that holds at least 5% of the Registrable Securities registered on such Registration Statement or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the prospectus or such securities have been withdrawn (the "*Effectiveness Period*");

3.1.3    prior to filing a Registration Statement or prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and the Holders of Registrable Securities included in such Registration, and such Holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the prospectus included in such Registration Statement (including each preliminary prospectus), and such other documents as the Underwriters and the Holders of Registrable Securities included in such Registration or the legal counsel for any such Holders may request in order to facilitate the disposition of the Registrable Securities owned by such Holders;

3.1.4    prior to any public offering of Registrable Securities, use commercially reasonable efforts to (a) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as the Holders of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request (or provide evidence satisfactory to such Holders that the Registrable Securities are exempt from such registration or qualification) and (b) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such

13

**EXHIBIT 2**
**Page 160 of 404**

jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5    use commercially reasonable efforts to cause all such Registrable Securities to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed;

3.1.6    provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7    advise each seller of such Registrable Securities, promptly after it shall receive written notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8    at least five (5) days prior to the filing of any Registration Statement or prospectus or any amendment or supplement to such Registration Statement or prospectus (other than by way of a document incorporated by reference) furnish a copy thereof to each seller of such Registrable Securities or its counsel;

3.1.9    comply with all applicable rules and regulations of the Commission and the Securities Act, and make available to its stockholders, as soon as practicable, an earnings statement covering a period of twelve (12) months, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

3.1.10  permit a representative of the Holders (such representative to be selected by a majority-in-interest of the participating Holders), the Underwriters, if any, and any attorney or accountant retained by such Holders or Underwriter to participate, at each such person's own expense, in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, attorney or accountant in connection with the Registration; provided, however, that such representatives or Underwriters enter into a confidentiality agreement, in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information;

3.1.11  obtain a "cold comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Registration, in customary form and covering such matters of the type customarily covered by "cold comfort" letters as the managing Underwriter may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.12  on the date the Registrable Securities are delivered for sale pursuant to such Registration, obtain an opinion, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the Holders, the placement agent or sales agent, if any, and the Underwriters, if any, covering such legal matters with respect to the Registration in respect

14

**EXHIBIT 2**
**Page 161 of 404**

of which such opinion is being given as the Holders, placement agent, sales agent, or Underwriter may reasonably request and as are customarily included in such opinions and negative assurance letters, and reasonably satisfactory to a majority in interest of the participating Holders;

        3.1.13 in the event of any Underwritten Offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing Underwriter of such offering;

        3.1.14 with respect to an Underwritten Offering, if the Registration involves the Registration of Registrable Securities with an aggregate offering price (before deduction of underwriting discounts) in excess of $50,000,000, use commercially reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter in any Underwritten Offering; and

        3.1.15 otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the Holders, in connection with such Registration.

Notwithstanding the foregoing, the Company shall not be required to provide any documents or information to an Underwriter or other sales agent or placement agent if such Underwriter or other sales agent or placement agent has not then been named with respect to the applicable Underwritten Offering or other coordinated offering that is registered pursuant to a Registration Statement.

3.2    <u>Registration Expenses</u>. The Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders, in each case pro rata based on the number of Registrable Securities that such Holders have sold in such Registration.

3.3    <u>Requirements for Participation in Underwritten Offerings</u>. Notwithstanding anything in this Agreement to the contrary, if any Holder does not timely provide the Company with any requested information in connection with an Underwritten Offering, the Company may exclude such Holder's Registrable Securities from the applicable Registration Statement if the Company determines, based on the advice of counsel, that such information is necessary to effect the registration and such Holder continues thereafter to withhold such information. No person may participate in any Underwritten Offering or other coordinated offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person (i) agrees to sell such person's securities on the basis provided in any arrangements approved by the Company and (ii) timely completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting or other agreements and other customary documents as may be reasonably required under the terms of such arrangements. The exclusion of a Holder's Registrable Securities as a result of this <u>Section 3.3</u> shall not affect the registration of the other Registrable Securities to be included in such Registration.

**EXHIBIT 2**
**Page 162 of 404**

3.4   <u>Information</u>. The Holders of Registrable Securities shall promptly provide such information as may reasonably be requested by the Company, or the managing Underwriter, if any, in connection with the preparation of any Registration Statement, including amendments and supplements thereto, in order to effect the registration of any Registrable Securities under the Securities Act and in connection with the Company's obligation to comply with Federal and applicable state securities laws.

## ARTICLE 4
## INDEMNIFICATION AND CONTRIBUTION

4.1   <u>Indemnification</u>.

4.1.1   The Company agrees to indemnify, to the extent permitted by law, each Holder and each of their respective affiliates and each of their respective officers, employees, directors, partners, members, attorneys and agents, and each person, if any, who controls a Holder (within the meaning of the Securities Act or the Exchange Act) against all losses, claims, damages, liabilities and reasonable expenses (including reasonable outside attorneys' fees) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such Holder expressly for use therein or is based on any selling holder's violation of the federal securities laws (including Regulation M) or failure to sell the Registrable Securities in accordance with the plan of distribution contained in the prospectus.

4.1.2   In connection with any Registration Statement in which a Holder is participating, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and agents and each person who controls the Company (within the meaning of the Securities Act or the Exchange Act) against any losses, claims, damages, liabilities and expenses (including without limitation reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such Holder expressly for use therein or is based on any selling holder's violation of the federal securities laws (including Regulation M) or failure to sell the Registrable Securities in accordance with the plan of distribution contained in the prospectus; <u>provided</u>, <u>however</u>, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement.

4.1.3   Any person or entity entitled to indemnification herein shall (a) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification

**EXHIBIT 2**
**Page 163 of 404**

(provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (b) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4    The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person or entity of such indemnified party and shall survive the transfer of securities. The Company and each Holder participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

4.1.5    If the indemnification provided under Section 4.1 hereof from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this subsection 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in subsections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this subsection 4.1.5 were determined by pro rata allocation or by any other method of allocation, which does not take account

17

**EXHIBIT 2**
**Page 164 of 404**

of the equitable considerations referred to in this <u>subsection 4.1.5</u>. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this <u>subsection 4.1.5</u> from any person who was not guilty of such fraudulent misrepresentation.

## ARTICLE 5
## UNDERWRITING AND DISTRIBUTION

5.1     <u>Rule 144</u>. The Company covenants that it shall file any reports required to be filed by it under the Securities Act and the Exchange Act and shall take such further action as the Holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable such holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission.

## ARTICLE 6
## MISCELLANEOUS

6.1     <u>Notices</u>. Any notice or communication under this Agreement must be in writing and given by (a) deposit in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (b) delivery in person or by courier service providing evidence of delivery, or (c) transmission by hand delivery, electronic mail or facsimile. Each notice or communication that is mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery, electronic mail or facsimile, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed to the parties as follows:

If to the Company:

NuScale Power Corp.
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attention:  General Counsel
Email:       generalcounsel@nuscalepower.com

With copies (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attention:  David C. Lee
                 John M. Williams III
                 Evan M. D'Amico

18

**EXHIBIT 2**
**Page 165 of 404**

E-mail:    DLee@GibsonDunn.com
             JWilliams@GibsonDunn.com
             EDAmico@GibsonDunn.com

Stoel Rives LLP
760 SW Ninth Avenue
Suite 3000
Portland, OR 97205
Attention:  Jason M. Brauser
             James M. Kearney
E-mail:    Jason.brauser@stoel.com
             Jim.kearney@stoel.com

If to the Sponsor or Sponsor Parent:

2100 McKinney Ave, Suite 1675
Dallas, TX 75201
Attention: Christopher Sorrells
Email: chris.sorrells@sv-ac.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002
Attention:  Matthew R. Pacey
Email:    matt.pacey@kirkland.com

If to any Holder, at such Holder's address or facsimile number as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this Section 6.1.

6.2    Assignment; No Third Party Beneficiaries. This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company in whole or in part. This Agreement and any of the rights, duties and obligations of the Holders hereunder may be freely assigned or delegated, in whole or in part, by such Holder in conjunction with and to the extent of any Transfer of any Registrable Security by any such Holder to a Permitted Transferee(s). This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns and the Holders and their respective successors and permitted assigns. This Agreement is not intended to confer any rights or benefits on any persons that are not party hereto other than as expressly set forth in Section 4 and this Section 6.2. The rights of a Holder under this Agreement may be Transferred, in whole or in part, by such Holder to a transferee who acquires or holds any Registrable Security; provided, however, that such transferee has executed and delivered to the Company a properly completed agreement to be bound by the terms of this Agreement

19

**EXHIBIT 2**
**Page 166 of 404**

substantially in form attached hereto as Exhibit A (a "*Joinder*"), and the transferor shall have delivered to the Company no later than five (5) business days following the date of the Transfer, written notification of such Transfer setting forth the name of the transferor, the name and address of the transferee, and the number of Registrable Securities so Transferred. The execution of a Joinder shall constitute a permitted amendment of this Agreement.

6.3    Amendments and Modifications. Upon the written consent of the Company and the holders of at least a majority in interest of the Registrable Securities at the time in question, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; provided, however, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects a Holder, solely in his, her or its capacity as a holder of the securities of the Company, in a manner that is materially different from other Holders (in such capacity) shall require the consent of such Holder so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company.

6.4    Other Registration Rights and Arrangements. Other than with respect to the Subscription Agreements, the Company represents and warrants that no person, other than a holder of the Registrable Securities has any right to require the Company to register any of the Company's share capital or capital stock for sale or to include the Company's share capital or capital stock in any registration filed by the Company for the sale of shares for its own account or for the account of any other person. The parties hereby terminate the Original RRA, which shall be of no further force and effect and is hereby superseded and replaced in its entirety by this Agreement. The Company shall not hereafter enter into any agreement with respect to its securities that would provide to such holder registration rights on a basis more favorable than the registration rights granted to the Holders in this Agreements or violate the rights granted to the Holders in this Agreement, and in the event of any conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

6.5    Term. This Agreement shall terminate upon the earlier of (a) the tenth (10th) anniversary of the date of this Agreement or (b) the date as of which there shall be no Registrable Securities outstanding; provided further that with respect to any Holder, such Holder will have no rights under this Agreement and all obligations of the Company to such Holder under this Agreement shall terminate upon the date that such Holder no longer holds Registrable Securities.

6.6    Severability. This Agreement shall be deemed severable, and the invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of this Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible that is valid and enforceable.

6.7    Counterparts. This Agreement may be executed in multiple counterparts (including facsimile or PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced. Signatures

to this Agreement transmitted via facsimile or e-mail shall be valid and effective to bind the party so signing (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law (e.g., www.docusign.com)).

6.8    Entire Agreement. This Agreement (including all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto) constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, representations, understandings, negotiations and discussions between the parties, whether oral or written, including, without limitation, the Original RRA.

6.9    Governing Law; Venue. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT THIS AGREEMENT, THE RIGHTS OF THE PARTIES UNDER OR IN CONNECTION HEREWITH OR IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, AND ALL ACTIONS ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION HEREWITH OR THEREWITH (WHETHER AT LAW OR IN EQUITY, WHETHER SOUNDING IN CONTRACT, TORT, STATUTE OR OTHERWISE) SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE AS APPLIED TO AGREEMENTS AMONG DELAWARE RESIDENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN DELAWARE, WITHOUT REGARD TO THE CHOICE OR CONFLICT OF LAW PROVISIONS OF SUCH JURISDICTION.

6.10    Consent to Jurisdiction; Venue; Service. Each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware located in Wilmington, Delaware, or if (but only if) such court does not have subject matter jurisdiction, the state or federal courts located in the State of Delaware for the purpose of any suit, action or other proceeding described in Section 6.9; (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, and agrees not to allow any of its subsidiaries to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such suit, action or proceeding brought in one of the above-named courts is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court; and (c) hereby agrees not to commence or maintain any such action other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise. Each party to this Agreement hereby also (i) consents to service of process in any action described in this Section 6.10 in any manner permitted by Delaware law, (ii) agrees that service of process made in accordance with clause (i) or made by overnight delivery by a nationally recognized courier service addressed to a party's address specified pursuant to Section 6.1 shall constitute good and valid service of process in any such action and (iii) waives and agrees not to assert (by way of motion, as a defense or otherwise) in any such action any claim that service of process made in accordance with clause (i) or (ii) does not constitute good and valid service of process. Notwithstanding the foregoing in

21

EXHIBIT 2
Page 168 of 404

this Section 6.10, a party may commence any action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

6.11 **WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM OR OTHER PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, CONNECTED WITH OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF THE SPONSOR OR SPONSOR PARENT IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.**

6.12    Titles and Headings. Titles and headings of sections of this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

6.13    Waivers and Extensions. Any party to this Agreement may waive any right, breach or default which such party has the right to waive, provided that such waiver will not be effective against the waiving party unless it is in writing, is signed by such party, and specifically refers to this Agreement. Waivers may be made in advance or after the right waived has arisen or the breach or default waived has occurred. Any waiver may be conditional. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof nor of any other agreement or provision herein contained. No waiver or extension of time for performance of any obligations or acts shall be deemed a waiver or extension of the time for performance of any other obligations or acts.

6.14    Remedies Cumulative. In the event that the Company fails to observe or perform any covenant or agreement to be observed or performed under this Agreement, the Holders may proceed to protect and enforce its rights by suit in equity or action at law, whether for specific performance of any term contained in this Agreement or for an injunction against the breach of any such term or in aid of the exercise of any power granted in this Agreement or to enforce any other legal or equitable right, or to take any one or more of such actions, without being required to post a bond. None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy, whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

*[SIGNATURE PAGES FOLLOW]*

**EXHIBIT 2**
**Page 169 of 404**

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed as of the date first written above.

**COMPANY:**

**NUSCALE POWER CORP.**

By: _____

Name:

Title:

*[Signature Page to Amended and Restated Registration Rights Agreement]*

**EXHIBIT 2**
**Page 170 of 404**

**HOLDERS:**

**SPRING VALLEY ACQUISITION SPONSOR, LLC**


By: _____
Name:    David Levinson
Title:    Corporate Secretary


**SPRING VALLEY ACQUISITION SPONSOR SUB, LLC**


By: _____
Name:    David Levinson
Title:    Corporate Secretary

[*Signature Page to Amended and Restated Registration Rights Agreement*]

**EXHIBIT 2**
**Page 171 of 404**

**NEW HOLDERS:**

**[●]**


By: _____
Name:
Title:

*[Signature Page to Amended and Restated Registration Rights Agreement]*

**EXHIBIT 2**
**Page 172 of 404**

**EXHIBIT A**

**Joinder**

This Joinder ("*Joinder*") is executed on _____, 20__, by the undersigned (the "*New Holder*") pursuant to the terms of that certain Amended and Restated Registration Rights Agreement, dated as of [●], 2022 (the "*Agreement*"), by and among NuScale Power Corp., a Delaware corporation (formerly known as Spring Valley Acquisition Corp., a Cayman Islands exempted company) (the "*Company*"), and the Holders identified therein, as such Agreement may be amended, supplemented or otherwise modified from time to time. Capitalized terms used but not defined in this Joinder shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Joinder, the New Holder hereby agrees as follows:

1. Acknowledgment. New Holder acknowledges that New Holder is acquiring certain equity securities of the Company (the "*Shares*") as a transferee of such Shares from a party in such party's capacity as a holder of Registrable Securities under the Agreement, and after such transfer, New Holder shall be considered a holder of Registrable Securities (a "Holder") for all purposes under the Agreement.

2. Agreement. New Holder hereby (a) agrees that the Shares shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if the New Holder were originally a party thereto.

3. Notice. Any notice required or permitted by the Agreement shall be given to New Holder at the address or facsimile number listed below New Holder's signature below.

**NEW HOLDER:**                                          ACCEPTED AND AGREED:

Print Name: _____          **COMPANY**

By: _____                       By: _____

Address: _____

_____

**EXHIBIT 2**
**Page 173 of 404**

**EXHIBIT D**                                                                    *FINAL FORM*

## LOCK-UP AGREEMENT

[On or before Closing Date]

Spring Valley Acquisition Corp.
2100 McKinney Ave., Suite 1675
Dallas, TX 75201

Re: Lock-Up Agreement

Ladies and Gentlemen:

This letter (this "Letter Agreement") is being delivered to you in accordance with that certain Agreement and Plan of Merger (the "Merger Agreement"), dated as of December 13, 2021, entered into by and among Spring Valley Acquisition Corporation, a Cayman Islands exempted corporation (together with its successor after the Redomicile, the "Acquiror"), Spring Valley Merger Sub, LLC, an Oregon limited liability company ("Merger Sub"), and NuScale Power, LLC, an Oregon limited liability company (the "Company"), pursuant to which, among other things, Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Acquiror. Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Merger Agreement.

In order to induce Acquiror to proceed with the Merger and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned (the "Securityholder") hereby agrees with Acquiror as follows:

1.      Subject to the exceptions set forth herein, the Securityholder agrees not to, without the prior written consent of the board of directors of Acquiror, (a) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, any shares of Acquiror Common Stock ("Common Stock") held by it immediately after the effective time of the Merger, any shares of Common Stock issuable upon the exercise of options to purchase shares of Common Stock held by the Securityholder immediately after the effective time of the Merger, or any securities convertible into or exercisable or exchangeable for Common Stock held by the Securityholder immediately after the effective time of the Merger (the "Lock-up Shares"), (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of the Lock-up Shares, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise or (c) publicly announce any intention to effect any transaction specified in clause (a) or (b) (the actions specified in clauses (a)-(c), collectively, "Transfer") until 180 days after the closing date of the Merger (the "Lock-Up Period"), subject to the early release provisions set forth in Section 2 below.

105041173.8

**EXHIBIT 2**
**Page 174 of 404**

2.      The restrictions set forth in paragraph 1 shall not apply to:

(i)      in the case of an entity, (A) to another entity that is an affiliate (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended) of the undersigned, or to any investment fund or other entity controlling, controlled by, managing or managed by or under common control with the undersigned or affiliates of the undersigned or who shares a common investment advisor with the undersigned or (B) as part of a distribution to members, partners or shareholders of the undersigned;

(ii)      in the case of an individual, Transfers by gift to members of the individual's immediate family (as defined below) or to a trust, the beneficiary of which is a member of one of the individual's immediate family, an affiliate of such person or to a charitable organization;

(iii)      in the case of an individual, Transfers by virtue of laws of descent and distribution upon death of the individual;

(iv)      in the case of an individual, Transfers by operation of law or pursuant to a court order, such as a qualified domestic relations order, divorce decree or separation agreement;

(v)      in the case of an individual, Transfers to a partnership, limited liability company or other entity of which the undersigned and/or the immediate family (as defined below) of the undersigned are the legal and beneficial owner of all of the outstanding equity securities or similar interests;

(vi)      in the case of an entity that is a trust, Transfers to a trustor or beneficiary of the trust or to the estate of a beneficiary of such trust;

(vii)      in the case of an entity, Transfers by virtue of the laws of the state of the entity's organization and the entity's organizational documents upon dissolution of the entity;

(viii)      Transfers of any shares of Common Stock or other securities acquired as part of the private placement with such Subscribers (as defined in the Merger Agreement) or issued in exchange for, or on conversion or exercise of, any securities issued as part of the private placement with such Subscribers;

(ix)      transactions relating to Common Stock or other securities convertible into or exercisable or exchangeable for Common Stock acquired in open market transactions after the effective time of the Merger, provided, that no such transaction is required to be, or is, publicly announced (whether on Form 4, Form 5 or otherwise, other than a required filing on Schedule 13F, 13G or 13G/A) during the Lock-Up Period;

(x)      the exercise of stock options or warrants to purchase shares of Common Stock or the settlement of stock or unit appreciation rights that are based on, and settled with, Common Stock or the vesting of stock awards of Common Stock and any related transfer of shares of Common Stock to Acquiror in connection therewith (A) deemed to

2

**EXHIBIT 2**
**Page 175 of 404**

occur upon the "cashless" or "net" exercise of such options or warrants or (B) for the purpose of paying the exercise price of such options or warrants or for paying taxes due as a result of the exercise of such options or warrants, the vesting of such options, warrants or stock awards, or as a result of the vesting of such shares of Common Stock, it being understood that all shares of Common Stock received upon such exercise, vesting, settlement or transfer will remain subject to the restrictions of this Letter Agreement during the Lock-Up Period;

(xi)    Transfers to Acquiror pursuant to any contractual arrangement in effect at the effective time of the Merger that provides for the repurchase by Acquiror or forfeiture of Common Stock or other securities convertible into or exercisable or exchangeable for Common Stock in connection with the termination of the Securityholder's service to Acquiror;

(xii)    the entry, by the Securityholder, at any time after the effective time of the Merger, of any trading plan providing for the sale of shares of Common Stock by the Securityholder, which trading plan meets the requirements of Rule 10b5-1(c) under the Exchange Act; provided, however, that such plan does not provide for, or permit, the sale of any shares of Common Stock during the Lock-Up Period and no public announcement or filing is voluntarily made or required regarding such plan during the Lock-Up Period;

(xiii)    transactions in the event of completion of a liquidation, merger, stock exchange or other similar transaction which results in all of Acquiror's securityholders having the right to exchange their shares of Common Stock for cash, securities or other property;

(xiv)    Transfers of Common Stock made (A) after the effective time of the Merger, (B) by the then-controlling stockholder of Acquiror, (C) in a block trade or trades which collectively Transfers more than 5% of the then-outstanding economic interests of the Acquiror (including economic units in the Company), and (D) to a purchaser or group of purchasers who each agree to be bound by a lock up which is substantially similar to the terms of this Letter Agreement for the then-remaining duration of the Lock-Up Period; provided, however, that such Transfers do not impair the ability of the Company to consummate the Merger or result in a change of control of the Company; and

(xv)    transactions to satisfy any U.S. federal, state, or local income tax obligations of the Securityholder (or its direct or indirect owners) arising from a change in the U.S. Internal Revenue Code of 1986, as amended (the "Code"), or the U.S. Treasury Regulations promulgated thereunder (the "Regulations") after the date on which the Merger Agreement was executed by the parties, and such change prevents the Merger from qualifying as a "reorganization" pursuant to Section 368 of the Code (and the Merger does not qualify for similar tax-free treatment pursuant to any successor or other provision of the Code or Regulations taking into account such changes), in each case solely and to the extent necessary to cover any tax liability as a direct result of the transaction.

provided, however, that (A) in the case of clauses (i) through (vii), these permitted transferees must enter into a written agreement, in substantially the form of this Letter Agreement (it being

EXHIBIT 2
Page 176 of 404

understood that any references to "immediate family" in the agreement executed by such transferee shall expressly refer only to the immediate family of the Securityholder and not to the immediate family of the transferee), agreeing to be bound by these Transfer restrictions. For purposes of this paragraph, "immediate family" shall mean a spouse, domestic partner, child (including by adoption), father, mother, brother or sister, in each case, of the undersigned, and lineal descendant (including by adoption) of the undersigned or of any of the foregoing persons; and "affiliate" shall have the meaning set forth in Rule 405 under the Securities Act of 1933, as amended.

3.        For the avoidance of any doubt, (i) the Securityholder shall retain all of its rights as a stockholder of the Acquiror during the Lock-up Period, including the right to vote, and to receive any dividends and distributions in respect of, any Lock-Up Shares, and (ii) the restrictions contained in Section 1 shall not apply to any Acquiror Common Stock or other securities of Acquiror acquired by the Securityholder in any public or private capital raising transactions of Acquiror or otherwise to any Acquiror Common Stock (or other securities of Acquiror) other than the Lock-Up Shares.

4.        If any Transfer is made or attempted contrary to the provisions of this Letter Agreement, such purported Transfer shall be null and void *ab initio*, and Acquiror and any duly appointed transfer agent shall refuse to make any such Transfer or recognize any such purported transferee of the Lock-Up Shares as an equity holder of Acquiror for any purpose.

5.        During the Lock-up Period, stop transfer orders shall be placed against the Lock-Up Shares and each certificate or book entry position statement evidencing any Lock-Up Shares shall be stamped or otherwise imprinted with a legend in substantially the following form, in addition to any other applicable legends:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER SET FORTH IN A LOCK-UP LETTER AGREEMENT, DATED AS OF [●], 2022, DELIVERED BY THE ISSUER'S SECURITY HOLDER NAMED THEREIN, AS AMENDED. A COPY OF SUCH LOCK-UP AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE ISSUER TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

6.        This Letter Agreement constitutes the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent they relate in any way to the subject matter hereof or the transactions contemplated hereby. This Letter Agreement may not be changed, amended, modified or waived (other than to correct a typographical error) as to any particular provision, except by a written instrument executed by the undersigned (i) Securityholder and (ii) Acquiror.

7.        No party hereto may assign either this Letter Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other party. Any purported assignment in violation of this paragraph shall be void and ineffectual and shall not operate to transfer or assign any interest or title to the purported assignee. This Letter Agreement shall be binding on the Securityholder and each of its respective successors, heirs and assigns and permitted transferees.

**EXHIBIT 2**
**Page 177 of 404**

8.    This Letter Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles that would result in the application of the substantive laws of another jurisdiction. The parties hereto (a) all agree that any action, proceeding, claim or dispute arising out of, or relating in any way to, this Letter Agreement shall be brought and enforced in the Delaware Chancery Court, and irrevocably submit to such jurisdiction and venue, which jurisdiction and venue shall be exclusive and (b) waive any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum.

9.    This Letter Agreement shall terminate on the expiration of the Lock-up Period.

[*Signature Pages Follow*]

**EXHIBIT 2**
**Page 178 of 404**

Very truly yours,

*If stockholder is an individual:*

Signature: _____
Print Name:

*If stockholder is an entity:*

Name of Stockholder:

_____

Signature: _____
Name:
Title:

[*Signature Page to Lock-Up Agreement*]

**EXHIBIT 2**
**Page 179 of 404**

**EXHIBIT E**                                                                        *FINAL FORM*

**FORM OF**
**CERTIFICATE OF INCORPORATION**
**of**
**NUSCALE POWER CORP.**
**(a Delaware corporation)**

**ARTICLE I**
**NAME**

The name of the Corporation is NuScale Power Corp. (the "Corporation").

**ARTICLE II**
**AGENT**

The address of the Corporation's registered office in the State of Delaware is c/o Registered Agent Solutions, Inc., 838 Walker Road, Suite 21-2, Dover, DE 19904 and the name of its registered agent at such address is Registered Agent Solutions, Inc.

**ARTICLE III**
**PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (as from time to time in effect, the "General Corporation Law").

**ARTICLE IV**
**STOCK**

Section 4.1    Authorized Stock.  The total number of shares of all classes of stock that the Corporation shall have authority to issue is [•] shares, consisting of: (i) [•] shares of common stock, divided into (a) [•][1] shares of Class A common stock, with the par value of $0.0001 per share (the "Class A Common Stock") and (b) [•] shares of Class B common stock, with the par value of $0.0001 per share (the "Class B Common Stock" and, together with Class A Common Stock, the "Common Stock"); and (ii) [•] shares of preferred stock, with the par value of $0.0001 per share (the "Preferred Stock")[2].

Section 4.2    No Class Vote on Changes in Authorized Number of Shares of Stock. Subject to the rights of the holders of any one or more series of Preferred Stock then outstanding, the number of authorized shares of any class of the Common Stock or the Preferred Stock may be increased or decreased, in each case by the affirmative vote of the holders of a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote thereon, voting together as a single class, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law, and no vote of the holders of any class of the Common Stock or the Preferred Stock voting separately as a class will be required therefor. Notwithstanding the immediately preceding sentence, the number of authorized shares of any particular class may not be decreased below the number of shares of such class then outstanding, plus, in the case of

---

[1]    Conceptually, this number should cover all existing SPAC shares, PIPE shares, SPAC warrants, all stock options and the Unit Appreciation Rights, the reserved equity incentive plan shares, and the A common shares that will be issuable upon exchange of the B common shares / LLC Units.

[2]    The Preferred are blank check preferred only.  No shares will be issued or outstanding as part of the Transactions.

Class A Common Stock, the number of shares of Class A Common Stock issuable in connection with (x) the exchange of all outstanding shares of Class B Common Stock, together with the corresponding number of Class B LLC Units, pursuant to the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC and (y) the exercise of outstanding options, warrants, exchange rights, conversion rights or similar rights for Class A Common Stock.

Section 4.3     Common Stock.

(a)   Voting Rights.

(i)   Each holder of Common Stock will be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote, except that, to the fullest extent permitted by law and subject to Section 4.3(a)(ii), holders of shares of each class of Common Stock, as such, will have no voting power with respect to, and will not be entitled to vote on, any amendment to this Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) that relates solely to the terms of any outstanding Preferred Stock if the holders of such Preferred Stock are entitled to vote as a separate class thereon under this Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) or under the General Corporation Law.

(ii)   (1) The holders of the outstanding shares of Class A Common Stock shall be entitled to vote separately upon any amendment to this Certificate of Incorporation (including by merger, consolidation, reorganization or similar event) that would alter or change the powers, preferences or special rights of the Class A Common Stock in a manner that is disproportionately adverse as compared to the Class B Common Stock and (2) the holders of the outstanding shares of Class B Common Stock shall be entitled to vote separately upon any amendment to this Certificate of Incorporation (including by merger, consolidation, reorganization or similar event) that would alter or change the powers, preferences or special rights of the Class B Common Stock in a manner that is disproportionately adverse as compared to the Class A Common Stock.

(iii)   Except as otherwise required in this Certificate of Incorporation or by applicable law, the holders of Common Stock will vote together as a single class on all matters (or, if any holders of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with the holders of Preferred Stock).

(b)   Dividends; Stock Splits or Combinations.

(i)   Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock or any class or series of stock having a preference senior to or the right to participate with the Class A Common Stock with respect to the payment of dividends, such dividends and other distributions of cash, stock or property may be declared and paid on the Class A Common Stock out of the assets of the Corporation that are by law available therefor, at the times and in the amounts as the board of directors of the Corporation (the "Board") in its discretion may determine.

(ii)   Except as provided in Section 4.3(b)(iii) with respect to stock dividends, dividends of cash or property may not be declared or paid on shares of Class B Common Stock.

**EXHIBIT 2**
**Page 181 of 404**

(iii) In no event will any stock dividend, stock split, reverse stock split, combination of stock, reclassification or recapitalization be declared or made on any class of Common Stock (each, a "Stock Adjustment") unless (a) a corresponding Stock Adjustment for all other classes of Common Stock not so adjusted at the time outstanding is made in the same proportion and the same manner and (b) the Stock Adjustment has been reflected in the same economically equivalent manner on all Class B LLC Units. Stock dividends with respect to each class of Common Stock may only be paid with shares of stock of the same class of Common Stock.

(c) Liquidation. In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation and of the preferential and other amounts, if any, to which the holders of Preferred Stock are entitled, if any, the holders of all outstanding shares of Class A Common Stock will be entitled to receive, *pari passu*, an amount per share equal to the par value thereof, and thereafter the holders of all outstanding shares of Class A Common Stock will be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares of Class A Common Stock. Without limiting the rights of the holders of Class B Common Stock to exchange their shares of Class B Common Stock, together with the corresponding number of Class B LLC Units constituting the remainder of any Paired Interests in which such shares are included, for shares of Class A Common Stock in accordance with the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC (or for the consideration payable in respect of shares of Class A Common Stock in such voluntary or involuntary liquidation, dissolution or winding-up), the holders of shares of Class B Common Stock, as such, will not be entitled to receive, with respect to such shares, any assets of the Corporation in excess of the par value thereof, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

Section 4.4    Preferred Stock. Shares of Preferred Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not retired of any and all such series shall not exceed the total number of shares of Preferred Stock hereinabove authorized, and with such powers, including voting powers, if any, and the designations, preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the designation and issue of such shares of Preferred Stock from time to time adopted by the Board pursuant to authority so to do which is hereby expressly vested in the Board. The powers, including voting powers, if any, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.

Section 4.5    Class B Common Stock.

(a) Retirement of Class B Shares. No holder of Class B Common Stock may transfer shares of Class B Common Stock to any person unless such holder transfers a corresponding number of Class B LLC Units to the same person in accordance with the provisions of the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC. If any outstanding share of Class B Common Stock ceases to be held by a holder of a corresponding Class B LLC Unit, such share shall automatically and without further action on the part of the Corporation or any holder of Class B Common Stock be transferred to the Corporation for no consideration and retired.

(b) Reservation of Shares of Class A Common Stock. The Corporation will at all times reserve and keep available out of its authorized and unissued shares of Class A Common Stock, solely for the purpose of the issuance in connection with the exchange of Paired Interests, the number of shares

EXHIBIT 2
Page 182 of 404

of Class A Common Stock that are issuable upon exchange of all outstanding Paired Interests, pursuant to the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC. The Corporation covenants that all the shares of Class A Common Stock that are issued upon the exchange of such Paired Interests will, upon issuance, be validly issued, fully paid and non-assessable.

(c) <u>Taxes</u>. The issuance of shares of Class A Common Stock upon the exercise by holders of Class B LLC Units of their right under the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC to exchange Paired Interests for shares of Class A Common Stock will be made without charge to such holders for any transfer taxes, stamp taxes or duties or other similar tax in respect of the issuance; <u>provided</u>, <u>however</u>, that if any such shares of Class A Common Stock are to be issued in a name other than that of the then record holder of the Paired Interests being exchanged (or The Depository Trust Company or its nominee for the account of a participant of The Depository Trust Company that will hold the shares for the account of such holder), then such holder and/or the Person in whose name such shares are to be delivered shall pay to the Corporation the amount of any tax that may be payable in respect of any transfer involved in the issuance or shall establish to the reasonable satisfaction of the Corporation that the tax has been paid or is not payable.

(d) <u>Preemptive Rights</u>. To the extent Class B LLC Units are issued pursuant to the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC to anyone other than the Corporation or a wholly owned subsidiary of the Corporation, an equivalent number of shares of Class B Common Stock (subject to adjustment as set forth herein) shall be issued to the same Person to which such Class B LLC Units are issued at par.

## ARTICLE V
## BOARD OF DIRECTORS

Section 5.1    <u>Number of Directors</u>.

(a) The business and affairs of the Corporation shall be managed by, or under the direction of, the Board. Unless and except to the extent that the Bylaws of the Corporation (as such Bylaws may be amended from time to time, the "<u>Bylaws</u>") shall so require, the election of the directors of the Corporation (the "<u>Directors</u>") need not be by written ballot. Except as otherwise provided for or fixed pursuant to the provisions of <u>Section 4.4</u> of this Certificate of Incorporation relating to the rights of the holders of any series of Preferred Stock to elect additional Directors, the total number of Directors constituting the entire Board shall, (a) as of the date of this Certificate of Incorporation, be eight (8) and (b) thereafter, shall be fixed exclusively by one or more resolutions adopted from time to time by the Board.

(b) During any period when the holders of any series of Preferred Stock have the right to elect additional Directors as provided for or fixed pursuant to the provisions of <u>Section 4.4</u> ("<u>Preferred Stock Directors</u>"), upon the commencement, and for the duration, of the period during which such right continues: (i) the then-total authorized number of Directors shall automatically be increased by such specified number of Preferred Stock Directors, and the holders of the related Preferred Stock shall be entitled to elect the Preferred Stock Directors pursuant to the provisions of the Board's designation for the series of Preferred Stock and (ii) each such Preferred Stock Director shall serve until such Preferred Stock Director's successor shall have been duly elected and qualified, or until such Preferred Stock Director's right to hold such office terminates pursuant to such provisions, whichever occurs earlier, subject to his or her earlier death, disqualification, resignation or removal. Except as otherwise provided by the Board in the resolution or resolutions

**EXHIBIT 2**
**Page 183 of 404**

establishing such series, whenever the holders of any series of Preferred Stock having such right to elect Preferred Stock Directors are divested of such right pursuant to the provisions of such stock, the terms of office of all such Preferred Stock Directors elected by the holders of such Preferred Stock, or elected to fill any vacancies resulting from the death, resignation, disqualification or removal of such Preferred Stock Directors, shall forthwith terminate and the total and authorized number of Directors shall be reduced accordingly.

Section 5.2    <u>Vacancies and Newly Created Directorships</u>. Subject to any limitations imposed by applicable law and the rights of the holders of any one or more series of Preferred Stock then outstanding, newly created directorships resulting from any increase in the authorized number of Directors or any vacancies on the Board resulting from death, resignation, retirement, disqualification, removal from office or other cause shall, unless the Board determines by resolution that any such vacancies or newly created directorships shall be filled by the stockholders and except as otherwise provided by applicable law, be filled only by the affirmative vote of a majority of the remaining Directors then in office, even if less than a quorum of the Board, and not by the stockholders. Any Director so chosen shall hold office until his or her successor shall be duly elected and qualified or until such Director's earlier death, disqualification, resignation or removal. No decrease in the number of Directors shall shorten the term of any Director then in office.

Section 5.3    <u>Removal of Directors</u>. Subject to any limitations imposed by applicable law, except for Preferred Stock Directors, any Director or the entire Board may be removed from office at any time, but only for cause by the affirmative vote of the holders of at least a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of Directors, voting together as a single class.

**ARTICLE VI**
**STOCKHOLDER ACTION**

Section 6.1    <u>Action by Written Consent</u>. Any action required or permitted to be taken by the stockholders of the Corporation may be effected (i) at a duly called annual or special meeting of stockholders of the Corporation or (ii) until such time as the Company is no longer a "Controlled Company" pursuant to Nasdaq Market Rule 5615(c)(1), by the consent in writing of the holders of a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of Directors, voting together as a single class, in lieu of a duly called annual or special meeting of stockholders of the Corporation.

Section 6.2    <u>Meetings of Stockholders</u>.

(a) An annual meeting of stockholders for the election of Directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting shall be held at such place, on such date, and at such time as the Board shall determine.

(b) Subject to any special rights of the holders of any series of Preferred Stock, and to the requirements of applicable law, special meetings of stockholders of the Corporation may be called only by the chairperson of the Board, the chief executive officer of the Corporation, at the direction of the Board pursuant to a written resolution adopted by a majority of the total number of Directors that the Corporation would have if there were no vacancies, or, until such time as the Company is no longer a "Controlled Company" pursuant to Nasdaq Market Rule 5615(c)(1), pursuant to a written resolution adopted by holders of a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of Directors, voting

**EXHIBIT 2**
**Page 184 of 404**

together as a single class. Any business transacted at any special meeting of stockholders shall be limited to matters relating to the purpose or purposes stated in the notice of meeting.

(c) Advance notice of stockholder nominations for the election of Directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws of the Corporation.

Section 6.3    No Cumulative Voting; Election of Directors by Written Ballot. There shall be no cumulative voting in the election of Directors. Unless and except to the extent that the Bylaws shall so require, the election of the Directors need not be by written ballot.

## ARTICLE VII
## LIABILITY OF DIRECTORS

Section 7.1    No Personal Liability. To the fullest extent permitted by the General Corporation Law as the same exists or as may hereafter be amended, no Director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director.

Section 7.2    Indemnification and Advancement of Expenses.

(a) To the fullest extent permitted by the applicable laws of the State of Delaware, as the same exists or may hereafter be amended, the Corporation shall indemnify and hold harmless each person who is or was made a party to or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation to procure a judgment in its favor (a "proceeding"), by reason of the fact that he or she is or was a Director or officer of the Corporation or, while a Director or officer of the Corporation, is or was serving at the request of the Corporation as a Director, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a Director, officer, employee or agent, or in any other capacity while serving as a Director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees and disbursements, judgments, fines, ERISA excise taxes, damages, claims and penalties and amounts paid in settlement) reasonably incurred by such indemnitee in connection with such proceeding. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by an indemnitee in defending or otherwise participating in any proceeding in advance of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking, by or on behalf of the indemnitee, to repay all amounts so advanced if it shall ultimately be determined that the indemnitee is not entitled to be indemnified under this Section 7.2 or otherwise. The rights to indemnification and advancement of expenses conferred by this Section 7.2 shall be contractual rights and such rights shall continue as to an indemnitee who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the foregoing provisions of this Section 7.2(a), except for proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board.

EXHIBIT 2
Page 185 of 404

(b)  The rights to indemnification and advancement of expenses conferred on any indemnitee by this Section 7.2 shall not be exclusive of any other rights that any indemnitee may have or hereafter acquire under law, this Certificate as it may be further amended from time to time, the Bylaws, an agreement, vote of stockholders or disinterested Directors, or otherwise.

(c)  Any repeal or amendment of this Section 7.2 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate inconsistent with this Section 7.2, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)  This Section 7.2 shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than indemnitees.

(e)  The Corporation shall maintain Directors' and officers' liability insurance coverage, on terms reasonably satisfactory to the Board, to the fullest extent permitted by law covering, among other things, violations of federal or state securities laws. The Corporation will pay all premiums due thereon and will not make any material alteration to the terms thereof, or the coverage provided by, such insurance policy without the prior written consent of the Board.

Section 7.3      Amendment or Repeal. Any amendment, repeal or elimination of this Article VII, or the adoption of any provision of the Corporation's certificate of incorporation inconsistent with this Article VII, shall not affect its application with respect to an act or omission by a Director occurring before such amendment, adoption, repeal or elimination.

**ARTICLE VIII**
**AMENDMENT**

Section 8.1      Amendment of Certificate of Incorporation.  Subject to Sections 4.3 and 4.4, the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the General Corporation Law, and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, Directors or any other Persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended, are granted and held subject to this reservation. Notwithstanding anything to the contrary contained in this Certificate of Incorporation, and notwithstanding that a lesser percentage may be permitted from time to time by applicable law, no provision of Section 5.2, Section 5.3, Section 6.1, Section 6.2, Article VII, Section 8.2, Article IX or Article XI may be altered, amended or repealed in any respect, nor may any provision or by-law inconsistent therewith be adopted, unless in addition to any other vote required by this Certificate of Incorporation or otherwise required by law, such alteration, amendment, repeal or adoption is approved by, in addition to any other vote otherwise required by law, the affirmative vote of the holders of sixty-six and two-thirds percent (66 and 2/3%) of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of Directors, voting together as a single class, at a meeting of the stockholders called for that purpose.

Section 8.2      Amendment of Bylaws. In furtherance and not in limitation of the powers conferred by law, the Board is expressly authorized to make, alter, amend or repeal the Bylaws. Any

**EXHIBIT 2**
**Page 186 of 404**

adoption, amendment or repeal of the Bylaws of the Corporation by the Board shall require the approval of a majority of the authorized number of Directors. The stockholders shall also have power to adopt, amend or repeal the Bylaws of the Corporation; provided, however, that, in addition to any vote of the holders of any class or series of stock of the Corporation required by law or by this Certificate of Incorporation, such action by stockholders shall require the affirmative vote of the holders of a majority of the voting power of all of the then-outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of Directors, voting together as a single class.

## ARTICLE IX
## FORUM FOR ADJUDICATION OF DISPUTES

Section 9.1    Forum. Unless the Corporation, in writing, selects or consents to the selection of an alternative forum: (a) the sole and exclusive forum for any complaint asserting any internal corporate claims (as defined below), to the fullest extent permitted by law, and subject to applicable jurisdictional requirements, shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have, or declines to accept, jurisdiction, another state court or a federal court located within the State of Delaware); and (b) the sole and exclusive forum for any complaint asserting a cause of action arising under the Securities Act of 1933, to the fullest extent permitted by law, shall be the federal district courts of the United States of America. Notwithstanding anything herein to the contrary, and for the avoidance of doubt: this Article IX shall not apply to suits brought to enforce a duty or liability created by the Securities Exchange Act of 1934. For purposes of this Article IX, internal corporate claims means claims, including claims in the right of the Corporation that are based upon a violation of a duty by a current or former Director, officer, employee or stockholder in such capacity, or as to which the DGCL confers jurisdiction upon the Court of Chancery. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article IX.

Section 9.2    Enforceability. If any provision of this Article IX shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provision in any other circumstance and of the remaining provisions of this Article IX (including, without limitation, each portion of any sentence of this Article IX containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable), and the application of such provision to other persons or entities or circumstances shall not in any way be affected or impaired thereby.

## ARTICLE X
## SEVERABILITY

If any provision or provisions of this Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate of Incorporation (including, without limitation, each portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of this Certificate of Incorporation (including, without limitation, each such portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its Directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.

EXHIBIT 2
Page 187 of 404

**ARTICLE XI**
**CORPORATE OPPORTUNITY**

Section 11.1    <u>Corporate Opportunities</u>.  To the maximum extent allowed by law, the doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or Directors, or any of their respective Affiliates, in circumstances where the application of any such doctrine would conflict with any fiduciary duties or contractual obligations they may have as of the date of this Certificate or in the future, and the Corporation renounces any expectancy that any of the Directors or officers of the Corporation will offer any such corporate opportunity of which he or she may become aware to the Corporation.

Section 11.2    <u>Amendments</u>.  Neither the alteration, amendment, addition to or repeal of this <u>Article XI</u>, nor the adoption of any provision of this Certificate (including any certificate of designation) inconsistent with this <u>Article XI</u>, shall eliminate or reduce the effect of this <u>Article XI</u> in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this <u>Article XI</u>, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption. This <u>Article XI</u> shall not limit any protections or defenses available to, or indemnification or advancement rights of, any Director or officer of the Corporation under this Certificate, the Bylaws or applicable law.

**ARTICLE XII**
**DEFINITIONS**

As used in this Certificate of Incorporation, unless the context otherwise requires or as set forth in another Article or Section of this Certificate of Incorporation, the term:

(a)    "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person; <u>provided</u>, that (i) neither the Corporation nor any of its subsidiaries will be deemed an Affiliate of any stockholder of the Corporation or any of such stockholders' Affiliates unless and during such time that such stockholder holds a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of Directors, voting together as a single class, and (ii) no stockholder of the Corporation will be deemed an Affiliate of any other stockholder of the Corporation, in each case, solely by reason of any investment in the Corporation (including any representatives of such stockholder serving on the Board).

(b)    "<u>Class A LLC Unit</u>" means a unit of NuScale Power, LLC designated as a Class A Unit pursuant to the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC.

(c)    "<u>Class B LLC Unit</u>" means a unit of NuScale Power, LLC designated as a Class B Unit pursuant to the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC.

(d)    "<u>control</u>" (including the terms "<u>controlling</u>" and "<u>controlled</u>"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of such subject Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

(e)    "<u>Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC</u>" means the Sixth Amended and Restated Limited Liability Company Agreement, dated as of [•], as the same may be amended, restated, supplemented and/or otherwise modified, from time to time.

**EXHIBIT 2**
**Page 188 of 404**

(f)  "General Corporation Law" is defined in Article III.

(g)  "LLC Units" means, collectively, the Class A LLC Units and the Class B LLC Units.

(h)  "NuScale Power, LLC" means NuScale Power, LLC, an Oregon limited liability company, or any successor thereto.

(i)  "Paired Interest" means one Class B LLC Unit together with one share of Class B Common Stock, subject to adjustment pursuant to Section 11.4 of the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC.

(j)  "Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity.

*[Remainder of page intentionally left blank.]*

**EXHIBIT 2**
**Page 189 of 404**

IN WITNESS WHEREOF, this Certificate of Incorporation of NuScale Power Corp. has been duly executed by the officer below this [•] day of [•].

By:_____
Name:
Title:

*[Signature Page to Certificate of Incorporation]*

**EXHIBIT F**                                                        *FINAL FORM*

# BYLAWS

## OF

## NUSCALE POWER CORP.
### (a Delaware corporation)

## ARTICLE I
## CORPORATE OFFICES

Section 1.1    Registered Office.  The registered office of NuScale Power Corp. (the "Corporation") shall be fixed in the Certificate of Incorporation of the Corporation.

Section 1.2    Other Offices.  The Corporation may also have an office or offices, and keep the books and records of the Corporation, except as otherwise required by law, at such other place or places, either within or without the State of Delaware, as the Corporation may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 2.1    Annual Meeting.  The annual meeting of stockholders, for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, if any, either within or without the State of Delaware, on such date, and at such time as the Board of Directors shall fix. The Board of Directors may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board of Directors.

Section 2.2    Special Meeting.

(a)    Except as otherwise required by law, and except as otherwise provided for or fixed pursuant to the Certificate of Incorporation, including any certificate of designations relating to any series of Preferred Stock (each hereinafter referred to as a "Preferred Stock Designation"), a special meeting of the stockholders of the Corporation:  (i) may be called at any time by the Board of Directors; and (ii) shall be called by the Chairman of the Board of Directors or the Secretary of the Corporation upon the written request or requests of one or more persons that:  (A) own (as defined below) shares representing at least 50% of the voting power of the stock entitled to vote on the matter or matters to be brought before the proposed special meeting (hereinafter, the "requisite percent") at the time a request is delivered; and (B) comply with the notice procedures set forth in this Section 2.2 with respect to any matter that is a proper subject for the meeting pursuant to Section 2.2(e) (a meeting called in accordance with clause (ii) above, a "stockholder-requested special meeting").  Except as otherwise required by law, and except as otherwise provided for or fixed pursuant to the Certificate of Incorporation (including any Preferred Stock Designation), special meetings of the stockholders of the Corporation may not be called by any other person or persons.  Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.

**EXHIBIT 2**
**Page 191 of 404**

(b)      For purposes of satisfying the requisite percent under this Section 2.2:

(i)      A person is deemed to "own" only those outstanding shares of stock of the Corporation as to which such person possesses both:  (A) the full voting and investment rights pertaining to the shares; and (B) the full economic interest in (including the opportunity for profit and risk of loss on) the shares, except that the number of shares calculated in accordance with the foregoing clauses (A) and (B) shall not include any shares:  (1) sold by such person in any transaction that has not been settled or closed; (2) borrowed by the person for any purposes or purchased by the person pursuant to an agreement to resell; or (3) subject to any option, warrant, forward contract, swap, contract of sale, or other derivative or similar agreement entered into by the person, whether the instrument or agreement is to be settled with shares or with cash based on the notional amount or value of outstanding shares of stock of the Corporation, if the instrument or agreement has, or is intended to have, or if exercised would have, the purpose or effect of: (x) reducing in any manner, to any extent or at any time in the future, the person's full right to vote or direct the voting of the shares; and/or (y) hedging, offsetting or altering to any degree any gain or loss arising from the full economic ownership of the shares by the person.  For purposes of the foregoing clauses (1)-(3), the term "person" includes its affiliates; and

(ii)      A person "owns" shares held in the name of a nominee or other intermediary so long as such person retains both:  (A) the full voting and investment rights pertaining to the shares; and (B) the full economic interest in the shares.  The person's ownership of shares is deemed to continue during any period in which the person has delegated any voting power by means of a proxy, power of attorney, or other instrument or arrangement that is revocable at any time by the person.

(c)      In order for a stockholder-requested special meeting to be called by the Secretary of the Corporation, one or more written requests for a special meeting signed by persons (or their duly authorized agents) who own or who are acting on behalf of persons who own, as of the ownership record date, at least the requisite percent (the "special meeting request"), shall be delivered to the Secretary.  A special meeting request shall:  (i) state the business (including the identity of nominees for election as a director, if any) proposed to be acted on at the meeting, which shall be limited to the business set forth in the record date request notice received by the Secretary; (ii) bear the date of signature of each such person (or duly authorized agent) submitting the special meeting request; (iii) set forth the name and address of each person submitting the special meeting request (as they appear on the Corporation's books, if applicable); (iv) contain the information required by Section 2.10(a) below with respect to any director nominations or other business proposed to be presented at the special meeting, and as to each person requesting the meeting and each other person (including any beneficial owner) on whose behalf the person is acting, other than persons who have provided such request solely in response to any form of public solicitation for such requests; (v) include documentary evidence that the requesting persons own the requisite percent as of the ownership record date; provided, however, that if the requesting persons are not the beneficial owners of the shares representing the requisite percent, then to be valid, the special meeting request must also include documentary evidence of the number of shares owned (as defined in Section 2.2(b) above) by the beneficial owners on whose behalf the special meeting request is made as of the ownership record date; and (vi) be delivered to the Secretary of the Corporation at the principal executive offices of the

2

**EXHIBIT 2**
**Page 192 of 404**

Corporation, by hand or by certified or registered mail, return receipt requested, within 60 days after the ownership record date.  The special meeting request shall be updated and supplemented within five business days after the record date for determining the stockholders entitled to vote at the stockholder requested-special meeting (or by the opening of business on the date of the meeting, whichever is earlier, if the record date for determining the stockholders entitled to vote at the meeting is different from the record date for determining the stockholders entitled to notice of the meeting), and in either case such information when provided to the Corporation shall be current as of the record date for determining the stockholders entitled to vote at the meeting.  In addition, the requesting person and each other person (including any beneficial owner) on whose behalf the person is acting, shall provide such other information as the Corporation may reasonably request within 10 business days of such a request.

(d)     After receiving a special meeting request, the Board of Directors shall determine in good faith whether the persons requesting the special meeting have satisfied the requirements for calling a special meeting of stockholders, and the Corporation shall notify the requesting person of the Board's determination about whether the special meeting request is valid.  The date, time and place of the special meeting shall be fixed by the Board of Directors, and the date of the special meeting shall not be more than 90 days after the date on which the Board of Directors fixes the date of the special meeting.  The record date for the special meeting shall be fixed by the Board of Directors as set forth in Section 7.6(a) below.

(e)     A special meeting request shall not be valid, and the Corporation shall not call a special meeting if:  (i) the special meeting request relates to an item of business that is not a proper subject for stockholder action under, or that involves a violation of, applicable law; (ii) an item of business that is the same or substantially similar (as determined in good faith by the Board of Directors) was presented at a meeting of stockholders occurring within 90 days preceding the earliest date of signature on the special meeting request, provided that the removal of directors and the filling of the resulting vacancies shall not be considered the same or substantially similar to the election of directors at the preceding annual meeting of stockholders; (iii) the special meeting request is delivered during the period commencing 90 days prior to the first anniversary of the preceding year's annual meeting and ending on the date of the next annual meeting of stockholders; or (iv) the special meeting request does not comply with the requirements of this Section 2.2.

(f)     Any person who submitted a special meeting request may revoke its written request by written revocation delivered to the Secretary of the Corporation at the principal executive offices of the Corporation at any time prior to the stockholder-requested special meeting.  A special meeting request shall be deemed revoked (and any meeting scheduled in response may be cancelled) if the persons submitting the special meeting request, and any beneficial owners on whose behalf they are acting (as applicable), do not continue to own (as defined in Section 2.2(b) above) at least the requisite percent at all times between the date the record date request notice is received by the Corporation and the date of the applicable stockholder-requested special meeting, and the requesting person shall promptly notify the Secretary of the Corporation of any decrease in ownership of shares of stock of the Corporation that results in such a revocation.  If, as a result of any revocations, there are no longer valid unrevoked written requests from the requisite percent, the Board of Directors shall have the discretion to determine whether or not to proceed with the special meeting.

3

**EXHIBIT 2**
**Page 193 of 404**

(g)     Business transacted at a stockholder-requested special meeting shall be limited to:  (i) the business stated in the valid special meeting request received from the requisite percent; and (ii) any additional business that the Board of Directors determines to include in the Corporation's notice of meeting.  If none of the persons who submitted the special meeting request (or their qualified representatives, as defined in Section 2.10(c)(i)) appears at the special meeting to present the matter or matters to be brought before the special meeting that were specified in the special meeting request, the Corporation need not present the matter or matters for a vote at the meeting, notwithstanding that proxies in respect of such vote may have been received by the Corporation.  The Board of Directors may postpone, reschedule or cancel any special meeting of stockholders previously scheduled pursuant to this Section 2.2.

Section 2.3     Notice of Stockholders' Meetings.

(a)     Whenever stockholders are required or permitted to take any action at a meeting, notice of the place, if any, date, and time of the meeting of stockholders, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for determining the stockholders entitled to notice of the meeting), the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting and, if the meeting is to be held solely by means of remote communications, the means for accessing the list of stockholders contemplated by Section 2.5 of these Bylaws, shall be given.  The notice shall be given not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided by law, the Certificate of Incorporation (including any Preferred Stock Designation) or these Bylaws.  In the case of a special meeting, the purpose or purposes for which the meeting is called also shall be set forth in the notice.

(b)     Except as otherwise required by law, notice may be given in writing directed to a stockholder's mailing address as it appears on the records of the Corporation and shall be given:  (i) if mailed, when notice is deposited in the U.S. mail, postage prepaid; and (ii) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address.

(c)     So long as the Corporation is subject to the Securities and Exchange Commission's proxy rules set forth in Regulation 14A under the Securities Exchange Act of 1934 (the "Exchange Act"), notice shall be given in the manner required by such rules.  To the extent permitted by such rules, notice may be given by electronic transmission directed to the stockholder's electronic mail address, and if so given, shall be given when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) of the General Corporation Law of the State of Delaware (the "DGCL").  If notice is given by electronic mail, such notice shall comply with the applicable provisions of Sections 232(a) and 232(d) of the DGCL.

(d)     Notice may be given by other forms of electronic transmission with the consent of a stockholder in the manner permitted by Section 232(b) of the DGCL and shall be deemed given as provided therein.

4

**EXHIBIT 2**
**Page 194 of 404**

(e)      An affidavit that notice has been given, executed by the Secretary of the Corporation, Assistant Secretary or any transfer agent or other agent of the Corporation, shall be *prima facie* evidence of the facts stated in the notice in the absence of fraud.  Notice shall be deemed to have been given to all stockholders who share an address if notice is given in accordance with the "householding" rules set forth in Rule 14a-3(e) under the Exchange Act and Section 233 of the DGCL.

(f)      When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the place, if any, date and time thereof, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting in accordance with Section 7.6(a), and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 2.4      Organization.

(a)      Unless otherwise determined by the Board of Directors, meetings of stockholders shall be presided over by the Chairman of the Board of Directors, or in his or her absence, by the Chief Executive Officer or, in his or her absence, by another person designated by the Board of Directors.  The Secretary of the Corporation, or in his or her absence, an Assistant Secretary, or in the absence of the Secretary and all Assistant Secretaries, a person whom the chairman of the meeting shall appoint, shall act as secretary of the meeting and keep a record of the proceedings thereof.

(b)      The date and time of the opening and the closing of the polls for each matter upon which the stockholders shall vote at a meeting of stockholders shall be announced at the meeting.  The Board of Directors may adopt such rules and regulations for the conduct of any meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of the meeting shall have the authority to adopt and enforce such rules and regulations for the conduct of any meeting of stockholders and the safety of those in attendance as, in the judgment of the chairman, are necessary, appropriate or convenient for the conduct of the meeting.  Rules and regulations for the conduct of meetings of stockholders, whether adopted by the Board of Directors or by the chairman of the meeting, may include, without limitation, establishing:  (i) an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders entitled to vote at the meeting, their duly authorized and constituted proxies and such other persons as the chairman of the meeting shall permit; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on the time allotted for consideration of each agenda item and for questions and comments by participants; (vi) regulations for the opening and closing of the polls for balloting and matters which are to be voted on by ballot (if any); and (vii) procedures (if any) requiring attendees to provide the

EXHIBIT 2
Page 195 of 404

Corporation advance notice of their intent to attend the meeting.  Subject to any rules and regulations adopted by the Board of Directors, the chairman of the meeting may convene and, for any or no reason, from time to time, adjourn and/or recess any meeting of stockholders pursuant to Section 2.7.  The chairman of the meeting, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall have the power to declare that a nomination or other business was not properly brought before the meeting if the facts warrant (including if a determination is made, pursuant to Section 2.10(c)(i) of these Bylaws, that a nomination or other business was not made or proposed, as the case may be, in accordance with Section 2.10 of these Bylaws), and if such chairman should so declare, such nomination shall be disregarded or such other business shall not be transacted.

Section 2.5    List of Stockholders.  The Corporation shall prepare, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; provided, however, that if the record date for determining the stockholders entitled to vote is less than 10 days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date.  Such list shall be arranged in alphabetical order and shall show the address of each stockholder and the number of shares registered in the name of each stockholder.  Nothing in this Section 2.5 shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder for any purpose germane to the meeting at least 10 days prior to the meeting:  (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of meeting; or (b) during ordinary business hours at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  Except as otherwise required by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 2.5 or to vote in person or by proxy at any meeting of stockholders.

Section 2.6    Quorum.  Except as otherwise required by law, the Certificate of Incorporation (including any Preferred Stock Designation) or these Bylaws, at any meeting of stockholders, a majority of the voting power of the stock outstanding and entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business; provided, however, that where a separate vote by a class or series or classes or series is required, a majority of the voting power of the stock of such class or series or classes or series outstanding and entitled to vote on that matter, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to such matter.  If a quorum is not present or represented at any meeting of stockholders, then the chairman of the meeting, or a majority of the voting power of the stock present in person or represented by proxy at the meeting and entitled to vote thereon, shall have power to adjourn or recess the meeting from time to time in

6

**EXHIBIT 2**
**Page 196 of 404**

accordance with Section 2.7, until a quorum is present or represented.  Subject to applicable law, if a quorum initially is present at any meeting of stockholders, the stockholders may continue to transact business until adjournment or recess, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, but if a quorum is not present at least initially, no business other than adjournment or recess may be transacted.

Section 2.7    <u>Adjourned or Recessed Meeting</u>.  Any annual or special meeting of stockholders, whether or not a quorum is present, may be adjourned or recessed for any or no reason from time to time by the chairman of the meeting, subject to any rules and regulations adopted by the Board of Directors pursuant to Section 2.4(b).  Any such meeting may be adjourned for any or no reason (and may be recessed if a quorum is not present or represented) from time to time by a majority of the voting power of the stock present in person or represented by proxy at the meeting and entitled to vote thereon.  At any such adjourned or recessed meeting at which a quorum is present, any business may be transacted that might have been transacted at the meeting as originally called.

Section 2.8    <u>Voting</u>.

(a)    Except as otherwise required by law or the Certificate of Incorporation (including any Preferred Stock Designation), each holder of stock of the Corporation entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of such stock held of record by such holder that has voting power upon the subject matter in question.

(b)    Except as otherwise required by law, the Certificate of Incorporation (including any Preferred Stock Designation), these Bylaws or any law, rule or regulation applicable to the Corporation or its securities, at each meeting of stockholders at which a quorum is present, all corporate actions to be taken by vote of the stockholders shall be authorized by the affirmative vote of at least a majority of the voting power of the stock present in person or represented by proxy and entitled to vote on the subject matter, and where a separate vote by a class or series or classes or series is required, if a quorum of such class or series or classes or series is present, such act shall be authorized by the affirmative vote of at least a majority of the voting power of the stock of such class or series or classes or series present in person or represented by proxy and entitled to vote on the subject matter.  Voting at meetings of stockholders need not be by written ballot.

Section 2.9    <u>Proxies</u>.  Every stockholder entitled to vote for directors, or on any other matter, shall have the right to do so either in person or by one or more persons authorized to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or an executed new proxy bearing a later date.

7

**EXHIBIT 2**
**Page 197 of 404**

Section 2.10    Notice of Stockholder Business and Nominations.

(a)    Annual Meeting.

(i)    Nominations of persons for election to the Board of Directors and the proposal of business other than nominations to be considered by the stockholders may be made at an annual meeting of stockholders only:  (A) pursuant to the Corporation's notice of meeting (or any supplement thereto); (B) by or at the direction of the Board of Directors (or any authorized committee thereof); or (C) by any stockholder of the Corporation who is a stockholder of record at the time the notice provided for in this Section 2.10(a) is delivered to the Secretary of the Corporation, who is entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.10(a).  For the avoidance of doubt, the foregoing clause (C) shall be the exclusive means for a stockholder to make nominations or propose other business at an annual meeting of stockholders (other than a proposal included in the Corporation's proxy statement pursuant to and in compliance with Rule 14a-8 under the Exchange Act).

(ii)    For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (C) of the foregoing paragraph, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation and, in the case of business other than nominations, such business must be a proper subject for stockholder action.  To be timely, a stockholder's notice must be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business (as defined in Section 2.10(c)(ii) below) on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 days before or more than 30 days after such anniversary date, or if no annual meeting was held in the preceding year, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the date on which public announcement (as defined in Section 2.10(c)(ii) below) of the date of such meeting is first made by the Corporation.  In no event shall an adjournment or recess of an annual meeting, or a postponement of an annual meeting for which notice of the meeting has already been given to stockholders or a public announcement of the meeting date has already been made, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.  The number of nominees a stockholder may nominate for election at the annual meeting (or in the case of a stockholder giving the notice on behalf of a beneficial owner, the number of nominees a stockholder may nominate for election at the annual meeting on behalf of the beneficial owner) shall not exceed the number of directors to be elected at such annual meeting.  Such stockholder's notice shall set forth:

(A)    as to each person whom the stockholder proposes to nominate for election or re-election as a director:  (1) all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to and in accordance with Regulation 14A under the Exchange Act; and (2) such person's written consent to serving as a director, if elected, for the full term for which such person is standing for election; provided, however, that, in

8

EXHIBIT 2
Page 198 of 404

addition to the information required in the stockholder's notice pursuant to this Section 2.10(a)(ii)(A), such person shall also provide the Corporation such other information that the Corporation may reasonably request and that is necessary to permit the Corporation to determine the eligibility of such person to serve as a director of the Corporation, including information relevant to a determination whether such person can be considered an independent director;

(B)    as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the Bylaws of the Corporation, the language of the proposed amendment), the reasons for conducting such business at the meeting and any substantial interest (within the meaning of Item 5 of Schedule 14A under the Exchange Act) in such business of such stockholder and the beneficial owner (within the meaning of Section 13(d) of the Exchange Act), if any, on whose behalf the proposal is made;

(C)    as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination is made or the other business is proposed:

(1)    the name and address of such stockholder, as they appear on the Corporation's books, and the name and address of such beneficial owner;

(2)    the class or series and number of shares of stock of the Corporation which are owned of record by such stockholder and such beneficial owner as of the date of the notice, and a representation that the stockholder will notify the Corporation in writing within five business days after the record date for such meeting of the class or series and number of shares of stock of the Corporation owned of record by the stockholder and such beneficial owner as of the record date for the meeting; and

(3)    a representation that the stockholder (or a qualified representative of the stockholder) intends to appear at the meeting to make such nomination or propose such business; and

(D)    as to the stockholder giving the notice or, if the notice is given on behalf of a beneficial owner on whose behalf the nomination is made or the other business is proposed, as to such beneficial owner, and if such stockholder or beneficial owner is an entity, as to each director, executive, managing member or control person of such entity (any such individual or control person, a "control person"):

(1)    the class or series and number of shares of stock of the Corporation which are beneficially owned (as defined in Section 2.10(c)(ii) below) by such stockholder or beneficial owner and by any control person as of the date of the notice, and a representation that the stockholder will notify the Corporation in writing within five business days after the record date for such meeting of the class or series and number of shares of stock of the Corporation beneficially owned by such stockholder or beneficial owner and by any control person as of the record date for the meeting;

(2)    a description of any agreement, arrangement or understanding with respect to the nomination or other business between or among such

9

**EXHIBIT 2**
**Page 199 of 404**

stockholder, beneficial owner or control person and any other person, including, without limitation any agreements that would be required to be disclosed pursuant to Item 5 or Item 6 of Exchange Act Schedule 13D (regardless of whether the requirement to file a Schedule 13D is applicable) and a representation that the stockholder will notify the Corporation in writing within five business days after the record date for such meeting of any such agreement, arrangement or understanding in effect as of the record date for the meeting;

(3)     a description of any agreement, arrangement or understanding (including, without limitation, any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the stockholder's notice by, or on behalf of, such stockholder, beneficial owner or control person, the effect or intent of which is to mitigate loss, manage risk or benefit from changes in the share price of any class or series of the Corporation's stock, or maintain, increase or decrease the voting power of the stockholder, beneficial owner or control person with respect to securities of the Corporation, and a representation that the stockholder will notify the Corporation in writing within five business days after the record date for such meeting of any such agreement, arrangement or understanding in effect as of the record date for the meeting; and

(4)     a representation whether the stockholder or the beneficial owner, if any, will engage in a solicitation with respect to the nomination or other business and, if so, the name of each participant in such solicitation (as defined in Item 4 of Schedule 14A under the Exchange Act) and whether such person intends or is part of a group which intends to deliver a proxy statement and/or form of proxy to holders of shares representing at least 50% of the voting power of the stock entitled to vote generally in the election of directors in the case of a nomination, or holders of at least the percentage of the Corporation's stock required to approve or adopt the business to be proposed in the case of other business.

(iii)     Notwithstanding anything in Section 2.10(a)(ii) above or Section 2.10(b) below to the contrary, if the record date for determining the stockholders entitled to vote at any meeting of stockholders is different from the record date for determining the stockholders entitled to notice of the meeting, a stockholder's notice required by this Section 2.10 shall set forth a representation that the stockholder will notify the Corporation in writing within five business days after the record date for determining the stockholders entitled to vote at the meeting, or by the opening of business on the date of the meeting (whichever is earlier), of the information required under clauses (ii)(C)(2) and (ii)(D)(1)-(3) of this Section 2.10(a), and such information when provided to the Corporation shall be current as of the record date for determining the stockholders entitled to vote at the meeting.

(iv)     This Section 2.10(a) shall not apply to a proposal proposed to be made by a stockholder if the stockholder has notified the Corporation of his or her intention to present the proposal at an annual or special meeting only pursuant to and in compliance with Rule 14a-8 under the Exchange Act and such proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such meeting.

(v)     Notwithstanding anything in this Section 2.10(a) to the contrary, in the event that the number of directors to be elected to the Board of Directors at an annual meeting is increased and there is no public announcement by the Corporation naming all of the

**EXHIBIT 2**
**Page 200 of 404**

nominees for director or specifying the size of the increased Board of Directors made by the Corporation at least 10 days prior to the last day a stockholder may deliver a notice in accordance with Section 2.10(a)(ii) above, a stockholder's notice required by this Section 2.10(a) shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the Corporation.

(b)     Special Meeting.  Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting:  (i) by or at the direction of the Board of Directors (or any authorized committee thereof); (ii) provided that one or more directors are to be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time the notice provided for in this Section 2.10(b) is delivered to the Secretary of the Corporation, who is entitled to vote at the meeting and upon such election and who delivers notice thereof in writing setting forth the information required by Section 2.10(a) above; or (iii) in the case of a stockholder-requested special meeting, by any stockholder of the Corporation pursuant to Section 2.2.  In the event the Corporation calls a special meeting of stockholders (other than a stockholder-requested special meeting) for the purpose of electing one or more directors to the Board of Directors, any stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the notice required by this Section 2.10(b) shall be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the close of business on the 120th day prior to such special meeting and not later than the close of business on the later of the 90th day prior to such special meeting or the 10th day following the date on which public announcement of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting is first made by the Corporation.  The number of nominees a stockholder may nominate for election at the special meeting (or in the case of a stockholder giving the notice on behalf of a beneficial owner, the number of nominees a stockholder may nominate for election at the annual meeting on behalf of such beneficial owner) shall not exceed the number of directors to be elected at such special meeting.  In no event shall an adjournment, recess or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.  Notwithstanding any other provision of these Bylaws, in the case of a stockholder-requested special meeting, no stockholder may nominate a person for election to the Board of Directors or propose any other business to be considered at the meeting, except pursuant to the written request(s) delivered for such special meeting pursuant to Section 2.2(a).

(c)     General.

(i)     Except as otherwise required by law, only such persons who are nominated in accordance with the procedures set forth in this Section 2.10 shall be eligible to be elected at any meeting of stockholders of the Corporation to serve as directors and only such other business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.10.  Except as otherwise required by law, each of the Board of Directors or the chairman of the meeting shall have the power to determine whether a nomination or any other business proposed to be brought before

EXHIBIT 2
Page 201 of 404

the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 2.10 (including whether a stockholder or beneficial owner solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in compliance with such stockholder's representation as required by clause (a)(ii)(D)(4) of this Section 2.10).  If any proposed nomination or other business is not in compliance with this Section 2.10, then except as otherwise required by law, the chairman of the meeting shall have the power to declare that such nomination shall be disregarded or that such other business shall not be transacted. Notwithstanding the foregoing provisions of this Section 2.10, unless otherwise required by law, or otherwise determined by the Board of Directors or the chairman of the meeting, if the stockholder does not provide the information required under clauses (a)(ii)(C)(2) and (a)(ii)(D)(1)-(3) of this Section 2.10 to the Corporation within the time frames specified herein, any such nomination shall be disregarded and any such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. Notwithstanding the foregoing provisions of this Section 2.10, unless otherwise required by law, or otherwise determined by the Board of Directors or the chairman of the meeting, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or other business (whether pursuant to the requirements of these Bylaws or in accordance with Rule 14a-8 under the Exchange Act), such nomination shall be disregarded and such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.  To be considered a qualified representative of a stockholder pursuant to the preceding sentence, a person must be a duly authorized officer, manager or partner of such stockholder or authorized by a writing executed by such stockholder (or a reliable reproduction of the writing) delivered to the Corporation prior to the making of such nomination or proposal at such meeting (and in any event not fewer than five days before the meeting) stating that such person is authorized to act for such stockholder as proxy at the meeting of stockholders.

(ii)     For purposes of this Section 2.10, the "close of business" shall mean 6:00 p.m. local time at the principal executive offices of the Corporation on any calendar day, whether or not the day is a business day, and a "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act. For purposes of clause (a)(ii)(D)(1) of this Section 2.10, shares shall be treated as "beneficially owned" by a person if the person beneficially owns such shares, directly or indirectly, for purposes of Section 13(d) of the Exchange Act and Regulations 13D and 13G thereunder or has or shares pursuant to any agreement, arrangement or understanding (whether or not in writing): (A) the right to acquire such shares (whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition or both); (B) the right to vote such shares, alone or in concert with others; and/or (C) investment power with respect to such shares, including the power to dispose of, or to direct the disposition of, such shares.

Section 2.11     Action by Written Consent.

(a)     Except as otherwise provided for or fixed pursuant to the Certificate of Incorporation (including any Preferred Stock Designation) or until such time as the Corporation is no longer a "Controlled Company" pursuant to Nasdaq Market Rule 5615(c)(1), any action

EXHIBIT 2
Page 202 of 404

required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents, setting forth the action so taken, are signed by the holders of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. To be effective, such a consent must be delivered to the Corporation in accordance with Section 228(d) of the DGCL; provided, however, that the Corporation has not designated, and shall not designate, any information processing system for receiving such consents.  No consent shall be effective to take the corporate action referred to therein unless consents signed by a sufficient number of holders to take action are delivered to the Corporation in accordance with this Section 2.11 within 60 days of the first date on which a consent is so delivered to the Corporation.  Any person executing a consent may provide, whether through instruction to an agent or otherwise, that such a consent shall be effective at a future time (including a time determined upon the happening of an event), no later than 60 days after such instruction is given or such provision is made, if evidence of such instruction or provision is provided to the Corporation.  Unless otherwise provided, any such consent shall be revocable prior to its becoming effective.

(b)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation in accordance with this Section 2.11.

Section 2.12    Inspectors of Election.  Before any meeting of stockholders, the Corporation may, and shall if required by law, appoint one or more inspectors of election to act at the meeting and make a written report thereof.  Inspectors may be employees of the Corporation.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the chairman of the meeting may, and shall if required by law, appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  Inspectors need not be stockholders. No director or nominee for the office of director at an election shall be appointed as an inspector at such election.

Such inspectors shall:

(a)    determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the validity of proxies and ballots;

(b)    determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors;

(c)    count and tabulate all votes and ballots; and

**EXHIBIT 2**
**Page 203 of 404**

(d)    certify their determination of the number of shares represented at the meeting, and their count of all votes and ballots.

Section 2.13    Meetings by Remote Communications.  The Board of Directors may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication in accordance with Section 211(a)(2) of the DGCL.  If authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication: (a) participate in a meeting of stockholders; and (b) be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that:  (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder; (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings; and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

Section 2.14    Delivery to the Corporation.  Whenever this Article II requires one or more persons (including a record or beneficial owner of stock) to deliver a document or information to the Corporation or any officer, employee or agent thereof (including any notice, request, questionnaire, revocation, representation or other document or agreement), the Corporation shall not be required to accept delivery of such document or information unless the document or information is in writing exclusively (and not in an electronic transmission) and delivered exclusively by hand (including, without limitation, overnight courier service) or by certified or registered mail, return receipt requested.

**ARTICLE III**
**DIRECTORS**

Section 3.1    Powers.  Except as otherwise required by the DGCL or as provided in the Certificate of Incorporation (including any Preferred Stock Designation), the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authorities these Bylaws expressly confer upon it, the Board of Directors may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate of Incorporation (including any Preferred Stock Designation) or these Bylaws required to be exercised or done by the stockholders.

Section 3.2    Number, Term of Office and Election.

(a)    Except as otherwise provided for or fixed pursuant to the Certificate of Incorporation (including any Preferred Stock Designation), the Board of Directors shall consist of not fewer than 5 nor more than 11 directors, the exact number to be determined from time to

14

**EXHIBIT 2**
**Page 204 of 404**

time solely by resolution adopted by the affirmative vote of a majority of the total number of directors then authorized (hereinafter referred to as the "Whole Board").

(b)     At any meeting of stockholders at which directors are to be elected, each nominee for election as a director in an uncontested election shall be elected if the number of votes cast for the nominee's election exceeds the number of votes cast against the nominee's election.  In all director elections other than uncontested elections, the nominees for election as a director shall be elected by a plurality of the votes cast.  For purposes of this Section 3.2, an "uncontested election" means any meeting of stockholders at which the number of candidates does not exceed the number of directors to be elected and with respect to which:  (a) no stockholder has submitted notice of an intent to nominate a candidate for election at such meeting in accordance with Section 2.10; or (b) such a notice has been submitted, and on or before the fifth business day prior to the date that the Corporation files its definitive proxy statement relating to such meeting with the Securities and Exchange Commission (regardless of whether thereafter revised or supplemented), the notice has been:  (i) withdrawn in writing to the Secretary of the Corporation; (ii) determined not to be a valid notice of nomination, with such determination to be made by the Board of Directors (or a committee thereof) pursuant to Section 2.10, or if challenged in court, by a final court order; or (iii) determined by the Board of Directors (or a committee thereof) not to create a *bona fide* election contest.

(c)     Each director shall hold office until the next election of directors and until his or her successor shall have been duly elected and qualified.  Directors need not be stockholders unless so required by the Certificate of Incorporation (including any Preferred Stock Designation) or these Bylaws, wherein other qualifications for directors may be prescribed.

Section 3.3     Vacancies and Newly Created Directorships.  Subject to the rights of the holders of any outstanding series of Preferred Stock, and unless otherwise required by law, newly created directorships resulting from any increase in the authorized number of directors and any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification, removal from office or other cause may be filled by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum, or by the sole remaining director, and any director so chosen shall hold office until the next election of directors and until his or her successor shall have been duly elected and qualified.  No decrease in the authorized number of directors shall shorten the term of any incumbent director.

Section 3.4     Resignations and Removal.

(a)     Any director may resign at any time upon notice given in writing or by electronic transmission to the Board of Directors, the Chairman of the Board of Directors or the Secretary of the Corporation.  Such resignation shall take effect upon delivery, unless the resignation specifies a later effective date or time or an effective date or time determined upon the happening of an event or events.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)     Any director, or the entire Board of Directors, may be removed, with or without cause, by the affirmative vote of at least a majority of the voting power of the stock

15

**EXHIBIT 2**
**Page 205 of 404**

outstanding and entitled to vote thereon; provided, however, that whenever the holders of any class or series are entitled to elect one or more directors by the Certificate of Incorporation (including any Preferred Stock Designation), with respect to the removal without cause of a director or directors so elected, the vote of the holders of the outstanding shares of that class or series and not the vote of the outstanding shares as a whole shall apply.

Section 3.5    Regular Meetings.  Regular meetings of the Board of Directors shall be held at such place or places, within or without the State of Delaware, on such date or dates and at such time or times, as shall have been established by the Board of Directors and publicized among all directors.  A notice of each regular meeting shall not be required.

Section 3.6    Special Meetings.  Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman of the Board of Directors, the Chief Executive Officer or a majority of the directors then in office.  The person or persons authorized to call special meetings of the Board of Directors may fix the place, within or without the State of Delaware, date and time of such meetings.  Notice of each such meeting shall be given to each director, if by mail, addressed to such director at his or her residence or usual place of business, at least five days before the day on which such meeting is to be held, or shall be sent to such director by electronic transmission, or be delivered personally or by telephone, in each case at least 24 hours prior to the time set for such meeting.  A notice of special meeting need not state the purpose of such meeting, and, unless indicated in the notice thereof, any and all business may be transacted at a special meeting.

Section 3.7    Participation in Meetings by Conference Telephone.  Members of the Board of Directors, or of any committee thereof, may participate in a meeting of such Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

Section 3.8    Quorum and Voting.  Except as otherwise required by law, the Certificate of Incorporation or these Bylaws, a majority of the Whole Board shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, and the vote of a majority of the directors present at a duly held meeting at which a quorum is present shall be the act of the Board of Directors.  The chairman of the meeting or a majority of the directors present may adjourn the meeting to another time and place whether or not a quorum is present.  At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called.

Section 3.9    Board of Directors Action by Written Consent Without a Meeting.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting, provided that all members of the Board of Directors or committee, as the case may be, consent in writing or by electronic transmission to such action.  After an action is taken, the consent or consents relating thereto shall be filed with the minutes or proceedings of the Board of Directors or committee in the same paper or electronic form as the minutes are maintained.  Any person (whether or not then a director) may provide, whether through instruction to an agent or otherwise, that a consent to action shall be effective at a future time

**EXHIBIT 2**
**Page 206 of 404**

(including a time determined upon the happening of an event), no later than 60 days after such instruction is given or such provision is made and such consent shall be deemed to have been given at such effective time so long as such person is then a director and did not revoke the consent prior to such time.  Any such consent shall be revocable prior to its becoming effective.

Section 3.10    Chairman of the Board.  The Chairman of the Board shall preside at meetings of stockholders (unless otherwise determined by the Board of Directors) and at meetings of directors and shall perform such other duties as the Board of Directors may from time to time determine.  If the Chairman of the Board is not present at a meeting of the Board of Directors, another director chosen by the Board of Directors shall preside.

Section 3.11    Rules and Regulations.  The Board of Directors shall adopt such rules and regulations not inconsistent with the provisions of law, the Certificate of Incorporation or these Bylaws for the conduct of its meetings and management of the affairs of the Corporation as the Board of Directors shall deem proper.

Section 3.12    Fees and Compensation of Directors.  Unless otherwise restricted by the Certificate of Incorporation, directors may receive such compensation, if any, for their services on the Board of Directors and its committees, and such reimbursement of expenses, as may be fixed or determined by resolution of the Board of Directors.

Section 3.13    Emergency Bylaws.  This Section 3.13 shall be operative during any emergency condition as contemplated by Section 110 of the DGCL (an "Emergency"), notwithstanding any different or conflicting provisions in these Bylaws, the Certificate of Incorporation or the DGCL.  In the event of any Emergency, or other similar emergency condition, the director or directors in attendance at a meeting of the Board of Directors or a standing committee thereof shall constitute a quorum.  Such director or directors in attendance may further take action to appoint one or more of themselves or other directors to membership on any standing or temporary committees of the Board of Directors as they shall deem necessary and appropriate.  Except as the Board of Directors may otherwise determine, during any Emergency, the Corporation and its directors and officers, may exercise any authority and take any action or measure contemplated by Section 110 of the DGCL.

**ARTICLE IV**
**COMMITTEES**

Section 4.1    Committees of the Board of Directors.  The Board of Directors may designate one or more committees, each such committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee to replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent permitted by law and provided in the resolution of the Board of Directors establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize

**EXHIBIT 2**
**Page 207 of 404**

the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters:  (a) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval; or (b) adopting, amending or repealing any bylaw of the Corporation.  All committees of the Board of Directors shall keep minutes of their meetings and shall report their proceedings to the Board of Directors when requested or required by the Board of Directors.

Section 4.2    Meetings and Action of Committees.  Unless the Board of Directors provides otherwise by resolution, any committee of the Board of Directors may adopt, alter and repeal such rules and regulations not inconsistent with the provisions of law, the Certificate of Incorporation or these Bylaws for the conduct of its meetings as such committee may deem proper.  A majority of the directors then serving on a committee shall constitute a quorum for the transaction of business by the committee except as otherwise required by law, the Certificate of Incorporation or these Bylaws, and except as otherwise provided in a resolution of the Board of Directors; provided, however, that in no case shall a quorum be less than one-third of the directors then serving on the committee.  Unless the Certificate of Incorporation, these Bylaws or a resolution of the Board of Directors requires a greater number, the vote of a majority of the members of a committee present at a meeting at which a quorum is present shall be the act of the committee.

## ARTICLE V
## OFFICERS

Section 5.1    Officers.  The officers of the Corporation shall consist of a Chief Executive Officer, a Chief Financial Officer, a Secretary, a Treasurer, a Controller and such other officers as the Board of Directors may from time to time determine, each of whom shall be elected by the Board of Directors, each to have such authority, functions or duties as set forth in these Bylaws or as determined by the Board of Directors.  Each officer shall be elected by the Board of Directors and shall hold office for such term as may be prescribed by the Board of Directors and until such person's successor shall have been duly elected and qualified, or until such person's earlier death, disqualification, resignation or removal.  Any number of offices may be held by the same person; provided, however, that no officer shall execute, acknowledge or verify any instrument in more than one capacity if such instrument is required by law, the Certificate of Incorporation or these Bylaws to be executed, acknowledged or verified by two or more officers.  The Board of Directors may require any officer, agent or employee to give security for the faithful performance of his or her duties.

Section 5.2    Compensation.  The salaries of the officers of the Corporation and the manner and time of the payment of such salaries shall be fixed and determined by the Board of Directors or by a duly authorized officer and may be altered by the Board of Directors from time to time as it deems appropriate, subject to the rights, if any, of such officers under any contract of employment.

Section 5.3    Removal, Resignation and Vacancies.  Any officer of the Corporation may be removed, with or without cause, by the Board of Directors or by a duly authorized officer, without prejudice to the rights, if any, of such officer under any contract to which it is a party.

18

**EXHIBIT 2**
**Page 208 of 404**

Any officer may resign at any time upon notice given in writing or by electronic transmission to the Corporation, without prejudice to the rights, if any, of the Corporation under any contract to which such officer is a party.  If any vacancy occurs in any office of the Corporation, the Board of Directors may elect a successor to fill such vacancy for the remainder of the unexpired term and until a successor shall have been duly elected and qualified.

Section 5.4    Chief Executive Officer.  The Chief Executive Officer shall have general supervision and direction of the business and affairs of the Corporation, shall be responsible for corporate policy and strategy, and shall report directly to the Board of Directors.  Unless otherwise provided in these Bylaws or determined by the Board of Directors, all other officers of the Corporation shall report directly to the Chief Executive Officer or as otherwise determined by the Chief Executive Officer.  The Chief Executive Officer shall, if present and in the absence of the Chairman of the Board of Directors, preside at meetings of the stockholders.

Section 5.5    Chief Financial Officer.  The Chief Financial Officer shall exercise all the powers and perform the duties of the office of the chief financial officer and in general have overall supervision of the financial operations of the Corporation.  The Chief Financial Officer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors, the Chief Executive Officer or the President may from time to time determine.

Section 5.6    Treasurer.  The Treasurer shall supervise and be responsible for all the funds and securities of the Corporation, the deposit of all monies and other valuables to the credit of the Corporation in depositories of the Corporation, borrowings and compliance with the provisions of all indentures, agreements and instruments governing such borrowings to which the Corporation is a party, the disbursement of funds of the Corporation and the investment of its funds, and in general shall perform all of the duties incident to the office of the Treasurer.  The Treasurer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors, the Chief Executive Officer, the President or the Chief Financial Officer may from time to time determine.

Section 5.7    Controller.  The Controller shall be the chief accounting officer of the Corporation.  The Controller shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer or the Treasurer may from time to time determine.

Section 5.8    Secretary.  The powers and duties of the Secretary are:  (i) to act as Secretary at all meetings of the Board of Directors, of the committees of the Board of Directors and of the stockholders and to record the proceedings of such meetings in a book or books to be kept for that purpose; (ii) to see that all notices required to be given by the Corporation are duly given and served; (iii) to act as custodian of the seal of the Corporation and affix the seal or cause it to be affixed to all certificates of stock of the Corporation and to all documents, the execution of which on behalf of the Corporation under its seal is duly authorized in accordance with the provisions of these Bylaws; (iv) to have charge of the books, records and papers of the Corporation and see that the reports, statements and other documents required by law to be kept and filed are properly kept and filed; and (v) to perform all of the duties incident to the office of

19

**EXHIBIT 2**
**Page 209 of 404**

Secretary. The Secretary shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as the Board of Directors, the Chief Executive Officer or the President may from time to time determine.

Section 5.9    Additional Matters. The Chief Executive Officer and the Chief Financial Officer of the Corporation shall have the authority to designate employees of the Corporation to have the title of Vice President, Assistant Vice President, Assistant Treasurer or Assistant Secretary. Any employee so designated shall have the powers and duties determined by the officer making such designation. The persons upon whom such titles are conferred shall not be deemed officers of the Corporation unless elected by the Board of Directors.

Section 5.10    Checks; Drafts; Evidences of Indebtedness. From time to time, the Board of Directors shall determine the method, and designate (or authorize officers of the Corporation to designate) the person or persons who shall have authority, to sign or endorse all checks, drafts, other orders for payment of money and notes, bonds, debentures or other evidences of indebtedness that are issued in the name of or payable by the Corporation, and only the persons so authorized shall sign or endorse such instruments.

Section 5.11    Corporate Contracts and Instruments; How Executed. Except as otherwise provided in these Bylaws, the Board of Directors may determine the method, and designate (or authorize officers of the Corporation to designate) the person or persons who shall have authority to enter into any contract or execute any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances. Unless so authorized, or within the power incident to a person's office or other position with the Corporation, no person shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 5.12    Signature Authority. Unless otherwise determined by the Board of Directors or otherwise provided by law or these Bylaws, contracts, evidences of indebtedness and other instruments or documents of the Corporation may be executed, signed or endorsed: (i) by the Chief Executive Officer; or (ii) by the Chief Financial Officer, Treasurer, Secretary or Controller, in each case only with regard to such instruments or documents that pertain to or relate to such person's duties or business functions.

Section 5.13    Action with Respect to Securities of Other Corporations or Entities. The Chief Executive Officer or any other officer of the Corporation authorized by the Board of Directors or the Chief Executive Officer is authorized to vote, represent, and exercise on behalf of the Corporation all rights incident to any and all shares or other equity interests of any other corporation or entity or corporations or entities, standing in the name of the Corporation. The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by the person having such authority.

Section 5.14    Delegation. The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding the foregoing provisions of this Article V.

**EXHIBIT 2**
**Page 210 of 404**

# ARTICLE VI
## INDEMNIFICATION AND ADVANCEMENT OF EXPENSES

Section 6.1    <u>Right to Indemnification</u>.

(a)    Each person who was or is a party or is threatened to be made a party to, or was or is otherwise involved in, any action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether brought by or in the right of the Corporation or otherwise, including any and all appeals, whether of a civil, criminal, administrative, legislative, investigative or other nature (hereinafter a "<u>proceeding</u>"), by reason of the fact that he or she is or was a director or an officer (which means, for purposes of this Article VI, any individual designated by the Board of Directors as an officer for purposes of Section 16 of the Exchange Act) of the Corporation or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee, agent or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "<u>indemnitee</u>"), or by reason of anything done or not done by him or her in any such capacity, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended, against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes, penalties and amounts paid in settlement by or on behalf of the indemnitee) actually and reasonably incurred by such indemnitee in connection therewith, all on the terms and conditions set forth in these Bylaws; <u>provided</u>, <u>however</u>, that, except as otherwise required by law or provided in Section 6.4 with respect to suits to enforce rights under this Article VI, the Corporation shall indemnify any such indemnitee in connection with a proceeding, or part thereof, voluntarily initiated by such indemnitee (including claims and counterclaims, whether such counterclaims are asserted by:  (i) such indemnitee; or (ii) the Corporation in a proceeding initiated by such indemnitee) only if such proceeding, or part thereof, was authorized or ratified by the Board of Directors or the Board of Directors otherwise determines that indemnification or advancement of expenses is appropriate.

(b)    To receive indemnification under this Article VI, an indemnitee shall submit a written request to the Corporation.  Such request shall include documentation or information that is necessary to determine the entitlement of the indemnitee to indemnification and that is reasonably available to the indemnitee.  Upon receipt by the Corporation of such a written request, unless indemnification is required by Section 6.3, the entitlement of the indemnitee to indemnification shall be determined by the following person or persons who shall be empowered to make such determination, as selected by the Board of Directors (except with respect to clause (v) of this Section 6.1(b)):  (i) the Board of Directors by a majority vote of the directors who are not parties to such proceeding, whether or not such majority constitutes a quorum; (ii) a committee of such directors designated by a majority vote of such directors, whether or not such majority constitutes a quorum; (iii) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the indemnitee; (iv) the stockholders of the Corporation; or (v) in the event that a change of control (as defined below) has occurred, by independent legal counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the indemnitee.  The determination of entitlement to indemnification shall be made and, unless a

21

**EXHIBIT 2**
**Page 211 of 404**

contrary determination is made, such indemnification shall be paid in full by the Corporation not later than 60 days after receipt by the Corporation of a written request for indemnification.  For purposes of this Section 6.1(b), a "change of control" will be deemed to have occurred if, with respect to any particular 24-month period, the individuals who, at the beginning of such 24-month period, constituted the Board of Directors (the "incumbent board"), cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the beginning of such 24-month period whose election, or nomination for election by the stockholders of the Corporation, was approved by a vote of at least a majority of the directors then comprising the incumbent board shall be considered as though such individual were a member of the incumbent board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board of Directors.

Section 6.2    Right to Advancement of Expenses.

(a)    In addition to the right to indemnification conferred in Section 6.1, an indemnitee shall, to the fullest extent permitted by law, also have the right to be paid by the Corporation the expenses (including attorneys' fees) incurred in defending any proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that an advancement of expenses shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Article VI or otherwise.

(b)    To receive an advancement of expenses under this Section 6.2, an indemnitee shall submit a written request to the Corporation.  Such request shall reasonably evidence the expenses incurred by the indemnitee and shall include or be accompanied by the undertaking required by Section 6.2(a).  Each such advancement of expenses shall be made within 20 days after the receipt by the Corporation of a written request for advancement of expenses.

(c)    Notwithstanding the foregoing Section 6.2(a), the Corporation shall not make or continue to make advancements of expenses to an indemnitee if a determination is reasonably made that the facts known at the time such determination is made demonstrate clearly and convincingly that the indemnitee acted in bad faith or in a manner that the indemnitee did not reasonably believe to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal proceeding, that the indemnitee had reasonable cause to believe his or her conduct was unlawful.  Such determination shall be made:  (i) by the Board of Directors by a majority vote of directors who are not parties to such proceeding, whether or not such majority constitutes a quorum; (ii) by a committee of such directors designated by a majority vote of such directors, whether or not such majority constitutes a quorum; or (iii) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the indemnitee.

22

**EXHIBIT 2**
**Page 212 of 404**

Section 6.3    Indemnification for Successful Defense.  To the extent that an indemnitee has been successful on the merits or otherwise in defense of any proceeding (or in defense of any claim, issue or matter therein), such indemnitee shall be indemnified under this Section 6.3 against expenses (including attorneys' fees) actually and reasonably incurred in connection with such defense.  Indemnification under this Section 6.3 shall not be subject to satisfaction of a standard of conduct, and the Corporation may not assert the failure to satisfy a standard of conduct as a basis to deny indemnification or recover amounts advanced, including in a suit brought pursuant to Section 6.4 (notwithstanding anything to the contrary therein); provided, however, that, any indemnitee who is not a current or former director or officer (as such term is defined in the final sentence of Section 145(c)(1) of the DGCL) shall be entitled to indemnification under Section 6.1 and this Section 6.3 only if such indemnitee has satisfied the standard of conduct required for indemnification under Section 145(a) or Section 145(b) of the DGCL.

Section 6.4    Right of Indemnitee to Bring Suit.  In the event that a determination is made that the indemnitee is not entitled to indemnification or if payment is not timely made following a determination of entitlement to indemnification pursuant to Section 6.1(b), if a request for indemnification under Section 6.3 is not paid in full by the Corporation within 60 days after a written request has been received by the Corporation, or if an advancement of expenses is not timely made under Section 6.2(b), the indemnitee may at any time thereafter bring suit against the Corporation in a court of competent jurisdiction in the State of Delaware seeking an adjudication of entitlement to such indemnification or advancement of expenses.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit to the fullest extent permitted by law.  In any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that the indemnitee has not met any applicable standard of conduct for indemnification set forth in Section 145(a) or Section 145(b) of the DGCL.  Further, in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the indemnitee has not met any applicable standard of conduct for indemnification set forth in Section 145(a) or Section 145(b) of the DGCL.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met such applicable standard of conduct, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under applicable law, this Article VI or otherwise shall be on the Corporation.

**EXHIBIT 2**
**Page 213 of 404**

Section 6.5    <u>Non-Exclusivity of Rights</u>.  The rights to indemnification and to the advancement of expenses conferred in this Article VI shall not be exclusive of any other right which any person may have or hereafter acquire under any law, agreement, vote of stockholders or disinterested directors, provisions of a certificate of incorporation or bylaws, or otherwise.

Section 6.6    <u>Insurance</u>.  The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Section 6.7    <u>Indemnification of Employees and Agents of the Corporation</u>.  The Corporation may, to the extent and in the manner permitted by law, and to the extent authorized from time to time, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation.

Section 6.8    <u>Nature of Rights</u>.  The rights conferred upon indemnitees in this Article VI shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director or officer and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this Article VI that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

Section 6.9    <u>Settlement of Claims</u>.  Notwithstanding anything in this Article VI  to the contrary, the Corporation shall not be liable to indemnify any indemnitee under this Article VI for any amounts paid in settlement of any proceeding effected without the Corporation's written consent, which consent shall not be unreasonably withheld.

Section 6.10    <u>Subrogation</u>.  In the event of payment under this Article VI, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of the indemnitee (excluding insurance obtained on the indemnitee's own behalf), and the indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Corporation effectively to bring suit to enforce such rights.

Section 6.11    <u>Severability</u>.  If any provision or provisions of this Article VI  shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law:  (a) the validity, legality and enforceability of such provision in any other circumstance and of the remaining provisions of this Article VI  (including, without limitation, all portions of any paragraph of this Article VI containing any such provision held to be invalid, illegal or unenforceable, that are not by themselves invalid, illegal or unenforceable) and the application of such provision to other persons or entities or circumstances shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VI  (including, without limitation, all portions of any paragraph of this Article VI  containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be

24

**EXHIBIT 2**
**Page 214 of 404**

construed so as to give effect to the intent of the parties that the Corporation provide protection to the indemnitee to the fullest extent set forth in this Article VI.

# ARTICLE VII
# CAPITAL STOCK

Section 7.1    Certificates of Stock.  The shares of the Corporation shall be represented by certificates; provided, however, that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Every holder of stock represented by certificates shall be entitled to have a certificate signed by or in the name of the Corporation by any two authorized officers of the Corporation, including, without limitation, the Chief Executive Officer, the President, the Chief Financial Officer, the Treasurer, the Controller, the Secretary, or an Assistant Treasurer or Assistant Secretary certifying the number of shares owned by such holder in the Corporation.  Any or all such signatures may be facsimiles.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

Section 7.2    Special Designation on Certificates.  If the Corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.  Within a reasonable time after the issuance or transfer of uncertificated stock, the registered owner thereof shall be given a notice, in writing or by electronic transmission, containing the information required to be set forth or stated on certificates pursuant to this Section 7.2 or Section 151, 156, 202(a) or 218(a) of the DGCL or with respect to this Section 7.2 and Section 151 of the DGCL a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.  Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

Section 7.3    Transfers of Stock.  Transfers of shares of stock of the Corporation shall be made only on the books of the Corporation upon authorization by the registered holder thereof

25

EXHIBIT 2
Page 215 of 404

or by such holder's attorney thereunto authorized by a power of attorney duly executed and filed with the Secretary of the Corporation or a transfer agent for such stock, and if such shares are represented by a certificate, upon surrender of the certificate or certificates for such shares properly endorsed or accompanied by a duly executed stock transfer power and the payment of any taxes thereon; provided, however, that the Corporation shall be entitled to recognize and enforce any lawful restriction on transfer.

Section 7.4    Lost Certificates.  The Corporation may issue a new share certificate or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate or the owner's legal representative to give the Corporation a bond (or other adequate security) sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.  The Board of Directors may adopt such other provisions and restrictions with reference to lost certificates, not inconsistent with applicable law, as it shall in its discretion deem appropriate.

Section 7.5    Registered Stockholders.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

Section 7.6    Record Date for Determining Stockholders.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjourned meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by law, not be more than 60 nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjourned meeting; provided, however, that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose

26

EXHIBIT 2
Page 216 of 404

of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 days prior to such action.  If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

          (c)     Unless otherwise restricted by the Certificate of Incorporation (including any Preferred Stock Designation), in order that the Corporation may determine the stockholders entitled to express consent to corporate action without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to express consent to corporate action without a meeting, when no prior action of the Board of Directors is required by law, shall be the first date on which a signed consent setting forth the action taken or proposed to be taken was delivered to the Corporation in accordance with Section 2.11.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to express consent to corporate action without a meeting, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

     Section 7.7    <u>Regulations</u>.  To the extent permitted by applicable law, the Board of Directors may make such additional rules and regulations as it may deem expedient concerning the issue, transfer and registration of shares of stock of the Corporation.

     Section 7.8    <u>Waiver of Notice</u>.  Whenever notice is required to be given under any provision of the DGCL or the Certificate of Incorporation or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, the Board of Directors or a committee of the Board of Directors need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these Bylaws.

## ARTICLE VIII
## GENERAL MATTERS

     Section 8.1    <u>Fiscal Year</u>.  The fiscal year of the Corporation shall begin on the first day of January of each year and end on the last day of December of the same year, or shall extend for such other 12 consecutive months as the Board of Directors may designate.

**EXHIBIT 2**
**Page 217 of 404**

Section 8.2 <u>Corporate Seal</u>. The Board of Directors may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary of the Corporation. If and when so directed by the Board of Directors or a committee thereof, duplicates of the seal may be kept and used by the Treasurer or by an Assistant Secretary or Assistant Treasurer.

Section 8.3 <u>Reliance Upon Books, Reports and Records</u>. Each director and each member of any committee designated by the Board of Directors shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 8.4 <u>Subject to Law and Certificate of Incorporation</u>. All powers, duties and responsibilities provided for in these Bylaws, whether or not explicitly so qualified, are qualified by the Certificate of Incorporation (including any Preferred Stock Designation) and applicable law.

Section 8.5 <u>Electronic Signatures, etc</u>. Except as otherwise required by the Certificate of Incorporation (including as otherwise required by any Preferred Stock Designation) or these Bylaws (including, without limitation, as otherwise required by Section 2.14), any document, including, without limitation, any consent, agreement, certificate or instrument, required by the DGCL, the Certificate of Incorporation (including any Preferred Stock Designation) or these Bylaws to be executed by any officer, director, stockholder, employee or agent of the Corporation may be executed using a facsimile or other form of electronic signature to the fullest extent permitted by applicable law. All other contracts, agreements, certificates or instruments to be executed on behalf of the Corporation may be executed using a facsimile or other form of electronic signature to the fullest extent permitted by applicable law. The terms "electronic mail," "electronic mail address," "electronic signature" and "electronic transmission" as used herein shall have the meanings ascribed thereto in the DGCL.

**ARTICLE IX**
**FORUM FOR ADJUDICATION OF DISPUTES**

Section 9.1 <u>Forum</u>. Unless the Corporation, in writing, selects or consents to the selection of an alternative forum: (a) the sole and exclusive forum for any complaint asserting any internal corporate claims (as defined below), to the fullest extent permitted by law, and subject to applicable jurisdictional requirements, shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have, or declines to accept, jurisdiction, another state court or a federal court located within the State of Delaware); and (b) the sole and exclusive forum for any complaint asserting a cause of action arising under the Securities Act of 1933, to the fullest extent permitted by law, shall be the federal district courts of the United States of America. For purposes of this Article IX, internal corporate claims means claims, including claims in the right of the Corporation: (a) that are based upon a violation of a duty by a current or former director, officer, employee or stockholder in such capacity, or (b) as to which the DGCL

28

**EXHIBIT 2**
**Page 218 of 404**

confers jurisdiction upon the Court of Chancery.  Any person or entity purchasing or otherwise acquiring or holding any interest in shares of stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article IX.

Section 9.2    <u>Enforceability</u>.  If any provision of this Article IX shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provision in any other circumstance and of the remaining provisions of this Article IX (including, without limitation, each portion of any sentence of this Article IX containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities or circumstances shall not in any way be affected or impaired thereby.

**ARTICLE X**
**AMENDMENTS**

Section 10.1    <u>Amendments</u>.  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors is expressly authorized to adopt, amend or repeal these Bylaws.  Except as otherwise provided in the Certificate of Incorporation (including the terms of any Preferred Stock Designation that provides for a greater or lesser vote) or these Bylaws, and in addition to any other vote required by law, the affirmative vote of at least a majority of the voting power of the stock outstanding and entitled to vote thereon, voting together as a single class, shall be required for the stockholders to adopt, amend or repeal, or adopt any provision inconsistent with, any provision of these Bylaws.

The foregoing Bylaws were adopted by the Board of Directors on _____, 2022.

29

**EXHIBIT 2**
**Page 219 of 404**

**<u>EXHIBIT G</u>**                                                                                  *FINAL FORM*

FORM OF
TAX RECEIVABLE AGREEMENT

dated as of

[•]

**EXHIBIT 2**
**Page 220 of 404**

# TABLE OF CONTENTS

**Page**

Article I DETERMINATION OF REALIZED TAX BENEFIT ...................................................2

    Section 1.01    Realized Tax Benefit and Realized Tax Detriment ..................................2
    Section 1.02    Assumptions, Conventions, and Principles for Calculations ...................2
    Section 1.03    Procedures Relating to Calculation of Tax Benefits................................3

Article II TAX BENEFIT PAYMENTS, THE CONSOLIDATED GROUP, AND
          TRANSFERS OF CORPORATE ASSETS ..................................................5

    Section 2.01    Payments .................................................................................................5
    Section 2.02    No Duplicative Payments ........................................................................6
    Section 2.03    Order of Payments ..................................................................................6
    Section 2.04    No Escrow or Clawback; Reduction of Future Payments ......................6

Article III EARLY TERMINATIONS ........................................................................................6

    Section 3.01    Early Termination Events .......................................................................6
    Section 3.02    Early Termination Notice and Early Termination Schedule...................8
    Section 3.03    Early Termination Payment .....................................................................9
    Section 3.04    Admission of the Corporation into a Consolidated Group;
                Transfers of Corporate Assets..................................................................9

Article IV SUBORDINATION AND LATE PAYMENTS ......................................................10

    Section 4.01    Subordination........................................................................................10
    Section 4.02    Late Payments by the Corporation.........................................................11
    Section 4.03    Manner of Payment ...............................................................................11

Article V PREPARATION OF TAX RETURNS; COVENANTS .............................................11

    Section 5.01    No Participation by TRA Holder in the Corporation's and the
                Company's Tax Matters..........................................................................11
    Section 5.02    Consistency...........................................................................................11
    Section 5.03    Cooperation...........................................................................................11
    Section 5.04    Section 754 Election .............................................................................12
    Section 5.05    Available Cash ......................................................................................12

Article VI MISCELLANEOUS.................................................................................................12

    Section 6.01    Notices ..................................................................................................12
    Section 6.02    Bank Account Information. ....................................................................14
    Section 6.03    Counterparts..........................................................................................14
    Section 6.04    Entire Agreement ..................................................................................14
    Section 6.05    Governing Law .....................................................................................14
    Section 6.06    Severability ...........................................................................................14
    Section 6.07    Assignment; Amendments; Waiver of Compliance; Successors...........14

**EXHIBIT 2**
**Page 221 of 404**

# TABLE OF CONTENTS
## (continued)

<u>**Page**</u>

Section 6.08    Titles and Subtitles.................................................................16
Section 6.09    Dispute Resolution.................................................................16
Section 6.10    Indemnification of the TRA Representative ...........................18
Section 6.11    Withholding ............................................................................18
Section 6.12    Confidentiality ........................................................................18
Section 6.13    LLC Agreement ......................................................................19
Section 6.14    Joinder....................................................................................19
Section 6.15    Survival...................................................................................19

Article VII DEFINITIONS .........................................................................19

ii

**EXHIBIT 2**
**Page 222 of 404**

## TAX RECEIVABLE AGREEMENT

This TAX RECEIVABLE AGREEMENT (this "**Agreement**"), dated as of [●], is entered into by and among NuScale Power Corp., a Delaware corporation (NuScale Power Corp., together with each of its Subsidiaries that is classified as a corporation for U.S. federal income tax purposes, and each successor thereto, the "**Corporation**"), NuScale Power, LLC, an Oregon limited liability company that is classified as a partnership for U.S. federal income tax purposes (the "**Company**"), each of the TRA Holders, and the TRA Representative.

## RECITALS

WHEREAS, the TRA Holders hold Class B common units in the Company (the "**Units**");

WHEREAS, the Corporation, Spring Valley Merger Sub LLC, an Oregon limited liability company ("**Merger Sub**"), and the Company entered into that certain Agreement and Plan of Merger, dated December [●], 2021 (as further amended or modified in whole or in part from time to time in accordance with such Agreement, the "**Merger Agreement**"), pursuant to which, among other things, Merger Sub merged with and into the Company with the Company surviving (the "**Merger**") and the Corporation acquired Class A common units in the Company in a contribution governed by Section 721 of the Code;

WHEREAS, following the Merger, the Corporation is the managing member of the Company;

WHEREAS, the Units, together with shares of Class B common stock of the Corporation, with the par value of $0.0001 per share (the "**Class B Shares**"), are exchangeable with the Company or the Corporation in certain circumstances for shares of Class A common stock of the Corporation, with the par value of $0.0001 per share (the "**Class A Shares**") and/or cash pursuant to the exchange provisions of the Sixth Amended and Restated Limited Liability Company Agreement of the Company (the "**LLC Agreement**");

WHEREAS, each of the Company and any of its direct or indirect (through Subsidiaries that are classified as partnerships or disregarded entities for United States federal income tax purposes) Subsidiaries classified as partnerships for United States federal income tax purposes shall have in effect an election under section 754 of the Code for the Taxable Year that includes the effective date of the Merger and each Taxable Year in which a taxable acquisition (including a deemed taxable acquisition under Section 707(a) of the Code) of Units, together with Class B Shares, by the Corporation or the Company from the TRA Holders for Class A Shares or cash pursuant to the exchange provisions of the LLC Agreement (an "**Exchange**") occurs, which election is intended to result in an adjustment to the tax basis of the assets owned by the Company and such Subsidiaries;

WHEREAS, as a result of an Exchange, the income, gain, loss, expense and deduction of the Corporation may be affected by the Tax Assets;

WHEREAS, the parties to this Agreement desire to make certain arrangements with respect to the benefits attributable to the effect of the Tax Assets on the liability for Taxes of the Corporation;

**EXHIBIT 2**
**Page 223 of 404**

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, the undersigned parties agree as follows:

## ARTICLE I
## DETERMINATION OF REALIZED TAX BENEFIT

Section 1.01    Realized Tax Benefit and Realized Tax Detriment.  Except as otherwise expressly provided in this Agreement, the parties intend that, for a Taxable Year, the excess, if any, of (a) the Hypothetical Tax Liability over the Actual Tax Liability (such excess, the "**Realized Tax Benefit**") or (b) the Actual Tax Liability over the Hypothetical Tax Liability (such excess, the "**Realized Tax Detriment**") shall measure the decrease or increase (respectively) in the Actual Tax Liability for such Taxable Year that is attributable to the Tax Assets, determined using a "with and without" methodology (that is, treating the Tax Assets as the last tax attributes used in such Taxable Year).  If all or a portion of the Actual Tax Liability for the Taxable Year arises as a result of an audit by a Taxing Authority of any Taxable Year, such liability shall not be included in determining the Realized Tax Benefit or Realized Tax Detriment unless and until there has been a Determination with respect to that portion of the Actual Tax Liability.

Section 1.02    Assumptions, Conventions, and Principles for Calculations.  The Actual Tax Liability shall be the U.S. federal, state and local income tax liability of the Corporation as reflected on the relevant Corporate Tax Return, using such reasonable methods as the Corporation determines; provided that, in making the calculations required by this Agreement, the Corporation shall use the following assumptions, conventions, and principles:

(a)    Treatment of Tax Benefit Payments.  Tax Benefit Payments (other than amounts accounted for as Imputed Interest) arising as a result of an Exchange shall (i) be treated as upward purchase price adjustments that give rise to further Basis Adjustments to Adjusted Assets for the Corporation and (ii) have the effect of creating additional Basis Adjustments to Adjusted Assets for the Corporation in the year of payment, and, as a result, such additional Basis Adjustments shall be incorporated into the current year calculation and into future year calculations, as appropriate.

(b)    Imputed Interest.  The Actual Tax Liability shall take into account the deduction of the portion of each Tax Benefit Payment that is accounted for as Imputed Interest under the Code due to the characterization of such Tax Benefit Payments as additional consideration payable by the Corporation for the Units acquired in connection with an Exchange.

(c)    Carryovers and Carrybacks.  Carryovers or carrybacks of any income, gain, loss, deduction, or credit attributable to the Tax Assets shall be considered to be subject to the rules of the Code and the Treasury Regulations governing the use, limitation and expiration of carryovers or carrybacks of the relevant type.  If a carryover or carryback of any Tax item includes a portion that is attributable to a Tax Asset and another portion that is not, the portion attributable to the Tax Asset shall be considered to be used in accordance with the "with and without" methodology.

**EXHIBIT 2**
**Page 224 of 404**

(d)    State and Local Taxes.  For purposes of calculating the Actual Tax Liability with respect to a Taxable Year, the Corporation may, but shall not be required to, assume that the Corporation's state and local income Tax liability (the "**Assumed SALT Liability**") equals (i) the product of (x) the taxable income and gain determined for the Taxable Year in accordance with this Agreement and (y) ten percent (10%) or (ii) if the Corporation determines in its sole discretion (but, in any case, not more frequently than annually) that the percentage described in clause (i) materially differs from its actual state and local liability, then, in consultation with the TRA Representative, the Corporation will use such other percentage as the Corporation reasonably determines from time to time reflects its actual blended state and local tax rate (using the apportionment factors set forth on the relevant Corporate Tax Returns for that Taxable Year unless otherwise determined by the Corporation after consultation with the TRA Representative). Any U.S. federal income tax benefit of the Corporation with respect to state and local income Taxes shall be determined by taking into account an assumed deduction based on the Assumed SALT Liability and by disregarding the actual deduction for state and local income Taxes reflected on the Corporation's U.S. federal income Tax return. The provisions of this Agreement, including the assumption, conventions, and principles with respect to the determination of income and gain, shall apply to state and local tax matters *mutatis mutandis*.

Section 1.03    Procedures Relating to Calculation of Tax Benefits.

(a)    Preparation and Delivery of Schedules.

(i)    Exchange Basis Schedule. Within 120 days after the filing of the U.S. federal income Tax Return of the Corporation for each Taxable Year in which any Exchange has occurred, the Corporation shall deliver to the TRA Representative a schedule (the "**Exchange Basis Schedule**") that shows, in reasonable detail, (w) the actual common tax basis of the Adjusted Assets as of each Exchange Date, (x) the Basis Adjustment with respect to the Adjusted Assets as a result of the Exchanges effected in such Taxable Year and all prior Taxable Years ending after the date of this Agreement, calculated (1) in the aggregate and (2) with respect to Exchanges by each TRA Holder, (y) the period or periods, if any, over which the common tax basis of the Adjusted Assets are amortizable and/or depreciable, and (z) the period or periods, if any, over which each Basis Adjustment is amortizable and/or depreciable.  The calculations required by this Agreement shall be made in accordance with the Exchange Basis Schedule.  If any calculation is required to be made before the Exchange Basis Schedule is agreed upon, reasonable estimates shall be used.

(ii)    Tax Benefit Schedule.  Within 120 days after the filing of the U.S. federal income Tax Return of the Corporation for any Taxable Year ending after the date of the first Exchange, the Corporation shall provide to the TRA Representative either (A) a schedule showing, in reasonable detail, the calculation of the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year (a "**Tax Benefit Schedule**") or, (B) if there is no Realized Tax Benefit or Realized Tax Detriment for that Taxable Year, notice to that effect.

- 3 -

**EXHIBIT 2**
**Page 225 of 404**

(iii)    <u>Supporting Material; Review Right</u>.  Each time the Corporation delivers to the TRA Representative an Exchange Basis Schedule, Early Termination Schedule or a Tax Benefit Schedule, the Corporation shall also deliver to the TRA Representative schedules and work papers providing reasonable detail regarding the preparation of the schedules and allow the TRA Representative reasonable access, at the cost and expense of the Company, to the appropriate representatives at the Corporation and, if applicable, the Advisory Firm in connection with a review of such schedules or workpapers.

(iv)    <u>Provision of Information to TRA Holders</u>.  Upon the reasonable request of a TRA Holder, the TRA Representative shall provide to that TRA Holder, in a reasonably prompt manner, such information that the TRA Representative receives pursuant to this Agreement (including the schedules described in this Section <u>1.03</u>), but only to the extent that the TRA Representative determines that such information is material, relevant, and relates to that TRA Holder.

(b)    <u>Objection to, and Finalization of, Schedules</u>.  Each Exchange Basis Schedule or Tax Benefit Schedule, including any Amended Schedule delivered pursuant to <u>Section 1.03(c)</u>, shall become final and binding on all parties unless the TRA Representative, within 30 days after receiving an Exchange Basis Schedule or a Tax Benefit Schedule, provides the Corporation with notice of a material objection to such schedule made in good faith (an "**Objection Notice**").  If the Corporation and the TRA Representative are unable to successfully resolve the issues raised in the Objection Notice within 30 days after receipt by the Corporation of the Objection Notice, the Corporation and the TRA Representative shall employ the dispute resolution procedures as described in <u>Section 6.09</u> (the "**Dispute Resolution Procedures**").

(c)    <u>Amendment of Schedules</u>.  After finalization of an Exchange Basis Schedule or a Tax Benefit Schedule in accordance with <u>Section 1.03(b)</u>, any Exchange Basis Schedule or Tax Benefit Schedule shall be amended from time to time by the Corporation (i) to correct material inaccuracies in any such schedule, (ii) to reflect a material change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year, including any such change attributable to either a carryback or carryforward of a Tax item to such Taxable Year or to an amended Tax Return filed with respect to such Taxable Year, (iii) to adjust the Exchange Basis Schedule to take into account material payments made pursuant to this Agreement, (iv) to comply with the Arbitrators' determinations under the Dispute Resolution Procedures, or (v) in connection with a material Determination affecting such schedule (any schedule amended in accordance with this <u>Section 1.03(c)</u>, an "**Amended Schedule**" or, as applicable, "**Amended Exchange Basis Schedule**", or "**Amended Tax Benefit Schedule**").  Any Amended Schedule shall (x) be subject to the finalization procedures set forth in Section <u>1.03(b)</u> and the Dispute Resolution Procedures set forth in <u>Section 6.09</u>, and (y) delivered to the TRA Representative.

**EXHIBIT 2**
**Page 226 of 404**

## ARTICLE II
## TAX BENEFIT PAYMENTS, THE CONSOLIDATED GROUP, AND TRANSFERS OF CORPORATE ASSETS

Section 2.01    Payments.

(a)    General Rule.  The Corporation shall pay to each TRA Holder for each Taxable Year the Tax Benefit Payment that is Attributable to that TRA Holder at the times set forth in Section 2.01(c).  For purposes of this Section 2.01(a), the amount of a Tax Benefit Payment that is Attributable to a TRA Holder shall be determined by multiplying (i) the aggregate Tax Benefit Payments for the Taxable Year that arose directly or indirectly as a result of any Exchanges by any TRA Holders or as a result of any payments under this Agreement to any TRA Holders by (ii) a fraction (x) the numerator of which is the aggregate amount of all Tax Benefit Items available for use in the Taxable Year that arose directly or indirectly as a result of an Exchange by such TRA Holder or as a result of payments to such TRA Holder under this Agreement and (y) the denominator of which is the aggregate amount of all Tax Benefit Items available for use in the Taxable Year that arose directly or indirectly as a result of all Exchanges by any TRA Holders or as a result of any payments under this Agreement to any TRA Holders.

(b)    Determination of Tax Assets.  The Tax Assets shall be determined separately with respect to each separate Exchange, on a Unit-by-Unit basis by reference to the Exchange of a Unit and the resulting Tax Assets with respect to the Corporation.

(c)    Timing of Tax Benefit Payments. The Corporation shall make each Tax Benefit Payment not later than 10 days after a Tax Benefit Schedule delivered to the TRA Representative becomes final in accordance with Section 1.03(b).  The Corporation may, but is not required to, make one or more estimated payments at other times during the Taxable Year and reduce future payments so that the total amount paid to a TRA Holder in respect of a Taxable Year equals the amount calculated with respect to such Taxable Year pursuant to Section 2.01(a).

(d)    Optional Cap on Payments.  Notwithstanding any provision of this Agreement to the contrary, any TRA Holder may elect with respect to any Exchange to limit the aggregate Tax Benefit Payments made to such TRA Holder in respect of that Exchange to a specified dollar amount, a specified percentage of the amount realized by the TRA Holder with respect to the Exchange, or a specified portion of the Basis Adjustment with respect to the Adjusted Assets as a result of the Exchange.  The TRA Holder shall exercise its rights under the preceding sentence by including a notice of its desire to impose such a limit and the specified limitation and such other details as may be reasonably necessary (including whether such limitation includes the Additional Amounts in respect of any such Exchange) in the Elective Exchange Notice (as defined in the LLC Agreement) delivered in accordance with the LLC Agreement.

Section 2.02    No Duplicative Payments.  The provisions of this Agreement are not intended to, and shall not be construed to, result in duplicative payment of any amount (including interest) required under this Agreement.

EXHIBIT 2
Page 227 of 404

Section 2.03   Order of Payments.  If for any reason (including, but not limited to, the lack of sufficient Available Cash to satisfy the Corporation's obligations to make all Tax Benefit Payments due in a particular Taxable Year under this Agreement) the Corporation does not fully satisfy its obligations to make all payments due under this Agreement in a particular Taxable Year, then (i) the TRA Holders shall receive payments under this Agreement in respect of such Taxable Year in the same proportion as they would have received if the Corporation had been able to fully satisfy its payment obligations, without favoring one TRA Holder over the other TRA Holders, and (ii) no payment under this Agreement shall be made in respect of any subsequent Taxable Year until all such payments under this Agreement in respect of the current Taxable Year and all prior Taxable Years have been made in full.

Section 2.04   No Escrow or Clawback; Reduction of Future Payments.  No amounts due to a TRA Holder under this Agreement shall be escrowed, and no TRA Holder shall be required to return any portion of any Tax Benefit Payment previously made to it.  No TRA Holder shall be required to make a payment to the Corporation on account of any Realized Tax Detriment.  If a TRA Holder receives amounts in excess of its entitlements under this Agreement (including as a result of an audit adjustment or Realized Tax Detriment), future payments under this Agreement shall be reduced until the amount received by the TRA Holder equals the amount the TRA Holder would have received had it not received the amount in excess of such entitlements.

## ARTICLE III
## EARLY TERMINATIONS

Section 3.01   Early Termination Events.

(a)   Early Termination Election by Corporation.  The Corporation may terminate all or a portion of the rights under this Agreement with respect to all or a portion of the Units held (including those previously Exchanged) by all TRA Holders at any time by (A) delivering an Early Termination Notice as provided in Section 3.02(a) and (B) paying the Early Termination Payment as provided in Section 3.03(a).  If the Corporation terminates less than all of the rights under this Agreement with respect to the TRA Holders, such termination shall be made among the TRA Holders in such manner that it results in each TRA Holder receiving the same proportion of the Early Termination Payment made at that time as each TRA Holder would have received had the Corporation terminated all of the rights of the TRA Holders under this Agreement at that time.

(b)   Deemed Early Termination.

(i)   Deemed Early Termination Event.  Upon a Material Uncured Breach of this Agreement with respect to a TRA Holder (an "**Affected TRA Holder**") or as soon as reasonably practicable before a Change of Control (each, a "**Deemed Early Termination Event**"), (A) the Corporation or the TRA Representative (with a copy to the Corporation) shall deliver, (x) in the case of a Material Uncured Breach, to the Affected TRA Holder(s) or, (y) in the case of a Change of Control, to all TRA Holders, an Early Termination Notice as contemplated in Section 3.02(a), and (B) all obligations under this Agreement with respect to such TRA Holder(s) shall be accelerated.

EXHIBIT 2
Page 228 of 404

(ii)    Payment upon Deemed Early Termination Event.  The amount payable to the applicable TRA Holder as a result of an acceleration contemplated in Section 3.01(b)(i) shall equal the sum of:

(A) an Early Termination Payment calculated with respect to such TRA Holder(s) pursuant to this Article III as if an Early Termination Notice had been delivered on the date of the Deemed Early Termination Event using the Valuation Assumptions but substituting the phrase "the date of the Deemed Early Termination Event" in each place where the phrase "**Early Termination Date**" appears;

(B) any Tax Benefit Payment agreed to by the Corporation and such TRA Holder(s) as due and payable but unpaid as of the date of such Deemed Early Termination Event; and

(C) any Tax Benefit Payment due to such TRA Holder(s) for the Taxable Year ending with or including the date of such Deemed Early Termination Event (except to the extent that any amounts described in clauses (B) or (C) are included in the amount payable upon early termination).

(iii)    Waiver of Deemed Early Termination.  A TRA Holder may elect to waive the acceleration of obligations under this Agreement triggered by a Deemed Early Termination Event by submitting a waiver in writing to the Corporation within 30 days after the date of the Early Termination Notice.  If a TRA Holder elects to waive the acceleration of obligations pursuant to the preceding sentence, this Agreement shall continue to apply with respect to that TRA Holder as though no Deemed Early Termination Event had occurred, and, if there are any due and unpaid amounts with respect to that TRA Holder, the Corporation shall pay those amounts to the TRA Holder in the manner provided in this Agreement.

Section 3.02    Early Termination Notice and Early Termination Schedule.

(a)    Notice; Schedule.

(i)    Delivery of Early Termination Notice and Early Termination Schedule.  If the Corporation chooses to exercise its right of early termination under Section 3.01(a) above, or if there is a Deemed Early Termination Event under Section 3.01(b) above, the Corporation shall, within 30 days after the Corporation elects to terminate this Agreement or the date of a Material Uncured Breach, deliver to each TRA Holder whose rights are being terminated a notice (an "**Early Termination Notice**") specifying (x) such early termination and (y) the date on which the termination of rights is to be effective (the "**Early Termination Date**"), which date shall be (I) the date of the Material Uncured Breach of this Agreement, in the case of a Material Uncured Breach, (II) the effective date of the Change of Control in the case of a Change of Control, and (III) not less than 30 days and not more than 120 days after the date of the Early

- 7 -

**EXHIBIT 2**
**Page 229 of 404**

Termination Notice in the case of a termination pursuant to Section 3.01(a). Within 60 days after the Corporation delivers an Early Termination Notice, the Corporation shall deliver to the applicable TRA Holder(s) a schedule showing in reasonable detail the calculation of the Early Termination Payment with respect to each TRA Holder as determined in accordance with Section 3.01(b)(ii)(A), (B) and (C) (the "**Early Termination Schedule**"), together with a Supporting Letter in respect of such schedule.

(ii)     Finalization of Early Termination Schedule; Disputes.  The applicable Early Termination Schedule delivered to a TRA Holder pursuant to Section 3.02(a)(i) shall become final and binding on the Corporation and such TRA Holder unless that TRA Holder, within 30 days after receiving the Early Termination Schedule, provides the Corporation with notice of a material objection to such schedule made in good faith ("**Material Objection Notice**").  If the Corporation and such TRA Holder are unable to successfully resolve the issues raised in the Material Objection Notice within 30 days after receipt by the Corporation of the Material Objection Notice, the Corporation and the TRA Holder shall employ the Dispute Resolution Procedures set forth in Section 6.09.

(iii)     Withdrawal of Early Termination Notice.  The Corporation may withdraw an Early Termination Notice delivered in connection with Section 3.01(a) before the Early Termination Payment is due and payable to any applicable TRA Holder(s).

(b)     Amendment of Early Termination Schedule.  After finalization of an Early Termination Schedule in accordance with Section 3.02(a)(ii), any Early Termination Schedule shall be amended by the Corporation at any time before the Early Termination Payment is made (i) in connection with a Determination materially affecting such schedule, (ii) to correct material inaccuracies in any such schedule, or (iii) to comply with the Arbitrators' determinations under Section 6.09.  Any amendment shall be subject to the procedures of Section 3.02(a)(ii) and the Dispute Resolution Procedures set forth in Section 6.09.

Section 3.03     Early Termination Payment.

(a)     Amount and Timing of Early Termination Payment.  The payment due to a TRA Holder in connection with an early termination described in Section 3.01(a) or 3.01(b) (the "**Early Termination Payment**") shall be an amount equal to the present value, discounted at the Early Termination Rate as of the Early Termination Date, of all Tax Benefit Payments that the Corporation would be required to pay to the TRA Holder beginning from the Early Termination Date and assuming that the Valuation Assumptions are applied.  Not later than 10 days after an Early Termination Schedule delivered to a TRA Holder becomes final in accordance with Section 3.02(a)(ii), the Corporation shall pay to the TRA Holder the Early Termination Payment (including, for the avoidance of doubt, any other amounts due pursuant to Section 3.01(b)(ii)(B) and Section 3.01(b)(ii)(C)) due to that TRA Holder.

- 8 -

**EXHIBIT 2**
**Page 230 of 404**

(b)     _Effect of Early Termination Payment_.  Upon payment of the Early Termination Payment by the Corporation under Section 3.03, neither the TRA Holder nor the Corporation shall have any further rights or obligations under this Agreement in respect of the payments that otherwise would be due pursuant to this Agreement or the Units (including those previously Exchanged) with respect to which the rights under this Agreement have been terminated in accordance with Section 3.01, other than for any (i) payment under this Agreement that is due and payable but has not been paid as of the Early Termination Date and (ii) Tax Benefit Payment due for the Taxable Year ending with or including the date of the Early Termination Date (except to the extent that the amounts described in clauses (i) or (ii) are included in the Early Termination Payment). For the avoidance of doubt, if an Exchange occurs after the Corporation has made an Early Termination Payments with respect to all Units (including those previously Exchanged), the Corporation shall have no obligations under this Agreement with respect to such Exchange other than any obligations described in clause (i) or clause (ii) of the preceding sentence.

Section 3.04    Admission of the Corporation into a Consolidated Group; Transfers of Corporate Assets.

(a)     _Admission of the Corporation into a Consolidated Group_. If the Corporation is or becomes a member of an affiliated or consolidated group of corporations that files a consolidated income Tax Return pursuant to sections 1501 et seq. of the Code or any corresponding provisions of state, local or non-U.S. law (a "**Consolidated Group**"), then:  (i) the provisions of this Agreement shall be applied with respect to the Consolidated Group as a whole; and (ii) Tax Benefit Payments, Early Termination Payments and other applicable items in this Agreement shall be computed with reference to the consolidated taxable income of the Consolidated Group as a whole. Nothing in this Section 3.04(a) shall be interpreted to alter the circumstances that give rise to an early termination as described in Section 3.01(a) or 3.01(b).

(b)     _Transfers of Assets by Corporation_.

(i)     _General Rule_.  If the Company or any of its Subsidiaries or the Corporation transfers one or more assets to a corporation with which the transferor does not file a consolidated Tax Return pursuant to section 1501 et. seq. of the Code, then, for purposes of calculating the amount of any payment due under this Agreement, the transferor shall be treated as having disposed of such asset(s) in a fully taxable transaction on the date of the transfer.

(ii)     _Rules of Application_.  For purposes of this Section 3.04(b):

(A)     Except as provided in Section 3.04(b)(ii)(B), the consideration deemed to be received by the transferor in the transaction shall be deemed to equal the fair market value of the transferred asset(s) (taking into account the principles of section 7701(g) of the Code);

- 9 -

**EXHIBIT 2**
**Page 231 of 404**

(B)    The consideration deemed to be received by the transferor in exchange for a partnership interest shall be deemed to equal the fair market value of the partnership interest increased by any liabilities (as defined in Treasury Regulation § 1.752-1(a)(4)) of the partnership allocated to the transferor with regard to such transferred interest under section 752 of the Code immediately after the transfer; and

(C)    A transfer to a "corporation" (other than the Corporation) includes a transfer to any entity or arrangement classified as a corporation for U.S. federal income tax purposes, and "partnership" includes any entity or arrangement classified as a partnership for U.S. federal income tax purposes.

## ARTICLE IV
## SUBORDINATION AND LATE PAYMENTS

Section 4.01    Subordination; Priority.  Any Tax Benefit Payment or Early Termination Payment required to be paid by the Corporation to a TRA Holder under this Agreement shall rank subordinate and junior in right of payment to any principal, interest or other amounts due and payable in respect of any current or future obligations in respect of indebtedness for borrowed money of the Corporation and its Subsidiaries and shall, except as otherwise provided in this Agreement, rank *pari passu* with all current or future unsecured obligations of the Corporation that are not principal, interest or other amounts due and payable in respect of any current or future obligations in respect of indebtedness for borrowed money of the Corporation and its Subsidiaries and shall be senior to equity interests in the Corporation.

Section 4.02    Late Payments by the Corporation.  The amount of all or any portion of any amount due under the terms of this Agreement that is not paid to any TRA Holder when due shall be payable, together with any interest thereon computed at the Default Rate commencing from the date on which such payment was due and payable.  Notwithstanding the preceding sentence, the Default Rate shall not apply (and the Agreed Rate shall apply) to any late payment that is late solely as a result of (a) a prohibition, restriction or covenant under any credit agreement, loan agreement, note, indenture or other agreement governing indebtedness of the Company or any of its Subsidiaries or the Corporation or (b) restrictions under applicable law.

Section 4.03    Manner of Payment.  All payments required to be made to a TRA Holder pursuant to this Agreement will be made by electronic payment of immediately available funds to a bank account previously designated and owned by such TRA Holder or, if no such account has been designated, by check payable to such TRA Holder.

## ARTICLE V
## PREPARATION OF TAX RETURNS; COVENANTS

Section 5.01    No Participation by TRA Holder in the Corporation's and the Company's Tax Matters.

(a)    General Rule.  Except as otherwise provided in this Article V, the Corporation shall have full responsibility for, and sole discretion over, all Tax matters concerning the Corporation and the Company, including, without limitation, the

- 10 -

**EXHIBIT 2**
**Page 232 of 404**

preparation, filing and amending of any Tax Return and defending, contesting or settling any issue pertaining to Taxes.

(b)    Notification of TRA Representative.  The Corporation shall notify the TRA Representative of, and keep the TRA Representative reasonably informed with respect to, the portion of any audit of the Corporation and the Company by a Taxing Authority the outcome of which is reasonably expected to affect the TRA Holders' rights and obligations under this Agreement.

Section 5.02    Consistency.  The Corporation and the TRA Holders agree to report and cause to be reported for all purposes, including U.S. federal, state, local and non-U.S. tax purposes and financial reporting purposes, all tax-related items (including without limitation the Basis Adjustment and each Tax Benefit Payment) in a manner consistent with that specified by the Corporation in any schedule provided by or on behalf of the Corporation under this Agreement unless the Corporation or a TRA Holder receives a written opinion from an Advisory Firm that reporting in such manner would reasonably be expected to result in an imposition of penalties pursuant to the Code.  Any Dispute concerning such written opinion shall be subject to the Dispute Resolution Procedures set forth in Section 6.09.

Section 5.03    Cooperation.  Each TRA Holder shall (a) furnish to the Corporation in a timely manner such information, documents and other materials, not to include such TRA Holder's personal Tax Returns, as the Corporation may reasonably request for purposes of making any determination or computation necessary or appropriate under this Agreement, preparing any Tax Return or contesting or defending any audit, examination or controversy with any Taxing Authority, (b) make itself available to the Corporation and its representatives to provide explanations of documents and materials and such other information as the Corporation or its representatives may reasonably request in connection with any of the matters described in clause (a) of this Section 5.03, and (c) reasonably cooperate in connection with any such matter. The Company shall reimburse each TRA Holder for any reasonable and documented third-party costs and expenses incurred by the TRA Holder in complying with this Section 5.03.

Section 5.04    Section 754 Election.  For the Taxable Year that includes the effective date of the Merger and each Taxable Year in which an Exchange occurs, the Corporation shall (i) ensure that the Company and each of its direct or indirect (through Subsidiaries that are classified as partnerships or disregarded entities for United States federal income tax purposes) Subsidiaries that is classified as a partnership for U.S. federal income Tax purposes shall have in effect an election pursuant to section 754 of the Code (and any similar provisions of applicable U.S. state or local law) and (ii) use commercially reasonable efforts to ensure that any entity in which the Company holds a direct or indirect (through entities that are classified as partnerships or disregarded entities for United States federal income tax purposes) interest that is classified as a partnership for U.S. federal income Tax purposes that is not a "Subsidiary" as defined in this Agreement will have in effect an election pursuant to section 754 of the Code (and any similar provisions of applicable U.S. state or local law).

Section 5.05    Available Cash. The Corporation shall use reasonable best efforts to ensure that it has sufficient Available Cash to make all payments due under this Agreement, including using reasonable best efforts to cause the Company to make distributions to the

- 11 -

EXHIBIT 2
Page 233 of 404

Corporation to make such payments so long as such distributions do not violate (a) a prohibition, restriction or covenant under any credit agreement, loan agreement, note, indenture or other agreement governing indebtedness of the Company or any of its Subsidiaries or the Corporation or (b) restrictions under applicable law.  This Section 5.05 shall not require the Corporation to borrow or otherwise raise funds.

**ARTICLE VI**
**MISCELLANEOUS**

Section 6.01    Notices.  All notices, requests, claims, demands and other communications with respect to this Agreement shall be in writing and shall be deemed duly given and received (a) on the date of delivery if delivered personally, or by e-mail if sent on a Business Day (or otherwise on the next Business Day) or (b) on the first Business Day following the date of dispatch if delivered by a nationally recognized next-day courier service.  All notices under this Agreement shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

if to the Corporation, to:

NuScale Power Corp.
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attention: General Counsel
E-mail: generalcounsel@nuscalepower.com

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Phone: +1.212.351.2340
Fax: +1.212.351.5220
Attention: Pamela Lawrence Endreny
E-mail: PEndreny@gibsondunn.com

Stoel Rives LLP
760 SW Ninth Ave, Suite 3000
Portland, OR 97205
Phone: +1.503.224.3380
Attention: Kevin Pearson
E-mail: kevin.pearson@stoel.com

if to the Company, to:

NuScale Power, LLC
6650 SW Redwood Lane

**EXHIBIT 2**
**Page 234 of 404**

Suite 210
Portland, OR 97224
Attn: General Counsel
E-mail: generalcounsel@nuscalepower.com

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Phone: +1.212.351.2340
Fax: +1.212.351.5220
Attention: Pamela Lawrence Endreny
E-mail: PEndreny@gibsondunn.com

Stoel Rives LLP
760 SW Ninth Ave, Suite 3000
Portland, OR 97205
Phone: +1.503.224.3380
Attention: Kevin Pearson
E-mail: kevin.pearson@stoel.com]


if to the TRA Representative, to:

Fluor Enterprises, Inc.
6700 Las Colinas Blvd.
Irving, TX 75039
Attention: Chief Legal Officer
Email: John.reynolds@fluor.com

if to the TRA Holder(s), to:

the address set forth for such TRA Holder in the records of the Company.

Any party may change its address by giving the other party written notice of its new address, fax number, or e-mail address in the manner set forth in this Section 6.01.

Section 6.02    Bank Account Information. The Corporation may require each TRA Holder to provide its bank account information to facilitate wire transfers. The Corporation shall be entitled to rely on the bank account information provided by a TRA Holder absent actual knowledge that such bank account information is incorrect.

Section 6.03    Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. This Agreement may be executed in two or more counterparts by manual, electronic or facsimile

- 13 -

EXHIBIT 2
Page 235 of 404

signature, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by electronic transmission or facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 6.04    Entire Agreement.  The provisions of this Agreement, the LLC Agreement, the Merger Agreement, and the other writings referred to in this Agreement or delivered pursuant to this Agreement which form a part of this Agreement contain the entire agreement among the parties hereto with respect to the subject matter of this Agreement and supersede all prior oral and written agreements and memoranda and undertakings among the parties to this Agreement with regard to such subject matter. Except as expressly provided herein, this Agreement does not create any rights, claims or benefits inuring to any person that is not a party to this Agreement nor create or establish any third party beneficiary hereto.

Section 6.05    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the law of the state of Delaware (and, to the extent applicable, federal law), without regard to the conflicts of laws principles thereof that would mandate the application of the laws of another jurisdiction.

Section 6.06    Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (i) the remainder of this Agreement shall not be affected thereby, and each other provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law, (ii) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (iii) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable as written, each Person party hereto shall take all necessary action to cause this Agreement to be amended so as to provide, to the maximum extent reasonably possible, that the purposes of the Agreement can be realized, and to modify this Agreement to the minimum extent reasonably possible.

Section 6.07    Assignment; Amendments; Waiver of Compliance; Successors and Assigns.

(a)    Assignment.  No TRA Holder may, directly or indirectly, assign or otherwise transfer its rights under this Agreement to any person without the express prior written consent of the Corporation, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that, the Corporation may withhold, condition, or delay its consent in its sole discretion to any transfer by a TRA Holder (i) if the TRA Holder is an original signatory to this Agreement and that TRA Holder seeks to transfer a portion of its rights, in the aggregate, to more than three transferees, and (ii) if the TRA Holder is not an original signatory to this Agreement and that TRA Holder seeks to transfer less than all of its rights.  Notwithstanding the provisions of the preceding sentence, to the extent Units are transferred in accordance with the terms of the LLC Agreement, the transferring TRA Holder may assign to the transferee all, but not less than all, of that TRA Holder's rights under this Agreement with respect to such

- 14 -

**EXHIBIT 2**
**Page 236 of 404**

transferred Units, but only if such transferee executes and delivers a joinder to this Agreement agreeing to become a "**TRA Holder**" for all purposes of this Agreement (except as otherwise provided in such joinder), with such joinder being, in form and substance, reasonably satisfactory to the Corporation.

(b)     Amendments.

(i)     General Rule.  No provision of this Agreement may be amended unless such amendment is approved in writing by the Corporation, the Company and the TRA Holders who would be entitled to receive at least two-thirds of the Early Termination Payments payable to all TRA Holders (as determined by the Corporation) if the Corporation had exercised its right of early termination under Section 3.01(a) on the date of the most recent Exchange prior to such amendment (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange). .

(ii)     Amendments with Disproportionate Adverse Effect.  Notwithstanding the provisions of Section 6.07(b)(i), if a proposed amendment would have a disproportionate adverse effect on the payments one or more TRA Holders will or may receive under this Agreement, such amendment shall not be effective without the written consent of at least two-thirds of the TRA Holders who would be disproportionately and adversely affected (with such two-thirds threshold being measured as set forth in Section 6.07(b)(i)).

(c)     Waiver of Compliance.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

(d)     Successors and Assigns.  Except as otherwise provided herein, all of the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors and permitted assigns of the parties hereto.  The Corporation shall require and cause any direct or indirect successor (whether by purchase, merger, consolidation, division, conversion or otherwise) to all or substantially all of the business or assets of the Corporation, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform if no such succession had taken place.

Section 6.08     Titles and Subtitles.  The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

Section 6.09     Dispute Resolution.

**EXHIBIT 2**
**Page 237 of 404**

(a)    Disputes as to Interpretation and Calculations.  Any Dispute as to the interpretation of, or calculations required by, this Agreement shall be resolved by the Corporation acting reasonably and in good faith; provided, that such resolution shall reflect a reasonable interpretation of the provisions of this Agreement, consistent with the goal that the provisions of this Agreement result in the TRA Holders receiving eighty-five percent (85%) of the Cumulative Net Realized Tax Benefit and the Additional Amount thereon.

(b)    Dispute Resolution; Arbitration.  If any dispute is not resolved in accordance with Section 6.09(a), the parties shall negotiate in good faith to resolve any dispute, controversy, or claim arising out of or in connection with this Agreement, or the interpretation, breach, termination or validity thereof ("**Dispute**").  To the extent any Dispute is not resolved through good faith negotiations between the Corporation and the TRA Representative, Disputes shall be finally resolved by arbitration before a panel of three independent tax lawyers at major law firms who are resident in New York, New York and are mutually acceptable to the parties (the "**Arbitrators**").  The Arbitrators, with the consent of the parties, may, or, at the direction of the parties, shall, delegate some or all of the issues under dispute (including Disputes under Section 1.03, Section 2.01(c), Article III, or Section 5.02) to a nationally recognized accounting firm selected by the Arbitrators and agreed to by the Corporation and the TRA Representative.  Notwithstanding anything to the contrary in this Agreement, in any Dispute proceeding, the TRA Representative shall represent the interests of any TRA Holder(s) in any Dispute and no TRA Holder shall individually have the right to participate in any proceeding.

(c)    Selection of Arbitrators; Timing.  There shall be three Arbitrators who shall be appointed by the parties within 20 days of receipt by a party of a copy of the demand for arbitration.  The Corporation shall appoint one arbitrator and the TRA Representative shall appoint one arbitrator (with the appointment being subject, in each case, to the reasonable objection of the other party), and the parties shall jointly appoint the third arbitrator.  If any of the Arbitrators is not appointed within 20 days, and the parties have not agreed to extend the 20-day time period, such arbitrator shall be appointed by JAMS (formerly known as the Judicial Arbitration and Mediation Services, Inc.) in accordance with the listing, striking and ranking procedure in the JAMS Comprehensive Arbitration Rules and Procedures, with each party being given a limited number of strikes, except for cause.  Any arbitrator appointed by JAMS shall be a retired judge or a practicing attorney with no less than fifteen years of experience with corporate and partnership tax matters and an experienced arbitrator.  In rendering an award, the Arbitrators shall be required to follow the laws of the state of Delaware, notwithstanding any Delaware choice-of-law rules.  The costs of arbitration shall be split equally between the parties participating in the arbitration.

(d)    Arbitration Award; Damages; Attorney Fees.  The arbitral award shall be in writing and shall state the findings of fact and conclusions of law on which it is based.  The Arbitrators shall not be permitted to award punitive, non-economic, or any non-compensatory damages.  The award shall be final and binding upon the parties and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or accounting presented to the Arbitrators.  Judgment upon the

- 16 -

**EXHIBIT 2**
**Page 238 of 404**

award may be entered in any court having jurisdiction over any party or any of its assets. Any costs or fees (including all attorneys' fees and expenses) incident to enforcing the award shall be charged against the party resisting such enforcement. Each party shall bear its own attorney's fees incurred in the underlying arbitration.

(e)    Confidentiality. All Disputes shall be resolved in a confidential manner. The Arbitrators shall agree to hold any information received during the arbitration in the strictest of confidence and shall not disclose to any non-party the existence, contents or results of the arbitration or any other information about such arbitration. The parties to the arbitration shall not disclose any information about the evidence adduced or the documents produced by the other party in the arbitration proceedings or about the existence, contents or results of the proceeding except as may be required by law, regulatory or governmental authority or as may be necessary in an action in aid of arbitration or for enforcement of an arbitral award. Before making any disclosure permitted by the preceding sentence (other than private disclosure to financial regulatory authorities), the party intending to make such disclosure shall use reasonable efforts to give the other party reasonable written notice of the intended disclosure and afford the other party a reasonable opportunity to protect its interests.

(f)    Discovery. Barring extraordinary circumstances (as determined in the sole discretion of the Arbitrators), discovery shall be limited to pre-hearing disclosure of documents that each side shall present in support of its case, and non-privileged documents essential to a matter of import in the proceeding for which a party has demonstrated a substantial need. The parties agree that they shall produce to each other all such requested non-privileged documents, except documents objected to and with respect to which a ruling has been or shall be sought from the Arbitrators. The parties agree that information from the Corporate Tax Return (including by way of a redacted Corporate Tax Return) shall be sufficient, and that the Corporation shall not be compelled to produce any unredacted Tax Returns. There will be no depositions or live witness testimony.

Section 6.10    Indemnification of the TRA Representative. The Corporation shall pay, or to the extent the TRA Representative pays, indemnify and reimburse, to the fullest extent permitted by applicable law, the TRA Representative for all costs and expenses, including legal and accounting fees (as such fees are incurred) and any other costs arising from claims in connection with the TRA Representative's duties under this Agreement; provided, that the TRA Representative must have acted reasonably and in good faith in incurring such expenses and costs.

Section 6.11    Withholding. The Corporation shall be entitled to deduct and withhold from any payment payable pursuant to this Agreement such amounts, if any, as the Corporation is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or non-U.S. tax law. To the extent that amounts are so withheld and are (or, when due, will be) paid over to the appropriate Taxing Authority by the Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the TRA Holder. Each TRA Holder shall provide such necessary tax forms, in form and substance reasonably acceptable to the Corporation, as the Corporation may request from time to

- 17 -

EXHIBIT 2
Page 239 of 404

time.  Before any withholding is made pursuant to this Section 6.11, the Corporation shall use commercially reasonable efforts to (a) notify a TRA Holder and (b) cooperate with such TRA Holder to avoid such withholding, unless the TRA Holder has failed to comply with the provisions of the preceding sentence.

Section 6.12    Confidentiality.

(a)    General Rule.  Each TRA Holder and assignee acknowledges and agrees that the information of the Corporation is confidential and, except in the course of performing any duties as necessary for the Corporation and its Affiliates, as required by law or legal process or to enforce the terms of this Agreement, shall keep and retain in the strictest confidence and not disclose to any Person any confidential matters or information of the Corporation, its Affiliates and successors and the other TRA Holders acquired pursuant to this Agreement, including marketing, investment, performance data, credit and financial information and other business affairs of the Corporation, its Affiliates and successors and the other TRA Holders.

(b)    Exceptions.  This Section 6.12 shall not apply to (i) any information that has been made publicly available by the Corporation or any of its Affiliates, becomes public knowledge (except as a result of an act of such TRA Holder in violation of this Agreement) or is generally known to the business community and (ii) the disclosure of information to the extent necessary for a TRA Holder to prepare and file his or her Tax Returns, to respond to any inquiries regarding such Tax Returns from any Taxing Authority or to prosecute or defend any action, proceeding or audit by any Taxing Authority with respect to such Tax Returns.  Notwithstanding anything to the contrary in this Section 6.12, each TRA Holder and assignee (and each employee, representative or other agent of such TRA Holder or assignee, as applicable) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of (x) the Corporation, the Company, the TRA Holders and their Affiliates and (y) any of their transactions, and all materials of any kind (including opinions or other tax analyses) that are provided to the TRA Holders relating to such tax treatment and tax structure.

(c)    Enforcement.  If a TRA Holder or assignee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 6.12, the Corporation shall have the right and remedy to have the provisions of this Section 6.12 specifically enforced by injunctive relief or otherwise by any court of competent jurisdiction without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Corporation or any of its Affiliates or the other TRA Holders and that money damages alone shall not provide an adequate remedy to such Persons.  Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

Section 6.13    LLC Agreement.  For U.S. federal income Tax purposes, to the extent this Agreement imposes obligations upon the Company or a member of the Company, this Agreement shall be treated as part of the LLC Agreement as described in section 761(c) of the Code and sections 1.704-1(b)(2)(ii)(h) and 1.761-1(c) of the Treasury Regulations.

Section 6.14    Joinder.  The Company shall have the power and authority (but not the obligation) to permit any Person who becomes a member of the Company to execute and deliver a joinder to this Agreement promptly upon acquisition of membership interests in the Company by such Person, and such Person shall be treated as a "**TRA Holder**" for all purposes of this Agreement.

Section 6.15    Survival.  If this Agreement is terminated pursuant to Article III, this Agreement shall become void and of no further force and effect, except for the provisions set forth in Section 6.05 (*Governing Law*), Section 6.09 (*Dispute Resolution*), Section 6.12 (*Confidentiality*), and this Section 6.15 (*Survival*).

## ARTICLE VII
## DEFINITIONS

As used in this Agreement, the terms set forth in this Article VII shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"**Actual Tax Liability**" is defined in Section 1.02.

"**Additional Amount**" for a given Taxable Year shall be the additional amount (calculated in the same manner as interest) payable on the Net Tax Benefit for such Taxable Year calculated at the Agreed Rate from the due date (without extensions) for filing the Corporate Tax Return with respect to Taxes for the most recently ended Taxable Year until the date on which the payment is required to be made.  In the case of a Tax Benefit Payment made in respect of an Amended Schedule, the "**Additional Amount**" shall equal the additional amount (calculated in the same manner as interest) payable on the Net Tax Benefit for such Taxable Year calculated at the Agreed Rate from the date of such Amended Schedule becoming final in accordance with Section 1.03(b) until the date on which the payment is required to be made, reduced to account for any payment of Additional Amount made in respect of the original Tax Benefit Schedule. Except to the extent that it is treated as Imputed Interest, the Additional Amount shall be treated as additional consideration for Tax purposes.

"**Adjusted Asset**" means any asset with respect to which a Basis Adjustment is made.

"**Advisory Firm**" means any accounting firm or any law firm, in each case, that is nationally recognized as being expert in Tax matters and that is reasonably selected by the Board.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

"**Agreed Rate**" means LIBOR plus 300 basis points.

"**Agreement**" is defined in the preamble of this Agreement.

"**Amended Schedule**" is defined in Section 1.03(c).

**EXHIBIT 2**
**Page 241 of 404**

"**Arbitrators**" is defined in Section 6.09(b).

"**Attributable**" means the portion of any Tax Asset of the Corporation that is attributable to a TRA Holder and shall be determined by reference to the Tax Assets, under the following principles:

(i)      any Basis Adjustments shall be determined separately with respect to each Exchanging Member and are Attributable to each Exchanging Member in an amount equal to the total Basis Adjustments relating to Units Exchanged by such TRA Holder;

(ii)      any deduction to the Corporation with respect to a Taxable Year in respect of any payment (including amounts attributable to Imputed Interest) made under this Agreement is Attributable to the Person that is required to include such payment or Imputed Interest in income (without regard to whether such Person is actually subject to Tax thereon).

"**Assumed SALT Liability**" is defined in Section 1.02(d).

"**Available Cash**" means all cash and cash equivalents of the Corporation on hand, less (i) the amount of cash reserves reasonably established in good faith by the Corporation to provide for the proper conduct of business of the Corporation (including paying creditors) and (ii) any amount the Corporation cannot pay to a TRA Holder by reason of (A) a prohibition, restriction or covenant under any credit agreement, loan agreement, note, indenture or other agreement governing indebtedness of the Company or any of its Subsidiaries or the Corporation or (B) restrictions under applicable law.

"**Basis Adjustment**" means any adjustment under sections 732, 734(b), 743(b), or 1012 of the Code (as applicable) as a result of an Exchange by a TRA Holder.

"**Beneficial Ownership**" (including correlative terms) shall have the meaning ascribed to that term in Rule 13d-3 promulgated under the Securities Exchange Act of 1934.

"**Board**" means the board of directors of the Corporation.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks located in New York City, New York are authorized or required to close.

"**Change of Control**" means the occurrence of any of the following events:

(a)      any Person or any group of Persons acting together which would constitute a "group" for purposes of Section 13(d) of the Securities Exchange Act of 1934, or any successor provisions thereto, excluding any TRA Party or any group of TRA Parties, becomes the Beneficial Owner, directly or indirectly, of securities of the Corporation representing more than fifty percent (50%) of the combined voting power of the Corporation's then outstanding voting securities; or

**EXHIBIT 2**
**Page 242 of 404**

(b)     the following individuals cease for any reason to constitute a majority of the directors of the Corporation then serving: (i) individuals who, on the Merger Date, constitute the Board, and (ii) any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation) whose appointment by the Board or nomination for election by the Corporation's shareholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the Merger Date or whose appointment or nomination for election was previously so approved or recommended by the directors referred to in this clause (ii); or

(c)     there is consummated a merger or consolidation of the Corporation or any direct or indirect Subsidiary of the Corporation with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, all of the Persons who were the respective Beneficial Owners of the voting securities of the Corporation immediately prior to such merger or consolidation do not Beneficially Own, directly or indirectly, more than fifty percent (50%) of the combined voting power of the then-outstanding voting securities of the Person resulting from such merger or consolidation in substantially the same proportions as their Beneficial Ownership of such securities of the Corporation immediately before such transaction; or

(d)     the shareholders of the Corporation approve a plan of complete liquidation or dissolution of the Corporation, or there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by the Corporation of all or substantially all of the Corporation's assets, other than the sale or other disposition by the Corporation of all or substantially all of the Corporation's assets to an entity, more than fifty percent (50%) of the combined voting power of the voting securities of which are Beneficially Owned by shareholders of the Corporation in substantially the same proportions as their Beneficial Ownership of such securities of the Corporation immediately before such sale.

"**Class A Shares**" is defined in the recitals of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended, and any successor or replacement statute.

"**Company**" is defined in the preamble to this Agreement.

"**Consolidated Group**" is defined in Section 3.04(a).

"**Control**" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Corporate Tax Return**" means a Tax Return of the Corporation for income Taxes.

"**Corporation**" is defined in the preamble of this Agreement.

- 21 -

**EXHIBIT 2**
**Page 243 of 404**

"**Cumulative Net Realized Tax Benefit**" for a Taxable Year means the excess, if any, of (a) the cumulative amount of Realized Tax Benefits for all Taxable Years of the Corporation, including such Taxable Year, over (b) the cumulative amount of Realized Tax Detriments, if any, for the same periods.  The Realized Tax Benefit and Realized Tax Detriment for each Taxable Year shall be determined based on the most recent Tax Benefit Schedule or Amended Schedule, if any, in existence at the time of such determination.

"**day**" means a calendar day.

"**Deemed Early Termination Event**" is defined in Section 3.01(b)(i).

"**Default Rate**" means LIBOR plus 500 basis points.

"**Determination**" shall have the meaning ascribed to such term in section 1313(a) of the Code or similar provision of state or local tax law, as applicable, or any other event (including the execution of a Form 870-AD) that finally and conclusively establishes the amount of any liability for Tax.

"**Dispute**" is defined in Section 6.09(b).

"**Dispute Resolution Procedures**" is defined in Section 1.03(b).

"**Early Termination Date**" is defined in Section 3.02(a)(i).

"**Early Termination Notice**" is defined in Section 3.02(a)(i).

"**Early Termination Payment**" is defined in Section 3.03(a).

"**Early Termination Rate**" means the lesser of (i) 6.5% and (ii) LIBOR plus 400 basis points.

"**Early Termination Schedule**" is defined in Section 3.02(a)(i).

"**Exchange**" is defined in the recitals of this Agreement.

"**Exchanging Member**" means any TRA Holder that participates in an Exchange.

"**Exchange Basis Schedule**" is defined in Section 1.03(a)(i)(B), including any Amended Exchange Basis Schedule.

"**Exchange Date**" is the date of any Exchange.

"**Hypothetical Tax Liability**" means, with respect to any Taxable Year, the amount that would be the liability for income Taxes of the Corporation if such liability were calculated using the same methods, elections, conventions and similar practices used on the relevant Corporate Tax Return (and/or Tax Return of the Company), as determined in accordance with Section 1.02, except that all Tax Assets shall be disregarded.  For the avoidance of doubt, the Assumed SALT Liability used to determine the Hypothetical Tax Liability shall be calculated by disregarding all Tax Assets.

- 22 -

**EXHIBIT 2**
**Page 244 of 404**

"**Imputed Interest**" means any interest imputed under sections 1272, 1274, or 483 or other provision of the Code with respect to the Corporation's payment obligations under this Agreement.

"**LIBOR**" means during any period, the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market or such other commercially available source providing quotations of such rates as may be designated by Corporation from time to time), or the rate which is quoted by another source selected by the Corporation as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (an "**Alternate Source**"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the first day of such period as the London interbank offered rate for U.S. dollars having a borrowing date and a maturity comparable to such period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by the Corporation and the TRA Representative at such time, which determination shall be conclusive absent manifest error); provided, that at no time shall LIBOR be less than 0%.  If the Corporation has made the determination (such determination to be conclusive absent manifest error) that (i) LIBOR is no longer a widely recognized benchmark rate for newly originated loans in the U.S. loan market in U.S. dollars or (ii) the applicable supervisor or administrator (if any) of LIBOR has made a public statement identifying a specific date after which LIBOR shall no longer be used for determining interest rates for loans in the U.S. loan market in U.S. dollars, then the Corporation and the TRA Representative shall (as determined by the Corporation and the TRA Representative to be consistent with market practice generally), establish a replacement interest rate (the "**Replacement Rate**"), in which case, the Replacement Rate shall, subject to the next two sentences, replace LIBOR for all purposes under this Agreement.  In connection with the establishment and application of the Replacement Rate, this Agreement shall be amended solely with the consent of the Corporation, the Company, and the TRA Representative, as may be necessary or appropriate, in the reasonable judgment of the Corporation and the TRA Representative, to effect the provisions of this section.  The Replacement Rate shall be applied in a manner consistent with market practice; provided, that in each case, to the extent such market practice is not administratively feasible for the Corporation, such Replacement Rate shall be applied as otherwise reasonably determined by the Corporation and the TRA Representative.

"**LLC Agreement**" is defined in the recitals of this Agreement.

"**Material Objection Notice**" is defined in Section 3.02.

"**Material Uncured Breach**" means the occurrence of any of the following events:

(a)    the Corporation fails to make any payment required by this Agreement within 180 days after the due date for that payment (except for a failure to make any payment due pursuant to this Agreement as a result of a lack of Available Cash);

- 23 -

**EXHIBIT 2**
**Page 245 of 404**

(b)      this Agreement is rejected in a case commenced under the Bankruptcy Code and the Corporation does not cure the rejection within 90 days after such rejection; or

(c)      the Corporation breaches any of its material obligations under this Agreement other than an event described in clause (a) or (b) with respect to one or more TRA Holders and the Corporation does not cure such breach within 90 days after receipt of notice of such breach from such TRA Holder(s).

"**Merger**" is defined in the recitals of this Agreement.

"**Merger Agreement**" is defined in the recitals of this Agreement.

"**Merger Date**" means the date of the Merger.

"**Merger Sub**" is defined in the recitals of this Agreement.

"**Net Tax Benefit**" means, for each Taxable Year, the amount equal to the excess, if any, of eighty-five percent (85%) of the Cumulative Net Realized Tax Benefit as of the end of such Taxable Year over the total amount of payments previously made under Section 2.01, excluding payments attributable to any Additional Amount.

"**Objection Notice**" is defined in Section 1.03(a).

"**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity, or other entity.

"**Realized Tax Benefit**" is defined in Section 1.01

"**Realized Tax Detriment**" is defined in Section 1.01.

"**Subsidiary**" means, with respect to any Person, as of any date of determination, any other Person as to which such Person, owns, directly or indirectly, or otherwise Controls more than 50% of the voting shares or other similar interests or the sole general partner interest or managing member or similar interest of such Person.

"**Tax Assets**" means, without duplication, (a) the Basis Adjustments, (b) Imputed Interest, and (c) any other item of loss, deduction or credit, including carrybacks and carryforwards, attributable to any item described in clauses (a) and (b) of this definition.

"**Tax Benefit Items**" means

(d)      a deduction to the Corporation for depreciation arising in respect of one or more Basis Adjustments;

(e)      a reduction in gain or increase in loss to the Corporation upon the disposition of an Adjusted Asset that arises in respect of one or more Basis Adjustments;

- 24 -

**EXHIBIT 2**
**Page 246 of 404**

(f)    a deduction to the Corporation of Imputed Interest that arises in respect of payments under this Agreement made to a TRA Holder; or

any other item of loss, deduction or credit, including carrybacks and carryforwards, attributable to any item described in clauses (a) – (c) of this definition.

"**Tax Benefit Payment**" means, for each Taxable Year, an amount, not less than zero, equal to the sum of the Net Tax Benefit and the Additional Amount.

"**Tax Benefit Schedule**" is defined in Section 1.03(a)(ii), including any Amended Tax Benefit Schedule.

"**Tax Return**" means any return, declaration, report or similar statement required to be filed with respect to Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"**Taxable Year**" means, for the Corporation or the Company, as the case may be, a taxable year as defined in section 441(b) of the Code or comparable section of state or local tax law, as applicable, ending on or after the closing date of the Merger.

"**Taxes**" means any and all U.S. federal, state, and local taxes, assessments, or similar charges that are based on or measured with respect to net income or profits (including any franchise taxes based on or measured with respect to net income or profits), and any interest, penalties, or additions related to such amounts imposed in respect thereof under applicable law.

"**Taxes of the Corporation**" means the Taxes of the Corporation and/or the Company, but only with respect to Taxes imposed on the Company and allocable to the Corporation for such Taxable Year.

"**Taxing Authority**" means any U.S. federal, national, state, county, or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any taxing authority or any other authority exercising Tax regulatory authority.

"**TRA Holder**" means any Person (other than the Corporation, its Subsidiaries, and the TRA Representative, solely in their capacity as TRA Representative) that is a party to this Agreement.

"**TRA Party**" means the Corporation, the Company, each of the TRA Holders, the TRA Representative, and any person who becomes a party to this Agreement from time to time.

"**TRA Representative**" means Fluor Enterprises, Inc. or, if Fluor Enterprises, Inc. is unable or unwilling to serve as the TRA Representative, the person designated by it from time to time to serve as the TRA Representative.

"**Treasury Regulations**" means the final, temporary, and proposed regulations under the Code promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

- 25 -

**EXHIBIT 2**
**Page 247 of 404**

"**Units**" is defined in the recitals of this Agreement.

"**Valuation Assumptions**" means, as of an Early Termination Date, the assumptions that

(a)    in each Taxable Year ending on or after such Early Termination Date, the Corporation will have sufficient taxable income such that the Corporation would be obligated to make a Tax Benefit Payment in respect of all available Tax Assets in such Taxable Year;

(b)    any NOLs and items of loss, deduction, or credit generated by a Basis Adjustment or Imputed Interest arising in a Taxable Year preceding the Taxable Year that includes an Early Termination Date will be used by the Corporation ratably from such Taxable Year through (i) the scheduled expiration of such Tax item or (ii) if there is no such scheduled expiration date, 15 years (provided that in any year in which the Corporation is unable to use the full amount of an NOL because of section 382 of the Code (or any successor provision or other similar limitation) that it otherwise would be deemed to use under this clause (b), the amount deemed to be used for purposes of this clause (b) shall equal the amount permitted to be used in such year under section 382 of the Code);

(c)    if, at the Early Termination Date, there are Exchangeable Units (as defined in the LLC Agreement) that have not been Exchanged, then each such Unit shall be deemed to be Exchanged for the Exchange Consideration as defined in the LLC Agreement on the Early Termination Date;

(d)    any non-amortizable assets are deemed to be disposed of in a fully taxable transaction for U.S. federal income Tax purposes on the fifteenth anniversary of the earlier of the Basis Adjustment and the Early Termination Date; and

(e)    the federal income tax rates and state and local income tax rates that will be in effect for each such Taxable Year will be those specified for each such Taxable Year by the Code and other law as in effect on the Early Termination Date, taking into account any scheduled or imminent tax rate increases.  For the avoidance of doubt, an "imminent" tax rate increase is one for which both the amount and the effective time can be determined with reasonable accuracy.

[Signature page follows]

**EXHIBIT 2**
**Page 248 of 404**

In witness whereof, the undersigned have executed this Agreement as of the date first set forth above.

**THE CORPORATION**

NuScale Power Corp.

By: _____
    Name: [•]
    Title: [•]

**THE COMPANY**

NuScale Power, LLC

By: _____
    Name: [•]
    Title: [•]

**TRA HOLDERS**

By: _____
    Name: [•]
    Title:  [•]

By: _____
    Name: [•]
    Title:  [•]

By: _____
    Name: [•]
    Title:  [•]

**TRA REPRESENTATIVE**

Fluor Enterprises, Inc.

By: _____
    Name: [•]
    Title:  [•]

[Signature Page to Tax Receivable Agreement]

**EXHIBIT 2**
**Page 250 of 404**

*FINAL FORM*

---

## SIXTH AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## NUSCALE POWER, LLC

**An Oregon limited liability company**

dated as of [●], 2022

---

THE LIMITED LIABILITY COMPANY INTERESTS IN NUSCALE POWER, LLC HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES LAWS OF ANY STATE, OR ANY OTHER APPLICABLE SECURITIES LAWS, AND HAVE BEEN OR ARE BEING ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND ANY OTHER APPLICABLE SECURITIES LAWS; (II) THE TERMS AND CONDITIONS OF THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT; AND (III) ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BETWEEN THE COMPANY AND THE APPLICABLE MEMBER.  THE LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS, THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, AND ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BY THE COMPANY AND THE APPLICABLE MEMBER.  THEREFORE, PURCHASERS AND OTHER TRANSFEREES OF SUCH LIMITED LIABILITY COMPANY INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT OR ACQUISITION FOR AN INDEFINITE PERIOD OF TIME.

**EXHIBIT 2**
**Page 251 of 404**

# TABLE OF CONTENTS

**Page**

ARTICLE I GENERAL PROVISIONS ........................................................................... 1

    Section 1.1    Organization.................................................................................. 1
    Section 1.2    Name ........................................................................................... 1
    Section 1.3    Principal Place of Business; Other Places of Business ............... 1
    Section 1.4    Designated Agent for Service of Process..................................... 2
    Section 1.5    Term............................................................................................ 2
    Section 1.6    No State Law Partnership ............................................................ 2
    Section 1.7    Business Purpose ........................................................................ 2
    Section 1.8    Powers ........................................................................................ 2
    Section 1.9    Certificates; Filings .................................................................... 2
    Section 1.10   Representations and Warranties by the Members........................ 3

ARTICLE II UNITS; CAPITAL CONTRIBUTIONS ..................................................... 4

    Section 2.1    Units............................................................................................ 4
    Section 2.2    Capital Contributions of the Members; No Deficit Restoration
                   Obligation................................................................................... 5
    Section 2.3    No Interest; No Return................................................................. 5
    Section 2.4    Issuances of Additional Units ..................................................... 5
    Section 2.5    Additional Funds and Additional Capital Contributions ............ 6

ARTICLE III DISTRIBUTIONS ..................................................................................... 8

    Section 3.1    Distributions Generally................................................................ 8
    Section 3.2    Tax Distributions ........................................................................ 8
    Section 3.3    Distributions in Kind................................................................. 10
    Section 3.4    Distributions to Reflect Additional Units ................................. 10
    Section 3.5    Other Distribution Rules ........................................................... 10

ARTICLE IV MANAGEMENT AND OPERATIONS ................................................... 11

    Section 4.1    Management............................................................................... 11
    Section 4.2    Tax Actions ............................................................................... 13
    Section 4.3    Compensation and Reimbursement of Manager....................... 14
    Section 4.4    Outside Activities...................................................................... 14
    Section 4.5    Transactions with Affiliates ...................................................... 15
    Section 4.6    Limitation on Liability .............................................................. 16
    Section 4.7    Indemnification ......................................................................... 17

ARTICLE V BOOKS AND RECORDS ......................................................................... 17

    Section 5.1    Books and Records ................................................................... 17
    Section 5.2    Financial Accounts.................................................................... 17
    Section 5.3    Inspection; Confidentiality........................................................ 18
    Section 5.4    Information to Be Provided by Manager to Members ............... 18

ARTICLE VI TAX MATTERS, ACCOUNTING, AND REPORTING .......................... 18

    Section 6.1    Tax Matters ............................................................................... 18

i

**EXHIBIT 2**
**Page 252 of 404**

# TABLE OF CONTENTS
## (continued)

Page

Section 6.2      Accounting and Fiscal Year ................................................................ 18

ARTICLE VII UNIT TRANSFERS AND MEMBER WITHDRAWALS ............................... 18

Section 7.1      Transfer Generally Prohibited ............................................................ 18
Section 7.2      Conditions Generally Applicable to All Transfers ............................ 19
Section 7.3      Substituted Members ......................................................................... 20
Section 7.4      Drag-Along Rights ............................................................................ 21
Section 7.5      Company Right to Call Units ............................................................ 22
Section 7.6      Withdrawal ........................................................................................ 22
Section 7.7      Restrictions on Termination Transactions ........................................ 23
Section 7.8      Incapacity .......................................................................................... 23
Section 7.9      Legend ............................................................................................... 24

ARTICLE VIII ADMISSION OF ADDITIONAL MEMBERS ........................................... 24

Section 8.1      Admission of Additional Members .................................................... 24
Section 8.2      Limit on Number of Members .......................................................... 24

ARTICLE IX DISSOLUTION, LIQUIDATION AND TERMINATION ............................. 25

Section 9.1      Dissolution Generally ....................................................................... 25
Section 9.2      Events Causing Dissolution .............................................................. 25
Section 9.3      Distribution upon Dissolution .......................................................... 25
Section 9.4      Rights of Members ............................................................................ 27
Section 9.5      Termination ....................................................................................... 27

ARTICLE X PROCEDURES FOR ACTIONS AND CONSENTS OF MEMBERS;
       MEETINGS ...................................................................................................... 27

Section 10.1     Actions and Consents of Members .................................................... 27
Section 10.2     Procedures for Meetings and Actions of the Members ...................... 27

ARTICLE XI EXCHANGE RIGHTS .................................................................................. 28

Section 11.1     Elective and Mandatory Exchanges .................................................. 28
Section 11.2     Additional Terms Applying to Exchanges ......................................... 29
Section 11.3     Exchange Consideration; Settlement ................................................. 30
Section 11.4     Adjustment ......................................................................................... 31
Section 11.5     Class A Common Stock to Be Issued in Connection with an
                  Exchange ........................................................................................... 32
Section 11.6     Withholding ....................................................................................... 32
Section 11.7     Tax Treatment .................................................................................... 32
Section 11.8     Contribution by Manager .................................................................. 32
Section 11.9     Apportionment of Distributions ........................................................ 33

ARTICLE XII MISCELLANEOUS ..................................................................................... 33

Section 12.1     Conclusive Nature of Determinations ............................................... 33

ii

**EXHIBIT 2**
**Page 253 of 404**

# TABLE OF CONTENTS
## (continued)

Page

Section 12.2    Company Counsel ................................................................. 33
Section 12.3    Appointment of Manager as Attorney-in-Fact......................... 34
Section 12.4    Entire Agreement ................................................................. 34
Section 12.5    Further Assurances.............................................................. 34
Section 12.6    Notices ................................................................................ 35
Section 12.7    Governing Law .................................................................... 36
Section 12.8    Jurisdiction and Venue ........................................................ 36
Section 12.9    Equitable Remedies ............................................................ 36
Section 12.10   Construction ....................................................................... 37
Section 12.11   Counterparts ....................................................................... 37
Section 12.12   Third-Party Beneficiaries.................................................... 37
Section 12.13   Binding Effect ..................................................................... 37
Section 12.14   Severability ......................................................................... 37
Section 12.15   Survival ............................................................................... 37
Section 12.16   Effect on Other Obligations of Members or the Company...... 37
Section 12.17   Confidentiality .................................................................... 37

ARTICLE XIII DEFINED TERMS ............................................................... 39
Section 13.1    Definitions........................................................................... 39
Section 13.2    Interpretation....................................................................... 47

iii

**EXHIBIT 2**
**Page 254 of 404**

# SIXTH AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF NUSCALE POWER, LLC

THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of NUSCALE POWER, LLC, an Oregon limited liability company (the "**Company**"), dated as of [●], 2022, is entered into by and among the Members that are party hereto, NUSCALE POWER CORP., a Delaware corporation (the "**Manager**"), and each other Person as may become a Member from time to time, pursuant to the provisions of this Agreement.

WHEREAS, the Company's current operating agreement is the Fifth Amended and Restated Operating Agreement, dated April 1, 2021 (the "**Fifth Operating Agreement**");

WHEREAS, as set forth in the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021, in the Merger (as defined in this Agreement), the Fifth Operating Agreement is amended and restated in its entirety by this Agreement, with this Agreement superseding and replacing the Fifth Operating Agreement in its entirety; and

WHEREAS, immediately upon the effectiveness of this Agreement and without any action required on part of the Company or any Member, the Recapitalization (as defined in this Agreement) occurs.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, agree as follows:

# ARTICLE I

# GENERAL PROVISIONS

Section 1.1 Organization.  The Company has been organized as an Oregon limited liability company by the filing of the Articles of Conversion and the Articles of Organization, pursuant to the OBCA and the Act on September 30, 2011.

Section 1.2 Name.  The name of the Company is "**NuScale Power, LLC**."  The Company may also conduct business at the same time under one or more fictitious names if the Manager determines that such is in the best interests of the Company.  The Company may change its name, from time to time, in accordance with Law.

Section 1.3 Principal Place of Business; Other Places of Business.  The principal business office of the Company shall be in Portland, Oregon or such other location as may be designated by the Manager from time to time.  The Company may maintain offices and places

EXHIBIT 2
Page 255 of 404

of business at such other place or places within or outside the State of Oregon as the Manager deems advisable.

Section 1.4 <u>Designated Agent for Service of Process</u>.  So long as required by the Act, the Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Oregon.  The address of the registered office of the Company in the State of Oregon is 8130 SW Beaverton-Hillsdale Hwy., Portland, Oregon 97225.  The Company's registered agent for service of process at such address is Registered Agent Solutions, Inc.

Section 1.5 <u>Term</u>.  The term of the Company shall be perpetual unless and until the Company is dissolved in accordance with the Act or this Agreement.  Notwithstanding the dissolution of the Company, the existence of the Company shall continue until its termination pursuant to this Agreement or as otherwise provided in the Act.

Section 1.6 <u>No State Law Partnership</u>.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member shall be an agent, partner or joint venturer of any other Member, for any purposes other than for U.S. federal, state, and local tax purposes, and this Agreement shall not be construed to suggest otherwise.  Each Member hereby acknowledges and agrees that, except as expressly provided herein, in performing its obligations or exercising its rights under this Agreement, it is acting independently and is not acting in concert with, on behalf of, as agent for, or as joint venturer of, any other Member.  Other than in respect of the Company, nothing contained in this Agreement shall be construed as creating a corporation, association, joint stock company, business trust, or organized group of Persons, whether incorporated or not, among or involving any Member or its Affiliates, and nothing in this Agreement shall be construed as creating or requiring any continuing relationship or commitment as between such parties other than as specifically set forth in this Agreement.

Section 1.7 <u>Business Purpose</u>.  The purpose of the Company is to carry on any and all lawful businesses and activities permitted from time to time under the Act. On the terms and subject to the conditions of this Agreement, the Company is authorized to enter into, make and perform all contracts and other undertakings, and engage in all other activities and transactions as the Manager may deem necessary, advisable or convenient for carrying out the purposes of the Company.

Section 1.8 <u>Powers</u>.  Subject to the limitations set forth in this Agreement, the Company will possess and may exercise all of the powers and privileges granted to it by the Act, any other Law, or this Agreement, together with all powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the purposes of the Company set forth in <u>Section 1.7</u>.

Section 1.9 <u>Certificates; Filings</u>.    The Articles of Conversion and Articles of Organization were previously filed on behalf of the Company in the office of the Secretary of State of the State of Oregon as required by the OBCA and the Act.  The Manager shall take any and all other actions reasonably necessary to maintain the status of the Company under the Laws of the State of Oregon or any other state in which the Company shall do business.  If

2

**EXHIBIT 2**
**Page 256 of 404**

requested by the Manager, the Members shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the Manager to accomplish all filing, recording, publishing, and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited liability company under the Laws of the State of Oregon, (b) if the Manager deems it advisable, the operation of the Company as a limited liability company, in all jurisdictions in which the Company proposes to operate, and (c) all other filings required (or determined by the Manager to be necessary or appropriate) to be made by the Company.

Section 1.10       Representations and Warranties by the Members.

(a)       Individual-Member-Specific Representations.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or a Substituted Member) that is an individual represents and warrants to, and covenants with, each other Member that (i) the execution of this Agreement and the consummation of the transactions contemplated by this Agreement to be performed by such Member will not result in a breach or violation of, or a default under, any material agreement by which such Member or any of such Member's property is bound, or any statute, regulation, order or other Law to which such Member is subject and (ii) this Agreement is binding upon, and enforceable against, such Member in accordance with its terms, except (A) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (B) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

(b)       Non-Individual-Member-Specific Representations.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or a Substituted Member) that is not an individual represents and warrants to, and covenants with, each other Member that (i) the execution of this Agreement and all transactions contemplated by this Agreement to be performed by it have been duly authorized by all necessary action, including that of its general partner(s), managing member(s), committee(s), trustee(s), beneficiaries, directors and/or stockholder(s) (as the case may be) as required, (ii) the execution of this Agreement and consummation of such transactions will not result in a breach or violation of, or a default under, its partnership or operating agreement, trust agreement, charter or bylaws (as the case may be), any material agreement by which such Member or any of such Member's properties or any of its partners, members, beneficiaries, trustees or stockholders (as the case may be) is or are bound, or any statute, regulation, order or other Law to which such Member or any of its partners, members, trustees, beneficiaries or stockholders (as the case may be) is or are subject, and (iii) this Agreement is binding upon, and enforceable against, such Member in accordance with its terms, except (A) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (B) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

(c)       Securities Laws.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or Substituted Member)

EXHIBIT 2
Page 257 of 404

represents and warrants that it has acquired and continues to hold its interest in the Company for its own account for investment purposes only and not for the purpose of, or with a view toward, the resale or distribution of all or any part thereof, and not with a view toward selling or otherwise distributing such interest or any part thereof at any particular time or under any predetermined circumstances. Each Member further represents and warrants that it is a sophisticated investor, able and accustomed to handling sophisticated financial matters for itself, and that it has a sufficiently high net worth that it does not anticipate a need for the funds that it has invested in the Company in what it understands to be a speculative and illiquid investment.

(d)     <u>Survival of Representations and Warranties</u>.  The representations and warranties contained in <u>Sections 1.10(a)</u>, <u>1.10(b)</u>, and <u>1.10(c)</u> shall survive the execution and delivery of this Agreement by each Member (and, in the case of an Additional Member or a Substituted Member, the admission of such Additional Member or Substituted Member as a Member in the Company), and the dissolution, liquidation, and termination of the Company.

(e)     <u>No Representations as to Performance</u>.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or Substituted Member) hereby acknowledges that no representations as to potential profit, cash flows, funds from operations or yield, if any, in respect of the Company or the Manager have been made by the Company or any Member or any employee or representative or Affiliate of the Company or any Member, and that projections and any other information, including financial and descriptive information and documentation, that may have been in any manner submitted to such Member shall not constitute any representation or warranty of any kind or nature, express or implied.

(f)     <u>Modification of Representations and Warranties</u>.  The Manager may permit the modification of any of the representations and warranties contained in <u>Sections 1.10(a)</u>, <u>1.10(b)</u>, and <u>1.10(c)</u>, as applicable, to any Member (including any Additional Member or Substituted Member or any transferee of either); *provided*, that such representations and warranties, as modified, shall be set forth in either (i) a Unit Designation applicable to the Units held by such Member or (ii) a separate writing addressed to the Company.

### ARTICLE II

### UNITS; CAPITAL CONTRIBUTIONS

Section 2.1<u>Units</u>.

(a)     <u>Generally</u>.  The interests of the Members in the Company are divided into, and represented by, the Units, each having the rights and obligations specified in this Agreement.

(b)     <u>Classes</u>.  The Units are initially divided into:

(i)     "**Class A Units**," which are issuable solely to the Manager and such other persons as the Manager shall determine;

(ii)     "**Class B Units**," which are issuable to the Members as set forth on the Register and as otherwise provided in this Agreement; and

4

**EXHIBIT 2**
**Page 258 of 404**

(iii)    Other Classes of Units.  The Company may issue additional Units or create additional classes, series, subclasses, or sub-series of Units in accordance with this Agreement.

(c)    Recapitalization.  Immediately upon the execution of this Agreement and without any action required on the part of the Company or any Member, each Series A Preferred Unit, Series A-1 Preferred Unit, Series A-2 Preferred Unit, Series A-3 Preferred Unit, Series A-4 Preferred Unit, Series A-5 Preferred Unit and Common Unit (each, as defined in the Fifth Operating Agreement) of the Company issued and outstanding immediately before the effective time of this Agreement shall be recapitalized into 1.5818, 1.5818, 1.5636, 1.5576, 1.5818, 1.6303, and 1.00, Class B Units of the Company, respectively (collectively, the "**Recapitalization**").

Section 2.2    Capital Contributions of the Members; No Deficit Restoration Obligation.

(a)    Capital Contributions.  The Members made, shall be treated as having made, or have agreed to make, Capital Contributions to the Company and were issued the Units indicated on the Register.  Except as provided by Law or in this Agreement, the Members shall have no obligation to or, except as otherwise provided in this Agreement or with the prior written consent of the Manager, right to make any other Capital Contributions or any loans to the Company.

(b)    No Deficit Restoration Obligation.  No Member shall have an obligation to make any contribution to the capital of the Company as the result of a deficit balance in its Capital Account, and any such deficit shall not be considered a Debt owed to the Company or to any other Person for any purpose whatsoever.

Section 2.3    No Interest; No Return.  No Member shall be entitled to interest on its Capital Contribution or on such Member's Capital Account balance.  Except as provided by this Agreement, any Unit Designation, or by Law, no Member shall have any right to demand or receive a withdrawal or the return of its Capital Contribution from the Company.  Except to the extent provided in this Agreement or in any Unit Designation, no Member shall have priority over any other Member as to distributions or the return of Capital Contributions.

Section 2.4    Issuances of Additional Units.  Subject to the rights of any Member set forth in a Unit Designation:

(a)    General.  The Company may issue additional Units for any Company purpose at any time or from time to time to the Members (including, subject to Section 2.4(b), the Manager) or any other Person and may admit any such Person as an Additional Member for such consideration and on such terms and conditions as shall be established by the Company.  Any additional Units may be issued in one or more classes or one or more series of any of such classes with such designations, preferences, conversion or other rights, voting powers, restrictions, rights to distributions, qualifications and terms and conditions of redemption (including rights that may be senior or otherwise entitled to preference over existing Units) as shall be determined by the Company (each, a "**Unit Designation**").  Upon the issuance of any additional Unit, the Manager shall amend the Register and the books and records of the Company as appropriate to reflect such issuance.  Except to the extent specifically set forth in any Unit Designation, a Unit of any class

5

**EXHIBIT 2**
**Page 259 of 404**

or series other than a Common Unit shall not entitle the holder thereof to vote on, or consent to, any matter.

(b)    _Issuances to the Manager_.  No additional Units shall be issued to the Manager unless at least one of the following conditions is satisfied:

(i)    The additional Units are issued to all Members holding Common Units in proportion to their respective Percentage Interests in the Common Units;

(ii)    The additional Units are (x) Class A Units issued in connection with an issuance of Class A Common Stock or issued with appropriate adjustments to the Exchange Rate in accordance with Section 11.4, or (y) Equivalent Units (other than Common Units) issued in connection with an issuance of Preferred Stock, New Securities, or other interests in the Manager (other than Common Stock), and, in each case, the Manager contributes to the Company the net proceeds received in connection with the issuance of such Class A Common Stock, Preferred Stock, New Securities, or other interests in the Manager;

(iii)    There is a recapitalization of the Capital Stock of the Manager, including any stock split, stock dividend, reclassification or similar transaction;

(iv)    The additional Units are issued upon the conversion, redemption or exchange of Debt, Units or other securities issued by the Company and held by the Manager; or

(v)    The additional Units are issued in accordance with the express terms of Section 2.5(g) or any of the other provisions of this Article II (other than Section 2.4(a)).

(c)    _Issuances of Class B Units_.  No additional Class B Units shall be issued except in the event of a recapitalization of the Capital Stock of the Manager, including any stock split, stock dividend, reclassification or similar transaction.

(d)    _No Preemptive Rights_.  Except as expressly provided in this Agreement or in any Unit Designation, no Person shall have any preemptive, preferential, participation or similar right or rights to subscribe for or acquire any Unit.

Section 2.5 Additional Funds and Additional Capital Contributions

(a)    _General_.  The Company may, at any time and from time to time, determine that it requires additional funds ("**Additional Funds**") for the acquisition or development of additional Assets, for the redemption of Units, or for such other purposes as the Company may determine.  Additional Funds may be obtained by the Company in any manner provided in, and in accordance with, the terms of this Section 2.5 without the approval of any Member or any other Person.

(b)    _Additional Capital Contributions_.  The Company may obtain any Additional Funds by accepting Capital Contributions from any Members or other Persons.  In connection with any such Capital Contribution, the Company is hereby authorized from time to time to issue additional Units (as set forth in Section 2.4) in consideration for such Capital Contribution.

6

**EXHIBIT 2**
**Page 260 of 404**

(c)     <u>Loans by Third Parties</u>.  The Company may obtain any Additional Funds by incurring Debt payable to any Person upon such terms as the Company determines appropriate, including making such Debt convertible, redeemable, or exchangeable for Units; *provided*, *however*, that the Company shall not incur any such Debt if any Member would be personally liable for the repayment of all or any portion of such Debt unless that Member otherwise agrees in writing.

(d)     <u>Issuance of Securities by the Manager</u>.

(i)     Unless otherwise agreed to by the Members, after the completion of the SPAC Transaction, except in the case of a Liquidity Offering for purposes of a Cash Settlement, the Manager shall not issue any additional Capital Stock or New Securities unless the Manager contributes the net proceeds received from the issuance of such additional Capital Stock or New Securities (as the case may be) and from the exercise of the rights contained in any such additional Capital Stock or New Securities to the Company in exchange for (i) in the case of an issuance of Class A Common Stock, Class A Units, (ii) in the case of an issuance of Class B Common Stock, Class B Units, or (iii) in the case of an issuance of Preferred Stock or New Securities, Equivalent Units.  If at any time any Preferred Stock or New Securities are issued that are convertible into or exercisable for Class A Common Stock or another security of the Manager, then upon any such conversion or exercise, the corresponding Equivalent Unit shall be similarly converted or exercised, as applicable, and an equal number of Class A Units or other Equivalent Units shall be issued to the Manager.  It is the intent of the parties that the Manager will always own Units equivalent in number and rights to its outstanding Capital Stock (other than Class B Units, which shall be equivalent in number, but not rights, to its outstanding Class B Common Stock), except as provided pursuant to <u>Section 11.4</u>, and the parties hereby acknowledge that the Manager may make reasonable adjustments to its own capitalization, subject to applicable Law and the terms of any such outstanding Capital Stock, in order to effect such parity.

(ii)     New Securities that are derivative securities issued under any Incentive Compensation Plan of the Manager shall not require issuance of Equivalent Units by the Company until such time as such derivative securities are exercised for Capital Stock of the Manager.

(e)     <u>Reimbursement of Issuance Expenses</u>.  If the Manager issues additional Capital Stock or New Securities and contributes the net proceeds (after deduction of any underwriters' discounts and commissions) received from such issuance to the Company pursuant to <u>Section 2.5(d)</u>, the Company shall reimburse or assume (on an after-tax basis) the Manager's expenses associated with such issuance.

(f)     <u>Repurchase or Redemption of Capital Stock</u>.  If any shares of Capital Stock, or New Securities are repurchased, redeemed or otherwise retired (whether by exercise of a put or call, automatically or by means of another arrangement) by the Manager, then the Manager shall cause the Company, immediately before such repurchase, redemption or retirement of such Capital Stock or New Securities, to redeem, repurchase or otherwise retire a corresponding number of Class A Units, Class B Units, or Equivalent Units held by the Manager, upon the same terms and for the same consideration as the Capital Stock or New Securities to be repurchased, redeemed, or retired.

7

**EXHIBIT 2**
**Page 261 of 404**

(g)    Reinvestment of Excess Tax Distributions.  Notwithstanding anything to the contrary in this Agreement, if the Manager (i) receives Tax Distributions in an amount in excess of the amount necessary to enable the Manager to meet or pay its U.S. federal, state and local Tax obligations, its obligations under the Tax Receivable Agreement, and any other operating expenses or (ii) holds any other excess cash amount, the Manager may, in its sole discretion, (A) distribute such excess cash amount to its shareholders or (B) contribute such excess cash amount to the Company in exchange for a number of Units or other equity securities of the Company determined in its sole discretion based on the Fair Market Value of such Units or securities, and in such case, the Manager may distribute to the holders of Class A Common Stock an amount of shares of Class A Common Stock (if the Company issues Units to the Manager) or such other equity securities of the Manager (if the Company issues equity securities of the Company other than Units) corresponding to the Class A Common Stock or equity securities issued by the Company and with substantially the same rights to dividends and distributions (including distributions upon liquidation) and other economic rights as those of such Class A Common Stock or equity securities of the Company that were issued to the Manager.

# ARTICLE III

# DISTRIBUTIONS

Section 3.1    Distributions Generally.

(a)    Except as otherwise provided in this Article III and subject to the terms of any Unit Designation, the Company shall distribute an amount of Available Cash if, when, and as determined by the Manager to the Members pro rata in accordance with the number of their Units.

Section 3.2    Tax Distributions.

(a)    Generally.  If the amount distributed to a Member pursuant to Section 3.1 in respect of a Fiscal Year is less than that Member's Assumed Tax Liability, the Company shall distribute an amount of Available Cash to the Members such that each Member receives distributions of Available Cash in respect of each Fiscal Year in an amount at least equal to the Member's Assumed Tax Liability for such Fiscal Year (each such distribution, a "**Tax Distribution**").  Any Tax Distribution made to a Member shall reduce future amounts otherwise distributable to such Member under Section 3.1 or Section 9.3(a).  Except as provided in Section 3.2(d) and subject to any Unit Designation, all Tax Distributions shall be made *pro rata* in accordance with Units.

(b)    Calculation of Assumed Tax Liability.  For purposes of calculating the amount of each Member's Tax Distributions under Section 3.2(a), a Member's "**Assumed Tax Liability**" means an amount equal to the product of:

(i)    the sum of (A) the net taxable income and gain allocated to that Member from the Company for U.S. federal income tax purposes in the Fiscal Year and (B) to the extent (x) determined by the Company in its sole discretion and (y) attributable to the Company, the amount the Member is required to include in income by reason of Code sections 707(c) (but

8

**EXHIBIT 2**
**Page 262 of 404**

not including guaranteed payments for services within the meaning of Code section 707(c)), 951(a), and 951A(a); *multiplied by*

        (ii)     unless otherwise determined by the Company, the highest combined effective U.S. federal, state, and local marginal rate of tax applicable to an individual resident in Portland, Oregon, San Francisco, California or New York, New York (whichever results in the application of the highest state and local tax rate for a given type of income) for the Fiscal Year (such tax rate, the "**Assumed Tax Rate**").

The calculation required by this Section 3.2(b) shall be made by (i) taking into account (x) the character of the income or gain and (y) any limitations on the use of deductions or credits allocable with respect to the Fiscal Year and (ii) disregarding the effect of any special basis adjustments resulting from any election under Section 754 of the Code, including adjustments under Code section 732, 734(b) or 743(b). In addition, the Company shall adjust a Member's Assumed Tax Liability to the extent the Company reasonably determines is necessary or appropriate as a result of any differences between U.S. federal income tax law and the tax laws of other jurisdictions in which the Company has a taxable presence. The Company shall calculate the amount of any increase described in the preceding sentence by applying the principles of Section 3.2(b)(i) and (ii) replacing the words "**U.S. federal**" with a reference to the applicable jurisdiction.

        (c)     Timing of Tax Distributions. If reasonably practicable, the Company shall make distributions of the estimated Tax Distributions in respect of a Fiscal Year on a quarterly basis to facilitate the payment of quarterly estimated income taxes, taking into account amounts previously distributed by reason of this Section 3.2. Not later than sixty (60) Business Days after the end of the Fiscal Year, the Company shall make a final Tax Distribution in an amount sufficient to fulfill the Company's obligations under Section 3.2(a).

        (d)     Impact of Insufficient Available Cash. If the amount of estimated or final Tax Distributions to be made exceeds the amount of the Available Cash, the Tax Distribution to which each Member is entitled shall be reduced in accordance with the provisions of this Section 3.2(d) (the amount of the reduction in each Member's share, the "**Tax Distribution Shortfall Amount**"), and Available Cash shall be distributed in the following order of priority:

        (i)     First, to the Manager in an amount equal to the full amount of its Tax Distribution, but calculated by substituting the words "a corporation doing business" for "an individual resident" in the definition of "**Assumed Tax Rate**";

        (ii)     Second, to the Members other than the Manager *pro rata* in accordance with their Units in an amount such that each such Member has received distributions pursuant to this Section 3.2(d)(ii) that is not less than their Assumed Tax Liability (calculated by substituting the words "a corporation doing business" for "an individual resident" in the definition of "**Assumed Tax Rate**"); and

        (iii)     Third, to the Members (including the Manager) *pro rata* in accordance with their Units until each Member has received the full amount of its Tax Distribution calculated in accordance with Section 3.2(b).

9

**EXHIBIT 2**
**Page 263 of 404**

Any Tax Distribution Shortfall Amounts will be carried forward to subsequent Fiscal Years and will be distributed when and to the extent that the Company has sufficient Available Cash. The distribution of any Tax Distribution Shortfall Amounts to a Member shall for all purposes of this Agreement be a Tax Distribution and shall reduce future amounts otherwise distributable to such Member under Section 3.1 or Section 9.3(a).

(e)  No Tax Distributions on Liquidation. No Tax Distributions shall be made in connection with a Liquidating Event or the liquidation of a Member's Units in the Company.

Section 3.3 Distributions in Kind. No Member may demand to receive property other than cash as provided in this Agreement. The Company may make a distribution in kind of Assets to the Members, and if a distribution is made both in cash and in kind, such distribution shall be made so that, to the fullest extent practical, the percentage of the cash and any other Assets distributed to each Member entitled to such distribution is identical.

Section 3.4 Distributions to Reflect Additional Units. If the Company issues additional Units pursuant to the provisions of Article II, subject to the provisions of any Unit Designation, the Manager is authorized to make such revisions to this Article III and to Annex C as it determines are reasonably necessary or desirable to reflect the issuance of such additional Units, including making preferential distributions to certain classes of Units.

Section 3.5 Other Distribution Rules.

(a)  Transfers. From and after the Transfer of a Unit, for purposes of determining the rights to distributions (including Tax Distributions) under this Agreement, distributions (including Tax Distributions) made to the transferor Member, along with any withholding or deduction in respect of any such distribution, shall be treated as having been made to the transferee unless otherwise determined by the Company.

(b)  Record Date for Distributions. The Company may designate a Record Date for purposes of calculating and giving effect to distributions. All distributions shall be made to the holders of record as of the applicable Record Date.

(c)  Over-Distributions. If the amount of any distribution to a Member under the Agreement exceeds the amount to which the Member in entitled (e.g., by reason of an accounting error), the Member shall, upon written notice of the over-distribution delivered to the Member within one year of the over-distribution, promptly return the amount of such over-distribution to the Company.

(d)  Reimbursements of Preformation Capital Expenditures. To the extent a distribution (or deemed distribution resulting from a reduction in a Member's share of Company liabilities for federal tax purposes) otherwise would be treated as proceeds in a sale under Code section 707(a)(2)(B), the Members intend such actual or deemed distribution to reimburse preformation capital expenditures under Treas. Reg. § 1.707-4(d) to the maximum extent permitted by Law.

(e)  Limitation on Distributions. Notwithstanding any provision of this Agreement to the contrary, the Company shall not make a distribution to any Member to the extent

10

**EXHIBIT 2**
**Page 264 of 404**

such distribution would violate the Act or other Law or would result in the Company or any of its Subsidiaries being in default under any material agreement.

# ARTICLE IV

## MANAGEMENT AND OPERATIONS

Section 4.1 <u>Management</u>.

(a)     <u>Authority of Manager</u>.

(i)     Except as otherwise provided in this Agreement, the Manager shall have full, exclusive, and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to do or cause to be done any and all acts, at the expense of the Company, as the Manager deems necessary or appropriate to accomplish the purposes and direct the affairs of the Company.  Without limiting the generality of the preceding sentence and subject to <u>Section 4.1</u>, the Manager may cause the Company, without the consent or approval of any other Member, to enter into any of the following in one or a series of related transactions: (i) any merger, (ii) any acquisition, (iii) any consolidation, (iv) any sale, lease or other transfer or conveyance of Assets, (v) any recapitalization or reorganization of outstanding securities, (vi) any merger, sale, lease, spin-off, exchange, transfer or other disposition of a Subsidiary, division or other business, (vii) any issuance of Debt or equity securities (subject to any limitations expressly provided for in this Agreement), or (viii) any incurrence of Debt.

(ii)     The Manager shall have the exclusive power and authority to bind the Company and shall be an agent of the Company's business.  The actions of the Manager taken in such capacity and in accordance with this Agreement shall bind the Company.  Except to the extent expressly delegated in writing by the Manager, no Member or Person other than the Manager shall be an agent for the Company or have any right, power or authority to transact any business in the name of the Company or act for or on behalf of or to bind the Company.

(iii)     Subject to the rights of any Member set forth in <u>Section 4.1(f)</u>, any determinations to be made by the Company pursuant to this Agreement shall be made by the Manager, and such determinations shall be final, conclusive and binding upon the Company and every Member.

(iv)     The Manager shall constitute a "manager" (as that term is defined in the Act) of the Company.

(v)     The Manager may not be removed by the Members, with or without cause, except with the consent of the Manager.

(b)     <u>Appointment of Officers</u>.  The Manager may, from time to time, appoint such officers and establish such management and/or advisory boards or committees of the Company as the Manager deems necessary or advisable, each of which shall have such powers, authority, and responsibilities as are delegated in writing by the Manager from time to time.  Each

11

**EXHIBIT 2**
**Page 265 of 404**

such officer and/or board or committee member shall serve at the pleasure of the Manager. The initial Officers of the Company are set forth on <u>Annex D</u> attached to this Agreement.

(c)    <u>No Participation by Members</u>.  Except as otherwise expressly provided in this Agreement or required by any non-waivable provision of the Act or other Law and subject to <u>Section 4.1</u>, no Member (acting in such capacity) shall (x) have any right to vote on or consent to any other matter, act, decision or document involving the Company or its business or any other matter, or (y) take part in the day-to-day management, or the operation or control, of the business and affairs of the Company. No Member, as such, shall have the power to bind the Company.

(d)    <u>Bankruptcy</u>.  Only the Manager may commence a voluntary case on behalf of, or an involuntary case against, the Company under a chapter of Title 11 U.S.C. by the filing of a "petition" (as defined in 11 U.S.C. 101(42)) with the United States Bankruptcy Court.  Any such petition filed by any other Member, to the fullest extent permitted by Law, shall be deemed an unauthorized and bad faith filing, and all parties to this Agreement shall use their best efforts to cause such petition to be dismissed.

(e)    <u>Amendment of Agreement</u>.  All amendments to this Agreement must be approved by the Manager.  Subject to the rights of any Member set forth in a Unit Designation and <u>Section 4.1(f)</u> and <u>Section 4.1(g)</u>, the Manager shall have the power, without the consent or approval of any Member, to amend this Agreement as may be required to facilitate or implement any of the following purposes:

(i)    To add to the obligations of the Manager or surrender any right or power granted to the Manager or any Affiliate of the Manager for the benefit of the Members;

(ii)    To reflect a change that is of an inconsequential nature or does not adversely affect the Members in any material respect, or to cure any ambiguity, correct or supplement any provision in this Agreement not inconsistent with Law or with other provisions, or make other changes with respect to matters arising under this Agreement that will not be inconsistent with Law or with the provisions of this Agreement;

(iii)    To satisfy any requirements, conditions, or guidelines contained in any order, directive, opinion, ruling or regulation of a federal or state agency, or in federal or state Law;

(iv)    To reflect the admission, substitution, or withdrawal of Members, the Transfer of any Units, the issuance of additional Units, or the termination of the Company in accordance with this Agreement, and to amend the Register in connection with such admission, substitution, withdrawal, or Transfer;

(v)    To set forth or amend the designations, preferences, conversion or other rights, voting powers, restrictions, limitations as to distributions, qualifications or terms or conditions of redemption of any additional Units issued pursuant to <u>Article II</u>;

(vi)    If the Company is the Surviving Company in any Termination Transaction, to modify <u>Section 11.1</u> or any related definitions to provide the holders of interests in the Surviving Company rights that are consistent with <u>Section 7.7(b)(iii)</u>; and

12

**EXHIBIT 2**
**Page 266 of 404**

(vii)    To reflect any other modification to this Agreement as is reasonably necessary or appropriate for the business or operations of the Company or the Manager and that does not violate a Unit Designation, Section 4.1(f), or Section 4.1(g).

(f)    <u>Certain Amendments and Actions Requiring Member Consent.</u>

(i)    Notwithstanding anything in Section 4.1(e) or Article X to the contrary, this Agreement shall not be amended, and no action may be taken by the Manager or the Company without the consent of any Member holding Common Units that would be adversely affected by such amendment or action.  Without limiting the generality of the preceding sentence, for purposes of this Section 4.1(f)(i), the Members holding Common Units will be deemed to be adversely affected by an amendment or action that would (A) adversely alter the rights of any Member to receive the distributions to which such Member is entitled pursuant to Article III or Section 9.3(a)(iii), (B) convert the Company into a corporation or cause the Company to be classified as a corporation for federal income tax purposes (other than in connection with a Termination Transaction), or (C) amend this Section 4.1(f)(i).  Notwithstanding the provisions of the preceding two sentences of this Section 4.1(f)(i), but subject to Section 4.1(f)(ii), the consent of any Member holding Common Units that would be adversely affected by an amendment or action shall not be required for any such amendment or action that affects all Members holding the same class or series of Units on a uniform or *pro rata* basis if such amendment or action is approved by a Majority-in-Interest of the Members of such class or series.  If some, but not all, of the Members consent to such an amendment or action, the Company may, in its discretion, make such amendment or action effective only as to the Members that consented to it, to the extent it is practicable to do so.

(ii)    This Agreement shall not be amended, and no action may be taken by the Manager without the consent of any Member holding Common Units that would be adversely affected by such amendment or action if such amendment or action would (A) modify the limited liability of a Member or increase the obligation of a Member to make a Capital Contribution to the Company or (B) amend this Section 4.1(f)(ii).

(g)    <u>Implementation of Amendments</u>.  Upon obtaining any Consent required under this Section 4.1 or otherwise required by this Agreement, and without further action or execution by any other Person, including any Member, (i) any amendment to this Agreement may be implemented and reflected in a writing executed solely by the Manager, and (ii) the Members shall be deemed a party to and bound by that amendment of this Agreement.

Section 4.2 <u>Tax Actions</u>.  All tax-related actions, decisions, or determinations (or failure to take any available tax-related action, decision, or determination) by or with respect to the Company or any Subsidiary of the Company not expressly reserved for the Members shall be made, taken, or determined by the Manager.

Section 4.3 <u>Compensation and Reimbursement of Manager</u>.

(a)    <u>General</u>.  The Manager shall not receive any fees from the Company for its services in administering the Company, except as otherwise provided in this Agreement.

13

**EXHIBIT 2**
**Page 267 of 404**

(b)    <u>Reimbursement of Manager</u>.  The Company shall be liable for, and shall reimburse the Manager on an after-tax basis at such intervals as the Manager may determine, all:

(i)    overhead, administrative expenses, insurance and reasonable legal, accounting and other professional fees and expenses of the Manager;

(ii)    expenses of the Manager incidental to being a public reporting company;

(iii)    reasonable fees and expenses related to the SPAC Transactions or any subsequent public offering of equity securities of the Manager (without duplicating any provisions of <u>Section 2.5(e)</u>) or private placement of equity securities of the Manager (including any reasonable fees and expenses related to the registration for resale of any such securities), whether or not consummated;

(iv)    franchise and similar taxes of the Manager and other fees and expenses in connection with the maintenance of the existence of the Manager;

(v)    customary compensation and benefits payable by the Manager, and indemnities provided by the Manager on behalf of, the officers, directors, and employees of the Manager; and

(vi)    reasonable expenses paid by the Manager on behalf of the Company; *provided*, *however*, that the amount of any reimbursement shall be reduced by any interest earned by the Manager with respect to bank accounts or other instruments or accounts held by it on behalf of the Company as permitted pursuant to <u>Section 4.4</u>.  Such reimbursements shall be in addition to any reimbursement of the Manager as a result of indemnification pursuant to <u>Section 4.7</u>.

Section 4.4<u>Outside Activities</u>.

(a)    <u>Limitation on Outside Activities of Manager</u>.  The Manager shall not directly or indirectly enter into or conduct any business, other than in connection with (i) the ownership, acquisition, and disposition of Units, (ii) maintaining its legal existence (including the ability to incur and pay, as applicable, fees, costs, expenses and taxes relating to that maintenance), (iii) the management of the business of the Company and its Subsidiaries, (iv) its operation as a reporting company with a class (or classes) of securities registered under the Exchange Act, (v) the offering, sale, syndication, private placement, or public offering of stock, bonds, securities, or other interests of the Manager, (vi) the financing or refinancing of any type related to the Company or its Assets or activities, (vii) receiving and paying dividends and distributions or making contributions to the capital of its Subsidiaries, (viii) filing tax reports and tax returns and paying taxes and other customary obligations in the ordinary course (and contesting any taxes), (ix) participating in tax, accounting, and other administrative matters with respect to its Subsidiaries and providing administrative and advisory services (including treasury and insurance services, including maintaining directors' and officers' insurance on its behalf and on behalf of its Subsidiaries) to its Subsidiaries, (x) holding any cash or property (but not operating any property), (xi) indemnifying officers, directors, members of management, managers, employees, consultants, or independent contractors of the Manager, the Company or their respective Subsidiaries, (xii) entering into any Termination Transaction or similar transaction in accordance with this

14

**EXHIBIT 2**
**Page 268 of 404**

Agreement, (xiii) preparing reports to governmental authorities and to its shareholders, (xiv) holding director and shareholder meetings, preparing organizational records, and other organizational activities required to maintain its separate organizational structure, (xv) complying with applicable Law, (xvi) engaging in activities relating to any management equity plan, stock option plan or any other management or employee benefit plan of the Manager, the Company or their respective Subsidiaries, and (xvii) engaging in activities that are incidental to clauses (i) through (xvi). The provisions of this <u>Section 4.4</u> shall restrict only the Manager and its Subsidiaries (other than the Company and its Subsidiaries) and shall not restrict the other Members or any Affiliate of the other Members (other than the Manager).

(b)     <u>Outside Activities of Members</u>.

(i)     Subject to (x) Article XI of the Certificate of Incorporation of the Manager, (y) any agreements entered into pursuant to <u>Section 4.5</u>, and (z) any other agreements (including any employment agreement) entered into by a Member or any of its Affiliates with the Manager, the Company or a Subsidiary, any Member (but, with respect to the Manager, subject to <u>Section 4.4(a)</u>), or any officer, director, employee, agent, trustee, Affiliate, member or stockholder of any Member shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, including business interests and activities that are in direct or indirect competition with the Company or that are enhanced by the activities of the Company, and, in any such case, need not (A) first offer the Company or any of its Subsidiaries an opportunity to participate in such business interests or activities or (B) account to the Company or any of its Subsidiaries with respect to such business interests or activities.

(ii)     None of the Members, the Company or any other Person shall have any rights by virtue of this Agreement or the relationship established hereby in any business ventures of any other Member or Person. Subject to any other agreements entered into by a Member or its Affiliates with the Manager, the Company or a Subsidiary, no Member (other than the Manager) or any such other Person shall have any obligation pursuant to this Agreement to offer any interest in any such business ventures to the Company, any Member, or any such other Person.

Section 4.5<u>Transactions with Affiliates</u>. Subject to the provisions of <u>Section 4.1(f)</u> and <u>Section 4.4</u>, the Company may enter into any transaction or arrangement with the Manager or Subsidiaries of the Company or other Persons in which the Company has an equity investment on terms and conditions determined by the Manager. Without limiting the foregoing, but subject to <u>Section 4.4</u>, (a) the Company may (i) lend funds to, or borrow funds from, the Manager or to Subsidiaries of the Company or other Persons in which the Company has an equity investment and (ii) transfer Assets to joint ventures, limited liability companies, partnerships, corporations, business trusts or other business entities in which the Company or any of its Subsidiaries is or thereby becomes a participant, and (b) the Manager may (i) propose and adopt on behalf of the employee benefit plans funded by the Company for the benefit of employees of the Manager, the Company, Subsidiaries of the Company or any Affiliate of any of them in respect of services performed, directly or indirectly, to or for the benefit of the Manager, the Company or any of the Company's Subsidiaries and (ii) sell, transfer or convey any property to the Company, directly or indirectly.

**EXHIBIT 2**
**Page 269 of 404**

Section 4.6 <u>Limitation on Liability</u>.

(a)    <u>General</u>.  To the fullest extent permitted by Law, including by ORS 63.160 of the Act, no Indemnitee, in such capacity, shall be liable to the Company, any Member or any of their respective Affiliates, for any losses sustained or liabilities incurred as a result of any act or omission of such Person if (i) either (A) the Indemnitee, at the time of such act or omission, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or (B) in the case of omission by the Indemnitee, the Indemnitee did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company and (ii) the act or omission did not constitute fraud or intentional misconduct by the Indemnitee.

(b)    <u>Action in Good Faith</u>.  An Indemnitee acting under this Agreement shall not be liable to the Company for its, his, or her good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand, restrict, or eliminate the duties and liabilities of such Persons otherwise existing at Law or in equity, are agreed by the Members to replace fully and completely such other duties and liabilities of such Persons.  Whenever the Manager or the Company is permitted or required to make a decision or take an action under this Agreement (i) in making such decisions, such Person shall be entitled to take into account its own interests as well as the interests of the Members as a whole or (ii) in its "good faith" or under another expressed standard, such Person shall act under such express standard and shall not be subject to any other or different standards.

(c)    <u>Outside Counsel</u>.  The Manager may consult with legal counsel, accountants and financial or other advisors, and any act or omission suffered or taken by the Manager on behalf of the Company or in furtherance of the interests of the Company in good faith in reliance upon and in accordance with the advice of such counsel, accountants or financial or other advisors will be full justification for any such act or omission, and the Manager will be fully protected in so acting or omitting to act so long as such counsel or accountants or financial or other advisors were selected with reasonable care.

(d)    <u>Duties of Members</u>. Other than obligations of Members explicitly set forth in this Agreement, no Member (other than the Manager in its capacity as a manager), including any Member who may be deemed to be a controlling Member under applicable Law (other than the Manager in its capacity as a manager), shall owe any duty (of loyalty, care or otherwise) to the Company or to any other Member solely by reason of being a Member. With respect to each matter requiring approval of a Majority-in-Interest of the Members, each Member having voting rights may grant or withhold such Member's vote under this Agreement, in such Member's sole judgment, as directed or otherwise determined by such Member, without regard to the interests of any other Member or of the Company, and no Member shall have any duty to represent or act in the best interests of the Company or any other Member.

Section 4.7 <u>Indemnification</u>.

(a)    <u>General</u>.  The Company shall indemnify and hold harmless each Indemnitee (and such Person's heirs, successors, assigns, executors or administrators) to the full extent permitted by Law and to the same extent and in the same manner provided by the provisions of

16

**EXHIBIT 2**
**Page 270 of 404**

Article VI of the Bylaws of the Manager applicable to officers and directors as if such provisions were set forth herein, *mutatis mutandis*, and applied to each such Indemnitee.

        (b)    <u>Non-Exclusivity of Rights</u>.  The rights to indemnification and to the advancement of expenses conferred in this <u>Section 4.7</u> shall not be exclusive of any other right that any Person may have or hereafter acquire under any law, agreement, vote of stockholders or disinterested directors, provisions of a certificate of incorporation or bylaws, or otherwise.

        (c)    <u>Nature of Rights</u>.  The rights conferred upon Indemnitees in this <u>Section 4.7</u> shall be contract rights and shall continue as to an Indemnitee who has ceased to be the Manager, an Affiliate of the Manager, the Tax Representative, the Designated Individual, or an officer or director of the Manager, the Company, or their respective Affiliates.  Any amendment, alteration or repeal of this <u>Section 4.7</u> or of Article VI of the Bylaws of the Manager that would adversely affect any right of an Indemnitee or its successors shall apply prospectively only and shall not limit or eliminate any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place before such amendment, alteration or repeal.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1<u>Books and Records</u>.

        (a)    <u>General</u>.  The Company shall maintain in its principal business office, or any other place as may be determined by the Company, the books and records of the Company.

        (b)    <u>Specific Records</u>.  In particular, the Company shall maintain:

        (i)    A register containing the name, address, and number and class of Units (including Equivalent Units) of each Member, and such other information as the Manager may deem necessary or desirable and attached to this Agreement as <u>Annex A</u> (as may be amended or updated from time to time, the "**<u>Register</u>**").  The Manager shall from time to time update the Register as necessary to ensure the Register is accurate, including as a result of any sales, exchanges, or other Transfers, or any redemptions, issuances, or similar events involving Units. Except as required by Law, no Member shall be entitled to receive a copy of the Register or of the information set forth in the Register relating to any Member other than itself.

        (ii)    A copy of the Articles of Conversion, Articles of Organization and this Agreement and all amendments thereto.

        Section 5.2<u>Financial Accounts</u>.  At all times during the continuance of the Company, the Company shall prepare and maintain separate books of account for the Company for financial reporting purposes, on an accrual basis, in accordance with United States generally accepted accounting principles, consistently applied.

        Section 5.3<u>Inspection; Confidentiality</u>.  The Manager may keep confidential from the Members (or any of them) for such period of time as the Manager determines to be reasonable,

17

**EXHIBIT 2**
**Page 271 of 404**

any information (a) that the Manager believes to be in the nature of trade secrets, (b) the disclosure of which the Manager in good faith believes is not in the best interests of the Company or the Manager, or (c) that the Company or the Manager is required by Law, agreement, or customary commercial practice to keep confidential.  Subject to the provisions of the previous sentence, the Members (personally or through an authorized representative) may, for purposes reasonably related to their respective interests in the Company, examine and copy (at their own cost and expense) the books and records of the Company at all reasonable business hours upon reasonable prior notice.

Section 5.4 Information to Be Provided by Manager to Members.  The Company shall deliver (or otherwise make accessible) to each Member a copy of any information mailed or delivered electronically to all of the common stockholders of the Manager as soon as practicable after such mailing or electronic delivery.

## ARTICLE VI

## TAX MATTERS, ACCOUNTING, AND REPORTING

Section 6.1 Tax Matters.

(a)    Tax Returns.  The Company shall use reasonable best efforts to cause to be prepared and timely filed (taking into account available extensions) all federal, state, and local, and non-U.S. tax returns of the Company for each year for which such returns are required to be filed and shall determine the appropriate treatment of each tax item of the Company and make all other determinations with respect to such tax returns.

(b)    Other Tax Matters.  Each of the provisions of Annex C, which address various tax matters, is incorporated into and shall constitute a part of this Agreement.

Section 6.2 Accounting and Fiscal Year.  Unless otherwise determined by the Company or required by Code section 706, the fiscal year of the Company (the "**Fiscal Year**") shall be the calendar year ending December 31st, or, in the case of the last Fiscal Year of the Company, the fraction thereof ending on the date on which the winding up of the Company is completed.

## ARTICLE VII

## UNIT TRANSFERS AND MEMBER WITHDRAWALS

Section 7.1 Transfer Generally Prohibited.  No Units shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Article VII and Article XI.  Any Transfer or purported Transfer of a Unit not made in accordance with this Article VII or Article XI shall be null and void *ab initio*.  Units shall not be subject to the claims of any creditor, spouse for alimony or support, or legal process and may not be voluntarily or involuntarily alienated or encumbered except as may be specifically provided for in this Agreement.

**EXHIBIT 2**
**Page 272 of 404**

Section 7.2 <u>Conditions Generally Applicable to All Transfers</u>.  All Transfers are subject to the satisfaction of the following conditions:

(a)    <u>Transfers by Members Other than the Manager</u>.

(i)    <u>Consent of Manager</u>.  No Member other than the Manager shall Transfer any portion of its Units to any transferee without the prior written consent of the Manager unless the Transfer is a Related-Party Transfer.

(ii)    <u>Assumption of Obligations; No Relief from Obligations</u>.  Any transferee of all or a portion of a Unit (whether or not admitted as a Substituted Member) shall take subject to and assume, by operation of Law or express agreement, all of the obligations of the transferor Member under this Agreement with respect to such Transferred Unit.  No Transfer (other than pursuant to a statutory merger or consolidation pursuant to which all obligations and liabilities of the transferor Member are assumed by a successor corporation by operation of Law) shall relieve the transferor Member of its obligations under this Agreement without the approval of the Manager.

(iii)    <u>No Rights as Member</u>.  No transferee, whether by a voluntary Transfer, by operation of Law or otherwise, shall have any rights under this Agreement unless admitted as a Substituted Member.

(b)    <u>Transfers by the Manager</u>.

(i)    <u>Consent of Members</u>.  The Manager may not Transfer any of its Units without the consent of a Majority-in-Interest of the Members, except in connection with an Applicable Sale or Termination Transaction or to a wholly owned subsidiary in accordance with Section 7.2(b)(ii).

(ii)    <u>Transfer to Subsidiary</u>.  Subject to compliance with the other provisions of this <u>Article VII</u>, the Manager may Transfer all of its Units at any time to any Person that is, at the time of such Transfer, a direct or indirect wholly owned Subsidiary of the Manager without the consent of any Member and may designate the transferee to become the new Manager for all purposes of this Agreement.

(c)    <u>Withholding with Respect to a Transfer of Units</u>.  A Member making a Transfer permitted by this Agreement shall comply with <u>Section 4.10(b)</u> of <u>Annex C</u>.

(d)    <u>Other Restrictions on Transfer</u>.  In addition to any other restrictions on Transfer in this Agreement, no Member may Transfer a Unit (including by way of acquisition of Units by the Manager or any other acquisition of Units by the Company) if the Company determines:

(i)    Such Transfer would create a material risk of the Company being classified as an association taxable as a corporation for U.S. federal, state, or local income tax purposes;

19

**EXHIBIT 2**
**Page 273 of 404**

(ii)    That the Transfer would be to any Person or entity that lacks the legal right, power or capacity to own a Unit;

(iii)    That the Transfer would be in violation of Law;

(iv)    That the Transfer would be of any fractional or component portion of a Unit or rights to distributions, separate and apart from all other components of a Unit;

(v)    That the Transfer would create a material risk that the Company would become, with respect to any employee benefit plan subject to Title I of ERISA, a "party-in-interest" (as defined in ERISA Section 3(14)) or a "disqualified Person" (as defined in Code section 4975(c));

(vi)    That the Transfer would create a material risk that any portion of the Assets would constitute assets of any employee benefit plan pursuant to Department of Labor Reg. § 2510.2-101;

(vii)    That the Transfer would require the registration of such Unit pursuant to any applicable federal or state securities Laws;

(viii)    That such Transfer would create a material risk that the Company would become a reporting company under the Exchange Act; or

(ix)    That the Transfer would subject the Company to regulation under the Investment Company Act of 1940, the Investment Advisors Act of 1940 or ERISA, each as amended.

Section 7.3 Substituted Members.

(a)    Admission as Member.  A transferee of Units of a Member, other than a Related-Party Transferee, may be admitted as a Substituted Member only with the consent of the Company.  A Related-Party Transferee shall be admitted as a Substituted Member without the consent of the Company, subject to compliance with Section 7.3(b).  The failure or refusal by the Company to permit a transferee of Units to become a Substituted Member shall not give rise to any cause of action against the Company or the Manager.  A transferee who has been admitted as a Substituted Member in accordance with this Article VII shall have all the rights and powers and be subject to all the restrictions and liabilities of a Member under this Agreement.

(b)    Documents to Be Provided by Transferee.  No transferee shall be admitted as a Substituted Member until and unless it furnishes to the Manager (i) evidence of acceptance, in form and substance satisfactory to the Manager, of all the terms, conditions and applicable obligations of this Agreement, (ii) a counterpart signature page to this Agreement executed by such transferee and (iii) such other documents and instruments as the Manager may require to effect such transferee's admission as a Substituted Member, including a certification from the transferee or an opinion of counsel reasonably acceptable to the Company in respect of any of the restrictions on transfer set forth in Section 7.2(d) (which certification or opinion may be waived, in whole or in part, in the sole discretion of the Company).

20

**EXHIBIT 2**
**Page 274 of 404**

(c)    Amendment of Books and Records.  In connection with, and as evidence of, the admission of a Substituted Member, the Manager or Company shall amend the Register and the books and records of the Company to reflect the name, address and number of Units of such Substituted Member and to eliminate or adjust, if necessary, the name, address and number of Units of the predecessor of such Substituted Member.

Section 7.4    Drag-Along Rights.

(a)    If at any time the Manager and/or its Affiliates (excluding, for purposes of this Section 7.4, the Company and its Subsidiaries) desire to Transfer in one or more transactions a sufficient portion of its and/or their Units (or any beneficial interest therein) to constitute a Change of Control to a bona fide third party that is not an Affiliate of the Manager (an "**Applicable Sale**"), the Manager may require each other Member either (i) to sell the same ratable share of its Units as is being sold by the Manager and such Affiliates (based upon the total Units held by the Manager and its Affiliates at such time) on the same terms and conditions and/or (ii) to exchange its Units pursuant to Section 11.1(b) (each, a "**Drag-Along Right**").  The Manager may in its sole discretion elect to cause the Manager and/or the Company to structure the Applicable Sale as a merger or consolidation or as a sale of the Company's Assets.No Member shall have any dissenters' rights, appraisal rights or similar rights in connection with any Applicable Sale, and no Member may object to any subsequent liquidation or other distribution of the proceeds from an Applicable Sale that is a sale of Assets.  Each Member agrees to consent to, and raise no objections against, an Applicable Sale.  In the event of the exercise by the Manager of its Drag-Along Right pursuant to this Section 7.4, each Member shall take all reasonably necessary and desirable actions approved by the Manager in connection with the consummation of the Applicable Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to provide customary and reasonable representations, warranties, indemnities, covenants, conditions and other agreements relating to such Applicable Sale and to otherwise effect the transaction; *provided*, *however*, that (A) such Members shall not be required to give disproportionately greater or more onerous representations, warranties, indemnities, or covenants than the Manager or its Affiliates, (B) such Members shall not be obligated to bear any share of the out-of-pocket expenses, costs, or fees (including attorneys' fees) incurred by the Company or its Affiliates in connection with such Applicable Sale unless and to the extent that such expenses, costs, and fees were incurred for the benefit of the Company or all of its Members, (C) such Members shall not be obligated or otherwise responsible for more than their proportionate shares of any indemnities or other liabilities incurred by the Company and the Members as sellers in respect of such Applicable Sale, (D) any indemnities or other liabilities approved by the Manager shall be limited, in respect of each Member, to such Member's share of the proceeds from the Applicable Sale, and (E) such Members shall not be required to enter into any non-compete agreement in connection with such Applicable Sale.

(c)    At least five (5) Business Days before consummation of an Applicable Sale, the Manager shall (i) provide the Members written notice (the "**Applicable Sale Notice**") of the Applicable Sale, which notice shall contain (A) the name and address of the third-party purchaser, (B) the proposed purchase price, terms of payment, and other material terms and conditions of the purchaser's offer, together with a copy of any binding agreement with respect to the Applicable Sale and (C) notification of whether the Manager has elected to exercise its Drag-Along Right and (ii) promptly notify the Members of all proposed changes to the material terms and keep the

21

**EXHIBIT 2**
**Page 275 of 404**

Members reasonably informed as to all material terms relating to the Applicable Sale or contribution, and promptly deliver to the Members copies of all final material agreements relating to the Applicable Sale not already provided in accordance with this Section 7.4(c) or otherwise. The Manager shall provide the Members written notice of the termination of an Applicable Sale within five (5) Business Days following such termination, which notice shall state that the Applicable Sale Notice served with respect to such Applicable Sale is rescinded.

Section 7.5 Company Right to Call Units.  Beginning on the date on which the aggregate Percentage Interests of the Members (other than the Manager and its Subsidiaries) are less than fifteen (15) percent, the Company shall have the right, but not the obligation, from time to time and at any time to redeem all (but not less than all) outstanding Exchangeable Units by treating each Member as an Exchangeable Unit Member who has delivered an Elective Exchange Notice pursuant to the Policy Regarding Exchanges in respect of all of such Exchangeable Unit Member's Exchangeable Units.  The Company shall exercise this right by giving notice to an Exchangeable Unit Member stating that the Company has elected to exercise its rights under this Section 7.5.  The notice given by the Company to an Exchangeable Unit Member pursuant to this Section 7.5 shall be treated as if it were an Elective Exchange Notice delivered to the Company by such Exchangeable Unit Member.  For purposes of this Section 7.5, the provisions of Annex C shall apply except to the extent otherwise determined by the Company.

Section 7.6 Withdrawal.

(a)    Permissible Withdrawals.  Subject to any Unit Designation, no Member may withdraw from the Company other than:

(i)    As a result of a Transfer of all of such Member's Units in accordance with this Article VII or Article XI with respect to which the transferee becomes a Substituted Member;

(ii)    Pursuant to an acquisition by the Manager or Subsidiary of the Manager of all of its Units; or

(iii)    With the prior written consent of the Company.

(b)    Consequences of Withdrawal.  Any Member who Transfers all of its Units in a Transfer (i) permitted pursuant to this Article VII where such transferee was admitted as a Substituted Member or (ii) to the Manager, whether or not pursuant to Section 11.1, shall cease to be a Member but shall continue to have the obligations of a former Member that are expressly set forth in this Agreement.

Section 7.7 Restrictions on Termination Transactions.

(a)    General.  Except as provided in Section 7.7(b), neither the Company nor the Manager shall engage in, or cause or permit, a Termination Transaction.

(b)    Consent.  The Company or Manager may engage in, cause, or permit a Termination Transaction only if at least one of the following conditions is satisfied:

EXHIBIT 2
Page 276 of 404

(i)        A Majority-in-Interest of the Members give Consent;

(ii)       In connection with any such Termination Transaction, each holder of Common Units (other than the Manager and its wholly owned Subsidiaries) will receive, or will have the right to elect to receive, for each Common Unit an amount of cash, securities or other property equal to the greatest amount of cash, securities or other property that the holder of Common Units would have received had it exercised its right to Exchange pursuant to Article XI and received Class A Common Stock in exchange for its Common Units immediately before such Termination Transaction; or

(iii)      All of the following conditions are met: (1) substantially all of the Assets directly or indirectly owned by the Company before the announcement of the Termination Transaction are, immediately after the Termination Transaction, owned directly or indirectly by the Company or another limited partnership or limited liability company that is the survivor of a merger, consolidation or combination of assets with the Company (in each case, the "**Surviving Company**"); (2) the Surviving Company is classified as a partnership for U.S. federal income tax purposes and each of its Subsidiaries has the same classification for U.S. federal, state, and local tax purposes immediately after the Termination Transaction that each Subsidiary had immediately before the Termination Transaction; (3) the rights of such Members with respect to the Surviving Company (including pursuant to a Tax Receivable Agreement) are at least as favorable as those of Members holding Units immediately before the consummation of such Termination Transaction (except to the extent that any such rights are consistent with clause (4) of this Section 7.7(b)(iii)) and as those applicable to any other limited partners or non-managing members of the Surviving Company; and (4) such rights include the right to cause their interests in the Surviving Company to be redeemed at any time or times for cash in an amount equal to the Fair Market Value of such interest at the time of redemption, as determined at least once every calendar quarter by an independent appraisal firm of recognized national standing retained by the Surviving Company.

Section 7.8Incapacity.    If a Member is subject to Incapacity, the executor, administrator, trustee, committee, guardian, conservator, or receiver of such Member's estate (a "**Member Representative**") shall have the same rights as the Incapacitated Member possessed to Transfer its Units.  The Incapacity of a Member, in and of itself, shall not dissolve or terminate the Company.  Unless a Member or Member Representative informs the Company in writing of the Member's Incapacity, the Company shall have the right to assume each Member is not Incapacitated.  The Company shall have no obligation to determine whether or not a Member is Incapacitated.

Section 7.9Legend.  Each certificate representing a Unit, if any, will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.

THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT.

**EXHIBIT 2**
**Page 277 of 404**

THE TRANSFER AND VOTING OF THESE SECURITIES IS SUBJECT TO THE CONDITIONS SPECIFIED IN THE SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF NUSCALE POWER, LLC DATED AS OF [●], 2022, AMONG THE MEMBERS LISTED THEREIN, AS IT MAY BE AMENDED, SUPPLEMENTED AND/OR RESTATED FROM TIME TO TIME, AND NO TRANSFER OF THESE SECURITIES WILL BE VALID OR EFFECTIVE UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE ISSUER OF SUCH SECURITIES."

## ARTICLE VIII

## ADMISSION OF ADDITIONAL MEMBERS

Section 8.1 <u>Admission of Additional Members</u>.

(a)    <u>Requirements for Admission</u>.    A Person (other than a then-existing Member) who makes a Capital Contribution to the Company in exchange for Units and in accordance with this Agreement shall be admitted to the Company as an Additional Member only upon furnishing to the Manager (i) evidence of acceptance, in form and substance satisfactory to the Manager, of all of the terms and conditions of this Agreement, including the power of attorney granted in <u>Section 12.1</u>, (ii) a counterpart signature page to this Agreement executed by such Person, and (iii) such other documents or instruments as may be required by the Manager in order to effect such Person's admission as an Additional Member.  In connection with, and as evidence of, the admission of an Additional Member, the Manager shall amend the Register and the books and records of the Company to reflect the name, address, number and type of Units of such Additional Member.

(b)    <u>Consent of Company Required</u>.    Notwithstanding anything to the contrary in this <u>Section 8.1</u>, no Person shall be admitted as an Additional Member without the consent of the Company.  The admission of any Person as an Additional Member shall become effective on the date determined by the Company (but in no case earlier than the satisfaction of all the conditions set forth in <u>Section 8.1(a)</u>).

Section 8.2 <u>Limit on Number of Members</u>.  Unless otherwise permitted by the Manager, no Person shall be admitted to the Company after the date of this Agreement as an Additional Member if the effect of such admission would be to cause the Company to have a number of Members (including as Members for this purpose those Persons indirectly owning an interest in the Company through another partnership, a limited liability company, a subchapter S corporation or a grantor trust) that would cause the Company to become a reporting company under the Exchange Act.

**EXHIBIT 2**
**Page 278 of 404**

# ARTICLE IX

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 9.1 Dissolution Generally.

(a)    Dissolution Only in Accordance with This Agreement.  The Company shall not be dissolved by the substitution of Members or the admission of Additional Members in accordance with the terms of this Agreement.  The Company may be dissolved, liquidated and terminated only pursuant to the provisions of this Article IX, and the Members hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's Assets.

(b)    Termination of Members.  The death, retirement, resignation, expulsion, Bankruptcy, insolvency or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company shall not in and of itself cause dissolution of the Company.

Section 9.2 Events Causing Dissolution.

(a)    Actions by Members.  No Member shall take any action to dissolve, terminate or liquidate the Company, or require apportionment, appraisal or partition of the Company or any of its Assets, or file a bill for an accounting, except as specifically provided in this Agreement, and each Member, to the fullest extent permitted by Law, waives any rights to take any such actions under Law, including any right to petition a court for judicial dissolution under ORS 63.661 of the Act.

(b)    Liquidating Events.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events (each, a "**Liquidating Event**"):

(i)    an election to dissolve the Company made by the Manager, with the Consent of a Majority-in-Interest of the Members;

(ii)    the expiration of forty-five (45) days after the sale or other disposition of all or substantially all Assets; or

(iii)    any other event that results in a mandatory dissolution under the Act.

Section 9.3 Distribution upon Dissolution.

(a)    Order of Distributions.  Upon the dissolution of the Company pursuant to Section 9.2, the Manager (or, in the event that the Manager has dissolved, become Bankrupt or ceased to operate, any Person elected by a Majority-in-Interest of the Members (the Manager or such other Person, the "**Liquidator**")) shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's Assets and liabilities, and the Company's Assets shall be liquidated as promptly as is consistent with obtaining the fair

**EXHIBIT 2**
**Page 279 of 404**

value thereof, and the proceeds therefrom (which may, to the extent determined by the Manager, include shares of stock in the Manager) shall be applied and distributed in the following order:

(i)     First, to the satisfaction of all of the Company's Debts and liabilities to creditors, including Members who are creditors (other than with respect to liabilities owed to Members in satisfaction of liabilities for previously declared distributions), whether by payment or the making of reasonable provision for payment thereof;

(ii)    Second, to the satisfaction of all of the Company's liabilities to the Members in satisfaction of liabilities for previously declared distributions, whether by payment or the making of reasonable provision for payment thereof; and

(iii)   The balance, if any, to the Members, in the same order of priorities provided for in Article III.

(b)     Discretion of Liquidator and Manager.

(i)     Notwithstanding the provisions of Section 9.3(a) that require liquidation of the Assets, but subject to the order of priorities set forth therein, if before or upon dissolution of the Company, the Liquidator determines that an immediate sale of part or all of the Company's Assets would be impractical or would cause undue loss to the Members, the Liquidator may, in its sole discretion, defer for a reasonable time the liquidation of any Assets except those necessary to satisfy liabilities of the Company (including to those Members as creditors) and/or distribute to the Members, in lieu of cash, as tenants-in-common and in accordance with the provisions of Section 9.3(a), undivided interests in such Company Assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and any agreements governing the operation of such properties at such time. The Liquidator shall determine the Fair Market Value of any property distributed in kind using such reasonable method of valuation as it may adopt.

(ii)    In the sole discretion of the Manager, a *pro rata* portion of the distributions that would otherwise be made to the Members pursuant to this Article IX may be:

A)      Distributed to a trust established for the benefit of the Manager and the Members for the purpose of liquidating Company Assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Manager arising out of or in connection with the Company and/or Company activities. The assets of any such trust shall be distributed to the Members, from time to time, in the reasonable discretion of the Manager, in the same proportions and amounts as would otherwise have been distributed to the Members pursuant to this Agreement; or

B)      Withheld or escrowed to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, *provided*, that such withheld or escrowed amounts shall be distributed to the Members in the manner and order of priority set forth in Section 9.3(a) as soon as practicable.

**EXHIBIT 2**
**Page 280 of 404**

Section 9.4<u>Rights of Members</u>.  Except as otherwise provided in this Agreement and subject to the rights of any Member set forth in a Unit Designation, (a) each Member shall look solely to the Assets for the return of its Capital Contribution, (b) no Member shall have the right or power to demand or receive property other than cash from the Company, and (c) no Member shall have priority over any other Member as to the return of its Capital Contributions or distributions.

Section 9.5<u>Termination</u>.  The Company shall terminate when all of the Assets, after payment of or due provision for all Debts, liabilities, and obligations of the Company, have been distributed to the Members in the manner provided for in this <u>Article IX</u> and the Articles of Organization shall have been cancelled in the manner required by the Act.

## ARTICLE X

## PROCEDURES FOR ACTIONS AND CONSENTS OF MEMBERS; MEETINGS

Section 10.1    <u>Actions and Consents of Members</u>.  The actions requiring Consent of any Member pursuant to this Agreement or otherwise pursuant to Law are subject to the procedures set forth in this <u>Article X</u>.

Section 10.2    <u>Procedures for Meetings and Actions of the Members</u>.

(a)    <u>Time; Quorum; Consent</u>.  Meetings of the Members may be called only by the Manager and shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members entitled to act at the meeting not less than two (2) days nor more than ninety (90) days before the date of such meeting.  Members may vote in Person or by proxy at such meeting.  Unless approval by a different number or proportion of the Members is required by this Agreement or any Unit Designation, the affirmative vote of a Majority-in-Interest of the Members shall be sufficient to approve such proposal at a meeting of the Members.  Whenever the Consent of any Members is permitted or required under this Agreement, such Consent may be given at a meeting of Members or in accordance with the procedure prescribed in <u>Section 10.2(b)</u>.

(b)    <u>Written Consents</u>.  Any action requiring the Consent of any Member or a group of Members pursuant to this Agreement or that is required or permitted to be taken at a meeting of the Members may be taken without a meeting if a Consent in writing or by electronic transmission and filed with the Manager setting forth the action so taken or consented to is given by Members whose affirmative vote would be sufficient to approve such action or provide such Consent at a meeting of the Members.  Such Consent may be in one or several instruments and shall have the same force and effect as the affirmative vote of such Members at a meeting of the Members.  An action so taken shall be deemed to have been taken at a meeting held on the effective date so certified.  For purposes of obtaining a Consent in writing or by electronic transmission, the Manager may require a response within a reasonable specified time, and failure to respond in such time period shall constitute a Consent that is consistent with the Manager's recommendation with respect to the proposal.

**EXHIBIT 2**
**Page 281 of 404**

(c)    <u>Proxy</u>.  Each Member entitled to act at a meeting of Members may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Each proxy must be signed by the Member or its attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy (or there is receipt of a proxy authorizing a later date).  Every proxy shall be revocable at the pleasure of the Member executing it, such revocation to be effective upon the Company's receipt of written notice of such revocation from the Member executing such proxy, unless such proxy states that it is irrevocable and is coupled with an interest.

(d)    <u>Record Date for Meetings and Other Purposes</u>.

(i)    The Manager may set, in advance, a Record Date (x) for the purpose of determining the identities of the Members entitled to Consent to any action or entitled to receive notice of or vote at any meeting of the Members or (y) to make a determination of Members for any other proper purpose.  Any such date shall not be before the close of business on the day the Record Date is fixed and shall be not more than ninety (90) days and, in the case of a meeting of the Members, not less than two (2) days, before the date on which the meeting is to be held.

(ii)    If no Record Date is set, the Record Date for the determination of Members entitled to notice of or vote at a meeting of the Members shall be at the close of business on the day on which the notice of the meeting is sent, and the Record Date for any other determination of Members shall be the effective date of such Member action, distribution or other event.  When a determination of the Members entitled to vote at any meeting of the Members has been made as provided in this <u>Section 10.2(d)</u>, such determination shall apply to any adjournment thereof.

(e)    <u>Conduct of Meetings</u>.  Each meeting of Members shall be conducted by the Manager or such other Person as the Manager may appoint pursuant to such rules for the conduct of the meeting as the Manager or such other Person deems appropriate.

(f)    <u>Waivers</u>.  Any time period for notice with respect to meetings or consents of the Members may be waived by a Member as to such Member.

## ARTICLE XI

## EXCHANGE RIGHTS

Section 11.1    <u>Elective and Mandatory Exchanges</u>.

(a)    <u>Elective Exchanges</u>.  Subject to the Policy Regarding Exchanges set forth in <u>Annex E</u>, as amended from time to time by the Company (the "**Policy Regarding Exchanges**"), an Exchangeable Unit Member shall have the right, from time to time, to surrender Exchangeable Units, along with an equal number of shares of Class B Common Stock, (free and clear of all liens, encumbrances, rights of first refusal and similar restrictions, except for those arising under this Agreement) to the Company or the Manager and to thereby cause the Company or the Manager to deliver to such Exchangeable Unit Member (or its designee) the Exchange Consideration as set forth in <u>Section 11.3</u> (an "**Elective Exchange**").

28

**EXHIBIT 2**
**Page 282 of 404**

(b)    <u>Mandatory Exchange Events</u>.  Units are subject to Mandatory Exchange in each of the following circumstances:

(i)    pursuant to <u>Section 7.4</u>, if an Applicable Sale is determined to be a Mandatory Exchange event in the sole discretion of the Manager;

(ii)    pursuant to <u>Section 7.5</u>; or

(iii)    in the discretion of the Manager, with the consent of Members whose Class B Units represent fifty percent (50%) of the Class B Units of all Members in the aggregate, all Members will be required to exchange all Exchangeable Units then held by the Members.

(c)    <u>Mandatory Exchange Notices and Dates</u>.  Upon the occurrence of any of the circumstances set out in <u>Section 11.1(b)</u>, the Manager may exercise its right to cause a mandatory exchange of a Member's Exchangeable Units and an equal number of shares of Class B Common Stock (a "**Mandatory Exchange**") by delivering to each Member a written notice pursuant to the notice provisions in <u>Section 12.6</u> (a "**Mandatory Exchange Notice**").  A Mandatory Exchange Notice will specify the basis for the Mandatory Exchange, the Exchangeable Units of the Company to which the Mandatory Exchange applies, the Exchange Consideration and the effective date of such Mandatory Exchange (the "**Mandatory Exchange Date**"), which shall be no earlier than ten (10) Business Days after delivery of the Mandatory Exchange Notice.  The Member receiving the Mandatory Exchange Notice shall use its reasonable best efforts to deliver the Certificates, as applicable, representing the applicable Exchangeable Units and corresponding shares of Class B Common Stock (free and clear of all liens, encumbrances, rights of first refusal and similar restrictions, except for those arising under this Agreement) no later than one (1) Business Day before the Mandatory Exchange Date.  Upon the Mandatory Exchange Date, the Company will affect the Mandatory Exchange.

Section 11.2    <u>Additional Terms Applying to Exchanges</u>.

(a)    <u>Rights of Exchangeable Unit Member</u>.  On an Exchange Date, all rights of the Exchangeable Unit Member as a holder of the Exchangeable Units and, if the applicable Exchangeable Units are Class B Units, shares of Class B Common Stock held by the holder of the Class B Units that are subject to the Exchange, shall cease, and, unless the Company or Manager, as applicable, has elected Cash Settlement as to all Exchangeable Units tendered, the Manager shall use commercially reasonable efforts to cause the transfer agent or registrar of the Manager to update the stock register of the Manager such that such Exchangeable Unit Member (or its designee) becomes the record holder of the shares of Class A Common Stock to be received by the Exchangeable Unit Member in respect of such Exchange.

(b)    <u>Right of Manager to Acquire Exchangeable Units</u>.  With respect to Units surrendered in an Elective Exchange or subject to a Mandatory Exchange, the Manager shall have the right but not the obligation to have the Manager (in lieu of the Company) acquire Exchangeable Units and, if the applicable Exchangeable Units are Class B Units, an equal number of shares of Class B Common Stock held by the holder of those Class B Units, directly from an Exchangeable Unit Member for the elected Exchange Consideration.  If the Manager acquires Exchangeable

29

**EXHIBIT 2**
**Page 283 of 404**

Units as described in the preceding sentence, those Exchangeable Units shall be automatically recapitalized into the same number of Class A Units as the Exchangeable Units.

(c)    Expenses.  Except as otherwise agreed by the Company, the Manager and an Exchangeable Unit Member, the Company, the Manager, and each Exchangeable Unit Member shall bear their own expenses in connection with the consummation of any Exchange, whether or not any such Exchange is ultimately consummated.  Notwithstanding the foregoing sentence, the Manager (or the Company, at the Manager's direction) shall bear any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, any Exchange; *provided*, *however*, that if any shares of Class A Common Stock are to be delivered pursuant to an Elective Exchange in a name other than that of the Exchangeable Unit Member that requested the Exchange (or The Depository Trust Company or its nominee for the account of a participant of The Depository Trust Company that will hold the shares for the account of such Exchangeable Unit Member) or the Cash Settlement is to be paid to a Person other than the Exchangeable Unit Member that requested the Exchange, then such Exchangeable Unit Member or the Person in whose name such shares are to be delivered or to whom the Cash Settlement is to be paid shall pay to the Manager (or the Company, at the Manager's direction) the amount of any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, such Exchange or shall establish to the reasonable satisfaction of the Manager that such tax has been paid or is not payable.

(d)    Concurrent Delivery of Class B Common Stock. No Exchange of Class B Units may be made without a concurrent delivery of an equal number of shares of Class B Common Stock. Any shares of Class B Common Stock surrendered in an Exchange shall automatically be deemed retired without any action on the part of any Person, including the Manager. Any such retired shares of Class B Common Stock shall no longer be outstanding, all rights with respect to such shares shall automatically cease and terminate, and such shares shall return to the status of authorized but unissued shares of the Manager.

Section 11.3    Exchange Consideration; Settlement.

(a)    Generally.  The Manager shall have the right, in its sole discretion, to elect the form of Exchange Consideration with respect to any Exchange.  On an Exchange Date, provided the Exchangeable Unit Member has satisfied its obligations under the Policy Regarding Exchanges and not validly retracted such proposed Exchange, the Manager shall deliver or cause to be delivered the Exchange Consideration to such Exchangeable Unit Member (or its designee), at the address set forth on the applicable Exchange Notice.  If the Manager elects a Cash Settlement, the Manager shall only be obligated to contribute to the Company (or, if the Manager elects to settle directly pursuant to Section 11.2(b), settle directly for an amount equal to) an amount in respect of such Cash Settlement equal to the net proceeds (after deduction of any underwriters' discounts and commissions) from the sale by the Manager of a number of shares of Class A Common Stock equal to the number of Exchangeable Units being Exchanged for such Cash Settlement.  Except as otherwise required by Law, the Manager shall, for U.S. federal income tax purposes, be treated as paying an appropriate portion of the selling expenses described in the previous sentence as agent for and on behalf of the Exchangeable Unit Member.  Except as otherwise determined by the Manager, if (i) the Manager determines that some or all of the Exchange Consideration with respect to an Exchange will be Class A Common Stock and (ii) such

30

EXHIBIT 2
Page 284 of 404

Exchange would, but for this <u>Section 11.3(a)</u>, result in the Exchangeable Unit Member's receipt of a fractional share of Class A Common Stock, then the number of shares of Class A Common Stock to be received by the Exchangeable Unit Member shall be rounded down to the nearest whole number of shares and the amount of the reduction shall be paid as a Cash Settlement.

(b) <u>Notice of Intended Exchange Consideration</u>.  At least two (2) Business Days before the Exchange Date, the Manager shall give written notice to the Company (with a copy to the Exchangeable Unit Member) of its intended Exchange Consideration.  If the Manager does not timely deliver such written notice, the Manager shall be deemed to have elected to settle the Exchange with shares of Class A Common Stock.

(c) <u>Settlement through Depository Trust Company</u>.  To the extent the Class A Common Stock is settled through the facilities of The Depository Trust Company, the Manager or the Company will, upon the written instruction of an Exchangeable Unit Member, deliver the shares of Class A Common Stock deliverable to such Exchangeable Unit Member through the facilities of The Depository Trust Company to the account of the participant of The Depository Trust Company designated by such Exchangeable Unit Member in the Exchange Notice.

(d) <u>Obligations of Manager and Company</u>.  Upon any Exchange, the Manager or the Company, as applicable, shall take such actions as (A) may be required to ensure that such Exchangeable Unit Member receives the shares of Class A Common Stock and/or the Cash Settlement that such Exchangeable Unit Member is entitled to receive in connection with such Exchange pursuant to <u>Section 11.3(a)</u>, and (B) may be reasonably within its control that would cause such Exchange to be treated as a direct exchange between the Manager and the Member for U.S. federal and applicable state and local income tax purposes.

Section 11.4    <u>Adjustment</u>.  To the extent not reflected in an adjustment to the Exchange Rate, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, then, upon any subsequent Exchange, an Exchangeable Unit Member shall be entitled to receive the amount of such security, securities or other property that such Exchangeable Unit Member would have received if such Exchange had occurred immediately before the effective date of such reclassification, reorganization, recapitalization or other similar transaction, taking into account any adjustment as a result of any subdivision (by any split, distribution or dividend, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse split, reclassification, recapitalization or otherwise) of such security, securities or other property that occurs after the effective time of such reclassification, reorganization, recapitalization or other similar transaction.  For the avoidance of doubt, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, this <u>Section 11.4</u> shall continue to be applicable, *mutatis mutandis*, with respect to such security or other property.

**EXHIBIT 2**
**Page 285 of 404**

Section 11.5      Class A Common Stock to Be Issued in Connection with an Exchange.

(a)      Class A Common Stock Reserve. The Manager shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, such number of shares of Class A Common Stock as shall be deliverable under this Agreement upon all such Exchanges; *provided*, *however*, that the Manager may satisfy its obligations in respect of any such Exchange by delivery of unencumbered purchased shares of Class A Common Stock (which may or may not be held in the treasury of the Manager or any subsidiary thereof). The preceding sentence shall not affect the Manager's right to elect a Cash Settlement.

(b)      Rule 16(b) Exemption. The Manager has taken and will take all such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions or dispositions of equity securities of the Manager (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of the Manager for such purposes that result from the transactions contemplated by this Agreement, by each director or officer of the Manager (including directors-by-deputization) who may reasonably be expected to be subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Manager upon the registration of any class of equity security of the Manager pursuant to Section 12 of the Exchange Act.

(c)      Validity of Class A Common Stock. The Manager covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable and not subject to any preemptive right of stockholders of the Manager or any right of first refusal or other right in favor of any Person.

Section 11.6      Withholding. Each Member acknowledges and agrees that the Company may be required by Law to deduct and withhold any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations in respect of any Exchange, as provided in Section 4.10(c) of Annex C.

Section 11.7      Tax Treatment. Unless otherwise agreed to in writing by the Exchangeable Unit Member and the Manager, it is intended that, for U.S. federal and applicable state and local income tax purposes, each Exchange be treated as direct exchange between the Manager and the Exchangeable Unit Member that is a taxable transaction to the Exchangeable Unit Member. All applicable parties shall treat each Exchange consistently with the intended treatment for all U.S. federal and applicable state and local tax purposes unless otherwise required by a "determination" within the meaning of Code section 1313(a) or a change in Law.

Section 11.8      Contribution by Manager. On the Exchange Date (i) the Manager shall contribute to the Company the shares of Class A Common Stock and/or Cash Settlement that the Manager has elected to deliver and that the Exchangeable Unit Member is entitled to receive in the applicable Exchange and (ii) the Company shall issue to the Manager a number

EXHIBIT 2
Page 286 of 404

of Class A Units equal to the number of Exchangeable Units (and corresponding number of Class B Shares) surrendered by the Exchangeable Unit Member.

Section 11.9    Apportionment of Distributions.  Distributions with a Record Date on or before the Exchange Date shall be made to the Exchangeable Unit Member.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1    Conclusive Nature of Determinations.    All determinations, interpretations, calculations, adjustments and other actions of the Manager, the Company, the Board of Directors (or a committee to which the Board of Directors has delegated such authority), or a designee of any of the foregoing that are within such Person's authority under this Agreement shall be binding and conclusive on a Member absent manifest error.  In connection with any such determination, interpretation, calculation, adjustment, or other action, the Manager, the Company, the Board of Directors (or a committee to which the Board of Directors has delegated such authority), or the designee of any of the foregoing shall be entitled to resolve any ambiguity with respect to the manner in which such determination, interpretation, calculation, adjustment or other action is to be made or taken, and shall be entitled to interpret the provisions of this Agreement in such a manner as such Person determines to be fair and equitable, and such resolution or interpretation shall be binding and conclusive on a Member absent manifest error.

Section 12.2    Company Counsel.  THE COMPANY, THE MANAGER AND AFFILIATED ENTITIES MAY BE REPRESENTED BY THE SAME COUNSEL.  THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR THE COMPANY MAY ALSO PERFORM SERVICES FOR THE MANAGER AND AFFILIATES THEREOF.  THE MANAGER MAY, WITHOUT THE CONSENT OF THE MEMBERS, EXECUTE ON BEHALF OF THE COMPANY ANY CONSENT TO THE REPRESENTATION OF THE COMPANY THAT COUNSEL MAY REQUEST PURSUANT TO THE NEW YORK RULES OF PROFESSIONAL CONDUCT OR SIMILAR RULES IN ANY OTHER JURISDICTION.  THE COMPANY HAS INITIALLY SELECTED GIBSON, DUNN & CRUTCHER LLP AND STOEL RIVES LLP (EACH, "**COMPANY COUNSEL**") AS LEGAL COUNSEL TO THE COMPANY.  EACH MEMBER ACKNOWLEDGES THAT COMPANY COUNSEL DOES NOT REPRESENT ANY MEMBER IN ITS CAPACITY AS SUCH IN THE ABSENCE OF A CLEAR AND EXPLICIT WRITTEN AGREEMENT TO SUCH EFFECT BETWEEN SUCH MEMBER AND COMPANY COUNSEL (AND THEN ONLY TO THE EXTENT SPECIALLY SET FORTH IN SUCH AGREEMENT), AND THAT IN THE ABSENCE OF ANY SUCH AGREEMENT COMPANY COUNSEL SHALL OWE NO DUTIES TO ANY MEMBER.  EACH MEMBER FURTHER ACKNOWLEDGES THAT, WHETHER OR NOT COMPANY COUNSEL HAS IN THE PAST REPRESENTED OR IS CURRENTLY REPRESENTING SUCH MEMBER WITH RESPECT TO OTHER MATTERS, UNLESS OTHERWISE EXPRESSLY AGREED BY COMPANY COUNSEL, COMPANY COUNSEL HAS NOT REPRESENTED THE INTERESTS OF ANY MEMBER IN THE PREPARATION AND/OR NEGOTIATION OF THIS AGREEMENT.

EXHIBIT 2
Page 287 of 404

Section 12.3      <u>Appointment of Manager as Attorney-in-Fact</u>.

(a)      <u>Execution of Documents</u>.  Each Member, including each Additional Member and Substituted Member that is a Member, irrevocably makes, constitutes and appoints the Manager, any Liquidator, and authorized officers and attorneys-in-fact of each, and each of those acting singly, in each case with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including:

(i)      All certificates and other instruments (including counterparts of this Agreement), and all amendments thereto, that the Manager deems appropriate to form, qualify, continue or otherwise operate the Company as a limited liability company (or other entity in which the Members will have limited liability comparable to that provided in the Act) in the jurisdictions in which the Company may conduct business or in which such formation, qualification or continuation is, in the opinion of the Manager, necessary or desirable to protect the limited liability of the Members.

(ii)      All amendments to this Agreement adopted in accordance with the terms of this Agreement, and all instruments that the Manager deems appropriate in accordance with the terms of this Agreement.

(iii)      All conveyances of Company Assets and other instruments that the Manager reasonably deems necessary in order to complete a dissolution and termination of the Company pursuant to this Agreement.

(b)      <u>Power and Interest</u>.  The appointment by all Members of the Manager as attorney-in-fact shall be deemed to be a power coupled with an interest in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Manager to act as contemplated by this Agreement in any filing and other action by it on behalf of the Company, shall survive the Incapacity of any Person hereby giving such power and the Transfer of all or any portion of such Person's Units, and shall not be affected by the subsequent Incapacity of the Person.

Section 12.4      <u>Entire Agreement</u>.   This Agreement, together with the Tax Receivable Agreement, the Registration Rights Agreement, and the certificate of incorporation of the Manager, in each case, as amended, supplemented or restated in accordance with its terms, and the other documents contemplated hereby and thereby, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersede any and all prior or contemporaneous agreements or understandings between the parties to this Agreement pertaining to the subject matter hereof, including the Fifth Operating Agreement.

Section 12.5      <u>Further Assurances</u>.  Each of the parties to this Agreement does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other

34

**EXHIBIT 2**
**Page 288 of 404**

instruments, documents and statements, and to take such other action as may be required by Law or reasonably necessary to effectively carry out the intent and purposes of this Agreement.

Section 12.6    <u>Notices</u>.  Any notice, consent, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be (a) delivered personally to the Person or an officer of the Person to whom the same is directed, (b) sent by facsimile, overnight mail or registered or certified mail, return receipt requested, postage prepaid, or (c) (except with respect to notice to the Company or the Manager) sent by email, with electronic, written or oral confirmation of receipt, in each case addressed as follows:

(i)      if to the Company or the Manager:

c/o NuScale Power Corp.
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attn:  General Counsel
E-mail: generalcounsel@nuscalepower.com

with copies (which shall not constitute notice) to:

Fluor Enterprises, Inc.
6700 Las Colinas Blvd.
Irving, TX 75039
Attention: Chief Legal Officer

and to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attn:   David C. Lee
        John M. Williams III
        Evan M. D'Amico
E-mail:DLee@GibsonDunn.com
        JWilliams@GibsonDunn.com
        EDAmico@GibsonDunn.com

and to:

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Attn:   Jason M. Brauser
E-mail: jason.brauser@stoel.com

**EXHIBIT 2**
**Page 289 of 404**

or to such other address as the Company may from time to time specify by notice to the Members;

(ii)     if to any Member, to:

the address, email, or facsimile number of such Member set forth in the records of the Company.

Any such notice shall be deemed to be delivered, given and received for all purposes as of: (A) the date so delivered, if delivered personally, (B) upon receipt, if sent by facsimile or email, or (C) on the date of receipt or refusal indicated on the return receipt, if sent by registered or certified mail, return receipt requested, postage and charges prepaid and properly addressed.

Section 12.7    Governing Law.  This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties to this Agreement, shall be governed by and construed in accordance with the Laws of the State of Oregon without regard to otherwise governing principles of conflicts of Law.

Section 12.8    Jurisdiction and Venue.  The parties to this Agreement agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (whether brought by any party or any of its Affiliates or against any party or any of its Affiliates) shall be brought in the state courts of the State of Oregon, or, if such court shall not have jurisdiction, any federal court located in the State of Oregon (the "**Selected Courts**"), and each of the parties hereby irrevocably consents to the jurisdiction of the Selected Courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any Selected Court. Without limiting the foregoing, each party agrees that service of process on such party in the manner provided for notice in Section 12.6 shall be deemed effective service of process on such party.

Section 12.9    Equitable Remedies.  The parties to this Agreement agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or was otherwise breached.  It is accordingly agreed that the parties to this Agreement shall be entitled to an injunction or injunctions and other equitable remedies to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any of the Selected Courts, this being in addition to any other remedy to which they are entitled at Law or in equity.  Any requirements for the securing or posting of any bond with respect to such remedy are hereby waived by each of the parties to this Agreement.  Each party further agrees that, in the event of any action for an injunction or other equitable remedy in respect of such breach or enforcement of specific performance, it will not assert the defense that a remedy at Law would be adequate.

EXHIBIT 2
Page 290 of 404

Section 12.10    Construction.  This Agreement shall be construed as if all parties to this Agreement prepared this Agreement.

Section 12.11    Counterparts.  This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed an original, and all such counterparts shall together constitute but one and the same agreement.

Section 12.12    Third-Party Beneficiaries.  Except as provided in Section 4.7, nothing in this Agreement, express or implied, is intended or shall be construed to give any Person other than the parties to this Agreement (or their respective legal representatives, successors, heirs and distributees) any legal or equitable right, remedy or claim under or in respect of any agreement or provision contained herein, it being the intention of the parties to this Agreement that this Agreement is for the sole and exclusive benefit of such parties (or such legal representatives, successors, heirs and distributees) and for the benefit of no other Person.

Section 12.13    Binding Effect.  Except as otherwise expressly provided herein, all of the terms and provisions of this Agreement shall be binding on, shall inure to the benefit of and shall be enforceable by the Members, their heirs, executors, administrators, successors and all other Persons hereafter holding, having or receiving an interest in the Company, whether as Substituted Members or otherwise.

Section 12.14    Severability.  If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be void, unenforceable or inoperative as a matter of Law, then the same shall in no way affect any other provision in this Agreement, the application of such provision in any other circumstance or with respect to any other party, or the validity or enforceability of the Agreement as a whole.

Section 12.15    Survival.  The provisions of Section 4.6 (*Limitation on Liability*), Section 4.7 (*Indemnification*), Section 12.1 (*Conclusive Nature of Determinations*), Section 12.3 (*Appointment of Manager as Attorney-in-Fact*), Section 12.4 (*Entire Agreement*), Section 12.5 (*Further Assurances*), Section 12.6 (*Notices*), Section 12.7 (*Governing Law*), Section 12.8 (*Jurisdiction and Venue*), Section 4.8 (*Survival of Obligations*) of Annex C, and this Section 12.15 (*Survival*) (and any other provisions of this Agreement necessary for the effectiveness of the enumerated sections) shall survive the termination of the Company and/or the termination of this Agreement.

Section 12.16    Effect on Other Obligations of Members or the Company.  Nothing in this Agreement shall modify, amend, terminate or supersede any obligations or rights of any Member or the Company under any agreement between or among Member(s) and/or the Company (other than the Fifth Operating Agreement) that is in effect as of the date hereof.

Section 12.17    Confidentiality.  Each Member recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company (including its predecessors), including confidential information of the Company (and its predecessors) regarding identifiable, specific and discrete business opportunities being pursued by the Company (the "**Confidential Information**"). Except as

**EXHIBIT 2**
**Page 291 of 404**

otherwise consented to by the Manager in writing, each Member (other than the Manager), on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency Law, its managers, directors, officers, shareholders, partners, members, employees, representatives and agents) agrees that, during the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, it (a) will use the same degree of care as it uses to protect its own confidential information to keep confidential any Confidential Information furnished to such Member; (b) will not intentionally use any of the Confidential Information for any purpose other than monitoring its investment in the Company; and (c) will not disclose such Confidential Information to any third party for any reason or purpose whatsoever, except that each Member may disclose such information (i) to authorized directors, officers, employees, representatives and agents of the Company or the Manager and as otherwise may be proper in the course of performing such Member's obligations or enforcing its rights under this Agreement and the agreements expressly contemplated hereby; (ii) to such Member's (or any of its Affiliates') Affiliates, auditors, accountants, attorneys or other agents who are informed of the Member's obligations hereunder; (iii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, provided that such purchaser or merger partner agrees to be bound by the provisions of this Section 12.17 or other confidentiality agreement approved by the Manager; or (iv) as is required to be disclosed by any Law, by any governmental authority or stock exchange or by any listing or trading agreement concerning a Member or its Affiliates; provided that the Member required to make such disclosure pursuant to clause (iv) above shall provide to the Company prompt notice of such disclosure to enable the Company to seek an appropriate protective order or confidential treatment.  It is acknowledged and agreed that a Member's review of Confidential Information will inevitably enhance its knowledge and understanding of the Company's industry in a way that cannot be separated from its other knowledge, and it shall not be a violation of Section 12.17(b) if such Member's overall knowledge and understanding are used for purposes other than monitoring its investment in the Company. For purposes of this Section 12.17, the term "Confidential Information" shall not include any information which (x) such Person learns from a source other than the Company or the Manager, or any of their respective representatives, employees, agents or other service providers, and in each case who is not bound by a confidentiality obligation, (y) is disclosed in a prospectus, in other documents or in any other manner for dissemination to the public (in each case, not in violation of this Section 12.17), or (z) is independently developed by the disclosing Member without violating any requirement hereunder.  Nothing in this Section 12.17 shall in any way limit or otherwise modify any confidentiality covenants entered into by any Member pursuant to any other agreement entered into with the Company or the Manager.

**EXHIBIT 2**
**Page 292 of 404**

# ARTICLE XIII

## DEFINED TERMS

Section 13.1     Definitions.     Unless otherwise indicated to the contrary, the following definitions shall be applied to the terms used in this Agreement:

"**Act**" means the Oregon Limited Liability Company Act (as it may be amended from time to time), and any successor to such statute.

"**Additional Funds**" is defined in Section 2.5(a).

"**Additional Member**" means a Person who is admitted to the Company as a Member pursuant to the Act and Section 8.1, who is shown as such on the books and records of the Company, and who has not ceased to be a Member pursuant to the Act and this Agreement.

"**Affiliate**" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; *provided*, *however*, that (i) none of the Members or their parent companies or Affiliates shall be deemed to be an Affiliate of any other Member or its parent company or Affiliates and (ii) none of the Members or their parent companies or Affiliates shall be deemed to be an Affiliate of the Company or any of its Affiliates.  With respect to any Person who is an individual, "**Affiliate**" shall also include, without limitation, any Family Member of such Person.

"**Applicable Sale**" is defined in Section 7.4(a).

"**Applicable Sale Notice**" is defined in Section 7.4(c).

"**Articles of Conversion**" means the articles of conversion delivered by NuScale Power Inc. (the Company's predecessor) to the office of the Secretary of State of the State of Oregon in accordance with the OBCA and the Act for filing, which articles became effective on September 30, 2011.

"**Articles of Organization**" means the articles of organization delivered by NuScale Power Inc. (the Company's predecessor) to the office of the Secretary of State of the State of Oregon in accordance with the Act for filing, which articles became effective on September 30, 2011, as amended in connection with the Merger, and as such articles may be amended from time to time in accordance with the Act.

"**Asset Value**" is defined in Annex C.

"**Assets**" means any assets and property of the Company.

"**Assumed Tax Liability**" is defined in Section 3.2(b).

"**Assumed Tax Rate**" is defined in Section 3.2(b)(ii).

EXHIBIT 2
Page 293 of 404

"**Available Cash**" means, after taking into account amounts determined by the Manager to be reasonably necessary or advisable to be retained by the Company to meet actual or anticipated, direct or indirect, expenses, capital investments, working capital needs or liabilities (actual, contingent or otherwise) of the Company, including the payment of any Imputed Underpayment or for the operation of the business of the Company, or to create reasonable reserves for any of the foregoing, cash (in United States dollars) of the Company that the Manager determines is available for distribution to the Members.

"**Bankruptcy**" means, with respect to any Person, the occurrence of any event specified in ORS 63.001(3) of the Act with respect to such Person, and the term "**Bankrupt**" has a correlative meaning.

"**Board of Directors**" means the Board of Directors of the Manager.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"**Capital Account**" is defined in <u>Annex C</u>.

"**Capital Contribution**" means, with respect to any Member, the aggregate amount of money and the initial Asset Value of property (other than money) in such form as may be permitted by the Act that the Member contributes (or is treated as contributing) to the Company.

"**Capital Stock**" means a share of any class or series of stock of the Manager now or hereafter authorized.

"**Cash Settlement**" means immediately available funds in U.S. dollars in an amount equal to the product of (x) the number of shares of Class A Common Stock that would otherwise be delivered to a Member in an Exchange, multiplied by (y) the price per share, net of underwriting discounts and commissions, at which Class A Common Stock is issued by the Manager in an underwritten offering or block trade commenced in anticipation of the applicable Exchange (a "**Liquidity Offering**"); or (z) if no such Liquidity Offering occurs prior to the receipt of the Exchange Notice, the arithmetic average of the volume-weighted average prices for a share of Class A Common Stock on the principal U.S. securities exchange or automated or electronic quotation system on which the Class A Common Stock trades, as reported by *The Wall Street Journal* or its successor, for each of the three (3) consecutive full Business Days ending on and including the last full Business Day immediately before the Exchange Date, in each case subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. If the Class A Common Stock no longer trades on a securities exchange or automated or electronic quotation system, then the amount specified in clause (y) shall be determined in good faith by a committee of the Board of Directors composed of a majority of the directors of the Manager that do not have an interest in the Exchangeable Units and, if the applicable Exchangeable Units are Class B Units, shares of Class B Common Stock being Exchanged.

"**Certificates**" means (A) if certificated, any certificates representing Exchangeable Units, (B) if certificated, any stock certificates representing the shares of Class B Common Stock required to be surrendered in connection with an Exchange of Class B Units, and (C) such other information,

**EXHIBIT 2**
**Page 294 of 404**

documents or instruments as either the Manager (or the Manager's transfer agent) or the Company may reasonably require in connection with an Exchange.  If any certificate or other document referenced in the immediately preceding sentence is alleged to be lost, stolen or destroyed, the Exchangeable Unit Member shall cooperate with and respond to the reasonable requests of the Manager (or the Manager's transfer agent) and the Company and, if required by the Manager or the Company, furnish an affidavit of loss and/or an indemnity against any claim that may be made against the Manager or the Company on account of the alleged loss, theft or destruction of such certificate or other document.

"**Change of Control**" means, as of any date of determination, in one transaction or a series of related transactions, the Transfer of Units (or any beneficial interest therein) of the Company representing more than fifty (50) percent of the outstanding Common Units as of such date of determination.

"**Class A Common Stock**" means the Class A common stock of the Manager, $0.0001 par value per share.

"**Class A Unit**" is defined in Section 2.1(b)(i).

"**Class B Common Stock**" means a non-economic voting share in the Manager, with each share having non-economic rights equivalent to one share of Class A Common Stock.

"**Class B Unit**" is defined in Section 2.1(b)(ii).

"**Code**" means the Internal Revenue Code of 1986, as amended.  All references in this Agreement to sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"**Common Stock**" means the Class A Common Stock or the Class B Common Stock (and shall not include any additional series or class of the Manager's common stock created after the date of this Agreement).

"**Common Unit**" means a Class A Unit, a Class B Unit, and any other Unit designated as a Common Unit by the Company.

"**Company**" is defined in the preamble to this Agreement.

"**Company Counsel**" is defined in Section 12.2.

"**Consent**" means the consent to, approval of, or vote in favor of a proposed action by a Member given in accordance with Article X.

"**control**," including the terms "controlled by" and "under common control with," means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the Board of Directors or similar body governing the affairs of such Person.

41

**EXHIBIT 2**
**Page 295 of 404**

"*de minimis*" shall mean an amount small enough as to make not accounting for it commercially reasonable or accounting for it administratively impractical, in each case as determined by the Manager.

"**Debt**" means, as to any Person, as of any date of determination, (i) all indebtedness of such Person for borrowed money or the deferred purchase price of property or services; (ii) all amounts owed by such Person to banks or other Persons in respect of reimbursement obligations under letters of credit, surety bonds and other similar instruments guaranteeing payment or other performance of obligations by such Person; and (iii) obligations of such Person as lessee under capital leases.

"**Drag-Along Right**" is defined in Section 7.4(a).

"**Elective Exchange**" is defined in Section 11.1(a).

"**Elective Exchange Date**" means the effective date of an Elective Exchange.

"**Elective Exchange Notice**" is defined in Annex B.

"**Equivalent Units**" means Units with preferences, conversion and other rights (other than voting rights), restrictions, limitations as to dividends and other distributions, qualifications, terms and conditions of redemption (the "**Terms**") that are (a) relative to the Common Units and the other classes and series of Units that correspond to classes and series of Capital Stock, and (b) substantially the same as (or corresponding to) the Terms that any new Capital Stock or New Securities have relative to the Common Stock and other classes and series of Capital Stock or New Securities. The foregoing shall not apply to matters such as voting for members of the Board of Directors that are not applicable to the Company. In comparing the economic rights of any Preferred Stock with the economic rights of any Units, the effect of taxes may be taken into account.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Exchange**" means any Elective Exchange or Mandatory Exchange.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and any successor statute thereto, and the rules and regulations of the SEC promulgated thereunder.

"**Exchange Consideration**" shall mean, in the case of any Exchange, (x) the number of shares of Class A Common Stock that is equal to the product of the number of Exchangeable Units surrendered in the Exchange multiplied by the Exchange Rate (the "**Stock Consideration**"), (y) the Cash Settlement, plus, in the case of an Exchange of Class B Units under either subclause (x) or (y), an amount that is equal to $0.0001 multiplied by the number of shares of Class B Common Stock included in the Exchange, or (z) a combination of the Stock Consideration and the Cash Settlement.

"**Exchange Date**" means an Elective Exchange Date or Mandatory Exchange Date.

EXHIBIT 2
Page 296 of 404

"**Exchange Rate**" means, in respect of any Exchange, subject to Section 11.4, a ratio, expressed as a fraction, the numerator of which shall be the number of shares of Class A Common Stock outstanding immediately before the Exchange and the denominator of which shall be the number of Class A Units owned by the Manager immediately before the Exchange. On the date of this Agreement, the Exchange Rate shall be 1.

"**Exchangeable Unit**" means each Class B Unit and any other Unit designated as an Exchangeable Unit by the Company.

"**Exchangeable Unit Member**" means (i) each Member, other than the Manager and any of its wholly owned Subsidiaries, that holds an Exchangeable Unit or (ii) each holder of an interest in a Member that holds an Exchangeable Unit pursuant to Article XI.

"**Fair Market Value**" of Units or other property, means the cash price that a third party would pay to acquire all of such Units (computed on a fully diluted basis after giving effect to the exercise of any and all outstanding conversion rights, exchange rights, warrants and options) or other property, as the case may be, in an arm's-length transaction. Unless otherwise determined by the Company, the following assumptions will be made when determining the Fair Market Value of Units:

(a) that the Company was being sold in a manner reasonably designed to solicit all possible participants and permit all interested Persons an opportunity to participate and achieve the best value reasonably available to the Members at the time; and

(b) that all existing circumstances are taken into account, including the terms and conditions of all agreements (including this Agreement) to which the Company is then a party or by which it is otherwise benefited or affected, determined.

"**Family Members**" means, as to a Person that is an individual, such Person's spouse, ancestors (whether by blood or by adoption), descendants (whether by blood or by adoption), brothers and sisters (whether by blood or by adoption) and *inter vivos* or testamentary trusts of which only such Person and his spouse, ancestors (whether by blood or by adoption), descendants (whether by blood or by adoption), brothers and sisters (whether by blood or adoption) are beneficiaries.

"**Fiscal Year**" is defined in Section 6.2.

"**Incapacity**" or "**Incapacitated**" means, (i) as to any Member who is an individual, death, total physical disability or entry by a court of competent jurisdiction adjudicating such Member incompetent to manage his or her Person or his or her estate; (ii) as to any Member that is a corporation or limited liability company, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; (iii) as to any Member that is a partnership, the dissolution and commencement of the winding up of the partnership; (iv) as to any Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; (v) as to any trustee of a trust that is a Member, the termination of the trust (but not the substitution of a new trustee); or (vi) as to any Member, the Bankruptcy of such Member.

EXHIBIT 2
Page 297 of 404

"**Incentive Compensation Plan**" means any plan, agreement or other arrangement that provides for the grant or issuance of equity or equity-based awards and that is now in effect or is hereafter adopted by the Company or the Manager for the benefit of any of their respective employees or other service providers (including directors, advisers and consultants), or the employees or other services providers (including directors, advisers and consultants) of any of their respective Affiliates or Subsidiaries.

"**Indemnitee**" means the Manager, each Affiliate of the Manager, the Tax Representative, the Designated Individual and each officer or director of the Manager, the Company or their respective Affiliates, in all cases in such capacity.

"**IRS**" means the United States Internal Revenue Service, or, if applicable, a state or local taxing agency.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any governmental authority.  The term "**Lawful**" has a correlative meaning.

"**Liquidating Event**" is defined in Section 9.2(b).

"**Liquidator**" is defined in Section 9.3(a).

"**Majority-in-Interest of the Members**" means Members (excluding the Manager in its capacity as a Member) entitled to vote on or consent to any matter holding more than fifty percent (50%) of all outstanding Common Units held by all Members (excluding the Manager in its capacity as a Member) entitled to vote on or consent to such matter.

"**Manager**" is defined in the preamble to this Agreement.

"**Mandatory Exchange**" is defined in Section 11.1(c).

"**Mandatory Exchange Date**" is defined in Section 11.1(c).

"**Mandatory Exchange Notice**" is defined in Section 11.1(c).

"**Member**" means any Person named as a member of the Company on the Register of this Agreement (as amended from time to time) and any Person admitted as an Additional Member of the Company or a Substituted Member of the Company, in each case, in such Person's capacity as a member of the Company, until such time as such Person has ceased to be a Member.

"**Member Representative**" is defined in Section 7.8.

"**Merger**" means the merger of Spring Valley Merger Sub, LLC with and into the Company, pursuant to the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021.

"**New Securities**" means any equity security as defined in Rule 3a11-1 under the Securities Exchange Act of 1934, as amended, excluding grants under the Incentive Compensation Plans,

44

**EXHIBIT 2**
**Page 298 of 404**

including (i) rights, options, warrants, or convertible or exchangeable securities that entitle the holder thereof to subscribe for or purchase, convert such securities into, or exchange such securities for, Common Stock or Preferred Stock and (ii) any Debt issued by the Manager that provides any of the rights described in clause (i).

"**OBCA**" means the Oregon Business Corporation Act, as amended from time to time.

"**Percentage Interest**" means, with respect to each Member, as to any class or series of relevant Units, the fraction, expressed as a percentage, the numerator of which is the aggregate number of Units of such class or series held by such Member and the denominator of which is the total number of Units of such class or series held by all Members, in each case determined as of the date of determination. If not otherwise specified, "**Percentage Interest**" shall be deemed to refer to Common Units.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, syndicate, person, trust, association, organization or other entity, including any governmental authority, and including any successor, by merger or otherwise, of any of the foregoing.

"**Policy Regarding Exchanges**" is defined in Section 11.1(a).

"**Preferred Stock**" means shares of preferred stock of the Manager now or hereafter authorized or reclassified that has dividend rights, or rights upon liquidation, winding up and dissolution, that are superior or prior to the Common Stock.

"**Recapitalization**" is defined in Section 2.1(c).

"**Record Date**" means the record date established by the Company for the purpose of determining the Members entitled to notice of or vote at any meeting of Members or to consent to any matter, or to receive any distribution or the allotment of any other rights, or in order to make a determination of Members for any other proper purpose, which, in the case of a record date fixed for the determination of Members entitled to receive any distribution, shall (unless otherwise determined by the Company) generally be the same as the record date established by the Manager for a distribution to the Members of its Capital Stock of some or all of its portion of such distribution.

"**Register**" is defined in Section 5.1(b)(i).

"**Registration Rights Agreement**" means the Registration Rights Agreement, effective on or about the date hereof, among the Manager and the other Persons party thereto, as the same may be amended, modified, supplemented or restated from time to time.

"**Regulations**" means the income tax regulations, including temporary regulations and, to the extent taxpayers are permitted to rely on them, proposed regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations). References to "**Treas. Reg. §**" are to the sections of the Regulations.

45

**EXHIBIT 2**
**Page 299 of 404**

"**Related-Party Transfer**" means a Transfer by a Member of all or part of its Units to any Related-Party Transferee.

"**Related-Party Transferee**" means, with respect to a Member, (i) any Family Member of that Member, (ii) any direct or indirect member or equityholder of that Member or any Affiliate of that Member, (iii) any Family Member of any direct or indirect member or equityholder described in (ii), or (iv) the Manager or any Subsidiary of the Manager.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Selected Courts**" is defined in Section 12.8.

"**SPAC Transactions**" means the series of transactions effectuated pursuant to the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021.

"**Subsidiary**" means, with respect to any Person, any corporation or other entity if a majority of (i) the voting power of the voting equity securities or (ii) the outstanding equity interests is owned, directly or indirectly, by such Person.

"**Substituted Member**" means a Person who is admitted as a Member to the Company pursuant to Section 7.3.

"**Surviving Company**" is defined in Section 7.7(b)(iii).

"**Tax Distribution**" is defined in Section 3.2(a).

"**Tax Distribution Shortfall Amount**" is defined in Section 3.2(d).

"**Tax Receivable Agreement**" means the Tax Receivable Agreement, dated as of [●], 2022, entered into by and among the Manager, the Company, each of the parties thereto identified as a "**TRA Holder**" or the "**TRA Representative**" and each of the successors and assigns thereto, and any other similar tax receivable (or comparable) agreements entered after the date of this Agreement.

"**Termination Transaction**" means any direct or indirect Transfer of all or any portion of the Manager's Units in connection with, or the other occurrence of, (a) a merger, consolidation or other combination involving the Manager, on the one hand, and any other Person, on the other, (b) a sale, lease, exchange or other transfer of all or substantially all of the assets of the Manager not in the ordinary course of its business, whether in a single transaction or a series of related transactions, (c) a reclassification, recapitalization or change of the outstanding Class A Common Stock (other than a change in par value, or from par value to no par value, or as a result of a stock split or reverse stock split, stock dividend or similar subdivision), (d) the adoption of any plan of liquidation or dissolution of the Manager, or (e) a Transfer of all or any portion of the Manager's Units (other than to a wholly owned Affiliate).

EXHIBIT 2
Page 300 of 404

"**Terms**" is defined in the definition of "**Equivalent Units**."

"**Transfer**" means, in respect of any Units, property or other assets, any sale, assignment, hypothecation, lien, encumbrance, transfer, distribution or other disposition thereof or of a participation therein, or other conveyance of legal or beneficial interest therein, including rights to vote and receive dividends or other income with respect thereto, or any short position in a security or any other action or position otherwise reducing risk related to ownership through hedging or other derivative instruments, whether voluntarily or by operation of Law, or any agreement or commitment to do any of the foregoing.  An Exchange shall not constitute a Transfer under this Agreement.

"**Unit**" means a fractional share of the limited liability company interest in the Company, which may be a Class A Unit or Class B Unit and shall be deemed to include any equity security received in connection with any recapitalization, merger, consolidation, or other reorganization, or by way of any distribution in respect of Units, in any such case, after the date of this Agreement.

"**Unit Designation**" is defined in Section 2.4(a).

Section 13.2      Interpretation.   In this Agreement and in the exhibits to this Agreement, except to the extent that the context otherwise requires:

(a)      the headings are for convenience of reference only and shall not affect the interpretation of this Agreement;

(b)      defined terms include the plural as well as the singular and vice versa;

(c)      words importing gender include all genders;

(d)      a reference to any statute or statutory provision shall be construed as a reference to the same as it may have been or may from time to time be amended, extended, re-enacted or consolidated and all statutory instruments or orders made under it;

(e)      any reference to a "day" or "**Business Day**" means the whole of such day, being the period of 24 hours running from midnight to midnight;

(f)      references to Articles, Sections, subsections, clauses and Exhibits are references to Articles, Sections, subsections, clauses and Exhibits to this Agreement;

(g)      the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation"; and

(h)      unless otherwise specified, references to any party to this Agreement or any other document or agreement shall include its successors and permitted assigns.

*[Remainder of page intentionally left blank.]*

47

**EXHIBIT 2**
**Page 301 of 404**

IN WITNESS WHEREOF, this Agreement has been executed as of the date first written above.

**MANAGER**

NUSCALE POWER CORP.


By: _____
    Name:
    Title:



**MEMBERS**

NUSCALE POWER CORP.


By: _____
    Name:
    Title:



By: _____
    Name:
    Title:

**EXHIBIT 2**
**Page 302 of 404**

## ANNEX A:  INITIAL UNITS

| **Member** | **Units** |
|---|---|
| NuScale Power Corp. | [_____] Class A Units |
| [_____] | [_____] Class B Units |
| [_____] | [_____] Class B Units |
| [_____] | [_____] Class B Units |
| [_____] | [_____] Class B Units |
| [_____] | [_____] Class B Units |
| [_____] | [_____] Class B Units |

A-1

**EXHIBIT 2**
**Page 303 of 404**

**ANNEX B:  FORM OF ELECTIVE EXCHANGE NOTICE**

ELECTIVE EXCHANGE NOTICE

NuScale Power Corp.
[Address]
Attention:
Email:

NuScale Power, LLC
[Address]
Attention:
Email:

This elective exchange notice ("Elective Exchange Notice") is delivered by the undersigned Exchangeable Unit Member pursuant to Section 11.1 of the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC, dated as of _____, 2022 (the "LLC Agreement"), by and among NuScale Power Corp., a Delaware corporation (the "Manager") and the members that are party thereto.  Capitalized terms used but not defined herein shall have the meanings given to them in the LLC Agreement.

The undersigned hereby transfers the number of Class B Units plus shares of Class B Common Stock set forth below (together, the "Paired Interests") in exchange for the Stock Consideration to be issued in its name as set forth below, or the Cash Settlement, as applicable, as set forth in the LLC Agreement.

Legal Name of Holder: _____

Address: _____

Number of Class B Units: _____

Number of Class B Common Stock: _____

Brokerage Account Details: _____

The undersigned hereby represents and warrants that (i) the undersigned has full legal capacity to execute and deliver this Elective Exchange Notice and to perform the undersigned's obligations hereunder; (ii) this Elective Exchange Notice has been duly executed and delivered by the undersigned and is the legal, valid and binding obligation of the undersigned enforceable against it in accordance with the terms thereof or hereof, as the case may be, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies; (iii) the Paired Interests subject to this Elective Exchange Notice are being transferred to the Manager or the Company, as applicable, free and clear of any pledge, lien,

B-1

**EXHIBIT 2**
**Page 304 of 404**

security interest, encumbrance, equities or claim; and (iv) no consent, approval, authorization, order, registration or qualification of any third party or with any court or governmental agency or body having jurisdiction over the undersigned or the Paired Interests subject to this Elective Exchange Notice is required to be obtained by the undersigned for the transfer of such Paired Interests to the Manager or the Company, as applicable.

The undersigned hereby irrevocably constitutes and appoints any officer of the Manager or of the Company as the attorney of the undersigned, with full power of substitution and resubstitution in the premises, to do any and all things and to take any and all actions that may be necessary to transfer to the Manager or the Company, as applicable, the Paired Interests subject to this Elective Exchange Notice and to deliver to the undersigned the Stock Consideration or Cash Settlement, as applicable, to be delivered in exchange therefor.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Elective Exchange Notice to be executed and delivered by the undersigned or by its duly authorized attorney.

Name: _____

Dated: _____

B-2

**EXHIBIT 2**
**Page 305 of 404**

## ANNEX C:  TAX MATTERS

## ARTICLE I

## DEFINITIONS

"**Asset Value**" means, with respect to any Asset, the adjusted basis of such Asset for federal income tax purposes; *provided*, *however*, that:

(i)      the initial Asset Value of any Asset (other than cash) contributed or deemed contributed by a Member to the Company shall be the gross Fair Market Value of such Asset as determined by the Company;

(ii)      the Asset Values of all Assets shall be adjusted to equal their respective gross Fair Market Values as determined by the Company as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member, in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g); (D) the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to the benefit of the Company by an existing Member acting in a Member capacity or by a new Member acting in a Member capacity or in anticipation of becoming a Member; or (E) any other instance in which such adjustment is permitted under Treas. Reg. § 1.704-1(b)(2)(iv); *provided*, *however*, that any adjustment pursuant to clause (A), (B), (D), or (E) above shall be made only if the Company determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      the Asset Value of any Asset distributed to any Member shall be the gross Fair Market Value of such Asset on the date of distribution, as determined by the Company; and

(iv)      the Asset Values of all Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m); *provided*, *however*, that Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that the Company determines that an adjustment pursuant to paragraph (ii) of this definition of Asset Value is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv).

If the Asset Value of an Asset has been determined or adjusted to paragraph (i), (ii), or (iv) of this definition of Asset Value, then such Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Asset for purposes of computing Net Profits and Net Losses.

**EXHIBIT 2**
**Page 306 of 404**

"**Audit**" is defined in Section 4.4(a) of this Annex C.

"**Company Minimum Gain**" has the meaning set forth as "partnership minimum gain" in Treas. Reg. § 1.704-2(b)(2) and is computed in accordance with Treas. Reg. § 1.704-2(d).

"**Company Unitholder Representative**" has the meaning as defined in the Merger Agreement.

"**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period; *provided*, *however*, that if the Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be determined in accordance with Treas. Reg. § 1.704-1(b)(2)(iv)(g)(3), or Treas. Reg. § 1.704-3(d)(2), as appropriate.

"**Designated Individual**" is defined in Section 4.3(a)(ii) of this Annex C.

"**Imputed Underpayment**" is defined in Section 4.4(d) of this Annex C.

"**Imputed Underpayment Share**" is defined in Section 4.4(e)(i) of this Annex C.

"**Member Nonrecourse Debt**" has the meaning given to the term "partner nonrecourse debt" in Treas. Reg. § 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to each Member Nonrecourse Debt, an amount equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treas. Reg. § 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the meaning given to the term "partner nonrecourse deduction" in Treas. Reg. §§ 1.704-2(i)(l) and 1.704-2(i)(2).

"**Merger Agreement**" means that certain Agreement and Plan of Merger entered into by the Manager, Spring Valley Merger Sub LLC, an Oregon limited liability company, and the Company, dated December 13, 2021 (as further amended or modified in whole or in part from time to time in accordance with such agreement).

"**Net Profits**" and "**Net Losses**" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code section 703(a) and, where appropriate (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1)), with the following adjustments:

(i)    any income of the Company exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

**EXHIBIT 2**
**Page 307 of 404**

(ii)     any expenditures of the Company described in Code section 705(a)(2)(B) (or treated as expenditures described in Code section 705(a)(2)(B) pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)     in the event the Asset Value of any Asset of the Company is adjusted in accordance with paragraph (ii) or paragraph (iii) of the definition of "**Asset Value**," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset for purposes of computing Net Profits or Net Losses;

(iv)     gain or loss resulting from any disposition of any Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Asset Value of the Asset disposed of, notwithstanding that the adjusted tax basis of such Asset differs from its Asset Value;

(v)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(vi)     to the extent an adjustment to the adjusted tax basis of any Asset pursuant to Code section 734(b) is required pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the Asset) or loss (if the adjustment decreases the basis of the Asset) from the disposition of the Asset and shall be taken into account for purposes of computing Net Profits and Net Losses;

(vii)     notwithstanding any other provision of this definition of Net Profits and Net Losses, any items that are specially allocated pursuant to Section 3.2 and Section 3.3 of this Annex C shall not be taken into account in computing Net Profits or Net Losses, but shall be determined by applying rules analogous to those set forth in paragraphs (i) through (vi) above; and

(viii)     where appropriate, references to Net Profits and Net Losses shall refer to specific items of income, gain, loss, deduction, and credit comprising or otherwise comprising Net Profits or Net Losses.

"**Nonrecourse Deductions**" has the meaning set forth in Treas. Reg. § 1.704-2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Treas. Reg. § 1.752-1(a)(2).

"**Original Member**" means each of the Members of the Company as of immediately prior to the Effective Time (as defined in the Merger Agreement) of the Merger.

"**Push Out Election**" means the election under Code section 6226 (or any similar provision of state or local law) to "push out" an adjustment to the Members or former Members, including filing IRS Form 8988 (Election for Alternative to Payment of the Imputed Underpayment), or any successor or similar form, and taking any other action necessary to give effect to such election.

C-3

**EXHIBIT 2**
**Page 308 of 404**

"**Revised Partnership Audit Provisions**" means Code Sections 6221 through 6241, as in effect for taxable years of the Company beginning after December 31, 2017, together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof, and any comparable provisions of state or local tax law.

"**Specified Audit**" is defined in Section 4.4(b) of this Annex C.

"**Tax Representative**" means, as applicable, and including the Designated Individual as the context requires, (a) the Member or other Person (including the Company) designated as the "partnership representative" of the Company under Code section 6223, (b) the Member designated as the "tax matters partner" for the Company under Code section 6231(a)(7) (as in effect before 2018 and before amendment by Title XI of the Bipartisan Budget Act of 2015, H.R. 1314, Public Law No. 114-74), and/or (c) the Member or other Person serving in a similar capacity under any similar provisions of state, local or non-U.S. Laws, in each case, acting solely at the direction of the Company to the maximum extent permitted under Law.

## ARTICLE II

## MEMBER'S CAPITAL ACCOUNTS.

The Company or the Manager shall establish and maintain a capital account for each Member in accordance with Treas. Reg. § 1.704-1(b)(2)(iv) (each, a "**Capital Account**"). The Company may maintain Capital Account subaccounts for different classes of Units, and any provisions of this Agreement pertaining to Capital Account maintenance shall apply, *mutatis mutandis*, to those subaccounts.

## ARTICLE III

## ALLOCATIONS

Section 3.1    Allocations Generally.  Each Fiscal Year, after adjusting each Member's Capital Account for all contributions and distributions with respect to such Fiscal Year and after giving effect to the allocations under Section 3.2 of this Annex C for the Fiscal Year, Net Profits and Net Losses shall be allocated among the Members in a manner such that, after such allocations have been made, each Member's Capital Account balance (which may be a positive, negative, or zero balance) will equal (proportionately) (a) the amount that would be distributed to each such Member, determined as if the Company were to (i) sell all of its Assets for their Asset Values, (ii) satisfy all of its liabilities in accordance with their terms with the proceeds from such sale (limited, with respect to Nonrecourse Liabilities, to the Asset Values of the Assets securing such liabilities), and (iii) distribute the remaining proceeds pursuant to the applicable provision of this Agreement, minus (b) the sum of (x) such Member's share of the Company Minimum Gain and Member Nonrecourse Debt Minimum Gain and (y) the amount, if any (without duplication of any amount included under clause (x)), that such Member is obligated (or is deemed for U.S. tax purposes to be obligated) to contribute, in its capacity as a Member, to the capital of the Company as of the last day of such Fiscal Year.

C-4

**EXHIBIT 2**
**Page 309 of 404**

Section 3.2     Priority Allocations.

(a)     <u>Minimum Gain Chargeback, Qualified Income Offset, and Stop Loss Provisions</u>.  Each of (i) the "minimum gain chargeback" provision of Treas. Reg. § 1.704-2(f), (ii) the "chargeback of partner nonrecourse debt minimum gain" provision of Treas. Reg. § 1.704-2(i)(4), (iii) the "qualified income offset" provision in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(3), and (iv) the requirement in the flush language immediately following Treas. Reg. § 1.704-1(b)(2)(ii)(d)(3) that an allocation "not cause or increase a deficit balance" in a Member's Capital Account is hereby incorporated by reference as a part of this Agreement.  The Company shall make such allocations as are necessary to comply with those provisions and shall make any determinations with respect to such allocations (to the extent consistent with clauses (i) – (iv) of the preceding sentence).

(b)     <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Fiscal Year shall be allocated to the Members in accordance with their Units, unless otherwise determined by the Company.

(c)     <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss (within the meaning of Treas. Reg. § 1.752-2) with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i)(l).

(d)     <u>Special Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company Asset, pursuant to Code section 734(b) or Code section 743(b) is required, pursuant to Treas. Reg. §§ 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treas. Reg. § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treas. Reg. § 1.704-1(b)(2)(iv)(m)(4) applies.

(e)     <u>Ameliorative Allocations</u>.  Any allocations made (as well as anticipated reversing or offsetting regulatory allocations to be made) pursuant to <u>Section 3.2(a)-(d)</u> of this <u>Annex C</u> shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount for any item so allocated and all other items allocated to each Member pursuant to this Agreement shall be equal, to the extent possible, to the net amount that would have been allocated to each Member pursuant to the provisions of this Agreement if those allocations had not occurred.

Section 3.3     Other Allocation Rules.

(a)     <u>In General</u>.  Except as otherwise provided in this <u>Section 3.3</u> of this <u>Annex C</u>, for income tax purposes under the Code and the Regulations, each Company item of income, gain, loss, deduction, and credit shall be allocated among the Members in the same manner as its

**EXHIBIT 2**
**Page 310 of 404**

correlative item of income, gain, loss, deduction, and credit (as calculated in accordance with the definitions of "Net Profits" and "Net Loss") is allocated pursuant to Section 3.1 and Section 3.2 of this Annex C.

(b)       Section 704(c) Allocations.   Notwithstanding the provisions of Section 3.3(a) of this Annex C to the contrary, in accordance with Code section 704(c)(1)(A) (and the principles of those provisions) and Treas. Reg. § 1.704-3, Company items of income, gain, loss, deduction, and credit with respect to any property contributed to the capital of the Company, or after Company property has been revalued under Treas. Reg. § 1.704-1(b)(2)(iv)(f) or (s), shall, solely for U.S. federal, state and local tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company property to the Company for U.S. federal income tax purposes and its value as so determined at the time of the contribution or revaluation of Company property.   The Company shall use the "traditional method" with respect to (i) any property contributed to the Company before the SPAC Transactions and (ii) "reverse section 704(c) allocations" (within the meaning of Treas. Reg. § 1.704-3(a)(6)) arising before or in connection with the SPAC Transactions.   With respect to property contributed or section 704(c) amounts arising from revaluations made after the SPAC Transactions, the Company may use any method permitted under Treas. Reg. § 1.704-3.   Allocations pursuant to Section 3.3(a) and this Section 3.3(b) of this Annex C are solely for U.S. federal, state, and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profit, loss, or other items, pursuant to any provision of this Agreement.

(c)       Allocations in Respect of Varying Interests.   If any Member's interest in the Company varies (within the meaning of Code section 706(d)) within a Fiscal Year, whether by reason of a Transfer of a Unit, redemption of a Unit by the Company, or otherwise, Net Profits and Net Losses for that Fiscal Year will be allocated so as to take into account such varying interests in accordance with Code section 706(d) using the daily proration method and/or such other permissible method, methods, or conventions selected by the Company.

(d)       Timing and Amount of Allocations of Net Profits and Net Loss.   Net Profits and Net Loss of the Company shall be determined and allocated with respect to each Fiscal Year as of the end of each such year, or at such other time or times determined by the Company.

(e)       Modification of Allocations.   The allocations set forth in Section 3.1 and Section 3.2 of this Annex C are intended to comply with certain requirements of the Regulations. The Company shall be authorized to make, in its reasonable discretion, appropriate modifications to the allocations of Net Profits and Net Losses pursuant to this Agreement in order to comply with Code section 704 or applicable Regulations.   Notwithstanding any provision of this Agreement to the contrary, if the Company reasonably determines an allocation other than the allocations that would otherwise be made pursuant to this Agreement would more appropriately reflect the Members' interests in the Company, the Company may in its discretion make appropriate adjustments to such allocations.

(f)       Allocation of Liabilities under Code Section 752.   Notwithstanding anything in this Agreement to the contrary, no Member will take, or permit any Affiliate to take, any action that would change the allocation of liabilities for purposes of Code section 752 without the consent of the Company.

**EXHIBIT 2**
**Page 311 of 404**

## ARTICLE IV

## CERTAIN TAX MATTERS

Section 4.1    Provision of Information.

(a)    Information to Be Provided by Company to Members.  No later than thirty (30) days after the filing by the Company of the Company's federal tax return (Federal Form 1065), the Company shall provide to each Member a copy of Schedule K-1 of Federal Form 1065 reporting that Member's allocable share of items of income, gain, loss, deduction, or credit for such Fiscal Year, and such additional information as is required to be provided on Schedule K-1 or as such Member may reasonably request for tax purposes, each as determined by the Company. The Member hereby consents to receive each Schedule K-1 in respect of the Member's LLC Interest in the Company through electronic delivery.

(b)    Information to Be Provided by Members to Company.

(i)    Notice of Audit or Tax Examination.  Each Member shall notify the Company within five (5) days after receipt of any notice regarding an audit or tax examination of the Company and upon any request for material information related to the Company by U.S. federal, state, local, or other tax authorities.

(ii)    Other Relevant Tax Information.  Each Member shall provide to the Company upon request tax basis information about Assets contributed by it to the Company and such other tax information as reasonably requested by the Company and necessary for it to prepare its financial reports or any tax returns and such other information and/or tax forms as the Company reasonably requests.

(c)    No Right to Member Tax Returns.  Notwithstanding anything to the contrary in this Agreement or any right to information under the Act, with respect to the financial statements or tax returns of a Member or its Affiliates, none of the Company, the other Members, such other Member's Affiliates or any of their respective representatives, will be entitled to review such financial statements or tax returns for any purpose, including in connection with any proceeding or other dispute (whether involving the Company, between the Members, or involving any other Persons).

Section 4.2    Tax Elections.  The Company shall have in effect (and shall cause each Subsidiary that is classified as a partnership for U.S. federal income tax purposes to have in effect) an election pursuant to Code section 754 (and any similar provisions of applicable U.S. state or local law) for the Company for the Fiscal Year that includes the date of the Merger and each Fiscal Year in which a sale or exchange (whether partial or complete) occurs.  The Company shall determine whether to make any other available election pursuant to the Code or Regulations that is not otherwise expressly provided for or prohibited in this Agreement, and the Members hereby consent to all such elections.

**EXHIBIT 2**
**Page 312 of 404**

Section 4.3    Tax Representative.

(a)    Appointment and Replacement of Tax Representative.

(i)    Tax Representative.    The Company shall act as the Tax Representative, but the Company may designate another Person to act as the Tax Representative and may remove, replace, or revoke the designation of that Person, or require that Person to resign. For taxable years ending on or before December 31, 2021, and for any jurisdiction with respect to which the Company cannot serve as the Tax Representative, however, Fluor Enterprises, Inc. shall act as the Tax Representative.

(ii)    Designated Individual.    If the Tax Representative is not an individual, the Company shall appoint a "designated individual" for each taxable year (as described in Treas. Reg. § 301.6223-1(b)(3)(ii)) (a "**Designated Individual**").

(iii)    Approval by Members.    Each Member agrees to execute, certify, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence the appointments described in Section 4.3(a)(i) and Section 4.3(a)(ii) of this Annex C, including statements required to be filed with the tax returns of the Company in order to effect the designation of the Tax Representative or Designated Individual (and any successor).

(b)    Authority of the Tax Representative; Delegation of Authority.    The Tax Representative shall have all of the rights, duties, powers, and obligations provided for under the Code, Regulations, or other applicable guidance; *provided*, that, if the Company designates a Person to be the Tax Representative, the Tax Representative shall in all cases act solely at the direction of the Company.  The Tax Representative may delegate its authority under this Section 4.3(b) of this Annex C to a Designated Individual who shall in all cases act solely at the direction of the Tax Representative.

(c)    Costs and Indemnification of Tax Representative and Designated Individual.  Without duplication of the provisions of Section 4.3(b) of this Annex C, the Company shall pay, or to the extent the Tax Representative or Designated Individual pays, indemnify and reimburse, to the fullest extent permitted by Law, the Tax Representative or Designated Individual for all costs and expenses, including legal and accounting fees (as such fees are incurred) and any claims incurred in connection with any tax audit or judicial review proceeding with respect to the tax liability of the Company.

Section 4.4    Tax Audits.

(a)    Subject to this Section 4.4 and Section 8.03 (Tax Matters) of the Merger Agreement, the Tax Representative shall have the sole authority to act on behalf of the Company in connection with, make all relevant decisions regarding application of, and to exercise the rights and powers provided for in the Revised Partnership Audit Provisions, including making any elections under the Revised Partnership Audit Provisions or any decisions to settle, compromise, challenge, litigate or otherwise alter the defense of any action, audit or examination before the IRS or any other tax authority (each, an "**Audit**"), and to expend Company funds for professional services and other expenses reasonably incurred in connection therewith.

C-8

**EXHIBIT 2**
**Page 313 of 404**

(b)      Without limiting the foregoing, the Tax Representative shall give prompt written notice to the Company Unitholder Representative of the commencement of any Audit of the Company or any of its Subsidiaries (i) that relates to a Pre-Closing Flow-Through Return or (ii) the resolution of which would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members (a "**Specified Audit**"). The Tax Representative shall (i) keep the Company Unitholder Representative reasonably informed of the material developments and status of any such Specified Audit, (ii) permit the Company Unitholder Representative (or its designee) to participate (including using separate counsel), in each case at the Original Members' sole cost and expense, in any such Specified Audit, and (iii) promptly notify the Company Unitholder Representative of receipt of a notice of a final partnership adjustment (or equivalent under applicable Laws) or a final decision of a court or IRS Independent Office of Appeals panel (or equivalent body under applicable Laws) with respect to such Specified Audit. The Tax Representative or the Company shall promptly provide the Company Unitholder Representative with copies of all material correspondence between the Tax Representative or the Company (as applicable) and any governmental entity in connection with such Specified Audit and shall give the Company Unitholder Representative a reasonable opportunity to review and comment on any material correspondence, submission (including settlement or compromise offers) or filing in connection with any such Specified Audit. Additionally, the Tax Representative shall not (and the Company shall not (and shall not authorize the Tax Representative to)) settle, compromise or abandon any Specified Audit in a manner that would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members without the Company Unitholder Representative's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned). The Tax Representative shall obtain the prior written consent of the Company Unitholder Representative (which consent shall not be unreasonably withheld, delayed or conditioned) before (i) making an election under Section 6226(a) of the Code (or any analogous provision of state or local Law) other than any such election required by Section 8.03 (Tax Matters) of the Merger Agreement or (ii) taking any material action under the Revised Partnership Audit Provisions that would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members, in the case of clauses (i) and (ii).

(c)      The Company, the Tax Representative, the Unitholder Representative and the Members expressly agree to be bound by the terms of Section 8.03 (Tax Matters) of the Merger Agreement. Notwithstanding anything to the contrary contained in this Agreement, in the event of any conflict between Section 8.03 of the Merger Agreement and this Agreement, Section 8.03 of the Merger Agreement shall control.  With respect to the preceding sentence, the Company Unitholder Representative and the Manager shall have all of the rights and protections against the Tax Representative as it does against the Manager or the Company Unitholder Representative, as applicable, as described in Section 8.03 of the Merger Agreement.

(d)      Determinations with Respect to Elections.  Subject to Section 8.03 (Tax Matters) of the Merger Agreement and the provisions of this Annex C (including Section 4.4(b)), the Tax Representative shall have the sole authority to determine whether to cause the Company to make a Push Out Election with respect to any adjustment that could result in an imputed underpayment (within the meaning of Code section 6225) (an "**Imputed Underpayment**").

(e)    <u>Responsibility for Payment of Tax; Former Members</u>.

(i)    <u>Imputed Underpayment Share</u>.  To the extent the Company is liable for any Imputed Underpayment, the Company shall determine the liability of the Members for a share of such Imputed Underpayment, taking into account the Members' Units and the status and actions of the Members (including those described in Code section 6225(c)) (such share, an "**Imputed Underpayment Share**").

(ii)    <u>Payment of Imputed Underpayment Share</u>.  The Company may (A) require a Member who is liable for an Imputed Underpayment Share to pay the amount of its Imputed Underpayment Share to the Company within ten (10) days after the date on which the Company notifies the Member (and in the manner required by the notice) and/or (B) reduce future distributions to the Member, such that the amount determined under clauses (A) and (B) equals the Member's Imputed Underpayment Share, *provided*, *however*, that no Member shall have an obligation to make any contribution to the capital of the Company with respect to any Imputed Underpayment.  If a Member fails to pay any amount that it is required to pay the Company in respect of an Imputed Underpayment Share within such ten (10) day period, that amount shall be treated as a loan to the Member, bearing interest at ten (10) percent annually (which interest shall increase the Member's Imputed Underpayment Share).  Such loan shall be repayable upon demand by the Company.  If the Member fails to repay the loan upon demand, the full balance of the loan shall be immediately due (including accrued but unpaid interest) and the Company shall have the right to collect the balance in any manner it determines, including by reducing future distributions to that Member; *provided*, *however*, that no Member may have any Imputed Underpayment Share treated as a loan to the extent it would violate Section 402 of the Sarbanes-Oxley Act of 2002.  Any Member not permitted to treat its Imputed Underpayment Share as a loan due to the provisions of the previous sentence shall pay any Imputed Underpayment Share within ten (10) days after the date of the notice referred to in the first sentence of this <u>Section 4.4(e)(ii)</u> of this <u>Annex C</u>.

Section 4.5    <u>No Independent Actions or Inconsistent Positions</u>.  Except as required by Law or previously authorized in writing by the Company (which authorization may be withheld in the sole discretion of the Company), no Member shall (i) independently act with respect to tax matters (including, but not limited to, audits, litigation and controversies) affecting or arising from the Company, or (ii) treat any Company item inconsistently on such Member's income tax return with the treatment of the item on the Company's tax return and/or the Schedule K-1 (or other written information statement) provided to such Member.  Solely to the extent required by Law, this <u>Section 4.5</u> of this <u>Annex C</u> shall not apply with respect to any "special enforcement matter" described in Code section 6241(11).

Section 4.6    <u>United States Person</u>.  Except as permitted by the Company, each Member represents and covenants that, for U.S. federal income tax purposes, it is and will at all times remain a "**United States Person**," within the meaning of Code section 7701, or is a disregarded entity the assets of which are treated as owned by a United States Person under Treas. Reg. §§ 301.7701-1, 301.7701-2, and 301.7701-3.

Section 4.7    <u>State, Local, and Non-U.S. Tax Law</u>.  The provisions of this Agreement with respect to U.S. federal income tax shall apply, *mutatis mutandis*, with respect to any similar provisions of state, local, or non-U.S. tax law as determined by the Company.

**EXHIBIT 2**
**Page 315 of 404**

Section 4.8    Survival of Obligations.  For purposes of this Article IV of this Annex C, the term "**Member**" shall include a former Member unless otherwise determined by the Company. The rights and obligations of each Member and former Member under this Article IV of this Annex C shall survive the Transfer by such Member of its Units (or withdrawal by a Member or redemption of a Member's Units) and the dissolution of the Company until ninety (90) days after the applicable statute of limitations.  Section 4.3 (*Tax Representative*), Section 4.4 (*Tax Audits*), and this Section 4.8 (*Survival of Obligations*) of this Annex C shall not be amended without the prior written consent of any Member or former Member that would be disproportionately and adversely impacted by such amendment.

Section 4.9    Tax Classification.  The parties intend that the Company shall be classified as a partnership for United States federal, state, and local tax purposes.  The parties intend that the Subsidiaries of the Company currently classified either as disregarded entities or as partnerships for United States federal, state, and local tax purposes as of the date of this Agreement shall remain classified either as disregarded entities or as partnerships for United States federal, state, and local tax purposes.  No Person shall take any action inconsistent with such classifications.

Section 4.10    Withholding.

(a)    Withholding Generally.  Each Member acknowledges and agrees that the Company may be required by Law to deduct and withhold taxes or to fulfill other similar obligations of such Member on any amount paid, distributed, disbursed, or allocated by the Company to that Member, including upon liquidation, and any transferee of a Member's interest or a Substituted Member shall, by reason of such Transfer or substitution, acknowledge, and agree to any such withholding by the Company, including withholding to discharge obligations of the Company with respect to prior distributions, allocations, or an Imputed Underpayment Share (to the extent not otherwise borne by the transferor Member pursuant to Section 4.4 of this Annex C). Taxes withheld by third parties from payments to the Company in respect of the Company shall be treated as an expense of the Company, unless such withholding is attributable to a specific Member, in which case, amounts so withheld shall be allocated to such Member and the Company may deduct and withhold such amounts from the Member. All amounts withheld pursuant to this Section 4.10 of this Annex C shall, except as otherwise determined by the Company pursuant to Section 4.4(e)(ii) of this Annex C, be treated as amounts distributed to such Person pursuant to the provision of this Agreement that would have applied if such amount had actually been distributed.

(b)    Additional Provisions with Respect to a Transfer of Units.  A Member transferring Units permitted by this Agreement shall, unless otherwise determined by the Company, (i) deliver to the Company, between ten (10) days and thirty (30) days before the Transfer, an affidavit of non-foreign status with respect to such transferor Member that satisfies the requirements of Code section 1446(f)(2) or other documentation establishing a valid exemption from withholding pursuant to Code section 1446(f) or (ii) ensure that, contemporaneously with the Transfer, the transferee of such interest properly withholds and remits to the IRS the amount of tax required to be withheld upon the Transfer by Code section 1446(f) (and promptly provide evidence to the Company of such withholding and remittance).  If a Member transferring Units will not satisfy clause (i) in connection with any such Transfer unless the transferor Member and transferee of such interest shall agree to jointly and severally indemnify and hold harmless the

Company against any loss (including taxes, interest, penalties, and any related expenses) arising out of any failure to comply with the provisions of this <u>Section 4.10(b)</u> of this <u>Annex C</u>.

(c)     <u>Additional Provisions with Respect to an Exchange of Units</u>.

(i)     <u>Withholding of Cash or Class A Common Stock Permitted</u>. If the Company or the Manager shall be required to withhold any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations in respect of any Exchange, the Company, or the Manager, as the case may be, shall be entitled to take such action as it deems appropriate in order to ensure compliance with such withholding requirements, including, at its option, withholding cash from the Cash Settlement or shares of Class A Common Stock with a Fair Market Value equal to the amount of any taxes that the Company or the Manager, as the case may be, may be required to withhold with respect to such Exchange. To the extent that amounts are (or property is) so withheld and paid over to the appropriate taxing authority, such withheld amounts (or property) shall be treated for all purposes of this Agreement as having been paid (or delivered) to the applicable Member.

(ii)     <u>Notice of Withholding</u>. If the Company or the Manager determines that any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations are required to be withheld in respect of any Exchange, the Company or the Manager, as the case may be, shall use commercially reasonable efforts to promptly notify the Exchangeable Unit Member and shall consider in good faith any positions or alternative arrangements that such Member raises (reasonably in advance of the date on which the Company or the Manager believes withholding is required) as to why withholding is not required or that may avoid the need for such withholding, provided, that neither the Company nor the Manager is required to incur additional costs as a result of such obligation, and this <u>Section 4.10(c)(ii)</u> of this <u>Annex C</u> shall not in any manner limit the authority of the Company or the Manager to withhold taxes with respect to an Exchangeable Unit Member pursuant to <u>Section 4.10(c)(i)</u> of this <u>Annex C</u>.

(iii)     <u>Reimbursement of Taxes by Exchangeable Unit Member</u>. If, within the two-year period beginning at the start of the date of an Exchange, (i) the Manager withholds or otherwise pays any amount on account of taxes in respect of exchanged Units, which amount is attributable to the two-year period ending at the end of the date of such Exchange, and (ii) the Manager or any person other than the Exchangeable Unit Member otherwise would bear the economic burden of such withholding or other payment (including by reason of such amount being treated as having been distributed to the Manager in respect of the Exchangeable Units pursuant to <u>Section 4.10</u> of this <u>Annex C</u>), the Exchangeable Unit Member shall, upon notice by the Company and/or the Manager, promptly reimburse the Company and/or the Manager for such amount; provided, however, that the Exchangeable Unit Member's reimbursement obligation under this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u> shall not exceed the amount of cash and Fair Market Value (determined as of the date of receipt) of other consideration received by the Exchangeable Unit Member in connection with such Exchange. Unless otherwise required by Law, any amount paid by an Exchangeable Unit Member pursuant to this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u> shall be treated as an adjustment to the proceeds received by the Exchangeable Unit Member in respect of the applicable Exchange. The Company and the Manager shall have the right to reduce any amounts due to such Exchangeable Unit Member from the Manager or any of its Affiliates by the amount owed by such Exchangeable Unit Member under this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u>.

C-12

**EXHIBIT 2**
**Page 317 of 404**

## ANNEX D: SCHEDULE OF OFFICERS

| Name | Title |
|------|-------|
| John Hopkins | Chief Executive Officer & President |
| Chris Colbert | Chief Financial Officer |
| Robert Temple | General Counsel & Secretary |
| Rudy Murgo | Treasurer |
| José Reyes | Chief Technology Officer |
| Dale Atkinson | Chief Operating Officer |
| Tom Bergman | Vice President, Regulatory Affairs |

D-1

**EXHIBIT 2**
**Page 318 of 404**

**ANNEX E: POLICY REGARDING EXCHANGES**
**Please see attached.**

E-1

**EXHIBIT 2**
**Page 319 of 404**

## ANNEX E:  POLICY REGARDING EXCHANGES

### Effective as of [●], 2022

This Policy Regarding Exchanges (the "<u>Policy</u>") of NuScale Power, LLC (the "<u>Company</u>") sets forth certain rules applicable to the exchange of Exchangeable Units for shares of Class A Common Stock of NuScale Power Corp. (the "<u>Common Stock</u>") and/or cash, at the option of the Managing Member (each, an "<u>Exchange</u>"), pursuant to the Company's Sixth Amended and Restated Limited Liability Company Agreement (the "<u>Agreement</u>").  Capitalized terms that are not defined in this Policy have the meanings given to them in the Agreement.  This Policy is made pursuant to, and supplements the provisions of, Article XI of the Agreement.

### ARTICLE I
### EXCHANGE DATES; PROVISIONS REGARDING EXCHANGEABLE AMOUNT

Section 1.1    <u>Quarterly Exchange Date</u>.  There shall be one (1) date per quarter of each Fiscal Year on which an Elective Exchange may occur (each, a "<u>Quarterly Exchange Date</u>") for a holder of Exchangeable Units (each holder, an "<u>Exchanging Holder</u>").  The Quarterly Exchange Date for Exchanging Holders that are required to file reports pursuant to Section 16(a) of the Exchange Act may be different than the Quarterly Exchange Date for Exchanging Holders that are not required to file reports pursuant to Section 16(a) of the Exchange Act.  The Company shall use commercially reasonable efforts to notify the applicable Exchanging Holders at least forty-five (45) days before a relevant Quarterly Exchange Date (such notice, a "<u>Quarterly Exchange Date Notice</u>").

Section 1.2    <u>Minimum Exchangeable Amount</u>.  The Company may set a minimum number or dollar value of Exchangeable Units that may be exchanged by Exchanging Holders on a Quarterly Exchange Date, which minimum amount shall be the same for all holders of Exchangeable Units (the "<u>Minimum Exchangeable Amount</u>") and shall include the applicable Minimum Exchangeable Amount in the applicable Quarterly Exchange Date Notice.  If an Exchanging Holder delivers an Elective Exchange Notice pursuant to **Section 3.1** requesting to exchange all of its Exchangeable Units, the number or dollar value, as applicable, of the Exchanging Holder's Exchangeable Units shall be deemed to satisfy the Minimum Exchangeable Amount requirement.

Section 1.3    <u>Maximum Exchangeable Amount</u>.  The Company may set a maximum aggregate number or dollar value of Exchangeable Units that may be exchanged by the Exchanging Holders on a Quarterly Exchange Date (the "<u>Maximum Exchangeable Amount</u>") and shall include the applicable Maximum Exchangeable Amount in the applicable Quarterly Exchange Date Notice.  If the aggregate number or dollar value of Exchangeable Units that the Exchanging Holders propose to exchange on the Quarterly Exchange Date (as set forth on the Elective Exchange Notices) exceeds the Maximum Exchangeable Amount, then the number or dollar value of Exchangeable Units that each Exchanging Holder specified in its Elective Exchange Notice shall be reduced by the same percentage by which the aggregate number or dollar value of Exchangeable Units of all Exchanging Holders is reduced so that the aggregate number or dollar value of Exchangeable Units does not exceed the Maximum Exchangeable Amount.

**EXHIBIT 2**
**Page 320 of 404**

**ARTICLE II**
**ADDITIONAL RIGHTS TO EXCHANGE**

Section 2.01    Rights to Exchange.

(a)    Right to Exchange Before Certain Transactions.  If the Company or the Managing Member consolidates, merges, combines or consummates any other transaction in which shares of Class A Common Stock are exchanged for or converted into other stock or securities, or the right to receive cash and/or any other property, no other provisions of this Policy shall limit the right of any Exchangeable Unit Member to effect an Elective Exchange in order to receive Class A Common Stock in advance of consummation of any such consolidation, merger, combination or other such transaction unless in connection with any such consolidation, merger, combination or other transaction each Class B Unit shall be entitled to be exchanged for or converted into the stock, cash, securities or other property that such holder of a Class B Unit would have received had it exercised its right to Exchange pursuant to this Policy and received Class A Common Stock in exchange for its Class B Units immediately before such consolidation, merger, combination or other property (subject to any differences in the kind and amount of stock or securities, cash and/or any other property as are intended (as determined by the Company in good faith) to maintain the relative voting power of each share of Class B Common Stock relative to each share of Class A Common Stock in effect before such transaction).  This Article II shall not apply to any action or transaction (including any consolidation, merger, or combination) approved by a Majority-in-Interest of the Members.

(b)    Right to Exchange Before an Applicable Sale or Termination Transaction. Upon the occurrence of an Applicable Sale or a Termination Transaction, no other provisions of this Policy shall limit the right of any Exchangeable Unit Member to effect an Elective Exchange in order to receive Class A Common Stock in advance of consummation of any such Applicable Sale or Termination Transaction.

**ARTICLE III**
**ELECTIVE EXCHANGE NOTICE**

Section 3.1    Timing of Elective Exchange Notice.

(a)    Elective Exchange Notice.  Each holder that elects to Exchange some or all of its Exchangeable Units must deliver notice of an election in respect of the Exchangeable Units to be exchanged (an "Elective Exchange Notice") to the Company, in a method determined by the Company at least thirty (30) days before the relevant Quarterly Exchange Date.  The Company shall provide to each Exchangeable Unit Holder the form of Elective Exchange Notice and the means for delivery of that Elective Exchange Notice.

(b)    Acceptance of Elective Exchange Notice.  After the Elective Exchange Notice has been delivered to the Company, and unless the Company or Managing Member, as applicable, has refused to honor the request in full pursuant to Section 1.2 (*Minimum Exchangeable Amount*), Section 1.3 (*Maximum Exchangeable Amount*), Section 3.1(c) (*Cancellation of*

**EXHIBIT 2**
**Page 321 of 404**

*Quarterly Exchange Window*), Section 3.2(c) (*Post-Retraction Limitation on Exchange*), or Article IV (*Other Restrictions*), the Company or Managing Member, as applicable, will effect the Elective Exchange on the applicable Quarterly Exchange Date in accordance with this Policy.

(c)     Cancellation of Quarterly Exchange Date.  The Company may at any time, in its sole discretion, cancel a Quarterly Exchange Date for any or no reason.  If the Company cancels a Quarterly Exchange Date, then no holder of Exchangeable Units shall be permitted to Exchange those Exchangeable Units on the cancelled Quarterly Exchange Date.

Section 3.2     Retraction of Elective Exchange Notice.

(a)     Ability to Retract; Retraction Deadline.  If, at any time between the close of business on the date of delivery of an Elective Exchange Notice and the close of trading on the date that is two (2) Business Days before the applicable effective date of such Elective Exchange (the "Elective Exchange Date"), the reported closing trading price of a share of the Common Stock on the principal United States securities exchange or automated or electronic quotation system on which the Common Stock trades decreases by five (5) percent or more, an Exchanging Holder may retract or amend its Elective Exchange Notice by delivering a notice to the Company in a manner determined by the Company not later than the Retraction Deadline (a "Retraction Notice" and the Exchangeable Units that were the subject of the Retraction Notice, the "Retracted Units") not later than the close of trading on the date that is two (2) Business Days before the applicable Elective Exchange Date (the "Retraction Deadline") pursuant to Section 3.2(b).  The Company shall have no obligation to notify the Exchanging Holders of any decrease in the Common Stock trading price.

(b)     Retraction Notice.  An Exchanging Holder wishing to retract must retract at least fifty percent (50%) of its Exchangeable Units that were the subject of the retracted Elective Exchange Notice.  If the revised Elective Exchange Notice does not satisfy the Minimum Exchangeable Amount, the Exchanging Holder will be deemed to retract the full amount of Exchangeable Units that were the subject of the retracted Elective Exchange Notice.  An Exchanging Holder's delivery of a Retraction Notice shall be irrevocable and shall terminate all of the Exchanging Holder's, Company's, and Managing Member's rights and obligations with respect to the Retracted Units, and all actions taken to effect the Elective Exchange contemplated by that retracted Elective Exchange Notice shall be deemed rescinded and void with respect to the Retracted Units. Subject to the applicable Minimum Exchangeable Amount and Maximum Exchangeable Amount, if any, if a Retraction Notice does not retract all of the Exchangeable Units that were the subject of an Elective Exchange Notice, the Exchangeable Units that are not Retracted Units will be exchanged on the relevant Quarterly Exchange Day.

(c)     Post-Retraction Limitation on Exchange.  If an Exchanging Holder delivers a Retraction Notice for a Quarterly Exchange Date pursuant to Section 3.2(b), the retracting Exchanging Holder shall not be entitled to participate in the Exchange on the Quarterly Exchange Date for which the Retraction Notice was delivered with respect to the Retracted Units.

- 3 -

**EXHIBIT 2**
**Page 322 of 404**

## ARTICLE IV
## OTHER RESTRICTIONS

Notwithstanding any provision of this Policy to the contrary (including the provisions of **Article** II), the Company may prohibit an Exchange by one or more holders of Exchangeable Units under any of the following conditions and determinations made by the Company based on the advice of counsel (which may be external or internal counsel):

(a)    If an Exchange is (or is reasonably likely to be) prohibited under applicable law, regulation, or agreement to which the Company or an affiliate is a party or could reasonably be expected to result in a bona fide lawsuit against the Company or its affiliates; or

(b)    If there is a material risk that the Company would be a "publicly traded partnership" under section 7704 of the Code as a result of an Exchange.

## ARTICLE V
## EXEMPTIONS FROM AND MODIFICATIONS TO POLICY

The Company may, in its discretion and based on the advice of counsel (which may be external or internal counsel), consider and grant requests from holders of Exchangeable Units, including for (i) additional Exchange Dates, (ii) Exchanges of less than the Minimum Exchangeable Amount, (iii) Exchanges in excess of the Maximum Exchangeable Amount, (iv) an Exchange to be subject to one or more contingencies relating to the Company or the Managing Member, or (v) any other matter with respect to Exchanges (to the extent permitted by the Agreement and applicable Law).  A holder of Exchangeable Units may request an exemption from this Policy by submitting a written request to the Company and following the delivery requirements set forth in Article III as if the written request were an Elective Exchange Notice.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1    Continuing Application of Company's Policies and Securities Laws. Nothing in this Policy shall affect, and each holder of Exchangeable Units shall remain subject to, the Company's Policies, including those addressing insider trading and any other Company policies regarding trading or the holding of investments.  All holders of Exchangeable Units shall comply with all applicable securities laws and rules.

Section 6.2    Independent Nature of Rights and Obligations.  Nothing in this Policy or in any other agreement or document or any action taken by any holder of Exchangeable Units shall be deemed to cause the holders of Exchangeable Units to have formed a partnership, association, joint venture, or any other kind of entity or create a presumption that the holders of Exchangeable Units are in any way acting in concert as a group.

Section 6.3    Mandatory Exchanges.  This Policy shall not apply to any Exchange of Exchangeable Units pursuant to a Mandatory Exchange, as described in, and pursuant to, the Agreement.

**EXHIBIT 2**
**Page 323 of 404**

Section 6.4    <u>Notice Delivery Deadlines on Non-Business Days</u>.  If the date on or before which the Company or an Exchanging Holder is required to deliver a notice pursuant to this Policy is not a Business Day, then that notice will be deemed to be timely delivered on that date if that notice is received on the Business Day immediately following that date.

Section 6.5    <u>Notifications Under This Policy</u>.  The Company will be deemed to have satisfied any notification requirement in this Policy by making available such notification on any system accessible by Exchanging Holders.

Section 6.6    <u>Modification of Policy</u>.  The Company may modify this Policy at any time without notice.  The Company will deliver or make available a copy of the revised Policy to the holders of Exchangeable Units at least forty-five (45) days before the next Quarterly Exchange Date.

*        *        *

**EXHIBIT 2**
**Page 324 of 404**

## AMENDMENT TO AGREEMENT AND PLAN OF MERGER

This Amendment to Agreement and Plan of Merger (this "Amendment") is dated as of December 28, 2021, with respect to that certain Agreement and Plan of Merger (the "Merger Agreement"), dated as of December 13, 2021, by and among Spring Valley Acquisition Corp., a Cayman Islands exempted company ("Acquiror"), Spring Valley Merger Sub, LLC, an Oregon limited liability company ("Merger Sub"), and NuScale Power, LLC, an Oregon limited liability company (the "Company").  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement.

## RECITALS

WHEREAS, Section 11.10 of the Merger Agreement provides that it may be amended or modified in whole or in part, by a duly authorized agreement in writing executed in the same manner as the Merger Agreement and Section 11.01 of the Merger Agreement provides that any party to the Merger Agreement may, at any time prior to the Closing, by action taken by its board of directors or board of managers, as applicable, or officers thereunto duly authorized, waive any of the terms or conditions of the Merger Agreement, or agree to an amendment or modification to this Agreement in the manner contemplated by Section 11.10 of the Merger Agreement and by an agreement in writing executed in the same manner as the Merger Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I
## AMENDMENT

Section 1.1    HSR Filing.

(a)    Each of Acquiror and Merger Sub waives the obligation of the Company pursuant to Section 6.03 of the Merger Agreement to submit the notification required from the Company under the HSR Act within 10 Business Days after the execution of the Merger Agreement.

(b)    The first sentence of Section 6.03 of the Merger Agreement is hereby amended and restated as follows:

In connection with the transactions contemplated by this Agreement, the Company shall file promptly but in no event later than January 21, 2022, the notification required from the Company under the HSR Act.

Section 1.2    Exhibit H.  Each of Acquiror and Merger Sub, on the one hand, and the Company, on the other hand, hereby amend and restate Exhibit H to the Merger Agreement in the form attached hereto as Annex I.

Section 1.3    Effect of Amendment; Counterparts. Except as specifically modified herein, the Merger Agreement remains in full force and effect.  This Amendment

**EXHIBIT 2**
**Page 325 of 404**

may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, with the same effect as if the signatures thereto were in the same instrument.   Article XI of the Merger Agreement is hereby incorporated by reference.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

2

**EXHIBIT 2**
**Page 326 of 404**

IN WITNESS WHEREOF, the Acquiror, the Merger Sub and the Company have each caused this Waiver to be duly executed as of the date first written above.

**ACQUIROR:**

**SPRING VALLEY ACQUISITION CORP.**

By: _____

Name:  Christopher Sorrells
Title:    Chief Executive Officer

**MERGER SUB:**

**SPRING VALLEY MERGER SUB, LLC**

By: _____

Name:  Christopher Sorrells
Title:    Chief Executive Officer

*[Signature Page to Amendment and Waiver]*

**EXHIBIT 2**
**Page 327 of 404**

**COMPANY:**

**NUSCALE POWER, LLC**

By: _____
    Name:  John Hopkins
    Title:   Chief Executive Officer

[*Signature Page to Amendment to Agreement and Plan of Merger*]

**EXHIBIT 2**
**Page 328 of 404**

## <u>ANNEX I</u>

See attached.

**EXHIBIT 2**
**Page 329 of 404**

**EXHIBIT H**

---

## SIXTH AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## NUSCALE POWER, LLC

**An Oregon limited liability company**

dated as of [●], 2022

---

THE LIMITED LIABILITY COMPANY INTERESTS IN NUSCALE POWER, LLC HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES LAWS OF ANY STATE, OR ANY OTHER APPLICABLE SECURITIES LAWS, AND HAVE BEEN OR ARE BEING ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND ANY OTHER APPLICABLE SECURITIES LAWS; (II) THE TERMS AND CONDITIONS OF THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT; AND (III) ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BETWEEN THE COMPANY AND THE APPLICABLE MEMBER.  THE LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS, THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, AND ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BY THE COMPANY AND THE APPLICABLE MEMBER.  THEREFORE, PURCHASERS AND OTHER TRANSFEREES OF SUCH LIMITED LIABILITY COMPANY INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT OR ACQUISITION FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS

Page

ARTICLE I GENERAL PROVISIONS ............................................................... 1

 Section 1.1  Organization.............................................................. 1
 Section 1.2  Name ........................................................................ 1
 Section 1.3  Principal Place of Business; Other Places of Business............... 1
 Section 1.4  Designated Agent for Service of Process.......................... 2
 Section 1.5  Term .......................................................................... 2
 Section 1.6  No State Law Partnership ......................................... 2
 Section 1.7  Business Purpose ..................................................... 2
 Section 1.8  Powers ...................................................................... 2
 Section 1.9  Certificates; Filings ................................................. 2
 Section 1.10 Representations and Warranties by the Members...................... 3

ARTICLE II UNITS; CAPITAL CONTRIBUTIONS .................................................. 4

 Section 2.1  Units........................................................................... 4
 Section 2.2  Capital Contributions of the Members; No Deficit Restoration
      Obligation ................................................................. 5
 Section 2.3  No Interest; No Return............................................... 5
 Section 2.4  Issuances of Additional Units ................................... 5
 Section 2.5  Additional Funds and Additional Capital Contributions ............ 6

ARTICLE III DISTRIBUTIONS ...................................................................... 8

 Section 3.1  Distributions Generally............................................. 8
 Section 3.2  Tax Distributions ...................................................... 8
 Section 3.3  Distributions in Kind............................................... 10
 Section 3.4  Distributions to Reflect Additional Units ................. 10
 Section 3.5  Other Distribution Rules......................................... 10

ARTICLE IV MANAGEMENT AND OPERATIONS .............................................. 11

 Section 4.1  Management............................................................. 11
 Section 4.2  Tax Actions ............................................................. 13
 Section 4.3  Compensation and Reimbursement of Manager...................... 14
 Section 4.4  Outside Activities.................................................... 14
 Section 4.5  Transactions with Affiliates .................................... 15
 Section 4.6  Limitation on Liability ........................................... 16
 Section 4.7  Indemnification ...................................................... 17

ARTICLE V BOOKS AND RECORDS ............................................................. 17

 Section 5.1  Books and Records ................................................. 17
 Section 5.2  Financial Accounts.................................................. 18
 Section 5.3  Inspection; Confidentiality...................................... 18
 Section 5.4  Information to Be Provided by Manager to Members ............. 18

ARTICLE VI TAX MATTERS, ACCOUNTING, AND REPORTING ............................ 18

 Section 6.1  Tax Matters ............................................................. 18

105070335.6

**EXHIBIT 2**
**Page 331 of 404**

# TABLE OF CONTENTS
## (continued)

Page

Section 6.2    Accounting and Fiscal Year..................................................................18

ARTICLE VII UNIT TRANSFERS AND MEMBER WITHDRAWALS..................................18

Section 7.1    Transfer Generally Prohibited..............................................................18
Section 7.2    Conditions Generally Applicable to All Transfers ...............................19
Section 7.3    Substituted Members ...........................................................................20
Section 7.4    Drag-Along Rights ..............................................................................21
Section 7.5    Company Right to Call Units ...............................................................22
Section 7.6    Withdrawal...........................................................................................22
Section 7.7    Restrictions on Termination Transactions ...........................................23
Section 7.8    Incapacity.............................................................................................23
Section 7.9    Legend..................................................................................................24

ARTICLE VIII ADMISSION OF ADDITIONAL MEMBERS .........................................24

Section 8.1    Admission of Additional Members......................................................24
Section 8.2    Limit on Number of Members .............................................................24

ARTICLE IX DISSOLUTION, LIQUIDATION AND TERMINATION .........................25

Section 9.1    Dissolution Generally ..........................................................................25
Section 9.2    Events Causing Dissolution ................................................................25
Section 9.3    Distribution upon Dissolution .............................................................25
Section 9.4    Rights of Members ..............................................................................27
Section 9.5    Termination ..........................................................................................27

ARTICLE X PROCEDURES FOR ACTIONS AND CONSENTS OF MEMBERS;
    MEETINGS .............................................................................................27

Section 10.1    Actions and Consents of Members ....................................................27
Section 10.2    Procedures for Meetings and Actions of the Members...........................27

ARTICLE XI EXCHANGE RIGHTS .................................................................................28

Section 11.1    Elective and Mandatory Exchanges..................................................28
Section 11.2    Additional Terms Applying to Exchanges.........................................29
Section 11.3    Exchange Consideration; Settlement ................................................30
Section 11.4    Adjustment .........................................................................................31
Section 11.5    Class A Common Stock to Be Issued in Connection with an
    Exchange.............................................................................................32
Section 11.6    Withholding ........................................................................................32
Section 11.7    Tax Treatment .....................................................................................32
Section 11.8    Contribution by Manager ...................................................................33
Section 11.9    Apportionment of Distributions .........................................................33

ARTICLE XII MISCELLANEOUS.....................................................................................33

Section 12.1    Conclusive Nature of Determinations..................................................33

ii

EXHIBIT 2
Page 332 of 404

# TABLE OF CONTENTS
## (continued)

**Page**

Section 12.2    Company Counsel ................................................................ 33
Section 12.3    Appointment of Manager as Attorney-in-Fact .......................... 34
Section 12.4    Entire Agreement ............................................................... 34
Section 12.5    Further Assurances .............................................................. 35
Section 12.6    Notices .............................................................................. 35
Section 12.7    Governing Law ................................................................... 36
Section 12.8    Jurisdiction and Venue ........................................................ 36
Section 12.9    Equitable Remedies ............................................................ 36
Section 12.10   Construction ...................................................................... 37
Section 12.11   Counterparts ...................................................................... 37
Section 12.12   Third-Party Beneficiaries ..................................................... 37
Section 12.13   Binding Effect .................................................................... 37
Section 12.14   Severability ....................................................................... 37
Section 12.15   Survival ............................................................................ 37
Section 12.16   Effect on Other Obligations of Members or the Company ........ 37
Section 12.17   Confidentiality ................................................................... 37

ARTICLE XIII DEFINED TERMS ................................................................. 39
Section 13.1    Definitions ........................................................................ 39
Section 13.2    Interpretation .................................................................... 47

iii

**EXHIBIT 2**
**Page 333 of 404**

## SIXTH AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF NUSCALE POWER, LLC

THIS SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of NUSCALE POWER, LLC, an Oregon limited liability company (the "**Company**"), dated as of [●], 2022, is entered into by and among the Members that are party hereto, NUSCALE POWER CORP., a Delaware corporation (the "**Manager**"), and each other Person as may become a Member from time to time, pursuant to the provisions of this Agreement.

WHEREAS, the Company's current operating agreement is the Fifth Amended and Restated Operating Agreement, dated April 1, 2021 (the "**Fifth Operating Agreement**");

WHEREAS, as set forth in the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021 (as further amended or modified in whole or in part from time to time in accordance with such agreement, the "**Merger Agreement**"), in the Merger (as defined in this Agreement), the Fifth Operating Agreement is amended and restated in its entirety by this Agreement, with this Agreement superseding and replacing the Fifth Operating Agreement in its entirety; and

WHEREAS, immediately upon the effectiveness of this Agreement and without any action required on part of the Company or any Member, the Recapitalization (as defined in this Agreement) occurs.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, agree as follows:

## ARTICLE I

## GENERAL PROVISIONS

Section 1.1 Organization.  The Company has been organized as an Oregon limited liability company by the filing of the Articles of Conversion and the Articles of Organization, pursuant to the OBCA and the Act on September 30, 2011.

Section 1.2 Name.  The name of the Company is "**NuScale Power, LLC**."  The Company may also conduct business at the same time under one or more fictitious names if the Manager determines that such is in the best interests of the Company.  The Company may change its name, from time to time, in accordance with Law.

Section 1.3 Principal Place of Business; Other Places of Business.  The principal business office of the Company shall be in Portland, Oregon or such other location as may be

105070335.6

**EXHIBIT 2**
**Page 334 of 404**

designated by the Manager from time to time.  The Company may maintain offices and places of business at such other place or places within or outside the State of Oregon as the Manager deems advisable.

Section 1.4<u>Designated Agent for Service of Process</u>.  So long as required by the Act, the Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Oregon.  The address of the registered office of the Company in the State of Oregon is 8130 SW Beaverton-Hillsdale Hwy., Portland, Oregon 97225.  The Company's registered agent for service of process at such address is Registered Agent Solutions, Inc.

Section 1.5<u>Term</u>.  The term of the Company shall be perpetual unless and until the Company is dissolved in accordance with the Act or this Agreement.  Notwithstanding the dissolution of the Company, the existence of the Company shall continue until its termination pursuant to this Agreement or as otherwise provided in the Act.

Section 1.6<u>No State Law Partnership</u>.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member shall be an agent, partner or joint venturer of any other Member, for any purposes other than for U.S. federal, state, and local tax purposes, and this Agreement shall not be construed to suggest otherwise.  Each Member hereby acknowledges and agrees that, except as expressly provided herein, in performing its obligations or exercising its rights under this Agreement, it is acting independently and is not acting in concert with, on behalf of, as agent for, or as joint venturer of, any other Member.  Other than in respect of the Company, nothing contained in this Agreement shall be construed as creating a corporation, association, joint stock company, business trust, or organized group of Persons, whether incorporated or not, among or involving any Member or its Affiliates, and nothing in this Agreement shall be construed as creating or requiring any continuing relationship or commitment as between such parties other than as specifically set forth in this Agreement.

Section 1.7<u>Business Purpose</u>.  The purpose of the Company is to carry on any and all lawful businesses and activities permitted from time to time under the Act. On the terms and subject to the conditions of this Agreement, the Company is authorized to enter into, make and perform all contracts and other undertakings, and engage in all other activities and transactions as the Manager may deem necessary, advisable or convenient for carrying out the purposes of the Company.

Section 1.8<u>Powers</u>.  Subject to the limitations set forth in this Agreement, the Company will possess and may exercise all of the powers and privileges granted to it by the Act, any other Law, or this Agreement, together with all powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the purposes of the Company set forth in <u>Section 1.7</u>.

Section 1.9<u>Certificates; Filings</u>.   The Articles of Conversion and Articles of Organization were previously filed on behalf of the Company in the office of the Secretary of State of the State of Oregon as required by the OBCA and the Act.  The Manager shall take any and all other actions reasonably necessary to maintain the status of the Company under the

EXHIBIT 2
Page 335 of 404

Laws of the State of Oregon or any other state in which the Company shall do business.  If requested by the Manager, the Members shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the Manager to accomplish all filing, recording, publishing, and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited liability company under the Laws of the State of Oregon, (b) if the Manager deems it advisable, the operation of the Company as a limited liability company, in all jurisdictions in which the Company proposes to operate, and (c) all other filings required (or determined by the Manager to be necessary or appropriate) to be made by the Company.

Section 1.10        Representations and Warranties by the Members.

(a)        Individual-Member-Specific Representations.    Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or a Substituted Member) that is an individual represents and warrants to, and covenants with, each other Member that (i) the execution of this Agreement and the consummation of the transactions contemplated by this Agreement to be performed by such Member will not result in a breach or violation of, or a default under, any material agreement by which such Member or any of such Member's property is bound, or any statute, regulation, order or other Law to which such Member is subject and (ii) this Agreement is binding upon, and enforceable against, such Member in accordance with its terms, except (A) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (B) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

(b)        Non-Individual-Member-Specific Representations.    Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or a Substituted Member) that is not an individual represents and warrants to, and covenants with, each other Member that (i) the execution of this Agreement and all transactions contemplated by this Agreement to be performed by it have been duly authorized by all necessary action, including that of its general partner(s), managing member(s), committee(s), trustee(s), beneficiaries, directors and/or stockholder(s) (as the case may be) as required, (ii) the execution of this Agreement and consummation of such transactions will not result in a breach or violation of, or a default under, its partnership or operating agreement, trust agreement, charter or bylaws (as the case may be), any material agreement by which such Member or any of such Member's properties or any of its partners, members, beneficiaries, trustees or stockholders (as the case may be) is or are bound, or any statute, regulation, order or other Law to which such Member or any of its partners, members, trustees, beneficiaries or stockholders (as the case may be) is or are subject, and (iii) this Agreement is binding upon, and enforceable against, such Member in accordance with its terms, except (A) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (B) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

EXHIBIT 2
Page 336 of 404

(c) <u>Securities Laws</u>.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or Substituted Member) represents and warrants that it has acquired and continues to hold its interest in the Company for its own account for investment purposes only and not for the purpose of, or with a view toward, the resale or distribution of all or any part thereof, and not with a view toward selling or otherwise distributing such interest or any part thereof at any particular time or under any predetermined circumstances.  Each Member further represents and warrants that it is a sophisticated investor, able and accustomed to handling sophisticated financial matters for itself, and that it has a sufficiently high net worth that it does not anticipate a need for the funds that it has invested in the Company in what it understands to be a speculative and illiquid investment.

(d) <u>Survival of Representations and Warranties</u>.  The representations and warranties contained in <u>Sections 1.10(a)</u>, <u>1.10(b)</u>, and <u>1.10(c)</u> shall survive the execution and delivery of this Agreement by each Member (and, in the case of an Additional Member or a Substituted Member, the admission of such Additional Member or Substituted Member as a Member in the Company), and the dissolution, liquidation, and termination of the Company.

(e) <u>No Representations as to Performance</u>.  Each Member (including each Additional Member or Substituted Member as a condition to becoming an Additional Member or Substituted Member) hereby acknowledges that no representations as to potential profit, cash flows, funds from operations or yield, if any, in respect of the Company or the Manager have been made by the Company or any Member or any employee or representative or Affiliate of the Company or any Member, and that projections and any other information, including financial and descriptive information and documentation, that may have been in any manner submitted to such Member shall not constitute any representation or warranty of any kind or nature, express or implied.

(f) <u>Modification of Representations and Warranties</u>.  The Manager may permit the modification of any of the representations and warranties contained in <u>Sections 1.10(a)</u>, <u>1.10(b)</u>, and <u>1.10(c)</u>, as applicable, to any Member (including any Additional Member or Substituted Member or any transferee of either); *provided*, that such representations and warranties, as modified, shall be set forth in either (i) a Unit Designation applicable to the Units held by such Member or (ii) a separate writing addressed to the Company.

## ARTICLE II

## UNITS; CAPITAL CONTRIBUTIONS

Section 2.1<u>Units</u>.

(a) <u>Generally</u>.  The interests of the Members in the Company are divided into, and represented by, the Units, each having the rights and obligations specified in this Agreement.

(b) <u>Classes</u>.  The Units are initially divided into:

(i) "**<u>Class A Units</u>**," which are issuable solely to the Manager and such other persons as the Manager shall determine;

4

**EXHIBIT 2**
**Page 337 of 404**

(ii)    "**Class B Units**," which are issuable to the Members as set forth on the Register and as otherwise provided in this Agreement; and

(iii)    <u>Other Classes of Units</u>.  The Company may issue additional Units or create additional classes, series, subclasses, or sub-series of Units in accordance with this Agreement.

(c)    <u>Recapitalization</u>.  Immediately upon the effectiveness of this Agreement and without any action required on the part of the Company or any Member, (i) each Series A Preferred Unit, Series A-1 Preferred Unit, Series A-2 Preferred Unit, Series A-3 Preferred Unit, Series A-4 Preferred Unit, Series A-5 Preferred Unit and Common Unit (each, as defined in the Fifth Operating Agreement) of the Company issued and outstanding immediately prior to the effective time of this Agreement shall be re-classified into 1.5818, 1.5818, 1.5636, 1.5576, 1.5818, 1.6303, and 1.00, Common Units of the Company, respectively, and immediately after such re-classification (ii) each Common Unit issued and outstanding immediately prior to the Effective Time (including each Common Unit issued pursuant to the immediately preceding clause (i)) shall be re-classified into a number of Class B Units equal to the Exchange Ratio (as defined in the Merger Agreement) (collectively, the "**Recapitalization**").

Section 2.2<u>Capital Contributions of the Members; No Deficit Restoration Obligation</u>.

(a)    <u>Capital Contributions</u>.  The Members made, shall be treated as having made, or have agreed to make, Capital Contributions to the Company and were issued the Units indicated on the Register.  Except as provided by Law or in this Agreement, the Members shall have no obligation or, except as otherwise provided in this Agreement or with the prior written consent of the Manager, right to make any other Capital Contributions or any loans to the Company.

(b)    <u>No Deficit Restoration Obligation</u>.  No Member shall have an obligation to make any contribution to the capital of the Company as the result of a deficit balance in its Capital Account, and any such deficit shall not be considered a Debt owed to the Company or to any other Person for any purpose whatsoever.

Section 2.3<u>No Interest; No Return</u>.  No Member shall be entitled to interest on its Capital Contribution or on such Member's Capital Account balance.  Except as provided by this Agreement, any Unit Designation, or by Law, no Member shall have any right to demand or receive a withdrawal or the return of its Capital Contribution from the Company.  Except to the extent provided in this Agreement or in any Unit Designation, no Member shall have priority over any other Member as to distributions or the return of Capital Contributions.

Section 2.4<u>Issuances of Additional Units</u>.  Subject to the rights of any Member set forth in a Unit Designation:

(a)    <u>General</u>.  The Company may issue additional Units for any Company purpose at any time or from time to time to the Members (including, subject to <u>Section 2.4(b)</u>, the Manager) or any other Person and may admit any such Person as an Additional Member for such consideration and on such terms and conditions as shall be established by the Company.  Any additional Units may be issued in one or more classes or one or more series of any of such classes with such designations, preferences, conversion or other rights, voting powers, restrictions, rights

5

**EXHIBIT 2**
**Page 338 of 404**

to distributions, qualifications and terms and conditions of redemption (including rights that may be senior or otherwise entitled to preference over existing Units) as shall be determined by the Company (each, a "**Unit Designation**"). Upon the issuance of any additional Unit, the Manager shall amend the Register and the books and records of the Company as appropriate to reflect such issuance. Except to the extent specifically set forth in any Unit Designation, a Unit of any class or series other than a Common Unit shall not entitle the holder thereof to vote on, or consent to, any matter.

(b)     Issuances to the Manager.  No additional Units shall be issued to the Manager unless at least one of the following conditions is satisfied:

(i)     The additional Units are issued to all Members holding Common Units in proportion to their respective Percentage Interests in the Common Units;

(ii)     The additional Units are (x) Class A Units issued in connection with an issuance of Class A Common Stock or issued with appropriate adjustments to the Exchange Rate in accordance with Section 11.4, or (y) Equivalent Units (other than Common Units) issued in connection with an issuance of Preferred Stock, New Securities, or other interests in the Manager (other than Common Stock), and, in each case, the Manager contributes to the Company the net proceeds received in connection with the issuance of such Class A Common Stock, Preferred Stock, New Securities, or other interests in the Manager;

(iii)     There is a recapitalization of the Capital Stock of the Manager, including any stock split, stock dividend, reclassification or similar transaction;

(iv)     The additional Units are issued upon the conversion, redemption or exchange of Debt, Units or other securities issued by the Company and held by the Manager; or

(v)     The additional Units are issued in accordance with the express terms of Section 2.5(g) or any of the other provisions of this Article II (other than Section 2.4(a)).

(c)     Issuances of Class B Units.  No additional Class B Units shall be issued except in the event of a recapitalization of the Capital Stock of the Manager, including any stock split, stock dividend, reclassification or similar transaction.

(d)     No Preemptive Rights.  Except as expressly provided in this Agreement or in any Unit Designation, no Person shall have any preemptive, preferential, participation or similar right or rights to subscribe for or acquire any Unit.

Section 2.5 Additional Funds and Additional Capital Contributions

(a)     General.  The Company may, at any time and from time to time, determine that it requires additional funds ("**Additional Funds**") for the acquisition or development of additional Assets, for the redemption of Units, or for such other purposes as the Company may determine. Additional Funds may be obtained by the Company in any manner provided in, and in accordance with, the terms of this Section 2.5 without the approval of any Member or any other Person.

6

**EXHIBIT 2**
**Page 339 of 404**

(b)    <u>Additional Capital Contributions</u>.  The Company may obtain any Additional Funds by accepting Capital Contributions from any Members or other Persons.  In connection with any such Capital Contribution, the Company is hereby authorized from time to time to issue additional Units (as set forth in <u>Section 2.4</u>) in consideration for such Capital Contribution.

(c)    <u>Loans by Third Parties</u>.  The Company may obtain any Additional Funds by incurring Debt payable to any Person upon such terms as the Company determines appropriate, including making such Debt convertible, redeemable, or exchangeable for Units; *provided*, *however*, that the Company shall not incur any such Debt if any Member would be personally liable for the repayment of all or any portion of such Debt unless that Member otherwise agrees in writing.

(d)    <u>Issuance of Securities by the Manager</u>.

(i)    Unless otherwise agreed to by the Members, after the completion of the SPAC Transaction, except in the case of a Liquidity Offering for purposes of a Cash Settlement, the Manager shall not issue any additional Capital Stock or New Securities unless the Manager contributes the net proceeds received from the issuance of such additional Capital Stock or New Securities (as the case may be) and from the exercise of the rights contained in any such additional Capital Stock or New Securities to the Company in exchange for (i) in the case of an issuance of Class A Common Stock, Class A Units, (ii) in the case of an issuance of Class B Common Stock, Class B Units, or (iii) in the case of an issuance of Preferred Stock or New Securities, Equivalent Units.  If at any time any Preferred Stock or New Securities are issued that are convertible into or exercisable for Class A Common Stock or another security of the Manager, then upon any such conversion or exercise, the corresponding Equivalent Unit shall be similarly converted or exercised, as applicable, and an equal number of Class A Units or other Equivalent Units shall be issued to the Manager.  It is the intent of the parties that the Manager will always own Units equivalent in number and rights to its outstanding Capital Stock (other than Class B Units, which shall be equivalent in number, but not rights, to its outstanding Class B Common Stock), except as provided pursuant to <u>Section 11.4</u>, and the parties hereby acknowledge that the Manager may make reasonable adjustments to its own capitalization, subject to applicable Law and the terms of any such outstanding Capital Stock, in order to effect such parity.

(ii)    New Securities that are derivative securities issued under any Incentive Compensation Plan of the Manager shall not require issuance of Equivalent Units by the Company until such time as such derivative securities are exercised for Capital Stock of the Manager.

(e)    <u>Reimbursement of Issuance Expenses</u>.  If the Manager issues additional Capital Stock or New Securities and contributes the net proceeds (after deduction of any underwriters' discounts and commissions) received from such issuance to the Company pursuant to <u>Section 2.5(d)</u>, the Company shall reimburse or assume (on an after-tax basis) the Manager's expenses associated with such issuance.

(f)    <u>Repurchase or Redemption of Capital Stock</u>.  If any shares of Capital Stock, or New Securities are repurchased, redeemed or otherwise retired (whether by exercise of a put or call, automatically or by means of another arrangement) by the Manager, then the Manager shall

7

EXHIBIT 2
Page 340 of 404

cause the Company, immediately before such repurchase, redemption or retirement of such Capital Stock or New Securities, to redeem, repurchase or otherwise retire a corresponding number of Class A Units, Class B Units, or Equivalent Units held by the Manager, upon the same terms and for the same consideration as the Capital Stock or New Securities to be repurchased, redeemed, or retired.

      (g)    <u>Reinvestment of Excess Tax Distributions</u>.  Notwithstanding anything to the contrary in this Agreement, if the Manager (i) receives Tax Distributions in an amount in excess of the amount necessary to enable the Manager to meet or pay its U.S. federal, state and local Tax obligations, its obligations under the Tax Receivable Agreement, and any other operating expenses or (ii) holds any other excess cash amount, the Manager may, in its sole discretion, (A) distribute such excess cash amount to its shareholders or (B) contribute such excess cash amount to the Company in exchange for a number of Units or other equity securities of the Company determined in its sole discretion based on the Fair Market Value of such Units or securities, and in such case, the Manager may distribute to the holders of Class A Common Stock an amount of shares of Class A Common Stock (if the Company issues Units to the Manager) or such other equity securities of the Manager (if the Company issues equity securities of the Company other than Units) corresponding to the Class A Common Stock or equity securities issued by the Company and with substantially the same rights to dividends and distributions (including distributions upon liquidation) and other economic rights as those of such Class A Common Stock or equity securities of the Company that were issued to the Manager.

# ARTICLE III

# DISTRIBUTIONS

Section 3.1<u>Distributions Generally</u>.

      (a)    Except as otherwise provided in this <u>Article III</u> and subject to the terms of any Unit Designation, the Company shall distribute an amount of Available Cash if, when, and as determined by the Manager to the Members pro rata in accordance with the number of their Units.

Section 3.2<u>Tax Distributions</u>.

      (a)    <u>Generally</u>.  If the amount distributed to a Member pursuant to <u>Section 3.1</u> in respect of a Fiscal Year is less than that Member's Assumed Tax Liability, the Company shall distribute an amount of Available Cash to the Members such that each Member receives distributions of Available Cash in respect of each Fiscal Year in an amount at least equal to the Member's Assumed Tax Liability for such Fiscal Year (each such distribution, a "**Tax Distribution**").  Any Tax Distribution made to a Member shall reduce future amounts otherwise distributable to such Member under <u>Section 3.1</u> or <u>Section 9.3(a)</u>.  Except as provided in <u>Section 3.2(d)</u> and subject to any Unit Designation, all Tax Distributions shall be made *pro rata* in accordance with Units.

**EXHIBIT 2**
**Page 341 of 404**

(b)      Calculation of Assumed Tax Liability.  For purposes of calculating the amount of each Member's Tax Distributions under Section 3.2(a), a Member's "**Assumed Tax Liability**" means an amount equal to the product of:

(i)      the sum of (A) the net taxable income and gain allocated to that Member from the Company for U.S. federal income tax purposes in the Fiscal Year and (B) to the extent (x) determined by the Company in its sole discretion and (y) attributable to the Company, the amount the Member is required to include in income by reason of Code sections 707(c) (but not including guaranteed payments for services within the meaning of Code section 707(c)), 951(a), and 951A(a); *multiplied by*

(ii)      unless otherwise determined by the Company, the highest combined effective U.S. federal, state, and local marginal rate of tax applicable to an individual resident in Portland, Oregon, San Francisco, California or New York, New York (whichever results in the application of the highest state and local tax rate for a given type of income) for the Fiscal Year (such tax rate, the "**Assumed Tax Rate**").

The calculation required by this Section 3.2(b) shall be made by (i) taking into account (x) the character of the income or gain and (y) any limitations on the use of deductions or credits allocable with respect to the Fiscal Year and (ii) disregarding the effect of any special basis adjustments resulting from any election under Section 754 of the Code, including adjustments under Code section 732, 734(b) or 743(b).  In addition, the Company shall adjust a Member's Assumed Tax Liability to the extent the Company reasonably determines is necessary or appropriate as a result of any differences between U.S. federal income tax law and the tax laws of other jurisdictions in which the Company has a taxable presence.  The Company shall calculate the amount of any increase described in the preceding sentence by applying the principles of Section 3.2(b)(i) and (ii) replacing the words "**U.S. federal**" with a reference to the applicable jurisdiction.

(c)      Timing of Tax Distributions.  If reasonably practicable, the Company shall make distributions of the estimated Tax Distributions in respect of a Fiscal Year on a quarterly basis to facilitate the payment of quarterly estimated income taxes, taking into account amounts previously distributed by reason of this Section 3.2.  Not later than sixty (60) Business Days after the end of the Fiscal Year, the Company shall make a final Tax Distribution in an amount sufficient to fulfill the Company's obligations under Section 3.2(a).

(d)      Impact of Insufficient Available Cash.  If the amount of estimated or final Tax Distributions to be made exceeds the amount of the Available Cash, the Tax Distribution to which each Member is entitled shall be reduced in accordance with the provisions of this Section 3.2(d) (the amount of the reduction in each Member's share, the "**Tax Distribution Shortfall Amount**"), and Available Cash shall be distributed in the following order of priority:

(i)      First, to the Manager in an amount equal to the full amount of its Tax Distribution, but calculated by substituting the words "a corporation doing business" for "an individual resident" in the definition of "**Assumed Tax Rate**";

(ii)      Second, to the Members other than the Manager *pro rata* in accordance with their Units in an amount such that each such Member has received distributions

9

**EXHIBIT 2**
**Page 342 of 404**

pursuant to this <u>Section 3.2(d)(ii)</u> that is not less than their Assumed Tax Liability (calculated by substituting the words "a corporation doing business" for "an individual resident" in the definition of "**Assumed Tax Rate**"); and

(iii)    Third, to the Members (including the Manager) *pro rata* in accordance with their Units until each Member has received the full amount of its Tax Distribution calculated in accordance with <u>Section 3.2(b)</u>.

Any Tax Distribution Shortfall Amounts will be carried forward to subsequent Fiscal Years and will be distributed when and to the extent that the Company has sufficient Available Cash. The distribution of any Tax Distribution Shortfall Amounts to a Member shall for all purposes of this Agreement be a Tax Distribution and shall reduce future amounts otherwise distributable to such Member under <u>Section 3.1</u> or <u>Section 9.3(a)</u>.

(e)    <u>No Tax Distributions on Liquidation</u>. No Tax Distributions shall be made in connection with a Liquidating Event or the liquidation of a Member's Units in the Company.

Section 3.3<u>Distributions in Kind</u>. No Member may demand to receive property other than cash as provided in this Agreement. The Company may make a distribution in kind of Assets to the Members, and if a distribution is made both in cash and in kind, such distribution shall be made so that, to the fullest extent practical, the percentage of the cash and any other Assets distributed to each Member entitled to such distribution is identical.

Section 3.4<u>Distributions to Reflect Additional Units</u>. If the Company issues additional Units pursuant to the provisions of <u>Article II</u>, subject to the provisions of any Unit Designation, the Manager is authorized to make such revisions to this <u>Article III</u> and to <u>Annex C</u> as it determines are reasonably necessary or desirable to reflect the issuance of such additional Units, including making preferential distributions to certain classes of Units.

Section 3.5<u>Other Distribution Rules</u>.

(a)    <u>Transfers</u>. From and after the Transfer of a Unit, for purposes of determining the rights to distributions (including Tax Distributions) under this Agreement, distributions (including Tax Distributions) made to the transferor Member, along with any withholding or deduction in respect of any such distribution, shall be treated as having been made to the transferee unless otherwise determined by the Company.

(b)    <u>Record Date for Distributions</u>. The Company may designate a Record Date for purposes of calculating and giving effect to distributions. All distributions shall be made to the holders of record as of the applicable Record Date.

(c)    <u>Over-Distributions</u>. If the amount of any distribution to a Member under the Agreement exceeds the amount to which the Member in entitled (e.g., by reason of an accounting error), the Member shall, upon written notice of the over-distribution delivered to the Member within one year of the over-distribution, promptly return the amount of such over-distribution to the Company.

10

**EXHIBIT 2**
**Page 343 of 404**

(d)     <u>Reimbursements of Preformation Capital Expenditures</u>.   To the extent a distribution (or deemed distribution resulting from a reduction in a Member's share of Company liabilities for federal tax purposes) otherwise would be treated as proceeds in a sale under Code section 707(a)(2)(B), the Members intend such actual or deemed distribution to reimburse preformation capital expenditures under Treas. Reg. § 1.707-4(d) to the maximum extent permitted by Law.

(e)     <u>Limitation on Distributions</u>.   Notwithstanding any provision of this Agreement to the contrary, the Company shall not make a distribution to any Member to the extent such distribution would violate the Act or other Law or would result in the Company or any of its Subsidiaries being in default under any material agreement.

## ARTICLE IV

## MANAGEMENT AND OPERATIONS

Section 4.1<u>Management</u>.

(a)     <u>Authority of Manager</u>.

(i)     Except as otherwise provided in this Agreement, the Manager shall have full, exclusive, and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to do or cause to be done any and all acts, at the expense of the Company, as the Manager deems necessary or appropriate to accomplish the purposes and direct the affairs of the Company.  Without limiting the generality of the preceding sentence and subject to <u>Section 4.1</u>, the Manager may cause the Company, without the consent or approval of any other Member, to enter into any of the following in one or a series of related transactions: (i) any merger, (ii) any acquisition, (iii) any consolidation, (iv) any sale, lease or other transfer or conveyance of Assets, (v) any recapitalization or reorganization of outstanding securities, (vi) any merger, sale, lease, spin-off, exchange, transfer or other disposition of a Subsidiary, division or other business, (vii) any issuance of Debt or equity securities (subject to any limitations expressly provided for in this Agreement), or (viii) any incurrence of Debt.

(ii)     The Manager shall have the exclusive power and authority to bind the Company and shall be an agent of the Company's business.  The actions of the Manager taken in such capacity and in accordance with this Agreement shall bind the Company.  Except to the extent expressly delegated in writing by the Manager, no Member or Person other than the Manager shall be an agent for the Company or have any right, power or authority to transact any business in the name of the Company or act for or on behalf of or to bind the Company.

(iii)     Subject to the rights of any Member set forth in <u>Section 4.1(f)</u>, any determinations to be made by the Company pursuant to this Agreement shall be made by the Manager, and such determinations shall be final, conclusive and binding upon the Company and every Member.

(iv)     The Manager shall constitute a "manager" (as that term is defined in the Act) of the Company.

11

EXHIBIT 2
Page 344 of 404

(v)    The Manager may not be removed by the Members, with or without cause, except with the consent of the Manager.

(b)    <u>Appointment of Officers</u>.  The Manager may, from time to time, appoint such officers and establish such management and/or advisory boards or committees of the Company as the Manager deems necessary or advisable, each of which shall have such powers, authority, and responsibilities as are delegated in writing by the Manager from time to time.  Each such officer and/or board or committee member shall serve at the pleasure of the Manager.  The initial Officers of the Company are set forth on <u>Annex D</u> attached to this Agreement.

(c)    <u>No Participation by Members</u>.  Except as otherwise expressly provided in this Agreement or required by any non-waivable provision of the Act or other Law and subject to <u>Section 4.1</u>, no Member (acting in such capacity) shall (x) have any right to vote on or consent to any other matter, act, decision or document involving the Company or its business or any other matter, or (y) take part in the day-to-day management, or the operation or control, of the business and affairs of the Company. No Member, as such, shall have the power to bind the Company.

(d)    <u>Bankruptcy</u>.  Only the Manager may commence a voluntary case on behalf of, or an involuntary case against, the Company under a chapter of Title 11 U.S.C. by the filing of a "petition" (as defined in 11 U.S.C. 101(42)) with the United States Bankruptcy Court.  Any such petition filed by any other Member, to the fullest extent permitted by Law, shall be deemed an unauthorized and bad faith filing, and all parties to this Agreement shall use their best efforts to cause such petition to be dismissed.

(e)    <u>Amendment of Agreement</u>.  All amendments to this Agreement must be approved by the Manager.  Subject to the rights of any Member set forth in a Unit Designation and <u>Section 4.1(f)</u> and <u>Section 4.1(g)</u>, the Manager shall have the power, without the consent or approval of any Member, to amend this Agreement as may be required to facilitate or implement any of the following purposes:

(i)    To add to the obligations of the Manager or surrender any right or power granted to the Manager or any Affiliate of the Manager for the benefit of the Members;

(ii)    To reflect a change that is of an inconsequential nature or does not adversely affect the Members in any material respect, or to cure any ambiguity, correct or supplement any provision in this Agreement not inconsistent with Law or with other provisions, or make other changes with respect to matters arising under this Agreement that will not be inconsistent with Law or with the provisions of this Agreement;

(iii)    To satisfy any requirements, conditions, or guidelines contained in any order, directive, opinion, ruling or regulation of a federal or state agency, or in federal or state Law;

(iv)    To reflect the admission, substitution, or withdrawal of Members, the Transfer of any Units, the issuance of additional Units, or the termination of the Company in accordance with this Agreement, and to amend the Register in connection with such admission, substitution, withdrawal, or Transfer;

12

**EXHIBIT 2**
**Page 345 of 404**

(v)     To set forth or amend the designations, preferences, conversion or other rights, voting powers, restrictions, limitations as to distributions, qualifications or terms or conditions of redemption of any additional Units issued pursuant to Article II;

(vi)    If the Company is the Surviving Company in any Termination Transaction, to modify Section 11.1 or any related definitions to provide the holders of interests in the Surviving Company rights that are consistent with Section 7.7(b)(iii); and

(vii)   To reflect any other modification to this Agreement as is reasonably necessary or appropriate for the business or operations of the Company or the Manager and that does not violate a Unit Designation, Section 4.1(f), or Section 4.1(g).

(f)     Certain Amendments and Actions Requiring Member Consent.

(i)     Notwithstanding anything in Section 4.1(e) or Article X to the contrary, this Agreement shall not be amended, and no action may be taken by the Manager or the Company without the consent of any Member holding Common Units that would be adversely affected by such amendment or action. Without limiting the generality of the preceding sentence, for purposes of this Section 4.1(f)(i), the Members holding Common Units will be deemed to be adversely affected by an amendment or action that would (A) adversely alter the rights of any Member to receive the distributions to which such Member is entitled pursuant to Article III or Section 9.3(a)(iii), (B) convert the Company into a corporation or cause the Company to be classified as a corporation for federal income tax purposes (other than in connection with a Termination Transaction), or (C) amend this Section 4.1(f)(i). Notwithstanding the provisions of the preceding two sentences of this Section 4.1(f)(i), but subject to Section 4.1(f)(ii), the consent of any Member holding Common Units that would be adversely affected by an amendment or action shall not be required for any such amendment or action that affects all Members holding the same class or series of Units on a uniform or *pro rata* basis if such amendment or action is approved by a Majority-in-Interest of the Members of such class or series. If some, but not all, of the Members consent to such an amendment or action, the Company may, in its discretion, make such amendment or action effective only as to the Members that consented to it, to the extent it is practicable to do so.

(ii)    This Agreement shall not be amended, and no action may be taken by the Manager without the consent of any Member holding Common Units that would be adversely affected by such amendment or action if such amendment or action would (A) modify the limited liability of a Member or increase the obligation of a Member to make a Capital Contribution to the Company or (B) amend this Section 4.1(f)(ii).

(g)     Implementation of Amendments.  Upon obtaining any Consent required under this Section 4.1 or otherwise required by this Agreement, and without further action or execution by any other Person, including any Member, (i) any amendment to this Agreement may be implemented and reflected in a writing executed solely by the Manager, and (ii) the Members shall be deemed a party to and bound by that amendment of this Agreement.

Section 4.2 Tax Actions.  All tax-related actions, decisions, or determinations (or failure to take any available tax-related action, decision, or determination) by or with respect to the

Company or any Subsidiary of the Company not expressly reserved for the Members shall be made, taken, or determined by the Manager.

Section 4.3 Compensation and Reimbursement of Manager.

(a)    General.  The Manager shall not receive any fees from the Company for its services in administering the Company, except as otherwise provided in this Agreement.

(b)    Reimbursement of Manager.  The Company shall be liable for, and shall reimburse the Manager on an after-tax basis at such intervals as the Manager may determine, all:

(i)    overhead, administrative expenses, insurance and reasonable legal, accounting and other professional fees and expenses of the Manager;

(ii)    expenses of the Manager incidental to being a public reporting company;

(iii)    reasonable fees and expenses related to the SPAC Transactions or any subsequent public offering of equity securities of the Manager (without duplicating any provisions of Section 2.5(e)) or private placement of equity securities of the Manager (including any reasonable fees and expenses related to the registration for resale of any such securities), whether or not consummated;

(iv)    franchise and similar taxes of the Manager and other fees and expenses in connection with the maintenance of the existence of the Manager;

(v)    customary compensation and benefits payable by the Manager, and indemnities provided by the Manager on behalf of, the officers, directors, and employees of the Manager; and

(vi)    reasonable expenses paid by the Manager on behalf of the Company; *provided*, *however*, that the amount of any reimbursement shall be reduced by any interest earned by the Manager with respect to bank accounts or other instruments or accounts held by it on behalf of the Company as permitted pursuant to Section 4.4.  Such reimbursements shall be in addition to any reimbursement of the Manager as a result of indemnification pursuant to Section 4.7.

Section 4.4 Outside Activities.

(a)    Limitation on Outside Activities of Manager.  The Manager shall not directly or indirectly enter into or conduct any business, other than in connection with (i) the ownership, acquisition, and disposition of Units, (ii) maintaining its legal existence (including the ability to incur and pay, as applicable, fees, costs, expenses and taxes relating to that maintenance), (iii) the management of the business of the Company and its Subsidiaries, (iv) its operation as a reporting company with a class (or classes) of securities registered under the Exchange Act, (v) the offering, sale, syndication, private placement, or public offering of stock, bonds, securities, or other interests of the Manager, (vi) the financing or refinancing of any type related to the Company or its Assets or activities, (vii) receiving and paying dividends and distributions or making contributions to the capital of its Subsidiaries, (viii) filing tax reports and tax returns and paying

14

**EXHIBIT 2**
**Page 347 of 404**

taxes and other customary obligations in the ordinary course (and contesting any taxes), (ix) participating in tax, accounting, and other administrative matters with respect to its Subsidiaries and providing administrative and advisory services (including treasury and insurance services, including maintaining directors' and officers' insurance on its behalf and on behalf of its Subsidiaries) to its Subsidiaries, (x) holding any cash or property (but not operating any property), (xi) indemnifying officers, directors, members of management, managers, employees, consultants, or independent contractors of the Manager, the Company or their respective Subsidiaries, (xii) entering into any Termination Transaction or similar transaction in accordance with this Agreement, (xiii) preparing reports to governmental authorities and to its shareholders, (xiv) holding director and shareholder meetings, preparing organizational records, and other organizational activities required to maintain its separate organizational structure, (xv) complying with applicable Law, (xvi) engaging in activities relating to any management equity plan, stock option plan or any other management or employee benefit plan of the Manager, the Company or their respective Subsidiaries, and (xvii) engaging in activities that are incidental to clauses (i) through (xvi).   The provisions of this Section 4.4 shall restrict only the Manager and its Subsidiaries (other than the Company and its Subsidiaries) and shall not restrict the other Members or any Affiliate of the other Members (other than the Manager).

    (b)  Outside Activities of Members.

      (i)  Subject to (x) Article XI of the Certificate of Incorporation of the Manager, (y) any agreements entered into pursuant to Section 4.5, and (z) any other agreements (including any employment agreement) entered into by a Member or any of its Affiliates with the Manager, the Company or a Subsidiary, any Member (but, with respect to the Manager, subject to Section 4.4(a)), or any officer, director, employee, agent, trustee, Affiliate, member or stockholder of any Member shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, including business interests and activities that are in direct or indirect competition with the Company or that are enhanced by the activities of the Company, and, in any such case, need not (A) first offer the Company or any of its Subsidiaries an opportunity to participate in such business interests or activities or (B) account to the Company or any of its Subsidiaries with respect to such business interests or activities.

      (ii)  None of the Members, the Company or any other Person shall have any rights by virtue of this Agreement or the relationship established hereby in any business ventures of any other Member or Person.   Subject to any other agreements entered into by a Member or its Affiliates with the Manager, the Company or a Subsidiary, no Member (other than the Manager) or any such other Person shall have any obligation pursuant to this Agreement to offer any interest in any such business ventures to the Company, any Member, or any such other Person.

    Section 4.5 Transactions with Affiliates.  Subject to the provisions of Section 4.1(f) and Section 4.4, the Company may enter into any transaction or arrangement with the Manager or Subsidiaries of the Company or other Persons in which the Company has an equity investment on terms and conditions determined by the Manager.  Without limiting the foregoing, but subject to Section 4.4, (a) the Company may (i) lend funds to, or borrow funds from, the Manager or to Subsidiaries of the Company or other Persons in which the Company has an equity investment and (ii) transfer Assets to joint ventures, limited liability companies,

15

**EXHIBIT 2**
**Page 348 of 404**

partnerships, corporations, business trusts or other business entities in which the Company or any of its Subsidiaries is or thereby becomes a participant, and (b) the Manager may (i) propose and adopt on behalf of the employee benefit plans funded by the Company for the benefit of employees of the Manager, the Company, Subsidiaries of the Company or any Affiliate of any of them in respect of services performed, directly or indirectly, to or for the benefit of the Manager, the Company or any of the Company's Subsidiaries and (ii) sell, transfer or convey any property to the Company, directly or indirectly.

Section 4.6 <u>Limitation on Liability</u>.

(a)    <u>General</u>.  To the fullest extent permitted by Law, including by ORS 63.160 of the Act, no Indemnitee, in such capacity, shall be liable to the Company, any Member or any of their respective Affiliates, for any losses sustained or liabilities incurred as a result of any act or omission of such Person if (i) either (A) the Indemnitee, at the time of such act or omission, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or (B) in the case of omission by the Indemnitee, the Indemnitee did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company and (ii) the act or omission did not constitute fraud or intentional misconduct by the Indemnitee.

(b)    <u>Action in Good Faith</u>.  An Indemnitee acting under this Agreement shall not be liable to the Company for its, his, or her good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand, restrict, or eliminate the duties and liabilities of such Persons otherwise existing at Law or in equity, are agreed by the Members to replace fully and completely such other duties and liabilities of such Persons.  Whenever the Manager or the Company is permitted or required to make a decision or take an action under this Agreement (i) in making such decisions, such Person shall be entitled to take into account its own interests as well as the interests of the Members as a whole or (ii) in its "good faith" or under another expressed standard, such Person shall act under such express standard and shall not be subject to any other or different standards.

(c)    <u>Outside Counsel</u>.  The Manager may consult with legal counsel, accountants and financial or other advisors, and any act or omission suffered or taken by the Manager on behalf of the Company or in furtherance of the interests of the Company in good faith in reliance upon and in accordance with the advice of such counsel, accountants or financial or other advisors will be full justification for any such act or omission, and the Manager will be fully protected in so acting or omitting to act so long as such counsel or accountants or financial or other advisors were selected with reasonable care.

(d)    <u>Duties of Members</u>. Other than obligations of Members explicitly set forth in this Agreement, no Member (other than the Manager in its capacity as a manager), including any Member who may be deemed to be a controlling Member under applicable Law (other than the Manager in its capacity as a manager), shall owe any duty (of loyalty, care or otherwise) to the Company or to any other Member solely by reason of being a Member. With respect to each matter requiring approval of a Majority-in-Interest of the Members, each Member having voting rights may grant or withhold such Member's vote under this Agreement, in such Member's sole judgment, as directed or otherwise determined by such Member, without regard to the interests of

16

EXHIBIT 2
Page 349 of 404

any other Member or of the Company, and no Member shall have any duty to represent or act in the best interests of the Company or any other Member.

Section 4.7 Indemnification.

(a)     General.  The Company shall indemnify and hold harmless each Indemnitee (and such Person's heirs, successors, assigns, executors or administrators) to the full extent permitted by Law and to the same extent and in the same manner provided by the provisions of Article VI of the Bylaws of the Manager applicable to officers and directors as if such provisions were set forth herein, *mutatis mutandis*, and applied to each such Indemnitee.

(b)     Non-Exclusivity of Rights.  The rights to indemnification and to the advancement of expenses conferred in this Section 4.7 shall not be exclusive of any other right that any Person may have or hereafter acquire under any law, agreement, vote of stockholders or disinterested directors, provisions of a certificate of incorporation or bylaws, or otherwise.

(c)     Nature of Rights.  The rights conferred upon Indemnitees in this Section 4.7 shall be contract rights and shall continue as to an Indemnitee who has ceased to be the Manager, an Affiliate of the Manager, the Tax Representative, the Designated Individual, or an officer or director of the Manager, the Company, or their respective Affiliates.  Any amendment, alteration or repeal of this Section 4.7 or of Article VI of the Bylaws of the Manager that would adversely affect any right of an Indemnitee or its successors that apply prospectively only and shall not limit or eliminate any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place before such amendment, alteration or repeal.

**ARTICLE V**

**BOOKS AND RECORDS**

Section 5.1 Books and Records.

(a)     General.  The Company shall maintain in its principal business office, or any other place as may be determined by the Company, the books and records of the Company.

(b)     Specific Records.  In particular, the Company shall maintain:

(i)     A register containing the name, address, and number and class of Units (including Equivalent Units) of each Member, and such other information as the Manager may deem necessary or desirable and attached to this Agreement as Annex A (as may be amended or updated from time to time, the "**Register**").  The Manager shall from time to time update the Register as necessary to ensure the Register is accurate, including as a result of any sales, exchanges, or other Transfers, or any redemptions, issuances, or similar events involving Units. Except as required by Law, no Member shall be entitled to receive a copy of the Register or of the information set forth in the Register relating to any Member other than itself.

(ii)     A copy of the Articles of Conversion, Articles of Organization and this Agreement and all amendments thereto.

17

**EXHIBIT 2**
**Page 350 of 404**

Section 5.2<u>Financial Accounts</u>.  At all times during the continuance of the Company, the Company shall prepare and maintain separate books of account for the Company for financial reporting purposes, on an accrual basis, in accordance with United States generally accepted accounting principles, consistently applied.

Section 5.3<u>Inspection; Confidentiality</u>.  The Manager may keep confidential from the Members (or any of them) for such period of time as the Manager determines to be reasonable, any information (a) that the Manager believes to be in the nature of trade secrets, (b) the disclosure of which the Manager in good faith believes is not in the best interests of the Company or the Manager, or (c) that the Company or the Manager is required by Law, agreement, or customary commercial practice to keep confidential.  Subject to the provisions of the previous sentence, the Members (personally or through an authorized representative) may, for purposes reasonably related to their respective interests in the Company, examine and copy (at their own cost and expense) the books and records of the Company at all reasonable business hours upon reasonable prior notice.

Section 5.4<u>Information to Be Provided by Manager to Members</u>.  The Company shall deliver (or otherwise make accessible) to each Member a copy of any information mailed or delivered electronically to all of the common stockholders of the Manager as soon as practicable after such mailing or electronic delivery.

## ARTICLE VI

## TAX MATTERS, ACCOUNTING, AND REPORTING

Section 6.1<u>Tax Matters</u>.

(a)    <u>Tax Returns</u>.  The Company shall use reasonable best efforts to cause to be prepared and timely filed (taking into account available extensions) all federal, state, and local, and non-U.S. tax returns of the Company for each year for which such returns are required to be filed and shall determine the appropriate treatment of each tax item of the Company and make all other determinations with respect to such tax returns.

(b)    <u>Other Tax Matters</u>.  Each of the provisions of <u>Annex C</u>, which address various tax matters, is incorporated into and shall constitute a part of this Agreement.

Section 6.2<u>Accounting and Fiscal Year</u>.  Unless otherwise determined by the Company or required by Code section 706, the fiscal year of the Company (the "**Fiscal Year**") shall be the calendar year ending December 31st, or, in the case of the last Fiscal Year of the Company, the fraction thereof ending on the date on which the winding up of the Company is completed.

## ARTICLE VII

## UNIT TRANSFERS AND MEMBER WITHDRAWALS

Section 7.1<u>Transfer Generally Prohibited</u>.  No Units shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Article VII</u> and <u>Article XI</u>.  Any Transfer or purported Transfer of a Unit not made in accordance with this

18

**EXHIBIT 2**
**Page 351 of 404**

Article VII or Article XI shall be null and void *ab initio*.  Units shall not be subject to the claims of any creditor, spouse for alimony or support, or legal process and may not be voluntarily or involuntarily alienated or encumbered except as may be specifically provided for in this Agreement.

Section 7.2 Conditions Generally Applicable to All Transfers.  All Transfers are subject to the satisfaction of the following conditions:

(a)    Transfers by Members Other than the Manager.

(i)    Consent of Manager.  No Member other than the Manager shall Transfer any portion of its Units to any transferee without the prior written consent of the Manager unless the Transfer is a Related-Party Transfer.

(ii)    Assumption of Obligations; No Relief from Obligations.  Any transferee of all or a portion of a Unit (whether or not admitted as a Substituted Member) shall take subject to and assume, by operation of Law or express agreement, all of the obligations of the transferor Member under this Agreement with respect to such Transferred Unit.  No Transfer (other than pursuant to a statutory merger or consolidation pursuant to which all obligations and liabilities of the transferor Member are assumed by a successor corporation by operation of Law) shall relieve the transferor Member of its obligations under this Agreement without the approval of the Manager.

(iii)    No Rights as Member.  No transferee, whether by a voluntary Transfer, by operation of Law or otherwise, shall have any rights under this Agreement unless admitted as a Substituted Member.

(b)    Transfers by the Manager.

(i)    Consent of Members.  The Manager may not Transfer any of its Units without the consent of a Majority-in-Interest of the Members, except in connection with an Applicable Sale or Termination Transaction or to a wholly owned subsidiary in accordance with Section 7.2(b)(ii).

(ii)    Transfer to Subsidiary.  Subject to compliance with the other provisions of this Article VII, the Manager may Transfer all of its Units at any time to any Person that is, at the time of such Transfer, a direct or indirect wholly owned Subsidiary of the Manager without the consent of any Member and may designate the transferee to become the new Manager for all purposes of this Agreement.

(c)    Withholding with Respect to a Transfer of Units.  A Member making a Transfer permitted by this Agreement shall comply with Section 4.10(b) of Annex C.

(d)    Other Restrictions on Transfer.  In addition to any other restrictions on Transfer in this Agreement, no Member may Transfer a Unit (including by way of acquisition of

19

**EXHIBIT 2**
**Page 352 of 404**

Units by the Manager or any other acquisition of Units by the Company) if the Company determines:

(i)      Such Transfer would create a material risk of the Company being classified as an association taxable as a corporation for U.S. federal, state, or local income tax purposes;

(ii)      That the Transfer would be to any Person or entity that lacks the legal right, power or capacity to own a Unit;

(iii)      That the Transfer would be in violation of Law;

(iv)      That the Transfer would be of any fractional or component portion of a Unit or rights to distributions, separate and apart from all other components of a Unit;

(v)      That the Transfer would create a material risk that the Company would become, with respect to any employee benefit plan subject to Title I of ERISA, a "party-in-interest" (as defined in ERISA Section 3(14)) or a "disqualified Person" (as defined in Code section 4975(c));

(vi)      That the Transfer would create a material risk that any portion of the Assets would constitute assets of any employee benefit plan pursuant to Department of Labor Reg. § 2510.2-101;

(vii)      That the Transfer would require the registration of such Unit pursuant to any applicable federal or state securities Laws;

(viii)      That such Transfer would create a material risk that the Company would become a reporting company under the Exchange Act; or

(ix)      That the Transfer would subject the Company to regulation under the Investment Company Act of 1940, the Investment Advisors Act of 1940 or ERISA, each as amended.

Section 7.3 Substituted Members.

(a)      Admission as Member.  A transferee of Units of a Member, other than a Related-Party Transferee, may be admitted as a Substituted Member only with the consent of the Company.  A Related-Party Transferee shall be admitted as a Substituted Member without the consent of the Company, subject to compliance with Section 7.3(b).  The failure or refusal by the Company to permit a transferee of Units to become a Substituted Member shall not give rise to any cause of action against the Company or the Manager.  A transferee who has been admitted as a Substituted Member in accordance with this Article VII shall have all the rights and powers and be subject to all the restrictions and liabilities of a Member under this Agreement.

(b)      Documents to Be Provided by Transferee.  No transferee shall be admitted as a Substituted Member until and unless it furnishes to the Manager (i) evidence of acceptance, in form and substance satisfactory to the Manager, of all the terms, conditions and applicable

20

**EXHIBIT 2**
**Page 353 of 404**

obligations of this Agreement, (ii) a counterpart signature page to this Agreement executed by such transferee and (iii) such other documents and instruments as the Manager may require to effect such transferee's admission as a Substituted Member, including a certification from the transferee or an opinion of counsel reasonably acceptable to the Company in respect of any of the restrictions on transfer set forth in Section 7.2(d) (which certification or opinion may be waived, in whole or in part, in the sole discretion of the Company).

(c)    Amendment of Books and Records. In connection with, and as evidence of, the admission of a Substituted Member, the Manager or Company shall amend the Register and the books and records of the Company to reflect the name, address and number of Units of such Substituted Member and to eliminate or adjust, if necessary, the name, address and number of Units of the predecessor of such Substituted Member.

Section 7.4 Drag-Along Rights.

(a)    If at any time the Manager and/or its Affiliates (excluding, for purposes of this Section 7.4, the Company and its Subsidiaries) desire to Transfer in one or more transactions a sufficient portion of its and/or their Units (or any beneficial interest therein) to constitute a Change of Control to a bona fide third party that is not an Affiliate of the Manager (an "**Applicable Sale**"), the Manager may require each other Member either (i) to sell the same ratable share of its Units as is being sold by the Manager and such Affiliates (based upon the total Units held by the Manager and its Affiliates at such time) on the same terms and conditions and/or (ii) to exchange its Units pursuant to Section 11.1(b) (each, a "**Drag-Along Right**"). The Manager may in its sole discretion elect to cause the Manager and/or the Company to structure the Applicable Sale as a merger or consolidation or as a sale of the Company's Assets. No Member shall have any dissenters' rights, appraisal rights or similar rights in connection with any Applicable Sale, and no Member may object to any subsequent liquidation or other distribution of the proceeds from an Applicable Sale that is a sale of Assets. Each Member agrees to consent to, and raise no objections against, an Applicable Sale. In the event of the exercise by the Manager of its Drag-Along Right pursuant to this Section 7.4, each Member shall take all reasonably necessary and desirable actions approved by the Manager in connection with the consummation of the Applicable Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to provide customary and reasonable representations, warranties, indemnities, covenants, conditions and other agreements relating to such Applicable Sale and to otherwise effect the transaction; *provided*, *however*, that (A) such Members shall not be required to give disproportionately greater or more onerous representations, warranties, indemnities, or covenants than the Manager or its Affiliates, (B) such Members shall not be obligated to bear any share of the out-of-pocket expenses, costs, or fees (including attorneys' fees) incurred by the Company or its Affiliates in connection with such Applicable Sale unless and to the extent that such expenses, costs, and fees were incurred for the benefit of the Company or all of its Members, (C) such Members shall not be obligated or otherwise responsible for more than their proportionate shares of any indemnities or other liabilities incurred by the Company and the Members as sellers in respect of such Applicable Sale, (D) any indemnities or other liabilities approved by the Manager shall be limited, in respect of each Member, to such Member's share of the proceeds from the Applicable Sale, and

(E) such Members shall not be required to enter into any non-compete agreement in connection with such Applicable Sale.

(c)    At least five (5) Business Days before consummation of an Applicable Sale, the Manager shall (i) provide the Members written notice (the "**Applicable Sale Notice**") of the Applicable Sale, which notice shall contain (A) the name and address of the third-party purchaser, (B) the proposed purchase price, terms of payment, and other material terms and conditions of the purchaser's offer, together with a copy of any binding agreement with respect to the Applicable Sale and (C) notification of whether the Manager has elected to exercise its Drag-Along Right and (ii) promptly notify the Members of all proposed changes to the material terms and keep the Members reasonably informed as to all material terms relating to the Applicable Sale or contribution, and promptly deliver to the Members copies of all final material agreements relating to the Applicable Sale not already provided in accordance with this Section 7.4(c) or otherwise. The Manager shall provide the Members written notice of the termination of an Applicable Sale within five (5) Business Days following such termination, which notice shall state that the Applicable Sale Notice served with respect to such Applicable Sale is rescinded.

Section 7.5 Company Right to Call Units.    Beginning on the date on which the aggregate Percentage Interests of the Members (other than the Manager and its Subsidiaries) are less than fifteen (15) percent, the Company shall have the right, but not the obligation, from time to time and at any time to redeem all (but not less than all) outstanding Exchangeable Units by treating each Member as an Exchangeable Unit Member who has delivered an Elective Exchange Notice pursuant to the Policy Regarding Exchanges in respect of all of such Exchangeable Unit Member's Exchangeable Units.    The Company shall exercise this right by giving notice to an Exchangeable Unit Member stating that the Company has elected to exercise its rights under this Section 7.5.    The notice given by the Company to an Exchangeable Unit Member pursuant to this Section 7.5 shall be treated as if it were an Elective Exchange Notice delivered to the Company by such Exchangeable Unit Member.    For purposes of this Section 7.5, the provisions of Annex C shall apply except to the extent otherwise determined by the Company.

Section 7.6 Withdrawal.

(a)    Permissible Withdrawals.    Subject to any Unit Designation, no Member may withdraw from the Company other than:

(i)    As a result of a Transfer of all of such Member's Units in accordance with this Article VII or Article XI with respect to which the transferee becomes a Substituted Member;

(ii)    Pursuant to an acquisition by the Manager or Subsidiary of the Manager of all of its Units; or

(iii)    With the prior written consent of the Company.

(b)    Consequences of Withdrawal.    Any Member who Transfers all of its Units in a Transfer (i) permitted pursuant to this Article VII where such transferee was admitted as a Substituted Member or (ii) to the Manager, whether or not pursuant to Section 11.1, shall cease to

**EXHIBIT 2**
**Page 355 of 404**

be a Member but shall continue to have the obligations of a former Member that are expressly set forth in this Agreement.

Section 7.7 Restrictions on Termination Transactions.

(a)     General.  Except as provided in Section 7.7(b), neither the Company nor the Manager shall engage in, or cause or permit, a Termination Transaction.

(b)     Consent.  The Company or Manager may engage in, cause, or permit a Termination Transaction only if at least one of the following conditions is satisfied:

(i)     A Majority-in-Interest of the Members give Consent;

(ii)     In connection with any such Termination Transaction, each holder of Common Units (other than the Manager and its wholly owned Subsidiaries) will receive, or will have the right to elect to receive, for each Common Unit an amount of cash, securities or other property equal to the greatest amount of cash, securities or other property that the holder of Common Units would have received had it exercised its right to Exchange pursuant to Article XI and received Class A Common Stock in exchange for its Common Units immediately before such Termination Transaction; or

(iii)     All of the following conditions are met: (1) substantially all of the Assets directly or indirectly owned by the Company before the announcement of the Termination Transaction are, immediately after the Termination Transaction, owned directly or indirectly by the Company or another limited partnership or limited liability company that is the survivor of a merger, consolidation or combination of assets with the Company (in each case, the "**Surviving Company**"); (2) the Surviving Company is classified as a partnership for U.S. federal income tax purposes and each of its Subsidiaries has the same classification for U.S. federal, state, and local tax purposes immediately after the Termination Transaction that each Subsidiary had immediately before the Termination Transaction; (3) the rights of such Members with respect to the Surviving Company (including pursuant to a Tax Receivable Agreement) are at least as favorable as those of Members holding Units immediately before the consummation of such Termination Transaction (except to the extent that any such rights are consistent with clause (4) of this Section 7.7(b)(iii)) and as those applicable to any other limited partners or non-managing members of the Surviving Company; and (4) such rights include the right to cause their interests in the Surviving Company to be redeemed at any time or times for cash in an amount equal to the Fair Market Value of such interest at the time of redemption, as determined at least once every calendar quarter by an independent appraisal firm of recognized national standing retained by the Surviving Company.

Section 7.8 Incapacity.     If a Member is subject to Incapacity, the executor, administrator, trustee, committee, guardian, conservator, or receiver of such Member's estate (a "**Member Representative**") shall have the same rights as the Incapacitated Member possessed to Transfer its Units.  The Incapacity of a Member, in and of itself, shall not dissolve or terminate the Company.  Unless a Member or Member Representative informs the Company in writing of the Member's Incapacity, the Company shall have the right to assume each Member is not Incapacitated.  The Company shall have no obligation to determine whether or not a Member is Incapacitated.

23

**EXHIBIT 2**
**Page 356 of 404**

Section 7.9<u>Legend</u>.  Each certificate representing a Unit, if any, will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.

THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT.

THE TRANSFER AND VOTING OF THESE SECURITIES IS SUBJECT TO THE CONDITIONS SPECIFIED IN THE SIXTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF NUSCALE POWER, LLC DATED AS OF [●], 2022, AMONG THE MEMBERS LISTED THEREIN, AS IT MAY BE AMENDED, SUPPLEMENTED AND/OR RESTATED FROM TIME TO TIME, AND NO TRANSFER OF THESE SECURITIES WILL BE VALID OR EFFECTIVE UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE ISSUER OF SUCH SECURITIES."

## ARTICLE VIII

## ADMISSION OF ADDITIONAL MEMBERS

Section 8.1<u>Admission of Additional Members</u>.

(a)    <u>Requirements for Admission</u>.  A Person (other than a then-existing Member) who makes a Capital Contribution to the Company in exchange for Units and in accordance with this Agreement shall be admitted to the Company as an Additional Member only upon furnishing to the Manager (i) evidence of acceptance, in form and substance satisfactory to the Manager, of all of the terms and conditions of this Agreement, including the power of attorney granted in <u>Section 12.1</u>, (ii) a counterpart signature page to this Agreement executed by such Person, and (iii) such other documents or instruments as may be required by the Manager in order to effect such Person's admission as an Additional Member.  In connection with, and as evidence of, the admission of an Additional Member, the Manager shall amend the Register and the books and records of the Company to reflect the name, address, number and type of Units of such Additional Member.

(b)    <u>Consent of Company Required</u>.  Notwithstanding anything to the contrary in this <u>Section 8.1</u>, no Person shall be admitted as an Additional Member without the consent of the Company.  The admission of any Person as an Additional Member shall become effective on the date determined by the Company (but in no case earlier than the satisfaction of all the conditions set forth in <u>Section 8.1(a)</u>).

Section 8.2<u>Limit on Number of Members</u>.  Unless otherwise permitted by the Manager, no Person shall be admitted to the Company after the date of this Agreement as an Additional

24

EXHIBIT 2
Page 357 of 404

Member if the effect of such admission would be to cause the Company to have a number of Members (including as Members for this purpose those Persons indirectly owning an interest in the Company through another partnership, a limited liability company, a subchapter S corporation or a grantor trust) that would cause the Company to become a reporting company under the Exchange Act.

# ARTICLE IX

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 9.1 Dissolution Generally.

(a)    Dissolution Only in Accordance with This Agreement.  The Company shall not be dissolved by the substitution of Members or the admission of Additional Members in accordance with the terms of this Agreement.  The Company may be dissolved, liquidated and terminated only pursuant to the provisions of this Article IX, and the Members hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's Assets.

(b)    Termination of Members.  The death, retirement, resignation, expulsion, Bankruptcy, insolvency or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company shall not in and of itself cause dissolution of the Company.

Section 9.2 Events Causing Dissolution.

(a)    Actions by Members.  No Member shall take any action to dissolve, terminate or liquidate the Company, or require apportionment, appraisal or partition of the Company or any of its Assets, or file a bill for an accounting, except as specifically provided in this Agreement, and each Member, to the fullest extent permitted by Law, waives any rights to take any such actions under Law, including any right to petition a court for judicial dissolution under ORS 63.661 of the Act.

(b)    Liquidating Events.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events (each, a "**Liquidating Event**"):

(i)    an election to dissolve the Company made by the Manager, with the Consent of a Majority-in-Interest of the Members;

(ii)    the expiration of forty-five (45) days after the sale or other disposition of all or substantially all Assets; or

(iii)    any other event that results in a mandatory dissolution under the Act.

Section 9.3 Distribution upon Dissolution.

(a)    Order of Distributions.  Upon the dissolution of the Company pursuant to Section 9.2, the Manager (or, in the event that the Manager has dissolved, become Bankrupt or

EXHIBIT 2
Page 358 of 404

ceased to operate, any Person elected by a Majority-in-Interest of the Members (the Manager or such other Person, the "**Liquidator**")) shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's Assets and liabilities, and the Company's Assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom (which may, to the extent determined by the Manager, include shares of stock in the Manager) shall be applied and distributed in the following order:

(i) First, to the satisfaction of all of the Company's Debts and liabilities to creditors, including Members who are creditors (other than with respect to liabilities owed to Members in satisfaction of liabilities for previously declared distributions), whether by payment or the making of reasonable provision for payment thereof;

(ii) Second, to the satisfaction of all of the Company's liabilities to the Members in satisfaction of liabilities for previously declared distributions, whether by payment or the making of reasonable provision for payment thereof; and

(iii) The balance, if any, to the Members, in the same order of priorities provided for in Article III.

(b) Discretion of Liquidator and Manager.

(i) Notwithstanding the provisions of Section 9.3(a) that require liquidation of the Assets, but subject to the order of priorities set forth therein, if before or upon dissolution of the Company, the Liquidator determines that an immediate sale of part or all of the Company's Assets would be impractical or would cause undue loss to the Members, the Liquidator may, in its sole discretion, defer for a reasonable time the liquidation of any Assets except those necessary to satisfy liabilities of the Company (including to those Members as creditors) and/or distribute to the Members, in lieu of cash, as tenants-in-common and in accordance with the provisions of Section 9.3(a), undivided interests in such Company Assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and any agreements governing the operation of such properties at such time. The Liquidator shall determine the Fair Market Value of any property distributed in kind using such reasonable method of valuation as it may adopt.

(ii) In the sole discretion of the Manager, a *pro rata* portion of the distributions that would otherwise be made to the Members pursuant to this Article IX may be:

A) Distributed to a trust established for the benefit of the Manager and the Members for the purpose of liquidating Company Assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Manager arising out of or in connection with the Company and/or Company activities. The assets of any such trust shall be distributed to the Members, from time to time, in the reasonable discretion of the Manager, in the same proportions and amounts as would otherwise have been distributed to the Members pursuant to this Agreement; or

B) Withheld or escrowed to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any

26

EXHIBIT 2
Page 359 of 404

installment obligations owed to the Company, *provided*, that such withheld or escrowed amounts shall be distributed to the Members in the manner and order of priority set forth in Section 9.3(a) as soon as practicable.

Section 9.4Rights of Members.  Except as otherwise provided in this Agreement and subject to the rights of any Member set forth in a Unit Designation, (a) each Member shall look solely to the Assets for the return of its Capital Contribution, (b) no Member shall have the right or power to demand or receive property other than cash from the Company, and (c) no Member shall have priority over any other Member as to the return of its Capital Contributions or distributions.

Section 9.5Termination.  The Company shall terminate when all of the Assets, after payment of or due provision for all Debts, liabilities, and obligations of the Company, have been distributed to the Members in the manner provided for in this Article IX and the Articles of Organization shall have been cancelled in the manner required by the Act.

## ARTICLE X

## PROCEDURES FOR ACTIONS AND CONSENTS OF MEMBERS; MEETINGS

Section 10.1     Actions and Consents of Members.  The actions requiring Consent of any Member pursuant to this Agreement or otherwise pursuant to Law are subject to the procedures set forth in this Article X.

Section 10.2     Procedures for Meetings and Actions of the Members.

(a)     Time; Quorum; Consent.  Meetings of the Members may be called only by the Manager and shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members entitled to act at the meeting not less than two (2) days nor more than ninety (90) days before the date of such meeting.  Members may vote in Person or by proxy at such meeting.  Unless approval by a different number or proportion of the Members is required by this Agreement or any Unit Designation, the affirmative vote of a Majority-in-Interest of the Members shall be sufficient to approve such proposal at a meeting of the Members.  Whenever the Consent of any Members is permitted or required under this Agreement, such Consent may be given at a meeting of Members or in accordance with the procedure prescribed in Section 10.2(b).

(b)     Written Consents.  Any action requiring the Consent of any Member or a group of Members pursuant to this Agreement or that is required or permitted to be taken at a meeting of the Members may be taken without a meeting if a Consent in writing or by electronic transmission and filed with the Manager setting forth the action so taken or consented to is given by Members whose affirmative vote would be sufficient to approve such action or provide such Consent at a meeting of the Members.  Such Consent may be in one or several instruments and shall have the same force and effect as the affirmative vote of such Members at a meeting of the Members.  An action so taken shall be deemed to have been taken at a meeting held on the effective date so certified.  For purposes of obtaining a Consent in writing or by electronic transmission, the Manager may require a response within a reasonable specified time, and failure to respond in such

EXHIBIT 2
Page 360 of 404

time period shall constitute a Consent that is consistent with the Manager's recommendation with respect to the proposal.

(c) <u>Proxy</u>. Each Member entitled to act at a meeting of Members may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Each proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy (or there is receipt of a proxy authorizing a later date). Every proxy shall be revocable at the pleasure of the Member executing it, such revocation to be effective upon the Company's receipt of written notice of such revocation from the Member executing such proxy, unless such proxy states that it is irrevocable and is coupled with an interest.

(d) <u>Record Date for Meetings and Other Purposes</u>.

(i) The Manager may set, in advance, a Record Date (x) for the purpose of determining the identities of the Members entitled to Consent to any action or entitled to receive notice of or vote at any meeting of the Members or (y) to make a determination of Members for any other proper purpose. Any such date shall not be before the close of business on the day the Record Date is fixed and shall be not more than ninety (90) days and, in the case of a meeting of the Members, not less than two (2) days, before the date on which the meeting is to be held.

(ii) If no Record Date is set, the Record Date for the determination of Members entitled to notice of or vote at a meeting of the Members shall be at the close of business on the day on which the notice of the meeting is sent, and the Record Date for any other determination of Members shall be the effective date of such Member action, distribution or other event. When a determination of the Members entitled to vote at any meeting of the Members has been made as provided in this <u>Section 10.2(d)</u>, such determination shall apply to any adjournment thereof.

(e) <u>Conduct of Meetings</u>. Each meeting of Members shall be conducted by the Manager or such other Person as the Manager may appoint pursuant to such rules for the conduct of the meeting as the Manager or such other Person deems appropriate.

(f) <u>Waivers</u>. Any time period for notice with respect to meetings or consents of the Members may be waived by a Member as to such Member.

## ARTICLE XI

## EXCHANGE RIGHTS

Section 11.1    <u>Elective and Mandatory Exchanges</u>.

(a) <u>Elective Exchanges</u>. Subject to the Policy Regarding Exchanges set forth in <u>Annex E</u>, as amended from time to time by the Company (the "**Policy Regarding Exchanges**"), an Exchangeable Unit Member shall have the right, from time to time, to surrender Exchangeable Units, along with an equal number of shares of Class B Common Stock, (free and clear of all liens, encumbrances, rights of first refusal and similar restrictions, except for those arising under this

28

**EXHIBIT 2**
**Page 361 of 404**

Agreement) to the Company or the Manager and to thereby cause the Company or the Manager to deliver to such Exchangeable Unit Member (or its designee) the Exchange Consideration as set forth in <u>Section 11.3</u> (an "**Elective Exchange**").

(b)    <u>Mandatory Exchange Events</u>.  Units are subject to Mandatory Exchange in each of the following circumstances:

(i)    pursuant to <u>Section 7.4</u>, if an Applicable Sale is determined to be a Mandatory Exchange event in the sole discretion of the Manager;

(ii)    pursuant to <u>Section 7.5</u>; or

(iii)    in the discretion of the Manager, with the consent of Members whose Class B Units represent fifty percent (50%) of the Class B Units of all Members in the aggregate, all Members will be required to exchange all Exchangeable Units then held by the Members.

(c)    <u>Mandatory Exchange Notices and Dates</u>.  Upon the occurrence of any of the circumstances set out in <u>Section 11.1(b)</u>, the Manager may exercise its right to cause a mandatory exchange of a Member's Exchangeable Units and an equal number of shares of Class B Common Stock (a "**Mandatory Exchange**") by delivering to each Member a written notice pursuant to the notice provisions in <u>Section 12.6</u> (a "**Mandatory Exchange Notice**").  A Mandatory Exchange Notice will specify the basis for the Mandatory Exchange, the Exchangeable Units of the Company to which the Mandatory Exchange applies, the Exchange Consideration and the effective date of such Mandatory Exchange (the "**Mandatory Exchange Date**"), which shall be no earlier than ten (10) Business Days after delivery of the Mandatory Exchange Notice.  The Member receiving the Mandatory Exchange Notice shall use its reasonable best efforts to deliver the Certificates, as applicable, representing the applicable Exchangeable Units and corresponding shares of Class B Common Stock (free and clear of all liens, encumbrances, rights of first refusal and similar restrictions, except for those arising under this Agreement) no later than one (1) Business Day before the Mandatory Exchange Date.  Upon the Mandatory Exchange Date, the Company will affect the Mandatory Exchange.

Section 11.2    <u>Additional Terms Applying to Exchanges</u>.

(a)    <u>Rights of Exchangeable Unit Member</u>.  On an Exchange Date, all rights of the Exchangeable Unit Member as a holder of the Exchangeable Units and, if the applicable Exchangeable Units are Class B Units, shares of Class B Common Stock held by the holder of the Class B Units that are subject to the Exchange, shall cease, and, unless the Company or Manager, as applicable, has elected Cash Settlement as to all Exchangeable Units tendered, the Manager shall use commercially reasonable efforts to cause the transfer agent or registrar of the Manager to update the stock register of the Manager such that such Exchangeable Unit Member (or its designee) becomes the record holder of the shares of Class A Common Stock to be received by the Exchangeable Unit Member in respect of such Exchange.

(b)    <u>Right of Manager to Acquire Exchangeable Units</u>.  With respect to Units surrendered in an Elective Exchange or subject to a Mandatory Exchange, the Manager shall have the right but not the obligation to have the Manager (in lieu of the Company) acquire Exchangeable

29

**EXHIBIT 2**
**Page 362 of 404**

Units and, if the applicable Exchangeable Units are Class B Units, an equal number of shares of Class B Common Stock held by the holder of those Class B Units, directly from an Exchangeable Unit Member for the elected Exchange Consideration. If the Manager acquires Exchangeable Units as described in the preceding sentence, those Exchangeable Units shall be automatically recapitalized into the same number of Class A Units as the Exchangeable Units.

      (c)    Expenses. Except as otherwise agreed by the Company, the Manager and an Exchangeable Unit Member, the Company, the Manager, and each Exchangeable Unit Member shall bear their own expenses in connection with the consummation of any Exchange, whether or not any such Exchange is ultimately consummated. Notwithstanding the foregoing sentence, the Manager (or the Company, at the Manager's direction) shall bear any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, any Exchange; *provided*, *however*, that if any shares of Class A Common Stock are to be delivered pursuant to an Elective Exchange in a name other than that of the Exchangeable Unit Member that requested the Exchange (or The Depository Trust Company or its nominee for the account of a participant of The Depository Trust Company that will hold the shares for the account of such Exchangeable Unit Member) or the Cash Settlement is to be paid to a Person other than the Exchangeable Unit Member that requested the Exchange, then such Exchangeable Unit Member or the Person in whose name such shares are to be delivered or to whom the Cash Settlement is to be paid shall pay to the Manager (or the Company, at the Manager's direction) the amount of any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, such Exchange or shall establish to the reasonable satisfaction of the Manager that such tax has been paid or is not payable.

      (d)    Concurrent Delivery of Class B Common Stock. No Exchange of Class B Units may be made without a concurrent delivery of an equal number of shares of Class B Common Stock. Any shares of Class B Common Stock surrendered in an Exchange shall automatically be deemed retired without any action on the part of any Person, including the Manager. Any such retired shares of Class B Common Stock shall no longer be outstanding, all rights with respect to such shares shall automatically cease and terminate, and such shares shall return to the status of authorized but unissued shares of the Manager.

      Section 11.3    Exchange Consideration; Settlement.

      (a)    Generally. The Manager shall have the right, in its sole discretion, to elect the form of Exchange Consideration with respect to any Exchange. On an Exchange Date, provided the Exchangeable Unit Member has satisfied its obligations under the Policy Regarding Exchanges and not validly retracted such proposed Exchange, the Manager shall deliver or cause to be delivered the Exchange Consideration to such Exchangeable Unit Member (or its designee), at the address set forth on the applicable Exchange Notice. If the Manager elects a Cash Settlement, the Manager shall only be obligated to contribute to the Company (or, if the Manager elects to settle directly pursuant to Section 11.2(b), settle directly for an amount equal to) an amount in respect of such Cash Settlement equal to the net proceeds (after deduction of any underwriters' discounts and commissions) from the sale by the Manager of a number of shares of Class A Common Stock equal to the number of Exchangeable Units being Exchanged for such Cash Settlement. Except as otherwise required by Law, the Manager shall, for U.S. federal income tax purposes, be treated as paying an appropriate portion of the selling expenses described in the

**EXHIBIT 2**
**Page 363 of 404**

previous sentence as agent for and on behalf of the Exchangeable Unit Member.  Except as otherwise determined by the Manager, if (i) the Manager determines that some or all of the Exchange Consideration with respect to an Exchange will be Class A Common Stock and (ii) such Exchange would, but for this <u>Section 11.3(a)</u>, result in the Exchangeable Unit Member's receipt of a fractional share of Class A Common Stock, then the number of shares of Class A Common Stock to be received by the Exchangeable Unit Member shall be rounded down to the nearest whole number of shares and the amount of the reduction shall be paid as a Cash Settlement.

(b)    <u>Restriction on Cash Settlement of Class B Units</u>.  Except in connection with a payment in respect of a fractional share (as described in the final sentence of <u>Section 11.3(a)</u>), the Manager may elect Cash Settlement with respect to an Exchange of Exchangeable Units that are Class B Units only to the extent the Cash Settlement is funded by the proceeds (net of underwriting discounts and commissions) of a Liquidity Offering with respect to that Exchange.

(c)    <u>Notice of Intended Exchange Consideration</u>.  At least two (2) Business Days before the Exchange Date, the Manager shall give written notice to the Company (with a copy to the Exchangeable Unit Member) of its intended Exchange Consideration.  If the Manager does not timely deliver such written notice, the Manager shall be deemed to have elected to settle the Exchange with shares of Class A Common Stock.

(d)    <u>Settlement through Depository Trust Company</u>.  To the extent the Class A Common Stock is settled through the facilities of The Depository Trust Company, the Manager or the Company will, upon the written instruction of an Exchangeable Unit Member, deliver the shares of Class A Common Stock deliverable to such Exchangeable Unit Member through the facilities of The Depository Trust Company to the account of the participant of The Depository Trust Company designated by such Exchangeable Unit Member in the Exchange Notice.

(e)    <u>Obligations of Manager and Company</u>.  Upon any Exchange, the Manager or the Company, as applicable, shall take such actions as (A) may be required to ensure that such Exchangeable Unit Member receives the shares of Class A Common Stock and/or the Cash Settlement that such Exchangeable Unit Member is entitled to receive in connection with such Exchange pursuant to <u>Section 11.3(a)</u>, and (B) may be reasonably within its control that would cause such Exchange to be treated as a direct exchange between the Manager and the Member for U.S. federal and applicable state and local income tax purposes.

Section 11.4    <u>Adjustment</u>.  To the extent not reflected in an adjustment to the Exchange Rate, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed into or for another security, securities or other property, then, upon any subsequent Exchange, an Exchangeable Unit Member shall be entitled to receive the amount of such security, securities or other property that such Exchangeable Unit Member would have received if such Exchange had occurred immediately before the effective date of such reclassification, reorganization, recapitalization or other similar transaction, taking into account any adjustment as a result of any subdivision (by any split, distribution or dividend, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse split, reclassification, recapitalization or otherwise) of such security, securities or other property that occurs after the effective time of such reclassification, reorganization, recapitalization or other similar transaction.  For the

31

EXHIBIT 2
Page 364 of 404

avoidance of doubt, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, this <u>Section 11.4</u> shall continue to be applicable, *mutatis mutandis*, with respect to such security or other property.

Section 11.5      <u>Class A Common Stock to Be Issued in Connection with an Exchange</u>.

(a)      <u>Class A Common Stock Reserve</u>.  The Manager shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, such number of shares of Class A Common Stock as shall be deliverable under this Agreement upon all such Exchanges; *provided*, *however*, that the Manager may satisfy its obligations in respect of any such Exchange by delivery of unencumbered purchased shares of Class A Common Stock (which may or may not be held in the treasury of the Manager or any subsidiary thereof).  The preceding sentence shall not affect the Manager's right to elect a Cash Settlement.

(b)      <u>Rule 16(b) Exemption</u>.  The Manager has taken and will take all such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions or dispositions of equity securities of the Manager (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of the Manager for such purposes that result from the transactions contemplated by this Agreement, by each director or officer of the Manager (including directors-by-deputization) who may reasonably be expected to be subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Manager upon the registration of any class of equity security of the Manager pursuant to Section 12 of the Exchange Act.

(c)      <u>Validity of Class A Common Stock</u>.  The Manager covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable and not subject to any preemptive right of stockholders of the Manager or any right of first refusal or other right in favor of any Person.

Section 11.6      <u>Withholding</u>.  Each Member acknowledges and agrees that the Company may be required by Law to deduct and withhold any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations in respect of any Exchange, as provided in <u>Section 4.10(c)</u> of <u>Annex C</u>.

Section 11.7      <u>Tax Treatment</u>.  Unless otherwise agreed to in writing by the Exchangeable Unit Member and the Manager, it is intended that, for U.S. federal and applicable state and local income tax purposes, each Exchange be treated as direct exchange between the Manager and the Exchangeable Unit Member that is a taxable transaction to the Exchangeable Unit Member.  All applicable parties shall treat each Exchange consistently with the intended treatment for all U.S. federal and applicable state and local tax purposes unless otherwise required by a "determination" within the meaning of Code section 1313(a) or a change in Law.

**EXHIBIT 2**
**Page 365 of 404**

Section 11.8    <u>Contribution by Manager</u>.  On the Exchange Date (i) the Manager shall contribute to the Company the shares of Class A Common Stock and/or Cash Settlement that the Manager has elected to deliver and that the Exchangeable Unit Member is entitled to receive in the applicable Exchange and (ii) the Company shall issue to the Manager a number of Class A Units equal to the number of Exchangeable Units (and corresponding number of Class B Shares) surrendered by the Exchangeable Unit Member.

Section 11.9    <u>Apportionment of Distributions</u>.  Distributions with a Record Date on or before the Exchange Date shall be made to the Exchangeable Unit Member.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    <u>Conclusive Nature of Determinations</u>.    All determinations, interpretations, calculations, adjustments and other actions of the Manager, the Company, the Board of Directors (or a committee to which the Board of Directors has delegated such authority), or a designee of any of the foregoing that are within such Person's authority under this Agreement shall be binding and conclusive on a Member absent manifest error.  In connection with any such determination, interpretation, calculation, adjustment, or other action, the Manager, the Company, the Board of Directors (or a committee to which the Board of Directors has delegated such authority), or the designee of any of the foregoing shall be entitled to resolve any ambiguity with respect to the manner in which such determination, interpretation, calculation, adjustment or other action is to be made or taken, and shall be entitled to interpret the provisions of this Agreement in such a manner as such Person determines to be fair and equitable, and such resolution or interpretation shall be binding and conclusive on a Member absent manifest error.

Section 12.2    <u>Company Counsel</u>.  THE COMPANY, THE MANAGER AND AFFILIATED ENTITIES MAY BE REPRESENTED BY THE SAME COUNSEL.  THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR THE COMPANY MAY ALSO PERFORM SERVICES FOR THE MANAGER AND AFFILIATES THEREOF.  THE MANAGER MAY, WITHOUT THE CONSENT OF THE MEMBERS, EXECUTE ON BEHALF OF THE COMPANY ANY CONSENT TO THE REPRESENTATION OF THE COMPANY THAT COUNSEL MAY REQUEST PURSUANT TO THE NEW YORK RULES OF PROFESSIONAL CONDUCT OR SIMILAR RULES IN ANY OTHER JURISDICTION.  THE COMPANY HAS INITIALLY SELECTED GIBSON, DUNN & CRUTCHER LLP AND STOEL RIVES LLP (EACH, "**COMPANY COUNSEL**") AS LEGAL COUNSEL TO THE COMPANY.  EACH MEMBER ACKNOWLEDGES THAT COMPANY COUNSEL DOES NOT REPRESENT ANY MEMBER IN ITS CAPACITY AS SUCH IN THE ABSENCE OF A CLEAR AND EXPLICIT WRITTEN AGREEMENT TO SUCH EFFECT BETWEEN SUCH MEMBER AND COMPANY COUNSEL (AND THEN ONLY TO THE EXTENT SPECIALLY SET FORTH IN SUCH AGREEMENT), AND THAT IN THE ABSENCE OF ANY SUCH AGREEMENT COMPANY COUNSEL SHALL OWE NO DUTIES TO ANY MEMBER. EACH MEMBER FURTHER ACKNOWLEDGES THAT, WHETHER OR NOT COMPANY COUNSEL HAS IN THE PAST REPRESENTED OR IS CURRENTLY

**EXHIBIT 2**
**Page 366 of 404**

REPRESENTING SUCH MEMBER WITH RESPECT TO OTHER MATTERS, UNLESS OTHERWISE EXPRESSLY AGREED BY COMPANY COUNSEL, COMPANY COUNSEL HAS NOT REPRESENTED THE INTERESTS OF ANY MEMBER IN THE PREPARATION AND/OR NEGOTIATION OF THIS AGREEMENT.

Section 12.3 Appointment of Manager as Attorney-in-Fact.

(a) Execution of Documents. Each Member, including each Additional Member and Substituted Member that is a Member, irrevocably makes, constitutes and appoints the Manager, any Liquidator, and authorized officers and attorneys-in-fact of each, and each of those acting singly, in each case with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including:

(i) All certificates and other instruments (including counterparts of this Agreement), and all amendments thereto, that the Manager deems appropriate to form, qualify, continue or otherwise operate the Company as a limited liability company (or other entity in which the Members will have limited liability comparable to that provided in the Act) in the jurisdictions in which the Company may conduct business or in which such formation, qualification or continuation is, in the opinion of the Manager, necessary or desirable to protect the limited liability of the Members.

(ii) All amendments to this Agreement adopted in accordance with the terms of this Agreement, and all instruments that the Manager deems appropriate in accordance with the terms of this Agreement.

(iii) All conveyances of Company Assets and other instruments that the Manager reasonably deems necessary in order to complete a dissolution and termination of the Company pursuant to this Agreement.

(b) Power and Interest. The appointment by all Members of the Manager as attorney-in-fact shall be deemed to be a power coupled with an interest in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Manager to act as contemplated by this Agreement in any filing and other action by it on behalf of the Company, shall survive the Incapacity of any Person hereby giving such power and the Transfer of all or any portion of such Person's Units, and shall not be affected by the subsequent Incapacity of the Person.

Section 12.4 Entire Agreement. This Agreement, together with the Tax Receivable Agreement, the Registration Rights Agreement, and the certificate of incorporation of the Manager, in each case, as amended, supplemented or restated in accordance with its terms, and the other documents contemplated hereby and thereby, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersede any and all prior or contemporaneous agreements or understandings between the parties to this Agreement pertaining to the subject matter hereof, including the Fifth Operating Agreement.

Section 12.5    <u>Further Assurances</u>.  Each of the parties to this Agreement does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by Law or reasonably necessary to effectively carry out the intent and purposes of this Agreement.

Section 12.6    <u>Notices</u>.  Any notice, consent, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be (a) delivered personally to the Person or an officer of the Person to whom the same is directed, (b) sent by facsimile, overnight mail or registered or certified mail, return receipt requested, postage prepaid, or (c) (except with respect to notice to the Company or the Manager) sent by email, with electronic, written or oral confirmation of receipt, in each case addressed as follows:

(i)    if to the Company or the Manager:

c/o NuScale Power Corp.
6650 SW Redwood Lane
Suite 210
Portland, OR 97224
Attn:  General Counsel
E-mail: generalcounsel@nuscalepower.com

with copies (which shall not constitute notice) to:

Fluor Enterprises, Inc.
6700 Las Colinas Blvd.
Irving, TX 75039
Attention: Chief Legal Officer

and to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612
Attn:    David C. Lee
         John M. Williams III
         Evan M. D'Amico
E-mail:DLee@GibsonDunn.com
         JWilliams@GibsonDunn.com
         EDAmico@GibsonDunn.com

and to:

Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

35

**EXHIBIT 2**
**Page 368 of 404**

Attn:   Jason M. Brauser
E-mail: jason.brauser@stoel.com

or to such other address as the Company may from time to time specify by notice to the Members;

(ii)    if to any Member, to:

the address, email, or facsimile number of such Member set forth in the records of the Company.

Any such notice shall be deemed to be delivered, given and received for all purposes as of: (A) the date so delivered, if delivered personally, (B) upon receipt, if sent by facsimile or email, or (C) on the date of receipt or refusal indicated on the return receipt, if sent by registered or certified mail, return receipt requested, postage and charges prepaid and properly addressed.

Section 12.7    Governing Law.  This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties to this Agreement, shall be governed by and construed in accordance with the Laws of the State of Oregon without regard to otherwise governing principles of conflicts of Law.

Section 12.8    Jurisdiction and Venue.  The parties to this Agreement agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (whether brought by any party or any of its Affiliates or against any party or any of its Affiliates) shall be brought in the state courts of the State of Oregon, or, if such court shall not have jurisdiction, any federal court located in the State of Oregon (the "**Selected Courts**"), and each of the parties hereby irrevocably consents to the jurisdiction of the Selected Courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any Selected Court. Without limiting the foregoing, each party agrees that service of process on such party in the manner provided for notice in Section 12.6 shall be deemed effective service of process on such party.

Section 12.9    Equitable Remedies.  The parties to this Agreement agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or was otherwise breached.   It is accordingly agreed that the parties to this Agreement shall be entitled to an injunction or injunctions and other equitable remedies to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any of the Selected Courts, this being in addition to any other remedy to which they are entitled at Law or in equity.  Any requirements for the securing or posting of any bond with respect to such remedy are hereby waived by each of the parties to this Agreement.  Each party further agrees that, in the event of any action for an

injunction or other equitable remedy in respect of such breach or enforcement of specific performance, it will not assert the defense that a remedy at Law would be adequate.

Section 12.10    Construction.  This Agreement shall be construed as if all parties to this Agreement prepared this Agreement.

Section 12.11    Counterparts.  This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed an original, and all such counterparts shall together constitute but one and the same agreement.

Section 12.12    Third-Party Beneficiaries.  Except as provided in Section 4.7, nothing in this Agreement, express or implied, is intended or shall be construed to give any Person other than the parties to this Agreement (or their respective legal representatives, successors, heirs and distributees) any legal or equitable right, remedy or claim under or in respect of any agreement or provision contained herein, it being the intention of the parties to this Agreement that this Agreement is for the sole and exclusive benefit of such parties (or such legal representatives, successors, heirs and distributees) and for the benefit of no other Person.

Section 12.13    Binding Effect.  Except as otherwise expressly provided herein, all of the terms and provisions of this Agreement shall be binding on, shall inure to the benefit of and shall be enforceable by the Members, their heirs, executors, administrators, successors and all other Persons hereafter holding, having or receiving an interest in the Company, whether as Substituted Members or otherwise.

Section 12.14    Severability.  If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be void, unenforceable or inoperative as a matter of Law, then the same shall in no way affect any other provision in this Agreement, the application of such provision in any other circumstance or with respect to any other party, or the validity or enforceability of the Agreement as a whole.

Section 12.15    Survival.  The provisions of Section 4.6 (*Limitation on Liability*), Section 4.7 (*Indemnification*), Section 12.1 (*Conclusive Nature of Determinations*), Section 12.3 (*Appointment of Manager as Attorney-in-Fact*), Section 12.4 (*Entire Agreement*), Section 12.5 (*Further Assurances*), Section 12.6 (*Notices*), Section 12.7 (*Governing Law*), Section 12.8 (*Jurisdiction and Venue*), Section 4.8 (*Survival of Obligations*) of Annex C, and this Section 12.15 (*Survival*) (and any other provisions of this Agreement necessary for the effectiveness of the enumerated sections) shall survive the termination of the Company and/or the termination of this Agreement.

Section 12.16    Effect on Other Obligations of Members or the Company.  Nothing in this Agreement shall modify, amend, terminate or supersede any obligations or rights of any Member or the Company under any agreement between or among Member(s) and/or the Company (other than the Fifth Operating Agreement) that is in effect as of the date hereof.

Section 12.17    Confidentiality.  Each Member recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company (including its predecessors), including confidential information of the

EXHIBIT 2
Page 370 of 404

Company (and its predecessors) regarding identifiable, specific and discrete business opportunities being pursued by the Company (the "**Confidential Information**"). Except as otherwise consented to by the Manager in writing, each Member (other than the Manager), on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency Law, its managers, directors, officers, shareholders, partners, members, employees, representatives and agents) agrees that, during the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, it (a) will use the same degree of care as it uses to protect its own confidential information to keep confidential any Confidential Information furnished to such Member; (b) will not intentionally use any of the Confidential Information for any purpose other than monitoring its investment in the Company; and (c) will not disclose such Confidential Information to any third party for any reason or purpose whatsoever, except that each Member may disclose such information (i) to authorized directors, officers, employees, representatives and agents of the Company or the Manager and as otherwise may be proper in the course of performing such Member's obligations or enforcing its rights under this Agreement and the agreements expressly contemplated hereby; (ii) to such Member's (or any of its Affiliates') Affiliates, auditors, accountants, attorneys or other agents who are informed of the Member's obligations hereunder; (iii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, provided that such purchaser or merger partner agrees to be bound by the provisions of this Section 12.17 or other confidentiality agreement approved by the Manager; or (iv) as is required to be disclosed by any Law, by any governmental authority or stock exchange or by any listing or trading agreement concerning a Member or its Affiliates; provided that the Member required to make such disclosure pursuant to clause (iv) above shall provide to the Company prompt notice of such disclosure to enable the Company to seek an appropriate protective order or confidential treatment.  It is acknowledged and agreed that a Member's review of Confidential Information will inevitably enhance its knowledge and understanding of the Company's industry in a way that cannot be separated from its other knowledge, and it shall not be a violation of Section 12.17(b) if such Member's overall knowledge and understanding are used for purposes other than monitoring its investment in the Company. For purposes of this Section 12.17, the term "Confidential Information" shall not include any information which (x) such Person learns from a source other than the Company or the Manager, or any of their respective representatives, employees, agents or other service providers, and in each case who is not bound by a confidentiality obligation, (y) is disclosed in a prospectus, in other documents or in any other manner for dissemination to the public (in each case, not in violation of this Section 12.17), or (z) is independently developed by the disclosing Member without violating any requirement hereunder.  Nothing in this Section 12.17 shall in any way limit or otherwise modify any confidentiality covenants entered into by any Member pursuant to any other agreement entered into with the Company or the Manager.

EXHIBIT 2
Page 371 of 404

# ARTICLE XIII

## DEFINED TERMS

Section 13.1    <u>Definitions</u>.    Unless otherwise indicated to the contrary, the following definitions shall be applied to the terms used in this Agreement:

"<u>**Act**</u>" means the Oregon Limited Liability Company Act (as it may be amended from time to time), and any successor to such statute.

"<u>**Additional Funds**</u>" is defined in <u>Section 2.5(a)</u>.

"<u>**Additional Member**</u>" means a Person who is admitted to the Company as a Member pursuant to the Act and <u>Section 8.1</u>, who is shown as such on the books and records of the Company, and who has not ceased to be a Member pursuant to the Act and this Agreement.

"<u>**Affiliate**</u>" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; *provided*, *however*, that (i) none of the Members or their parent companies or Affiliates shall be deemed to be an Affiliate of any other Member or its parent company or Affiliates and (ii) none of the Members or their parent companies or Affiliates shall be deemed to be an Affiliate of the Company or any of its Affiliates.  With respect to any Person who is an individual, "<u>**Affiliate**</u>" shall also include, without limitation, any Family Member of such Person.

"<u>**Applicable Sale**</u>" is defined in <u>Section 7.4(a)</u>.

"<u>**Applicable Sale Notice**</u>" is defined in <u>Section 7.4(c)</u>.

"<u>**Articles of Conversion**</u>" means the articles of conversion delivered by NuScale Power Inc. (the Company's predecessor) to the office of the Secretary of State of the State of Oregon in accordance with the OBCA and the Act for filing, which articles became effective on September 30, 2011.

"<u>**Articles of Organization**</u>" means the articles of organization delivered by NuScale Power Inc. (the Company's predecessor) to the office of the Secretary of State of the State of Oregon in accordance with the Act for filing, which articles became effective on September 30, 2011, as amended in connection with the Merger, and as such articles may be amended from time to time in accordance with the Act.

"<u>**Asset Value**</u>" is defined in <u>Annex C</u>.

"<u>**Assets**</u>" means any assets and property of the Company.

"<u>**Assumed Tax Liability**</u>" is defined in <u>Section 3.2(b)</u>.

"<u>**Assumed Tax Rate**</u>" is defined in <u>Section 3.2(b)(ii)</u>.

**EXHIBIT 2**
**Page 372 of 404**

"**Available Cash**" means, after taking into account amounts determined by the Manager to be reasonably necessary or advisable to be retained by the Company to meet actual or anticipated, direct or indirect, expenses, capital investments, working capital needs or liabilities (actual, contingent or otherwise) of the Company, including the payment of any Imputed Underpayment or for the operation of the business of the Company, or to create reasonable reserves for any of the foregoing, cash (in United States dollars) of the Company that the Manager determines is available for distribution to the Members.

"**Bankruptcy**" means, with respect to any Person, the occurrence of any event specified in ORS 63.001(3) of the Act with respect to such Person, and the term "**Bankrupt**" has a correlative meaning.

"**Board of Directors**" means the Board of Directors of the Manager.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"**Capital Account**" is defined in Annex C.

"**Capital Contribution**" means, with respect to any Member, the aggregate amount of money and the initial Asset Value of property (other than money) in such form as may be permitted by the Act that the Member contributes (or is treated as contributing) to the Company.

"**Capital Stock**" means a share of any class or series of stock of the Manager now or hereafter authorized.

"**Cash Settlement**" means immediately available funds in U.S. dollars in an amount equal to the product of (x) the number of shares of Class A Common Stock that would otherwise be delivered to a Member in an Exchange, multiplied by (y) the price per share of Class A Common Stock. For purposes of the preceding sentence, in an Exchange of Class B Units, the price per share of Class A Common Stock shall only be determined by an underwritten offering undertaken by the Manager in anticipation of the Exchange (a "**Liquidity Offering**"). For purposes of this definition, the price per share of Class A Common Stock shall be determined net of any underwriting discounts and commissions and shall be subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. For purposes of determining Cash Settlement to be paid in settlement of a fractional share of Class A Common Stock, the price per share of Class A Common Stock shall be determined as the arithmetic average of the volume-weighted average prices for a share of Class A Common Stock on the principal U.S. securities exchange or automated or electronic quotation system on which the Class A Common Stock trades, as reported by The Wall Street Journal or its successor, for each of the three (3) consecutive full Business Days ending on and including the last full Business Day immediately before the Exchange Date, in each case subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. If, at the time of determination, the Class A Common Stock no longer trades on a securities exchange or automated or electronic quotation system, then the price per share of Class A Common Stock shall be determined in good faith by a committee of the

EXHIBIT 2
Page 373 of 404

Board of Directors composed of a majority of the directors of the Manager that do not have an interest in the Exchangeable Units.

"**Certificates**" means (A) if certificated, any certificates representing Exchangeable Units, (B) if certificated, any stock certificates representing the shares of Class B Common Stock required to be surrendered in connection with an Exchange of Class B Units, and (C) such other information, documents or instruments as either the Manager (or the Manager's transfer agent) or the Company may reasonably require in connection with an Exchange.  If any certificate or other document referenced in the immediately preceding sentence is alleged to be lost, stolen or destroyed, the Exchangeable Unit Member shall cooperate with and respond to the reasonable requests of the Manager (or the Manager's transfer agent) and the Company and, if required by the Manager or the Company, furnish an affidavit of loss and/or an indemnity against any claim that may be made against the Manager or the Company on account of the alleged loss, theft or destruction of such certificate or other document.

"**Change of Control**" means, as of any date of determination, in one transaction or a series of related transactions, the Transfer of Units (or any beneficial interest therein) of the Company representing more than fifty (50) percent of the outstanding Common Units as of such date of determination.

"**Class A Common Stock**" means the Class A common stock of the Manager, $0.0001 par value per share.

"**Class A Unit**" is defined in Section 2.1(b)(i).

"**Class B Common Stock**" means a non-economic voting share in the Manager, with each share having non-economic rights equivalent to one share of Class A Common Stock.

"**Class B Unit**" is defined in Section 2.1(b)(ii).

"**Code**" means the Internal Revenue Code of 1986, as amended.  All references in this Agreement to sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"**Common Stock**" means the Class A Common Stock or the Class B Common Stock (and shall not include any additional series or class of the Manager's common stock created after the date of this Agreement).

"**Common Unit**" means a Class A Unit, a Class B Unit, and any other Unit designated as a Common Unit by the Company.

"**Company**" is defined in the preamble to this Agreement.

"**Company Counsel**" is defined in Section 12.2.

"**Consent**" means the consent to, approval of, or vote in favor of a proposed action by a Member given in accordance with Article X.

41

**EXHIBIT 2**
**Page 374 of 404**

"**control**," including the terms "<u>controlled by</u>" and "<u>under common control with</u>," means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the Board of Directors or similar body governing the affairs of such Person.

"***de minimis***" shall mean an amount small enough as to make not accounting for it commercially reasonable or accounting for it administratively impractical, in each case as determined by the Manager.

"**Debt**" means, as to any Person, as of any date of determination, (i) all indebtedness of such Person for borrowed money or the deferred purchase price of property or services; (ii) all amounts owed by such Person to banks or other Persons in respect of reimbursement obligations under letters of credit, surety bonds and other similar instruments guaranteeing payment or other performance of obligations by such Person; and (iii) obligations of such Person as lessee under capital leases.

"**Drag-Along Right**" is defined in Section 7.4(a).

"**Elective Exchange**" is defined in Section 11.1(a).

"**Elective Exchange Date**" means the effective date of an Elective Exchange.

"**Elective Exchange Notice**" is defined in Annex B.

"**Equivalent Units**" means Units with preferences, conversion and other rights (other than voting rights), restrictions, limitations as to dividends and other distributions, qualifications, terms and conditions of redemption (the "**Terms**") that are (a) relative to the Common Units and the other classes and series of Units that correspond to classes and series of Capital Stock, and (b) substantially the same as (or corresponding to) the Terms that any new Capital Stock or New Securities have relative to the Common Stock and other classes and series of Capital Stock or New Securities. The foregoing shall not apply to matters such as voting for members of the Board of Directors that are not applicable to the Company. In comparing the economic rights of any Preferred Stock with the economic rights of any Units, the effect of taxes may be taken into account.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Exchange**" means any Elective Exchange or Mandatory Exchange.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and any successor statute thereto, and the rules and regulations of the SEC promulgated thereunder.

"**Exchange Consideration**" shall mean, in the case of any Exchange, (x) the number of shares of Class A Common Stock that is equal to the product of the number of Exchangeable Units surrendered in the Exchange multiplied by the Exchange Rate (the "**Stock Consideration**"), (y) the Cash Settlement, plus, in the case of an Exchange of Class B Units under either subclause (x)

**EXHIBIT 2**
**Page 375 of 404**

or (y), an amount that is equal to $0.0001 multiplied by the number of shares of Class B Common Stock included in the Exchange, or (z) a combination of the Stock Consideration and the Cash Settlement.

"**Exchange Date**" means an Elective Exchange Date or Mandatory Exchange Date.

"**Exchange Rate**" means, in respect of any Exchange, subject to Section 11.4, a ratio, expressed as a fraction, the numerator of which shall be the number of shares of Class A Common Stock outstanding immediately before the Exchange and the denominator of which shall be the number of Class A Units owned by the Manager immediately before the Exchange.  On the date of this Agreement, the Exchange Rate shall be 1.

"**Exchangeable Unit**" means each Class B Unit and any other Unit designated as an Exchangeable Unit by the Company.

"**Exchangeable Unit Member**" means (i) each Member, other than the Manager and any of its wholly owned Subsidiaries, that holds an Exchangeable Unit or (ii) each holder of an interest in a Member that holds an Exchangeable Unit pursuant to Article XI.

"**Fair Market Value**" of Units or other property, means the cash price that a third party would pay to acquire all of such Units (computed on a fully diluted basis after giving effect to the exercise of any and all outstanding conversion rights, exchange rights, warrants and options) or other property, as the case may be, in an arm's-length transaction.  Unless otherwise determined by the Company, the following assumptions will be made when determining the Fair Market Value of Units:

(a) that the Company was being sold in a manner reasonably designed to solicit all possible participants and permit all interested Persons an opportunity to participate and achieve the best value reasonably available to the Members at the time; and

(b) that all existing circumstances are taken into account, including the terms and conditions of all agreements (including this Agreement) to which the Company is then a party or by which it is otherwise benefited or affected, determined.

"**Family Members**" means, as to a Person that is an individual, such Person's spouse, ancestors (whether by blood or by adoption), descendants (whether by blood or by adoption), brothers and sisters (whether by blood or by adoption) and *inter vivos* or testamentary trusts of which only such Person and his spouse, ancestors (whether by blood or by adoption), descendants (whether by blood or by adoption), brothers and sisters (whether by blood or adoption) are beneficiaries.

"**Fiscal Year**" is defined in Section 6.2.

"**Incapacity**" or "**Incapacitated**" means, (i) as to any Member who is an individual, death, total physical disability or entry by a court of competent jurisdiction adjudicating such Member incompetent to manage his or her Person or his or her estate; (ii) as to any Member that is a corporation or limited liability company, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; (iii) as to any Member that is a partnership, the

43

**EXHIBIT 2**
**Page 376 of 404**

dissolution and commencement of the winding up of the partnership; (iv) as to any Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; (v) as to any trustee of a trust that is a Member, the termination of the trust (but not the substitution of a new trustee); or (vi) as to any Member, the Bankruptcy of such Member.

"**Incentive Compensation Plan**" means any plan, agreement or other arrangement that provides for the grant or issuance of equity or equity-based awards and that is now in effect or is hereafter adopted by the Company or the Manager for the benefit of any of their respective employees or other service providers (including directors, advisers and consultants), or the employees or other services providers (including directors, advisers and consultants) of any of their respective Affiliates or Subsidiaries.

"**Indemnitee**" means the Manager, each Affiliate of the Manager, the Tax Representative, the Designated Individual and each officer or director of the Manager, the Company or their respective Affiliates, in all cases in such capacity.

"**IRS**" means the United States Internal Revenue Service, or, if applicable, a state or local taxing agency.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any governmental authority.  The term "**Lawful**" has a correlative meaning.

"**Liquidating Event**" is defined in Section 9.2(b).

"**Liquidator**" is defined in Section 9.3(a).

"**Liquidity Offering**" is defined in the definition of Cash Settlement.

"**Majority-in-Interest of the Members**" means Members (excluding the Manager in its capacity as a Member) entitled to vote on or consent to any matter holding more than fifty percent (50%) of all outstanding Common Units held by all Members (excluding the Manager in its capacity as a Member) entitled to vote on or consent to such matter.

"**Manager**" is defined in the preamble to this Agreement.

"**Mandatory Exchange**" is defined in Section 11.1(c).

"**Mandatory Exchange Date**" is defined in Section 11.1(c).

"**Mandatory Exchange Notice**" is defined in Section 11.1(c).

"**Member**" means any Person named as a member of the Company on the Register of this Agreement (as amended from time to time) and any Person admitted as an Additional Member of the Company or a Substituted Member of the Company, in each case, in such Person's capacity as a member of the Company, until such time as such Person has ceased to be a Member.

"**Member Representative**" is defined in Section 7.8.

**EXHIBIT 2**
**Page 377 of 404**

"**Merger**" means the merger of Spring Valley Merger Sub, LLC with and into the Company, pursuant to the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021.

"**New Securities**" means any equity security as defined in Rule 3a11-1 under the Securities Exchange Act of 1934, as amended, excluding grants under the Incentive Compensation Plans, including (i) rights, options, warrants, or convertible or exchangeable securities that entitle the holder thereof to subscribe for or purchase, convert such securities into, or exchange such securities for, Common Stock or Preferred Stock and (ii) any Debt issued by the Manager that provides any of the rights described in clause (i).

"**OBCA**" means the Oregon Business Corporation Act, as amended from time to time.

"**Percentage Interest**" means, with respect to each Member, as to any class or series of relevant Units, the fraction, expressed as a percentage, the numerator of which is the aggregate number of Units of such class or series held by such Member and the denominator of which is the total number of Units of such class or series held by all Members, in each case determined as of the date of determination.  If not otherwise specified, "**Percentage Interest**" shall be deemed to refer to Common Units.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, syndicate, person, trust, association, organization or other entity, including any governmental authority, and including any successor, by merger or otherwise, of any of the foregoing.

"**Policy Regarding Exchanges**" is defined in Section 11.1(a).

"**Preferred Stock**" means shares of preferred stock of the Manager now or hereafter authorized or reclassified that has dividend rights, or rights upon liquidation, winding up and dissolution, that are superior or prior to the Common Stock.

"**Recapitalization**" is defined in Section 2.1(c).

"**Record Date**" means the record date established by the Company for the purpose of determining the Members entitled to notice of or vote at any meeting of Members or to consent to any matter, or to receive any distribution or the allotment of any other rights, or in order to make a determination of Members for any other proper purpose, which, in the case of a record date fixed for the determination of Members entitled to receive any distribution, shall (unless otherwise determined by the Company) generally be the same as the record date established by the Manager for a distribution to the Members of its Capital Stock of some or all of its portion of such distribution.

"**Register**" is defined in Section 5.1(b)(i).

"**Registration Rights Agreement**" means the Registration Rights Agreement, effective on or about the date hereof, among the Manager and the other Persons party thereto, as the same may be amended, modified, supplemented or restated from time to time.

"**Regulations**" means the income tax regulations, including temporary regulations and, to the extent taxpayers are permitted to rely on them, proposed regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).  References to "**Treas. Reg. §**" are to the sections of the Regulations.

"**Related-Party Transfer**" means a Transfer by a Member of all or part of its Units to any Related-Party Transferee.

"**Related-Party Transferee**" means, with respect to a Member, (i) any Family Member of that Member, (ii) any direct or indirect member or equityholder of that Member or any Affiliate of that Member, (iii) any Family Member of any direct or indirect member or equityholder described in (ii), or (iv) the Manager or any Subsidiary of the Manager.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Selected Courts**" is defined in Section 12.8.

"**SPAC Transactions**" means the series of transactions effectuated pursuant to the Agreement and Plan of Merger, by and among the Company, the Manager, and Spring Valley Merger Sub, LLC, dated December 13, 2021.

"**Subsidiary**" means, with respect to any Person, any corporation or other entity if a majority of (i) the voting power of the voting equity securities or (ii) the outstanding equity interests is owned, directly or indirectly, by such Person.

"**Substituted Member**" means a Person who is admitted as a Member to the Company pursuant to Section 7.3.

"**Surviving Company**" is defined in Section 7.7(b)(iii).

"**Tax Distribution**" is defined in Section 3.2(a).

"**Tax Distribution Shortfall Amount**" is defined in Section 3.2(d).

"**Tax Receivable Agreement**" means the Tax Receivable Agreement, dated as of [●], 2022, entered into by and among the Manager, the Company, each of the parties thereto identified as a "**TRA Holder**" or the "**TRA Representative**" and each of the successors and assigns thereto, and any other similar tax receivable (or comparable) agreements entered after the date of this Agreement.

"**Termination Transaction**" means any direct or indirect Transfer of all or any portion of the Manager's Units in connection with, or the other occurrence of, (a) a merger, consolidation or other combination involving the Manager, on the one hand, and any other Person, on the other, (b) a sale, lease, exchange or other transfer of all or substantially all of the assets of the Manager not in the ordinary course of its business, whether in a single transaction or a series of related

transactions, (c) a reclassification, recapitalization or change of the outstanding Class A Common Stock (other than a change in par value, or from par value to no par value, or as a result of a stock split or reverse stock split, stock dividend or similar subdivision), (d) the adoption of any plan of liquidation or dissolution of the Manager, or (e) a Transfer of all or any portion of the Manager's Units (other than to a wholly owned Affiliate).

"**Terms**" is defined in the definition of "**Equivalent Units**."

"**Transfer**" means, in respect of any Units, property or other assets, any sale, assignment, hypothecation, lien, encumbrance, transfer, distribution or other disposition thereof or of a participation therein, or other conveyance of legal or beneficial interest therein, including rights to vote and receive dividends or other income with respect thereto, or any short position in a security or any other action or position otherwise reducing risk related to ownership through hedging or other derivative instruments, whether voluntarily or by operation of Law, or any agreement or commitment to do any of the foregoing.  An Exchange shall not constitute a Transfer under this Agreement.

"**Unit**" means a fractional share of the limited liability company interest in the Company, which may be a Class A Unit or Class B Unit and shall be deemed to include any equity security received in connection with any recapitalization, merger, consolidation, or other reorganization, or by way of any distribution in respect of Units, in any such case, after the date of this Agreement.

"**Unit Designation**" is defined in Section 2.4(a).

Section 13.2    Interpretation.   In this Agreement and in the exhibits to this Agreement, except to the extent that the context otherwise requires:

(a)    the headings are for convenience of reference only and shall not affect the interpretation of this Agreement;

(b)    defined terms include the plural as well as the singular and vice versa;

(c)    words importing gender include all genders;

(d)    a reference to any statute or statutory provision shall be construed as a reference to the same as it may have been or may from time to time be amended, extended, re-enacted or consolidated and all statutory instruments or orders made under it;

(e)    any reference to a "day" or "**Business Day**" means the whole of such day, being the period of 24 hours running from midnight to midnight;

(f)    references to Articles, Sections, subsections, clauses and Exhibits are references to Articles, Sections, subsections, clauses and Exhibits to this Agreement;

(g)    the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation"; and

**EXHIBIT 2**
**Page 380 of 404**

(h)    unless otherwise specified, references to any party to this Agreement or any other document or agreement shall include its successors and permitted assigns.

[*Remainder of page intentionally left blank*.]

48

EXHIBIT 2
Page 381 of 404

IN WITNESS WHEREOF, this Agreement has been executed as of the date first written above.

**MANAGER**

NUSCALE POWER CORP.

By: _____
    Name:
    Title:

**MEMBERS**

NUSCALE POWER CORP.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**EXHIBIT 2**
**Page 382 of 404**

## ANNEX A:  INITIAL UNITS

| Member | Units |
|---|---|
| NuScale Power Corp. | [_____] Class A Units |
| [____] | [_____] Class B Units |
| [____] | [_____] Class B Units |
| [____] | [_____] Class B Units |
| [____] | [_____] Class B Units |
| [____] | [_____] Class B Units |
| [____] | [_____] Class B Units |

A-1

## ANNEX B:  FORM OF ELECTIVE EXCHANGE NOTICE

ELECTIVE EXCHANGE NOTICE

NuScale Power Corp.
[Address]
Attention:
Email:

NuScale Power, LLC
[Address]
Attention:
Email:

This elective exchange notice ("Elective Exchange Notice") is delivered by the undersigned Exchangeable Unit Member pursuant to Section 11.1 of the Sixth Amended and Restated Limited Liability Company Agreement of NuScale Power, LLC, dated as of _____, 2022 (the "LLC Agreement"), by and among NuScale Power Corp., a Delaware corporation (the "Manager") and the members that are party thereto.  Capitalized terms used but not defined herein shall have the meanings given to them in the LLC Agreement.

The undersigned hereby transfers the number of Class B Units plus shares of Class B Common Stock set forth below (together, the "Paired Interests") in exchange for the Stock Consideration to be issued in its name as set forth below, or the Cash Settlement, as applicable, as set forth in the LLC Agreement.

Legal Name of Holder: _____

Address: _____

Number of Class B Units: _____

Number of Class B Common Stock: _____

Brokerage Account Details: _____

The undersigned hereby represents and warrants that (i) the undersigned has full legal capacity to execute and deliver this Elective Exchange Notice and to perform the undersigned's obligations hereunder; (ii) this Elective Exchange Notice has been duly executed and delivered by the undersigned and is the legal, valid and binding obligation of the undersigned enforceable against it in accordance with the terms thereof or hereof, as the case may be, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies; (iii) the Paired Interests subject to this Elective Exchange Notice are being transferred to the Manager or the Company, as applicable, free and clear of any pledge, lien,

105070335.6

EXHIBIT 2
Page 384 of 404

security interest, encumbrance, equities or claim; and (iv) no consent, approval, authorization, order, registration or qualification of any third party or with any court or governmental agency or body having jurisdiction over the undersigned or the Paired Interests subject to this Elective Exchange Notice is required to be obtained by the undersigned for the transfer of such Paired Interests to the Manager or the Company, as applicable.

The undersigned hereby irrevocably constitutes and appoints any officer of the Manager or of the Company as the attorney of the undersigned, with full power of substitution and resubstitution in the premises, to do any and all things and to take any and all actions that may be necessary to transfer to the Manager or the Company, as applicable, the Paired Interests subject to this Elective Exchange Notice and to deliver to the undersigned the Stock Consideration or Cash Settlement, as applicable, to be delivered in exchange therefor.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Elective Exchange Notice to be executed and delivered by the undersigned or by its duly authorized attorney.

Name: _____

Dated: _____

B-2

**EXHIBIT 2**
**Page 385 of 404**

# ANNEX C:  TAX MATTERS

## ARTICLE I

## DEFINITIONS

"**Asset Value**" means, with respect to any Asset, the adjusted basis of such Asset for federal income tax purposes; *provided*, *however*, that:

(i)       the initial Asset Value of any Asset (other than cash) contributed or deemed contributed by a Member to the Company shall be the gross Fair Market Value of such Asset as determined by the Company;

(ii)       the Asset Values of all Assets shall be adjusted to equal their respective gross Fair Market Values as determined by the Company as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member, in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g); (D) the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to the benefit of the Company by an existing Member acting in a Member capacity or by a new Member acting in a Member capacity or in anticipation of becoming a Member; or (E) any other instance in which such adjustment is permitted under Treas. Reg. § 1.704-1(b)(2)(iv); *provided*, *however*, that any adjustment pursuant to clause (A), (B), (D), or (E) above shall be made only if the Company determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)       the Asset Value of any Asset distributed to any Member shall be the gross Fair Market Value of such Asset on the date of distribution, as determined by the Company; and

(iv)       the Asset Values of all Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m); *provided*, *however*, that Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that the Company determines that an adjustment pursuant to paragraph (ii) of this definition of Asset Value is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv).

If the Asset Value of an Asset has been determined or adjusted to paragraph (i), (ii), or (iv) of this definition of Asset Value, then such Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Asset for purposes of computing Net Profits and Net Losses.

105070335.6

**EXHIBIT 2**
**Page 386 of 404**

"**Audit**" is defined in Section 4.4(a) of this Annex C.

"**Company Minimum Gain**" has the meaning set forth as "partnership minimum gain" in Treas. Reg. § 1.704-2(b)(2) and is computed in accordance with Treas. Reg. § 1.704-2(d).

"**Company Unitholder Representative**" has the meaning as defined in the Merger Agreement.

"**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period; *provided*, *however*, that if the Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be determined in accordance with Treas. Reg. § 1.704-1(b)(2)(iv)(g)(3), or Treas. Reg. § 1.704-3(d)(2), as appropriate.

"**Designated Individual**" is defined in Section 4.3(a)(ii) of this Annex C.

"**Imputed Underpayment**" is defined in Section 4.4(d) of this Annex C.

"**Imputed Underpayment Share**" is defined in Section 4.4(e)(i) of this Annex C.

"**Member Nonrecourse Debt**" has the meaning given to the term "partner nonrecourse debt" in Treas. Reg. § 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to each Member Nonrecourse Debt, an amount equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treas. Reg. § 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the meaning given to the term "partner nonrecourse deduction" in Treas. Reg. §§ 1.704-2(i)(l) and 1.704-2(i)(2).

"**Net Profits**" and "**Net Losses**" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code section 703(a) and, where appropriate (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1)), with the following adjustments:

(i)     any income of the Company exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)     any expenditures of the Company described in Code section 705(a)(2)(B) (or treated as expenditures described in Code section 705(a)(2)(B) pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

**EXHIBIT 2**
**Page 387 of 404**

(iii)    in the event the Asset Value of any Asset of the Company is adjusted in accordance with paragraph (ii) or paragraph (iii) of the definition of "**Asset Value**," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Asset for purposes of computing Net Profits or Net Losses;

(iv)    gain or loss resulting from any disposition of any Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Asset Value of the Asset disposed of, notwithstanding that the adjusted tax basis of such Asset differs from its Asset Value;

(v)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(vi)    to the extent an adjustment to the adjusted tax basis of any Asset pursuant to Code section 734(b) is required pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the Asset) or loss (if the adjustment decreases the basis of the Asset) from the disposition of the Asset and shall be taken into account for purposes of computing Net Profits and Net Losses;

(vii)    notwithstanding any other provision of this definition of Net Profits and Net Losses, any items that are specially allocated pursuant to Section 3.2 and Section 3.3 of this Annex C shall not be taken into account in computing Net Profits or Net Losses, but shall be determined by applying rules analogous to those set forth in paragraphs (i) through (vi) above; and

(viii)    where appropriate, references to Net Profits and Net Losses shall refer to specific items of income, gain, loss, deduction, and credit comprising or otherwise comprising Net Profits or Net Losses.

"**Nonrecourse Deductions**" has the meaning set forth in Treas. Reg. § 1.704-2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Treas. Reg. § 1.752-1(a)(2).

"**Original Member**" means each of the Members of the Company as of immediately prior to the Effective Time (as defined in the Merger Agreement) of the Merger.

"**Push Out Election**" means the election under Code section 6226 (or any similar provision of state or local law) to "push out" an adjustment to the Members or former Members, including filing IRS Form 8988 (Election for Alternative to Payment of the Imputed Underpayment), or any successor or similar form, and taking any other action necessary to give effect to such election.

"**Revised Partnership Audit Provisions**" means Code Sections 6221 through 6241, as in effect for taxable years of the Company beginning after December 31, 2017, together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof, and any comparable provisions of state or local tax law.

**EXHIBIT 2**
**Page 388 of 404**

"**Specified Audit**" is defined in Section 4.4(b) of this Annex C.

"**Tax Representative**" means, as applicable, and including the Designated Individual as the context requires, (a) the Member or other Person (including the Company) designated as the "partnership representative" of the Company under Code section 6223, (b) the Member designated as the "tax matters partner" for the Company under Code section 6231(a)(7) (as in effect before 2018 and before amendment by Title XI of the Bipartisan Budget Act of 2015, H.R. 1314, Public Law No. 114-74), and/or (c) the Member or other Person serving in a similar capacity under any similar provisions of state, local or non-U.S. Laws, in each case, acting solely at the direction of the Company to the maximum extent permitted under Law.

## ARTICLE II

## MEMBER'S CAPITAL ACCOUNTS.

The Company or the Manager shall establish and maintain a capital account for each Member in accordance with Treas. Reg. § 1.704-1(b)(2)(iv) (each, a "**Capital Account**"). The Company may maintain Capital Account subaccounts for different classes of Units, and any provisions of this Agreement pertaining to Capital Account maintenance shall apply, *mutatis mutandis*, to those subaccounts.

## ARTICLE III

## ALLOCATIONS

Section 3.1    Allocations Generally.  Each Fiscal Year, after adjusting each Member's Capital Account for all contributions and distributions with respect to such Fiscal Year and after giving effect to the allocations under Section 3.2 of this Annex C for the Fiscal Year, Net Profits and Net Losses shall be allocated among the Members in a manner such that, after such allocations have been made, each Member's Capital Account balance (which may be a positive, negative, or zero balance) will equal (proportionately) (a) the amount that would be distributed to each such Member, determined as if the Company were to (i) sell all of its Assets for their Asset Values, (ii) satisfy all of its liabilities in accordance with their terms with the proceeds from such sale (limited, with respect to Nonrecourse Liabilities, to the Asset Values of the Assets securing such liabilities), and (iii) distribute the remaining proceeds pursuant to the applicable provision of this Agreement, minus (b) the sum of (x) such Member's share of the Company Minimum Gain and Member Nonrecourse Debt Minimum Gain and (y) the amount, if any (without duplication of any amount included under clause (x)), that such Member is obligated (or is deemed for U.S. tax purposes to be obligated) to contribute, in its capacity as a Member, to the capital of the Company as of the last day of such Fiscal Year.

Section 3.2    Priority Allocations.

(a)    Minimum Gain Chargeback, Qualified Income Offset, and Stop Loss Provisions.  Each of (i) the "minimum gain chargeback" provision of Treas. Reg. § 1.704-2(f), (ii) the "chargeback of partner nonrecourse debt minimum gain" provision of Treas. Reg. § 1.704-2(i)(4), (iii) the "qualified income offset" provision in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(3), and

**EXHIBIT 2**
**Page 389 of 404**

(iv) the requirement in the flush language immediately following Treas. Reg. § 1.704-1(b)(2)(ii)(d)(3) that an allocation "not cause or increase a deficit balance" in a Member's Capital Account is hereby incorporated by reference as a part of this Agreement. The Company shall make such allocations as are necessary to comply with those provisions and shall make any determinations with respect to such allocations (to the extent consistent with clauses (i) – (iv) of the preceding sentence).

(b)    <u>Nonrecourse Deductions</u>.    Nonrecourse Deductions for any Fiscal Year shall be allocated to the Members in accordance with their Units, unless otherwise determined by the Company.

(c)    <u>Member Nonrecourse Deductions</u>.    Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss (within the meaning of Treas. Reg. § 1.752-2) with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i)(l).

(d)    <u>Special Basis Adjustments</u>.    To the extent an adjustment to the adjusted tax basis of any Company Asset, pursuant to Code section 734(b) or Code section 743(b) is required, pursuant to Treas. Reg. §§ 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treas. Reg. § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treas. Reg. § 1.704-1(b)(2)(iv)(m)(4) applies.

(e)    <u>Ameliorative Allocations</u>.    Any allocations made (as well as anticipated reversing or offsetting regulatory allocations to be made) pursuant to <u>Section 3.2(a)-(d)</u> of this <u>Annex C</u> shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount for any item so allocated and all other items allocated to each Member pursuant to this Agreement shall be equal, to the extent possible, to the net amount that would have been allocated to each Member pursuant to the provisions of this Agreement if those allocations had not occurred.

Section 3.3    <u>Other Allocation Rules</u>.

(a)    <u>In General</u>.    Except as otherwise provided in this <u>Section 3.3</u> of this <u>Annex C</u>, for income tax purposes under the Code and the Regulations, each Company item of income, gain, loss, deduction, and credit shall be allocated among the Members in the same manner as its correlative item of income, gain, loss, deduction, and credit (as calculated in accordance with the definitions of "Net Profits" and "Net Loss") is allocated pursuant to <u>Section 3.1</u> and <u>Section 3.2</u> of this <u>Annex C</u>.

(b)    <u>Section 704(c) Allocations</u>.    Notwithstanding the provisions of <u>Section 3.3(a)</u> of this <u>Annex C</u> to the contrary, in accordance with Code section 704(c)(1)(A) (and the

**EXHIBIT 2**
**Page 390 of 404**

principles of those provisions) and Treas. Reg. § 1.704-3, Company items of income, gain, loss, deduction, and credit with respect to any property contributed to the capital of the Company, or after Company property has been revalued under Treas. Reg. § 1.704-1(b)(2)(iv)(f) or (s), shall, solely for U.S. federal, state and local tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company property to the Company for U.S. federal income tax purposes and its value as so determined at the time of the contribution or revaluation of Company property.  The Company shall use the "traditional method" with respect to (i) any property contributed to the Company before the SPAC Transactions and (ii) "reverse section 704(c) allocations" (within the meaning of Treas. Reg. § 1.704-3(a)(6)) arising before or in connection with the SPAC Transactions.  With respect to property contributed or section 704(c) amounts arising from revaluations made after the SPAC Transactions, the Company may use any method permitted under Treas. Reg. § 1.704-3.  Allocations pursuant to <u>Section 3.3(a)</u> and this <u>Section 3.3(b)</u> of this <u>Annex C</u> are solely for U.S. federal, state, and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profit, loss, or other items, pursuant to any provision of this Agreement.

(c)  <u>Allocations in Respect of Varying Interests</u>.  If any Member's interest in the Company varies (within the meaning of Code section 706(d)) within a Fiscal Year, whether by reason of a Transfer of a Unit, redemption of a Unit by the Company, or otherwise, Net Profits and Net Losses for that Fiscal Year will be allocated so as to take into account such varying interests in accordance with Code section 706(d) using the daily proration method and/or such other permissible method, methods, or conventions selected by the Company.

(d)  <u>Timing and Amount of Allocations of Net Profits and Net Loss</u>.  Net Profits and Net Loss of the Company shall be determined and allocated with respect to each Fiscal Year as of the end of each such year, or at such other time or times determined by the Company.

(e)  <u>Modification of Allocations</u>.  The allocations set forth in <u>Section 3.1</u> and <u>Section 3.2</u> of this <u>Annex C</u> are intended to comply with certain requirements of the Regulations. The Company shall be authorized to make, in its reasonable discretion, appropriate modifications to the allocations of Net Profits and Net Losses pursuant to this Agreement in order to comply with Code section 704 or applicable Regulations.  Notwithstanding any provision of this Agreement to the contrary, if the Company reasonably determines an allocation other than the allocations that would otherwise be made pursuant to this Agreement would more appropriately reflect the Members' interests in the Company, the Company may in its discretion make appropriate adjustments to such allocations.

(f)  <u>Allocation of Liabilities under Code Section 752</u>.  Notwithstanding anything in this Agreement to the contrary, no Member will take, or permit any Affiliate to take, any action that would change the allocation of liabilities for purposes of Code section 752 without the consent of the Company.

**ARTICLE IV**

**CERTAIN TAX MATTERS**

C-6

**EXHIBIT 2**
**Page 391 of 404**

Section 4.1    <u>Provision of Information</u>.

(a)    <u>Information to Be Provided by Company to Members</u>.  No later than thirty (30) days after the filing by the Company of the Company's federal tax return (Federal Form 1065), the Company shall provide to each Member a copy of Schedule K-1 of Federal Form 1065 reporting that Member's allocable share of items of income, gain, loss, deduction, or credit for such Fiscal Year, and such additional information as is required to be provided on Schedule K-1 or as such Member may reasonably request for tax purposes, each as determined by the Company. The Member hereby consents to receive each Schedule K-1 in respect of the Member's LLC Interest in the Company through electronic delivery.

(b)    <u>Information to Be Provided by Members to Company</u>.

(i)    <u>Notice of Audit or Tax Examination</u>.  Each Member shall notify the Company within five (5) days after receipt of any notice regarding an audit or tax examination of the Company and upon any request for material information related to the Company by U.S. federal, state, local, or other tax authorities.

(ii)    <u>Other Relevant Tax Information</u>.  Each Member shall provide to the Company upon request tax basis information about Assets contributed by it to the Company and such other tax information as reasonably requested by the Company and necessary for it to prepare its financial reports or any tax returns and such other information and/or tax forms as the Company reasonably requests.

(c)    <u>No Right to Member Tax Returns</u>.  Notwithstanding anything to the contrary in this Agreement or any right to information under the Act, with respect to the financial statements or tax returns of a Member or its Affiliates, none of the Company, the other Members, such other Member's Affiliates or any of their respective representatives, will be entitled to review such financial statements or tax returns for any purpose, including in connection with any proceeding or other dispute (whether involving the Company, between the Members, or involving any other Persons).

Section 4.2    <u>Tax Elections</u>.  The Company shall have in effect (and shall cause each Subsidiary that is classified as a partnership for U.S. federal income tax purposes to have in effect) an election pursuant to Code section 754 (and any similar provisions of applicable U.S. state or local law) for the Company for the Fiscal Year that includes the date of the Merger and each Fiscal Year in which a sale or exchange (whether partial or complete) occurs.  The Company shall determine whether to make any other available election pursuant to the Code or Regulations that is not otherwise expressly provided for or prohibited in this Agreement, and the Members hereby consent to all such elections.

Section 4.3    <u>Tax Representative</u>.

(a)    <u>Appointment and Replacement of Tax Representative</u>.

(i)    <u>Tax Representative</u>.  The Company shall act as the Tax Representative, but the Company may designate another Person to act as the Tax Representative and may remove, replace, or revoke the designation of that Person, or require that Person to resign.

C-7

**EXHIBIT 2**
**Page 392 of 404**

For taxable years ending on or before December 31, 2021, and for any jurisdiction with respect to which the Company cannot serve as the Tax Representative, however, Fluor Enterprises, Inc. shall act as the Tax Representative.

(ii)     Designated Individual.    If the Tax Representative is not an individual, the Company shall appoint a "designated individual" for each taxable year (as described in Treas. Reg. § 301.6223-1(b)(3)(ii)) (a "**Designated Individual**").

(iii)     Approval by Members.    Each Member agrees to execute, certify, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence the appointments described in Section 4.3(a)(i) and Section 4.3(a)(ii) of this Annex C, including statements required to be filed with the tax returns of the Company in order to effect the designation of the Tax Representative or Designated Individual (and any successor).

(b)     Authority of the Tax Representative; Delegation of Authority.    The Tax Representative shall have all of the rights, duties, powers, and obligations provided for under the Code, Regulations, or other applicable guidance; *provided*, that, if the Company designates a Person to be the Tax Representative, the Tax Representative shall in all cases act solely at the direction of the Company.  The Tax Representative may delegate its authority under this Section 4.3(b) of this Annex C to a Designated Individual who shall in all cases act solely at the direction of the Tax Representative.

(c)     Costs and Indemnification of Tax Representative and Designated Individual.  Without duplication of the provisions of Section 4.3(b) of this Annex C, the Company shall pay, or to the extent the Tax Representative or Designated Individual pays, indemnify and reimburse, to the fullest extent permitted by Law, the Tax Representative or Designated Individual for all costs and expenses, including legal and accounting fees (as such fees are incurred) and any claims incurred in connection with any tax audit or judicial review proceeding with respect to the tax liability of the Company.

Section 4.4     Tax Audits.

(a)     Subject to this Section 4.4 and Section 8.03 (Tax Matters) of the Merger Agreement, the Tax Representative shall have the sole authority to act on behalf of the Company in connection with, make all relevant decisions regarding application of, and to exercise the rights and powers provided for in the Revised Partnership Audit Provisions, including making any elections under the Revised Partnership Audit Provisions or any decisions to settle, compromise, challenge, litigate or otherwise alter the defense of any action, audit or examination before the IRS or any other tax authority (each, an "**Audit**"), and to expend Company funds for professional services and other expenses reasonably incurred in connection therewith.

(b)     Without limiting the foregoing, the Tax Representative shall give prompt written notice to the Company Unitholder Representative of the commencement of any Audit of the Company or any of its Subsidiaries (i) that relates to a Pre-Closing Flow-Through Return or (ii) the resolution of which would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members (a "**Specified Audit**").  The

Tax Representative shall (i) keep the Company Unitholder Representative reasonably informed of the material developments and status of any such Specified Audit, (ii) permit the Company Unitholder Representative (or its designee) to participate (including using separate counsel), in each case at the Original Members' sole cost and expense, in any such Specified Audit, and (iii) promptly notify the Company Unitholder Representative of receipt of a notice of a final partnership adjustment (or equivalent under applicable Laws) or a final decision of a court or IRS Independent Office of Appeals panel (or equivalent body under applicable Laws) with respect to such Specified Audit. The Tax Representative or the Company shall promptly provide the Company Unitholder Representative with copies of all material correspondence between the Tax Representative or the Company (as applicable) and any governmental entity in connection with such Specified Audit and shall give the Company Unitholder Representative a reasonable opportunity to review and comment on any material correspondence, submission (including settlement or compromise offers) or filing in connection with any such Specified Audit. Additionally, the Tax Representative shall not (and the Company shall not (and shall not authorize the Tax Representative to)) settle, compromise or abandon any Specified Audit in a manner that would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members without the Company Unitholder Representative's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned). The Tax Representative shall obtain the prior written consent of the Company Unitholder Representative (which consent shall not be unreasonably withheld, delayed or conditioned) before (i) making an election under Section 6226(a) of the Code (or any analogous provision of state or local Law) other than any such election required by Section 8.03 (Tax Matters) of the Merger Agreement or (ii) taking any material action under the Revised Partnership Audit Provisions that would reasonably be expected to have a disproportionate (compared to the Manager) and material adverse effect on the Original Members, in the case of clauses (i) and (ii).

(c)     The Company, the Tax Representative, the Unitholder Representative and the Members expressly agree to be bound by the terms of Section 8.03 (Tax Matters) of the Merger Agreement. Notwithstanding anything to the contrary contained in this Agreement, in the event of any conflict between Section 8.03 of the Merger Agreement and this Agreement, Section 8.03 of the Merger Agreement shall control.  With respect to the preceding sentence, the Company Unitholder Representative and the Manager shall have all of the rights and protections against the Tax Representative as it does against the Manager or the Company Unitholder Representative, as applicable, as described in Section 8.03 of the Merger Agreement.

(d)     Determinations with Respect to Elections.  Subject to Section 8.03 (Tax Matters) of the Merger Agreement and the provisions of this Annex C (including Section 4.4(b)), the Tax Representative shall have the sole authority to determine whether to cause the Company to make a Push Out Election with respect to any adjustment that could result in an imputed underpayment (within the meaning of Code section 6225) (an "**Imputed Underpayment**").

(e)     Responsibility for Payment of Tax; Former Members.

(i)     Imputed Underpayment Share.  To the extent the Company is liable for any Imputed Underpayment, the Company shall determine the liability of the Members for a

share of such Imputed Underpayment, taking into account the Members' Units and the status and actions of the Members (including those described in Code section 6225(c)) (such share, an "**Imputed Underpayment Share**").

(ii)    Payment of Imputed Underpayment Share. The Company may (A) require a Member who is liable for an Imputed Underpayment Share to pay the amount of its Imputed Underpayment Share to the Company within ten (10) days after the date on which the Company notifies the Member (and in the manner required by the notice) and/or (B) reduce future distributions to the Member, such that the amount determined under clauses (A) and (B) equals the Member's Imputed Underpayment Share, *provided*, *however*, that no Member shall have an obligation to make any contribution to the capital of the Company with respect to any Imputed Underpayment. If a Member fails to pay any amount that it is required to pay the Company in respect of an Imputed Underpayment Share within such ten (10) day period, that amount shall be treated as a loan to the Member, bearing interest at ten (10) percent annually (which interest shall increase the Member's Imputed Underpayment Share). Such loan shall be repayable upon demand by the Company. If the Member fails to repay the loan upon demand, the full balance of the loan shall be immediately due (including accrued but unpaid interest) and the Company shall have the right to collect the balance in any manner it determines, including by reducing future distributions to that Member; *provided*, *however*, that no Member may have any Imputed Underpayment Share treated as a loan to the extent it would violate Section 402 of the Sarbanes-Oxley Act of 2002. Any Member not permitted to treat its Imputed Underpayment Share as a loan due to the provisions of the previous sentence shall pay any Imputed Underpayment Share within ten (10) days after the date of the notice referred to in the first sentence of this Section 4.4(e)(ii) of this Annex C.

Section 4.5    No Independent Actions or Inconsistent Positions. Except as required by Law or previously authorized in writing by the Company (which authorization may be withheld in the sole discretion of the Company), no Member shall (i) independently act with respect to tax matters (including, but not limited to, audits, litigation and controversies) affecting or arising from the Company, or (ii) treat any Company item inconsistently on such Member's income tax return with the treatment of the item on the Company's tax return and/or the Schedule K-1 (or other written information statement) provided to such Member. Solely to the extent required by Law, this Section 4.5 of this Annex C shall not apply with respect to any "special enforcement matter" described in Code section 6241(11).

Section 4.6    United States Person. Except as permitted by the Company, each Member represents and covenants that, for U.S. federal income tax purposes, it is and will at all times remain a "**United States Person**," within the meaning of Code section 7701, or is a disregarded entity the assets of which are treated as owned by a United States Person under Treas. Reg. §§ 301.7701-1, 301.7701-2, and 301.7701-3.

Section 4.7    State, Local, and Non-U.S. Tax Law. The provisions of this Agreement with respect to U.S. federal income tax shall apply, *mutatis mutandis*, with respect to any similar provisions of state, local, or non-U.S. tax law as determined by the Company.

Section 4.8    Survival of Obligations. For purposes of this Article IV of this Annex C, the term "**Member**" shall include a former Member unless otherwise determined by the Company. The rights and obligations of each Member and former Member under this Article IV of this Annex

**EXHIBIT 2**
**Page 395 of 404**

C shall survive the Transfer by such Member of its Units (or withdrawal by a Member or redemption of a Member's Units) and the dissolution of the Company until ninety (90) days after the applicable statute of limitations.  Section 4.3 (*Tax Representative*), Section 4.4 (*Tax Audits*), and this Section 4.8 (*Survival of Obligations*) of this Annex C shall not be amended without the prior written consent of any Member or former Member that would be disproportionately and adversely impacted by such amendment.

Section 4.9    Tax Classification.  The parties intend that the Company shall be classified as a partnership for United States federal, state, and local tax purposes.  The parties intend that the Subsidiaries of the Company currently classified either as disregarded entities or as partnerships for United States federal, state, and local tax purposes as of the date of this Agreement shall remain classified either as disregarded entities or as partnerships for United States federal, state, and local tax purposes.  No Person shall take any action inconsistent with such classifications.

Section 4.10    Withholding.

(a)    Withholding Generally.  Each Member acknowledges and agrees that the Company may be required by Law to deduct and withhold taxes or to fulfill other similar obligations of such Member on any amount paid, distributed, disbursed, or allocated by the Company to that Member, including upon liquidation, and any transferee of a Member's interest or a Substituted Member shall, by reason of such Transfer or substitution, acknowledge, and agree to any such withholding by the Company, including withholding to discharge obligations of the Company with respect to prior distributions, allocations, or an Imputed Underpayment Share (to the extent not otherwise borne by the transferor Member pursuant to Section 4.4 of this Annex C). Taxes withheld by third parties from payments to the Company in respect of the Company shall be treated as an expense of the Company, unless such withholding is attributable to a specific Member, in which case, amounts so withheld shall be allocated to such Member and the Company may deduct and withhold such amounts from the Member. All amounts withheld pursuant to this Section 4.10 of this Annex C shall, except as otherwise determined by the Company pursuant to Section 4.4(e)(ii) of this Annex C, be treated as amounts distributed to such Person pursuant to the provision of this Agreement that would have applied if such amount had actually been distributed.

(b)    Additional Provisions with Respect to a Transfer of Units.  A Member transferring Units permitted by this Agreement shall, unless otherwise determined by the Company, (i) deliver to the Company, between ten (10) days and thirty (30) days before the Transfer, an affidavit of non-foreign status with respect to such transferor Member that satisfies the requirements of Code section 1446(f)(2) or other documentation establishing a valid exemption from withholding pursuant to Code section 1446(f) or (ii) ensure that, contemporaneously with the Transfer, the transferee of such interest properly withholds and remits to the IRS the amount of tax required to be withheld upon the Transfer by Code section 1446(f) (and promptly provide evidence to the Company of such withholding and remittance).  If a Member transferring Units will not satisfy clause (i) in connection with any such Transfer unless the transferor Member and transferee of such interest shall agree to jointly and severally indemnify and hold harmless the Company against any loss (including taxes, interest, penalties, and any related expenses) arising out of any failure to comply with the provisions of this Section 4.10(b) of this Annex C.

(c)    Additional Provisions with Respect to an Exchange of Units.

C-11

**EXHIBIT 2**
**Page 396 of 404**

(i)    <u>Withholding of Cash or Class A Common Stock Permitted</u>.  If the Company or the Manager shall be required to withhold any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations in respect of any Exchange, the Company, or the Manager, as the case may be, shall be entitled to take such action as it deems appropriate in order to ensure compliance with such withholding requirements, including, at its option, withholding cash from the Cash Settlement or shares of Class A Common Stock with a Fair Market Value equal to the amount of any taxes that the Company or the Manager, as the case may be, may be required to withhold with respect to such Exchange.  To the extent that amounts are (or property is) so withheld and paid over to the appropriate taxing authority, such withheld amounts (or property) shall be treated for all purposes of this Agreement as having been paid (or delivered) to the applicable Member.

(ii)    <u>Notice of Withholding</u>.  If the Company or the Manager determines that any amounts by reason of any federal, state, local, or non-U.S. tax laws or regulations are required to be withheld in respect of any Exchange, the Company or the Manager, as the case may be, shall use commercially reasonable efforts to promptly notify the Exchangeable Unit Member and shall consider in good faith any positions or alternative arrangements that such Member raises (reasonably in advance of the date on which the Company or the Manager believes withholding is required) as to why withholding is not required or that may avoid the need for such withholding, provided, that neither the Company nor the Manager is required to incur additional costs as a result of such obligation, and this <u>Section 4.10(c)(ii)</u> of this <u>Annex C</u> shall not in any manner limit the authority of the Company or the Manager to withhold taxes with respect to an Exchangeable Unit Member pursuant to <u>Section 4.10(c)(i)</u> of this <u>Annex C</u>.

(iii)    <u>Reimbursement of Taxes by Exchangeable Unit Member</u>.  If, within the two-year period beginning at the start of the date of an Exchange, (i) the Manager withholds or otherwise pays any amount on account of taxes in respect of exchanged Units, which amount is attributable to the two-year period ending at the end of the date of such Exchange, and (ii) the Manager or any person other than the Exchangeable Unit Member otherwise would bear the economic burden of such withholding or other payment (including by reason of such amount being treated as having been distributed to the Manager in respect of the Exchangeable Units pursuant to <u>Section 4.10</u> of this <u>Annex C</u>), the Exchangeable Unit Member shall, upon notice by the Company and/or the Manager, promptly reimburse the Company and/or the Manager for such amount; provided, however, that the Exchangeable Unit Member's reimbursement obligation under this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u> shall not exceed the amount of cash and Fair Market Value (determined as of the date of receipt) of other consideration received by the Exchangeable Unit Member in connection with such Exchange.  Unless otherwise required by Law, any amount paid by an Exchangeable Unit Member pursuant to this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u> shall be treated as an adjustment to the proceeds received by the Exchangeable Unit Member in respect of the applicable Exchange.  The Company and the Manager shall have the right to reduce any amounts due to such Exchangeable Unit Member from the Manager or any of its Affiliates by the amount owed by such Exchangeable Unit Member under this <u>Section 4.10(c)(iii)</u> of this <u>Annex C</u>.

**EXHIBIT 2**
**Page 397 of 404**

## ANNEX D: SCHEDULE OF OFFICERS

| Name | Title |
| --- | --- |
| John Hopkins | Chief Executive Officer & President |
| Chris Colbert | Chief Financial Officer |
| Robert Temple | General Counsel & Secretary |
| Rudy Murgo | Treasurer |
| José Reyes | Chief Technology Officer |
| Dale Atkinson | Chief Operating Officer |
| Tom Bergman | Vice President, Regulatory Affairs |

D-1

**EXHIBIT 2**
**Page 398 of 404**

**ANNEX E: POLICY REGARDING EXCHANGES**
**Please see attached.**

105070335.6

**EXHIBIT 2**
**Page 399 of 404**

## ANNEX E:  POLICY REGARDING EXCHANGES

### Effective as of [●], 2022

This Policy Regarding Exchanges (the "Policy") of NuScale Power, LLC (the "Company") sets forth certain rules applicable to the exchange of Exchangeable Units for shares of Class A Common Stock of NuScale Power Corp. (the "Common Stock") and/or cash, at the option of the Managing Member (each, an "Exchange"), pursuant to the Company's Sixth Amended and Restated Limited Liability Company Agreement (the "Agreement").  Capitalized terms that are not defined in this Policy have the meanings given to them in the Agreement.  This Policy is made pursuant to, and supplements the provisions of, Article XI of the Agreement.

### ARTICLE I
### EXCHANGE DATES; PROVISIONS REGARDING EXCHANGEABLE AMOUNT

Section 1.1    Quarterly Exchange Date.  There shall be one (1) date per quarter of each Fiscal Year on which an Elective Exchange may occur (each, a "Quarterly Exchange Date") for a holder of Exchangeable Units (each holder, an "Exchanging Holder").  The Quarterly Exchange Date for Exchanging Holders that are required to file reports pursuant to Section 16(a) of the Exchange Act may be different than the Quarterly Exchange Date for Exchanging Holders that are not required to file reports pursuant to Section 16(a) of the Exchange Act.  The Company shall use commercially reasonable efforts to notify the applicable Exchanging Holders at least forty-five (45) days before a relevant Quarterly Exchange Date (such notice, a "Quarterly Exchange Date Notice").

Section 1.2    Minimum Exchangeable Amount.  The Company may set a minimum number or dollar value of Exchangeable Units that may be exchanged by Exchanging Holders on a Quarterly Exchange Date, which minimum amount shall be the same for all holders of Exchangeable Units (the "Minimum Exchangeable Amount") and shall include the applicable Minimum Exchangeable Amount in the applicable Quarterly Exchange Date Notice.  If an Exchanging Holder delivers an Elective Exchange Notice pursuant to Section 3.1 requesting to exchange all of its Exchangeable Units, the number or dollar value, as applicable, of the Exchanging Holder's Exchangeable Units shall be deemed to satisfy the Minimum Exchangeable Amount requirement.

Section 1.3    Maximum Exchangeable Amount.  The Company may set a maximum aggregate number or dollar value of Exchangeable Units that may be exchanged by the Exchanging Holders on a Quarterly Exchange Date (the "Maximum Exchangeable Amount") and shall include the applicable Maximum Exchangeable Amount in the applicable Quarterly Exchange Date Notice.  If the aggregate number or dollar value of Exchangeable Units that the Exchanging Holders propose to exchange on the Quarterly Exchange Date (as set forth on the Elective Exchange Notices) exceeds the Maximum Exchangeable Amount, then the number or dollar value of Exchangeable Units that each Exchanging Holder specified in its Elective Exchange Notice shall be reduced by the same percentage by which the aggregate number or dollar value of Exchangeable Units of all Exchanging Holders is reduced so that the aggregate number or dollar value of Exchangeable Units does not exceed the Maximum Exchangeable Amount.

105038903.4

**EXHIBIT 2**
**Page 400 of 404**

## ARTICLE II
## ADDITIONAL RIGHTS TO EXCHANGE

Section 2.01   <u>Rights to Exchange</u>.

(a)   <u>Right to Exchange Before Certain Transactions</u>.   If the Company or the Managing Member consolidates, merges, combines or consummates any other transaction in which shares of Class A Common Stock are exchanged for or converted into other stock or securities, or the right to receive cash and/or any other property, no other provisions of this Policy shall limit the right of any Exchangeable Unit Member to effect an Elective Exchange in order to receive Class A Common Stock in advance of consummation of any such consolidation, merger, combination or other such transaction unless in connection with any such consolidation, merger, combination or other transaction each Class B Unit shall be entitled to be exchanged for or converted into the stock, cash, securities or other property that such holder of a Class B Unit would have received had it exercised its right to Exchange pursuant to this Policy and received Class A Common Stock in exchange for its Class B Units immediately before such consolidation, merger, combination or other transaction (subject to any differences in the kind and amount of stock or securities, cash and/or any other property as are intended (as determined by the Company in good faith) to maintain the relative voting power of each share of Class B Common Stock relative to each share of Class A Common Stock in effect before such transaction).  This <u>Article II</u> shall not apply to any action or transaction (including any consolidation, merger, or combination) approved by a Majority-in-Interest of the Members.

(b)   <u>Right to Exchange Before an Applicable Sale or Termination Transaction</u>. Upon the occurrence of an Applicable Sale or a Termination Transaction, no other provisions of this Policy shall limit the right of any Exchangeable Unit Member to effect an Elective Exchange in order to receive Class A Common Stock in advance of consummation of any such Applicable Sale or Termination Transaction.

## ARTICLE III
## ELECTIVE EXCHANGE NOTICE

Section 3.1   <u>Timing of Elective Exchange Notice</u>.

(a)   <u>Elective Exchange Notice</u>.  Each holder that elects to Exchange some or all of its Exchangeable Units must deliver notice of an election in respect of the Exchangeable Units to be exchanged (an "<u>Elective Exchange Notice</u>") to the Company, in a method determined by the Company at least thirty (30) days before the relevant Quarterly Exchange Date.  The Company shall provide to each Exchangeable Unit Holder the form of Elective Exchange Notice and the means for delivery of that Elective Exchange Notice.

(b)   <u>Acceptance of Elective Exchange Notice</u>.   After the Elective Exchange Notice has been delivered to the Company, and unless the Company or Managing Member, as applicable, has refused to honor the request in full pursuant to <u>Section 1.2</u> (*Minimum Exchangeable Amount*), <u>Section 1.3</u> (*Maximum Exchangeable Amount*), <u>Section 3.1(c)</u> (*Cancellation of*

**EXHIBIT 2**
**Page 401 of 404**

*Quarterly Exchange Window*), <u>Section 3.2(c)</u> (*Post-Retraction Limitation on Exchange*), or <u>Article IV</u> (*Other Restrictions*), the Company or Managing Member, as applicable, will effect the Elective Exchange on the applicable Quarterly Exchange Date in accordance with this Policy.

(c)   <u>Cancellation of Quarterly Exchange Date</u>.  The Company may at any time, in its sole discretion, cancel a Quarterly Exchange Date for any or no reason.  If the Company cancels a Quarterly Exchange Date, then no holder of Exchangeable Units shall be permitted to Exchange those Exchangeable Units on the cancelled Quarterly Exchange Date.

Section 3.2   <u>Retraction of Elective Exchange Notice</u>.

(a)   <u>Ability to Retract; Retraction Deadline</u>.  If, at any time between the close of business on the date of delivery of an Elective Exchange Notice and the close of trading on the date that is two (2) Business Days before the applicable effective date of such Elective Exchange (the "<u>Elective Exchange Date</u>"), the reported closing trading price of a share of the Common Stock on the principal United States securities exchange or automated or electronic quotation system on which the Common Stock trades decreases by five (5) percent or more, an Exchanging Holder may retract or amend its Elective Exchange Notice by delivering a notice to the Company in a manner determined by the Company not later than the Retraction Deadline (a "<u>Retraction Notice</u>" and the Exchangeable Units that were the subject of the Retraction Notice, the "<u>Retracted Units</u>") not later than the close of trading on the date that is two (2) Business Days before the applicable Elective Exchange Date (the "<u>Retraction Deadline</u>") pursuant to <u>Section 3.2(b)</u>.  The Company shall have no obligation to notify the Exchanging Holders of any decrease in the Common Stock trading price.

(b)   <u>Retraction Notice</u>.  An Exchanging Holder wishing to retract must retract at least fifty percent (50%) of its Exchangeable Units that were the subject of the retracted Elective Exchange Notice.  If the revised Elective Exchange Notice does not satisfy the Minimum Exchangeable Amount, the Exchanging Holder will be deemed to retract the full amount of Exchangeable Units that were the subject of the retracted Elective Exchange Notice.  An Exchanging Holder's delivery of a Retraction Notice shall be irrevocable and shall terminate all of the Exchanging Holder's, Company's, and Managing Member's rights and obligations with respect to the Retracted Units, and all actions taken to effect the Elective Exchange contemplated by that retracted Elective Exchange Notice shall be deemed rescinded and void with respect to the Retracted Units. Subject to the applicable Minimum Exchangeable Amount and Maximum Exchangeable Amount, if any, if a Retraction Notice does not retract all of the Exchangeable Units that were the subject of an Elective Exchange Notice, the Exchangeable Units that are not Retracted Units will be exchanged on the relevant Quarterly Exchange Day.

(c)   <u>Post-Retraction Limitation on Exchange</u>.  If an Exchanging Holder delivers a Retraction Notice for a Quarterly Exchange Date pursuant to <u>Section 3.2(b)</u>, the retracting Exchanging Holder shall not be entitled to participate in the Exchange on the Quarterly Exchange Date for which the Retraction Notice was delivered with respect to the Retracted Units.

**EXHIBIT 2**
**Page 402 of 404**

## ARTICLE IV
## OTHER RESTRICTIONS

Notwithstanding any provision of this Policy to the contrary (including the provisions of Article II), the Company may prohibit an Exchange by one or more holders of Exchangeable Units under any of the following conditions and determinations made by the Company based on the advice of counsel (which may be external or internal counsel):

        (a)     If an Exchange is (or is reasonably likely to be) prohibited under applicable law, regulation, or agreement to which the Company or an affiliate is a party or could reasonably be expected to result in a bona fide lawsuit against the Company or its affiliates; or

        (b)     If there is a material risk that the Company would be a "publicly traded partnership" under section 7704 of the Code as a result of an Exchange.

## ARTICLE V
## EXEMPTIONS FROM AND MODIFICATIONS TO POLICY

The Company may, in its discretion and based on the advice of counsel (which may be external or internal counsel), consider and grant requests from holders of Exchangeable Units, including for (i) additional Exchange Dates, (ii) Exchanges of less than the Minimum Exchangeable Amount, (iii) Exchanges in excess of the Maximum Exchangeable Amount, (iv) an Exchange to be subject to one or more contingencies relating to the Company or the Managing Member, or (v) any other matter with respect to Exchanges (to the extent permitted by the Agreement and applicable Law). A holder of Exchangeable Units may request an exemption from this Policy by submitting a written request to the Company and following the delivery requirements set forth in Article III as if the written request were an Elective Exchange Notice.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1    Continuing Application of Company's Policies and Securities Laws. Nothing in this Policy shall affect, and each holder of Exchangeable Units shall remain subject to, the Company's Policies, including those addressing insider trading and any other Company policies regarding trading or the holding of investments. All holders of Exchangeable Units shall comply with all applicable securities laws and rules.

Section 6.2    Independent Nature of Rights and Obligations. Nothing in this Policy or in any other agreement or document or any action taken by any holder of Exchangeable Units shall be deemed to cause the holders of Exchangeable Units to have formed a partnership, association, joint venture, or any other kind of entity or create a presumption that the holders of Exchangeable Units are in any way acting in concert as a group.

Section 6.3    Mandatory Exchanges. This Policy shall not apply to any Exchange of Exchangeable Units pursuant to a Mandatory Exchange, as described in, and pursuant to, the Agreement.

**EXHIBIT 2**
**Page 403 of 404**

Section 6.4     <u>Notice Delivery Deadlines on Non-Business Days</u>.  If the date on or before which the Company or an Exchanging Holder is required to deliver a notice pursuant to this Policy is not a Business Day, then that notice will be deemed to be timely delivered on that date if that notice is received on the Business Day immediately following that date.

Section 6.5     <u>Notifications Under This Policy</u>.  The Company will be deemed to have satisfied any notification requirement in this Policy by making available such notification on any system accessible by Exchanging Holders.

Section 6.6     <u>Modification of Policy</u>.  The Company may modify this Policy at any time without notice.  The Company will deliver or make available a copy of the revised Policy to the holders of Exchangeable Units at least forty-five (45) days before the next Quarterly Exchange Date.

*     *     *